N7DDJAVC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        23 Cr. 251 (AKH)

CHARLIE JAVICE AND
OLIVIER AMAR,

                                      Conference
            Defendants.

------------------------------x

                                      New York, N.Y.
                                      July 13, 2023
                                      10:45 a.m.


Before:

                  HON. ALVIN K. HELLERSTEIN,

                                      U.S. District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
DINA MCLEOD
MICAH FESTA FERGENSON
     Assistant United States Attorney

ALEXANDER B. SPIRO
     Attorneys for Defendant Charlie Javice

SEAN BUCKLEY
STEVE KOBRE
     Attorneys for Defendant Olivier Amar
```

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3   appearances for the record, and remain seated

4          THE COURT:  Remove your mask when you speak.

5          MR. FERGENSON:  Good morning, your Honor.  Micah

6   Fergenson and Dina McLeod for the government.

7          THE COURT:  Good morning.

8          MR. SPIRO:  Good morning, your Honor.  Alex Spiro.

9   I'm joined by my colleagues Maaren Shah and Sam Nitze on behalf

10  of Ms. Javice.

11         THE COURT:  Good morning.

12         MR. BUCKLEY:  Good morning, your Honor.  Sean Buckley

13  and Steve Kobre on behalf of Mr. Amar, who joins us at counsel

14  table.

15         THE COURT:  Good morning.

16         Who is Mr. Kobre?  How do you do.

17         Is Tai Hyun Park and Jan Philip Kernisan here?  Are

18  they on this case?

19         MR. SPIRO:  They are not, your Honor.

20         THE COURT:  Okay.  So what are we doing now,

21  Ms. McLeod?

22         MR. FERGENSON:  Yes, your Honor.  So I think the first

23  order of business is to arraign both defendants on the

24  superseding indictment; and then on scheduling, your Honor, the

25  plan at the first conference had been to set a motion schedule

1  today.  Given the addition of the new defendant, we understand

2  that the defense is going to ask for, you know, some additional

3  time to come back and set a motion schedule in 45 or 60 days,

4  your Honor.

5          And, lastly, I just note that at the Court's

6  convenience, as we noted at the first conference, the

7  government is ready to set a trial date.

8          THE COURT:  Fine.  Let's arraign the two defendants.

9          THE DEPUTY CLERK:  Where is Charlie Javice?  I'm

10  sorry.  I should have remembered.

11          You are Charlie Javice?

12          DEFENDANT JAVICE:  I am.

13          THE COURT:  Please stand.  Remove your mask.

14          THE DEPUTY CLERK:  Have you seen a copy of the

15  indictment?

16          DEFENDANT JAVICE:  I have.

17          THE DEPUTY CLERK:  Have you discussed it with your

18  attorney?

19          DEFENDANT JAVICE:  I have.

20          THE DEPUTY CLERK:  Would you like me to read it to

21  you?

22          DEFENDANT JAVICE:  No, thank you.

23          THE DEPUTY CLERK:  How do you plead?

24          DEFENDANT JAVICE:  Not guilty.

25          THE COURT:  A plea of not guilty will be entered on

1    behalf of Ms. Javice.

2              How do you pronounce Javice?

3              DEFENDANT JAVICE:  Javice, your Honor.

4              THE COURT:  Javice.  Thank you.

5              THE DEPUTY CLERK:  Mr. Amar.  You are Olivier Amar?

6              DEFENDANT AMAR:  Correct.

7              THE COURT:  Have you seen a copy of the indictment?

8              DEFENDANT AMAR:  I have.

9              THE DEPUTY CLERK:  Have you discussed it with your

10   attorney?

11             DEFENDANT AMAR:  I have.

12             THE DEPUTY CLERK:  Would you like me to read it to

13   you?

14             DEFENDANT AMAR:  No, thank you.

15             THE DEPUTY CLERK:  How do you plead?

16             DEFENDANT AMAR:  Not guilty.

17             THE COURT:  A plea of not guilty will be entered on

18   behalf of Mr. Amar.

19             So, again, both defendants plead not guilty.

20             Mr. Fergenson, please tell me more about the case.

21   There's not much in the indictment.

22             MR. FERGENSON:  Yes, your Honor.

23             So the case relates to the acquisition of a company

24   called Frank.  Frank was a start up fintech company that sought

25   to help students apply for financial aid for college or

graduate school.  Ms. Javice was the CEO and founder of Frank.

Mr. Amar was the chief growth officer, effectively the number

two at the company.

In 2021, the defendants sought to put their company on

the market for an acquisition.  They pitched to a variety of

potential acquiring companies, including two major banks.  The

bank that ultimately acquired Frank was JPMorgan Chase.  A

material part of that deal, your Honor, was the number of

customers or the number of account sign-ups that Frank had.

The defendants lead Chase and others to believe that

Frank had over four million customer sign-ups.  In reality, the

number was far less, around 300,000.  Eventually, and, you

know, your Honor, there's a very detailed complaint that has

additional facts, but at a high level, eventually, JPMC found

out about the fraud, terminated the defendants.  And that's why

we're here today.

THE COURT:  But there was no acquisition?

MR. FERGENSON:  There actually was an acquisition,

your Honor.  I apologize if I skimmed over that.  Chase

acquired Frank for $175 million.

THE COURT:  Was Frank an audited company?

MR. FERGENSON:  It was not, your Honor.  I mean, it

was not a publicly traded company.  It was a start up.

THE COURT:  Did it have Certified Public Accountants

doing audits?

1    MR. FERGENSON:  I'm not certain of that, your Honor,

2    but it may well have.

3        THE COURT:  It's curious to me how this kind of set of

4    facts could continue through an acquisition --

5        MR. FERGENSON:  Yes, your Honor.

6        THE COURT:  -- understanding the due diligence Chase

7    and Chase's lawyers, and Chase's investment bankers, and the

8    accounting that was done at Frank.

9        MR. FERGENSON:  Yes.  And perhaps to provide a little

10   more context on that, your Honor, in the course of the due

11   diligence on the deal, JPMorgan sent the defendants a data

12   validation request.  So they said, you've told us you have all

13   this data from your account sign-ups, these, you know, over

14   four million people.  We want to verify that, that you actually

15   have this data.

16       And in response, the defendants created a fake data

17   set.  So a giant -- essentially, a giant Excel spreadsheet that

18   had over four million rows, and lots of purported data.  But it

19   was all fake.  And they sent that to a -- you know, a data

20   company, essentially, that was going to perform the diligence

21   to check that they had, in fact, had data in the rows and

22   columns, as they had represented.  And that's what they did,

23   because it, in fact, was filled in as was represented, even

24   though it was all fake.  The data validation company, this

25   third party, said, yeah, they have data filled in these rows.

1    And then, I think the second point, your Honor, is

2  that the defendants immediately sought to start the cover up as

3  well.  So they actually went -- they knew that eventually

4  Chase, since they had been acquired and become a part of it,

5  would ask them for the customer data list, and they wouldn't be

6  able to send them a completely fake list, so they went and

7  purchased, on the open market, college student data.  And they

8  bought a list of over four million college students, and when

9  Chase eventually went and asked them, okay, send your student

10  data list, they sent this student list that they had bought on

11  the open market.

12    And the way Chase I think ultimately identified the

13  fraud, and what lead them to start sort of investigating the

14  issue, there were a few things, but one of the important events

15  was they sent this list that they had bought on the open

16  market -- and they bought it for $100,000, your Honor.  A lot

17  less than 175 million.  And when Chase -- they sent that to

18  Chase.  When Chase did a test run of a marketing campaign, so

19  they sent an email, marketing email to about 400,000 of the

20  students on this list.  The response was horrible.  A lot of

21  the emails were old and didn't work.  Almost nobody clicked

22  through to it.  And it was completely unexpected.

23    I mean, it basically essentially, from their view, was

24  if not worthless, worth a lot less than what they had expected.

25    THE COURT:  This was discovered after the acquisition?

1          MR. FERGENSON:  That's correct, your Honor.  It took

2     several months, and then there was an investigation.

3          THE COURT:  There was a fraud, and they uncovered the

4     fraud.

5          MR. FERGENSON:  Correct, your Honor.

6          THE COURT:  All right.  So what are we going to do

7     now?  You want a delay of how much time?

8          MR. FERGENSON:  I'll defer to the defense.  We

9     understand that they were --

10          THE COURT:  Have you made your discovery?

11          MR. FERGENSON:  Yes, your Honor.  So we have produced

12     the Rule 16 in our possession today.  We made a large initial

13     production at the time of the first -- the initial conference,

14     your Honor, and we made a second substantial production

15     recently.  And those have been to Ms. Javice's counsel.

16          Mr. Amar's counsel has not -- given he just got

17     indicted yesterday, he does not yet have that discovery, but I

18     think certainly within the next two weeks, we will get him a

19     copy of all the Rule 16 in our possession, your Honor.

20          MR. SPIRO:  Your Honor, this is Alex Spiro.  May I

21     respond briefly?

22          THE COURT:  You may.

23          MR. SPIRO:  Your Honor asked a question in the

24     government's recitation, that some of it was a bit puzzling, or

25     raising a question with your Honor, and it sort of goes to

1    that, and a little bit of what the government is representing,

2    and representing about discovery.

3            The reality is the government is just regurgitating to

4    the Court JPMorgan's civil lawsuit against my client.  That's

5    actually all it was.  They haven't received --

6            THE COURT:  Mr. Spiro, you don't have to worry about

7    your client -- the government has the obligation to prove its

8    case.  I'm asking what they intend to prove.

9            MR. SPIRO:  I understand, but I'm going to get to the

10   discovery issue.  We don't have currently, in discussion, we

11   don't have any of JPMorgan's -- essentially, any of their

12   internal communications amongst themselves about the

13   accusation.  They sent us some discovery, told us it should be

14   substantially completed within 45 days.  They told the Court

15   what they said in recitation, which I have an obligation I

16   think in a public forum to respond to.  They don't actually

17   have, according to them, the internal communications of the

18   JPMorgan side of this yet.  They haven't provided them to us.

19   And we believe that they will be exculpatory.

20           So I want the Court to understand that, and understand

21   that's where we are in discovery.  The way the discovery

22   happened, and since we are --

23           THE COURT:  Let me interrupt --

24           MR. SPIRO:  Sure.

25           THE COURT:  -- and ask Mr. Fergenson about that.

1          Are you intending to produce that information?

2          MR. FERGENSON:  Yes, your Honor.

3          So we have produced, I think, from JPMC, well over

4     100,000 documents just from that one party.  We understand

5     they're continuing to make rolling productions.  As we receive

6     them, we will also produce them as Rule 16 discovery, your

7     Honor.

8          I think Mr. Spiro may be slightly confused about the

9     way Rule 16 works, which is the government provides the Rule 16

10    materials in its possession.  We can't produce things we have

11    not received.

12          MR. SPIRO:  Your Honor, may I be heard further on the

13    discovery issue?

14          THE COURT:  You may.

15          MR. SPIRO:  I'm not confused about Rule 16.  This case

16    has proceeded differently than other cases, because rather than

17    a grand jury subpoena, the production of documents, an

18    assessment -- an independent assessment by the government, and

19    then a decision to charge, JPMorgan simply provided what they

20    wanted to provide to the government.

21          And so my point to the Court is this is a different

22    set of discovery issues than what we thought existed at the

23    time.

24          THE COURT:  I understand what you want.

25          Let me ask this:  Can you, under the Rules, issue a

1    trial subpoena to JPMorgan to produce, well, the things you say

2    you want to have?

3              MR. SPIRO:  We can prepare one immediately for your

4    Honor, yes.

5              THE COURT:  Would there be any objection to doing

6    that, Mr. Fergenson?

7              MR. FERGENSON:  Your Honor, I think we would have to

8    assess whether it would comply with the requirements of Rule

9    17, but I think maybe just one further --

10             THE COURT:  It would be ahead of the trial, but for

11   purposes of use in a trial.  I can see the relevance of that

12   information.  Did JPMorgan rely on this information, from your

13   point -- from your account, reliance is suggested, but there

14   may be items in the correspondence that show differently.

15             I think it would be a good idea, but -- unless you

16   issue the subpoena --

17             MR. FERGENSON:  Well, your Honor, so when I mentioned

18   the rolling productions we're expecting to receive, we expect

19   those to also include additional internal JPMC communications.

20             THE COURT:  Do they have a compulsion to deliver -- is

21   there a grand jury subpoena --

22             MR. FERGENSON:  Yes.  Yes, your Honor.

23             THE COURT:  So in complying with a subpoena.

24             MR. FERGENSON:  Correct.

25             THE COURT:  All right.  It doesn't seem to me a

1    third-party subpoena is necessary, Mr. Spiro, but this is

2    information obtained by the government to the extent it exists

3    in the files of Chase Manhattan, Morgan Chase, and produced to

4    you.

5           When do you think all your production will be

6    finished, Mr. Fergenson?

7           MR. FERGENSON:  Do you mean when we expect to produce

8    the discovery we currently have?

9           THE COURT:  You have to give a terminal date to Chase

10   to get everything going.  You can't let them just, at their

11   leisure --

12          MR. FERGENSON:  Understood, your Honor.

13          Look, our understanding is they're diligently

14   responding to the subpoena that produced hundreds of thousands

15   of documents, and there are hundreds of thousands of documents

16   to review in total in this.

17          It's a bit of an unusual situation where JPMorgan

18   acquired this company entirely, and so the documents responsive

19   to, you know, the topic of its acquisition are voluminous.  But

20   our understanding is they are diligently responding.  They've

21   made several productions, including many substantial

22   productions.

23          I just wanted to also note --

24          THE COURT:  I think you should obtain a date from

25   them, and let Mr. Spiro, and Mr. Amar's counsel, and me know

1    that.

2         MR. FERGENSON:  Understood, your Honor.  We'll do

3    that.

4         THE COURT:  How much time do you need now, Mr. Spiro?

5         MR. SPIRO:  I don't want to revisit the Groundhog Day

6    of last time, but I just need the discovery, and then we can --

7    so it's sort of circular to me that your Honor had, the last

8    time we were here, asked other pointed questions to the

9    government about the time.  Your Honor just did it again.

10        THE COURT:  How about I say to you 30 days from now.

11        MR. SPIRO:  If 30 days from now is going to move this

12   ball further down the field, so we can get the relevant

13   discovery, not what we've been provided, absolutely happy to

14   come back in 30 days.

15        THE COURT:  I don't know that you'll be entitled to

16   all of the discovery you would be in a civil case, but I'd like

17   the government to discharge its obligations under Rule 16

18   promptly, not at a leisurely pace.

19        So we'll have a status conference in 30 days to find

20   out where you stand.

21        MR. SPIRO:  Thank you, your Honor.

22        THE COURT:  At that time, I will fix dates for

23   motions.

24        MR. FERGENSON:  Understood, your Honor.  And I know

25   Mr. Amar's counsel recently joined the case, but as long as

1    they are okay with 30 days to set the motion schedule as well,

2    that is fine for the government.

3         THE COURT:  Nothing's going to happen in 30 days

4    except I'm going to know if there's more production or not.

5         MR. FERGENSON:  Understood, your Honor.

6         THE COURT:  And hopefully there will be some more

7    production.

8         MR. FERGENSON:  Understood.

9         THE COURT:  Is 30 days okay, Mr. Kobre?  Mr. Buckley?

10        MR. BUCKLEY:  Yes, your Honor.  For a status

11   conference?

12        THE COURT:  Yes.

13        MR. BUCKLEY:  That's fine.  Thank you.

14        THE COURT:  Is there a *Brady* order in the case?

15        MS. MCLEOD:  Actually, there is one for Javice, but

16   there is not one for --

17        THE COURT:  Take your mask off.

18        MS. MCLEOD:  Sorry, your Honor.

19        There is one for Ms. Javice, but not for Mr. Amar.  So

20   it makes sense to --

21        THE COURT:  The government knows its obligations under

22   *Brady*, what could happen in terms of trying the case if you

23   don't comply with *Brady*.

24        MR. FERGENSON:  Yes, your Honor.

25        THE COURT:  Okay.  We'll put in such an order.

1     MR. FERGENSON:  Thank you, your Honor.

2     THE COURT:  Is there anything else you want to bring

3  to my attention, Mr. Spiro?

4     MR. SPIRO:  No, your Honor.  Thank you.

5     THE COURT:  Mr. Buckley?

6     MR. BUCKLEY:  No, your Honor.  Thank you.

7     THE COURT:  Okay.  So I'll fix a date 30 days from

8  now.

9     THE DEPUTY CLERK:  August 15 at 11:00.

10    THE COURT:  August 15 at 11:00.

11    Any motion?

12    MR. FERGENSON:  Yes, your Honor.  The government moves

13  to exclude time under the Speedy Trial Act in the interests of

14  justice, so that the government can produce Rule 16 discovery

15  to Mr. Amar's counsel, and they can continue to -- and both

16  defendants can continue to assess any motions.

17    THE COURT:  Without objection, folks?

18    MR. SPIRO:  No, your Honor.

19    MR. BUCKLEY:  No objection, your Honor.

20    THE COURT:  So ordered.

21    Is there anything else you want to bring to my

22  attention?

23    MR. FERGENSON:  No.  Thank you, your Honor.

24    THE COURT:  We'll see you in 30 days.

25    (Adjourned)