```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
----------------------------:
UNITED STATES OF AMERICA,    :
                             : Docket #23-cr-0251

             Plaintiff,      :

      v.                     :

OLIVIER AMAR,                : New York, New York

             Defendant.      : July 13, 2023

----------------------------:
```

              TRANSCRIPT OF PRESENTMENT CONFERENCE

            BEFORE THE HONORABLE ONA T. WANG

              UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

```
For Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                  SOUTHERN DISTRICT OF NEW YORK
                  BY:  Dina McLeod, AUSA
                       Micah Fergenson, AUSA
                  One St. Andrew's Plaza
                  New York, New York 10007


For Defendant:    KOBRE & KIM, LLP
                  BY:  Sean S. Buckley, Esq.
                       Steven G. Kobre, Esq.
                  800 Third Avenue
                  New York, New York 10022
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

      AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  This is 23-cr-251; United States versus Olivier Amar.  Please state your appearances for the record.

MS. McLEOD:  Good morning, Your Honor. Dina McLeod and Micah Fergenson for the government.

MR. BUCKLEY:  Good morning, Your Honor. Sean Buckley for Mr. Amar.

MR. KOBRE:  And Steven Kobre.  Good morning, Your Honor.

THE COURT:  All right.  Mr. Amar, are you able to speak and understand English?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  Can I have the date and time of arrest, please.

MS. McLEOD:  Your Honor, the defendant surrendered this morning at 9 a.m.

THE COURT:  Okay.  All right.  I am Judge Wang.  You are here because you are charged with certain crimes by an indictment.  Do you have a copy of the indictment?

THE DEFENDANT:  I do.

THE COURT:  Okay.  The purpose of today's proceeding is to advise you of certain rights that you have, inform you of the charges against you, consider whether counsel should be appointed for

you, and decide under what conditions, if any, you shall be released pending trial.

I'm now going to explain certain constitutional rights that you have.

You have the right to remain silent. You are not required to make any statements. Even if you have already made statements to the authorities, you do not need to make any further statements. Any statements that you do make can be used against you.

You have the right to be released, either conditionally or unconditionally, pending trial, unless I find that there are no conditions that would reasonably assure your presence at future court appearances and the safety of the community.

If you're not a United States citizen, you have the right to request that a government attorney or a law enforcement official notify a consular officer from your country of origin that you have been arrested. In some cases, a treaty or other agreement may require the United States government to give that notice, whether you request it or not.

You have the right to be represented by an attorney during all court proceedings, including this one, and during all questioning by the authorities. You have the right to hire your own

attorney.  If you cannot afford an attorney, I will appoint one today to represent you.

Do you understand your rights as I have just explained them?

THE DEFENDANT:  I do.

THE COURT:  All right.  And I understand, Mr. Buckley and Mr. Kobre are here as retained counsel?

MR. BUCKLEY:  That's correct, Your Honor.

THE COURT:  All right.  So we don't need appointment of counsel today.  All right.

And we're not -- we're here for presentment only, right; no arraignment?

MS. McLEOD:  That's correct, Your Honor.

THE COURT:  All right.  A grand jury of the Southern District of New York has returned an indictment against you, charging with you with certain offenses.

I just want to confirm -- and this is a four-count indictment, and the counts are conspiracy to commit wire fraud and bank fraud, substantive wire fraud, substantive bank fraud and substantive securities fraud.

Counsel, have you received a copy of the indictment?

MR. BUCKLEY:  Yes, Your Honor.

THE COURT:  And have you reviewed it with your client?

MR. BUCKLEY:  We have, Your Honor.

THE COURT:  And, Mr. Amar, do you understand the charges that you face?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  All right.  And, Counselor, does your client waive a detailed reading of the indictment?

MR. BUCKLEY:  Yes, he does, Your Honor.

THE COURT:  All right.  All right.  I'll hear next from the government as to bail, detention or release.  I understand there may be partial and almost complete agreement to conditions of release.

MS. McLEOD:  That's right, Your Honor.

THE COURT:  Okay.

MS. McLEOD:  I've handed up the government's proposal of conditions.  And the main sticking point, I believe, is location monitoring and curfew.

THE COURT:  Okay.

MS. McLEOD:  So I'll focus a bit on that.

THE COURT:  Why don't you run through the --

MS. McLEOD:  Conditions?

THE COURT:  -- conditions that are agreed upon --

MS. McLEOD:  Sure.

THE COURT:  -- and then let's have a further conversation about anything that there -- that might still be the subject of disagreement.

MS. McLEOD:  Yes, Your Honor.

So the government is proposing a $1 million personal recognizance bond secured by the defendant's residence at -- in Sands Point, New York, to be signed by two financially responsible persons; surrender of all passports and no new applications; travel restrictions to Southern and Eastern Districts of New York; Pretrial supervision as directed.

The government would be seeking location monitoring and curfew with the exact nature of the location monitoring and the curfew itself to be at the discretion of Pretrial Services.  Meaning that the particular technology would be up to them. Defendant is not to open any new bank accounts or lines of credit without Pretrial approval.

And for Your Honor's context, these next few conditions are the same as the conditions that

were set for the defendant's co-defendant,
Ms. Javice.

Defendant is not to have any contact with
Javice, the person identified as "Data Scientist-1"
in the complaint, or current employees of JPMorgan
Chase, except in the presence of counsel.  Defendant
is not to have any communication about the case with
former employees, investors, and/or board members of
rank, except in the presence of counsel.

And if the passports have been surrendered
to Pretrial, then the government would have no
objection to the defendant's release on his own
signature, with all other conditions to be met
within two weeks.

THE COURT:  All right.  And when you say
"if the passports have been surrendered," I noticed
that the -- I believe the Pretrial report
recommended the -- both Mr. Amar's passport or
passports, as well as his wife's passports be
surrendered; is that right?

MS. McLEOD:  That is -- can you give us one
second to just discuss?

THE COURT:  Uh-huh.

MR. BUCKLEY:  Your Honor, just to clarify,
the Pretrial Services report included the additional

AMM TRANSCRIPTION SERVICE - 631.334.1445

surrender of the wife's passport because it --
Pretrial Services is not recommending location
monitoring or a curfew, so the inclusion of the
wife's passport, as well as a third co-signer, is
being proposed by Pretrial, as we understand it, in
order to address any concerns about his dual
nationality and to ameliorate the need for location
monitoring or curfew.

        MS. McLEOD:  Okay.  So the bottom -- the
bottom line is, Your Honor, that there is, at
present, not an agreement as to the wife's passport,
surrender of the wife's passport.

        THE COURT:  Well, why don't you tell me
who's agreeing and who's not agreeing, or if you're
all not agreeing, except for Pretrial.

        MS. McLEOD:  So --

        MR. BUCKLEY:  The --

        MS. McLEOD:  Our understanding is,
essentially, what defense counsel is saying is they
would be fine with that condition if location
monitoring were to be removed, so it's, kind of, a
domino-effect situation.

        THE COURT:  Or it's a --

        MS. McLEOD:  Exactly.

        THE COURT:  So Pretrial's recommendation of

a third co-signer and a wife's passport, you
would -- defendant would agree to in lieu of
location monitoring and curfew.

And the government seeks location
monitoring and curfew, and you don't much care
whether you get the wife's passport or a third
co-signer?

MS. McLEOD:  That's right, Your Honor.

THE COURT:  Okay.  Why don't you talk to me
about the -- or, actually, before that, let me get
from Mr. Buckley or Mr. Kobre --

Is that the nub of the disagreement?  All
the other conditions are generally agreed?

MR. BUCKLEY:  That's correct.

THE COURT:  Okay.  All right.  Why don't
we -- let's have a conversation about location
monitoring, why you think it's necessary, and why,
if the wife, Mr. Amar's wife, also surrenders her
passport or passports, and there's an additional
co-signer, why that would not be sufficient.

MS. McLEOD:  Sure, Your Honor.

And so I'll start with, you know, the
obvious.  This is a risk-of-flight issue, and there
are a couple, sort of, factors that are motivating
the government's proposal.  And, you know -- as you

know, we are agreeing to bail conditions, so we think that there is a balance that can be struck. But we have serious concerns about the risk of flight, and there's a couple of reasons why.

First, the defendant is not a U.S. citizen. He is a lawful, permanent resident. He is a citizen of Canada and Israel. Israel does not extradite its own citizens. Canada shares a lengthy land border with the United States, which can be driven over and does not -- typically, when you go over that border, it doesn't run through, sort of, the normal systems that will necessarily flag going over that border.

Once someone is in Canada, the U.S. government has no way of knowing where someone goes from there. And, in fact, just as an example, one of my colleagues had a white-collar defendant flee through Canada. He went to Canada, then he went to Ghana.

And, as Your Honor knows, in almost every situation where we have somebody who has passports, we have surrender of passports, and yet we have had a number of white-collar defendants flee, nonetheless, at different stages in the case, even though passports have been surrendered.

In the case that I just was referencing, I

believe in that case, he acquired a fake passport.
And there was another case last year in front of
Judge Rakoff where everybody -- there was a trial
date set.  Everybody showed up for the trial except
for the defendant.  And I think that the people
believe that he had another passport that just
hadn't been surrendered.

   And so, you know, despite the fact that
in -- essentially always we ask for surrender of
passports, and typically there's some sort of
passport given, unfortunately, there have been a
number of situations where defendants have fled.
And so there's a couple of ways that that really
feeds into this case here.

   The first is that, when we think about what
the defendant's motivations are, the defendant is
facing really serious charges here.  The loss amount
in this case is $175 million.  It's a significant,
significant loss amount.  There are a number of
guidelines enhancements which will likely apply, but
if you look just at the loss amount itself and you
assume that he does not plead, then you are looking
at a criminal -- a guidelines range of 135 to 168
months.  And with a plea, you're looking at 97 to
121 months.  That's just on the loss amount, setting

aside any enhancements which the government might believe applies.  So, sort of, almost at a minimum, the guidelines range are in the ten-year range.

And, you know, this isn't to say, obviously, the ultimate decision on that, you know, if there's a conviction, will be left to the sentencing judge.  But the point is, is that these -- at the outset, this is a very serious crime, and so you're facing a lot of time.

Now, pair that with the fact that defendants who are not citizens of the United States are typically removed.  So we have a defendant here who has only lived in the United States for five years of his entire life.  He's 49 years old.  He was raised in Canada.  He left Canada as a young man for Israel, and he lived most of his adult life in Israel.  He raised his family there.  And he moved to the United States in 2018.

So this isn't somebody who is a lawful, permanent resident who has lived for, you know, 45 of his 49 years in the United States.  Most of his adult life has been in the countries of his nationality, of his citizenship, so it's -- frankly, would not, you know, be such a stretch to think, if I am going to have to go back to Canada or Israel

anyway, let's just avoid having to spend the time in jail.

And so all that's to say there's that significant concern for the United -- for the government. And all that said, you know, we are trying to strike a balance. We are trying to find the least restrictive conditions, so we're not even asking for home incarceration or home detention or with a bracelet. We're asking for a curfew with location monitoring, the technology for which to be set by Pretrial.

So we're not -- I don't think these are Draconian conditions by any means. The defendant will be able to live his daily life. He will just have a bracelet. And I would note that his co-defendant, who is a citizen of France, which also does not extradite its own citizens, is on location monitoring and a curfew. That is part of her condition.

And here, you know, where we have a defendant who, unlike his co-defendant, is not a citizen, and so, likely, is facing the fact that he may -- he may have to move out of this country anyway. That's really where we -- where we think that this is necessary for mitigation and reflects,

sort of, a balance, I think, that we're trying to strike between our concerns and the concerns of the bail statute, which requires the least restrictive conditions.

THE COURT:  All right.  Let's hear from defense counsel.

MR. BUCKLEY:  Yes.  Thank you, Your Honor.

So, as I indicated earlier, and consistent with Pretrial's recommendation, we don't think that location monitoring or a curfew is appropriate here. You know, the standard isn't whether other defendants facing similar crimes have fled the country.  As the Court is aware, the standard is whether, with respect to this particular individual, he presents a risk of flight.  If that is established by a preponderance, then the standard is the least restrictive set of conditions that can be imposed to ensure his appearance in court.

We submit that the proposal that we've made and agreed upon satisfies that "least restrictive conditions" requirement.  In particular, the defendant's wife and two children are U.S. Citizens.  The defendant's residence is here in New York State.  He doesn't have a residence anywhere else.  His passports will be surrendered

today.  I have them here with me in my possession.

But in addition to that, Mr. Amar self-surrendered.  He has been aware of the investigation by JPMorgan since August of 2022.  He has been aware of the government's investigation since April of this year.  And he was aware of the indictment yesterday and arrived at the time and place as directed today.  So I think that goes a long way to showing how committed Mr. Amar is to appearing and vigorously defending his case here.

Other evidence of that though is -- there's a civil lawsuit pending in Delaware.  Mr. Amar has been vigorously fighting that lawsuit.  So it's no surprise to him that he's here today.  He's had numerous opportunities, if he had wanted to avoid justice, to leave the country and go either to Canada or Israel or anywhere else.  But he has no desire to do so because his life is here, his wife and children are here, his house is here, and he intends to clear his name at trial.

As far as the strength of the government's case, we think, with respect to Mr. Amar, it is not a very strong case.  It is very circumstantial.  The references to any activities engaged in by Mr. Amar have been very limited in all of the pleadings to

date.

And as -- well, yeah, I can say this
because it's in the civil proceedings, but this is a
case premised upon a merger where JPMorgan purchased
a company for 175 million, so it's not a
$175 million loss, as the AUSAs contend.  And loss
amount will be yet another issue that will be
vigorously contended.

But in addition to that, Mr. Amar was not a
party to the merger agreement.  He was not involved
in any of the direct merger discussions with
JPMorgan.  And we submit that the government has a
very high burden here to demonstrate that he did
anything wrong.  And because of that, Mr. Amar is
eager to clear his name and to fight the charges.

One moment, Your Honor.

And with the Court's permission, we'd like
to approach and have a sidebar to raise one issue
that we would ask be sealed from any public
transcript.

THE COURT:  Okay.  Is the government aware
of this issue?

MS. McLEOD:  No.

THE COURT:  Okay.  Why don't you have a
conversation.

AMM TRANSCRIPTION SERVICE - 631.334.1445

(Discussion held off the record.)

THE COURT:  Do you want to -- do you want to approach?

MS. McLEOD:  Your Honor, we've discussed.

THE COURT:  Actually, over here because of the (inaudible).

MS. McLEOD:  Okay.

(Discussion held off the record.)

MR. KOBRE:  I'll just add on that last point that -- just to be clear, that we recognize the government's concern, and I think Pretrial Services did also, which is why adding an additional co-signer and the consequence if he were to flee to, now, a third co-signer that would lose their assets --

THE COURT:  Do you have any understanding who the co-signers might be?  And I'm wondering if -- that if figuring out who the co-signers might be might alleviate some of the issues about, well, just non-appearance.

MR. BUCKLEY:  Your Honor, one of the co-signers would be Mr. Amar's wife, and the two other co-signers that we're envisioning would be Mr. Amar's wife's cousin, as well as one of her very, very close friends, both of whom are

attorneys.

THE COURT:  Both attorneys in New York?

THE DEFENDANT:  Yes.

MR. BUCKLEY:  Your Honor, just two more points.  One that I neglected to mention is that, even while all of this was going on, after Mr. Amar was served with a search warrant and knew that he was the subject of a federal investigation, Mr. Amar was very conscious of making sure that nobody thought he was going to take any steps to try to evade justice or avoid justice.

And one very concrete example of that is when he took a trip to Buffalo.  Recognizing that Buffalo is near the Canadian border, he asked us to contact the prosecutors and notify them of the trip and give them the details about the trip, which we, of course, did.

So, again, as Pretrial recommends, you know, to the extent Your Honor does have concerns about risk of non-appearance -- and, respectfully, we submit there should not be any -- we think that that can be addressed by modifying the other conditions; for example, adding the third co-signer, increasing the amount of the bond, requiring his wife to surrender her passports as well.

The idea that Mr. Amar would flee the country without his passports, abandoning his wife and children and his property, it just weighs heavily in favor of a finding that he will appear.

THE COURT:  All right.  And where -- so I noticed the Pretrial report mentions two children. Are they both living at home with Mr. Amar at this time?

MR. BUCKLEY:  Yes, they are, Your Honor.

THE COURT:  Okay.  And is the older child in college, or, you know -- and do they have other -- do they have summer activities that take them out of the district, or summer plans that take them out of the district?

MR. BUCKLEY:  So the older child does attend college.  The younger child lives at home. With regard to summer plans, Mr. Amar's older child is planning to take an internship that will have him in Israel from the end of August until January.  But I don't believe Mr. Amar's daughter or wife have any summer plans or intention to leave the district unless necessary for business, which, of course, we would clear with Pretrial.

MS. McLEOD:  Your Honor, when you have a second, I just would like an opportunity to respond

to some of the points.

THE COURT:  Go ahead.

MS. McLEOD:  So I just want to comment on the -- couple things.  One is the strength of the government's case.  So the government obviously agree -- disagrees with argument there, that the case is extremely strong against Mr. Amar, and defense counsel claimed that it was circumstantial.

So just to give Your Honor a little bit of background, the facts regarding the case are essentially that Mr. Amar was an executive at a startup company called Frank, which provided an online platform for students to fill out the FAFSA, the form that people fill out to get student aid. And in 2021, he and Ms. Javice, the co-defendant, who was the CEO of Frank, were essentially shopping their company on the market.  They were trying to sell their company to a number of various larger companies, including JPMorgan Chase.  To JPMorgan Chase, they made the assertion that they had over 4 million customers who had signed up with the Frank website.  This was a vastly inflated number.  The number was actually 300,000.

In terms of the evidence specifically against Amar, we have a number of messages between

the defendant and his co-defendant about the fraud
itself, about specific aspects of the fraud.  We
also have a phone call with a third party.

So just to give Your Honor some context
about this, part of what happened was that, at a
certain point, JPMorgan Chase said, we would like
you to verify that you have the number of customer
sign-ups that you say you do.  And Javice and Amar
realized that they did not have what they needed to
get it verified, so what they did is they called up
their director of engineering, a software engineer,
and they asked him -- and, again, this is a phone
call which included Mr. Amar.  They asked him to
create a set of synthetic data, so fake data, that
would be given to JPMorgan Chase.

And on that phone call, which Mr. Amar was
a part of, the software engineer asked, is this
legal?  To which they responded, yes, it's legal; we
don't want to end up in orange jumpsuits.  The
engineer, nonetheless, said, I don't want to do it.
I don't want to have any part in this.  And so they
went to somebody else and hired somebody else to
make up fake data, which was then given to JPMorgan
Chase.  That's just some of the evidence that's
against the defendant.  That's a phone call with the

defendant, so I'm not sure how circumstantial that
is.

In addition, I just want to touch on the
question of the defendant's ties to other countries.
I think what -- what I think we have been trying to
convey to the Court, and which I think -- I think
Your Honor understands, is that the defendant
primarily lived his adult life in Israel, raised his
family there, and it sounds like one of his children
is going back to live there for six months.  They're
Israeli nationals, so the idea that they couldn't
all just move to Israel is a clear possibility.  It
sounds like the older child would have spent the
majority of his life living in Israel and is going
back there.

The -- one of the things in the Pretrial
report was that the defendant had had a number of
bank accounts closed recently, and so he opened new
ones, and the new bank accounts that he opened were
in Israel.  He opened foreign bank accounts.  So
I -- there's a significant concern here that, where
you have a defendant who is facing removal, whose
family was raised in a different country, primarily,
who all have citizenship in a different country --

THE COURT:  I thought you said that the

children and the wife are U.S. citizens.  They're
not?

          MS. McLEOD:  I believe they're also dual
nationals.

          MR. BUCKLEY:  Yes.  That's correct, but
they're U.S. citizens, Your Honor.

          MS. McLEOD:  But --

          THE COURT:  But they're also Israeli
citizens?

          THE DEFENDANT:  Yeah.

          MR. BUCKLEY:  Yes.

          THE COURT:  And Israel doesn't extradite
their own?

          MS. McLEOD:  Correct.  So the whole -- this
is -- the concern is that the whole family, who was
primarily based in Israel until 20 -- until five
years ago, could just go back to living their life
in Israel, which they were living in up until 2018.

          So I really -- the government feels very
strongly that this is not an unreasonable condition.
This is just a curfew with a bracelet.  We are not
asking for home incarceration, but we are very -- we
are very seriously concerned about this.  I
wouldn't -- we wouldn't be asking for it if we
weren't, and so it's something that is very

important to us.

I also just want to note the -- sort of,
the examples that I was providing to the Court
earlier about defendants who had fled was not to
suggest, you know, well, that means every defendant
will flee.  My point was that the safeguards are not
foolproof, and people flee at different stages in
the case, and incentives change over time.  And
often, once people understand more about the case
and understand what the government is going to be
proving at trial, that's why people don't show up on
their trial date.

And so that's really the concern that we
have.  And so we -- again, the government feels
strongly about this.  We think it's not an
unreasonable ask, given the situation.  And so we
really think that this is something that is
necessary to mitigate the concerns.

THE COURT:  I have a couple more questions.
One which is, you know, that I am bound to impose
the least -- consider and impose the least
restrictive conditions to reasonably assure, in this
case, appearance at future court proceedings.  My
question is -- I'm just wondering how one considers
restraining the ability of a U.S. citizen to travel

outside of the U.S. is less restrictive than, you
know, some form of location monitoring.  I mean,
just as a -- you know, setting aside any other
considerations, that if you were to look at any
other defendant, any defendant, how restraining, you
know, a U.S. citizen who's not charged with any
crime -- how restraining the movements of another
person is less restrictive than location monitoring
on somebody who has been charged with a crime.

   MR. BUCKLEY:  Yes, Your Honor.  So to
answer your question, we don't think it's necessary
to impose that restriction, but it is something that
we're willing to offer, and that Mr. Amar's wife
would be willing to do.  So it wouldn't be the Court
imposing that on her.  It's just another way to give
the Court assurances that the conditions being
imposed satisfy what is required to ensure that he
appears here.

   THE COURT:  Right.  But just because
there's consent, I still need to be assured -- you
know, it -- I still need to be assured that it's
less restrictive.  And one of the things that
concerns me is understanding the dual citizenship of
the rest of the family and the fact that the older
child, who has reached the age of majority, is going

to be spending a significant amount of time out of
the country.

Those are all things that go into my
assessment and my concern about whether, A,
surrendering another individual's passport is less
restrictive in a circumstance like this, but also
whether it's -- you know, whether it's even going to
be sufficient.  I mean, there -- those can play out
in different ways, I understand, and in particular
in the facts and circumstances as you presented to
me and as I've heard here.  So I was just wondering
if there was any consideration there.

MR. BUCKLEY:  Yes, Your Honor.  So we
understand the point Your Honor is making, but given
that it is voluntary, and given that it is, you
know, something that his wife would consent to do,
his daughter would consent to do -- if you wanted an
additional assurance there, given the dual
nationality considerations that you noted, we
certainly think that is a less restrictive condition
than requiring an individual to wear GPS monitoring
and abide by a curfew, particularly in connection
with a white-collar crime.  I'm not sure I
understand the point --

THE COURT:  Yeah, I mean -- and the

other -- I mean, the other thing that was brought
home to me is the existence of foreign bank
accounts.

        MR. BUCKLEY:  So --

        THE COURT:  That's a little bit concerning.

        MR. BUCKLEY:  Yes.  Sorry, Your Honor.

        THE COURT:  I mean, there's -- you know,
I -- look, we're here considering risk of
non-appearance we're concerned about.  And when
assessing that, we look at, you know, motive, means
and opportunity, right, to leave the country or
leave the jurisdiction.

        MR. BUCKLEY:  So --

        THE COURT:  So, yes, go ahead.

        MR. BUCKLEY:  Okay.  So just to clarify
that point, I think Ms. McLeod misspoke or simply
made a mistake.  The bank accounts in Israel predate
Mr. Amar moving here, and that was all disclosed to
the Pretrial Services officer.  One is a pension
account, and another is, like, an educational fund.
The new bank account that was opened was a bank
account here in the United States at Valley National
Bank.  So, again, that demonstrates that he's not
going anywhere.  He doesn't have an intention to go
anywhere.

With respect to your questions about means, motive and opportunity, I think, as far as means are concerned, he has next to no means anymore.  The government has seized and frozen his primary bank account.  It's been something that we've been in discussions with the government about so that he can pay the upkeep on his house here in the United States.

As far as motive, I don't want to belabor the point, but we submit that he has no motive to flee because he wants to clear his name.  He had a very successful career that has been destroyed by the civil litigation and the criminal litigation, and he intends to fight both of those vigorously and clear his name.  So the motive, if anything, is for him to stay here because he can't fight them if he becomes a fugitive.

And as far as opportunity, he's already had the opportunity for nearly a year to flee, whether it be to Israel or somewhere else, and he has opted not to do so.  And, again, I think that underscores his motive here.

MS. McLEOD:  Just a couple of points.  And one thing I want to mention, in terms of ties to the United States, one of the main reasons the defendant

moved to the United States was to take this job at
Frank.  He moved here.  He continued -- he -- there
was originally an Israeli office of Frank that
closed down.  He moved to the United States to
continue working for Frank here.  Frank is no longer
operational.  He was fired from JPMorgan Chase.  He
does not have a job in the United States, so there
is not that tie either.  He's not employed.

So -- and in terms of Your Honor's point
about the means, the means he does have are in bank
accounts in Israel, which the government can't
seize.  We can't do anything about that money.  If
there are flows of money that we're not aware of
that goes to Israel, that's a big problem.  We --
there's very limited things that we can do in terms
of things we can do in foreign jurisdictions to
seize assets.

So we really -- and just to the point
about, you know, he's known for a long time.  Look,
people know about things for a long time, and they
hope that they're not going to get indicted.  The
defendant hoped he wasn't going to get indicted and
was trying to convince the government not to indict
him, and, you know, things change.  So he's now been
indicted.  He's going to get discovery in the case.

He's going to eventually, you know, learn more about
the case and what the case might be.

        And so, again, the government does feel
very strongly that this is -- this is a reasonable
condition.  It's not particularly restrictive,
again, because the defendant's not employed, so he
doesn't -- it's not restricting a lot of, you know,
necessarily, you know, things that he needs to do.
It's not like he has work trips that he needs to be
going on.

        So we think that this is -- this is a
reasonable condition here, especially given the fact
that his entire family, including himself, are
Israeli citizens.  His 18-year-old is going to
Israel for six months in -- next month.  So, you
know, we strongly, strongly feel that this is
necessary.  Thanks, Your Honor.

        MR. BUCKLEY:  Your Honor, just two final
points.  He was served with a search warrant by
federal and local authorities that seized his phone.
He has been aware of this.  And, as I mentioned
before, recognizing that, even just traveling to
Buffalo, even though he had not been charged, he
made sure that he wanted to keep everybody informed
of that travel.

With regard to the prosecutor's point about
he came here solely for Frank and, therefore, now
that he's not employed by Frank, he has no desire to
stay.  I would note, as disclosed to the Pretrial
Services Office, after leaving -- or after being
terminated by JPMorgan, Mr. Amar went out and got
another job here in the United States.  So I think
that also weighs in favor of his desire to maintain
ties to the United States.

The only reason he's unemployed -- and I
don't think that's fair to cite as a factor against
him here -- is because of the civil lawsuits and,
now, the criminal case.

THE COURT:  Wait.  But you said that
Mr. Amar got another job, but he's now unemployed?

MR. BUCKLEY:  Correct.  He briefly had
another position, but then when JPMorgan filed its
lawsuit in December of 2022 -- I think it was around
December 23rd -- he was asked to resign until that
lawsuit could be resolved, but that was with a U.S.
company, Your Honor.

THE COURT:  Okay.

MR. KOBRE:  Your Honor, the only -- the
last point on this, just because I can't leave this
point to set aside.  And I know this isn't the forum

to fight the strength of case, but the government's recitation of, they did this, they did that is exactly, sort of, the way we've been having to deal with it, as JPMorgan Chase has recited it in their lawsuit.

In fact, when they say they made it, this false assertion of X or Y, in fact, we don't believe they have evidence that Mr. Amar made any false assertion; that this assertion was made by others, but not by him.  He was on -- there -- we take their point about the allegation being on a phone call and there being chats, but I think that is one of the main things, which is why we think this case is a particularly weak one, actually, as it relates to Mr. Amar, is because it's a fraud case where they actually, we believe, do not have evidence of his participation in any direct falsehoods.

MS. McLEOD:  Unless Your Honor is interested in more about the strength of the case, I won't go into it more, but suffice to say it is a factor.  That's why we were talking about it.

I do just want to -- I don't want to rehash.  If Your Honor has anything more specific. Our concerns are the funds overseas, Israel not extraditing its own nationals, the entire family

being Israeli citizens, the defendant not being a
U.S. citizen and, thus, facing removal, and the fact
that indictment and the various stages of the case
change people's mindsets in ways that are not always
predictable. And the fact that this is not --
Your Honor has been on the bench for years. You
know, this is not a particularly -- this is not a
Draconian set of conditions that the government is
proposing.

       We're not asking for home incarceration.
We're not asking for, necessarily, a GPS bracelet,
unless that's what Pretrial wants to do. We're just
asking for location monitoring and a curfew, and
so -- and we think that's reasonable. And that's --
and I agree with Your Honor, that is less
restrictive than telling his daughter and his wife
that they can't travel anymore.

       So unless Your Honor has further questions,
thank you.

       THE COURT: Okay. Anything else to add?

       MR. BUCKLEY: No, Your Honor. But just in
case it got lost in the broader discussion --

       THE COURT: So, no, nothing else to add,
but I'm going to add this now? Okay. Go ahead.

       MR. BUCKLEY: He self-surrendered, Your

Honor --

    THE COURT:  Yeah.

    MR. BUCKLEY:  -- aware of the indictment, and walked in this morning.

    THE COURT:  All right.  I'm going to take just a short break, and then I'll be back out.

    (A recess was taken.)

    THE DEPUTY CLERK:  Okay.  We are back on the record.

    THE COURT:  Now, we had an unexpectedly lengthy argument about a condition that normally is not the subject of so much dispute when the parties have actually agreed upon -- agreed to release on some fairly -- a fairly extensive set of conditions.

    But having heard all of the argument today by counsel, these are the conditions that I believe are the least restrictive conditions that will reasonably assure Mr. Amar's appearance at future court proceedings.  And I will set out right now, I'm going to rule in favor of the government on the location monitoring piece.

    And these are the conditions:  Mr. Amar is to be released on a $1 million personal recognizance bond co-signed by two financially responsible persons, and secured by the residence at Sands

Point.  Travel is restricted to the Southern and
Eastern Districts of New York.  He is to surrender
all travel documents and make no new applications.

Mr. Amar's wife is not required to
surrender her travel documents because I am imposing
Pretrial supervision as directed, as well as
location monitoring as directed by Pretrial
Services.  Defendant may continue or seek
employment, although recognizing that it may be
difficult, given the recent, fairly recent, job
changes.  Once the necessary passports have been
surrendered, he may be released on his own
signature, with remaining conditions to be met by
July 27, 2023.

Additionally, he is not to open any new
bank accounts or lines of credit without Pretrial
Services' approval.  He is not to have any contact
with Ms. Javice, Data Scientist-1, or current
employees of JPMorgan Chase, except in the presence
of counsel.  He is not to have any communications
concerning this case with former employees,
investors and/or board members of Frank, except in
the presence of counsel.

Did I miss anything, Ms. McLeod?

PRETRIAL SERVICES:  Your Honor?

THE COURT:  Yeah.

PRETRIAL SERVICES:  This is curfew as well as location monitoring?  That's the only restriction?

THE COURT:  Yes, location monitor and curfew.  I'm sorry.  All right.

Anything else, Ms. McLeod?

MS. McLEOD:  No.  That's everything, Your Honor.

THE COURT:  Okay.  Anything else, Mr. Buckley?

MR. BUCKLEY:  No, Your Honor.

MR. KOBRE:  No, Your Honor.

THE COURT:  Okay.  All right.  Look, this is without prejudice to a future bail modification application if the parties are able to agree that there is something else that could reasonably assure.  This is my ruling at this time, okay.

All right.  Mr. Amar, if you fail to appear in court as required or if you violate any of the conditions of your release, one, a warrant will be issued for your arrest; two, you and anyone who signed the bond will each be responsible for paying its full amount, that is $1 million; and three, you may be charged with a separate crime of

bail-jumping, which can mean additional jail time and/or a fine.

In addition, if you commit a new offense while you are released, in addition to the sentence prescribed for that offense, you will be sentenced to an additional term of imprisonment of not more than ten years if the offense is a felony, or not more than one year if the offense is a misdemeanor. This term of imprisonment will be executed after any other sentence of imprisonment is completed.

While you're awaiting trial, I also must warn you not to have any contact with or engage in any intimidation of potential or designated witnesses or jurors, not to engage in any intimidation of any court officer, and not to engage in any conduct that would obstruct any investigation by law enforcement. And finally, if you don't agree with my decision, you do have a right to appeal it.

I understand that you saw Judge Hellerstein earlier today. I assume he's going to be entering the Rule 5(f) order.

MS. McLEOD: Yes.

THE COURT: All right. And I'm guessing he's probably also excluded time?

MS. McLEOD: Yes.

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT:  All right.  So, then, is there anything else I need to do at this time?

MS. McLEOD:  No, Your Honor.

MR. BUCKLEY:  No, Your Honor.

THE COURT:  All right.  Thank you very much.  We are adjourned.

MS. McLEOD:  Thanks, Your Honor.

MR. KOBRE:  Thank you, Your Honor.


0o0

C E R T I F I C A T E


    I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of United States of America v. Olivier Amar; Docket #23CR0251 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature ___*Adrienne M. Mignano*_____
               ADRIENNE M. MIGNANO, RPR


Date:     August 16, 2023


AMM TRANSCRIPTION SERVICE - 631.334.1445