**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

CHARLIE JAVICE and OLIVIER AMAR,

        Defendants.

23-cr-00251-AKH

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL**
**PRODUCTION OF RULE 16 DISCOVERY AND BRADY/GIGLIO MATERIAL**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

I.     The Government's Rushed Charging Decision and Criminal Complaint ..........5

II.    JPMC Coordinated the Government's Investigation ......................................6

       A.    The Government and JPMC's Close Communications .........................7

       B.    The Government's Refusal to Enforce Its Own Subpoena to JPMC......9

ARGUMENT .............................................................................................................12

I.     Due Process and Fundamental Fairness Protections of Rule 16 and *Brady* Require
     Broad Disclosure of Evidence Within the Government's Control ...................12

II.    The Government Has Control Over Material Documents in JPMC's Possession
     and Should Be Directed to Search for Rule 16 and *Brady* Material..............16

       A.    Whether the Government Has Control Over—or the Practical Ability to
            Obtain—Documents Pursuant to Rule 16 is a Fact-Intensive Inquiry..........16

       B.    The Government Has Control Over JPMC's Documents......................19

            1.    The Government Has Control Over Material Documents in
                JPMC's Possession .................................................................20

            2.    The Government Has Yielded Critical Portions of Its Investigation
                to JPMC .................................................................................24

            3.    JPMC Has Reputational and Financial Incentives for the
                Government to Succeed in Its Prosecution ................................26

            4.    JPMC Has a History of Cooperation with the Government ......27

III.   The Court Has Both Statutory And Inherent Authority Over The Discovery
     Process To Further The Ends Of Justice........................................................27

IV.   In The Alternative, the Court Should Grant Defendants the Authority to Issue a
     Limited Rule 17(c) Subpoena Regarding the Government's Control of JPMC and
     Its Documents ...............................................................................................29

CONCLUSION..........................................................................................................32

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Alexander Interactive, Inc. v. Adorama, Inc.*,
No. 12-cv-6608 (PKC)(JCF), 2014 WL 61472 (S.D.N.Y. Jan. 6, 2014)..........................16, 19

*Berger v. United States*,
295 U.S. 78 (1935)...............................................................................................................2

*Brady v. Maryland*,
373 U.S. 83 (1964)..................................................................................................1, 13, 15

*Coventry Cap. US LLC v. EEA Life Settlements Inc.*,
333 F.R.D. 60 (S.D.N.Y. 2019) ...........................................................................................19

*Dietrich v. Bauer*,
No. 95-cv-7051(RWS), 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000) ...............................17

*Giglio v. United States*,
405 U.S. 150 (1972)................................................................................................................1

*Kyles v. Whitley*,
514 U.S. 419 (1995)......................................................................................................3, 15, 16

*N. Mariana Islands v. Millard*,
287 F.R.D. 204 (S.D.N.Y. 2012) .........................................................................................19

*Royal Park Invs. SA/NV.*,
No. 14-cv-04394, 2016 WL 5408171 (S.D.N.Y. Sept. 27, 2016) .........................................16

*S.E.C. v. Strauss*,
No. 09 Civ. 4150 (RMB)(HBP)p, 2009 WL 3459204 (S.D.N.Y. Oct. 28,
2009) ......................................................................................................................................18

*S.E.C. v. Javice*,
No. 23-cv-02795 (S.D.N.Y. Apr. 4, 2023) ....................................................................13, 24

*Signify N. Am. Corp. v. Satco Prod., Inc.*,
No. 19-CV-6125, 2020 WL 9455192 (E.D.N.Y. Oct. 22, 2020)...............................16, 20, 27

*In re Turkey Lake, LLC*,
No. 15-12091, 2021 WL 4189696 (Bankr. N.D.N.Y. Sept. 14, 2021) ...................................16

*United Sates v. Avellino*,
136 F.3d 249 (2d Cir. 1998)..................................................................................................15

*United States v. Agurs*,
    427 U.S. 97 (1976) ..............................................................................................13

*United States v. Bagley*,
    473 U.S. 667 (1985) ................................................................................12, 14, 15

*United States v. Bergstein*,
    788 F. App'x 742 (2d Cir. 2019) .......................................................................30

*United States v. Bin Laden*,
    397 F. Supp. 2d 465 (S.D.N.Y. 2005) ...............................................................15

*United States v. Clarke*,
    979 F.3d 82 (2d Cir. 2020) ................................................................................14

*United States v. Connolly*,
    2019 WL 2120523 (S.D.N.Y. May 2, 2019) ................................................25, 26

*United States v. Gallo*,
    654 F. Supp. 463 (E.D.N.Y. 1987) ....................................................................28

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002) ................................................................................15

*United States v. Goldstein*,
    No. 21-cr-550 (DC), 2023 WL 3662971 (E.D.N.Y. May 25, 2023) ....................30

*United States v. Hossain*,
    No. 19-cr-606 (SHS), 2020 WL 6874910 (S.D.N.Y. Nov. 23, 2020) ..................14

*United States v. Hwa*,
    No. 18-cr-538 (MKB), 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ................19

*United States v. Jackson*,
    508 F.2d 1001 (7th Cir. 1975) ...........................................................................28

*United States v. Kilroy*,
    523 F. Supp. 206 (E.D. Wis. 1981) ..............................................................18, 20

*United States v. Lucas*,
    841 F.3d 796 (9th Cir. 2016) .............................................................................15

*United States v. McElroy*,
    697 F.2d 459 (2d Cir. 1982) ..............................................................................14

*United States v. Meregildo*,
    920 F. Supp. 2d 434 (S.D.N.Y. 2013) ..........................................................15, 19

*United States v. Morell*,
    524 F.2d 550 (2d Cir. 1975).................................................................................15

*United States v. Nachamie*,
    91 F. Supp. 2d 522 (S.D.N.Y. 2000)...................................................................30

*United States v. Nixon*,
    418 U.S. 683 (1974)......................................................................................30, 31

*United States v. Noel*,
    No. 19-cr-830-2 (AT), 2020 WL 12834537 (S.D.N.Y. June 9, 2020) ............17, 18

*United States v. Raheja*,
    No. 1:19-cr-559, 2020 WL 7769725 (N.D. Ohio Dec. 30, 2020)........................19

*United States v. Rezaq*,
    156 F.R.D. 514 (D.D.C. 1994)............................................................................14

*United States v. Smith*,
    No. 19-cr-00669, 2020 WL 4934990 (N.D. Ill. Aug. 23, 2020)..........................31

*United States v. Soliman*,
    No. 06-cr-00236A, 2009 WL 1531569 (W.D.N.Y May 29, 2009) ......................30

*United States v. Stein*,
    488 F.Supp.2d 350 (S.D.N.Y. 2007)............................................................ *passim*

*United States v. Stevens*,
    985 F.2d 1175 (2d Cir. 1993).............................................................................14

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)...............................................................................15

*United States v. Tomasetta*,
    10-cr-1205, 2012 WL 896152 (S.D.N.Y. Mar. 16, 2012) .............................20, 27

*United States v. Tucker*,
    249 F.R.D. 58 (S.D.N.Y. 2008) .........................................................................30

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017)................................................................................14

*United States v. Weigand*,
    482 F.Supp.3d 224 (S.D.N.Y. 2020)..................................................................14

*United States v. Weigand*,
    520 F. Supp. 3d 609 (S.D.N.Y. 2021) ..........................................................30, 31

*Vacco v. Harrah's Operating Co.*,
   2008 WL 4793719 (N.D.N.Y. Oct. 29, 2008) ......................................................26

*In re Various Grand Jury Subpoenas*,
   235 F. Supp. 3d 472 (S.D.N.Y. 2017).................................................................17

## **Rules/Statutes**

15 U.S.C. § 78u–4(b)(3)(B) ........................................................................................25

Fed. R. Crim. P. 2 .....................................................................................................14

Fed. R. Crim. P. 16 ............................................................................................. *passim*

Fed. R. Crim. P. 17 ............................................................................................. *passim*

Fed. R. Crim. P. 17(c) ........................................................................................ *passim*

## **Other Authorities**

Fifth Amendment ......................................................................................................26

Defendants Charlie Javice and Olivier Amar ("Defendants") respectfully submit this motion to compel the Government's compliance with basic principles of due process and its discovery obligations under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1964), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny (the "Motion").

## PRELIMINARY STATEMENT

It is bedrock and unassailable law that criminal defendants—while not benefiting from the expansive discovery rights available to civil litigants—nonetheless remain constitutionally entitled to due process and the guarantee of a fair trial. These principles are codified in the Federal Rules of Criminal Procedure and embodied in a long line of precedent emanating from this country's highest court and this Court. Fundamental to these constitutional safeguards is the basic notion that the Government is obligated to turn over documents within its possession, custody, or control that are potentially exculpatory or material to the preparation of the defense. Here, the Government has control over documents in the possession of JPMorgan Chase Bank, N.A. ("JPMC" or the "Bank") that are material to the preparation of the defenses in this case, and JPMC should be compelled to gather and produce them. A number of factors demonstrate the Government's control over the materials at issue, including its extraordinary delegation of responsibility for investigating its own case to JPMC.

First, the Government has issued broad subpoenas to the Bank compelling production of all merger-related documents but also has given the Bank significant latitude to determine which documents to collect and produce. Indeed, there are likely thousands of documents responsive to the Government's subpoenas that JPMC has not produced. The Government has not even bothered to gather documents from individuals quoted in its own Complaint, or from certain individuals who held central roles in the transactions at the heart of this case, simply because JPMC chose not

to produce them. The record demonstrates that these omissions are not incidental—they are strategic. Multiple judges addressing this case have questioned the Government for leaving obvious stones unturned. Indeed, when considering Ms. Javice's efforts to obtain discovery in a parallel civil matter, Judge Liman noted: "**There might be a smoking gun**." Since then, Defendants have continued to identify glaring deficiencies in JPMC's productions to the Government. The Government's response has been deliberate inaction, making clear that although JPMC holds highly relevant, potentially exculpatory, readily available materials that are responsive to the Government's subpoenas, the Government does not intend to collect them. *See infra* § II. B.

In sum, the Government is willfully and intentionally burying its head in the sand to avoid identifying, let alone reviewing, documents that are material to the preparation of the defense that would undermine the Bank's theory of the offense—a theory the Government has consistently adopted without question. But the "United States Attorney is the representative not of an ordinary party to a controversy," and thus its "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

When pressed by this Court as to whether Defendants should pursue missing documents through other avenues (namely, Rule 17), the Government indicated that there was no need and would follow the discovery procedures fashioned by this Court to ensure more efficient—or at least less egregiously delayed—production of relevant materials to the defense (procedures this Court had the inherent authority to impose). In reality, the Government has been stringing Defendants along, only to later object to Defendants' requests, essentially blocking Defendants' access to the materials they need and thereby depriving them of a fair trial. *See infra* § II.B.1.

<u>Second</u>, the Government has relinquished critical aspects of its investigation, ceding to the

2

Bank important judgments about which documents should be produced (and when). For the past year (and months before it even brought charges against Defendants), the Government has worked hand-in-glove with JPMC, receiving curated sets of documents, access to witnesses, and suggestions as to targets for third-party subpoenas, all without imposing any end date on JPMC. Meanwhile, the Government largely has deferred to the Bank's judgment about which documents should be withheld pursuant to attorney-client privilege, despite demonstrably unfounded privilege assertions by JPMC.[1]  Now that the Government has obtained the subset of allegedly incriminating documents selected by JPMC that it believes will be sufficient to make its case, the Government is apparently content to ignore the highly relevant and likely exculpatory materials JPMC is strategically choosing to hold back.

Third, JPMC is no ordinary third-party subpoena recipient, but an interested party with a significant financial and reputational stake in the outcome of this case. The charging instruments in this case present JPMC—one of the world's largest, wealthiest, and most sophisticated financial institutions—as the unwitting victim of fraudulent conduct in connection with JPMC's acquisition of Frank. In truth, JPMC is no victim, but instead a remorseful buyer, vindictive advocate, and an obviously interested private party with a monetary stake in the outcome of this case. What is more, JPMC has a far-reaching and longstanding record of cooperation with the Government. *See infra* §§ II.B.3, II.B.4.

---

[1]    After receiving Defendants' objections to JPMC's voluminous privilege log, and ahead of the September 26 pre-trial conference scheduled to discuss those objections, the Government questioned Defendants' standing to raise challenges to a third-party's subpoena responses and stated that it had no challenges to JPMC's invocation of privilege at that time. *See* Gov't Sept. 22 Suppl'l Letter at 5 n.2, ECF No. 50.  Most recently, during an October 12 conferral with Defendants, the Government indicated that JPMC is re-reviewing its privilege logs to see if any documents can "fall off" the log, but Defendants have no indication of what calls, if any, JPMC will reverse.  The Government has not indicated that they intend to challenge, or even review, any of JPMC's privilege claims.

In light of the foregoing, and consistent with this Court's prior precedents and Defendants' constitutional entitlement to fundamental due process and a fair trial, Defendants respectfully move for an order compelling the Government to provide Defendants with documents in JPMC's files that are material to the preparation of the defense in this matter, and which the Government has the demonstrable right to obtain, including files maintained in hard copy, in electronic repositories, and on devices used by relevant custodians. Defendants' rights to due process and a fair opportunity to defend their liberty interests requires no less, particularly here, where the Government and one of the world's wealthiest financial institutions appear to be coordinating to block Defendants' access to relevant and potentially exculpatory materials within the Bank's files that are effectively within the Government's "control."

In the alternative, Defendants move for a subpoena to JPMC pursuant to Federal Rule of Criminal Procedure 17(c), seeking a limited set of communications between JPMC and the Government as well as any documents exchanged from September 2022 to the present. Such documents will further establish the extraordinarily close coordination between the Government and JPMC in the investigative and discovery phases of this case, thereby demonstrating that Defendants' requested relief is warranted. While the instant record sufficiently shows that the Government has been outsourcing its investigation to JPMC in a manner that effectively absolves the Government of its ordinary and practical discovery and disclosure obligations, this additional, targeted discovery will only bolster the point.[2]

---

[2]    Attached as Appendix A, Defendants respectfully submit a proposed and limited subpoena to JPMC that Defendants request the Court issue as an alternative form of relief. As the Court made clear at the last conference, broader Rule 17(c) subpoenas authorizing Defendants to seek directly from JPMC the documents the Government should have obtained which sought herein would be premature at this juncture based upon the discussions with counsel for the Government, JPMC's continued production of materials, and (ideally) an agreement by the Government to continue to

## BACKGROUND[3]

### I.    The Government's Rushed Charging Decision and Criminal Complaint

In 2021, JPMC acquired Frank, a company with an online platform intended to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). Whether JPMC failed to understand the business it had acquired or simply had a change of heart, the Bank mismanaged Frank's integration, which already had been affected by unanticipated regulatory changes that rendered aspects of Frank's FAFSA tool less effective. JPMC decided to shut down Frank and lay blame for the Bank's poor judgment and mismanagement at Defendants' feet.

Following a series of pretextual investigations and Defendants' terminations, JPMC filed a civil suit against Ms. Javice and Mr. Amar citing losses of more than $175 million, alleging that Ms. Javice and Mr. Amar fraudulently had misrepresented the number of Frank's users. Apparently, the Bank also sought to have the Government prosecute Ms. Javice and Mr. Amar on those same allegations.

The Government obliged. It filed a sealed criminal complaint dated March 31, 2023, that closely tracks the allegations set forth in JPMC's December 2022 civil lawsuit against Ms. Javice and Mr. Amar (named as "CC-1" in the criminal complaint) and selectively quotes many of the same documents. *Compare, e.g.*, Compl. ("JPMC Compl."), *JPMorgan Chase Bank, N.A. v. Charlie Javice* No. 22-cv-01621, ¶ 8 (D. Del. Dec. 22, 2022), ECF No. 1 ("Not comfortable, the

---

press its subpoena to obtain these clearly relevant materials consistent with its constitutional and other disclosure obligations. *See* Sept. 26, 2023 Hr'g Tr., United States vs. Javice, No. 23-cr-00251, at 9:21-22 (S.D.N.Y. Mar. 31, 2022) (Hellerstein, J.) ("I suspect it's premature."). However, if the Court concludes that it cannot compel the Government to obtain these or other relevant materials, Defendants reserve the right to seek such materials, and additional materials as may be necessary as the case progresses, through Rule 17(c).

[3]    The limited redactions in this filing correspond to materials the Government has designated highly confidential under the protective order in this case. Defendants have no objection to their publication, but, in an abundance of caution, redact them from this public filing in the first instance.

engineer asked Javice and Amar whether the request was legal."), *with* Compl. ("Crim. Compl."), *United States v. Javice* 1:23-cr-00251 (AKH) ("Crim. Compl.") ¶ 22(g), ECF No. 1 ("Engineer-1 was uncomfortable with the request and stated, in sum and substance, 'I don't want to do anything illegal.'"). The Government filed its criminal complaint notwithstanding that, by that time, JPMC had produced to the Government only a fraction of the materials JPMC now has produced in response to the Government's subpoenas.[4] There were no exigencies requiring the Government to charge first and investigate later (or maybe never)—no potential for violence or criminal conduct, no risk of exceeding the statute of limitations, and no threat to the integrity of an ongoing investigation—but there were obvious reasons to be skeptical of the Bank's financial and reputational motives to instigate these charges.

## II.    JPMC Coordinated the Government's Investigation

JPMC is not the typical third-party or even "victim" that provides information to law enforcement pursuant to a grand jury subpoena. Rather, the Government has apparently permitted JPMC to make unilateral, unchallenged decisions about what and whose documents should be collected, searched, and produced by JPMC in response to the Government's subpoenas, under the guise of the Government declining to "micromanage" JPMC's subpoena responses. This has resulted in the **omission of core custodians from the Bank's document collections—including individuals identified in the Government's own complaint, Ms. Javice's direct supervisor, and individuals responsible for and deeply involved in the merger process**. JPMC even

---

[4]  On October 13, 2022, the Government sent JPMC the first of several subpoenas, requiring production of, among other things, "███████████████████████" of Frank by JPMC. *See* Gov't Ltr. dated Aug. 30, 2023, attached as Exhibit A. A series of at least seven additional subpoenas followed. By March 31, 2023, JPMC had provided the Government with only approximately 200,000 pages of documents. By July of 2023, that number would be more than 619,000.

informed the Government about Defendants' outreach to a potential witness—an indication that the witness may hold information favorable to the defense—but then provided only select documents to the Government in preparation for the Government's interview of said witness. That witness, considered relevant by both JPMC and the Government, is also missing from JPMC's custodian list in this case.

It is telling that JPMC's first four productions to the Government contain only 250 documents that conveniently comprise nearly every aspect of the Government's allegations and significantly overlap with the documents referenced in the Government's Complaint. In other words, the Government's allegations are based on JPMC's cherry-picked set of documents. The Government has likewise deferred to JPMC on the timing of the production,[5] and its quality.[6]

The Government also has deferred to JPMC's judgment about which documents should be withheld on the basis of privilege and, to date, has said it has no challenges to even the most obviously overbroad privilege calls.

### A.    The Government and JPMC's Close Communications

The Government and JPMC have been in contact about Ms. Javice and Mr. Amar since at least early October 2022, while Defendants were on administrative leave and before they were terminated from employment by JPMC. Ex. A, 2023.08.30 Gov't Letter. At that time, JPMC was pressing both Ms. Javice and Mr. Amar to submit to "interviews" with JPMC investigators and outside counsel regarding the allegations now at the heart of this case. That same month, the

---

[5]    It was this Court, not the Government, that finally imposed a terminal date on JPMC. *See* Aug. 23 Tr. 9:1–6 (*"THE COURT: I would like you to tell counsel at JPMorgan Chase that the Court wants the production ended by October 13."*).

[6]    The productions provided have been made more inaccessible by the apparent failure of the government or JPMC to run basic deduplication, or maintain the integrity of various metadata fields, making the actual volume of material provided to the defense both smaller, and more convoluted, than mere document count would suggest.

Government issued its first subpoena to JPMC seeking Mr. Amar's bank and financial records (along with those for Ms. Javice and another witness, also known as the "Scientist-1" in the criminal complaint).

Moreover, the few communications produced (and, therefore, available to Defendants) between the Government and JPMC show their close relationship and the Government's corresponding ability to exact information from JPMC related to this matter if and as it sees fit. For example, on April 24, 2023, James McGovern, JPMC's counsel from Hogan Lovells, emailed AUSAs McLeod and Fergenson with the subject line, "Charlie's Preliminary Hearing." The body of the email reads, "Not going forward tomorrow, right? PACER does not reflect a change. Very interested client. Thanks." Ex. B, 2023.05.04 Email Chain. In response, AUSA McLeod explained that the preliminary hearing date was waived until May 4.

On May 4, the conversation continued with a degree of casual familiarity. AUSA McLeod then asked Mr. McGovern, "Jim, Do you have time for a quick call sometime today?," and she added Special Agent Jeremy Rosenmann to the email thread. *Id*. Mr. McGovern replied, "Of course," and the team set a time. *Id*. After this call, AUSA McLeod then resumed the email thread with a subpoena, "As discussed, subpoena attached." The following week, AUSA McLeod stated that the Government "may want to speak with additional JPMC witnesses" and asked for another call. *Id.* They further discussed the departure date of an employee, and access to a Frank document repository. *Id.* As a whole, the email thread suggests that JPMC and the Government have been coordinating on when and how JPMC would furnish witnesses and materials to the Government. *See id.*

Indeed, that is precisely what happened in June of this year. As revealed by produced email communications, on June 27, 2023, a defense representative contacted a former JPMC employee

who participated in the post-merger data collection and analysis of Frank's data.  Ex. C, 2023.06.27 Email Chain.   The witness declined to speak with the defense on the ground that he was indemnified by JPMC.  Just a few hours later, JPMC's outside counsel emailed the Government that the witness "was contacted by an investigator from Charlie's team."  *Id.*  JPMC counsel also provided the Government with "documents relevant to" the witness in preparation for the Government's previously scheduled interview of that same witness.  *Id.*  At that time, the documents had not been produced in any of JPMC's twelve formal productions, and JPMC's counsel simply stated to the Government that it would "formally produce . . . in due course."  *Id.* This witness is an individual whom Defendants identified to the Government as a person likely to have relevant materials, whom JPMC has so far refused to include on its custodian list, with no pushback from the Government.

### B.  The Government's Refusal to Enforce Its Own Subpoena to JPMC

The Government and JPMC's collaborative, cooperative relationship is particularly evident when examining how the Government is—or rather is not—enforcing its subpoenas to JPMC.  The Government sent its first grand jury subpoena to JPMC on or about October 13, 2022, requiring, among other things, production of, "████████████████████████████████████ ████████████"  Ex. A.  Yet, in the year since it issued that subpoena, the Government has stopped short of requiring full compliance with the grand jury's request.  Defendants have informed the Government that JPMC is omitting documents from critical custodians—including custodians referenced in the Government's own complaint—and improperly withholding non-privileged documents responsive to the Government's subpoenas.  But the Government has deferred entirely to JPMC and, in doing so, has avoided collecting the full complement of materials it is entitled to and which should be produced to Defendants under Rule 16.

First, the Government, to date, has not challenged JPMC's many privilege assertions (approximately 13,000 in total), despite being made aware of demonstrably overbroad withholding by the Bank.  Indeed, with initial consent of the Government, Defendants identified categorical and specific examples of JPMC's improper withholdings and redactions of information that is not subject to the attorney-client privilege.[7]  In some cases, JPMC has withheld documents on privilege grounds that other third-party subpoena recipients have produced in unredacted form to the Government and which reveal that the withheld documents are in fact not privileged.  JPMC has so far declined even to address these deficiencies.  Moreover, the Government originally consented to Defendants raising their objections directly to JPMC and then, at the eleventh-hour, objected to Defendants' standing to do so—conveniently only after JPMC itself made that exact same objection. *See* Ex. C, Def. Amar's Sept. 25 Supp'l Letter to Court, ECF No. 52 at 2.

Second, per the direction of this Court, Defendants provided the Government with a supplemental list of custodians whose information JPMC has not produced in response to the Government's subpoena and who are highly likely to have information material to the defense. The Government has refused to reveal how the custodians JPMC has included to date were selected, even as Defendants have pointed out glaring gaps in JPMC's list of custodians—**including JPMC personnel identified in the Government's *own* complaint.**[8]  Many of these individuals play a central role in the facts of this case and are almost certain to possess material information.  Rather than engage with Defendants or explore the rationale for Defendants' proposed list, the Government has expressed that it will not, under any circumstances, ask JPMC to provide

---

[7]  For example, Defendants have identified withheld communications in which Frank's General Counsel and Chief Operating Officer, likely participated in a non-legal, business role, and Slack chat communications that appear to span entire days.

[8]  The omissions also include Ms. Javice's direct supervisor, merger decisionmakers, and JPMC executives involved in diligence and the data requests at the core of the Government's case.

materials from those individuals even though their documents are responsive to the Government's

subpoena. Status Conf. Tr. 9:19–22, September 26, 2023 ("Sept. 26 Tr.").

Finally, the Bank's productions to date omit perhaps the most central documents responsive

to the Government's request for "███████████████████████████████" of Frank by JPMC.

These include the following:

- **JPMC internal assessments of Frank acquisition and Frank deal file documents**.
  Typically, when a bank (like JPMC) makes the decision to buy a business, the bank
  performs internal assessments and analysis and often assembles a "deal file" on the
  acquisition target (here, Frank) with analysis of comparable companies, valuation materials
  or models to determine offer price, and descriptions of its investment thesis. JPMC's
  production includes templates and other policy guidelines that demonstrate it would
  prepare such a file in the normal course when evaluating and preparing for an acquisition.[9]
  The Bank has not produced its full deal file for the Frank acquisition.

- **JPMC internal investigation materials**. The Government produced JPMC's memoranda
  summarizing "follow up interviews" of four Frank employees, including Ms. Javice, but
  failed to provide JPMC's memoranda or notes from any prior interviews with these
  individuals. Also missing are records of the interview of an employee described in the
  JPMC and criminal complaints as Frank's "Director of Engineering." JPMC. Compl. ¶¶ 8,
  74–76; Crim. Compl. ¶ 22–23.[10] In addition, individuals who conducted JPMC's internal
  investigation, including the lead investigator, are not on JPMC's custodian list.

- **Integration documents**. After the acquisition, Frank employees prepared monthly
  Business Unit Review ("BUR") presentations for JPMC decisionmakers on the status of
  Frank's integration efforts. During these monthly BUR presentations, Frank and JPMC
  discussed Frank's growth in user numbers and compliance concerns, among other issues.
  While JPMC's productions contain certain BUR presentations, others from critical months
  leading up to Defendants' termination are missing.

- **Internal JPMC communications**. The Government has produced only a scant selection
  of the Bank's "internal" communications—documents and communications exchanged
  between and among JPMC employees outside of the presence of Defendants or other
  former Frank employees. The Government has not produced *any* discussions among key

---

[9]    *E.g.*, Ex. D, Transaction Overview Template.

[10]    Both JPMC and the Government relied upon this Director of Engineering to purportedly recall
the sum, substance, and exact quotations from a discussion with Ms. Javice and Mr. Amar.
*Compare* JPMC Compl. ¶¶ 75–76 (describing this witness's alleged conversation with defendants
and his subjective reaction thereto), *with* Crim. Compl. ¶ 22 (Special Agent Jeremy Rosenmann
introducing a ten-sub-paragraph description of the same conversation described in the JPMC
Complaint as "based on my interview" of the witness).

Bank personnel regarding whether to purchase Frank, for what price, and for what short and long term investment thesis or "business case." It has not provided internal diligence materials (e.g., a diligence tracker) from JPMC. Nor does it plan to, apparently—the Government declined to require that JPMC search the files of the executives who actually made the decision to buy Frank, among the other key custodians.

These omissions are not incidental oversights, and yet the Government has made no effort to gather these fundamental documents and communications, which are plainly material to the defense, and of which the Government is almost certainly aware. Meanwhile, the Government seems content to rest its entire complaint (and theory of the case) on JPMC's cherry-picked set of documents. Indeed, it is no coincidence that JPMC's first four productions to the Government contain a mere 250 documents that significantly overlap with the documents referenced in the Government's complaint and that conveniently address nearly every aspect of the Government's allegations.

## ARGUMENT

In its delegation and deference to JPMC in connection with the Bank's response to grand jury subpoenas, the Government effectively has avoided its discovery and constitutionally mandated disclosure obligations (or, at least, allowed JPMC—a self-interested third party—to determine the scope of its obligations). The Government may not avoid its constitutional and Rule 16 obligations by willfully manufacturing blindness. Given the unique context of this case, including the extraordinary relationship between the Government and JPMC, justice here requires a finding that the Government has control over documents in JPMC's possession and therefore must produce relevant materials therein pursuant to its obligations under Rule 16 and *Brady*.

## I.   Due Process and Fundamental Fairness Protections of Rule 16 and *Brady* Require Broad Disclosure of Evidence Within the Government's Control

The Government's approach throughout this case has been to obtain selecte materials it desires for the purpose of making its case and to blindly accept JPMC's incomplete and curated

responses to its subpoenas, leaving the remaining relevant (and likely exculpatory) evidence undisclosed, a strategy recognized immediately by both this Court and the court presiding over the parallel SEC proceeding. *See* July 13, 2023 Hr'g Transcript ("July 13 Tr."), *United States vs. Javice*, No. 23-cr-00251, at 11:10-16 (S.D.N.Y. Mar. 31, 2022) (Hellerstein, J.) ("I can see the relevance of that information. Did JPMorgan rely on this information, from your point—from your account, reliance is suggested, but there may be items in the correspondence that show differently."); *see also* June 15, 2023 Hr'g Tr., *SEC v. Javice*, No. 23-cv-02795, at 24:13-24 (S.D.N.Y. Apr. 4, 2023) (Liman, J.) ("SEC Tr.") ("There might be a smoking gun. There might be an email where Ms. Javice said to J.P. Morgan, these customers are not yet real customers where we have information, identifying information."). The Government's conduct fundamentally contradicts the bedrock principles of the criminal justice system and the cornerstones of due process guaranteed under the Constitution that a criminal defendant is constitutionally entitled to be alerted to, and enabled to use, any and all evidence that may tend to be exculpatory relative to the charges. *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *United States v. Bagley*, 473 U.S. 667, 674 (1985); *United States v. Agurs*, 427 U.S. 97, 106–07 (1976); *Brady*, 373 U.S. at 86. Defendants should not be forced to face *criminal* charges with one hand tied behind their back.

Together, Rule 16 and *Brady* encapsulate principles of due process and fairness by obligating the Government to identify and turn over whatever evidence in its control that may tend to be material to the defense before trial. "Broad discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence." *United States v. McElroy*, 697 F.2d 459, 463–64 (2d Cir. 1982) (quoting Advisory Committee Notes to

the 1974 Proposed Amendments to Rule 16). In keeping with this principle, the Rules of Criminal Procedure "are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2.

"Rule 16 discovery is an important guarantor of simple fairness to defendants." *McElroy*, 697 F.2d at 463. It requires the Government to permit a defendant access to documents and other information "within the government's possession, custody, or control," if "(i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E); *United States v. Hossain*, No. 19-CR-606 (SHS), 2020 WL 6874910 at *2 (S.D.N.Y. Nov. 23, 2020). Materiality is not a high standard. A document is material if "it could be used to counter the government's case or to bolster a defense." *United States v. Clarke*, 979 F.3d 82, 97 (2d Cir. 2020) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)); *United States v. Weigand*, 482 F.Supp.3d 224, 243 (S.D.N.Y. 2020) (quoting *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017)). "[T]he documents need not directly relate to the defendant's guilt or innocence. Rather, they simply must play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal." *United States v. Rezaq*, 156 F.R.D. 514, 519 (D.D.C. 1994), *vacated in part*, 899 F.Supp. 697 (D.D.C. 1995) (citations omitted). "This 'low threshold' is satisfied if the information requested would have 'helped' [the Defendant] prepare a defense. *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016) (internal citations omitted).

The requirements of *Brady* are similarly grounded in fundamental fairness. As the court in *United States v. Wood* explained:

> The [*Brady*] duty arose from the unfairness of the government prosecuting a person on a criminal charge while keeping as a secret to itself material that might exonerate him. ***It is a duty that assumes that the government's aim in a criminal trial is not victory but justice***.

57 F.3d 733, 737 (9th Cir. 1995) (emphasis added). Under *Brady*, if a prosecutor knows of material evidence favorable to the defendant, the Government has a due process obligation to disclose it. *Brady*, 373 U.S. at 87; *Kyles*, 514 U.S. at 432; *see also United States v. Bagley*, 473 U.S. at 676 (explaining that [i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule"). Significantly, the "prosecutor has a duty to *learn* of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437 (emphasis added); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). For purposes of disclosure and *Brady* obligations, "[a] prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him." *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) (citing *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002); *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975)).[11]

The Government knows or should know that JPMC has not produced material information responsive to its subpoena, either because it is not searching files of critical custodians or because it is withholding non-privileged information. The Government therefore should be required to comply with its constitutional obligation to secure those materials and review them to ensure that

---

[11]    Whether JPMC's participation in this investigation makes it a part of the prosecution team under the unusual circumstances presented here is an open question. "Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual." *United States v. Meregildo*, 920 F. Supp. 2d 434, 4441 (S.D.N.Y. 2013). "[T]he more involved individuals are with the prosecutor, the more likely they are team members." *Id.* at 442. Additionally, indicia that the party consults with, aids in, or acts under the direction of the prosecution, including by helping to develop prosecutorial strategy, suggests they are an "arm of the prosecution." *Id.* Critically, an individual need not be a government official to be considered an "arm of the prosecution." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006).

proceeding with this prosecution comports with fundamental principles of justice. *See Kyles*, 514 U.S. at 437–38 (observing that *Brady* and *Bagley* impose upon the prosecution "a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case," and the prosecution's responsibility for failing "to disclose known, favorable evidence rising to a material level of importance is inescapable"). These authorities stand for the unremarkable proposition that prosecutors cannot knowingly or deliberately turn a blind eye to the existence of potentially exculpatory evidence because it may weaken their case. Yet that is precisely what is happening here.

## II.    The Government Has Control Over Material Documents in JPMC's Possession and Should Be Directed to Search for Rule 16 and *Brady* Material

### A.    Whether the Government Has Control Over—or the Practical Ability to Obtain—Documents Pursuant to Rule 16 is a Fact-Intensive Inquiry

Determining whether a party has the "practical ability" to obtain documents involves a "fact-intensive" inquiry, and "courts in the Second Circuit have looked to the existence of cooperative agreements or contracts between the responding party and non-party, the extent to which the non-party has a stake in the outcome of the litigation and the non-party's past history of cooperating with document requests." *Signify N. Am. Corp. v. Satco Prod., Inc.*, No. 19-CV-6125 (JMA)(SIL), 2020 WL 9455192, at *3 (E.D.N.Y. Oct. 22, 2020); *Royal Park Invs. SA/NV.*, No. 14-cv-04394, 2016 WL 5408171, at *9 (S.D.N.Y. Sept. 27, 2016); *In re Turkey Lake, LLC*, No. 15-12091, 2021 WL 4189696, at *7 (Bankr. N.D.N.Y. Sept. 14, 2021); *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-cv-6608 (PKC)(JCF), 2014 WL 61472, at *3 (S.D.N.Y. Jan. 6, 2014). Likewise, the principle of "control" is straightforward and informed by practical realities. The Government is deemed to have control over documents that it has the practical ability and legal right to obtain under the circumstances presented. *See United States v. Stein*, 488 F.Supp.2d 350, 363 (S.D.N.Y. 2007); *United States v. Noel*, No. 19-cr-830-2 (AT), 2020 WL 12834537, at *2

(S.D.N.Y. June 9, 2020); *Dietrich v. Bauer*, No. 95-cv-7051(RWS), 2000 WL 1171132, at *3–4 (S.D.N.Y. Aug. 16, 2000).

In *United States v. Stein*, Judge Kaplan held that the Government's Rule 16 discovery obligations extended to documents possessed by nonparty KPMG, where the Government had the "unqualified right" to demand such documents from KPMG pursuant to a DPA. *See* 488 F. Supp. 2d at 360. Judge Kaplan explicitly rejected the argument that the Government advances here: that it has no obligation under Rule 16 unless documents are within its physical possession at the moment of a demand for discovery under Rule 16(a). *Id.* at 369. That argument, Judge Kaplan found, "would read the words 'custody or control' out of the rule in flat contravention of the principle that all words in a statute, rule or contract are to be given meaning whenever possible." *Id.* at 363. "It therefore is not surprising," the Court reasoned, "that every circuit to have considered the question has held that 'control' under the federal rules of procedure includes the legal right to obtain the documents in question," also observing that "[t]here is no hint in the history of these rules that the meaning of the phrase differs depending upon which rule is in question." *Id.* at 361; *see also In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 478 (S.D.N.Y. 2017).

The *Stein* court concluded that because the DPA "obliges KPMG to cooperate extensively with the government," the DPA gave the Government "possession, custody or control of documents that are within the hands of KPMG and its agents." *See* 488 F. Supp. 2d at 353, 360 (internal quotation marks omitted). Accordingly, pursuant to Rule 16, the Government was directed to produce all responsive, nonprivileged KPMG documents that were material to the defense. *Id.* at 363-64.

*Stein* is not alone in its treatment of Rule 16 obligations as informed by the practical and legal relationship between the Government and the third party possessing the documents. In

*United States v. Kilroy*, too, the court refused to endorse an overly literalist interpretation of the technical distinctions between Rule 16 and Rule 17 where the circumstances revealed that the history of cooperation between the government and the third party gave the government the practical ability to obtain—or at least attempt to obtain—the requested documents from the third party's files. *See* 523 F. Supp. 206, 215 (E.D. Wis. 1981).  That court noted that since third-party "Standard Oil is cooperating with the Government in the preparation of the case and is making available to the Government for retention in the Government's files any records which Standard Oil has and which the Government wants . . . it is not unreasonable to treat the records as being within the Government's control at least to the extent of requiring the Government to request the records on the defendant's behalf and to include them in its files for the defendant's review if Standard Oil agrees to make them available to the Government." *Id*. at 214.  As discussed further below, the facts present here not only meet, but exceed, the factual circumstances in *Kilroy*.

The principles articulated in *Stein* have since been affirmed in numerous cases in this jurisdiction, both in the criminal and civil context. *See, e.g.*, *S.E.C. v. Strauss*, No. 09 Civ. 4150 (RMB)(HBP), 2009 WL 3459204, at *8 (S.D.N.Y. Oct. 28, 2009) (noting that the SEC "appears to have the legal right to obtain the materials in [a] database by virtue of [an] agreement"); *Noel*, 2020 WL 12834537, at *2 ("[A]ctual possession [is not] necessary if the party has control of the items" and "'[c]ontrol has been defined to include the legal right to obtain the documents requested upon demand.  The term 'control' is broadly construed.'") (quoting *Stein*, 488 F. Supp. at *361); *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 333 F.R.D. 60, 64 (S.D.N.Y. 2019) ("A party also has control over material that it has a legal right to obtain"); *N. Mariana Islands v. Millard*, 287 F.R.D. 204, 211 (S.D.N.Y. 2012) ("'Control,' it seems to the Court, is a much broader concept than possession or constructive possession—or custody[]" and includes "'the legal right, authority

or practical ability to obtain the materials sought upon demand.'" (quoting *Stein*));  *Adorama, Inc.*, 2014 WL 61472, at \*3 ("The term control in the context of discovery is to be broadly construed" to include practical ability to obtain the documents, which looks to "the existence of cooperative agreements or contracts between the responding party and non-party, the extent to which the non-party has a stake in the outcome of the litigation, and the non-party's past history of cooperating with document requests.").[12]

*Stein* and its progeny therefore plainly establish that control is to be construed "broadly" in discovery, and that it includes *both* the "legal right" and "practical ability" to obtain documents from a party in possession of documents under the factual circumstances presented.  As discussed further below, both factors are amply present here.

**B.    The Government Has Control Over JPMC's Documents**

The Government is in "control" of JPMC's documents because of: (a) the Government's broad subpoena requests to the Bank; (b) the Government's yielding of its investigation to JPMC; (c) JPMC's financial and reputational incentives in the outcome of prosecution, influencing the

---

[12]   Defendants do not, and need not, contend that *Stein* stands for the broad proposition that any documents possessed by a subpoena target or cooperating witness are automatically deemed under government control.  Indeed, there are cases rejecting so broad an interpretation, and rightly so, under circumstances that are factually distinct from this case.  *See, e.g., United States v. Hwa*, No. 18-CR-538 (MKB), 2021 WL 11723583, at \*57 (E.D.N.Y. Sept. 3, 2021) (refusing to apply *Stein* to compel production of all documents in third party's files that could potentially comprise *Brady* or Rule 16 material under "arm of prosecution" theory where company was not under grand jury subpoena, had less than one year history of cooperation, and represented it had already produced all relevant materials compelled by DPA); *Meregildo*, 920 F. Supp. 2d at 443  (noting, in the context of an arm of the prosecution motion, that "*Stein* does not address the Government's *Brady* obligations," where information in the possession of a friend of a cooperating witness, who was not under subpoena or subject to a DPA, and where defendant already had possession of the allegedly withheld materials, was deemed outside the government's control for Brady purposes); *United States v. Raheja*, No. 1:19-CR-559, 2020 WL 7769725 (N.D. Ohio Dec. 30, 2020) (declining to apply *Stein* under Ohio law to third-party co-conspirator under limited DPA whose interests in the case did not align with the government's).

course of the Government's investigation; and (d) JPMC's past history of cooperation with the Government. *See, e.g.*, *Signify N. Am. Corp.*, 2020 WL 9455192, at *3 (observing that, in assessing practical ability to obtain documents, "courts in the Second Circuit have looked to the existence of cooperative agreements or contracts between the responding party and non-party, the extent to which the non-party has a stake in the outcome of the litigation and the non-party's past history of cooperating with document requests"); *United States v. Tomasetta*, 10 CR 1205 (PAC), 2012 WL 896152, at *4 (S.D.N.Y. Mar. 16, 2012) (explaining that cooperating nonparties are not within the government's control absent a written agreement in part because "cooperating parties have their own sets of interests—namely, avoiding prosecution—that 'are often far from identical to—or even congruent with—the government's interest in justice being served'"); *Kilroy*, 523 F. Supp. At 215 (holding that documents in the possession of a cooperating company, which produced any records requested by the Government on demand, were "practically speaking, within the Government's control"). While Defendants acknowledge JPMC has not been under a DPA (in connection with *this* case), the Government has demonstrated repeatedly its practical control over the documents Defendants are seeking, and, for the same reasons *Stein* considered, it must produce them.

1.    The Government Has Control Over Material Documents in JPMC's Possession

The Government has subpoenaed from JPMC "███████████████████████████ ███████████████" Yet the Government, with the apparent cooperation of JPMC, has decided to enforce its subpoenas selectively, heedless of the importance of that material to any fair investigation, and to the defense, delegating largely to JPMC the discretion to determine how and to what extent it chooses to comply. Indeed, the Government's and JPMC's coordinated position seems to be that the Government will refuse to obtain physical possession of the relevant

documents, but also will object to issuance of Rule 17 subpoenas by the defense seeking to obtain the materials directly from JPMC.

Although a grand jury subpoena alone does not necessarily give the Government "control" over all documents in the subpoena target's possession, the circumstances here do. Specifically, the Government has on multiple occasions stalled the issuance of a Rule 17 subpoena to JPMC for the materials Defendants seek on the ground that the Government was in a position to compel production of those documents.[13] That objection functions as an admission that the Government indeed has a legal right and practical ability to obtain the documents within the definition of Rule 16. *Stein*, 488 F. Supp. 2d at 365. Specifically, in *Stein*, the Government argued against the issuance of a Rule 17(c) subpoena to KPMG on the grounds that it would request the documents itself from KPMG and provide them to the defense. *Id.* In doing so, the Court found that the Government had made a "tacit acknowledgement—which subsequently has been made explicit— that the government has the legal right to require KPMG to produce documents for the purposes of enabling the government to disclose them to the defense." *Id.*

Here, at the July 13, 2023, status conference, counsel for Ms. Javice explained that the Government had yet to produce "the internal communications of the JPMorgan side of" the merger—which counsel expected to be exculpatory. July 13 Tr. at 9:9–19. The Court—explicitly acknowledging the relevance of those materials—asked the Government, "Are you intending to produce that information?" *Id.* 9:25–10:1. AUSA Fergenson replied, "Yes, your Honor." *Id.* 10:2. The Court even asked the Government if the materials were being produced pursuant to a grand

---

[13]    The Government even advocated for staying the parallel case brought by the SEC—and avoiding Rule 45 subpoena practice in that matter—on grounds that such discovery would be "essentially moot because again Defendants are getting the documents." *See* June 15, 2023 Hr'g Tr., *SEC v. Javice*, No. 23-cv-02795, at 10:15-16 (S.D.N.Y. Apr. 4, 2023).

jury subpoena and, upon receiving an affirmative response, stated that a Rule 17 subpoena was unnecessary in light of the forthcoming production. *Id*. at 10:24-12:4 ("All right. It doesn't seem to me a third-party subpoena is necessary, Mr. Spiro, but this is information obtained by the government to the extent it exists in the files of Chase Manhattan, Morgan Chase, and produced to you.").

At the following conference, the Government, again, indicated it would consider the omissions Defendants had identified in the documents JPMC was searching and producing, namely critical omissions in the custodians JPMC had identified. *See* August 23, 2023 Hr'g Tr. ("Aug 23 Tr."), *United States vs. Javice*, No. 23-cr-00251, at 13:3–7 (S.D.N.Y. Mar. 31, 2022) (AUSA Mcleod: "The devil is in the details, I think, because there are claims about things that are missing. Those names have never been given to the government and we have talked to defense counsel many times about this, ***so if they want to explain to us so we can concretely look at things*** . . . ." (emphasis added). Despite the Court's invitation, the Government did not object to the Court's discovery procedure designed *explicitly to avoid* issuing Rule 17 subpoenas:

> THE COURT: Ms. McLeod?
>
> MS. MCLEOD: Your Honor, as you know, defendants are not entitled to tell a responding third-party how to respond to a subpoena. If they have their own subpoena that might be a different question if they want to work something out.
>
> THE COURT: Don't invite them to have their own subpoena because it is going to take more time.
>
> MS. MCLEOD: That's fair, your Honor.

*Id.* 10:20–11:2. The Government never suggested that it or JPMC would refuse to consider Defendants' additional custodians, as the Court clearly intended. To the contrary, when the Court stated that it would be in control of the discovery procedures, Ms. McLeod responded, "That is absolutely correct, your Honor." *Id.* 11:3–17.

Thus, despite suggesting to Defendants and the Court on multiple occasions that it would compel production of critical, exculpatory documents from JPMC to avoid Rule 17 subpoena practice (and therefore tacitly conceding its "control" over those documents), the Government now insists that it need not—and purportedly cannot—produce any *Brady* or responsive materials that remain in JPMC's, and not the Government's, physical possession.[14] But this formalistic excuse masks what practically amounts to an exercise of whack-a-mole, where the Government is artificially limiting its possession of materials through coordination with JPMC (or others), while Defendants attempt in vain to identify what is missing. Defendants long ago put the Government on notice of the deficiencies in JPMC's subpoena compliance, including its failure to produce documents from key merger decision-makers and even JPMC personnel identified in the Government's own complaint.[15] But the Government has put its hands over its eyes and ears and claimed that the defense may not "interject itself" into the Government's subpoenas to JPMC. The Government expressed that it has no intention of doing anything more. *See* Sept. 26 Tr. at 9:19-22 (D. McLeod: "We are not agreeing to [Defendants'] request that we have to do anything related

---

[14] Only at the most recent status conference did the Government change its position and argue that Defendants must use a Rule 17 subpoena to obtain the critical, exculpatory information they seek. Sept. 26 Tr. at 12:12–16, *United States vs. Javice*, No. 23-cr-00251, at 11:10-16 (S.D.N.Y. Mar. 31, 2022) ("The government's obligation is to turn over the Rule 16 in our possession. That's what we're entitled to do. Just to put a finer point on this, the defendants have a means under the rules if they want to seek this information. That is a Rule 17 subpoena."). As discussed *supra*, this Court indicated such a subpoena would be premature, and Defense counsel raised the gamesmanship described herein: "It's not only premature, but on multiple occasions in front of your Honor—in fact, at both meaningful discovery conferences, at one I said we can prepare one immediately for your Honor, and government and the Court had a colloquy, and it was deemed not to be necessary because at least there would be a good-faith meeting of their obligations to provide this stuff. At the last court appearance, your Honor said don't invite them to do their own subpoena because it's going to take more time. Ms. McLeod said that's fair." *Id.* at 15:1–9.

[15] While the Government will surely cite the 149 custodians JPMC identified, many of these custodians are facially irrelevant. For example, among those people that JPMC did produce documents from are various administrative and tech support listservs, contractors who departed Frank long before the merger, and even a student intern.

to the custodian list.").

These are not marginal, or technical, omissions. They are seemingly deliberate and involve **materials whose relevance is plain as day to each Judge in this Court to have considered Defendants' legitimate request that the Government produce all exculpatory information**. *See* June 15, 2023 Hr'g Tr., *SEC v. Javice*, No. 23-cv-02795, at 24:13-24 (S.D.N.Y. Apr. 4, 2023) (Liman, J.) ("There might be a smoking gun. There might be an email where Ms. Javice said to J.P. Morgan, these customers are not yet real customers where we have information, identifying information. And the SEC said to them, you know what, hold back on that document."); July 13 Tr. at 11:10-16 ("I can see the relevance of that information. Did JPMorgan rely on this information, from your point -- from your account, reliance is suggested, but there may be items in the correspondence that show differently."). The Government has strung Defendants along long enough.

2.    <u>The Government Has Yielded Critical Portions of Its Investigation to JPMC</u>

The Government's and JPMC's conduct affirm the Government's "practical ability" to obtain documents from JPMC. The Government and JPMC have coordinated about the subject matter of this case—which JPMC was then itself investigating—since at least October 2022, prior to the filing of these charges and JPMC's civil lawsuit, and while Defendants were still employed by JPMC.[16] Since then, JPMC has provided the Government with curated sets of documents, access to witnesses, and suggestions as to targets for third-party subpoenas, all while withholding obviously relevant documents and advancing dubious privilege assertions. *See supra* n. 6; *see also*

---

[16]   Defendants believe that the Government and JPMC began coordinating even earlier than 2022, which is why they have requested, in the alternative, authority to issue a Rule 17 subpoena seeking information about the Government's and JPMC's communications regarding this matter. *See infra* Section III.

*JPMorgan Chase Bank, supra*, D.I. 28 –31, 16, 39 (JPMC's motion, and subsequent briefing from the parties on the motion, to lift the stay in effect pursuant to 15 U.S.C. § 78u–4(b)(3)(B) in order to obtain discovery into Ms. Javice's assets).  Indeed, as explained above, **the evidence of the Government's reliance on JPMC's investigative efforts is extensive**:

- In October 2022, JPMC was pressuring Ms. Javice and Mr. Amar into "confidential" interviews while they were still employees of the Bank. *See United States v. Connolly*, 2019 WL 2120523 at *4-5 (S.D.N.Y. May 2, 2019).

- That same month, the Government issued a subpoena to JPMC for bank records of Ms. Javice, Mr. Amar, and "Scientist-1."

- The Government filed a criminal complaint largely mirroring JPMC's civil complaint based on JPMC's own investigation of the allegations in this matter.

- JPMC's initial productions appear to be a curated set of documents that JPMC apparently views as the most inculpatory in the case and on which the Government relied in drafting its civil complaint.

- JPMC notified the Government of Defendants' outreach to a potential witness and former employee of JPMC and provided the Government with documents JPMC deemed relevant for the Government's interview of said witness. Meanwhile, the Government has not required JPMC to include this individual as a custodian and search his files, notwithstanding the custodian's obvious relevance to the case and to the Defense.

- The Government has acquiesced to JPMC's selection of custodians and document selection, notwithstanding glaring omissions in both.

- To date, the Government has declined to challenge JPMC's 13,000+ privilege assertions and is instead relying on JPMC to re-review and see if any of the privileged communications "fall off" their privilege log.

On this record, one thing is clear: the Government has taken JPMC's lead and abrogated critical parts of its investigation to JPMC.  This dynamic is the issue raised in *Connolly* but in reverse.  There, federal agencies violated defendants' Fifth Amendment rights when they directed how Deutsche Bank attorneys conducted their internal investigation, essentially telling them "what to do and about how to do it." *Id.* at *2.  During the five years of Deutsche Bank's internal investigation in *Connolly*, the government did not conduct a substantive parallel investigation; it simply gave direction to Deutsche Bank and took the results of their labor.  *Id.* at *9.  Here, the

Government has adopted JPMC's investigation as its own, yet it need not give any direction to JPMC because JPMC has significant financial and reputational incentives to see that the Government's case against Ms. Javice and Mr. Amar succeeds.

       3.     JPMC Has Reputational and Financial Incentives for the Government to Succeed in Its Prosecution

In determining whether a party controls documents possessed by a non-party, courts "have examined various relevant factors, including . . . the non-party's connection to the transaction at issue; and whether the non-party stands to benefit from a favorable litigation outcome." *Vacco v. Harrah's Operating Co.*, 2008 WL 4793719 (TJM)(DEP), at *10 (N.D.N.Y. Oct. 29, 2008) (holding that this inquiry is "inherently fact specific"). What makes the Government's wholesale abdication so troubling is that it allowed an interested third party—one with a substantial reputational and financial stake in the Government's success—to run point. The press coverage of this case has been prolific and likely embarrassing to JPMC, with many questioning apparent failures of the world's most significant financial institutions. Indeed, JPMorgan's CEO had to admit to shareholders and the public that the Bank "made a huge mistake." Tr. at 13, JPMorgan Chase & Company, Q4 2022 Earnings Call (January 13, 2023).

JPMC's pending civil suit, which seeks substantial monetary relief, demonstrates its financial interest in this matter. JPMC's incentives to cherry-pick evidence against Ms. Javice and Mr. Amar are striking, and the Government's failure to scrutinize JPMC's decision-making on account of those incentives is even more so. *Cf. Tomasetta*, 2012 WL 896152 at *5–6 (holding that the government did not breach its Rule 16 discovery obligations where, among other things, it was not "even aware of the possible existence" of the documents sought by the defendants and once the government was made aware of the documents, it "promptly disclosed and produced the materials.").

4.    JPMC Has a History of Cooperation with the Government

Among the factors courts in this Circuit examine in determining whether a party has the practical ability to obtain documents from a non-party to the litigation is the "non-party's past history of cooperating with document requests." *Signify N. Am. Corp.*, 2020 WL 9455192, at *9. Until September 29, 2023,[17] JPMC was subject to a deferred prosecution agreement (the "DPA") that its parent company entered into with the U.S. Department of Justice, Criminal Division, Fraud Section ("Fraud Section"), and the U.S. Attorney's Office of Connecticut ("USAO-Connecticut"). Ex. E, DPA at 34.  The DPA required JPMC to cooperate fully with any future investigations or prosecutions initiated during the life of the DPA, including making employees and officers available for interviews, producing documents upon request, and agreeing to proactively disclose instances of malfeasance.  *Id.*  As if JPMC's own financial and significant reputational incentives were not enough to warrant the highest level of cooperation with the Government (they are), its broad cooperation obligation under the DPA also provided the Government with an additional layer of control over material documents in JPMC's physical possession.  *See Stein*, 488 F. Supp. 2d at 363–64 (finding that the DPA gave the government "the possession, custody or control" of documents in KPMG's possession).

III.    **The Court Has Both Statutory And Inherent Authority Over The Discovery Process To Further The Ends Of Justice**

Defendants' request is well within the powers of this Court, which has the statutory and inherent authority over the discovery process in criminal prosecutions to further the ends of

---

[17]  This DPA was active when the Government issued its grand jury subpoenas to JPMC and during the time in which JPMC should have already completed its production.  *See* Aug. 23 Tr. 9:9–14 ("The Court: I'm not very pleased with the slow procedures being used by JP Morgan. . . . [T]his is also a criminal case and it deserves priority, not only between you and me, but also with the party subpoenaed.  What can you do to hasten their production?").

justice.[18]  *See, e.g.*, Fed. R. Crim. P. 16(d)(2)(A) & (d)(2)(D) (providing that, when the government fails to satisfy its obligations hereunder, the Court may order the government to provide the requested discovery or "enter any other order that is just under the circumstances"); *United States v. Jackson*, 508 F.2d 1001, 1006 (7th Cir. 1975) ("[T]he district court possesses, in the exercise of its inherent power to promote the proper administration of criminal justice, the authority to" order discovery beyond that provided by the federal rules or statute); *United States v. Gallo*, 654 F. Supp. 463, 467, 471 (E.D.N.Y. 1987) ("The rules are intended, and must be construed, to 'enhance a just determination,' not to inhibit it. '[T]here must necessarily be some inherent authority in the federal courts' to order discovery by the government 'when dictated by compelling circumstances.'") (internal citations omitted).

For the reasons stated above, justice here requires that the Government search and produce all documents within its control, including those within JPMC's possession and to which the Government is entitled, but has turned a blind eye.  This includes relevant, material, and likely exculpatory files belonging to the critical custodians Defendants' have identified, internal assessments by JPMC about the Frank acquisition, non-privileged communications that JPMC is withholding without a legal basis to do so, among others.  *See supra* p. 11 (describing a few of the missing categories of documents material to the defense).  Defendants should not be forced to proceed to trial without these documents and the ability to defend themselves fairly.

---

[18]   When attempting to pursue this very same information in the civil matter with the SEC, Judge Liman explicitly suggested this is a matter that squarely falls to the criminal Court to address. SEC Tr. 20.

**IV.    In The Alternative, the Court Should Grant Defendants the Authority to Issue a Limited Rule 17(c) Subpoena Regarding the Government's Control of JPMC and Its Documents**

The circumstances of this case provide more than adequate grounds to compel the Government to search and produce all relevant and material documents from JPMC under Rule 16. Though Defendants are entitled to this information now, if the Court is of the view that Defendants have not sufficiently shown the Government's control, Defendants move in the alternative for the issuance of a subpoena to JPMC pursuant to Federal Rule of Criminal Procedure 17(c), seeking all communications exchanged between JPMC and the Government related to JPMC's investigation of and the Government's investigation and prosecution of Ms. Javice and Mr. Amar from September 2022 to the present.[19] Defendants expect such communications will show that JPMC is effectively acting as part of the prosecution team by further establishing that the Government has relied only on the fruits of JPMC's investigation and delegated its own investigation to JPMC such that further production under Rule 16—as described above—is required.

The materials sought by Defendants in the attached subpoena are the proper subject of subpoenas pursuant to Rule 17(c). Rule 17(c) authorizes the Court to "direct the witness to produce the designated items in court before trial or before they are to be offered in evidence" so long as the production would not be "unreasonable or oppressive." Fed. R. Crim. P. 17(c); *see also United States v. Goldstein*, No. 21-CR-550 (DC), 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (subpoena must be "(1) reasonable, construed as 'material to the defense' and (2) not unduly

---

[19]  As noted in n.2, supra, if the Court is not inclined to grant any of the relief requested herein, Defendants intend to seek disclosure of the information pursuant to broader Rule 17(c) subpoenas.

oppressive for the producing party to respond." (citing *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008))).

Second Circuit authority does not require application of the more stringent standard espoused in *United States v. Nixon*, 418 U.S. 683 (1974) in circumstances such as these, namely, where Defendants seek limited documents from a third party on a discovery dispute that is essential to the discovery of documents material to the defense (as well as potential *Brady* and *Giglio* materials). *See, e.g.*, *United States v. Weigand*, 520 F. Supp. 3d 609, 613 (S.D.N.Y. 2021) (Rakoff, J.) (explaining that Second Circuit authority does not require application of the *Nixon* standard and finding it should not apply to subpoenas issued by a defendant to non-parties) (citing *United States v. Bergstein*, 788 F. App'x 742, 746 (2d Cir. 2019)); *United States v. Goldstein*, No. 21-CR-550 (DC), 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (opining that a "standard less stringent than *Nixon* is appropriate" for subpoenas issued by defendants to non-parties).[20]  And even if it did, Defendants' request still satisfies that standard.

The information Defendants seek is not only material, but necessary for Defendants' access to information that is crucial to their defense. Defendants' request is not "unduly oppressive"— Defendants seek a specific and narrowly tailored set of communications and related documents reflecting JPMC's and the Government's communications about the investigations and prosecutions of Defendants.  Given the time frame is only one year, the request is not overly burdensome.

---

[20] *See also United States v. Soliman*, No. 06-CR-00236A, 2009 WL 1531569, at *4 (W.D.N.Y May 29, 2009) (applying less stringent standard and granting request to issue subpoenas); *Tucker*, 249 F.R.D. at 66 (S.D.N.Y. 2008) (same); *United States v. Nachamie*, 91 F. Supp. 2d 522, 563 (S.D.N.Y. 2000) (same).

Defendants' request also satisfies *Nixon*'s admissibility standard: any materials sought will be admissible at a subsequent evidentiary hearing on whether the Government has outsourced its investigation to JPMC such that it should be required to search and produce documents under Rule 16. *See Weigand*, 520 F. Supp. 3d at 615 ("While admissibility is the second *Nixon* factor, Rule 17(c) does not by its terms require that a subpoena seek only admissible evidence. A subpoena for evidence, itself inadmissible, that could lead to the discovery of admissible evidence, is not necessarily 'unreasonable or oppressive.'"); *cf. United States v. Smith*, No. 19-CR-00669, 2020 WL 4934990, at *3-4 (N.D. Ill. Aug. 23, 2020) (declining to adopt a "bright-line admissibility requirement" for subpoena issued to third party) ("[E]ven *Nixon* did not require absolute certainty on admissibility or absolute precision in specificity. . . . The key is weighing the likelihood that the subpoena will uncover relevant evidence and the potential probative force of that evidence, against the burdens on complying.").

The record available to Defendants to date contains sufficient evidence that the Government has outsourced its investigation to JPMC, which has a significant financial incentive in the Government's successful prosecution of Defendants. Nevertheless, Defendants have only limited insight into the Government's and JPMC's relationship and course of conduct and respectfully contend that, should the Court find the current record insufficient to order discovery pursuant to Rule 16, Rule 17 is an appropriate discovery tool for this issue. Determination of the nature of JPMC's cooperation is crucial given that the Government has not provided Defendants with all documents responsive to its subpoenas, and JPMC may be holding back potential *Brady* and *Giglio* materials. And by relying wholesale on JPMC's say-so, the Government is avoiding its discovery and disclosure obligations. Defendants therefore urge the Court—in the event that it does not see fit to grant the relief sought by Defendants under Rule 16 and *Brady*, *Giglio*, and their

progeny—to issue the attached Rule 17(c) subpoena so that the extent and nature of the Government and JPMC's cooperation can be appropriately assessed.

## CONCLUSION

For these reasons, Defendants Charlie Javice and Olivier Amar respectfully request that this Court compel the Government to (a) enforce its subpoenas to JPMC at least to the extent of ensuring production of all documents material to the preparation of the defense in this case, or satisfying the standard for production set by *Brady*, *Giglio*, and their progeny, and (b) advance objections to JPMC's assertions of privilege proposed by Defendants through good faith conferral.

Dated:  October 13, 2023

Respectfully submitted,

/s/ *Sean S. Buckley*
Sean S. Buckley
Steven G. Kobre
Alexandria E. Swette
Ana Frischtak
KOBRE & KIM LLP
800 Third Ave
New York, New York 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220
Sean.Buckley@kobrekim.com
Steven.Kobre@kobrekim.com
Alexandria.Swette@kobrekim.com
Ana.Frischtak@kobrekim.com

Sydney Sgambato Johnson (pro hac vice)
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Telephone: (202) 664-1900
Facsimile: (202) 664-1920
Sydney.Johnson@kobrekim.com

*Counsel for Defendant Olivier Amar*

/s/ *Alex Spiro*
Alex Spiro
Maaren A. Shah
Samuel Nitze
JP Kernisan
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10038
Tel: 202-538-8122
Fax: 202-538-8100
alexspiro@quinnemanuel.com
maarenshah@quinnemanuel.com
samuelnitze@quinnemanuel.com
jpkernisan@quinnemanuel.com

*Attorneys for Defendant Charlie Javice*

**APPENDIX A**

**DEFINITIONS**

1.      "**Acquisition**" means J.P. Morgan Chase Bank's purchase of Frank, pursuant to the terms of the Agreement and Plan of Merger dated August 8, 2021.

2.      "**All/Any/Each**" have the meaning ascribed to those terms in S.D.N.Y Local Rule 26.3 and shall each be construed as encompassing any and all.

3.      "**Communications**" has the meaning ascribed to that term in S.D.N.Y Local Rule 26.3 and means "the transmittal of information (in the form of facts, ideas, inquiries or otherwise).".

4.      "**Concerning**" has the meaning ascribed to that term in S.D.N.Y Local Rule 26.3 and means "relating to, referring to, describing, evidencing or constituting."

5.      "**Criminal Matter**" shall mean the case captioned *United States v. Javice*, 23 Cr. 251 (AKH).

6.      "**Defendants**" means Charlie Javice and Olivier Amar.

7.      "**Documents**" has the meaning ascribed to that term in S.D.N.Y Local Rule 26.3 and Federal Rule of Civil Procedure 34(a)(1)(A) and means any "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained directly, or, if necessary, after translation by the responding party into a reasonably usable form."

8.      "**Frank**" means TAPD, Inc. d/b/a Frank.

9.      "**Government**" means the United States Attorney's Office for the Southern District of New York or the United States Securities and Exchange Commission, and/or any affiliated entity, as well as any agents, attorneys, employee(s), representative(s), or any other Person(s) acting or purporting to act on the United States of America's behalf.

10.     "**Including**" shall not be construed to limit any request to the items enumerated after such term but instead shall be construed to mean "including but not limited to" or "including without limitation."

11.     "**JPMC**" means JPMorgan Chase Bank, N.A. and/or any affiliated entity, as well as any agents, attorneys, employee(s), representative(s), or any other Person(s) acting or purporting to act on JPMC's behalf.

12.     "**Person**" has the meaning ascribed to that term in S.D.N.Y Local Rule 26.3 and means "any natural person or any legal entity, including, without limitation, any business or governmental entity or association."

13.     "**Relevant Time Period**" means the time period from September 1, 2022, to the present, unless otherwise specified.

1

14.     "**SEC Matter**" shall mean the case captioned *Securities and Exchange Commission v. Javice*, 1:23-cv-02795 (DLC).

15.     "**Subpoenas**" shall mean the grand jury subpoenas dated October 13, 2022, January 9, 2023, January 31, 2023, February 3, 2023, February 22, 2023, February 28, 2023, May 4, 2023, issued by the grand jury to JPMC in connection with *United States v. Javice*, 23 Cr. 251 (AKH).

16.     "**You**" has the same meaning as "JPMC," defined above.


## INSTRUCTIONS

1.     In addition to the requirements set forth in the S.D.N.Y. Local Rules, which are incorporated herein by reference, the following instructions apply to each Request.

2.     Documents that are in paper form or that constitute other physical objects from which recorded information may be visually read, as well as audio or video tapes or text messages or similar recordings, should be produced in their original form or in copies that are exact duplicates of the originals.

3.     Computer files and similar electronic records should be produced in a readable and text-searchable form with the metadata fields reflected in Exhibit 1. Any password-protected Documents shall be produced with applicable passwords.  Any Documents that contain color shall be produced in color.

4.     Each page of all Documents produced must be marked with a unique identifier or "Bates Number."

5.     Unless otherwise specified, the requests below apply for the entirety of the Relevant Time Period.

6.     This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below, such as, for example, Documents maintained by your counsel.

7.     To the extent there are no responsive Documents to a particular Request, please indicate that in your response. If a Document once existed and has been lost, destroyed, or is otherwise missing, please provide sufficient information to identify the Document and the details concerning its non-existence.

8.     To the extent that a Document otherwise responsive to any of the Requests is withheld on the ground(s) that it is subject to the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege, please provide a log that identifies each such document and the specific reason for which it is being withheld in sufficient detail to allow assessment of the validity of the withholding.

9.      If you redact any portion of a Document, please stamp the word "REDACTED" on each portion of the Document that contains redactions and provide the reason for the redactions in sufficient detail to allow assessment of the validity of the claim for redaction.

## **DOCUMENT REQUESTS**

1.      All Communications and Documents exchanged between JPMC and the Government during the Relevant Time Period concerning Charlie Javice, Olivier Amar, Frank, the Acquisition, and the subsequent integration of Frank into JPMC, excluding any documents formally produced by JPMC to the Government, and then on to Defendants, in connection with the Criminal Matter or the SEC Matter.

2.      All Communications and Documents exchanged between JPMC and the Government during the Relevant Time Period regarding JPMC's investigation into Charlie Javice, Olivier Amar, Frank, the Acquisition, and the subsequent integration of Frank into JPMC, excluding any documents formally produced by JPMC to the Government, and then on to Defendants, in connection with the Criminal Matter or the SEC Matter.

3.      All Communications and Documents exchanged between JPMC and the Government during the Relevant Time Period regarding the Government's investigation into Charlie Javice, Olivier Amar, Frank, the Acquisition, and the subsequent integration of Frank into JPMC, excluding any documents formally produced by JPMC to the Government, and then on to Defendants, in connection with the Criminal Matter or the SEC Matter.

4.      All Communications and Documents exchanged between JPMC and the Government during the Relevant Time Period regarding the Criminal Matter or the SEC Matter that have not been formally produced by JPMC to the Government, and then on to Defendants, in connection with those matters.

5.      All Communications and Documents exchanged between JPMC and the Government during the Relevant Time Period regarding the Subpoenas and JPMC's response to the Subpoenas, excluding any documents formally produced by JPMC to the Government, and then on to Defendants, in connection with the Criminal Matter or the SEC Matter.

6.      All written or electronic notes of oral Communications between JPMC and the Government during the Relevant Time Period concerning the topics in Requests 1–5 above.

## EXHIBIT 1

### Production of ESI

**Image Production Standard.** Except as provided herein, the parties shall produce all non-database ESI and hard copy documents in TIFF format. All TIFF formatted documents will be single-page, black & white, TIFF files. All TIFF images shall be produced in a folder named "**IMAGES**," which shall contain sub-folders named "0001," "0002," etc. Images from a single document shall not span multiple sub-folders.

**Production of Native Files.** For documents and ESI whose native format is MS Excel, MS PowerPoint, MS Access, QuickBooks, other database formats, multi-media files (audio or video), and any other file type that cannot be converted to TIFF, the original native files shall be produced in addition to a single-page TIFF placeholder. Native files shall be produced in a folder named "**NATIVES**."

**Extracted Text or OCR Text for TIFF Images and Native Files.** To the extent practicable, each individual document based on an electronic file shall be accompanied by one corresponding text file with text that is extracted from the electronic file. Extracted text or OCR files shall be produced in a folder named "**TEXT**."

**Load Files.** The parties' document productions shall include Relativity compatible Load Files, including a DAT file and an Opticon delimited file, that indicate document breaks of the TIFF images and additional fields as identified below. All Load and Cross-reference files shall be produced in a folder named "**DATA**."

**File Name.** Each document image file shall be named with the unique production number of the first page of the document in question followed by the file extension "TIF."

**Document Unitization.** If a document is more than one page, the unitization of the document and any attachments and/or notes shall be maintained as they existed in the original document.

**Parent-Child Relationships.** Parent-child relationships (the association between an attachment and its parent document) should be preserved and appropriately reflected in the metadata.

**Production of Metadata.** The following metadata fields associated with each electronic document, to the extent they are available, will be produced.

1. Custodian
2. BegBates
3. EndBates
4. BegAttach
5. EndAttach
6. AttachCount
7. AttachName
8. ParentBates
9. From
10. Author
11. To
12. Cc
13. Bcc
14. E-mail Subject
15. Filename
16. Title
17. DateSent
18. DateRcvd
19. DateCreated
20. Date Last Modified
21. Importance
22. Conversation
23. TimeSent
24. TimeRcvd
25. File Path
26. Native Link - (if natives are exchanged)
27. Text Link - (if text is exchanged)
28. Confidentiality Designation - (for natively produced documents only, if required)
29. Redacted
30. Exceptions
31. Hash Value
32. File Extension

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 13, 2023, I electronically served a copy of the foregoing to all counsel of record.

*/s/ Alex Spiro*