UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 23-cr-251-AKH

CHARLIE JAVICE, OLIVIER AMAR,

Defendants. Criminal Conference

------------------------------x

New York, N.Y.
January 17, 2024
2:30 p.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
DINA MCLEOD
MICAH FERGENSON
Assistant United States Attorney

QUINN EMANUEL
Attorneys for Defendant Javice
BY: SAMUEL P. NITZE
ERICA PERDOMO

KOBRE & KIM
Attorneys for Defendant Amar
BY: SEAN BUCKLEY
STEVE KOBRE
ALEXANDRIA SWETTE

HOGAN LOVELLS
Attorneys for JPMorgan Chase
BY: ALLISON WEURTZ
MATTHEW SULLIVAN
THOMAS HUNT

(Case called)

THE COURT: We have Dina McLeod and Micah Fergenson for the government?

MR. FERGENSON: Yes. Good afternoon, your Honor.

THE COURT: I don't require wearing a mask. You can if you wish, but you don't have to. My deputy is not here. And we have Alex Spiro and Maaren Shah and Jan Kernisan?

MR. NITZE: Today, your Honor, we have the Sam Nitze and Erica Perdomo for defendant Javice. Good afternoon.

THE COURT: And for defendant Amar, we have Sean Buckley?

MR. BUCKLEY: Yes, your Honor.

THE COURT: And Steve Kobre?

MR. KOBRE: Yes, your Honor.

THE COURT: And Alexandria Swette?

MS. SWETTE: Swette, your Honor.

THE COURT: Okay. A few preliminary observations. I don't intend to write a learned decision about the distinctions between *United States v. Nixon* and *United States v. Tucker* and where it falls in this case. What I'm interested in is that there should be adequate disclosure in this case regarding preparation by the defendant. I have a question. Aren't the protagonists here JP Morgan Chase and Javice and Amar.

MR. FERGENSON: Yes, your Honor. The motion to squash was filed by JP Morgan Chase.

THE COURT: What are you doing there? You should be at the end.

MR. FERGENSON: I believe counsel for JP Morgan is --

THE COURT: Why don't you shift over to the left because you are not involved in this case or at least the motion.

MR. FERGENSON: Not the motion, your Honor.

THE COURT: JP Morgan Chase, step up. Get their appearances, please.

THE CLERK: Who is appearing for JPMorgan Chase?

MS. WEURTZ: Good afternoon, Allison Weurtz from Hogan Lovells.

MR. SULLIVAN: Good afternoon. Matthew Sullivan, Hogan Lovells.

MR. HUNT: Good afternoon, your Honor. Thomas Hunt from Hogan Lovells.

THE COURT: Those representing JPMorgan Chase are Allison Weurtz, Matthew Sullivan and Thomas Hunt. Good afternoon.

MS. WEURTZ: Good afternoon, your Honor.

THE COURT: We have a motion to quash by JPMorgan Chase of a 17(c) subpoena issued by defendants Javice and Amar. I'm directing my attention to that motion to quash today. And I started to say, I'm not intending to write a learned decision about where the scope of a 17(c) subpoena should be trying to

juggle *United States v. Nixon* and *United States v. Tucker* and a whole lot of other cases in the Southern District of New York. Clearly 17(c) was not intended to be a discovery weapon the way it is used in civil cases, but clearly, also, there's been a growing need of recognition on part of United States District Judges that 17(c) has to be the method of obtaining a decent amount of disclosure in a case as complicated and as fact oriented as this case is.

So I'm going to trying to thread through and find a way not to spend hours on each particular discovery request but to find a methodology that you can apply to your own case. So I have to start with what I understand to be the situation. JPMorgan Chase has stated, not in any affidavit or disclosure but in a brief, that they have searched the files of 146 custodians and disclosed to the government every document within those files touching upon -- not touching upon, reflecting communications by Javice and Amar with people at Chase. Defendants want more. Defendants want an understanding of how these disclosures were treated by people in JPMorgan Chase, and they want these 146 custodians and 51 more to be the subjects of a search for documents within the scope of the subject matter listed in various ways in a large number of discovery requests.

The papers of the defendants suggest that they are intending to be particularized, but by the nature of their

requests, they are not particularized. They are not focused on admissible documents. However, the definition of admissibility is not the technical admissibility at trial. I can't foretell what I will be ruling in many of these cases. It's more than that. How much more is not clear. So that's where I'm going to focus my attention.

I'm trying to find a way to give the defendants more information than they have. And here is my assumption, that in some fashion, that I have not yet been able to confidently state, there is a relevance to how JPMorgan Chase understood the misrepresentations alleged to have been made by Javice and Amar and the effort to hide the misinformation post-deal, post-transaction. These misrepresentations have not been stated in a particular transactional document, which would be a normal way that most acquisitions occur. They are a set of warranties and representations along with a provision later on in the agreement that nothing not contained herein counts. But this set of misrepresentations, according to the complaint, is spread over time and is spread over many documents. And it is compounded by a story relating efforts to hide the misrepresentations later on.

The misrepresentations also allege to a large data set of information having to do with numbers of student recipients or customers or clients of Frank in various data fields. So as I understand it, to prove the falsity of the representations,

the government will have to get into the sets of data that we have here and try to prove where there's falsity, where there's not. And it's ascertainable at this time just what respects will be covered. Furthermore, as I understand these things, a set of customers is not a fixed set of points in time but rather a flow.

Now, having said all this, there's more than my ability to relate. I have not really been able to absorb all the information in the case, and I will not be a discovery master looking at each particular phrase, but I think there is relevance beyond what Javice and Amar said. And the understandings of Chase, of what they said, and Chase's actions based on that understanding have a relevance to the case. I can't tell you right now how much relevance there is, but at this point, I'm not prepared to shut off discovery under Rule 17(c) at this point.

Now to sum up, what we have here are defendant's requests that the custodians files, 146 that have been identified as having been searched by JPMorgan Chase and 51 others that may be similar or may be different that defendants list as also of their interest. That is too broad and not fit for a 17(c) subpoena. One purpose of 17(c) is to bridge the gap between the defendant's need to know and the government's need to prosecute without getting embroiled in three years of discovery as happens in civil cases, three years or more.

Here is my proposal. The field of what fate, what JPMorgan Chase understood, has to be limited to a control group of executives within JPMorgan Chase charged with responsibility to accept the transactions, ask for more information and act upon it.

They, no doubt, were advised by many others, but those many others you classify in the field of discovery are suitable for a civil case but not a criminal case. The control group is a different question. And importing that concept from the concept of privilege, I will apply that concept here. So I think the files of those people who are the control group, they'll have to be the subject of the discussions among you. Have to be searched, and they have to be searched not only for what Javice and Amar may have said, but also, to some level, what Chase understood and did. That's one large point.

The second large point is that there can't be a postponement of the privilege law. Defendants are entitled to have a comprehensive and complete listing satisfactory to the local rules in a discovery case of what they contend is privileged, what JP Morgan contends is privileged. And then defendants will have an opportunity to challenge what they believe is not privileged. And ultimately, I have to decide it.

Now, I will decide not going through every single document. My procedure is the following: As to the entire

field of documents withheld because of privilege and after intensive discussions between you, that box or boxes of documents will be brought to the courtroom, and defendants will be entitled to a reasonable sampling of documents for me to examine in front of you but in camera. I'll describe the documents in terms of that which would clearly not be privileged and make rulings. The point of this is that we will cover in this sample all the different substantive areas that give rise to privilege. I will make rulings, and then you will be able to apply them.

So that's how I wish to proceed, and I'm ready for comments. First, Ms. Weurtz?

MS. WEURTZ: Thank you, your Honor. That's very helpful.

THE COURT: You would take the podium, right?

MS. WEURTZ: Thank you, your Honor. We appreciate that guidance that you're able to give us. I think that the concept of a control group is something that the parties can certainly speak about. The parties have met and conferred prior to today.

THE COURT: Yes, but they don't feel that there's much of a meeting, and I don't believe that there's much of a meeting because you are stuck on the notion of only communications by Javice and Amar, and they are stuck on the theory that they are entitled to a lot more. There's no

ability of the meeting of the minds in that fashion. That's why I'm making the comments I did.

MS. WEURTZ: Your Honor, JPMC has produced more documents than only the conversations belonging to Javice and Amar. So your Honor is correct that the entirety of the custodial email files of Mr. Javice and Mr. Amar have been produced in full, and then JPMorgan has produced additional communications that were responsive to the government's ten grand jury subpoenas.

THE COURT: Another problem we have is you made production to the government and the government has made production to the defense. That makes it very difficult to trace documents. So what you say you have produced, theoretically may not be that which defendants have received. You can't be responsible for that. But on the other hand, if you are holding back documents because you've already produced them, there's no assurance unless you give the Bates numbers that they are the same documents that the government received. Do you follow me?

MS. WEURTZ: Yes, your Honor. Our understanding was that the vast majority if not all of the documents were turned over to defendants. I take can your Honor's point that we don't know for sure what has transpired between the government and between defense. I think the additional guidance that we would ask for is the subject matter that your Honor is

contemplating for this control group. The Rule 17 subpoenas ask for documents relating to a variety of topics, not just the misrepresentations that the defendants are alleged to have made. They seek documents related to the entirety of the integration process that JPMorgan went through with Frank; seek documents about all aspects of due diligence, not just those related to the customers or the numbers.

THE COURT: That's too broad.

MS. WEURTZ: So I think to figure out who the proper custodians are, they may be custodians we already identified and produced before.

THE COURT: That's why I'm limiting it to the control group. Let's say there are ten people in a control group, I don't think there are many more. There may be less, and that has to be identified. I can't say who they are. What would be wrong in turning over the whole set of files that you have on those people? Not other peoples files, just theirs.

MS. WEURTZ: That we would turn over the entire email files of those individuals in the control group?

THE COURT: Yes, as a proposition.

MS. WEURTZ: I think that cuts too broadly. These individuals are involved in a lot of different deals. Your Honor is proposing a group of high --

THE COURT: No, no, no, I'm not saying that. All their files pertaining to the relationship with Javice and Amar

and Frank. Not just those communications from them but everything relating to them, and if there's privileged documents, they would be listed on a privilege log.

MS. WEURTZ: It's still a relatively broad set of documents.

THE COURT: Yes.

MS. WEURTZ: There are aspects of the Frank transaction that aren't at issue in the complaint against the defendants.

THE COURT: So what? So what? First of all, I don't think it's impressive, and if it is, I can shift costs. These are the words in 17(c). Was it reasonable? Reasonable in relationship to the way the fraud has been mapped out in, I think, an 18-page complaint. Is it 18 pages? It's long. I couldn't finish it in one sitting. So it's very hard to just isolate what is at stake here, and I am not going to go over item by item as a discovery master would. And I don't want to send it to a discovery master because discovery masters don't deal with criminal cases. So I'm going to keep control and consistent with the burdens on me, I'll be available to you to make decisions. But once I make the overall distinctions, I think you can apply them.

MS. WEURTZ: Yes, your Honor. I think the concern is that the fraud is narrower than everything related to Frank. And I think that's what we're grappling with which is is every

decision about how to integrate the Frank payroll system into JPMorgan something we should be turning over or every decision --

THE COURT: Discuss that. Discuss that. And if there's topics that you think are outside the scope and they think they are within the scope, then bring them to me. I don't think they want payroll, but I think they can tell you what they do want. And I don't know what integration means. I think -- and I'm not the lawyer on the case; I'm just the Judge -- what would be interesting to them is to know, A, what were the names of the people on the documents given to Chase; and B, which of these people were found to be fictitious and lacking the data sets that were supposed to come with them? That would define the flow.

MS. WEURTZ: That list, your Honor, is a single list and that has been produced at least to the government.

I don't know if that list has gone over.

THE COURT: Well, I think they need a little more scope to find out how that list was produced. What you did with it? Did you find it? I can't tell you what is and what is not relevant, but I can deal -- I cannot deal with the situation that was presented to me here today by saying what I did. I would hope that you would be better able to apply and resolve your differences and come up with something that is agreed and done and accomplished without the kind of

skirmishing that goes on in a civil case because it doesn't belong in a criminal case. This is a prosecution and not civil discovery. Civil discovery was stayed in this case.

Let me hear the views of the defendants.

You haven't even started and you get a note.

MR. NITZE: They keep me on a short leash, your Honor.

Sam Nitze for Ms. Javice, and I appreciate the spirit in which you laid out your perspective on this. I do want to frame the issue slightly differently. I think there is something of an illusion that we are in a context similar to civil discovery, and part of that is because I think your Honor started out by saying my understanding is JPMorgan has searched the custodial files of 146 custodians.

THE COURT: That's what I said.

MR. NITZE: Well, if you read the representations about what was searched, they are very carefully worded. Our understanding is that nine custodians were selected whose files were searched -- not text messages, which I'll get to in a moment -- and that an additional 14 were added whose custodial files have been searched. We have not been informed of the specific search terms or relevance parameters. The 146, as far as we can --

THE COURT: I'll stop you and make a comment. The normal practice in a civil case when people challenge the adequacy of the search is for there to be an affidavit that

sets out exactly what was done. We don't have that here. We don't really know what JPMorgan Chase did, do we?

MR. NITZE: Well, it's a problem because I take your Honor's point. We're not in a civil case, but to just emphasize the interests that animate Judge Rakoff and Judge Scheindlin and even Judge Holwell's opinions, we have defendants in a case with a liberty interest at stake who are now faced first for months with the government saying we won't add to what we're gathering and now the bank saying, we won't add.

THE COURT: But I didn't say that, did I?

MR. NITZE: You didn't. I appreciate that you didn't and, in fact, to the contrary --

THE COURT: Let's work with what we can do.

MR. NITZE: Great. The control group concept works so long as it captures the custodians who matter here. To remind your Honor --

THE COURT: How would you define that?

MR. NITZE: I would define it as the Chase personnel who were most closely involved with the transaction and integration, and I'll tell you what integration means, but the company into Chase. Remember these defendants are charged with an 18-month conspiracy. JPMorgan wants to make it sound it's the point of the acquisition. But the grand jury said 18 months.

THE COURT: The complaint says 18 months.

MR. NITZE: The complaint says 18 months.

THE COURT: And the complaint is before and after the transaction. I'm with you on this, but I want you to limit you now. I want you to define the control group, and we'll see what Ms. Weurtz says about that.

MR. NITZE: I'm happy to define it conceptually and I'm happy to define it by names. To give one example, Sonali Divilek is the supervisor of the two defendants deeply involved in just about every phase temporally of this case, and we reject falsity, we reject intent to defraud, and we reject materiality of the alleged misrepresentations. And one powerful way of understanding what was said, how it was understood, whether anybody cared about it is to see how the people at the bank are communicating with one another over the course of the charged period.

THE COURT: I'm not going to give you that. I'd be more interested in communications to whoever is the control group. How would you define the control group?

MR. NITZE: I can give you a list of names or I can say it was the people at JPMorgan who were tasked with the responsibility for taking this company in and then shepherding it through into Chase during the course of criminal conduct, the people that were most involved. And I can give you names.

THE COURT: What do you think about that, Ms. Weurtz?

You can stay where you are.

MS. WEURTZ: Thank you, your Honor. A lot of those individuals are custodians. We have focused on documents from --

THE COURT: I want you to focus on what Mr. Nitze said. Mr. Nitze, what did you say? Better still, we'll have the reporter repeat it.

(Read back)

MR. NITZE: Surely I said alleged criminal conduct.

THE COURT: Don't. Everything is an allegation, and everything is denied so don't get hung up there. Those that took in and shepherded; what do you think of that? I don't know what shepherded means but we'll get to that.

MS. WEURTZ: I think that's meant to mean the people at JPMorgan who were in charge of assessing the accusation and conducting at least the due diligence relevant here. I think that is a relatively helpful definition for who would be in the control group.

THE COURT: What about the part of the fraud that is the hiding of the fraud?

MS. WEURTZ: I think there are individuals who we could probably agree would be in that bucket as well if we're limiting it, again, to the fraud with respect to the customer accounts.

THE COURT: We're listening to what?

MS. WEURTZ: If we're limiting it to aspects of things related to the fraud, again, which relates to customer numbers. Not every aspect of the integration of Frank.

THE COURT: Well, give me a definition. I think we're okay in the first two parts of what you said, the charge of taking in and the charge of due diligence. So that's all before the transaction, right.

MS. WEURTZ: Correct.

THE COURT: Post-transaction how would you propose the control group?

MS. WEURTZ: I would propose individuals who were in charge of determining the scope of Frank's true customer base.

THE COURT: What about that, Mr. Nitze?

MR. NITZE: You'll notice at every turn the bank is trying to get away from the custodians are witnesses who were involved in integrating Frank, evaluating the business once it was acquired, and those people have powerful -- we have some of it already.

THE COURT: Mr. Nitze, the control group, post-transaction, those who were determining the customer base given to them by Frank.

MR. NITZE: And responsible for integrating Frank into the Chase business.

THE COURT: Ms. Weurtz?

MS. WEURTZ: I think, your Honor, that's where it

starts to be too broad. Integrating with respect to what?

THE COURT: There could be a lot of other activities going on there.

MS. WEURTZ: That's correct, your Honor.

THE COURT: I don't think that I would go with that, Mr. Nitze.

MR. NITZE: How about we're responsible for evaluating the perceived problems with the Frank business, and I raise that --

THE COURT: How about that, Ms. Weurtz?

MS. WEURTZ: Your Honor, I believe it's still too broad. There's many issues that arose with Frank that had nothing to do with the customer base.

THE COURT: First, customer base. Evaluating the customer base. What did you say, Mr. Nitze?

MR. NITZE: Two points. What I said was evaluating perceived problems with the Frank business.

THE COURT: That's too broad.

MR. NITZE: It's not very broad.

THE COURT: Too broad.

MR. NITZE: Perceived problems with the bank's original business case for the acquisition.

THE COURT: That's too broad. Focus on the alleged misrepresentations and the coverup.

MR. NITZE: Responsible for assessing the ways in

which the customer list was perceived to have affected the business case. I mean, I'm here -- you are trying to cabin me down.

THE COURT: I certainly am. You've got me. Right, I'm cabining you down.

MR. NITZE: I've got an 18-month conspiracy charge.

THE COURT: We're involved in a criminal case, and I'm cabining you down. You are absolutely right. I'm asking you to come up with a definition of the control group regarding the coverup.

MR. NITZE: Respectfully, could we submit -- I'm doing my best on my feet.

THE COURT: I know. You are doing very well.

MR. NITZE: But it matters enough, it's so important to the scope of what we receive. Could we submit -- it would be a page, but could we think through a definition that we think captures the materials that we think we need to defend ourselves.

THE COURT: How about a recess for ten minutes and you and Ms. Weurtz have a little chat.

MR. NITZE: I'd like a day, but if it's ten minutes, I'll take them.

THE COURT: You can take the team to the jury room and I can stay here, or you can go wherever you want.

MR. NITZE: Are we conferring with one another or are

we --

THE COURT: Yes. I want adversaries talking. You can all sit. The government has no role in this. It's not your business.

(Recess)

THE COURT: Ms. Weurtz, if you can tell me where we are.

MS. WEURTZ: Thank you, your Honor. I think we had a productive conversation. I don't know that we arrived on a final definition that both sides are comfortable with. Where we landed is in the beginning that we had spoken about that it's people charged with the acquisition, overseeing and conducting due diligence. And then following the acquisition, what JPMorgan is proposing is analyzing or assessing or using the customer list or the customer base for business purposes, and I think defense would like to add sort of a colon and a series of items following that.

THE COURT: And what after the colon?

MS. WEURTZ: A series of additional topics following that.

THE COURT: List those for me.

MS. WEURTZ: Marketing, user base, monetization, partnerships, valuation, funding for Frank and regulatory. I think I got those right.

MR. NITZE: Yes, and I'm happy to explain.

THE COURT: Give me the list again.

MR. NITZE: Marketing, user base, monetization, partnerships, valuation, funding for Frank and regulatory. And I'm happy to talk about the relevance of each of those if helpful.

THE COURT: Yes, go on.

MR. NITZE: Yes. Would you like me to do that?

THE COURT: Yes. What was the last one?

MR. NITZE: Regulatory.

THE COURT: Okay. Marketing?

MR. NITZE: So marketing, JPMorgan's efforts to market its -- this newly acquired business, the communications involved in those marketing efforts, reflect their understanding of what they bought, why they bought it, what was material to them in their evaluation of the business, and --

THE COURT: What do you think, Ms. Weurtz?

MS. WEURTZ: I'm sorry, your Honor?

THE COURT: What do you say, Ms. Weurtz?

MS. WEURTZ: We agree to a certain extent with the extent that they were marketing with Frank's customer base. We view that as using the customer base for business purposes, but I think it starts to go too far with there were other efforts --

THE COURT: So you would agree to what marketing for?

MS. WEURTZ: Marketing, you know, based on or

concerning Frank's customer base.

THE COURT: Say again.

MS. WEURTZ: Marketing based on or concerning Frank's customer base.

THE COURT: Okay. I think that's a reasonable limitation.

MR. NITZE: You've come awfully close to ruling there, but can I offer the reasoning for our effort to broaden it somewhat?

THE COURT: Yes. Pull the microphone closer. Yes. Go ahead.

MR. NITZE: So the restriction put on that by Ms. Weurtz, tracks the government's theory of the case which is that the bank bought Chase because of this data, and then sought to market it using that data. One vein of defense may be not so. In fact, the bank had other interests, other aspects of the business, other aspects they were focusing on, and so marketing efforts by the bank that reflect focus elsewhere is directly relevant to the question of materiality.

THE COURT: I disagree. How Chase marketing, what it had, is as much of a function of what it would do with what it had and not so much the issue of whether or not there was a misrepresentation. Reliance by Chase is not an issue of the case. I rule in favor of the interpretation that Ms. Weurtz gave. What is the next one? User base?

MR. NITZE: I don't think we have any disagreement on including that one.

MS. WEURTZ: That's correct, your Honor.

THE COURT: Good.

MS. WEURTZ: Our definition says customer list or customer base, so same thing in our view.

THE COURT: Monetization?

MR. NITZE: Yes. How did JPMorgan go about -- think about making money? What was the business case for Frank? Again, relevant to materiality.

THE COURT: The same issue as the first one, I disagree and I deny that. Next is?

MR. NITZE: Valuation.

MS. WEURTZ: Partnerships.

MR. NITZE: Oh, sorry, partnerships.

THE COURT: Yes. Tell me about the partnerships.

MR. NITZE: So partnerships are directly relevant to JPMorgan's assessment of the business opportunity here because Frank had partnerships with a number of other agencies. And part of its presentation about how this would be profitable and why this was a useful platform to the bank included within it a set of partnerships that were to be grown over time. And JPMorgan paid attention to that to some degree, sometimes didn't pay attention to it. And the ways in which they talk about those partnerships bear directly on the things that

matter to them in terms of materiality and their understanding of users and the data that is at issue because the data turned in part on partnerships. This user base that they focused on, I suppose we could argue that this is subsumed within the inclusion of user base. But Chase's efforts to grow the user base and its expectation, the allegation that there were misrepresentations turns in part on this idea that, oh, we aren't able to grow as much as we thought we were. That turns on these partnerships.

THE COURT: Ms. Weurtz?

MS. WEURTZ: Your Honor, I think we may agree that the existing partnerships, to the extent they generated users and customers for Frank, would have some sort relevance, but this sort of forward looking what Chase thought about the quality of partnerships or how they would grow the interest base in the future, we think starts to get far afield.

THE COURT: I agree. I adopt your limitation.

MS. WEURTZ: Thank you, your Honor.

THE COURT: Valuation?

MR. NITZE: I don't know what argument there could be that valuation is not relevant here; that is, what factors went into Chase's view of the value of this company. The allegations are rife with -- full of -- the idea that the misrepresentations are what caused Chase to buy it. I'm not arguing that reliance is an element, but I'm saying that --

THE COURT: You made your point. What are you saying, Ms. Weurtz?

MS. WEURTZ: With respect to valuation with the actual transaction, due diligence, we think valuation is relevant. We have documents already on what Chase viewed as the valuation of Frank at the time of transaction. When we go post-merger and the request is generally for what JP Morgan now thinks of the valuation, it starts to feel limitless, and we're really not sure if they are asking just for --

THE COURT: I agree. Valuation has to do with pre-closing and not post-closing.

MR. NITZE: I don't disagree that it has to do with pre-closing, but the question is to the extent they are speaking about the pre-closing valuation afterwards. That's relevant. The bank personnel --

THE COURT: Yes, I agree with you. To the extent they are reflecting a pre-valuation even though the document is written post-valuation, you should get it. Next, funding for Frank?

MR. NITZE: There's a suggestion -- more than that -- in the charges, in the allegations, that this all went bad because there were misrepresentations. Obviously, we reject that allegation, but one of the issues going on here is that the bank, when it takes Frank in and its communications about how to fund this new acquisition, what resources to give it,

that is in the mix of factors that cause this relationship to be -- to go wrong. And so to the extent there is focus on, oh, misrepresentations, users, this is the ball game, there are other elements there that the defense thinks it should be able to point to that reflect a more complicated picture.

THE COURT: Ms. Weurtz?

MS. WEURTZ: Your Honor, to the extent that there are issues related to the amount of money allocated in connection with assessing the customer list or using the customer list for business purposes, I think our definition captures that. But the idea that everything related to the dollars and cents that Frank was given to operate in any aspect, we think, goes beyond what's at issue here.

THE COURT: So you object to what Mr. Nitze wants?

MS. WEURTZ: Yes, your Honor.

THE COURT: I sustain the objection.

Regulation?

MR. NITZE: There are regulatory limits, legal limits, regulatory complications with respect to how a business may use data of individuals, data that has to do with student, data that has to do with banking customers, and failure to understand those properly, miscommunication about the implications there, misunderstandings about the landscape, all are relevant because they can have the effect, independent of any alleged misrepresentation, to cause confusion and

misunderstanding. Confusion and misunderstanding are not fraud.

THE COURT: I don't know what you mean by "regulations."

MR. NITZE: Regulation with respect -- part of the business case is we want to market to students. We want to send them things, and we have their data as a result of this platform. There are regulations --

THE COURT: How does regulation affect that?

MR. NITZE: Because there are regulations that directly -- either restrictions on what sorts of consent do you need? Which students can you market to? Are you allowed to use your data or aren't you? And those come up with --

THE COURT: I can't see any relevance to that. Ms. Weurtz?

MS. WEURTZ: We don't either, your Honor. To the extent --

THE COURT: Objection sustained. Does that not resolve all of --

MR. BUCKLEY: Your Honor, if I could just be heard?

THE COURT: Yes.

MR. BUCKLEY: On the regulatory point, as Mr. Nitze was explaining, we do think that that was important to the valuation. We think it was important to the ability for Frank to succeed when it joined JPMorgan. And it's our view, and one

of the defenses will be, that the user list that has occupied centrality in the government's theory of the case was just one of only several factors that were taken into account. And one of the reasons why Frank by Chase ultimately did not succeed was because of changes in the regulatory environment. This was an issue raised both pre-acquisition and post-acquisition.

THE COURT: Whether Chase succeeded or not is not an issue. The issue is whether false representations were made that were material, and I can't see how this bears upon that.

MR. BUCKLEY: Judge, it goes to the materiality question.

THE COURT: I don't think so. I don't think so. I sustain the objection.

What else is at issue?

MR. NITZE: Well, I did want to reorient your Honor to the standard set by the rule which has to do with unreasonable or oppressive. And we're now down -- you've fashioned a compromise, I guess. We think we should have more, and we would want to be able to propose within the construct your Honor just approved, the custodians that to us, the witnesses that we know from our clients, have the relevant materials. And we're talking about 15 people or 20 people.

THE COURT: You haven't even discussed who the people are?

MS. WEURTZ: No, your Honor we haven't yet discussed

who would be the people who fall within this definition, but we are willing to discuss with defense counsel --

THE COURT: Do you want another ten minutes?

MS. WEURTZ: I don't know that will be just ten minutes, your Honor.

THE COURT: How long do you need? Do you want to come back tomorrow at 2:30?

MR. NITZE: Can we file a letter tomorrow?

THE COURT: I don't want a letter because it's just more disputes. My purpose is to close things, not to open them up, as you can imagine.

MR. NITZE: I can understand that, your Honor.

MS. WEURTZ: We're available and we can come back tomorrow if that's the way your Honor would like to proceed.

THE COURT: 2:30 tomorrow, folks? The purpose of 2:30 is to decide who are the control group, and then we finish, right? Then I need to know a few things. I need to know when you're going to have a full and complete privilege log.

MS. WEURTZ: With respect to the additional documents produced or with respect to the existing?

THE COURT: Every claim and privilege you have. Every single claim has to be on a privilege log satisfactorily to the -- I forget the local rule number.

MS. WEURTZ: With respect to documents produced to date to the government, we have produced those privilege logs.

We agreed to produce sort of a -- not a condensed log, but we produced multiple privilege logs to the government. We agreed to produce a single one to the defendants for convenience, but they do have every privilege log.

THE COURT: I would like you to submit a single privilege log, so we'll be in a position to figure out procedure moving forward.

MS. WEURTZ: The timing would depend on how quickly we can produce what your Honor ordered.

THE COURT: I'll press you for a date tomorrow, so think about that overnight. And then I think we're finished with Rule 17(c).

MR. NITZE: We would ask that whatever custodian list your Honor orders, the bank produce all data including documents hard copy on the computer, not just emails. There are --

THE COURT: I think everything in the custodians are fair game. Whatever medium was used to communicate, that medium is relevant.

MR. NITZE: So are we to see you here tomorrow afternoon; is that your direction?

THE COURT: Yes, I'll give you another ruling.

MS. WEURTZ: If I could ask one question as well? Once we agree on those custodians, it's your ruling that JPMorgan should produce anything related to Frank?

THE COURT: Whatever medium was used to communicate with these people.

MS. WEURTZ: In terms of -- so we have the documents, right, and a single custodian has a lot of different documents many of which don't relate to Frank at all. Are there search terms that you would like us to search for that are related to Frank?

THE COURT: Whatever pertains to Frank. I don't know. I am not good at search terms. I never had to do that when I was in practice.

MR. NITZE: Pertains to Frank works well.

MS. WEURTZ: I think in our view it sort of undoes the choosing the control group.

THE COURT: Say that again.

MS. WEURTZ: Going with just anything that pertains to Frank undoes a little bit of the control group. It starts to be broader.

THE COURT: No, it's a combination. The person in the control group and any communication to that person or by that person, anything that follows by any means of communication pertaining to Frank. Got it? Good?

MR. NITZE: Got it. So we are coming tomorrow afternoon for this final ruling on the custodian list?

THE COURT: Right.

MR. NITZE: Right.

THE COURT: And dates.

MR. NITZE: May I confer for 30 seconds with counsel for --

THE COURT: You may.

MR. NITZE: I thank you.

(Counsel conferring)

THE COURT: I'm advised, folks, that I did not give you good enough information. Pertains to Franks in the categories that I've allowed.

MS. WEURTZ: Thank you for that clarification, your Honor.

MR. NITZE: Your Honor, in the hope-springs-eternal category, in the event we are able --

THE COURT: Don't advertise that. You are tipping me off. I should say no.

MR. NITZE: You are going to say yes, I think, to this one but we'll see. In the event we are able to reach agreement before tomorrow's appearance, would you be open to receiving our filing so stating we've reached agreement on custodians and dates and here is the plan, or do you want to see us in the flesh in any event?

THE COURT: I don't need to see you if you reached agreement. I need dates. I need to manage the case in a way that assures me that all pretrial work is going to be finished and a date that accommodates the trial. The government has a

couple points they want to make. I haven't heard them yet. I'll hear them now, but that's my purpose. We have an October trial date. You need a lot of time to prepare. JPMorgan Chase has work to do. You may come back to me for ruling on privilege to allow that, and I have other cases that I have to try and deal with as well. So it probably would be a good idea to come back because then we can really create a calendar that would be useful to both sides and me. Right?

MR. NITZE: Yes, right. So you would like us back in any event?

THE COURT: Yes, but do agree. Let's have a 15-minute meeting.

MR. FERGENSON: Two housekeeping matters, your Honor.

THE COURT: This is Mr. Fergenson.

MR. FERGENSON: Yes, your Honor. Thank you.

The first is to set a pretrial motions schedule, and the second is to set a date for the defense to give notice of affirmative defenses. Those were two matters discussed at the prior conference.

THE COURT: Why don't you work it in with your conferences and give me an agreed date. It doesn't have to be controversial.

MR. FERGENSON: We have asked for --

THE COURT: What you are doing is conditional on what they do, so you have to know those dates before you can suggest

your dates, right?

MR. FERGENSON: That's right, your Honor. On the first, the motion schedule, we have an agreement on a proposed schedule with defendant Amar's counsel. And I believe the position of Javice's counsel today is that they are not able to agree to the proposed schedule but don't necessarily object to it.

THE COURT: What are the dates?

MR. FERGENSON: The dates are: The filing of pretrial motions -- the opening briefs are due March 18 of this year. The government's opposition is due April 15, and then the defendants' reply or replies are due April 29.

THE COURT: And what are these motions?

MR. FERGENSON: It's a question for the defense, I believe, but we would anticipate --

THE COURT: What do you anticipate?

MR. FERGENSON: Motions to dismiss, motions to suppress, pretrial motions under Rule 12, your Honor.

MR. NITZE: And counsel for Javice's objection, it is objection with discovery and Rule 17 and privilege still underway. It's just harder to know which of those motions might be filed and on what timeline. We do understand the Court's feeling about wanting to move this forward, but that's the basis for the objection.

THE COURT: Ms. Weurtz, what's your anticipation? How

long will it take you to make a full production? And a different question: What do you think you could have a comprehensive privilege log?

MS. WEURTZ: Your Honor, it's going to depend significantly on the volume of documents that we're dealing with. We'll probably need three to four weeks to produce and another two weeks for the privilege log.

THE COURT: You are talking by the end of February.

MS. WEURTZ: I haven't done the math but either February or the first week in March, but this is a bit of a guess.

THE COURT: Let's say by the end of February. What does that do with the motions, Mr. Fergenson?

MR. FERGENSON: Your Honor, nothing would be our view because there hasn't been any indication that this discovery affects something like a motion to dismiss, which is based on just the face of the indictment, your Honor, not discovery. Similarly, a motion to suppress is typically based on warrant affidavits or the warrant itself, which they've had for many months now.

THE COURT: That seems right. Mr. Nitze?

MR. NITZE: The contours of discovery can inform the bases for motions to dismiss if there are allegations that we think lack any support, or with respect to bill of particulars, if we think there are other particulars that might be

forthcoming. It is fairly common for discovery to be at least substantially complete before the filing of motions. The position is not no way do we think those dates work; rather, it is we prefer to pause until we understand the timing of the privilege and related Rule 17 disputes before setting that schedule.

THE COURT: I think there needs to be a space of time between the production date that Ms. Weurtz fixes, which I'm anticipating to be the end of February and not later, and the onset of motions. I don't think you need wait for the privilege log. I can do that simultaneous, but you do need the production.

MR. NITZE: You could set the dates as proposed, and we could seek leave to push them back if we --

THE COURT: Always. You know, I'm trying to anticipate and push you to some degree. I don't want to be unreasonable. I don't believe in judging in a way that puts undue pressure on attorneys, but I do want to move the case.

MR. NITZE: We're happy, speaking for the Javice camp, to give this more thought overnight and see you tomorrow and revisit this question if that would help.

THE COURT: I'd like a complete schedule that takes me through all that I have to do. We're going to have to get into experts. It's going to be another set of activities for us. We have a date for final pretrial conference. What is it,

early October?

MR. FERGENSON: Off memory, maybe mid October, your Honor.

THE COURT: I think we need to approximate dates that Mr. Fergenson set out. The spacing from one event to another seems appropriate, but I think the entire schedule needs a slight adjustment. Let's do that tomorrow.

MR. FERGENSON: Thank you, your Honor.

THE COURT: Anything else, folks? It's been a joy.

MR. FERGENSON: Your Honor, we have one application just to exclude time until tomorrow --

THE COURT: Where are we excluding time to? Why don't we do it to the trial date?

MR. FERGENSON: We actually haven't excluded time until the trial date, but your Honor is correct. We would move to exclude time until the trial date of October 28, this year, so that the parties can continue discussing this schedule, file any pretrial motions and any pretrial filings.

THE COURT: And in the interest of justice.

MR. FERGENSON: And in the interest of justice.

THE COURT: Without prejudice, Mr. Nitze?

MR. NITZE: I guess what I would say is --

THE COURT: If you object, I'll give you a trial date next week.

MR. NITZE: We feel as though we've been pushed out in

time because of these discovery issues and things ought to have moved faster, so when we've withheld consent, you've pulled out your calendar. We need the time to prepare for trial, so on that basis, I guess you have our consent.

THE COURT: Mr. Buckley?

MR. BUCKLEY: No objection, your Honor.

THE COURT: Now we're finished. Right?

MR. BUCKLEY: Yes, your Honor.

MR. FERGENSON: Thank you, your Honor.

MS. WEURTZ: Thank you, your Honor.

THE COURT: Have a good night. See you tomorrow at 2:30.

(Adjourned)