UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :
UNITED STATES OF AMERICA,          :

            Plaintiff,                 :

  - against –                               :    S1 23 Cr. 251 (AKH)

OLIVIER AMAR,                          :

            Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT OLIVIER AMAR'S MOTION FOR THE EXCHANGE OF SEIZED PROPERTY

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States
   of America

Rushmi Bhaskaran
Nicholas Chiuchiolo
Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys

   *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1
BACKGROUND ............................................................................................................... 1
    A.    The Fraud Scheme.................................................................................................. 1
    B.    Amar's Criminal Proceeds ..................................................................................... 3
    C.    The Property.......................................................................................................... 4
ARGUMENT ...................................................................................................................... 5
    A.    Applicable Law ..................................................................................................... 6
    B.    There is No Legal Basis for the Relief Amar Seeks ............................................. 7
    C.    Even if the Court Could Order An Exchange of Property, The Defendant's Proposal is Not Cost Neutral .............................................................................................................. 10
    D.    Amar's Proposal Risks Dissipating Funds that Belong to a Victim .............................. 12
CONCLUSION................................................................................................................. 16

# TABLE OF AUTHORITIES

Cases
*Kaley v. United States*, 571 U.S. 320 (2014) ........................................................................... 7
*United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013) .......................................................... 7
*United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991) ..................................................... 7,8
*United States v. Peters*, 732 F.3d 93 (2d Cir. 2013) .................................................................. 6
*United States v. Real Prop. in Waterboro*, 64 F.3d 752 (1st Cir. 1995) ............................... 9, 10
*United States v. Stern*, 16 Cr. 525 (JGK), 2021 WL 3474040 (S.D.N.Y. Aug. 5, 2021) ............ 11
*United States v. Swenson*, 13 Cr. 91 (BLW), 2014 WL 2506300 (D. Idaho Jun. 3, 2014) ...... 9, 10
*United States v. Wolf*, 375 F. Supp. 3d 428 (S.D.N.Y. 2019) .................................................. 11
*United States v. Wolf*, No. 22 Cr. 137, 2022 WL 3585154 (D. Minn. Aug. 22, 2022) .............. 8, 9

Statutes
15 U.S.C. § 78j(b) & 78ff ............................................................................................................ 4
18 U.S.C. § 2 ............................................................................................................................... 4
18 U.S.C. § 981(a)(1)(C) and 984 ............................................................................................... 4
18 U.S.C. § 982(a)(2)(A) ......................................................................................................... 4, 6
18 U.S.C. § 983(a)(3)(C) ............................................................................................................. 7
18 U.S.C. § 983(f) ....................................................................................................................... 7
18 U.S.C. § 1343 ......................................................................................................................... 4
18 U.S.C. § 1344 and 2 ............................................................................................................... 4
18 U.S.C. § 1349 ......................................................................................................................... 4
21 U.S.C. § 853 ........................................................................................................................... 5
21 U.S.C. § 853(e) ....................................................................................................................... 6
21 U.S.C. § 853(e)(1)(A) ..................................................................................................... 6, 7, 8
21 U.S.C. § 853(e)(1)(B)) .................................................................................................. 6,7,8,9
21 U.S.C. § 853(i) ..................................................................................................................... 12
28 U.S.C. § 2461(c) .................................................................................................................... 6

Regulations
Title 17, Code of Federal Regulations, Section 240.10b-5 ......................................................... 4

**PRELIMINARY STATEMENT**

Olivier Amar participated in a brazen fraud on J.P. Morgan Chase ("JPMC") that allowed him to personally pocket more than two million dollars. After the defendant spent nearly ▌ of his ill-gotten gains, the Government indicted Amar and seized what remained of the victim funds. The defendant now moves for the Government to return to him ▌ of victim funds. He does not seek these crime proceeds to pay for counsel of his choosing, whose fees JPMC, the victim, pays pursuant to an indemnity agreement. Instead, he seeks these fraud proceeds so that he can pay for his bills and living expenses, all while continuing to live in a lavish ▌ square foot home valued at ▌ located ▌ (the "Property"). In exchange for liquid cash, Amar offers a ▌ security interest in the Property—an illiquid asset owned jointly with his spouse and which is ▌ ▌ and secures his $1 million appearance bond in this case.

Amar's request is as extraordinary as is it unprecedented. He asks the Court to force the Government to assume an interest—and all of its many attendant risks—in Amar's jointly-held illiquid asset, so that he can further dissipate crime proceeds and continue to live in his ▌ ▌ home. Nothing in the law permits this "exchange." Even if there were some legal basis to Amar's proposal, it is hardly an equal-value exchange. The Property is an encumbered, illiquid asset over which Amar does not have complete title; in return for an interest in the Property, he seeks cash to spend. Amar's proposal, moreover, risks further dissipating funds that rightfully belong to a victim.

Accordingly, the defendant's motion should be denied.

**BACKGROUND**

**A.    The Fraud Scheme**

In 2021, Javice and Amar engaged in a calculated scheme to falsely and dramatically inflate

1

the number of customers of their company, Frank, in order to fraudulently induce JPMC to acquire Frank for $175 million.  *See, e.g.*, Compl. ¶ 8.[1]

In or about 2017, Javice founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA").  The FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school.  Javice was Frank's CEO.  *See, e.g.*, Compl. ¶¶ 9, 15-16.  Amar was Frank's Chief Growth Officer.  In or about 2021, Javice began to pursue the sale of Frank to a larger financial institution, including JPMC.  Two major banks—one being JPMC, with the other identified as "Bank-2" in the Complaint and Superseding Indictment—expressed interest and began acquisition processes with Frank.  Javice represented repeatedly to JPMC and Bank-2 that Frank had 4.25 million customers or "users."  Javice explicitly defined "users"—to both banks—as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number).  In fact, Frank had less than 300,000 users.  *See, e.g.*, Compl. ¶¶ 10, 18-19, 22-23.

Bank-2 ultimately declined to acquire Frank, but JPMC's acquisition process continued.  When JPMC sought to verify the number of Frank's users and the amount of data collected about those users—information that was critical to JPMC's decision to move forward with the acquisition process—Javice fabricated a data set.  In order to do this, Javice and Amar first approached a Frank employee and asked him to create a synthetic data set using, as a starting point, a smaller set of actual Frank data.  After raising concerns about the legality of the request, the employee declined.  *See* Compl. ¶ 22.

---

[1] Citations to "Compl." refer to the criminal complaint.  *See* ECF No. 1.

Javice then approached a data scientist and hired him to create an artificially generated data set (a so-called synthetic data set). Then, Javice provided that synthetic data set to an agreed-upon third-party vendor in an effort to confirm to JPMC that the data set had over 4.25 million rows, consistent with Javice's misrepresentations. Through this process, Javice caused the third-party vendor to convey to JPMC that the data set had over 4.25 million entries. *See, e.g.*, Compl. ¶¶ 11, 21, 24-26.

In reliance on Javice's fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. Javice and Amar made millions of dollars from the acquisition. *See, e.g.*, Compl. ¶¶ 12, 31. The transaction closed on or about September 21, 2021.

Unbeknownst to JPMC, at or about the same time that Javice was creating the fabricated data set, Javice and Amar sought to purchase, on the open market, real data for over 4.25 million college students in an effort to cover up their lies. Javice and Amar succeeded in purchasing a data set of 4.5 million students for $105,000, but it did not contain all the data fields that Javice had represented to JPMC were maintained by Frank. Javice then purchased an additional set of data on the open market, in order to augment the data set of 4.5 million users. After JPMC acquired Frank, JPMC employees asked Javice and Amar to provide the data set of Frank users so that JPMC could begin a marketing campaign to those users. In response, Javice and Amar provided what was supposedly Frank's user data. In fact, Javice and Amar provided the data they had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users. *See, e.g.*, Compl. ¶¶ 13, 28-30, 32.

### B. Amar's Criminal Proceeds

On September 22, 2021—approximately one day after the JPMC-Frank acquisition closed—AMAR received approximately $2,496,307.94, representing his payout from JPMC, and

3

thus proceeds of the fraud, into his bank account. Two days later, Amar transferred ▇ of these proceeds to an Interactive Brokers LLC account (the "IBKR Account"), held solely in Amar's name. Prior to this transfer, the IKBR's account value was zero dollars.

After funding the IKBR account, Amar made no additional deposits.[2] He did, however, make ▇ in withdrawals. As of April 13, 2023, the IKBR Account balance was approximately $1,257,369.13. On April 14, 2024, Magistrate Judge Sarah Netburn issued a warrant authorizing the Government to seize all money, assets and funds held in the IKBR Account, finding that there was probable cause to believe that the funds in that Account were subject to seizure and civil forfeiture pursuant Title 18, United States Code, Sections 981(a)(1)(C) and 984. *See* Exhibit A (under seal).

On July 12, 2023, a Grand Jury indicted Amar in four counts: (1) conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; (3) bank fraud, in violation of 18 U.S.C. § 1344 and 2; and (4) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and 18 U.S.C. § 2. *See* Superseding Indictment, ECF No. 27, ¶¶ 1-6. The Indictment further alleges that the monies, assets, and funds in the IKBR Account are subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A) as proceeds traceable to the commission of conspiracy, bank fraud, and wire fraud offenses. *See Id.* ¶ 7.

**C.     The Property**

In February 2021, several months before Amar made millions from the fraud, Amar and

---

[2] Because the IKBR is an investment account, the account did receive monthly credits for dividends in relatively small amounts (*e.g.*, approximately ▇ in the month of February 2023). These dividends constitute property traceable to the fraudulent proceeds deposited in the IKBR Account.

4

his spouse purchased the Property, located ███████████████████, for approximately ███████. According to the real estate listing, the Property is a ███████████████████████████████████████████████████████████████████████. See Exhibit B (under seal) ████████████████████████████.

Based on a review of Amar's bank records, Amar spent █████████████ renovating the Property.³ Indeed, according to a recent appraisal, the Property's appraised value of approximately ██████████████████████████. The Property is, however, ████████████████████████████████████████████████████. The Property further secures Amar's $1 million appearance bond.

## ARGUMENT

The criminal forfeiture laws do not give the Court the authority to grant the relief Amar seeks. Amar's efforts to find exceptions to this clear authority are unavailing and principally rely on the *wrong* provision of 21 U.S.C. § 853—*i.e.*, the provision that applies to pre-indictment seizures. Furthermore, even if there were a legal basis to seek the exchange of seized assets—which there is not—Amar's proposal is not, as he claims, an equal-value, dollar-for-dollar

---

³ According to his motion, Amar and his spouse purchased the house approximately six months before his JPMC payout ████████████████████████. However, Amar may have used some of the criminal proceeds to renovate the Property, along with funds from other sources. The Government has not foreclosed the possibility that, through further tracing analysis, Amar's interest in the Property is directly forfeitable because criminal proceeds were used for its renovations.

exchange, and it risks further dissipating victim funds. The Court should accordingly deny his motion.

A. **<u>Applicable Law</u>**

Criminal defendants convicted of wire fraud offenses affecting a financial institution "shall forfeit to the United States any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2)(A). In this context, "proceeds" are not limited to profits, but broadly includes "gross receipts" the defendant controlled, directly or indirectly, as a result of committing the offense. *United States v. Peters*, 732 F.3d 93, 101-102 (2d Cir. 2013). A court may restrain (or take other action to preserve) an indicted defendant's forfeitable assets prior to trial. *See* 21 U.S.C. § 853(e)(1)(A); *see also* 28 U.S.C. § 2461(c) (providing that the procedures found in 21 U.S.C. § 853(e) govern criminal forfeiture proceedings).

Section 853 governs criminal forfeiture proceedings in two scenarios—before an indictment is filed (Section 853(e)(1)(B)) and after an indictment is filed alleging that property is subject to forfeiture (Section 853(e)(1)(A)). Section 853(e)(1)(B) provides that a court may restrain assets for up to 90 days (with extension for good cause shown) *prior* to the filing of an indictment if:

> (i) there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and (ii) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered[.]

Section 853(e)(1)(A) provides that a court may restrain assets *following* the filing of an indictment:

> upon the filing of an indictment or information charging a violation of this subchapter or subchapter II for which criminal forfeiture may be ordered under

6

> this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section[.]

In other words, restraints *prior* to an indictment require, among other things, a showing that the need to preserve the property outweighs any hardship to the defendant. To the contrary, restraints *following* an indictment need only be properly alleged in the indictment.

### B. There is No Legal Basis for the Relief Amar Seeks

The criminal forfeiture provisions applicable to this case do not recognize a hardship exception to allow an indicted defendant to access seized funds prior to conviction. Unlike the statutory procedures governing civil forfeiture proceedings (*see* 18 U.S.C. § 983(f)) or restraints on property taken prior to indictment (*see* 21 U.S.C. § 853(e)(1)(B)), Section 853(e)(1)(A) does *not* create a hardship exception for a defendant to seek the return of seized property. If Congress had intended there to be a hardship exception as to seized, forfeitable property in indicted cases, it could have created an exception in the statute, as it has in others—but it has not. Indeed, Congress has made clear that its decision to include or exclude a hardship exception in a forfeiture statute is an intentional one. *See* 18 U.S.C. § 983(a)(3)(C) ("If criminal forfeiture is the only forfeiture proceeding commenced by the Government, the Government's right to continued possession of the property shall be governed by the applicable criminal forfeiture statute.").

Consistent with this statutory scheme, courts have recognized only one circumstance in which a defendant can access seized funds following an indictment but prior to a conviction—a *Monsanto* hearing. Those proceedings are of a constitutional dimension: a defendant must first make a preliminary showing that, but for restrained funds, the defendant is unable to afford counsel of choice. *See United States v. Bonventre*, 720 F.3d 126, 131-32 (2d Cir. 2013). After making that showing, the defendant is entitled to an adversary hearing as to whether probable cause exists to believe that the restrained funds are properly forfeitable. *See United States v. Monsanto*, 924

F.2d 1186, 1203 (2d Cir. 1991) (en banc), *see also Kaley v. United States*, 571 U.S. 320, 339-41 (2014) (upholding that a defendant could challenge the probable cause as to the forfeitability of assets, but reaffirming that neither the Sixth Amendment nor due process requires a hearing to disturb a grand jury's finding that there is probable cause that the defendant committed a crime). At that hearing, the defendant is required to make detailed disclosures regarding his financial condition. Notably, the defendant here does *not* attempt to seek the return of seized assets through a *Monsanto* proceeding—nor could he. He is indemnified by the victim in this case, JPMC, which is paying the fees of his counsel of choice, and he does not, because he cannot, challenge that the IKBR Account contains proceeds directly traceable to the alleged offenses.

None of the authorities on which Amar relies support his novel claim that he may choose which assets the Government seizes prior to conviction. Amar relies on Section 853(e)(1)(B)(i) and (ii) for the proposition that a Court must weigh whether a failure to seize property will result in the property becoming unavailable and the need to preserve the property outweighs the hardship to the defendant. (Def. Br. at 6). That reliance is misplaced. Section 853(e)(1)(B) applies to pre-indictment property restraints that are entered *before* the filing of an indictment or information. Here, while the IKBR Account was initially seized pre-indictment, it was then specifically listed as forfeitable property in the Superseding Indictment. Accordingly, by its plain terms, Section 853(e)(1)(A)—not Section 853(e)(1)(B)—governs the asset seizure here.

Equally misplaced is Amar's reliance on *United States v. Wolf*, No. 22 Cr. 137, 2022 WL 3585154 (D. Minn. Aug. 22, 2022), whose facts are unique and distinguishable from this case in numerous respects.[4] In *Wolf*, the Government had seized, prior to indictment, large farm

---

[4] Indeed, the *Wolf* court described the facts in that case "unique" four times in the opinion.

equipment, purchased with funds traceable to a wire fraud. *Wolf*, 2022 WL 3585154 at *1-2. After the seizure warrants issued, the Government agreed to temporarily return some of the farm equipment to allow the defendant to plant his crops. *Id.* After the defendant was indicted, he again sought the brief return of the farm equipment for harvest. *Id.* The court permitted the temporary return of the farm equipment for the harvest. Unlike here, the *Wolf* case concerned the temporary return of an illiquid asset—heavy farming equipment—pursuant to a protective order, whereby the government would receive the same asset following the harvest. Amar, to the contrary, seeks the exchange of an illiquid asset (an interest in his home) for liquid cash that belongs to a victim that he intends to dissipate. *Wolf* is also unique in that the Government had initially agreed to return the farming equipment to allow the defendant to plant his crops, but then refused to return the equipment to allow the defendant to harvest the same crops. *Wolf*, 2022 WL 3585154 at *1-2. In this case, the Government has made no analogous representation and, to the contrary, has made clear to the defendant that it cannot and will not give him funds that rightfully belong to the victim. In addition, the court noted that the judge who issued the seizure warrant was not made aware of certain material facts, such as the Government's agreement to temporarily return the farm equipment. *Id.* at *2. In summary, nothing in *Wolf* stands for the proposition that a defendant may take back a liquid asset and spend it in exchange for an encumbered and risky asset.[5]

Amar's passing reliance on *United States v. Real Prop. in Waterboro*, 64 F.3d 752, 756

---

[5] The Report and Recommendation that the *Wolf* decision adopted also appears to rely, in part, on Section 853(e)(1)(B), which applies to forfeitures before the filing of an indictment. *See United States v. Wolf*, No. 22 Cr. 137, ECF No. 27, *Report and Recommendation,* at 12 (D. Minn. Aug. 12, 2022) ("Thus, this Court turns to the question of whether, pursuant to § 853, the Court can take action to address the hardship to Wolf by issuing an order for temporary use of the farm equipment.").

(1st Cir. 1995), and *United States v. Swenson*, 13 Cr. 91 (BLW), 2014 WL 2506300 (D. Idaho Jun. 3, 2014), is also unavailing. *Real Property in Waterboro* concerned the rights of *third parties* in proceedings related to the entry of an order of forfeiture—*i.e.*, *after* a criminal conviction. *Real Prop. in Waterboro*, 64 F.3d at 756. While the court acknowledged that prudential arguments may be raised in such third-party proceedings, the court did not, as Amar suggests, state that a court may consider prudential arguments upon a defendant's request for the return of seized assets. *Id.* at 756-757. As for *Swenson*, the court acknowledged that the standard for seeking a seizure warrant requires a showing, among other things, that the asset could be transferred or concealed prior to conviction. *Swenson*, 2014 WL 2506300, at *3. That case does not, as the defendant suggests, permit a court to re-evaluate a court's determination about the forfeitability of a particular asset.

Amar can therefore point to no authority that supports the extraordinary relief that he seeks. Nor could he. While the law permits courts to authorize seizures and restraints of property upon a showing of probable cause that such property is forfeitable, it does not allow the defendant to then unilaterally decide that the court's order should cover different property at his convenience. This is absolutely true, but all the more important in this case given that the seized property belongs to a victim. In light of the absence of any authority supporting Amar's proposal, coupled with the absence of a general hardship exception for post-indictment criminal forfeitures, the Court may not return properly-seized criminal proceeds for a defendant to spend prior to trial.

### C. Even if the Court Could Order An Exchange of Property, The Defendant's Proposal is Not Cost Neutral

Even if there were a basis in law for the exchange of property that Amar seeks (and there is not), Amar's entire argument rests upon the false premise that his proposal constitutes a

10

"dollar-for-dollar" exchange. (Def. Br. at 7). It does not. Liquid cash is simply not equivalent to illiquid and encumbered real property. Unlike a liquid asset, in order to realize a ▮ interest in the Property, the Property would need to be sold. Any such sale would be plagued with numerous risks—which the *Government* would be required to assume—and the Government's security in the Property would not, as a result, have the effect intended by statute of preserving the availability of the Property for eventual forfeiture.

First, under New York law, Amar's wife has a half-interest in the property and a right to the entire property upon the death of her spouse. *See United States v. Stern*, 16 Cr. 525 (JGK), 2021 WL 3474040, at *3-5 (S.D.N.Y. Aug. 5, 2021) (forfeiture of defendant's interest in marital home gave both government and innocent spouse an undivided half-interest in home as tenants in common, with government owning a survivorship right tied to innocent spouse's life and spouse owning a survivorship right tied to defendant's life); *United States v. Wolf*, 375 F. Supp. 3d 428, 438 (S.D.N.Y. 2019) (declining to dismiss defendant's spouse's claim to substitute assets because "the question of how to value individual interests in marital property that include rights of lifetime possession and survivorship . . . is an unsettled one in federal courts"). Accordingly, not only does Amar have only a half-interest in the Property (making the value of the asset ▮), its eventual forfeiture is subject to claims by his wife. Under the precedent cited above, this means that the Government would be entitled to forfeit the property only if the defendant's spouse passed before the defendant.

Second, in addition to his wife's half-interest and survivorship interest, the Property is encumbered by ▮.[6] Splitting these ▮

---

[6] The Property is also used to secure the defendant's $1 million bond. Should Amar seek a sale of the Property, the Government is willing to renegotiate his bail package to secure his appearance bond through other means.

evenly across his wife's interest and the defendant's interest, the theoretical equity available to the Government becomes ▮.  Thus, the Government's ability to collect its interest from this limited portion of the Property's value is subject to a further risk—the market risk that the Property drops in value, or that, as with any real property, the Property could be damaged or destroyed.

Finally, the Government would then have to take on the risks and expenses of selling the Property and any ancillary proceedings to pay off the liens.   Given these risks and associated costs to the Government, there is no basis for Amar's contention that his proposal reflects a "dollar-for-dollar" exchange.   Amar is giving the Government no "dollars" at all.   Rather, he would like the best of both worlds—to continue to live in a ▮ house and to also spend the liquid crime proceeds that rightfully belong to the victim in this case.   The Court should reject the defendant's extraordinary request.

D. **Amar's Proposal Risks Dissipating Funds that Belong to a Victim**

Amar's proposal is not only legally unsound and an unequal exchange, it also poses a risk to the availability of funds for restitution in this case.   The cash Amar seeks properly belongs to JPMC, the victim of this fraud.   If Amar is convicted at trial, he will be required to pay restitution to JPMC.   In the event that he is unable to meet his obligations, the Government can recommend that forfeited funds, like the IKBR Account, can be applied to the defendant's restitution obligations.  *See* 21 U.S.C. 853(i) (providing that the Attorney General is authorized to restore forfeited funds to victims).   Allowing Amar to spend his criminal proceeds prior to trial accordingly risks the ability of the Government to return victim funds.

## CONCLUSION

Accordingly, for the reasons set forth above, the Court should deny the defendant's motion.

Dated: New York, New York
March 22, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ *Rushmi Bhaskaran*
Rushmi Bhaskaran
Nicholas Chiuchiolo
Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2439 / 1247/ 2190 / 1040