O1I3JAVC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

    v.        23 Cr. 251 (AKH)

CHARLIE JAVICE and OLIVIER
AMAR,

     Defendants.

------------------------------x  Conference

            New York, N.Y.
            January 18, 2024
            2:45 p.m.

Before:

     HON. ALVIN K. HELLERSTEIN,

            District Judge

      APPEARANCES

DAMIAN WILLIAMS
  United States Attorney for the
  Southern District of New York
DINA McLEOD
  Assistant United States Attorney

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Attorneys for Defendant Javice
SAMUEL P. NITZE
SARA C. CLARK

KOBRE & KIM, LLP,
  Attorneys for Defendant Amar
SEAN S. BUCKLEY
STEVEN G. KOBRE
ALEXANDRIA E. SWETTE

HOGAN LOVELLS, LLP
  Attorneys for Interested Party JPMorgan Chase Bank, N.A.
ALLISON M. WUERTZ
WILLIAM REGAN
THOMAS HUNT
ELIZABETH COCHRANE

1          MS. WUERTZ:  Good afternoon.  We're here on behalf of

2    JPMorgan Chase.

3          THE COURT:  We have Dina McLeod for the government and

4    colleagues.  Mr. Nitze and colleagues for Charlie Javice, and

5    Buckley and colleagues for defendant Amar.  And for Morgan, we

6    have Ms. Wuertz and two colleagues.

7          MS. WUERTZ:  Yes, your Honor we have some different

8    colleagues here today.

9          THE COURT:  You would like to confuse me.  So you got

10   some good news for me?

11         MS. WUERTZ:  Not entirely, your Honor.

12         THE COURT:  Oh.

13         MS. WUERTZ:  Good afternoon.  This is Allison Wuertz

14   from Hogan Lovells on behalf of nonparty JPMorgan Chase N.A.

15         MR. HUNT:  Thomas Hunt from Hogan Lovells.

16         MR. REGAN:  William Regan from Hogan Lovells.

17         MS. COCHRANE:  Elizabeth Cochrane from Hogan Lovells.

18         MR. NITZE:  And for Charlie Javice you have Sam Nitze

19   and Sara Clark.  Good afternoon.

20         MR. BUCKLEY:  On behalf of Mr. Amar, your Honor, you

21   have Sean Buckley, Steven Kobre, and Alexandria Swette.

22         THE COURT:  Good afternoon.

23         Ms. Wuertz.

24         MS. WUERTZ:  Would you like me to go to the podium?

25         THE COURT:  Please.

1     MS. WUERTZ:  Good afternoon, your Honor.  So,
2  following the hearing yesterday, JPMorgan and defendants did
3  work to try to come to an agreement on the individuals who
4  would fall within the control group definition that your Honor
5  provided yesterday.
6         Defendants provided an initial list of 11 individuals.
7  JPMorgan provided its own list of 10 individuals.  There was an
8  overlap of three people on those two lists.
9         After the parties --
10        THE COURT:  You can agree on three people and disagree
11 on eight?
12        MS. WUERTZ:  We're disagreeing on closer to 18 I
13 guess.
14        But subsequent to those initial lists, the defense
15 counsel came back, they said they would agree to add everybody
16 from our list, minus one person, and then they also wanted to
17 add seven additional people that appeared on their original
18 list.  So they left one person off their list.
19        But at the moment, JPMorgan doesn't view the
20 individuals that they wish to add as consistent with the
21 control group definition.
22        THE COURT:  What?
23        MS. WUERTZ:  Consistent with the control group
24 definition, your Honor.
25        THE COURT:  Mr. Nitze, what's your perspective?  Stay

1  where you are.

2  MR. NITZE: Thank you, Judge. I largely share the

3  perspective Ms. Wuertz just gave. I think we're down to six,

4  maybe it's seven individuals that we're in disagreement about.

5  We've tried to reach compromise.

6  THE COURT: Let me understand what people do you want

7  to add that she doesn't want to add?

8  MR. NITZE: I can list them by name and title if

9  that's --

10  THE COURT: Start. Take one at a time.

11  MR. NITZE: Jamie Dimon.

12  THE COURT: He's the chief. Was he involved in the

13  deal?

14  MR. NITZE: Yes.

15  THE COURT: Ms. Wuertz?

16  MS. WUERTZ: Your Honor, he had one meeting with

17  Ms. Javice early on July 7.

18  THE COURT: He is a boss. I think you should include

19  him.

20  MS. WUERTZ: Your Honor, I think that --

21  THE COURT: I know it's delicate. It doesn't mean he

22  is going to be a witness. But his documents are fair game.

23  MS. WUERTZ: We're happy to do so, your Honor. We

24  think he falls outside of the definition your Honor was trying

25  to get at as people who were truly involved.

1          THE COURT:  He's in control of the control.  Nobody

2     was higher in the company, and he was involved in this deal.  I

3     saw his name in the complaint.

4          MS. WUERTZ:  He had a meeting with Ms. Javice.  That's

5     correct.

6          THE COURT:  So he's included.

7          MS. WUERTZ:  Yes.

8          THE COURT:  Next?

9          MR. NITZE:  Next we would put Lisa Neunder, your

10    Honor.

11         THE COURT:  What's his name?

12         MR. NITZE:  Lisa and her last name is Neunder.

13         THE COURT:  What was her position?

14         MR. NITZE:  She was a vice president of partnership

15    integration.  She worked during diligence, after diligence,

16    communicated to corporate development and marketing teams about

17    the users, she was integrally involved in this process, and had

18    some decision making authority.  So we view her as part of

19    control group.

20         THE COURT:  The integration aspect I've already

21    disallowed.  So, but you're saying she also took part in the

22    due diligence before the transaction?

23         MR. NITZE:  Yes.  I say "integration," I should use a

24    different word.  As the company's dealing with the marketing of

25    the user base, the sort of core piece that your Honor put into

O1I3JAVC

1   the -- as a set that's included, she is responsible for

2   communicating as kind of a liaison from the ground to higher

3   up.  And she's sort of vetting the uses of Frank data.

4           It is directly germane to this user list, user base

5   issue.

6           THE COURT:  Ms. Wuertz.

7           MS. WUERTZ:  Your Honor, we think that really

8   overstates Ms. Neunder's involvement.  She had very little to

9   no involvement in diligence.  She came in post-merger, and

10  she's really effectively a project manager, so she helped

11  marshal resources, she helped try to encourage --

12          THE COURT:  Did she enter the situation after the

13  transaction was over?

14          MS. WUERTZ:  Your Honor, that's my understanding.  She

15  sort of got a hand off from the corporate development team.  So

16  she joined --

17          THE COURT:  So the only potential relevance she might

18  have is she wanted to market in such a way, and she found out

19  she couldn't because the customer base was not there.

20          MS. WUERTZ:  That wasn't her role.  She didn't decide

21  whether to market or not.  She helped oversee the folks who

22  were doing that work who we agreed to add to the list.

23          THE COURT:  I rule for you on her.  She's not part of

24  the group.

25          MS. WUERTZ:  Thank you, your Honor.

1           THE COURT:  Next?

2           MR. NITZE:  Your Honor, if I might take one step back.

3   We're --

4           THE COURT:  She's probably redundant anyhow.  You

5   probably have four people ahead of her.

6           MR. NITZE:  It is a losing proposition to fight you on

7   her.  We're talking here about Rule 17 and undue burden, and

8   four custodians who our clients -- or five custodians -- have

9   reason to believe are deeply involved.

10          THE COURT:  I understand that, but I'm going to assess

11   burden as a whole.  I'm already substantially burdening Chase.

12   So it's not a matter of marginal or incremental burden.  It is

13   an overall burden.  You've got other people, I'm sure.  We

14   don't need her.

15          MR. NITZE:  I'm going to turn it to Mr. Buckley who

16   wants to advance some names as well.

17          MR. BUCKLEY:  Yes, your Honor.  Ravi Govindaraju, who

18   is the head of product and digital financial management.  She

19   was also Mr. Amar's supervisor at a certain point of time and

20   was intimately involved in operating Frank post-merger,

21   including assessment of which users Frank could market to.

22   Frank's true or marketable user base.

23          MS. WUERTZ:  Your Honor, in our view Mr. Govindaraju

24   was brought in, he was brought in post-merger, after a few

25   months that Frank had been operating.  He was brought in

O1I3JAVC

1    between Ms. Javice and Mr. Amar, and their ultimate supervisor,

2    Ms. Divilek, and brought in really more of a mentoring role to

3    help Frank set business goals, to help them understand how to

4    sort of integrate at Chase, how to work things at Chase.  He

5    was not again sort of hands on, providing his views on who

6    should be marketed to.

7              THE COURT:  I take your point and I rule for you,

8    except I have a certain reservation of how the government is

9    going to prove that the names that Morgan bought really weren't

10   there.  And the data sets that they bought weren't really

11   there.  So, it's hard to make a ruling on individuals unless I

12   know more from the government.  And you'll enlighten me.

13             MS. McLEOD:  Yes, your Honor.

14             THE COURT:  Dina McLeod.

15             MS. McLEOD:  Yes, your Honor.

16             So, in terms of the synthetic data set, which is one

17   of the subjects of the complaint, first of all, actually I

18   don't know that there is actually a dispute that those people

19   don't exist.  I've never heard the defendants say, either in

20   this case or in their civil case, that in fact, those were real

21   people.  So there actually might not be a live dispute.

22             THE COURT:  Say that again?  I didn't follow that

23   point.

24             MS. McLEOD:  So --

25             THE COURT:  They're not people within the data sets

1    that were bought, right?

2         MS. McLEOD:  So there's a couple of data sets, which

3    makes it kind of confusing.  But, there was one set of data

4    which Frank provided to JPMorgan Chase which was meant to

5    represent their users, and it had 4.2 five million rows, and

6    each of the rows was meant to be a user of the Frank website.

7    In fact, that data was synthetic data, so these people were

8    made up.  It was made up data.

9         THE COURT:  It was fake.

10         MS. McLEOD:  Yes.  So that's one set of data, and as I

11    said, I actually --

12         THE COURT:  That was exposed post-merger, right?

13         MS. McLEOD:  Correct.

14         THE COURT:  So, I need to know the witnesses who will

15    be used to prove that.

16         MS. McLEOD:  So, in terms of how JPMorgan Chase

17    eventually uncovered the synthetic data set, they uncovered

18    that by looking at essentially the marketing lists.  They tried

19    to do a marketing campaign with these various lists of users

20    that Javice and Amar provided to the JPMorgan Chase marketing

21    team, and the marketing campaign didn't work out.  That's sort

22    of how the scheme started to unravel, because people were

23    confused.

24         I'm not sure, and we're not taking -- the government

25    doesn't have a position on these particular individuals.  This

O1I3JAVC

1   is between JPMorgan Chase and the defendants.  But, I don't
2   know that, I don't know that Mr.  -- that Ms. and I missed the
3   fullness of her last name, whether the head of product --
4           THE COURT:  Mr. Buckley, give us that name again.
5           MR. BUCKLEY:  Ravi Govindaraju.  It is a mister.  I
6   misspoke.
7           THE COURT:  It might be good to spell it.
8           MR. BUCKLEY:  Sure.  G-O-V-I-N-D-A-R-A-J-U.  And your
9   Honor, I don't want to interrupt Ms. McLeod, but I'd like to be
10  heard further on the relevance.
11          THE COURT:  You'll be heard.
12          MR. BUCKLEY:  Excuse me, your Honor?
13          THE COURT:  Let her speak and then you'll be heard.  I
14  might rule for you without hearing from you.  You wouldn't mind
15  that.
16          MR. BUCKLEY:  Certainly not.
17          MS. McLEOD:  To cut to the point, I don't know at this
18  point that we would call Mr. Govindaraju to prove that this
19  data set was false.  I'm not sure as to the synthetic data set,
20  he certainly would not be the witness we would call.
21          THE COURT:  My question though has to do with this
22  issue.  I just ruled for two people involved in marketing,
23  however fancy the names are, that they are out of the control
24  group.  But, now that I speak with you, it seems to me that
25  these people are necessary because that's how the fraud was

O1I3JAVC

1    uncovered.

2          Who is shaking heads?  Who is nodding his head up and

3    down?

4          MR. KOBRE:  That was me.

5          THE COURT:  Do you think that would help me?

6          MR. KOBRE:  No.

7          THE COURT:  Then don't do it.

8          So I think from what you say, I need to be more

9    liberal on this.

10         MS. McLEOD:  So again we don't -- we don't have a

11   position.  I think this is a very fact intensive --

12         THE COURT:  I am asking you to be helpful.

13         MS. McLEOD:  In terms of being helpful, I don't think

14   that these people are the ones who are the closest to the

15   ground on marketing.  That said, I don't want to say that they

16   had no involvement in marketing, because I'm not sure.

17         THE COURT:  How many marketers do you want, Mr. Nitze

18   and Mr. Buckley?

19         MR. NITZE:  We'd have to put our heads together about

20   the number, but these five or six people we're talking about,

21   all of them had some touch point on this aspect.

22         Perhaps Ms. McLeod has articulated it better than I

23   was.  This is a core part of the case.

24         THE COURT:  Who is reporting to whom?  I don't want

25   you to get all the bits and pieces on the low guys.  I want you

O1I3JAVC

1  to focus on the big guys because that's where the reporting

2  would be, and you get those guys, you've got the whole story.

3      MR. NITZE:  It's a big team.  There is 1,000 of these

4  people running around on it.  The control group is 25 people,

5  intimately involved.  We've pared down to less than a half a

6  dozen in dispute, for a bank that says it's already collected

7  all the data.  We're talking about running some search terms

8  and giving us some materials.  And each of them, I can tell you

9  their titles, they all have fancy titles, they are all on the

10  communications, they're all guiding this project forward.

11      MR. BUCKLEY:  Judge, if I can add to Mr. Nitze's

12  presentation there, we're asking for seven additional people

13  that we have identified as the core personnel.

14      THE COURT:  One minute.

15      MR. BUCKLEY:  Sure.

16      THE COURT:  Go ahead.

17      MR. NITZE:  Kelley Reichert is one of the people we're

18  asking for, executive director and head of consumer bank

19  acquisition marketing.

20      THE COURT:  Do you have a list?

21      MR. NITZE:  We have a list.

22      THE COURT:  Does Ms. Wuertz have the list?

23      MR. NITZE:  She has the list.

24      MS. WUERTZ:  Yes, your Honor.

25      THE COURT:  Does Mr. Buckley have the same list?

1          MR. NITZE:  May I approach?

2          THE COURT:  Absolutely.

3          MR. BUCKLEY:  Just while we're waiting to hand up the

4   list, I wanted to address one item that came up in Ms. McLeod's

5   presentation.

6          THE COURT:  I need Ms. Wuertz's attention.

7          MR. BUCKLEY:  Certainly, Judge.

8          THE COURT:  We'll mark this as Exhibit A to this

9   argument, January 18, 2024.

10          So where should I look, what numbers?

11          MR. NITZE:  I'm going to tell you the numbers that are

12   in dispute.

13          THE COURT:  Okay.

14          MR. NITZE:  Number 4, Ravi.

15          Number 5.

16          Number 6, sorry.  You've already ruled on 6.  I don't

17   think you ruled on 6.

18          THE COURT:  Give me the whole list.  Give me what you

19   want.

20          MR. NITZE:  The names in dispute are 4 -- this is at

21   the bottom list, the list of 16.  It says "current list."

22          THE COURT:  Yes.

23          MR. NITZE:  And the names in dispute are 4, 5, 6, 7,

24   9, and 16.  Those are the remaining names in dispute.

25          THE COURT:  Okay.  Now give me a moment just to look

O1I3JAVC

1    at this.

2            MR. NITZE:  And 8 was in dispute, Dimon also.

3            THE COURT:  I ruled on Dimon.  Right?

4            MS. WUERTZ:  You did, your Honor.  And I don't know if

5    you're revisiting your rulings on Ms. Neunder and --

6            THE COURT:  No, Dimon's in.

7            I think, Ms. Wuertz, there is justification for some

8    of these names, but redundancy with all the names.

9            MS. WUERTZ:  Yes, your Honor.

10           THE COURT:  It's not clear to me from this list who is

11   the overall supervisor in this group.

12           MS. WUERTZ:  Not all of these individuals fall along

13   neat reporting lines.  I'd like to point out that so,

14   Mr. Govindaraju, for example, has nothing to do with marketing,

15   so he would not be in the marketing bucket.  And Ms. Neunder

16   also is not in marketing.  Her job title has to do with

17   integration.  So she's again really a project manager for

18   integration, not someone who would have been involved in the

19   marketing decisions.

20           Mr. Mark Goldstein, who defense has actually agreed to

21   remove, he was really the one in charge of the marketing

22   campaign that Ms. McLeod spoke about, which is why he was on

23   our list originally.

24           But there are other individuals such as Keona

25   Drakeford who were involved in marketing as well.

1        MR. NITZE:  And your Honor, this is Mr. Nitze if I

2   might.  I think part of the reason I come back to burden is

3   just if there is some redundancy in a context like this, we are

4   talking about a very well-resourced bank searching data for

5   just over a dozen custodians.  If we have some redundancy as we

6   defend ourselves against criminal charges, that is hardly a

7   redundancy that constitutes a major burden with respect to Rule

8   17.

9        THE COURT:  Maybe yes, maybe no.

10        I want to get a better understanding how the reporting

11   lines went.  It looks from the title that Govindaraju shouldn't

12   be searched.  I don't understand how a digital product manager

13   needs to be searched.

14        MR. BUCKLEY:  Did you say should not be searched?

15        THE COURT:  Should not.

16        MR. BUCKLEY:  May I be heard on that, Judge?

17        THE COURT:  Yeah.

18        MR. BUCKLEY:  I think I misheard your Honor.  You said

19   Mr. Govindaraju should be searched?

20        THE COURT:  If I give you these six names, 4, 5, 6, 7,

21   9, and 16.  Would that satisfy you?

22        MR. NITZE:  The ones that are in dispute in addition

23   to the ones that are not in dispute, yes.

24        THE COURT:  What is not in dispute?

25        MR. NITZE:  Everybody else.  They've agreed to the

1     rest.  I've given you the numbers for the custodians that are

2     now in dispute.  The others were on their list.

3              THE COURT:  Morgan proposes 10.  And you defendants

4     propose 11.  Are they the same 10 and 11?

5              MR. NITZE:  No.  The bank proposed 10, we have taken

6     one out who the bank said they've already given us much of

7     their data, and we proposed an additional seven to make a total

8     of 16.

9              And so, we have the nine that they've initially agreed

10    to, and then the seven.  You've ruled on Dimon, that leaves the

11    six numbers that I gave to your Honor that we're asking to move

12    from 10 to 16, which strikes us again, in the context of a

13    criminal case, six custodians to search for, if there is a

14    little redundancy, what is the harm?  It won't come into the

15    evidence, the jury won't learn about it, it is hardly a burden

16    for this bank that has an army of attorneys and others working

17    for it to search for this data.

18             THE COURT:  15 in all.

19             MR. NITZE:  16 total.

20             THE COURT:  16 in all.  It's actually more than I

21    envisioned.

22             MS. WUERTZ:  Your Honor, if I may, I think there is a

23    lot of duplication.  Because in addition, when we proposed our

24    list, we proposed who we thought were going to be the people

25    closest to the transaction who would not be duplicative of one

01I3JAVC

1    another, and there are a number of people on our list that the

2    defendants then agreed to, to add up to 16, who are duplicative

3    in light of some of the individuals that they've added.

4              THE COURT:  So, help me out.  Of 10 custodians, which

5    ones are not of interest to the defendants?

6              MS. WUERTZ:  They're willing to have them all except

7    for Mr. Goldstein.

8              MR. BUCKLEY:  Who we agreed to eliminate, Judge, to

9    reduce redundancy.

10             THE COURT:  Who of the defendants' list do you object

11   to?

12             MS. WUERTZ:  Your Honor, we object to everyone except

13   for Ms. Divilek, Mr. Adelsberg, and Ms. Drakeford, who are also

14   on our list, in the interest of filling out the control group.

15             THE COURT:  Who is on your list?  Divilek?

16             MS. WUERTZ:  Adelsberg.

17             THE COURT:  Number two.

18             MS. WUERTZ:  And Drakeford.  So they are the three who

19   are in shading on that combined list.

20             THE COURT:  Number 3.  Drakeford.  Okay.

21             MS. WUERTZ:  That's correct.

22             MR. NITZE:  Really.  It is the six numbers I gave are

23   the ones in dispute, your Honor.  The ones that the defense

24   wants, and that JPMorgan has said are redundant.

25             It is very difficult I would think for the Court

1    sitting here with these titles and the different overlapping

2    work streams to make a precision judgment about which ones were

3    actually the most involved and likely to have the

4    communications and evidence most relevant to the defense which

5    is ultimately what we're doing here.  Not sort of formalizing

6    org charts.

7              So with that in mind, we struggle to see the harm in

8    six additional custodians.

9              THE COURT:  I know.  You made the point.  I'm looking.

10   So on the defendants' list that was given to Chase, there are

11   only two, Lorraine Hansen and Neil Seideman, who are not

12   included in the bottom list.

13             MS. WUERTZ:  Lorraine Hansen is also included in the

14   bottom list.  There is only one that they removed from their

15   original list.

16             THE COURT:  Hansen is included you said.  Yes.  Right.

17   Correct.  So they've removed Seideman.

18             MS. WUERTZ:  That's correct, your Honor.

19             THE COURT:  And they wanted seven more.

20             MR. BUCKLEY:  Not to pile on, but it is --

21             THE COURT:  I need a couple minutes.  Let me take a

22   few minutes.

23             (Recess)

24             THE COURT:  Be seated, please.  So what I've done is

25   compare the defendants' wish list to the descriptions found in

O1I3JAVC

1    Exhibit B to the defendants' opposition.  And on the basis of

2    that, I believe that numbers 4, 6, and 9 would be in the

3    control group, and the rest not.

4            MR. NITZE:  So if I understand your Honor, it is the

5    group that is uncontested, plus Dimon, and then 4, 6, 9, so

6    Ravi, Jameson, and Kelley.

7            THE COURT:  Yes.

8            MR. NITZE:  Understood.

9            MR. BUCKLEY:  Judge, if I could just address what is

10   on the defendants' list as number 7, Lorraine Hansen.

11           THE COURT:  Yes.

12           MR. BUCKLEY:  We think that she is critical to

13   Mr. Amar's defense.  If your Honor recalls, the main allegation

14   against Mr. Amar is the post-merger coverup.  And Lorraine

15   Hansen in her role was, among other things, responsible for the

16   data list assessment.  So, it goes directly to the question of

17   who said what.

18           THE COURT:  I'll give you Hansen.  She's described as

19   having worked on the deal and marketing plan during diligence

20   and the deal review.  So she would have been in a position to

21   know what was the set of data that Chase bought.  Later, Hansen

22   participated in business unit reviews, assessing the status of

23   Frank operations, and marketing strategies and in the

24   post-merger analysis of Frank's data.

25           I recognize that this is defendants' descriptions.

O1I3JAVC

1  But, giving the defendants the benefit of the doubt, we'll

2  include Hansen, number 7 as well.  So 4, 6, 9 and 7.

3          MS. WUERTZ:  If I may be heard on just one point.

4          THE COURT:  Yes.

5          MS. WUERTZ:  If your Honor is going to add

6  Ms. Reichert, we believe that renders Mr. MacDonald and

7  Mr. Goodman duplicative.  And so we would propose --

8          THE COURT:  Who?

9          MS. WUERTZ:  Mr. Goodman and Mr. MacDonald.

10          THE COURT:  I didn't include Goodman.

11          MR. NITZE:  Those are in the consent list, your Honor.

12          THE COURT:  She wants to take them off.

13          MS. WUERTZ:  I guess then if you could clarify, your

14  Honor.  So, the control group is --

15          THE COURT:  The reason you want to take Goodman off is

16  because he's described as a managing director and head of

17  product consumer banking, and it doesn't seem from that

18  description that he had anything to do with the user base.

19          But let me see how he is described in the motion.

20          MR. NITZE:  He led --

21          THE COURT:  I've got to read here.  It says Goodman

22  led the product work stream and diligence.

23          MR. NITZE:  He's critical.

24          THE COURT:  It looks like he is a coordinator and in

25  that way he has a lot of information.  I think he should be in.

O1I3JAVC

1    You don't have to argue everything.  Sometimes I get you

2    without arguing.

3          So Goodman is in.  Anything else?

4          MR. BUCKLEY:  Just want to clarify your ruling.

5          THE COURT:  I'm with Chase now.

6          MS. WUERTZ:  So, your Honor, just to clarify.  So,

7    from that current list that originally had 16 names, you are

8    not including Ms. Colbert, you're not including Ms. Neunder.

9    But you are including everybody else.  I wanted to make sure I

10    have that correct.

11          THE COURT:  You took out Seideman.

12          MS. WUERTZ:  I'm sorry, your Honor.  I'm looking at

13    the very bottom list.

14          THE COURT:  This is confusing because there are a lot

15    of lists.

16          MS. WUERTZ:  Yes, your Honor.

17          THE COURT:  I think we took out Seideman, so in the

18    defendants' proposed 10 custodians, we're taking out number 5,

19    Maria Colbert; number 8, Lisa Neunder; and number 10, Neil

20    Seideman.

21          MR. NITZE:  In the current list at the bottom.

22          THE COURT:  We're adding in the bottom list, number 4,

23    Ravi Govindaraju; number 6, Jameson Troutman; number 7,

24    Lorraine Hansen; number 9, Kelley Reichert.

25          Do we have agreement?

1  MR. NITZE:  I think if I understand it, please tell me

2  if I'm wrong, you have a set of custodians --

3  THE COURT:  It's like herding cats.

4  MR. NITZE:  I think we're down to 14 custodians total.

5  You have cut from the list, there is a list of nine that we

6  agreed to, and then we wanted seven more.  And you've trimmed

7  those down, you told us the numbers that are in.

8  THE COURT:  You know what, you and Ms. Wuertz and

9  Mr. Buckley, make a list.  Take a piece of yellow paper, make a

10  list.  And we'll put that on the record and that will be the

11  agreed list.

12  MR. NITZE:  Okay.

13  (Counsel conferring)

14  THE COURT:  That will be exhibit B.  This is the

15  agreed list of the identities of the control group whose files

16  have to be searched according to the criteria set yesterday.

17  There are 14 names.

18  I'll give Exhibit B to the reporter and ask that it be

19  bound up with the record.

20  Next we have to decide --

21  MR. BUCKLEY:  Before we move on, just one additional

22  point.  With regard to the due diligence meetings, while we

23  have received PDF versions of sanitized notes of those

24  meetings, we have not received any of the underlying notes.  It

25  is possible that certain of the 14 individuals that your Honor

1    just identified may be some of the note takers, but if we don't

2    find the realtime notes in the course of this search, that is

3    still an issue that remains in play.  It goes to the point that

4    your Honor made --

5            THE COURT:  We assigned topics, and if there is a

6    development of information within a topic, it has to be

7    produced, the beginning and the end.

8            MR. BUCKLEY:  Understood.  Thank you, Judge.

9            THE COURT:  Unless it's privileged.

10           Now the next thing I want to know is when production

11   of documents.

12           MS. WUERTZ:  With the expansion of the list, we had

13   originally estimated something like three to four weeks for

14   production, and an additional two weeks for the privilege log.

15   We'd like to ask for a couple more weeks, so to finish our

16   production by let's say March 15, and then privilege logs by

17   the end of March.

18           THE COURT:  The proposal is the production of

19   documents will be made by March 15, and the comprehensive and

20   complete privilege log by March 29.

21           Are defendants satisfied?  Is the government

22   satisfied?

23           MR. NITZE:  Yes, your Honor.

24           MR. BUCKLEY:  Yes, your Honor.

25           MS. McLEOD:  That's fine, your Honor.

O1I3JAVC

1          THE COURT:  Yes.  Okay.  I adopt those dates.

2          The next thing we need to do is to work out a

3    procedure for challenges.  So, how much time, after JPMorgan

4    Chase produces a complete privilege log, do you need so set up

5    challenges?  Mr. Nitze?

6          MR. NITZE:  A month?

7          MR. BUCKLEY:  Just so your Honor understands, the

8    privilege logs are dozens, if not hundreds, of pages with

9    thousands of individual entries.

10          THE COURT:  April 30 defendants will -- this doesn't

11    have to be filed, the privilege log should be filed.  The

12    challenges should go to Chase directly, and then by May 16, I

13    would like to be filed a modified privilege log which would

14    reflect things that are removed from privilege because of

15    agreement, leaving only the disputed items for me to deal with.

16          I shouldn't say a modified privilege log.  A privilege

17    log from which documents that are agreed to be produced has

18    been removed, and on which challenges by defendants are made.

19    And that will be done by May 16.

20          MS. WUERTZ:  Your Honor, just to clarify, what about

21    entries where there is no dispute?  Do you want just a list of

22    challenged entries?

23          THE COURT:  I think if you give me a whole privilege

24    log, and have another column for objections by defendants.

25    Mr. Buckley, Mr. Nitze will get together with their teams, and

O1I3JAVC

1  come up with a complete list of challenges.  And then you

2  should work it out.  Try to work it out.

3       They have to set their challenges to you on April 30.

4       MS. WUERTZ:  Yes, your Honor.

5       THE COURT:  It does not have to be a filed document.

6  May 16 will be a filed document, it will be a privilege list

7  that removes everything that the parties agree is producible,

8  and shows in another column the objections and very brief

9  reasons for the objections by defendants.  And that has to be

10  filed May 16.

11       MS. WUERTZ:  Thank you, your Honor.

12       THE COURT:  I will set a hearing date or dates with a

13  procedure following that I'll set a date for, but I may have a

14  trial going on at which time I'll have to adjourn the date.

15       So May 30 at 2:30 we'll have the sampling procedures I

16  mentioned yesterday.  That is, when all the privilege documents

17  will be brought into the courthouse, defendants will be able to

18  sample.  I think a reasonable sampling number might be 15, but

19  you can push me on that or each other.  And different

20  categories, I can make rulings and then you can apply them.

21  That will be done May 30 at 2:30.

22       I think that completes what we have to do with the

23  log.

24       And now with production of documents being made on

25  March 15, I'd like to have a proposed motion schedule.

O1I3JAVC

1      MS. McLEOD:  Your Honor, I think the parties are very

2  close to a proposed schedule on almost all pretrial dates,

3  including, for example, motions in limine.  We were very close

4  prior to the conference.  If we could have just have a couple

5  minutes to confirm.

6      THE COURT:  Yes.

7      (Counsel conferring)

8      MS. McLEOD:  Okay, your Honor.  We are ready to go.

9      THE COURT:  Okay.

10      MS. McLEOD:  All right.  We have one issue that is in

11  dispute, but I'll start with the many dates that we are agreed

12  on.

13      So for the motion schedule, April 5 for defendants'

14  Rule 12 pretrial motions.

15      April 30 -- sorry.  This is a privilege related issue.

16      May 3 for government response.

17      May 20 for defendant replies.

18      June 15 for government and defense expert disclosures

19  as for case in chief.

20      July 15, supplemental expert disclosures, if any.

21      September 13, government preliminary exhibit list and

22  witness list and 3500 material.

23      September 20, defendant preliminary exhibit list.

24      September 27, motions in limine, request to charge,

25  and voir dire.

O1I3JAVC

1          THE COURT:  Start with June 15, please.

2          MS. McLEOD:  Go back to June 15?

3          THE COURT:  Yes.

4          MS. McLEOD:  June 15, expert disclosures.

5          July 15, supplemental expert disclosures, if any.

6          THE COURT:  Why do you need those?

7          MS. McLEOD:  The defendants had a concern that they

8   might want different experts based on any government experts.

9          THE COURT:  So simultaneous submissions of experts on

10  June 15, and supplements on July 15?

11         MS. McLEOD:  Correct, a month later.

12         THE COURT:  Supplements being in the substantive

13  report as well?

14         MS. McLEOD:  I'm sorry, your Honor?

15         THE COURT:  Meaning substantive additions as well and

16  modifications.

17         MS. McLEOD:  I think by supplemental expert -- yes.  I

18  think, yes, or any new expert that needs to be disclosed based

19  on the other parties' expert disclosures.

20         THE COURT:  All right.

21         MS. McLEOD:  September 13, the government's

22  preliminary exhibit list, government witness list, and

23  government's 3500 material.

24         September 20, defendants' preliminary exhibit list.

25         September 27, motions in limine, request to charge,

O1I3JAVC

1    and voir dire.

2              October 9, oppositions to motions in limine.

3              THE COURT: October when?

4              MS. McLEOD: October 9.

5              THE COURT: Yeah.

6              MS. McLEOD: Then October 15 is the final pretrial

7    conference, which has already been set by the Court.

8              THE COURT: Yes.

9              MS. McLEOD: Then October 28 is the trial date.

10             THE COURT: Yes.

11             MS. McLEOD: And the parties have agreed that the

12   defendants will disclose the defense witness list and any 26.2

13   statements to the government 10 days before the close of the

14   government's case in chief.

15             THE COURT: How will they know what the close date is?

16             MS. McLEOD: It will be based on the government's

17   projection as to how far we are out. But that was what the

18   defendants proposed, and the government is okay with that, if

19   that's how they want to do it.

20             THE COURT: It's not something I can implement. So if

21   we're going to start trial on the 28th, why don't you do three

22   weeks in for the defendants' list.

23             MS. McLEOD: Okay. Let me look at the calendar. So I

24   think that would take us to November 18th.

25             THE COURT: Let's do November 15.

O1I3JAVC

1    MS. McLEOD:  That schedule is all on consent between

2    the parties.  And then we have one final issue which we would

3    need the Court's guidance on.

4    THE COURT:  Okay.

5    MS. McLEOD:  So, in the past, at conferences, in the

6    fall, the government had asked for a date on which the

7    defendant was to provide notice of any affirmative defenses,

8    including advice of counsel.  And that was because we wanted to

9    resolve any issues well in advance of trial, because if there

10   is an advice of counsel defense, the government needs to

11   conduct discovery.

12   So, we proposed a date of February 12th, in part

13   because, as I believe that your Honor had noted at one of the

14   last conferences, the information needed as to the notice for

15   advice of counsel is subjective and would be known to the

16   defense now.

17   THE COURT:  I'm not catching you.  What's going to

18   happen on February 12?

19   MS. McLEOD:  The government would propose the

20   defendants would provide notice of any affirmative defenses,

21   including advice of counsel, so that if need be, the government

22   can engage in discovery on those issues.  Because as your Honor

23   knows, if there is an advice of counsel defense, then typically

24   the privilege is waived and the government is entitled to

25   discovery on what happened between counsel and the defendants.

O1I3JAVC

1    And that process we would like to get started earlier rather

2    than later.

3              THE COURT:  What's the defendants' proposal?

4              MS. McLEOD:  The defendants propose after the hearing

5    as to the privilege logs, which is --

6              THE COURT:  May 30.

7              MS. McLEOD:  -- May 30, which I think is then pushing

8    us into the summer.

9              And the other thing I would just note on this is that

10   it is a little unclear what JPMorgan Chase has that would be

11   relevant to the advice of counsel defense in the sense that,

12   although correct me if I'm wrong, they would have, they have

13   communications from Matt Glazer, who was the general counsel.

14   But they do not, and have segregated communications from

15   counsel for the merger.  And so, that will not even be -- that

16   is not going to be decided by then.

17             So, in the government's view, we should just get this

18   process started in order to get the ball rolling on this, and

19   to not have this prolonged discovery process and disputes

20   continuing into the summer as we're leading up to trial, and

21   we're trying to nail down what happened with counsel.

22             So that's the government's view.  But the defendants'

23   position is that they need until after the hearing in order to

24   decide, and the government just disagrees.

25             THE COURT:  I think you can give the list, they may

O1I3JAVC

1    want to supplement it.  I think the government should know the

2    affirmative defenses.  You know what they are.  I think the

3    government's right.  February 12.

4            MR. NITZE:  May I be heard on the question, your

5    Honor?

6            THE COURT:  Yes.

7            MR. NITZE:  With respect to advice of counsel, in

8    particular, the point the defense is making is that there's

9    going to be, potentially anyway, litigation over documents

10    withheld from our access on the basis of privilege, including

11    documents at the moment withheld on which our clients are

12    participants.  And the scope of what is said, what is in those

13    documents, and their potential evidentiary value, has direct

14    relevance to whether we might or might not advance an advice of

15    counsel defense.  So it's very hard for us to make that

16    judgment.

17            THE COURT:  So you'll withdraw it.

18            MR. BUCKLEY:  The problem is, your Honor, if the

19    government is going to contend that by providing notice of

20    advice of counsel three months before we even know what the

21    documents contain, and, you know, it's more than simply the

22    merits.

23            THE COURT:  You're going to know the bulk of the

24    documentary production.

25            MR. BUCKLEY:  But, your Honor, it pertains to the

1    documents that JPMorgan has withheld as privileged, and if the

2    government is going to assert that there's been a waiver by

3    virtue of asserting the advice of counsel defense, they are

4    going to be getting access to documents that neither my client

5    nor Ms. Javice --

6            THE COURT:  Advice of counsel is not the advice that

7    Morgan got.  It is the advice that Javice and Amar got.

8            MR. BUCKLEY:  That's correct, Judge.  But included in

9    those files are, as Ms. McLeod indicated, among other things,

10   communications with Matt Glazer that involve our clients.  Matt

11   Glazer was the general counsel of Frank prior to the merger.

12           THE COURT:  So?

13           MR. BUCKLEY:  We don't have access to those

14   communications, and therefore cannot evaluate the scope of what

15   a waiver would entail, until we get access to the

16   communications.

17           THE COURT:  And Matt Glazer is part of Chase?

18           MR. BUCKLEY:  No, Glazer was Frank, your Honor.

19           THE COURT:  So Chase is not involved.

20           MR. BUCKLEY:  Chase owns Frank's files.  So, Chase has

21   possession of all of those communications, and at least for the

22   time being has asserted privilege over them.  So, neither of

23   our clients has access to the communications with Glazer

24   because they were on Frank's servers, which are owned by Chase.

25           MS. McLEOD:  But in part, because of the complexity of

1    the issues, that's one of the reasons why it makes sense to

2    start the process earlier, because there are complicated

3    questions of privilege.  The government is really concerned

4    about having months of litigation rolling into the summer when

5    we could start this process now.  As the Court knows, the

6    elements of an advice of counsel defense involve --

7              THE COURT:  I adopt the February 12 date.  And if it

8    gives defendants some trouble, they can make a move to relax

9    that date.  But I don't think there is a need to relax it.

10   There may be a need to supplement, but not to relax.

11             February 12.

12             MR. NITZE:  Your Honor, one final point at least from

13   Ms. Javice's perspective with respect to the schedule that

14   Ms. McLeod laid out.  Ms. McLeod has agreed to this point, but

15   I wanted to put it on the record that the deadlines for defense

16   exhibits, witness statements, and so on, are necessarily

17   conditioned by the fact that a defense comes together in large

18   part based on what the government puts before the jury.  And so

19   these are preliminary lists and such.  But the defense would

20   reserve the right to adjust its defense based on the

21   government's case.

22             THE COURT:  That's correct.  Anything else?

23             Yes, Ms. McLeod?

24             MS. McLEOD:  I was just going to say that's correct,

25   your Honor.

O1I3JAVC

1          THE COURT:  Okay.  All right.  Have we excluded time?

2          MS. McLEOD:  Yes.  Time is excluded until the trial

3     date, your Honor.

4          THE COURT:  So we have nothing more to do.

5          MS. McLEOD:  From the government's point of view,

6     correct.

7          THE COURT:  And defendants?

8          MR. NITZE:  We agree, your Honor.

9          THE COURT:  Excellent.  Okay.  Have a wonderful summer

10    of relaxation and vacation and so on.

11         MS. McLEOD:  Thank you, your Honor.

12         (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

# Custodian List

1. Jay Adelsberg
2. Sonali Divilek
3. Keona Drakeford
4. Ravi Govindaraju
5. Jameson Troutman
6. Lorraine Hanson
7. Jamie Dimon
8. Kelley Reichert
9. Steve Goodman
10. David Katz
11. Ryan MacDonald
12. Alex Sweeney
13. Adam Spiro
14. Leslie Wims Morris

JPMC Proposed 10 Custodians:
1. Jay Adelsberg – Managing Director, M&A
2. Sonali Divilek – Head of Digital Products & Channels
3. Keona Drakeford – Executive Director, CCB Marketing Analytics & Targeting
4. Mark Goldstein – Former Executive Director, Acquisition Marketing Strategy
5. Steve Goodman – Managing Director and Head of Product, Consumer Banking
6. David Katz – Chief Financial Officer of Chase Corporate
7. Ryan MacDonald
8. Alex Sweeney
9. Adam Shpiro – VP, Corporate Development
10. Leslie Wims Morris

Javice and Amar Proposed 10 Custodians:
1. Sonali Divilek – Head of Digital Products & Channels
2. Jay Adelsberg – Managing Director, M&A
3. Keona Drakeford – Executive Director, CCB Marketing Analytics & Targeting
4. Ravi Govindaraju – Managing Director, Head of Product – Financial Tools
5. Maria Colbert – Digital Product Manager
6. Jamie Dimon – Chairman and Chief Executive Officer of JPMorgan Chase & Co.
7. Lorraine Hansen – Chief Marketing Officer of Chase Consumer Bank
8. Lisa Neunder – VP, Partnership Integration
9. Kelley Reichert – Executive Director, Head of Consumer Bank Acquisition Marketing
10. Neil Seideman – Managing Director, Digital Channels, Growth
11. Jameson Troutman – Managing Director – Data/Analytics, and then Head of Product


Current List
1. Jay Adelsberg – Managing Director, M&A
2. Sonali Divilek – Head of Digital Products & Channels
3. Keona Drakeford – Executive Director, CCB Marketing Analytics & Targeting
4. Ravi Govindaraju - Managing Director, Head of Product – Financial Tools
5. Maria Colbert - Digital Product Manager
6. Jameson Troutman - Managing Director – Data/Analytics, and then Head of Product
7. Lorraine Hansen - Chief Marketing Officer of Chase Consumer Bank
8. Jamie Dimon - Chairman and Chief Executive Officer of JPMorgan Chase & Co.
9. Kelley Reichert - Executive Director, Head of Consumer Bank Acquisition Marketing
10. Steve Goodman - Managing Director and Head of Product, Consumer Banking
11. David Katz - Chief Financial Officer of Chase Corporate
12. Ryan MacDonald - Chief Marketing Officer, Managing Director, Head of Product
13. Alex Sweeney - Head of Partnerships and M&A, and M.D., Partnerships and M&A
14. Adam Shpiro - VP, Corporate Development
15. Leslie Wims Morris – M.D. and Head of Corp. Dev., Consumer & Community Banking
16. Lisa Neunder - VP, Partnership Integration