1   UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------x

3   UNITED STATES OF AMERICA,

4         v.                   23 CR 251 (AKH)

5   CHARLIE JAVICE and OLIVIER
  AMAR,

6
            Defendants.

7
  ------------------------------x   Conference

8
                    New York, N.Y.

9                     September 23, 2024
                    2:30 p.m.

10

11   Before:

12                  HON. ALVIN K. HELLERSTEIN,

13                              District Judge

14
                    APPEARANCES

15
  DAMIAN WILLIAMS

16      United States Attorney for the
     Southern District of New York

17   DINA McLEOD
  NICHOLAS W. CHIUCHIOLO

18   RUSHMI BHASKARAN
  GEORGIA V. KOSTOPOULOS

19      Assistant United States Attorneys

20
  QUINN EMANUEL URQUHART & SULLIVAN, LLP

21      Attorneys for Defendant Javice
  SAMUEL P. NITZE

22   ERICA PERDOMO
  SARAH H. CONCANNON

23   ALANAH HARRIS
     -and-

24   JOSE A. BAEZ
     Attorney for Defendant Javice

25

O9N3JAVC

1  Appearances (Continued)

2  KOBRE & KIM, LLP
        Attorneys for Defendant Amar
3  STEVEN G. KOBRE
   ALEXANDRIA E. SWETTE
4
   DAVIS POLK & WARDWELL, LLP
5       Attorneys for Nonparty JPMorgan Chase Bank, N.a.
   GREG D. ANDRES
6  SIDNEY BASHAGO
   MICHELLE ADLER
7  CHRISTIAN HINES

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  This is U.S. v. Charlie Javice.

2     Counsel, please state your appearances for the record.

3          MR. CHIUCHIOLO:  Good afternoon.  Nicholas Chiuchiolo,

4     Dina McLeod, Rushmi Bhaskaran, and Georgia Kostopoulos on

5     behalf of the government.

6          THE COURT:  Who pushed you out of your seats?

7          MS. McLEOD:  Davis Polk.

8          THE COURT:  They must be a powerful bank.

9          Yes, Chase people.

10         MR. ANDRES:  Good afternoon, your Honor.  Greg Andres,

11    Sidney Bashago, Michelle Adler, and Christian Hines, all from

12    Davis Polk on behalf of JPMorgan.

13         THE COURT:  Good afternoon.  And in the back row.  How

14    are you.

15         MR. NITZE:  I'm well, thank you, Judge.  How are you.

16    Sam Nitze and Jose Baez for Charlie Javice, who is here in the

17    courtroom with us.

18         THE COURT:  Mr. Baez, this is our first chance to say

19    hello.

20         MR. BAEZ:  Hello.  Pleasure to meet you.

21         THE COURT:  Welcome to the case.

22         MR. BAEZ:  Thank you.

23         THE COURT:  For Amar?

24         MS. SWETTE:  Good afternoon.  This is Alexandria

25    Swette and Steve Kobre on behalf of Olivier Amar, who is here

1   at counsel's table.

2           THE COURT:  Mr. Andres, what I don't understand is

3   this.  Every document that was listed on the privilege log was

4   a document that was potentially producible.  It wasn't produced

5   because it was allegedly privileged.

6           I held that almost half of those documents that were

7   listed as privileged were not privileged.  So, they should go

8   under the initial umbrella and produce them.

9           It indicates if a sample of 10 percent had 50 percent

10  not privileged, the entire mass is half not privileged.

11          So I don't know if these things are important or not.

12  I suspect they're not.  But, since you started to produce and

13  you were producing them, follow through.

14          MR. ANDRES:  Your Honor, to the extent that's a

15  question and not an order, I'm happy to respond.

16          THE COURT:  Oh, it is a question.  Didn't you hear?

17          MR. ANDRES:  I didn't want to be presumptuous and

18  start things off being presumptuous.

19          Before we get started, I just wanted to clarify a

20  correction with respect to the footnote 2 in our response.  We

21  referenced 35 documents -- excuse me, 34 documents.  And

22  instead we should have referenced 160.  We've let all the

23  parties know that before we got to court here today.

24          Let me back up for one second and answer your

25  question.

1          I would take issue with your Honor's characterization

2     of what you asked us to do and what your ruling was at the end

3     of the last hearing.  At the end of the last hearing, we

4     reviewed approximately 12 documents, and you very helpfully,

5     the Court went through each one of those documents and agreed

6     or disagreed with our privilege calls, and asked us to apply

7     those not to half of the documents, but instead to a sample

8     10 percent.

9          THE COURT:  Right.

10          MR. ANDRES:  2300 documents.  And you asked the

11     defendants to take their best shot, since they had the

12     privilege logs, understood who was on those documents, whether

13     they were lawyers, not lawyers, what the subjects were.  You

14     asked the defendants to pick their 2300, 10 percent, best

15     documents, and they weren't able to even do that.

16          They instead produced to us 2240, 2242 documents, so

17     they didn't make it -- the reason I point that out is because

18     these are the documents that they thought were the most likely

19     to have relevant information.  And we went through that

20     exercise at the Court's direction.

21          At the end of that hearing, your Honor said I have

22     concerns -- I don't want to paraphrase, obviously you can

23     review the transcript.  I'm not really sure what the purpose of

24     this is, because the information that they're receiving does

25     not appear to be material or relevant in any way to any

1   defense.  You're getting dates and somebody saying send me

2   another e-mail or the core of what's being unredacted is not

3   material or relevant.  And what your Honor said was, trying to

4   grapple or understand whether the burden on the third-party

5   victim, JPMorgan, for whom the defendants are accused of

6   stealing more than $150 million, whether the burden to them is

7   appropriate, given what the byproduct is or what it is that the

8   defendants are receiving.

9           THE COURT:  I'm not sure, to tell you the truth.  I've

10  not made a study.  Rule 16 is the guidepost.  And under

11  Rule 16, a subpoena -- under Rule 17, a subpoena was issued,

12  the bounds of relevance being Rule 16.

13          You produced a lot of stuff.  You also produced a

14  privilege log.  I assume that what was on the privilege log,

15  had it not been privileged, would have been produced.

16          So, if now it seems that a big chunk of those are

17  non-privileged, inferentially it should have been produced.

18          I can accept every word you said.  But, logically, I

19  think you've got to agree with my logic.  Now, maybe the logic

20  doesn't make sense.  Which time are we talking about?  How much

21  effort?  How much money?  Before I get rid of this issue.

22          MR. ANDRES:  Okay.  Your Honor, if I could just,

23  before we --

24          THE COURT:  We're in a bad position if I don't order

25  production.

1    MR. ANDRES:  I understand that.  But your Honor, if I

2    could just address one issue before we talk about time and

3    cost.

4         I want to not conflate the Rule 17 subpoena and the

5    Rule 16 or the grand jury subpoena that the government issued

6    to JPMorgan.  And in the course of that, JPMorgan's produced

7    more than 25,000 documents.  Let's talk about that for a

8    second.

9         There are 23,000 documents on the privilege log before

10   we did the 10 percent exercise.  Of the remaining 20,000, I'm

11   using rough numbers, 5,000 of those relate to the defendants'

12   Rule 17 subpoena.  15,000 relate to the grand jury subpoena.

13   And what your Honor ruled specifically, now I'm quoting from

14   the last hearing was --

15        THE COURT:  But I'm only interested in the 17(c).

16        MR. ANDRES:  Yes.  So those are 5,000 documents, your

17   Honor.  And if where we're headed is that your Honor can't make

18   a determination about the relevance of those, and we should

19   apply your rulings or apply the rulings from the last hearing

20   to those documents, I think we could agree to that with certain

21   exceptions so we're not producing or rereviewing duplicates or

22   we're not reviewing documents that are irrelevant.

23        So, the defendants have argued that we've waived, etc.

24   We don't agree with that.  But if what you're saying is we have

25   to review the remaining 5,000 that are relevant to the Rule 17

1  subpoena, we would agree to that.  We do not think that we

2  should have to rereview all of the documents.

3          THE COURT:  Why were they on a privilege list?

4          MR. ANDRES:  There are two different requests.  One

5  was a privilege log relating to the government's subpoenas in

6  which your Honor ruled last time it is up to the government to

7  enforce its own subpoenas, not the defendants.  So the

8  privilege log includes both Rule 17 and the grand jury

9  material.  If all we're talking about is Rule 17 --

10          THE COURT:  Why did you do that?

11          MR. ANDRES:  Because that's what we were ordered to do

12  in producing a privilege log.  We had a privilege log that

13  covered all of the documents produced in this case.

14          THE COURT:  I ordered you to produce a privilege log

15  for the grand jury subpoena?

16          MR. ANDRES:  Your Honor, I think that may have been

17  before we were in the case, so I don't remember that

18  specifically.  But the reality is that all of the documents

19  produced in this case, either the Rule 16 -- I'm sorry.  Either

20  the grand jury subpoena or the Rule 17 are, for ease, are on

21  one document.  One privilege log.

22          THE COURT:  What do you want me to do?

23          MR. ANDRES:  What I want you to do, your Honor, is

24  confine the rereview to the documents in the Rule 17 subpoena,

25  which is what relates to the defendants' application, for the

1  reason that you ruled last time, that the defendants are not in

2  the position to --

3      THE COURT:  If I were to seek to so order, and you

4  were to assume, which is what I would order, that there has

5  been no waiver, is that an acceptable order?

6      MR. ANDRES:  I'm sorry, your Honor.  I didn't

7  understand that.

8      THE COURT:  What Mr. Andres proposes is that I confine

9  the privilege log to that which relates to the Rule 17

10  subpoena.  There are approximately 5,000 documents on that

11  privilege log.  And I order JPMorgan Chase to go through that

12  log and make the same kind of analysis that it did when it

13  produced 1,000 additional documents following our last session

14  together.

15      MR. ANDRES:  Your Honor, that would be acceptable to

16  us, as we note in our brief.

17      THE COURT:  I'm asking Mr. Nitze though.  Is it

18  acceptable to Mr. Nitze.

19      MR. NITZE:  Not really, your Honor.  And if I might

20  provide a reason why.

21      So just to go back in time a little bit, and this was

22  before the good people at Davis Polk joined the matter.  You'll

23  recall that it's over a year ago now, this all began, and we,

24  the defendants, were trying to get information from the

25  government, to get the government to expand the list of

1  custodians, expand the list, the types of materials we were

2  going to get through the government.  And the government

3  argued, and I think the Court agreed, look, it's not for you,

4  defendants, to be policing the scope of grand jury subpoenas,

5  that's Rule 16.

6          And at some point in that process we said, well, there

7  is this privilege log, and we think it's holding back materials

8  that we ought to have.  And you basically said, well, there is

9  a mechanism for that, and it's Rule 17.  If there is something

10 you think you need, do it through Rule 17.  And we had an

11 appearance before your Honor --

12         THE COURT:  You don't need my signature.  You could

13 just issue the subpoena.

14         MR. NITZE:  Yes, and we had --

15         THE COURT:  Saying that also.

16         MR. NITZE:  We had a motion to quash effectively and

17 litigation before the Court on the scope of Rule 17 and what we

18 could have, and the bank argued --

19         THE COURT:  I remember.  And you fellows got together

20 and you came up with an acceptable production list, and I

21 didn't have to make any rulings.

22         MR. NITZE:  Well, you adjudicated the proper scope of

23 the subpoena.

24         If you bear with me, the reason I'm raising all this,

25 it answers the Court's question about why we have a log that

1    includes documents that are privileged in connection with the

2    Rule 16 process with the grand jury subpoena.  And the reason

3    is, we had as part of our Rule 17 subpoena a request for all

4    documents on the log, that is the log that was given to the

5    government, so that we could be in privity, so to speak, with

6    the bank.

7              So all of these documents, Rule 16, Rule 17, are the

8    subject of our requests for materials.  And so every bit of it,

9    it's not just the 5,000 documents.  The bank consented to this

10   process.  The Court ordered this process.  We have this moving

11   target here where we keep trying to just get --

12             THE COURT:  I don't recall ever focusing on a

13   difference between the privilege logs for the government and

14   the privilege logs for your subpoena.  This is the first time I

15   hear about this.

16             MR. NITZE:  It's in the briefing and we discussed it.

17   I would be happy to put a letter to the Court about it.  But it

18   is the reason why --

19             THE COURT:  Don't write more letters.

20             MR. NITZE:  What's that?

21             THE COURT:  Don't write any more letters.

22             MR. NITZE:  You don't want any more letters.

23             THE COURT:  I want to resolve this.  I think there is

24   no principle involved here, there is zero.  It is even

25   debatable whether there is anything useful in this.  Everything

1  I've seen so far, if it were produced, is relevant against you.

2  Not for you.

3        MR. NITZE:  Your Honor, with respect, I don't think

4  that's right.  There are relevant materials.  And even things

5  that are against us give us context for how to understand other

6  materials in the record.  And the burdens go both ways here.

7        THE COURT:  I have no way to know.

8        MS. SWETTE:  Your Honor, if I may, this is Ms. Swette

9  on behalf of Mr. Amar.

10        Some of the documents that have fallen off the

11  privilege log are documents that we put in our submission for

12  our advice of counsel defense.  These are documents in which

13  our client or Mr. Nitze's client are communicating with

14  in-house counsel for Frank.  They're running through in-house

15  counsel various disclosures that end up either on the website

16  or in pitch materials.  These are documents that have been

17  withheld from defendants for over a year.  They are responsive

18  and material to the defense.

19        So these are documents, the efforts the bank is

20  undertaking are yielding documents that are ones that could be

21  used in advance of defendants' defense at trial.

22        MR. ANDRES:  Your Honor --

23        THE COURT:  Let me take a comment before we go

24  further.

25        We're in an area where the law is against the

1    defendants.  A very fine decision by my colleague on this

2    point, to the effect that you don't have the privilege at all.

3    Maybe because I came up in a non-governmental way, I disagree

4    with him.  But not because the law tells me to disagree with

5    him, but because I have an issue with basic fairness.

6            If you were given advice and you were part of a

7    corporate web, it's never been so clear to me that the advice

8    is not personal as well as corporate.  At least there is a core

9    to it.  If I were shown that particular advice was focused on

10   something personal to the individual, I would order it

11   produced.

12           But we're dealing in an amorphous, ambiguous field.

13   So I want to tell you where I'm coming from, and then I'm going

14   to ask you to work it out.

15           (A) The large number of documents on the privilege

16   list that should not have been on the list indicates to me that

17   there should be a further inquiry.  (B) I do not wish to impose

18   a burden on Chase to go through -- how many documents?

19           MR. ANDRES:  23,000.

20           THE COURT:  And I don't want to prolong the discovery,

21   pretrial discovery, even though I've adjourned the trial date.

22   And (3) I'm not here to enforce the government's subpoena.

23           And so, it's logical to me to focus on that aspect of

24   the privilege log that focused on the Rule 17 production.

25           With those three criteria, I'd like to call upon you

1   to have a conference and to work something out that would be

2   not unsatisfactory to anybody.

3           Is that worthwhile or do I have to rule?

4           MR. ANDRES:  We're willing to give it a shot, your

5   Honor.  Thank you.

6           THE COURT:  Mr. Nitze?

7           MR. NITZE:  We'll try, yes.

8           THE COURT:  Ms. Swette?

9           MS. SWETTE:  We'll try.

10          THE COURT:  So shall I go back to chambers for an hour

11  and then come back?  Or sooner if you tell me to?

12          MR. ANDRES:  Happy to try to do it now, or if it's

13  more helpful, we could get back to your Honor within a day or

14  two.  But whatever you prefer, your Honor.

15          THE COURT:  You could either agree or not.

16          MR. ANDRES:  Fair enough.

17          THE COURT:  That's good.  Take a short period of time.

18  But I think it would be a good idea for everybody to agree on

19  something.

20          See you in an hour.  Or if you finish before, call me,

21  Brigitte is in the back.  Just let her know.

22          MR. ANDRES:  Thank you, your Honor.

23          (Recess)

24          THE COURT:  Talk to me, I hope you have good news.

25          MR. ANDRES:  We have good news, your Honor.  I can't

1  say we've solved world peace, but we've settled on what I

2  understand the agreement is, and I understand that Mr. Nitze

3  and Mr. Kobre may want to add certain reservations or rights.

4  But my understanding of the agreement is that JPMorgan

5  Chase will rereview the materials that are responsive to the

6  Rule 17 subpoena with the following exceptions.

7  That documents that are duplicatives, that is real

8  duplicatives, we will not have to rereview, and together with

9  the defendants we'll establish a protocol to demonstrate that

10  these are in fact duplicatives, so there's no disagreement

11  about that.

12  Secondly, we have agreed that we will not be required

13  to rereview documents that are not relevant.  And just for the

14  record, to be clear, because it may not seem obvious what's not

15  relevant to a document that's on a privilege log that relates

16  to a subpoena.  If an e-mail has two attachments, and one

17  attachment relates to the deal at issue with Ms. Javice, and

18  has a second document attached that has to do with a deal with

19  Coke and Pepsi, the Coke and Pepsi document wouldn't be

20  relevant and wouldn't have to be produced.  So the second

21  caveat is we've agreed that documents that are not relevant

22  don't have to be produced.

23  And the third --

24  THE COURT:  Relevance being defined as something

25  having to do with matters not involving the deal between Chase

1    and Frank.

2            MR. ANDRES:  Right.  Broadly construed.  We are not

3    trying to draw narrow lines here, as witnessed by the example I

4    gave you.  Coke and Pepsi have nothing to do with this.  They

5    would be completely extraneous.

6            And the third issue I suppose is duplicative of the

7    first two, but it has to do with different threading on the

8    e-mails, and if there is an e-mail that includes a thread that

9    is either not relevant or duplicative, we wouldn't be required

10   to reproduce that as well.

11           Once we talk about threading it gets a little beyond

12   my competencies.  That's what we've agreed to.  We've agreed to

13   do that.

14           Produce those 5,000 documents over the next seven

15   weeks and to do it in rolling production, so we wouldn't do it

16   all at once.  That much we've agreed on.  To the extent we got

17   more technical than that, we would prefer to do the rolling

18   every two weeks because it saves us time on the actual

19   production.

20           My understanding is that's what JPMorgan and the

21   parties, the defendants have agreed to, and we've alerted the

22   government to that as well.

23           And I'll leave it at that.

24           THE COURT:  Let's do seven weeks, rolling.  A seventh

25   each week.

O9N3JAVC

1          MR. ANDRES:  I didn't hear you.

2          THE COURT:  A seventh each week.  14 percent a week.

3          Mr. Nitze?

4          MR. NITZE:  Yes, thank you, Judge.  Just a couple of

5     points for the record, please.

6          We understand your Honor to have ruled against the

7     defendants in our application for broader rereview, and we just

8     want the record to be clear.  We heard you to direct us to come

9     to some compromise, but we do not consent, broadly speaking, to

10    this process.  And the reason for that is, we have 23,000

11    entries in a log --

12         THE COURT:  Once you get this, then you are going to

13    ask for more?

14         MR. NITZE:  Well, no.  Maybe.  The point I'm making is

15    we have these entries on a log that, but for the assertion of

16    privilege, would have been produced either to the government or

17    to us.  And we have an error rate, so to speak, of well over

18    50 percent.  90 percent, depending how you do the math.  It

19    appears to us there are thousands --

20         THE COURT:  The error rate is skewed by the selection

21    that you made of the documents to be searched.

22         MR. NITZE:  That could be.

23         THE COURT:  So --

24         MR. NITZE:  That could be.

25         THE COURT:  Any percentage higher than what we have is

1  false, and the percentage we have of almost 50 percent is

2  unreliable.

3       MR. NITZE:  I don't hang my hat on the percentage.  I

4  mean, 50 percent understates it.

5       THE COURT:  We could say there is an appreciable

6  number of documents that, following my rulings, are more

7  susceptible to being produced.

8       MR. NITZE:  Yes.  And we had understood your Honor

9  through previous rulings to effectively put us on the other

10  side of the bank, not across the Rule 17, but with the entirety

11  of the privilege log, with the ability to challenge.  And

12  candidly, I don't know why the government -- I understand it is

13  not our job to enforce their grand jury subpoena.  But I don't

14  know why the government, aware there are thousands of documents

15  responsive to a grand jury subpoena, doesn't care to ask for

16  them.  But that seems to be the situation we're in.

17       THE COURT:  I don't think we're ever going to have a

18  malpractice case based on that assertion.

19       MR. NITZE:  That's probably fair to say.

20       I guess the last point I'd make, I know your Honor is

21  very eager to put this whole issue behind you.  Believe me, we

22  are as well.  But I do feel the need to say we reserve the

23  right to issue follow-on Rule 17 subpoenas.  We hope this will

24  be a clarifying process.  But as the witness list comes into

25  view, and as we understand the details of the materials that

O9N3JAVC

1    remain behind, it is possible we will return to the Court or at

2    least out in the world with subpoenas, and potentially to the

3    Court, to the extent they are opposed, to sort through these

4    issues further.

5            THE COURT:  So as I understand you, you're agreeing

6    because you feel I compelled you to agree.

7            MR. NITZE:  I think that's fairly put.  We have

8    fashioned a compromise in the shadow of the order denying our

9    motion to compel, so we went back and worked in good faith.

10   Given your Honor's ruling that we can't have access to the

11   portion of the log that addresses Rule 16, we've in good faith

12   tried to reach a sort of distant second-best compromise.

13           THE COURT:  Very well.  Ms. Swette?

14           MS. SWETTE:  Your Honor, we echo what Mr. Nitze said.

15   We consent to this process, insofar as it comports with the

16   Court's ruling.  We do hold open we may subpoena for additional

17   documents that happened to have been swept up in the Rule 16

18   production that are on the privilege log that don't on their

19   face appear to be privileged.

20           THE COURT:  Hearing that, Mr. Andres, do you have any

21   further comment?

22           MR. ANDRES:  No, your Honor.

23           THE COURT:  I order the production as recited by

24   Mr. Andres.

25           Now, I'm not supposed to meet with you until the final

O9N3JAVC

1   pretrial conference; is that right?

2          MR. NITZE:  We may find occasion to come before your

3   Honor before then, but yes, I think you set --

4          THE COURT:  I have nothing scheduled until the final

5   pretrial conference.

6          MR. NITZE:  Correct.  And I think the government has a

7   proposed schedule for intervening dates.  We would ask for just

8   a day or two to confer and file something, hopefully jointly to

9   the Court, proposing adjusted dates for motions in limine and

10  so on, disclosure of exhibits.

11         THE COURT:  My thought was that I would use that final

12  pretrial conference date to decide 404 motions, motions in

13  limine and the like.  I'll reserve the entire day for you.

14  Would that be sufficient?

15         Government?

16         MR. CHIUCHIOLO:  That works for the government, your

17  Honor.  Thank you.

18         THE COURT:  Is it sufficient?

19         MR. CHIUCHIOLO:  Yes, your Honor.  And the government

20  does have a proposed schedule that largely mirrors the schedule

21  that the Court had previously set.

22         THE COURT:  I don't really care what your schedule is

23  leading up to it.  What I do care about is that you give me a

24  week with the finished papers so I can appear to be informed.

25         MR. NITZE:  We care a great deal, your Honor, as you

O9N3JAVC

1   might imagine, just with respect to disclosure of witness

2   statements, and I think we're working with the government.  I

3   think we can come to agreement.  We just would ask to file a

4   proposed schedule with your Honor in a day or two.

5           THE COURT:  My rule is that on or as soon before the

6   final pretrial conference the government has to disclose *Giglio*

7   material, Jencks material, and the like.  I have no reason not

8   to extend that back further.

9           MR. NITZE:  We have a proposal from the government

10  with some dates that we're considering.  You're making me think

11  we should accept them on the spot.

12          THE COURT:  You might.  You might.  That's been my

13  practice.  There has to be some good reason why I should change

14  it.  So I thought that might help you come to decision also.

15          Do we have any experts in this case?

16          MR. CHIUCHIOLO:  The experts -- there have been expert

17  notices by defense, your Honor.

18          THE COURT:  You didn't answer my question.  Talk to me

19  in plain English.  Are there experts in this case?

20          MR. CHIUCHIOLO:  There are experts that the defense

21  intends to call at trial.  I expect that would be the subject

22  of motion practice and motions in limine.  The government --

23          THE COURT:  Is the government going to use any

24  experts?

25          MR. CHIUCHIOLO:  No, your Honor.

O9N3JAVC

1          THE COURT:  You answered my question.

2          Have defendants, I'll speak to you again, has the

3   government made disclosure to you of its experts?  Has the

4   defense made disclosure?

5          MR. CHIUCHIOLO:  They have, your Honor.  In the

6   government's view they're not sufficient, but they have

7   provided --

8          THE COURT:  They've told you who the people are.

9          MR. CHIUCHIOLO:  Yes, your Honor.

10          THE COURT:  How many?

11          MR. CHIUCHIOLO:  Four, your Honor.  One defendant has

12   noticed three experts, and the other defendant has noticed one

13   expert.

14          THE COURT:  I suspect when we come down to trial there

15   will be fewer experts.  I also require in terms of disclosures,

16   disclosures conforming to the civil rules about experts.  So

17   that there should be full disclosure of what their opinions are

18   going to be.  There shouldn't be any hide the ball with that.

19          MR. CHIUCHIOLO:  It sounds like we have an agreement

20   on dates, your Honor.

21          THE COURT:  Super.

22          MR. CHIUCHIOLO:  Monday, December 16, preliminary

23   government exhibit list, witness list, and Jencks Act material.

24          THE COURT:  And *Giglio*.

25          MR. CHIUCHIOLO:  January 6.

1           THE COURT:  *Giglio*.

2           MR. CHIUCHIOLO:  Yes, with the 3500; yes, your Honor.

3           Monday, January 6, preliminary defense exhibit list,

4    Rule 26.2 material --

5           THE COURT:  Sorry.  You said the defendants' exhibit

6    list?

7           MR. CHIUCHIOLO:  Yes, for January 6.

8           THE COURT:  And?

9           MR. CHIUCHIOLO:  Their Rule 26.2, their 3500, as well

10   as their preliminary witness list.

11          January 13, motions in limine, requests to charge, and

12   voir dire.

13          THE COURT:  January 13, motions in limine.

14          MR. CHIUCHIOLO:  Motions in limine, requests to

15   charge, and voir dire.

16          And then oppositions to motions in limine on

17   January 27.

18          THE COURT:  That's fine.  That gives me lots of time.

19          MR. CHIUCHIOLO:  Then, your Honor, on the issue of

20   disclosures, the government does have one issue to raise with

21   the Court prior to the end of today.

22          THE COURT:  Let me make some comments.

23          On voir dire, I have my boilerplate.  Don't bother

24   with that.  I'm interested in the particular questions that

25   pertain to this case.  The particular sensitivities that you

1    have that you want me to bring out.  So focus on that.

2           Similarly with request to charge.  I have my

3    boilerplate.  Focus on this case.  That's really what I want.

4           I want to ask you something else.  It is a four-week

5    trial.  When I did the long trial, which was nine weeks, and

6    was predicted to be seven, we broke the voir dire into a

7    preliminary phase, where we identified the number of jurors we

8    would need, and we just asked them questions, one by one, to

9    elicit their ability to sit.  Shall I follow that here?  I'm

10   going to take your comments in advisement, because I want to

11   put this question to the jury clerk.

12          MR. NITZE:  Are you referring specifically to ability

13   to sit for the anticipated duration, like a question of

14   conflicts and the like?

15          THE COURT:  Just ability to sit.  "I have a vacation

16   in two weeks."

17          MR. NITZE:  Right, right.

18          THE COURT:  "I'm giving birth in three weeks."  Things

19   like that.

20          MR. NITZE:  I don't know what the Court's usual -- I

21   would think in some fashion, although it could be handled

22   generally, rather than one by one, you would want to ascertain

23   if people have immoveable conflicts, somebody's taking care

24   of --

25          THE COURT:  I'll give you my experience.  If you do it

O9N3JAVC

1    en masse, there are many more conflicts.  One learns from the

2    other.  This works.

3            MR. NITZE:  Certainly no opposition doing it one by

4    one if you think that is more efficient.

5            MR. CHIUCHIOLO:  No opposition from the government,

6    your Honor.

7            THE COURT:  I'll consult with the jury clerk on that.

8            MS. SWETTE:  No opposition from Mr. Amar.

9            THE COURT:  The next comment.

10           MR. CHIUCHIOLO:  Your Honor, are you envisioning a

11   questionnaire or a date --

12           THE COURT:  We're not using a questionnaire.

13           MR. CHIUCHIOLO:  Just a date for them to come in?

14           THE COURT:  They're brought in one by one, and I ask

15   them questions, what's coming up in the next six to eight

16   weeks.

17           MR. CHIUCHIOLO:  Understood.

18           THE COURT:  I tell them about the trial in a way to

19   interest them about it so they want to sit.  And I think once

20   they learn that there are no narcotics or guns or organized

21   crime, it becomes a little easier for them.

22           And in the setting of a room with the lawyers, and we

23   have to restrict the number of people in the room because you

24   don't want to be overbearing, you get good answers.  We'll get

25   a jury.  We were surprised how quickly we got a jury.

1    I'm always bothered on lists of exhibits by their

2    fulsome nature.  And one technique that we've all learned to

3    use in the age of disclosure is to so overburden disclosure it

4    becomes hard to discern what's really being disclosed.  So I

5    would adjure you to the disciplined identification of exhibits.

6    I think you know enough from experience as a trial lawyer that

7    only a few exhibits count.  The more exhibits that are used,

8    the lower the threshold of boredom by the jurors.  And a bored

9    jury is the worst kind of jury to have.  They're more

10    unpredictable and that hurts either way.

11    Try to be disciplined with your witness list and be

12    disciplined with your list of exhibits.

13    I take it that Daubert motions will be, if they are to

14    be made, will be considered as motions in limine?

15    MR. CHIUCHIOLO:  That was the government's plan, your

16    Honor.

17    THE COURT:  Okay.  So would you like to know how I

18    pick a jury?

19    MR. NITZE:  Yes.

20    THE COURT:  Okay.  We seat -- how many alternates we

21    will need, four?

22    MR. CHIUCHIOLO:  At least four, given the length of

23    the trial.

24    THE COURT:  I think four is enough.  Again I'll

25    take -- Hannah, ask Brigitte to come out.

1    I'm going to assume four jurors.  So we have,

2  therefore, two challenges per two jurors, that gives us six

3  people.  I will sit 34 people in the array.  After we finish

4  all the questions, then have an account they give about

5  themselves, where they were born, their education, their work,

6  the people in the household, what they read, what they listen

7  to and on so on.

8    After all that, you then exercise your peremptories.

9  You will do them at your desk or in the hallway or anywhere

10  around.  It is a 20-minute procedure.  Each side will exercise

11  his peremptories.  The defendants exercise 10, and the

12  government 6 to the first 28 in the array.  At the same time

13  you'll exercise your peremptories to the Jurors 29 through 34

14  to exercise against alternate jurors, and you'll give this up

15  to me at the end of the session.  One piece of paper.

16    So as to the first 28, if you coincide in your

17  peremptories, or you don't exercise your peremptories, I excuse

18  Jurors No. 28 and down so that we have a jury of 12.

19    And then I turn to the alternates, and do the same

20  thing, and if you coincide, or don't exercise, I will start

21  from Juror No. 34 and challenge down to the time of four jurors

22  who are alternate jurors, which will give us a jury of 16, the

23  number of seats in this room.  Whether we'll stay in this room

24  or a larger room, I don't know.  I think a larger room would be

25  better.  But I'll have to work that out.

1        At the end of the case, there is a question whether

2    alternates should be excused or should be held on standby.

3    I've never used the procedure of standby, because if a standby

4    juror has to be brought into the panel, the jury is required to

5    begin deliberations anew.  And it has always occurred to me

6    that is a very large task for the human mind to accomplish to

7    start afresh, and it seems to me artificial.  Once we start

8    deliberations, we can go ahead and even lose a juror and still

9    be able to come to a verdict that's acceptable.  But you think

10    about that.  We'll decide.

11        Are there any other questions?  You're going to be

12    using electronic exhibits, right?

13        MR. CHIUCHIOLO:  Yes.

14        THE COURT:  Defendants?

15        MR. NITZE:  Yes, your Honor.

16        MS. SWETTE:  Yes, your Honor.

17        THE COURT:  Okay.  Any other questions of me?

18        MR. NITZE:  Not from the Javice team.  Thank you.

19        MS. SWETTE:  Not at this time on behalf of Mr. Amar.

20        THE COURT:  I think we're adjourned.

21        MR. CHIUCHIOLO:  Your Honor, there was one issue that

22    the government wanted to raise.

23        THE COURT:  Yes.

24        MR. CHIUCHIOLO:  And that relates to the defendants'

25    disclosure of their notice of advice of counsel defense.

1          As the Court is aware, on August 20, the Court ordered

2     the defendants to disclose by December 6 whether they intend to

3     present an advice of counsel defense, and if they do, to

4     identify the attorneys who gave the advice, and when they gave

5     the advice, and if oral, describe the substance of that advice,

6     and if written, to disclose the documents.

7          On December 6 or September 6, rather, the defendants

8     filed a letter saying that they may present an advice of

9     counsel defense, but other than that, we're still largely in

10    the dark as to what the contours of that defense would look

11    like.  They cited examples of documents, and the government

12    appreciates that there is an ongoing dispute about documents

13    and the privilege log.  But the defense cited no oral

14    statements, no oral legal advice that would be the subject of

15    this defense.  And this is information the government's been

16    trying to get for a year now.

17         And it would seem if there is legal advice that the

18    defendants relied on that would negate their mens rea, which is

19    what would establish an advice of counsel defense, they should

20    know that and they should be ordered to disclose that to the

21    government consistent with the Court's order.  And they still

22    haven't done that.

23         So, the government would ask that the Court order the

24    defendants to do that, again.

25         MS. SWETTE:  Your Honor, Ms. Swette on behalf of

1    Mr. Amar.  We complied with the Court's order.

2              THE COURT:  No, you didn't.

3              MS. SWETTE:  We're not aware of any rule or case law

4    that requires any additional disclosure above and beyond what

5    we provided.

6              I think the government is now asking for things we

7    don't intend on disclosing because they're either not available

8    to us or we don't intend on relying on them at trial.  Within

9    the contours of what is available to us, we've fully complied

10   with the Court's order.

11             MR. CHIUCHIOLO:  Your Honor, again, the government

12   appreciates the ongoing issues related to documents.

13             THE COURT:  What's the law?

14             MR. CHIUCHIOLO:  I think we --

15             THE COURT:  What's the law?

16             MR. CHIUCHIOLO:  I think your Honor said that a

17   disclosure that is not fulsome is not a disclosure at all, in

18   substance.

19             THE COURT:  They're declining to do more.  So, can I

20   order them to do more?

21             MR. CHIUCHIOLO:  I think what we would like to know

22   is --

23             THE COURT:  I know what you want to know.  And if the

24   law requires, I'll order it.  But is it discretionary?  Am I

25   required?

O9N3JAVC

1          MR. CHIUCHIOLO:  Respectfully, the Court did order it.

2          THE COURT:  We are where we are right now, okay.  So

3     the defendants decline to do so.  Should I hold them in

4     contempt?  Should I prevent them from using an advice of

5     counsel defense?

6          MR. CHIUCHIOLO:  At least if there are oral statements

7     or oral legal advice that they wish to put in at trial, yes,

8     that should be precluded, because they were ordered to disclose

9     it and they failed to do so.

10          I think it's a pretty reasonable request.  They are

11     saying that there is this potential defense out there.  If they

12     truly relied on legal advice, they should know what it is.

13          THE COURT:  You told them what your witnesses are

14     going to say?

15          MR. CHIUCHIOLO:  We are disclosing our witness

16     statements quite early.  But --

17          THE COURT:  You are disclosing 3500 material, but

18     you're not really disclosing what your witnesses are going to

19     say.  Why should you get what they want to say?

20          MR. CHIUCHIOLO:  I think it's very different in kind.

21     This is a defense that they are now saying they may put on.

22          THE COURT:  You are going to prove mens rea.  They

23     want to disprove mens rea.  What's the law?

24          MR. CHIUCHIOLO:  We can put in --

25          THE COURT:  We can reason this to death.  What's the

1   law?

2           MR. CHIUCHIOLO:  We can put in a letter on the law on

3   this.  I think it's -- I think your Honor was correct in

4   ordering them to do it.  And we're happy to provide some

5   additional law to support this very basic disclosure of what is

6   the legal advice.

7           THE COURT:  My view --

8           MR. CHIUCHIOLO:  Your Honor, the government, I mean,

9   based on -- they've identified the lawyer, right.  And we've

10  obviously met with that lawyer.  We have a sense of what that

11  lawyer is going to say.  We think based on that, there can be

12  no valid legal, valid advice of counsel defense.

13          But unless we know what the advice is to be, how can

14  we brief any issue?  It makes it nearly impossible to put

15  before the Court what the nature of the dispute is until it's

16  too late, before the jury has already heard it.

17          THE COURT:  The same is true of all other witnesses.

18  That's why we have cross-examination.

19          I think what I should do, though, is to require

20  defendants to identify the documents that will be used to

21  support the advice of counsel defense.  So when would you like

22  to do that?

23          MS. SWETTE:  Your Honor, we have disclosed the

24  documents in our possession that we've been able to see and

25  review.

1          THE COURT:  What I mean by identifying the documents

2    is to say "Dear government, here are the documents that we will

3    use in support of the defense.  Very truly yours."

4          Can you write such a letter?  And when?

5          MR. NITZE:  The letter that was provided effectively

6    says what you just described.

7          THE COURT:  I don't like the word "effective."

8          MR. NITZE:  I'm building in some qualifications.

9          THE COURT:  I'm not letting you build in any

10   qualifications.  I want identification of documents.  I'll be

11   lenient on time, but I want identification of documents.

12          MR. NITZE:  Of the particular documents, so, we have a

13   deadline now for defense exhibit disclosures I believe --

14          THE COURT:  December 6.

15          MR. NITZE:  January 6.

16          THE COURT:  December 6 is the government's list.

17          MR. NITZE:  The government's December and then ours

18   are in January.

19          THE COURT:  So what about if you add to that

20   defendants' witness list a special identification of the

21   documents that will be used in support of your advice of

22   counsel defense.

23          MS. SWETTE:  Your Honor, on behalf of Mr. Amar, that

24   deadline works for us.  I will say there are still a handful of

25   documents that on their face don't appear to be privileged that

1    would potentially --

2              THE COURT:  Not going to review that again.

3              MS. SWETTE:  I hear you, your Honor.

4              THE COURT:  You will have whatever you have on

5    January 6 that you're going to use.  You are going to set down

6    or I won't let you use it.

7              MS. SWETTE:  Okay.

8              THE COURT:  It's got to be clear and marked, these are

9    the documents that will be used to support advice of counsel.

10             MS. SWETTE:  Understood.  Thank you, your Honor.

11             THE COURT:  Okay.  What further mischief do you have

12   for me, Ms. McLeod?

13             MS. McLEOD:  Thank you, your Honor.  So, first of all,

14   I think the main concern we have is sort of the efficient

15   running of the trial, I think --

16             THE COURT:  That's my job.

17             MS. McLEOD:  We share that with your Honor.

18             THE COURT:  That's my job.

19             MS. McLEOD:  It is your job.

20             THE COURT:  I'll do my job if you do yours.

21             MS. McLEOD:  I think in part, towards that end, you

22   had ordered them to do this some time ago.  They put in a

23   letter, the --

24             THE COURT:  Are we now going to renew the last

25   argument?

1          MS. McLEOD:  No, your Honor.

2          THE COURT:  I'm not going to require them to answer an

3     interrogatory of what their lawyers' advice was.  I'm not going

4     to ask them to do that.

5          MS. McLEOD:  That's totally understood, your Honor.  I

6     think the one thing that we wanted to note is just the level of

7     potential litigation which I think both sides have now noted,

8     they noted in their adjournment request their concerns about

9     the level of litigation that would need to arise in order to

10    have this be an efficient process pretrial.

11         THE COURT:  I don't know what you're talking about.

12         MS. McLEOD:  So for example, your Honor, so to the

13    extent there is an advice of counsel defense, the government is

14    entitled to discovery.  We are entitled to see the documents

15    upon which they rely.  All of them.  We are also entitled --

16         THE COURT:  Ms. McLeod, I ordered it for January 6.

17    Is that too late?

18         MS. McLEOD:  In the government's view, yes.

19         THE COURT:  What would you like?

20         MS. McLEOD:  I think we would prefer the Court's

21    order, but we understand you would like to give them additional

22    time.

23         THE COURT:  I haven't said anything about that.  What

24    would you like?

25         MS. McLEOD:  We would like them to provide it in the

1    next two weeks, they should provide it to us.

2              THE COURT:  Let's go --

3              MS. McLEOD:  Four weeks.

4              THE COURT:  They're not ready with that until they're

5    finished with the lists and the productions.

6              MS. McLEOD:  Seven weeks.

7              MR. NITZE:  Your Honor, we won't have the --

8              THE COURT:  Stop, stop, stop.

9              I propose December 7.

10             MR. NITZE:  Your Honor, December 7 would work with

11   respect to documents that we have available at that time.

12             THE COURT:  You're not getting any more later.  Seven

13   weeks have elapsed.

14             MR. NITZE:  We've indicated that, depending on what

15   comes off the log, we may need to seek additional materials.

16             THE COURT:  You may seek, but you may not find.

17             MR. NITZE:  We may not, but we can only give notice --

18             THE COURT:  December 7.

19             MR. NITZE:  -- of what we have.  If the interest here

20   is in efficiency and building in time for pretrial litigation,

21   you know, we would welcome the government's exhibit list and

22   witness statements sooner.  That would make things more

23   efficient, too, I'm sure.

24             MS. McLEOD:  So, I think at this point we've --

25             THE COURT:  I think the schedule is good enough.

O9N3JAVC

1    We'll leave it that way.

2            December 7 for lists of the documents on which you're

3    going to rely to prove an advice of counsel.

4            Anything else, Ms. McLeod?

5            MS. McLEOD:  Nothing else from the government, your

6    Honor.

7            THE COURT:  Mr. Nitze?

8            MR. NITZE:  Nothing else from us.  Thank you, Judge.

9            THE COURT:  Ms. Swette?

10            MS. SWETTE:  Nothing else on behalf of Mr. Amar.

11    Thank you, your Honor.

12            THE COURT:  Thank you all for this wonderful session.

13    See you soon.

14            (Adjourned)

15

16

17

18

19

20

21

22

23

24

25