**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| CHARLIE JAVICE and OLIVIER AMAR, | 23-cr-00251-AKH |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT OLIVIER AMAR'S**
**MOTION TO COMPEL DISCLOSURE AND RELATED RELIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ...........................................................................................................3

I.  THE GOVERNMENT RELIED ON THE BANK'S EXTENSIVE
    PARTICIPATION IN PROSECUTING DEFENDANTS .................................................3

    A.  The Government Relied on JPMC For the Basis of the Allegations in the
        Criminal Complaint ..............................................................................................4

    B.  The Government Improperly Outsourced Its *Brady* Obligations to JPMC ............6

II. THE GOVERNMENT'S COORDINATION WITH JPMC PREVENTED AND
    DELAYED DISCLOSURE OF EXCULPATORY INFORMATION..............................8

    A.  The Government's Deference to JPMC Resulted in a Delayed and Largely
        Unusable Production of Exculpatory Google Analytics Data .................................9

    B.  The Government's Reliance on JPMC Resulted in Late Disclosure of
        Deleted Exculpatory Material of Key Custodians .................................................15

    C.  The Government Permitted JPMC's Improper Privilege Assertions to
        Delay Disclosure of Exculpatory Documents Evidencing Mr. Amar's
        Good Faith ..........................................................................................................19

ARGUMENT ..............................................................................................................21

I.  THE GOVERNMENT'S *BRADY* OBLIGATIONS EXTEND TO MATERIAL IN
    THE POSSESSION, CUSTODY, AND CONTROL OF J.P. MORGAN CHASE ..........21

II. THE GOVERNMENT'S DEFERENCE TO JPMC RESULTED IN *BRADY*
    VIOLATIONS AND PREJUDICED DEFENDANTS ....................................................24

III. SUBSTANTIAL PREJUDICE TO DEFENDANTS AND PRINCIPLES OF
     DETERRENCE WARRANT RELIEF..........................................................................28

    A.  The Court Should Order Disclosure of *Brady* and *Giglio* Materials in the
        Bank's Possession................................................................................................29

    B.  The Court Should Permit Defense Counsel to Argue and Present Evidence
        Concerning the Prosecution's Investigative Methods or Lack Thereof.................32

    C.  The Court Should Order An Evidentiary Hearing To Resolve Any Issues
        of Fact and Review Redacted Meeting Notes........................................................33

CONCLUSION............................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                  **Page(s)**

*Berger v. United States*,
  295 U.S. 78 (1935) ............................................................................................ 23

*Bowen v. Maynard*,
  799 F.2d 593 (10th Cir. 1986) ......................................................................... 31

*Brady v. Maryland*,
  373 U.S. 83 (1963) ...................................................................................... 1, 27

*Davis v. Alaska*,
  415 U.S. 308 (1974) .................................................................................. 30, 31

*Delaware v. Van Arsdall*,
  475 U.S. 673 (1986) ......................................................................................... 30

*Giglio v. United States*,
  405 U.S. 150 (1972) ..................................................................................... 1, 23

*Kyles v. Whitley*,
  514 U.S. 419 (1995) .................................................................................. 21, 31

*Skilling v. United States*,
  561 U.S. 358 (2010) ......................................................................................... 26

*U.S. v. Canter*,
  338 F. Supp. 2d 460 (S.D.N.Y. 2004) ............................................................. 30

*United Sates v. Avellino*,
  136 F.3d 249 (2d Cir. 1998) ............................................................................ 21

*United States v. Bagley*,
  473 U.S. 667 (1985) ......................................................................................... 29

*United States v. Blaszczak*,
  308 F. Supp. 3d 736 (S.D.N.Y. 2018) ............................................................. 21

*United States v. Bundy*,
  968 F.3d 1019 (9th Cir. 2020) .................................................................. 28, 31

*United States v. Chapman*,
  524 F.3d 1073 (9th Cir. 2008) ......................................................................... 28

*United States v. Connolly*,
  2019 WL 2120523 (S.D.N.Y. May 2, 2019) .......................................... 21, 22, 23

*United States v. Cutting,*
  2017 WL 132403 (N.D. Cal. Jan. 12, 2017)........................................................................ 28

*United States v. Diabate,*
  90 F. Supp. 2d 140 (D. Mass. 2000).................................................................................. 27

*United States v. FNU LNU,*
  2021 WL 5822230 (S.D.N.Y. Dec. 7, 2021)...................................................................... 27

*United States v. Giffen,*
  03 Cr. 404 2004 WL 1475499 (S.D.N.Y. July 2, 2004)..................................................... 29

*United States v. Gil,*
  297 F.3d 93 (2d Cir. 2002) ...............................................................................23, 24, 25, 27

*United States v. Halliburton,*
  2020 WL 6746477 (S.D.N.Y. Nov. 16, 2020).................................................................... 28

*United States v. Hossain,*
  2020 WL 6874910 (S.D.N.Y. Nov. 23, 2020).................................................................... 28

*United States v. Hunter,*
  32 F.4th 22 (2d Cir. 2022) ..........................................................................................21, 22

*United States v. Mason,*
  951 F.3d 567 (D.C. Cir. 2020)............................................................................................ 24

*United States v. Pasha,*
  797 F.3d 1122 (D.C. Cir. 2015).......................................................................................... 24

*United States v. Quinto,*
  582 F.2d 224 (2d Cir. 1978) ............................................................................................... 30

*United States v. Saffarinia,*
  424 F. Supp. 3d 46 (D.D.C. 2020)...................................................................................... 28

*United States v. Salyer,*
  2010 WL 3036444 (E.D. Ca. Aug. 2, 2010)....................................................................... 29

*United States v. Santiago,*
  174 F. Supp. 2d 16 (S.D.N.Y. 2001) .................................................................................. 30

*United States v. Skilling,*
  554 F.3d 529 (5th Cir. 2009) .............................................................................................. 25

*United States v. Stewart,*
  433 F.3d 273 (2d Cir. 2006) ..........................................................................................21, 22

*United States v. Sutton*,
  2022 WL 2383974 (D.D.C. July 1, 2022) ................................................................ 32

*United States v. Thomas*,
  981 F. Supp. 2d 229 (S.D.N.Y. 2013) ............................................................... 23, 25

*United States v. Watson*,
  404 F.3d 163 (2d Cir. 2005) ................................................................................. 31

## Statutes

Pub. L. No. 116-182 (2020) ..................................................................................... 27

## Rules

Fed. R. Evid. 607 ..................................................................................................... 31

Federal Rule of Criminal Procedure 5(f) .................................................... 24, 27, 28

Federal Rule of Criminal Procedure 16 ............................................................ 1, 3, 33

## Other Authorities

Co-Opted Cooperators: Corporate Internal Investigations and Brady v. Maryland,
  2021 Colum. Bus. L. Rev. 417 (2021) .................................................................. 22

Defendant Olivier Amar respectfully moves to compel the Government to comply with basic principles of due process, its discovery obligations under Federal Rule of Criminal Procedure 16, as well as its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and their progeny, and for relief narrowly crafted to remedy its failure to so comply. As explained below, the Court should (1) require the Government to obtain relevant materials from J.P. Morgan Chase Bank, N.A. ("JPMC" or the "Bank"); and (2) instruct the jury that it may consider the fact that certain materials were not sought, obtained, or preserved in evaluating whether the Government has met its burden of proof.

## PRELIMINARY STATEMENT

The Government's pretrial disclosures produced for the first time on December 17, 2024, reveal that the Government egregiously downplayed to Defendants and the Court the true extent of its coordination with the Bank and its outside counsel. The Government worked intimately with JPMC, despite the Bank's reputational stake in the outcome of the case as the acquiror of TAPD, Inc., d/b/a Frank ("Frank"), overlooked the Bank's failures to preserve or disclose relevant documents, and built a distorted evidentiary record adhering to the Bank's predetermined view of Defendants' culpability.

The 3500 materials reveal that the SDNY's criminal charges were premised on the fruits of the Bank's own fraud investigation against Defendants and yet the Government has not obtained JPMC's interview notes with individuals whom the Government seeks to call at trial. JPMC's outside counsel provided SDNY ███████████████████████████████████████
████████████████████████████████████████████████.[1] *See infra* pp. 4–6.

---

[1] The redactions in this filing are intended to correspond to materials designated under the Protective Orders entered in this action. *See* ECF Nos. 37 & 108.

After the criminal complaint was filed, the Government ███████████████████████

████████████████████████████████████████. *See infra* pp. 6–9. The

Government went so far as to rely only on the Bank's lawyers—after JPMC terminated and sued

Defendants—█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████. *See infra* pp. 6–9. The Bank's coordination with the prosecution

resulted in an evidentiary record focused on corroborating JPMC's theory of fraud: that the Bank

was deceived into acquiring Frank based on Defendants' alleged misrepresentations about the

company and its users.

Indeed, the 3500 materials confirm that the Government turned a blind eye toward evidence

favorable to Defendants and used the Bank as both sword and shield to avoid its discovery and

disclosure obligations. Even before the criminal charges were filed, the Government knew—████

██████████████████████████████████████████████████████████████—

that Frank's Google Analytics database was a central repository of information relied on by Mr.

Amar and his team (the "Growth Team") to track and analyze data on Frank's users. *See infra* pp.

9–11. The 3500 materials make clear that the Government ███████████████████████

██████████████████████████████████████████████████████████████████

██████████████████. *See infra* pp. 11–15.

Despite knowing of the Bank's repeated failures to disclose critical material and potentially

exculpatory evidence—████████████████████████████████████, *see infra* pp. 16–

19—the Government relied on the Bank █████████████████████████████████

██████. SDNY worked with the Bank's lawyers ███████████████████████████

██████████████████████████████████████████████████████████████████.

*See infra* pp. 11–15. Worse still, the Government then ██████████████████████████

████████████████████████████████████████████████████████

████████████████████, ensuring Defendants would have no opportunity to learn what was

missing or fill in the blanks. *See infra* pp. 14–16.

Given the unique circumstances present here, Second Circuit case law and fundamental

fairness require extending the Government's discovery and disclosure obligations to the materials

within the possession, custody, and control of the Bank. As such, the Court should require the

Government to produce under Rule 16, *Brady* and *Giglio*, certain material in the Bank's possession,

custody or control, *see infra* pp. 29–32, and permit defense counsel to argue and introduce evidence

at trial about the prosecution's investigatory methods (or lack thereof) and the delayed production

and/or absence of certain evidence, *see infra* pp. 32–33, so that the jury may properly consider the

evidentiary record in context and for impeachment purposes. At a minimum, the Court should hold

an evidentiary hearing to decide any disputed facts. With trial scheduled to commence in a mere

few weeks, the relief sought is both necessary and warranted.[2]

## **BACKGROUND**

## I.    **THE GOVERNMENT RELIED ON THE BANK'S EXTENSIVE PARTICIPATION IN PROSECUTING DEFENDANTS**

Time and again the Government attempted to discredit Defendants' concerns over the

Bank's outsized influence in this case as mere speculation and surmise. *See, e.g.*, Defs. Mem. in

Support of Mot. Compel, *United States v. Javice*, No. 1:23-cr-00251 (AKH), ECF No. 58; Gov't

Opp. Mot. Compel, ECF No. 60. The Government's 3500 disclosures now leave no doubt that

JPMC's lawyers made extraordinary efforts to assist the prosecution going far beyond the norm

---

[2] Pursuant to Local Crim. Rule 16.1, defense counsel conferred with the Government in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court and has been unable to reach agreement.

for corporations under any cooperation agreement with the Government. JPMC consistently guided the Government's prosecutorial strategy, identifying witnesses and sources for document collection, beyond the examples previously raised before the Court. *See* ECF No. 58 at 6-9.

### A.    The Government Relied on JPMC For the Basis of the Allegations in the Criminal Complaint

The Government previously represented that the allegations supporting its charges filed on March 31, 2023, were based on its own investigation. *See* Compl. ("Crim. Compl."), ECF No. 1; Gov't Opp. Mot. Compel, ECF No. 60 at 8. That representation is belied by the 3500 materials.

The Government's coordination with JPMC dates back to before Defendants were discharged as employees of the Bank. In October 2022—before the Government filed the criminal charges or the Bank sued Defendants—JPMC's counsel



presumably to educate the Government on its pre-existing theory of Defendants' culpability. *See* Ex. A ¶ 1 (          3545-001 at 1) (counsel explained                ). Two weeks later, counsel met with the Government

—both of whom appear on the Government's witness list and are referenced in JPMC's civil and the Government's criminal complaints—

. *See id.* ¶ 2 (JPMC 3510-001 at 5, 7, 11) (indicating JPMC

).

Before the criminal charges were filed, the Government spoke with JPMC's lawyers at least seven times over the course of five months. The notes from these meetings show that the

Bank ████████████████████████████████████████████████████████

███████████████. For example, counsel for JPMC informed the Government that ████

████████████████████████████████████████████████. *See id.* ¶ 3 (JPMC

3510-002 at 1) (on December 19, 2022, ████████████████████████

██████████████████████████████); *id.* ¶ 4 (JPMC 3510-003 at 1) (on

February 28, 2023, ████████████████████████████████████

████████████████████████████████████████████████████

████████). Those ████████████████ would have no relevance to JPMC's own civil suit,

which seeks damages from the Bank's alleged injury stemming from its own acquisition of Frank.

*See generally* Compl., *JPMorgan Chase Bank, N.A. v. Javice, et al.*, No. 22-cv-01621 (D. Del.

Dec. 22, 2022) ("Civ. Compl.").

　　　One day after the charges were filed, JPMC's counsel responded ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *See* Ex. B (JPMC 3510-006 at 1-2); Crim. Compl. ¶¶ 25, 26(e).

JPMC's counsel indicated ████████████████████████████████—the same

day the criminal charges were filed—even though the allegation in question was purportedly

substantiated by a "review of records" and an interview with "Scientist-1" (who could not possibly

have knowledge of JPMC's direct communications with "Vendor-1," a separate third party). *See*

Crim. Compl. ¶ 25. Given the scientist's lack of knowledge and the Government's lack of

awareness of the referenced records, it appears the Government's actual basis for the allegation

was JPMC's own representations, either shared in meetings or duplicated from the Bank's civil complaint, which the Government did not verify before filing the charges.

The parallel allegations in the criminal complaint and JPMC's civil complaint likewise reflect that the Government stayed within the boundaries of the Bank's theory of the case, failing to investigate other leads. *Compare, e.g.*, Civ. Compl. ¶ 8 ("Not comfortable, the engineer asked Javice and Amar whether the request was legal."), *with* Crim. Compl. ¶ 22(g) ("Engineer-1 was uncomfortable with the request and stated, in sum and substance, 'I don't want to do anything illegal.'"). At the time the Government filed its charges, the Bank had produced only approximately 200,000 pages of documents in response to the grand jury subpoenas (and initially withheld or failed to produce hundreds of thousands more). Those documents substantially overlap with the documents referenced in the criminal complaint. Indeed, the 3500 materials show, for example, that the Government █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ and only after ████████████████████████████████

███████████████████. *See* Ex. A ¶ 16 (JPMC 3510-023 at 1); *id.* ¶ 17 (██████ 3549-001 at 1).

## B.    The Government Improperly Outsourced Its *Brady* Obligations to JPMC

Even after the criminal complaint was filed, the Government relied on JPMC to ████████

████████████████████████████████████████████████████████ deferring to JPMC's own factual findings and opinions about their relative evidentiary weight. The Government's astonishing willingness to overlook the Bank's incentives—and the Bank's known pattern of failing to preserve, collect, and produce relevant documents—to corroborate their own fraud allegations in their publicly filed complaint is apparent throughout the 3500 materials.

The Government apparently had no need for an FBI or other investigative agent on the case. Instead, the Government continued to rely on the investigative work completed by the Bank. Even

after the Government was in receipt of the Bank's productions, JPMC ███████
█████████████████████████████████████████████████████████
██████████████████ *See* Ex. B (JPMC 3510-006) (███████████████████
███████████████████████████████████). For
example, the Bank's lawyers ██████████████████████████████
██████████████████████████. *See id.* No less than a month
later, ███████████████████████████████████████████
███████████████████████████████████ *See*
Ex. C (JPMC 3510-008).

The Government likewise outsourced its *Brady* obligations to the Bank, asking JPMC's
counsel ██████████████████████████████████████
███████████████████. In each case, counsel provided ██████████████
██████████████████:

- On April 12, 2023, JPMC counsel ████████████████████
  █████████████████████████████████████
  █████████████████████████████████████
  ██████ *See* Ex. A ¶ 6 (JPMC 3510-007 at 2).

- On April 24, 2023, JPMC's counsel ███████████████████
  █████████████████████████████████████
  ████████████████████ *See* Ex. C
  (JPMC 3510-008).

- On May 9, 2023, the Government asked █████████████████
  ██████████ and JPMC's counsel responded,
  ████ Counsel ████████████████████████
  █████████████████████████████████████
  *See* Ex. A ¶ 7 (JPMC 3510-010 at 1).

Even setting aside the impropriety of outsourcing its *Brady* obligations to a private party without any such constitutional duty to disclose favorable evidence, it is apparent the Government's questioning implicitly conceded that such materials could exist within the Bank's possession, and yet it ███████████████████████████████████████████████████████.

In sum, the 3500 materials confirm that the Bank's role in the prosecution was more akin to a joint investigator rather than a third-party witness or corporate "victim." The Government continued to rely on the Bank in this manner, even after the Court recognized the Government's failures to enforce their own grand jury subpoenas and SDNY were aware that the Bank held back critical material evidence, *see infra* pp. 14–19.[3] Even though the Government was alert to the risk of relying so heavily on the investigative work and opinions of JPMC, an interested party with a significant financial and reputational stake in the outcome of this case, the Government did so anyway.

## II.    THE GOVERNMENT'S COORDINATION WITH JPMC PREVENTED AND DELAYED DISCLOSURE OF EXCULPATORY INFORMATION

The Government's 3500 materials confirm that the SDNY's failure to conduct an independent investigation—treating the Bank as a joint investigator rather than a typical subpoena recipient—caused substantial prejudice to Defendants. The Government and JPMC coordinated to avoid disclosing potentially exculpatory evidence, including Google Analytics data that would substantiate the purportedly fraudulent representations about Frank's users, and obfuscated the

---

[3] Indeed, the 3500 materials reflect additional examples beyond those specified here. As recently as this past fall, the Bank continued to identify new leads for the prosecution. *See* Ex. A ¶ 14 (JPMC 3510-021 at 1). Outside counsel purportedly █████████████████████████████████—*i.e.,* two years prior to their meeting. The Bank's lawyer characterized that ██████████████████████████████████ *Id.* ¶ 15 (JPMC 3510-022 at 1-2). After delivering his one-sided narrative ████████████████████████████████████████████████████████████████████████████████████ and whom the Government now intends to call at trial. *See id.* ███████████████); *id.* ¶ 18 (████ 3550-001 at 1).

extent to which the Government's reliance on JPMC as an agent of the prosecution delayed disclosure of other evidence favorable to the defense and otherwise corrupted the record.

A.    **The Government's Deference to JPMC Resulted in a Delayed and Largely Unusable Production of Exculpatory Google Analytics Data**

Having adopted the Bank's fraud allegations, *see supra* pp. 5–9, the prosecution charges Defendants with allegedly deceiving JPMC into acquiring Frank based on false representations about Frank and its users. *See, e.g.*, Crim. Compl. ¶ 19. Even though those alleged user representations are central to the charged criminal conduct, the Government ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. When the data was finally produced, it was largely unusable, and the source of that data was permanently deleted. The substantial risk of prejudice to a defendant wrought by prosecutors wholly relying on an interested third party to determine what information to produce to the Government is laid bare by this example alone.

Frank's Google Analytics database was a central repository for user data that Mr. Amar and the Growth Team used to substantiate representations made to Frank's Board, potential investors, and to the public. *See* Ex. A ¶ 19 (██████ 3507-006 at 2 ██████████████████ ████████████████████████████); SEC-SDNY-EPROD-000094956 & SEC-SDNY-EPROD-000094982 (██████████████████████████████████████████ ██████████████). Even before the criminal charges were filed, the Government and the Bank were on notice regarding the paramount importance of Google Analytics data and the potential for the database to contain exculpatory information.

The Government discussed ███████████████████████████████████████ ██████████. In January 2023, ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. A ¶ 20

(██████ 3531-011 at 2). A few months later, in May 2023, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ *See id.* ¶ 21 (██████ 3535-002

at 1).

 The Growth Team's use of Google Analytics data to substantiate Frank's user

representations █████████████████████████████████████████████

████████████████████████. Simply put, the potential exculpatory nature of that evidence

for Mr. Amar has long been known and obvious to the Government. Before the criminal complaint

was filed, ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████, *see supra* p. 5, ██████████████████████████

████████████████████████████████████████████████ *See*

USAO_Rel__000109415. ████████████████████████████████████

██████████████████████████████████████. *See id.* at 4.

  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Ex. A ¶ 22 (3501-

002 at 1-3). ██████████████████████████████████████████████████

████████████████████████████████████████████████ . *Id.* While the

Government has ███████████████████████████████ , it apparently ignored

until the eleventh hour the obviously exculpatory evidence plainly discussed in them.

On October 6, 2023—half a year after filing the criminal complaint—the Government, by

its own admission, explicitly acknowledged the relevance of Google Analytics data to the core

allegations against Defendants but nevertheless failed to obtain that evidence. When the

Government issued a search warrant to ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

*See* USAO_00030822 at 19, 30. The Government allowed its already belated request to languish.

Defendants did not receive Google Analytics data for almost nine months after the issuance of the

Government subpoena (and only after significant effort by Defendants).

Faced with the Government's utter failure to enforce its own subpoenas to collect such

materials from JPMC, Defendants were forced to seek relief from the Court and issue their own

Rule 17 subpoenas. The Government claimed that it could not produce any *Brady* or responsive

materials in JPMC's, and not the Government's, physical possession, and repeatedly declared it

was prepared to go to trial by June and July 2023, thereby disclaiming any responsibility to collect

this evidence. *See, e.g.*, June 6, 2023 Hr'g Tr. 6:12-7:18; 8:1-8 (on June 6, 2023, the Government

represented to this Court that it was "ready to try the case," and that "within the next 45 days, we

will produce any additional subpoena returns" from JPMC). Because Defendants could not depend

on the Government to obtain that potentially exculpatory evidence consistent with their discovery and disclosure obligations, defense counsel pressed for those materials. The 3500 materials show, however, that the Bank and the Government were in fact able to coordinate but did so to the detriment of Defendants. Specifically, the materials ██████████████████████████ ████████████████████████████ until after counsel for Defendants, operating based upon an imperfect record and suspicion borne from prior experience sought—and obtained—Court intervention.

On November 9, 2023, Mr. Amar issued a Rule 17(c) subpoena on JPMC, specifically seeking documents related to Google Analytics.[4] The Bank moved to quash those requests, and Mr. Amar ultimately withdrew his request for Google Analytics-related information after the Bank represented that "JPMC has previously produced any responsive, non-privileged documents that JPMC was able to locate." JPMC Mot. to Quash, ECF No. 75. At that point in time, Defendants continued to remain in the dark about what Google Analytics data, if any, the Government or JPMC collected or preserved from Frank's Google Analytics database. After learning on June 29, 2024, that Google was decommissioning the Google Analytics database on July 1 and Frank's user data would be deleted, defense counsel promptly issued a preservation demand to JPMC on June 30, 2024. *See* Ex. D (June 30, 2024 email from Defendants to JPMC's counsel). On the same day defense counsel also issued a Rule 17 subpoena on Google to retrieve that data.

Although JPMC's counsel represented that they had "taken steps to preserve" the Google Analytics data, *id.* (July 1, 2024 email from JPMC's counsel to Defendants), the 3500 materials

---

[4] Those requests included: (1) "A list of JPMC personnel with access to Frank's Google Analytics platform and the permissions of those with access"; and (2) "Documents and Communications related to internal discussions of the content and subject matter of JPMC's review of Frank's Google Analytics data in or around the time JPMC received access." *See* Decl. in Support of JPMC Mot. to Quash, Ex. A, ECF No. 74-3.

show  that ████████████████████████████████████████████

████████████████, *see* Ex. A ¶ 10 (JPMC 3510-017 at 1). After the preservation notice was issued,

on July 12, 2024, the Bank's lawyers met with the Government ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*Id.* (JPMC 3510-017 at 1). In notes from a related call, counsel informed the Government ████

████████████████████████████████████████████████████████

████████████████████████████████████████ *See id.* ¶ 13 (JPMC

3510-020 at 1).

The notes from the July 12 meeting also suggest that the Government and the Bank ████

████████████████████████████████████████████████████████

██████████████████████████████████████ *See id.* ¶ 13 (JPMC 3510-

017 at 1) (████████████████████████████). In essence, the Government assiduously

refused to collect material evidence from JPMC identified by Defendants, even though it quite

clearly had the ability to do so, in a strategic attempt to shield Defendants from accessing these

materials in time for trial, needlessly wasting Defendants' resources and time in discovery efforts

throughout this prosecution.

And even though such discovery deficiencies by any ordinary subpoena recipient would

warrant additional oversight, the Government continued to defer to the Bank. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See*

*id.* (████████████████████████████████████████████

████████████████████████). The Government solicited counsel's views on ████████

██████████████████████████████████████████████████

████████████████████████████████" *See id.*

 When JPMC informed ████████████████████████████████████

████████████████████████████████, the Government made no additional effort

to collect potentially exculpatory material, ███████████████████████████████

██████████████████████████████████████████████████

████████ *See id.* ¶ 11 (JPMC 3510-018 at 1); *id.* ¶ 12 (JPMC 3510-019 at 1) (indicating JPMC

informed ████████████████████████████████████████

████████████████████████████████). Notes from a later meeting confirm

that the only Google Analytics data made available to Defendants ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ *See id.* ¶ 13 (JPMC 3510-020).

 The Government made sure Defendants would have no chance in capturing Google

Analytics data in a usable format. SDNY waited until July 23, 2024—█████████████████

████████████████████████████████████████ before telling Defendants that the

Bank "recently gained access" to the database and was "capturing the data." *See* Ex. E (July 23,

2024 correspondence between Defendants and Government); Ex. A ¶ 12 (JPMC 3510-019 at 1)

(notes from July 22, 2024, call stating that ███████████████████████████████████

███████████████). Ultimately, when Frank's Google Analytics data was finally produced to

Defendants on August 9, 2024—on the eve of Defendants' initial trial date—it was in largely

unusable form. The enormous production was scattered and contained no index. Worse still, the

production represented a static snapshot of Frank's Google Analytics, which is a dynamic tool,

containing screengrabs and selective datasets of limited utility to the defense. The Google Analytics data was pulled for the entirety of Frank's existence instead of specific to the relevant time period—that is, when Frank was going to market and engaged in diligence. As far as defense counsel can tell, no attempts were made to replicate the data pulls that Mr. Amar and the Growth Team did in connection with diligence, including relating to the alleged misrepresentations at the heart of the Government's case.

When Defendants sought information from JPMC about its collection efforts, the Bank refused to respond stating that the discovery would be produced in response to the grand jury subpoena (███████████████████████████). JPMC's counsel and the Government thereafter met to ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. *Compare id.* Ex. F (Sept. 6, 2024 email from SDNY to defense counsel) (stating "JPMC no longer has access to the Google Analytics accounts. Google *recently* discontinued its Universal Analytics feature and no longer maintains historical data for this platform" (emphasis added)) *and* Ex. A ¶ 16 (JPMC 3510-023 at 1) (notes from September 6, 2024, meeting reflecting JPMC counsel's response to same inquiry as ████████████████████████████████████████

████████████████████████████████ (emphasis added)).

### B. The Government's Reliance on JPMC Resulted in Late Disclosure of Deleted Exculpatory Material of Key Custodians

Due to the Government's failure to enforce its subpoenas on JPMC, the Bank could pick and choose whose documents would be collected and produced. JPMC avoided producing documents of custodians likely to possess material evidence, including merger decision-makers, members of the Frank team who worked most closely with Defendants, and even Bank personnel

referred to in the criminal complaint.[5] The Government's 3500 materials show that— ███████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████. On September 14, 2023,

the Bank advised the Government that ████████████████████████████████████

████████████████████████████████████████. *See* Ex. A ¶ 9 (JPMC

3510-016 at 1) (identifying ███████████████████████). Defendants were later

advised that files of a third JPMC employee were also deleted. *See* Gov't Letter to Court, ECF No.

69 at 3 n.6.

    One of these custodians ██████████████ is a former JPMC employee who allegedly

created notes during Frank diligence meetings on July 7, July 12, and July 13, at which the

Government asserts misrepresentations were made. Only after the criminal charges were filed, did

the Government ask counsel for JPMC whether ████████████████████████████████

██████. *See* Ex. A ¶ 8 (JPMC 3510-014 at 1). JPMC's outside counsel offered their understanding,

purportedly based on the Bank's own investigation, of who was present and what occurred:



*See id.* ¶ 8 (JPMC 3510-014 at 1). As it happened, the only notes produced in connection with that

meeting was a compiled set of notes purportedly by ████████████████. For the July 12 and 13

---

[5] The relevance of those materials was clear to each Court considering Defendants' request for such exculpatory information. *See* June 15, 2023 Hr'g Transcript, *SEC v. Javice*, No. 23-CV-02795, at 24:13–24 (S.D.N.Y. Apr. 4, 2023) (Liman, J.) ("There might be a smoking gun. There might be an email where Ms. Javice said to J.P. Morgan, these customers are not yet real customers where we have information, identifying information. And the SEC said to them, you know what, hold back on that document."); July 13, 2023 Hr'g Transcript, *United States vs. Javice*, No. 23-cr-00251, at 11:10–16 (S.D.N.Y. Mar. 31, 2022) (Hellerstein, J.) ("I can see the relevance of that information. Did JPMorgan rely on this information, from your point -- from your account, reliance is suggested, but there may be items in the correspondence that show differently.").

meetings, the criminal complaint alleged that "contemporaneous notes" were taken, *see* Crim. Compl. ¶ 19(g), but the only notes produced were likewise a compilation of notes by this employee. The Government intends to call ████████████ to testify at trial and introduce these notes despite their questionable reliability. *See* Def. Javice's Mot. *in Limine*, ECF No. 196 at 8-9.

Even though outside counsel represented that ████████████████████████ ███████████████████████, *see supra* n.1, they failed to preserve ████████████ inbox, which was purged on or around ████████████, *see* Ex. G (Jan. 17, 2024 email from JPMC's outside counsel to defense counsel). Deletion of ████████████ custodial files could have caused underlying copies or drafts, as well as documents providing additional context for these notes, to be deleted. All these potentially spoliated documents would have been advantageous to the defense case, potentially identified additional JPMC witnesses whose recollections differed from what is recorded in the notes, and critically for impeachment purposes at trial, as the Government intends to call ████████████ to testify.

JPMC likewise deleted documents of a key custodian ████████████████ ████████████████ received Frank's user data and performed an analysis of the data after Frank was acquired. JPMC appears to have ████████████████████ ████████████████, *see supra* pp. 4–5, but only after ████████████ ████████████. *See* Ex. H (Dec. 8, 2023 Letter from JPMC's outside counsel to SDNY). JPMC thereafter issued a litigation hold for ████████████████████ ████████████████████████. *See* Ex. I (Mar. 27, 2024 email from JPMC's counsel to defense counsel); Ex. J (excerpted information from "Appendix A" attached to Mar. 27, 2024 email). Due to those deleted files, Defendants are missing key communications about the Frank data transfer and Mr. Amar's involvement in the same.

When Defendants pursued information about JPMC's failure to retain these documents—among other custodians—the Bank provided evasive responses, using the Government as a shield, even after the Court directed JPMC to produce information about JPMC's retention policies. *See* Ex. G (Jan. 17, 2024 email from JPMC's outside counsel to defense counsel). The Bank's list of custodians and litigation holds provided to defense counsel reflect that over a year following the Government's first grand jury subpoena, JPMC ████████████████████████████████ ████████████████████, including those at the Bank whose documents would be materially relevant and potentially exculpatory. For example, ████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████. *See* Ex. J (excerpted information from "Appendix A" attached to Mar. 27, 2024 email). And ████████████████████████████████████████████████ ████████████████████████████ on September 14, 2023, the Government does not appear to have taken action to ensure the Bank then issued litigation holds to all key custodians. For example, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████, and likely only because of the Court had ordered JPMC to produce to the Government all of the custodial documents excerpted in the Complaint. *See id.*

The Bank's complete control over which email inboxes of current and former JPMC and Frank personnel were collected and produced to the Government also resulted in the Government not receiving the custodial email files of at least ten individuals on the Government's witness list, including individuals quoted in the Government's complaint (*e.g.*, "Engineer-1," "Executive-1," and "Executive-2") and witnesses who worked closely with Defendants pre- and post-acquisition,

whose 3500 materials indicate that the Government plans to elicit testimony to explain alleged misrepresentations by Defendants that are at the heart of the Government's criminal charges (*e.g.*,

██████████████████████████████████████████████████████████████████

██████████████████ and "Engineer-1" ██████████████ ).

### C. The Government Permitted JPMC's Improper Privilege Assertions to Delay Disclosure of Exculpatory Documents Evidencing Mr. Amar's Good Faith

The 3500 materials also reveal ████████████████████████████████████

██████████████████████████████, while the Bank—in coordination with the Government— steadfastly fought off Defendants' challenges to JPMC's overbroad assertions of privilege.

Throughout the prosecution, the Government declined to challenge JPMC's extensive redactions based on privilege. Through Defendants' efforts alone, JPMC produced or downgraded over 16,000 documents wrongly withheld as privileged for over a year, winnowing the Bank's privilege log of over 30,000 documents (25,000 fully withheld) to a log of around 20,000 documents (5,000 fully withheld). *See, e.g.*, ECF No. 152 at 4 & n.1; ECF No. 143 at 1-17 (describing year-long fight to obtain non-privileged documents despite inconsistent and erroneous privilege calls from Bank's prior and current counsel). Many of these documents are material to Mr. Amar's defense as they show his lack of intent to defraud and therefore are exculpatory, and are included in Defendants' prior disclosures, *see, e.g.*, ECF No. 153 at 1-2, and Mr. Amar's trial exhibit list, *see, e.g.*, DX OA 27.

The 3500 materials reflect that ████████████████████████████████████

████████████████████████████████████████████ Meeting notes reflect that throughout the case, ██████████████████████████████████████ . Counsel conveyed ████████████████████████████████████████████████ while maintaining broad swathes of redactions to avoid disclosure, preventing the defense from

understanding the relevant context necessary to assess the potential exculpatory nature of the evidence. For example, on March 21, 2023, JPMC's counsel ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████. *See* Ex. A ¶ 5 (JPMC 3510-005 at 1). A few weeks later, on April 12, the Government and the Bank's lawyers met again ████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████." *See id.* ¶ 6 (JPMC 3510-007 at 2-3).

On April 24, JPMC's lawyers were ████████████████████████████

██████████████████████████████████████████████████████████

██████████  *See* Ex. C (JPMC 3510-008). Counsel responded that ████████████████

██████████████████████████████████████████████████████████

███████████████  *See id.* That document was produced to Defendants with significant redactions based on attorney-client privilege. *See id.* (citing JPMC_00204402). Even though Defendants were precluded from learning critical context surrounding the unredacted portions of the email, ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████  *See id.* ¶ 8 (JPMC 3510-014 at 1).

In sum, the Bank's vested interest in prosecuting Defendants influenced the Government's prosecution throughout the case. The above reflects only a handful of events that may be aptly

summarized or gleaned from the unredacted portions of the Governments' 3500 materials; Defendants suspect a full account of the prejudicial impact wrought by the Bank's participation in prosecution would be much broader were all the facts known to Defendant.

## ARGUMENT

Second Circuit precedent and fundamental fairness require extending the Government's disclosure obligations under *Brady*, *Giglio*, and the Jencks Act to materials in the possession, custody, and control of the Bank. The Government made the decision to outsource its investigative, discovery, and disclosure obligations to JPMC—adopting the Bank's investigatory work, recommendations on prosecutorial strategy, and views on what evidence would be responsive to the Government's grand jury subpoenas—resulting in grave omissions in the available evidence and delayed disclosure of exculpatory materials. The prejudice caused by the Government's inappropriate deference to an interested third party is compounded by the Government's extant *Brady* violations in this case. Without such a finding and accompanying relief, the Government will have effectively avoided its constitutionally mandated disclosure obligations, depriving Defendant Amar from a fair opportunity to prepare his defense.

## I. THE GOVERNMENT'S *BRADY* OBLIGATIONS EXTEND TO MATERIAL IN THE POSSESSION, CUSTODY, AND CONTROL OF J.P. MORGAN CHASE

The Government cannot skirt its *Brady* obligations by devolving them to a private company. Prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (discussing prosecutors' obligations under *Brady* and its progeny); *United Sates v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). They cannot knowingly or deliberately turn a blind eye to the existence of potentially exculpatory evidence because it may weaken their case. *See Kyles*, 514 U.S. at 437–38.

The Government's disclosure obligations therefore extend to those who act on behalf of the government. *See United States v. Hunter*, 32 F.4th 22, 35 (2d Cir. 2022) ("prosecution team" includes not only prosecutors and case agents, but any other entity or individual "'acting on the government's behalf' in a case").

The Government's 3500 materials confirm that the Bank and its counsel did not simply collect documents for the Government or respond to information requests, but took initiatives squarely consistent with actions that courts in this Circuit found sufficient to deem a third party a member of the "prosecution team." The Bank was closely "involved with the investigation," shared interview information with prosecutors, "gathered facts" and "reviewed documents" for the Government, and "developed prosecutorial strategy." *United States v. Blaszczak,* 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018); *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). JPMC and its counsel's actions are therefore "fairly attributable" to the Government because "rather than simply produc[e] documents and provid[e] interview summaries," counsel "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect." *United States v. Connolly*, 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019).

The Government's criminal charges blindly relied on ███████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████. *See supra* pp. 4–6. The Government "outsourced the important developmental stage of its investigation" to the Bank and "then built its own 'investigation' into specific employees . . . on a very firm foundation constructed for it." *Connolly*, 2019 WL 2120523, at *12. Even after the charges were filed, the 3500 materials show that the Government delegated authority to JPMC allowing it to "develop prosecutorial strategy."

*Stewart*, 433 F.3d at 299. The Government repeatedly relied on JPMC ████████████
████████████████████████████████████████████████, in deference to the Bank's
analysis and investigation—notwithstanding the Bank's obvious incentive for Bank to deny the
existence of any materials favorable to the defense. *See supra* pp. 6–9. The Bank recommended
█████████████████████████████████████████████████. *See supra* pp. 4–9.
Under these circumstances it is justifiable to extend the Government's *Brady* obligations to a third
party like the Bank. *See Connolly*, 2019 WL 2120523, at *10.

In this case, it is not only appropriate to find the Bank an agent of the prosecution, but Due
Process and fundamental fairness necessitate that finding. The Government used JPMC as both
sword and shield—strategically benefitting from its investigative work while stymieing
Defendants' efforts to obtain materials critical to their defense. "If a core component of due process
could be circumvented by the mere delegation of the fact-collecting phase to a party outside of the
prosecutor's office, the notion of constructive knowledge embraced by the Court in *Kyles* would
be meaningless."[6] Indeed, under these circumstances, the Second Circuit has suggested that
extension of the Government's disclosure obligations to a third party, even if not determined to be
a member of the "prosecution team," may still be required to protect a defendant's constitutional
rights. *See United States v. Hunter*, 32 F.4th 22, 38 & n.70 (2d Cir. 2022) (identifying serious
concern about whether Second Circuit "jurisprudence circumscribing the 'prosecution team' . . .
[is] adequate to protect [d]efendants' rights"); *Connolly*, 2019 WL 2120523, at *10 (applying arm
of prosecution doctrine where defendants' Fifth Amendment rights were violated by the
government's failure to conduct a substantive parallel investigation, relying on the fruits of
Deutsche Bank's internal investigation).

---

[6] *See* Sarah Patterson, Co-Opted Cooperators: Corporate Internal Investigations and Brady v. Maryland,
2021 Colum. Bus. L. Rev. 417, 437 (2021).

## II.    THE GOVERNMENT'S DEFERENCE TO JPMC RESULTED IN *BRADY* VIOLATIONS AND PREJUDICED DEFENDANTS

The Government violates a defendant's due process rights when, as here, it suppresses favorable material evidence, including exculpatory material and information that could be used to impeach Government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Thomas*, 981 F. Supp. 2d 229, 238 (S.D.N.Y. 2013); *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002). Even though the Government claimed it could not be required to produce critical exculpatory evidence in the Bank's possession, requiring Defendants to attempt to obtain those materials through their own trial subpoenas, the record is now clear that the Government and JPMC coordinated to thwart Defendants' efforts to obtain critical exculpatory material.

While the Government is sure to argue that discovery obtained from Defendants' Rule 17 subpoenas should allow Defendants to defend themselves fairly, the "United States Attorney is the representative not of an ordinary party to a controversy," and thus its "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). It is the Government's *affirmative* duty to identify exculpatory material and not suppress it by burying it within the productions. *See, e.g.*, *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002) (document in effect suppressed within meaning of *Brady* when buried in "five reams of paper labeled '3500 material'"); *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (noting that "the Government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials). Moreover, the Government is required to disclose *Brady* material as soon as it learns of it. *See, e.g.*, *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015) ("[C]ounsel for the Government should have understood that as soon as they were finished talking with [a witness], they had an obligation to give [exculpatory] information to the defense."); *United States v. Mason*, 951 F.3d 567, 573 (D.C. Cir. 2020) (the Government's delayed

disclosure of impeachment evidence "for months" was "inexcusable"). *Brady* disclosures must be made promptly, or "in time for its effective use at trial." *Gil*, 297 F.3d at 105. The May 22, 2023 Order entered in this case "pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protection Act [("DPPA")]" confirms that the Government must "disclose such information to the defense *promptly after its existence becomes known to the Government* so that the defense may make effective use of the information in the preparation of its case." *Id.* (emphasis added).[7]

The Government's deference to JPMC as to what evidence to collect and how to collect it, resulted in the delayed disclosure of and possibly incomplete preservation of Google Analytics data, as well as the delayed production of improperly withheld materials evidencing Mr. Amar's lack of intent to defraud. *See supra* pp. 9–16, 19–21. Only because the Court intervened after becoming aware of what the Government concealed did JPMC ultimately produce the very materials to which the Government had willfully blinded itself (and thereby shielded access from the Court and Defendants), even though the record is clear that the Government had access to and should have been aware of their existence through Defendants' own efforts to retrieve those materials. Even when the Government was on notice of ███████████████████████████ ████████████████████████████████████████████—the Government apparently took no action, instead welcoming JPMC's continued assistance throughout the

---

[7] While the Rule 5(f) Order precedes the Superseding Indictment returned against Mr. Amar, the Court has reminded the Government of its disclosure obligations as to Mr. Amar specifically. *See* July 13, 2023 Hr'g Tr. at 14-15.

prosecution ███████████████████████████████████████████████████

███████.[8] *See supra* pp. 19–21.

The prejudice to Defendants is compounded here by the Government's failure to identify *Brady* material within the more than one million documents SDNY produced in the case (and over two million including the Bank's productions). The Government's prior Rule 16 productions and transmittal letters consistently acknowledged its disclosure obligations yet failed to specifically identify any *Brady* material.[9] Even though the Government "cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials," the Government left the defense to sift through the overwhelming number of documents produced by the Government and the Bank to find *Brady* or documents material to preparing the defense. *See Thomas*, 981 F. Supp. 2d at 239 (citation omitted); *see also Gil*, 297 F.3d at 106.

Nonetheless, defense counsel managed to identify some *Brady* material in the Government's prior productions that was in effect suppressed. *See Gil*, 297 F.3d at 106; *cf. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009) (rejecting argument that Government's "voluminous open file" violated *Brady*, but only because it "produced a set of 'hot documents' that it thought were important to its case or were potentially relevant to [the] defense"), *aff'd in part, vacated in part, remanded*, *Skilling v. United* States, 561 U.S. 358 (2010). This material is directly relevant to allegations the Government advances in its Disclosure Letter, *see* ECF No. 140;

---

[8] ████████████████████ DOJ's Justice Manual expressly provides that "a corporation is not required to waive its attorney-client privilege or attorney work product protection to be eligible to engage in cooperation or satisfy any threshold" of evaluating cooperation. U.S. Dep't of Justice, JM 9-28.700 Cmt. B; *see also id.* at 9-28.720 ("Eligibility for cooperation credit is not predicated upon the waiver of attorney-client privilege or work product protection.").

[9] The Government first produced materials on July 25, 2023, and did so as recently as January 22, 2025, just weeks before the start of trial. The Government's January 22 production contains materials responsive to the Google search warrant from well over a year ago, which are the subject of Mr. Amar's motion to suppress filed simultaneously with this Motion.

covers statements where individuals deny that Mr. Amar misrepresented user-related metrics while at JPMC; and includes communications between Mr. Amar and Ms. Javice rebutting elements of the Government's theory of the case.  These include:

- USAO_Rel_000109553 ███████████████████████████████████████

- USAO_Rel_000107896 ███████████████████████████████████████
  ███████████████████████████████;

- USAO_Rel_001735542 ███████████████████████████████████████
  ████████████████████████████████;

- USAO_00001093 ████████████████████████████████████████████
  ████████████████████████████████ suggesting that
  as far as Mr. Amar knew the purchase was sanctioned, legitimate, and in good-faith);

- USAO_Rel_000558402 ███████████████████████████████████████
  ████████████ indicating that Mr. Amar had no interactions with Scientist-1 during the periods described in the charging documents and did not know of his identity before this date);

- USAO_00001093 ████████████████████████████████████████████
  ████████████████ indicating a lack of knowledge about the validation exercise in connection with the merger); and

- USAO_00001093 ████████████████████████████████████████████
  ███████████████████████████

Defense counsel believes other exculpatory material is likely buried in the mountain of documents the Government continues to produce and therefore remains concealed if not actually suppressed.

        In sum, the Government has not disclosed any *Brady* material "in a manner that gives the defendant an adequate opportunity to do the investigation that would be reasonably necessary to use those documents to the maximum effect or to determine whether there are witnesses who could

be called to enhance the value of those documents to the defense." *United States v. Diabate,* 90 F. Supp. 2d 140, 142–43 (D. Mass. 2000); *see, e.g.*, *Gil*, 297 F.3d at 106. Nor did it timely disclose or produce exculpatory material in JPMC's possession by permitting the Bank to control what evidence to produce in response to the grand jury subpoenas. Less than two months before trial, Defendants are now scrambling to deal with the Government's belated productions, *see supra* n.9, 26-person witness list and an exhibit list containing approximately 1,200 exhibits and cannot possibly make use of any exculpatory evidence that may remain buried in the productions or withheld by JPMC. The Government has therefore caused substantial prejudice to the defense due to its *Brady* violations.

## III.    SUBSTANTIAL PREJUDICE TO DEFENDANTS AND PRINCIPLES OF DETERRENCE WARRANT RELIEF

Pursuant to the Rule 5(f) Order entered in this case, the Government's failure to abide by its disclosure obligations warrant relief. *See* ECF No. 20. The Due Process Protection Act enforces compliance with the Government's discovery obligations under *Brady* and its progeny. *See* Due Process Protection Act ("DPPA"), 134 Stat. 894, Pub. L. No. 116-182 (2020). The DPPA amended Federal Rule of Criminal Procedure 5(f) to require that, "[i]n all criminal proceedings, on the first scheduled court date when both prosecutor and defense counsel are present, the judge shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law." Fed. R. Crim. P. 5(f); *United States v. FNU LNU*, No. 06-cr-172 (LTS), 2021 WL 5822230, at *2 (S.D.N.Y. Dec. 7, 2021) (Rule 5(f) and DPPA "remind prosecutors of their obligations to disclose materially exculpatory materials to the defense").

To address these failures, and for the reasons stated herein, the Court should adopt measures to deter the Government's conduct, not reward it. *See United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (dismissing indictment over mistrial to deter prosecutorial misconduct); *accord United States v. Bundy*, 968 F.3d 1019, 1043–44 (9th Cir. 2020) (affirming dismissal of indictment for failure to disclose *Brady* material until the middle of trial to "deter future prosecutions from engaging in the same misconduct"). Rule 5(f) ensures a wide range of remedies to deter *Brady* violations, including evidentiary sanctions, sanctions against Government parties, and dismissal. *See* DPPA, 134 Stat. 894; *United States v. Hossain*, No. 19-cr-606 (SHS), 2020 WL 6874910, at *6 (S.D.N.Y. Nov. 23, 2020) ("[Congress] was so concerned about [inadequate safeguards to ensure prosecutorial compliance with disclosure obligations] that it chose to amend the Federal Rules of Criminal Procedure itself, a process usually initiated by the U.S. Supreme Court"); *United States v. Halliburton*, No. 20-cr-499 (LTS), 2020 WL 6746477, at *2 (S.D.N.Y. Nov. 16, 2020) (listing remedies under Rule 5(f)).

### A.  The Court Should Order Disclosure of *Brady* and *Giglio* Materials in the Bank's Possession

The Court should order the Government to specifically identify any exculpatory and impeachment evidence in the possession, custody, or control of the Bank. *See, e.g.*, *United States v. Saffarinia*, 424 F. Supp. 3d 46, 86 (D.D.C. 2020) ("[T]he government's *Brady* obligations require it to identify any known *Brady* material to the extent that the government knows of any such material in its production of approximately 3.5 million pages of documents."); *United States v. Cutting*, No. 14-cr-139 (SI), 2017 WL 132403, at *9 (N.D. Cal. Jan. 12, 2017) ("[I]t is appropriate to require the government to identify the *Brady* material in the discovery that has been produced."); *United States v. Salyer*, No. 10-cr-61 (GGH), 2010 WL 3036444, at *2 (E.D. Ca.

Aug. 2, 2010) (ordering Government, "as a matter of case management (and fairness)," to identify as *Brady* material documents or evidence already disclosed to defendant).

In particular, the Government should be required to provide full and complete copies of internal notes from the Bank's internal investigation, and at the very least, notes from JPMC's interviews of any witness that it may call, including "Engineer-1," "Executive-1," "Executive-2," "Scientist-1," and ████████, *See United States v. Bagley,* 473 U.S. 667, 676 (1985) (noting that impeachment evidence, such as prior witness statements, "falls within the *Brady* rule"); *United States v. Giffen*, No. 03 Cr. 404 (WHP), 2004 WL 1475499, at *8 (S.D.N.Y. July 2, 2004) ("In the Second Circuit, *Giglio* materials, like *Brady* materials, must be disclosed in time for [their] effective use at trial." (quotations omitted; alteration in original)). Even though the Government ████████████████████████████████████████████████████, the Government apparently never sought all notes from the Bank's internal investigation. For example, at the start of the prosecution, JPMC's counsel apparently ████████████████████ ████████████████ The Government never required the Bank to produce notes from that interview and instead relied on the Bank's representations. Although the 3500 materials reflect that before filing the charges the Government ████████████████████████████ ████████████████████ and presumably after the employee was prepared by the Bank's lawyers. It is incumbent on the prosecutors—and critical for the defense—to attain prior witness statements made during the Bank's interviews.

The Government should also be required to produce relevant communications and documents from the email inboxes and files of the Government's witnesses to the extent in the Bank's possession, including "Engineer-1," ████████, and ████████, each of whom worked closely with Defendants either pre-acquisition at Frank and/or post-acquisition at JPMC,

and through whom, the Government's 3500 emails strongly suggest, the Government intends to introduce testimonial and documentary evidence that go to the core allegations against Defendants. As explained above, because the Government refused to collect material evidence from JPMC identified by Defendants, even though the 3500 materials reflect that it had the ability to do so, s*ee supra* pp. 18–19, Defendants are now lacking highly relevant and potentially exculpatory and impeachment material of these witnesses. For example, Engineer-1 began surreptitiously and without consent recordings calls and meetings between himself and Defendants. Of these recordings, the Bank has selectively produced only three files—one of which the Government intends to introduce during its case-in-chief. *See* GX300. Due to the Bank's selective production, Defendants lack information that would allow effective cross-examination of when Engineer-1 began making these recordings, under what circumstances, and what other interactions he may have recorded, including interactions that may be exculpatory in nature. Requiring Defendants to pursue such materials through the Rule 17 process at this late stage would prejudice the defense on the eve of trial and reward the Government for its use of JPMC as a shield in discovery.

Furthermore, because a witnesses' "credibility is always an issue of consequence," evidence "which aids in the jury's determination of a (witness's) credibility and veracity (is always relevant)." *United States v. Quinto*, 582 F.2d 224, 233 (2d Cir. 1978) (internal quotation marks omitted, alteration in original). Without these materials, Mr. Amar would likewise be deprived of his Sixth Amendment right to "impeach, *i.e.*, discredit, the [government's] witness[es]." *Davis v. Alaska,* 415 U.S. 308, 316 (1974). Because constitutionally adequate confrontation includes the meaningful opportunity to challenge the Government's witnesses for "prototypical form[s] of bias," such as prior inconsistent statements, disclosure of these materials is likewise required under the Sixth Amendment. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986); *U.S. v. Canter*,

338 F. Supp. 2d 460, 462 (S.D.N.Y. 2004) (agreeing impeachment materials, including prior witness statements, must be produced to the defendant pretrial noting that that is the "practice of this Court and of other courts in this district"); *United States v. Santiago,* 174 F. Supp. 2d 16, 40-41 (S.D.N.Y. 2001) (same).

### B.    The Court Should Permit Defense Counsel to Argue and Present Evidence Concerning the Prosecution's Investigative Methods or Lack Thereof

The Court should, at minimum, seek to mitigate at trial the prejudice caused by the Government and provide an adverse jury instruction allowing defense counsel to argue and admit evidence concerning the Government's investigative methods or lack thereof that permitted JPMC to determine what materials to produce pursuant to the grand jury subpoena, including with respect to (1) the delayed production of and potentially limited the scope of Frank's user data from the Google Analytics database in the evidentiary record; (2) evidence improperly withheld as privileged that are relevant to Defendants' intent; (3) the Bank's deletion of documents of custodians that the Government intends to call at trial; and (4) to the extent the Court does not order production as requested above, the absence of potential exculpatory and impeachment material.

While the Government may argue that the Second Circuit does not permit argument that the prosecution should have used any particular "investigative technique," the Court is permitted and, indeed, due process and fundamental fairness require the Court to allow defense counsel to elicit evidence and argument challenging the "thoroughness and even the good faith of the [government's] investigation." *Kyles,* 514 U.S. at 445; *see also id.* at 446 ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant[.]" (citing *Bowen v. Maynard,* 799 F.2d 593, 613 (10th Cir. 1986)). Moreover, such evidence and argument concerning the coordination between the Government and JPMC during

the prosecution, and the resulting impact on the availability of certain evidence, is highly relevant and necessary to ensure Mr. Amar is not deprived of constitutionally adequate confrontation. *See Davis*, 415 U.S. at 316; *see also* Fed. R. Evid. 607.

### C. The Court Should Order An Evidentiary Hearing To Resolve Any Issues of Fact and Review Redacted Meeting Notes

To the extent the Government disputes the facts herein, Mr. Amar respectfully requests that the Court hold an evidentiary hearing, and review the Government's redactions of meeting notes between JPMC and the Government, to determine (1) the extent of cooperation between the Government and the Bank, (2) the extent to which the Bank has granted the Government access to its work product and files, and (3) the extent of the Bank in crafting prosecution strategy. Such hearings have been held in similar cases and is warranted here. *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (an evidentiary hearing is permitted if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question"); *Bundy*, 968 F.3d at 1043 ("The district court held several hearings on the various *Brady* violations, complete with rounds of briefing and oral arguments."); *see also United States v. Sutton*, No. CR 21-0598-01 (PLF), 2022 WL 2383974, at *9–10 (D.D.C. July 1, 2022).

## <u>CONCLUSION</u>

For these reasons, Defendant Olivier Amar respectfully requests that this Court compel the

Government's compliance with its discovery and disclosure obligations under Rule 16, *Brady*,

*Giglio*, and their progeny, and order the relief requested herein.

Dated:  January 27, 2025                                Respectfully submitted,

**KOBRE & KIM LLP**

<u>*/s/ Alexandria E. Swette*</u>
Alexandria E. Swette
Sean S. Buckley
Jonathan D. Cogan
Steven G. Kobre
Daisy Joo
800 Third Ave
New York, New York 10022
Tel: (212) 488-1200
Alexandria.Swette@kobrekim.com
Sean.Buckley@kobrekim.com
Jonathan.Cogan@kobrekim.com
Steven.Kobre@kobrekim.com
Daisy.Joo@kobrekim.com

Erika L. Berman (pro hac vice forthcoming)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Erika.Berman@kobrekim.com

*Counsel for Defendant Olivier Amar*