# EXHIBIT A

PERSONAL EMPLOYMENT AGREEMENT

This Personal Employment Agreement ("**Agreement**") is entered into this March 8, 2017 (the "**Effective Date**"), by and between TAPD Israel Ltd., a private company incorporated under the laws of the State of Israel (the "**Company**") and the employee whose details are specified in Annex A hereto (the "Employee").

WITNESSETH

WHEREAS, the Company desires to engage the Employee in the position indicated hereinafter and the Employee represents that he has the requisite skills and knowledge to serve in such position; and

WHEREAS, the parties desire to state the terms and conditions of the Employee's engagement with the Company, effective as of the Employment Starting Date, as such term is defined hereinafter, all subject to the terms set forth below.

NOW THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound, the parties hereto hereby declare and agree as follows:

1. **Appointment; The Position**

1.1    The Company hereby appoints the Employee to the position detailed in Annex A. The Employee shall perform the services and duties hereunder in accordance with the Company's policy (the "Services"), under the supervision of the person(s) detailed in Annex A and in accordance with his/her instructions and in any other framework as the Company shall direct in order to facilitate its needs.

1.2    The parties hereto warrant and confirm that Employee's employment by the Company shall commence on the date specified in Annex A (the "**Employment Starting Date**"). The provisions of this Agreement shall apply to the parties as of the Employment Starting Date.

1.3    The Employee shall perform his/her duties hereunder at the Company's principal offices indicated above or at such other offices in either the Jerusalem or Tel Aviv areas. The Employee acknowledges and agrees that the performance of his/her duties hereunder may require domestic and international travel.

1.4    This Agreement is specific and personal and exclusively determines the Employee's terms of employment.

2. **Devotion of Time**

2.1    As of the Employment Starting Date, Employee shall devote the required and necessary business time, attention and efforts to the performance of his/her duties and responsibilities hereunder. The Employee shall perform the duties and responsibilities hereunder with expertise and in a professional and efficient manner.

2.2    During the term of this Agreement, and unless and until otherwise agreed, Employee shall be employed on a full-time basis (5 days a week, 9 hours per day including half an hour lunch break), with Friday and Saturday as rest days.

The performance of Employee's responsibilities requires work during over-time hours, over and above the regular working days and hours and the Employee undertakes to work these hours in accordance with the Company's demands and requirements.



2.3    As of the Employment Starting Date, Employee shall not engage in any other business activities, whether or not such business activities are conducted outside of normal business hours and whether or not such activities are pursued for gain or profit unless specifically approved by the Company. The above notwithstanding, it is hereby clarified and agreed that: (i) the Employee may engage is volunteer work; (ii) as of the Effective Date, the Employee is currently engaged and may continue to be engaged with the entities listed on **Annex B** hereto, and (iii) the Employee may engage in other unpaid activities upon notification to the Company, provided however, that in each case, unless otherwise approved by the Company, such engagements will not disrupt or interfere with Employee's performance of the duties and responsibilities hereunder, shall not be conducted during the time Employee is obligated to devote for the performance of his/her duties and responsibilities according to this Agreement and/or compete with the Company's and/or any of its subsidiaries' and/or any of its affiliates' business.

3.    **Term and Termination**

3.1    This Agreement shall be effective as of the Employment Starting Date, and shall continue until terminated in accordance with the provisions of Section 3.2 or 3.3 hereinafter.

3.2    The Company and the Employee may terminate this Agreement at any time by giving the other party a prior written notice of termination, of a period detailed in **Annex A.**

3.3    The Company may waive in writing and in advance Employee's Services in any prior notice period. In the event that the Company notifies Employee of such waiver, the Company shall be entitled to pay Employee the Monthly Salary (as defined below) otherwise payable to Employee during such prior notice period in one lump-sum and by doing so bring the employer-employee relations between the parties to end upon such payment.

3.4    Notwithstanding the above, the Company shall have the right to immediately terminate this Agreement for a Cause, as determined by the Company. A **"Cause"** shall mean either (i) circumstances entitling the Company under any applicable law to terminate the employment of the Employee without payment of severance pay; (ii) any material breach by the Employee of this Agreement, any breach of the NDA or any breach of the Employee's fiduciary duties; (iii) conviction of the Employee of any felony involving moral turpitude and/or (iv) a willful failure to perform Employee's responsibilities or duties which failure has a significant adverse effect on the Company in cases (ii) and (iv) above, but in each case only if the Employee did not cure such breach within seven (7) days of written notification of the same by the Company. Subject to section 5.1 (iv), in the event of termination for Cause, Employee's entitlement to severance pay will be subject to Sections 16 and 17 of the Severance Pay Law 5723-1963 (the **"Severance Law"**) and/or any other applicable law.

4.    **Salary**

4.1    During the term of this Agreement, the Company shall pay Employee a monthly gross salary in a total amount detailed in **Annex A** (the **"Monthly Salary"**). The Monthly Salary is composed of a determinative salary in the gross amount detailed in **Annex A** (the **"Determinative Monthly Salary"**) and, since Employee's position may require working overtime hours, a global addition for overtime, on account of working additional monthly working hours (in an amount detailed in **Annex A**), in a gross sum detailed in **Annex A** (**"Global Overtime Payment"**), which will be paid to the Employee subject to working overtime hours.

For avoidance of doubt, it is hereby declared and clarified that the amount of the Global Overtime Payment specified above has been determined and agreed in light of the



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

anticipated amount of monthly overtime hours to be conducted by the Employee, therefore in the event the Employee shall not work the full amount of over-time hours, mentioned above, Employee will still be entitled to receive the Global Overtime Payment. The Company shall, on a regular basis from time to time, reevaluate this anticipated amount of monthly overtime.

4.2     It is hereby clarified that unless indicated specifically otherwise in this Agreement, the Monthly Salary indicated in **Annex A** includes reimbursement for all travel expenses, costs, out of pocket and/or other expenses relating to the performance of the Services, and that the Employee shall not be entitled to any additional payment in connection with the Services.

## 5.     Additional Benefits

5.1     Pension Insurance. As of the Employment Starting Date, the Company shall insure the Employee under an accepted "Managers Insurance Plan" (the "**Managers Insurance**") and/or a comprehensive pension plan (the "**Pension Plan**"). The Managers Insurance and/or Pension Plan shall be provided through an agency/agent selected by the Employee, by an insurance company and/or a pension fund, to be selected by the Employee and approved by the Company. For the avoidance of doubt, the Company's contributions may exceed the maximum exemption from income tax allowed by any applicable law and regulations.

(i)     In the case of a Pension Plan, the percentages detailed in Annex A shall be contributed.

(ii)     In the case of a Managers Insurance, the percentages detailed in Annex A shall be contributed. The Company shall make additional payments, as detailed in Annex A, on account of insurance for loss of earning capacity.

(iii)     The Employee hereby instructs the Company to transfer to such Managers Insurance and/or Pension Plan the amount of Employee's and the Company's contribution from the Monthly Salary, as detailed in Annex A.

(iv)     The Company and the Employee agree and acknowledge that the Company's contribution towards the Managers Insurance or Pension Plan as set forth in this Section 5.1, are in lieu of severance payments to which the Employee (or his beneficiaries) is otherwise entitled to with respect to the Monthly Salary upon which such contributions were made and for the period in which they were made, pursuant to Section 14 of the Severance Law. The parties hereby adopt the General Approval of the Minister of Labor and Welfare, which is attached hereto as Annex C. The Company hereby forfeits any right it may have for reimbursement of sums paid by the Company into the Managers Insurance or Pension Plan, except: (i) in the event that the Employee withdraws such sums from the Managers Insurance or Pension Plan, other than in the event of death, disability or retirement at the age of 60 or more; or (ii) upon the occurrence of any of the events provided for in Sections 16 and 17 of the Severance Law, subject to the terms of the General Approval.

5.2     Additional Benefits. Employee shall receive additional benefits, if any, as detailed in Annex A.

5.3     Annual Vacation. Employee shall be entitled to paid vacation days during each year of employment with the Company as detailed in Annex A, but in any event no less than the number of annual vacation days prescribed by law. Employee shall be obligated to take at least one vacation each year of at least 7 consecutive days (5 working days which shall be counted as vacation days and 2 rest days), as prescribed by law. Any vacation day snot



used by the Employee during the year will be cancelled on 1st January of the following year and no vacation days shall be redeemed at any time.

For the avoidance of doubt, the dates of the Employee's vacation shall be coordinated with the Company.

In addition, to the extent that the Employee requires additional vacation days, the Employee is entitled to request such days from the Supervisor and coordinate such vacation with the Company at its discretion and according to the Company's policy from time to time. The Company shall be entitled to set uniform dates for vacation for all or part of its employees, with respect to all or any part of the vacation days, as it shall deem fit.

5.4    Cellular Phone; Laptop. If detailed on Annex A, Company shall provide Employee with a laptop (the "Laptop"). Subject to the Employee's request, the Company shall provide Employee with a cellular phone. Such device (or its cost) shall be returned to the Company in any case that the Employee leaves the Company within 4 months of the signing of this agreement. Company shall bear the costs of maintaining a cellular phone, subject to the Company's policy and as detailed below (together with cost of cellular device, the "Cellular Phone Expenses") for Employee's use in the course of performing his/her obligations under this Agreement.

Company shall bear all expenses in connection with the use and maintenance of the Laptop, including, internet services, in accordance with the Company's policies from time to time. The Cellular Phone Expenses as well as the maintenance of the Cellular Phone shall be subject to Company's policy from time to time, as well as its agreement with the cellular company.

In order to benefit from the payment of the Cellular Phone Expenses, the Employee shall be required to sign and execute any form which transfers the line of the Cellular Phone to the business plan of the Company such that the Company shall pay the Cellular Phone Expenses directly to the cellular Company, the identity of the cellular company as well as the plan so chosen for the Employee shall be determined by the Company at its sole discretion. To the extent that the Employee will request to upgrade the plan provided by the Company, the Company may require that the Employee pays the amount which exceeds the Cellular Phone Expenses and the Employee hereby irrevocably authorizes Company to deduct and set off from his Monthly Salary such excess amount. The Employee shall sign the necessary documents required to transfer the line back to Employee's ownership no later than his/her last day of work with the Company and the Company shall be permitted to disconnect the line immediately thereafter.

The Employee shall bear (and hereby irrevocably authorizes Company to deduct and set off from his Monthly Salary) all tax obligations related to the use of the Laptop and the Cellular Phone Expenses, if any. The Employee shall return the Laptop to the Company no later than his/her last day of work with the Company. The Employee shall have no rights of ownership in Laptop, nor any rights to any lien or charge with respect thereto.

The use of the Laptop and payment of Cellular Phone Expenses shall not be considered in any case whatsoever as part of the Monthly Salary and Employee will not receive any social benefits on the imputed income related to the grant of the Laptop hereunder or the payment of the Cellular Phone Expenses.



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

5.5    Sick Leave & Recreation pay. The Employee shall be entitled to sick leave (commencing the first day of sickness), and to recreation pay ("dmei havra'ah") according to any applicable law.

5.6    It is hereby clarified that unless indicated specifically otherwise in this Agreement, the Monthly Salary indicated in **Annex A** includes reimbursement for all daily travel expenses, costs, food costs, out-of-pocket and/or other expenses relating to the performance of the Services, and that the Employee shall not be entitled to any additional payment in connection with the Services. Notwithstanding the above, the Employee shall be entitled to reimbursement of special or extraordinary expenses necessary for the performance of the Services, provided that such expenses have been approved in advance and in writing by the Company.

6.    **Tax Withholding**

For avoidance of doubt, all payments and benefits under this Agreement are gross amounts. Any tax consequences arising from the grant or exercise of any option or right or from any payment made to Employee under this Agreement or any other event or act, whether on Employee's part or the Company's part, shall be borne solely by Employee (other than taxes which are imposed by law on the Company). The Company shall withhold the applicable taxes as required under any applicable law from any Monthly Salary and/or from all other payments and/or benefits granted to Employee under this Agreement.

7.    **Proprietary Information & Non Disclosure**

The provisions of the Proprietary Information, Assignment of Inventions, Non Disclosure and Non Compete Agreement attached hereto as Annex D (the "NDA") are hereby incorporated by reference. Employee hereby acknowledges and agrees that this Agreement shall not come into force, unless the NDA is executed. The provisions of the NDA shall survive the rescission or termination, for any reason, of this Agreement.

8.    **Representations**

8.1    Employee represents and warrants to the Company that the execution and delivery of this Agreement and the fulfillment of the terms hereof (i) will not constitute a default under or conflict with any agreement or other instrument to which he is or was a party or by which he is bound, and (ii) does not require the consent of any person or entity.

8.2    The Employee represents that the Employee has the requisite skills and knowledge to perform his/her duties, responsibilities and obligations under this Agreement.

8.3    Employee represents and warrants that the Employee will use the Company's assets and equipment (including the Laptop, Cellular Phone, email account assigned to it by the Company, and/or documentation) (collectively "Company's Equipment") primarily for the purpose of his/her employment.

8.4    The Employee acknowledges and agrees as follows: (i) upon reasonable suspicion of a breach of the provisions of this Agreement or applicable law, the Company shall have the right to conduct inspections on any and all the Company's computers, including inspections of electronic mail transmissions in the email account assigned to him/her by the Company, internet usage and inspections of their content, all subject to applicable law. For the avoidance of any doubt, it is hereby clarified that all findings of any such examinations



LTF-0002038

shall be the Company's sole property; and (ii) in any and all times the Employee will transfer to the Company the log-on passwords to the computer/Laptop provided by the Company and the Company assigned email account.

9. **Notice; Addresses**

9.1    The addresses of the parties for purposes of this Agreement shall be the addresses first written above, or any other address which shall be provided by due notice.

9.2    All notices in connection with this Agreement shall be sent by registered mail or delivered by hand to the addresses set forth above, and shall be deemed to have been delivered to the other party at the earlier of the following two dates: if sent by registered mail, as aforesaid, 3 (three) business days from the date of mailing; if delivered by hand, upon actual delivery or proof of delivery at the address of the addressee (in the event of a refusal to accept it). Delivery by email or other electronic communication shall be sufficient and be deemed to have occurred upon electronic confirmation of receipt.

10. **Miscellaneous**

10.1    The preamble to this Agreement constitutes an integral part hereof.

10.2    Headings are included for reference purposes only and are not to be used in interpreting this Agreement.

10.3    This Agreement is a personal employment agreement and therefore no collective bargaining agreements whatsoever shall apply with respect to the relationship between the parties hereto.

10.4    No failure, delay of forbearance of either party in exercising any power or right hereunder shall in any way restrict or diminish such party's rights and powers under this Agreement, or operate as a waiver of any breach or nonperformance by either party of any terms or conditions hereof.

10.5    Any determination of the invalidity or unenforceability of any provision of the Agreement shall not affect the remaining provisions hereof unless the business purpose of this Agreement is substantially frustrated thereby.

10.6    This Agreement is personal and non-assignable by Employee. It shall inure to the benefit of any corporation or other entity with which the Company shall merge or consolidate or to which the Company shall lease or sell all or substantially all of its assets, and may be assigned by the Company to any affiliate of the Company or to any corporation or entity with which such affiliate shall merge or consolidate or which shall lease or acquire all or substantially all of the assets of such affiliate. Any assignee must assume all the obligations of the Company hereunder, but such assignment and assumption shall not serve as a release of the Company.

10.7    This Agreement and any annexes thereto constitute an "employee notice" as required under the Employee's Notice (Terms of Employment) Law – 2002.

10.8    This Agreement, including any annexes thereto, constitutes the entire understanding and agreement between the parties hereto, supersedes any and all prior discussions, agreements and correspondence with regard to the subject matter hereof, and may not be amended, modified or supplemented in any respect, except by a subsequent writing executed by both parties hereto.

10.9    It is hereby agreed between the parties that this Agreement shall be governed by and construed according to the laws of the State of Israel. Any dispute arising under or relating



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

to this Agreement or any transactions contemplated herein shall be resolved by the courts of Tel Aviv, and each of the parties hereby submits irrevocably to the exclusive jurisdiction of such venue.

*{Remainder of Page Intentionally Left Blank. Signature Page to Follow}*



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

IN WITNESS WHEREOF, the parties have executed this Personal Employment Agreement as of the date first above written.

TAPD ISRAEL LTD.

Signature:

By: Adi Omesy

Title: Site Manager

EMPLOYEE

Signature:

OLIVER AMAR,
EVP Growth + Acquisition

ANNEX A

| | | |
|---|---|---|
| 1. | Employee Personal Details: | Full Name: Olivier Amar<br>Israeli I.D. Number: ███████<br>Address: ████████████<br>Phone No.: ██████████ |
| 2. | Position in the Company: | EVP Marketing & Acquisition |
| 3. | Supervisor / direct manager: | CEO |
| 4. | Employment Starting Date: | March 8, 2017 |
| 5. | Period of Prior Written Notice: | Both parties agree to give a 30-day prior written termination for the first 12 months of employment. From 13th month onwards 60 days notice will be required by both parties. |
| 6. | Monthly Salary: | ██████ to be paid no later than the 9th day of each month. Salary includes travel and food expenses. |
| 7. | Contributions to Managers Insurance (percentages out of the Monthly Salary): | i. Company shall contribute 13.33%, of which: 8.33% shall constitute payment towards severance pay component and 5% shall constitute payment towards providence component).<br><br>ii. 5% shall be contributed by the Employee and deducted from Employee's Monthly Salary.<br><br>iii. In addition, the Company shall make provision for the loss of earning capacity component at the lower of: 2.5% of the Monthly Salary or such amount as shall be required to ensure 75% of the Monthly Salary. |



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

| 8. | Contributions to Education Fund (percentages out of the Monthly Salary. For the purpose of this section 9- the Education Fund - the Monthly Salary shall be calculated up to the applicable maximum amount as determined from time to time by and accordance with the Israeli Income Tax Ordinance - the **"Determining Salary"** ): | Following the completion of three consecutive month period commencing on the Employment Starting Date and provided that Employee is still employed by the Company, Company shall contribute an amount equal to 7.5% of the Employee's Determining Salary, and the Employee shall contribute an amount equal to 2.5% of the Determining Salary. The Employee instructs the Company to transfer to such Education Fund the amount of Employee's contribution from each Determining Salary.<br><br>In the event of termination of Employee's employment under this Agreement for any reason other than a termination for Cause (as defined in the Agreement) Employee shall be entitled to all sums accumulated in the Education Fund. In the event of termination for Cause (as defined in the Agreement).<br><br>Employee shall not be entitled to any of Company's contributions to the Education Fund made during the Agreement. |
| --- | --- | --- |
| 9. | Annual Vacation Days: | 21 Days |
| 10. | Cellular Phone Expenses: | Cellular Phone- Company shall pay the Cellular Phone Expenses directly to the cellular phone carrier. Other terms are as above. |
| 11. | Local Travel Expenses | 555 nis a month |



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

ANNEX B

CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

## ANNEX B

**Re: PROPRIETARY INFORMATION, ASSIGNMENT OF INVENTIONS NON DISCLOSURE AND NON COMPETE AGREEMENT (the "Agreement")**

The undersigned, employee of the Company (the "**Employee**") hereby acknowledges that in the course of his employment with the Company (the "**Employment**"), he/she will have access to, and/or participate in the development or marketing of, the Company's products and/or certain proprietary information, inventions, commercial secrets and other confidential information of the Company disclosed to the Employee, and/or accessed by, and/or developed by the Employee and/or with the assistance of the Employee. In relation to such confidential information, the Employee hereby undertakes as follows, in full knowledge that the force of this undertaking is in no way dependent upon the force of the Employee's employment agreement entered with the Company and is entirely independent from the obligations under in the Employee's employment agreement with the Company, dated as of 8 March, 2017 (the "**Employment Agreement**"):

**1.      Proprietary Information and Non Disclosure**

1.1.      Employee acknowledges and agrees that he had, and will have access to or be involved in the making or development of, confidential and proprietary information concerning the business and financial activities of the Company or any of its affiliated entities and/or information and technology regarding the Company's products, services, research and development, including without limitation, the Company's banking, investments, investors, properties, operational methods, plans and strategies, business plans, research projects, employees, marketing plans, supplier lists, customers, data, operating procedures, trade secrets, test results, formulas, processes, data and know-how, improvements, inventions, patents, application for patents, copyrights, trademarks, engineering specifications, product designs, technical information, discoveries, studies, techniques, specifications, computer programs (in source and object code), databases, products (actual or planned), any other commercial secret, as defined in the Commercial Torts Law, 5759-1999, and any intellectual property. Such information, whether in documentary, written, oral, digital format or otherwise, shall be deemed to be and referred to as "Proprietary Information". The term "Company" shall include for purposes of this Section 1 any subsidiaries and/or affiliates thereof.

1.2.      Proprietary Information shall be deemed to include any and all proprietary information disclosed by or on behalf of the Company irrespective of form, but excluding information that (i) was known to Employee prior to his association with the Company and can be so proven by Employee by documentary evidence; (ii) is or has become a part of the public knowledge, except as a result of a breach of this Agreement by Employee; (iii) was received by Employee from a third party, having no obligation to the Company.

1.3.      Employee agrees and declares that all Proprietary Information and rights in connection therewith are, and shall be the sole property of the Company and its assignees and no license or other rights to Proprietary Information is granted or implied hereby to have been granted to Employee, in the past, now or in the future.



1.4.    At all times, both during his engagement by the Company and after its termination, Employee will continue to keep in strict confidence and trust all Proprietary Information, and Employee will not copy, transmit, reproduce, summarize, quote, publish, reverse engineer, make any commercial or other use, disclose and/or make available, directly or indirectly any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing Employee's duties under his employment with the Company in the best interests of the Company.

1.5.    Upon termination of his Employment with the Company, or upon the Company's first request, Employee will promptly deliver to the Company all Proprietary Information and all documents and materials of any nature (whether in printed, digital or other form) prepared by Employee or which came to Employee's possession howsoever, at any time during the Employment with the Company. Employee will not take with him or retain any documents or materials or copies thereof containing any Proprietary Information in whatever form.

1.6.    Employee recognizes that the Company received and will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. At all times, both during his Employment and after its termination, Employee undertakes to keep and hold all such information in strictest confidence and trust, and not to use or disclose any of such information without the prior written consent of the Company, except as may be necessary to perform his duties as an employee of the Company and consistent with the Company's agreement with such third party. Upon termination of his Employment with the Company, Employee shall act with respect to such information as set forth in Section 1.4, mutatis mutandis.

1.7.    Without derogating from the generality of the foregoing, Employee agrees as follows: (i) Employee undertakes not to place itself in a situation of any potential or actual conflict of interests between itself and the Company and to notify the Company immediately of any matter which may lead to the creation of a conflict of interests between the Employee and the Company; (ii) Employee shall exercise the highest degree of care in safeguarding the Proprietary Information against loss, theft or other inadvertent disclosure and has, and will take all reasonable steps necessary to ensure the maintaining of confidentiality; and (iii) Employee shall not enter into the databases of Company for any purpose whatsoever, including, without limitation, review, download, insert, change, delete and/or relocate any information, except as may be necessary in the performance of his/her duties pertaining to the Company.

1.8.    The provisions of this Section 1 shall survive the termination of the Employee's Employment with the Company regardless of the cause of such termination.

## 2.    Assignment of Inventions

2.1.    Employee understands that the Company is engaged, involved or associated in a continuous program of research, development, production or marketing in connection with its business and that, as an essential part of his employment with the Company, he/she may and is expected to make new contributions to and create inventions of value for the Company.



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

2.2.         During the term of this Agreement, Employee undertakes and covenants that he will promptly disclose in confidence to the Company all inventions, patents, patent applications, patent rights, improvements, innovations, designs, copyrights, original works of authorship, formulas, concepts, techniques, forecasts, test results and documentation, discoveries, business methods and any other methods, confidential information, data, models, drawings, tooling, schematics and other diagrams, instructional material, notes, records, algorithms, integrated circuits, know-how, operating procedures, methods, systems, processes, compositions of matter, computer software programs, binary code, object code, source code, databases, mask works, brands, trademarks, logos, goodwill and trade secrets, whether or not patentable, copyrightable, registerable or otherwise protectable as trade secrets or under any other intellectual property right, that are made or conceived or first reduced to practice or created by Employee, either alone or jointly with others, in the course of his Employment with the Company, (including, without limitation, "Service Inventions" as defined under Section 132 of the Israeli Patent Law 5727-1967 (the "**Patent Law**")) and any rights analogous to the foregoing anywhere in the world, which relates to any of the Company's and/or its subsidiaries and/or affiliates business, products, scope of work, or actual or demonstrably anticipated research and development or which are developed in whole or in part on the Company's time ("**Inventions**").

2.3.         Employee agrees and represents, that all Inventions will be the sole and exclusive property of the Company. Employee hereby covenants and agrees that so long as he/she will be employed with the Company, he/she shall not cooperate with any third party in purpose of creating any Invention/s, unless a prior written consent is obtained from the Company.

2.4.         Employee agrees to keep and maintain adequate and current written records of all Inventions made by him (solely or jointly with others) during his Employment. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times and will be returned to the Company upon the earlier of completion of the services or the request of the Company.

2.5.         Employee agrees that if in the course of performing services, he will wish to incorporate any intellectual property right, including without limitation, invention (whether or not patentable), work of authorship, mask work, design, trade secret, improvement, development, concept, discovery or other proprietary information that does not belong to the Company, but rather owned by him or in which he has an interest ("**Employee's IP**") into any Invention developed hereunder ("**Incorporated IP**") (i) Employee shall inform the Company, in writing, before incorporating such Employee's IP into any Invention; and, whether or not he complies with the foregoing, (ii) the Company is hereby granted and shall have a nonexclusive, royalty-free, perpetual, irrevocable, worldwide license (including the right to sublicense) use, reproduce, publish, make available to the public, distribute, perform, display, prepare derivative works of, make, have made, modify, exploit, sell, export or make any commercial use of such Employee's IP .

2.6.         Employee shall not incorporate any invention, work of authorship, mask work, protectable design, improvement, development, concept, discovery, trade secret



or other proprietary information owned in whole or in part by any third party into any Invention without prior written permission of the Company.

2.7.    Without thereby derogating from any right of the Company pursuant to any applicable law, and to the extent that Employee may have rights in any Inventions which do not vest upon creation in the Company, Employee hereby irrevocably transfers and assigns to the Company and/or its assignees, successors and legal representatives, and shall transfer and assign, as and when any such Invention is first created or conceived and when first reduced to practice or first fixed in a tangible medium, as applicable, without additional consideration other than his salary and other benefits to which he is entitled to as an employee of the Company (including without limitation, without any compensation or royalties in accordance with Section 134 of the Patent Law), any and all worldwide patents, patent applications, copyrights, mask works, trade secrets and other any rights, intellectual property rights, titles and interests, in any Invention, including all powers, privileges and immunities arising thereunder or conferred thereby, and all applications for intellectual or industrial property that have been or may hereinafter be filed for the Inventions in any jurisdiction, and all divisions, renewals and continuations thereof, and all registrations that may be granted thereon and all extensions and reissues thereof, together with any and all rights of priority relating to the Inventions and any registrations that may be granted thereon, expressly including the right to sue for past infringement, and hereby further acknowledges and shall in the future acknowledge Company's full and exclusive ownership in all such Inventions.

2.8.    Employee also hereby forever waives and agrees never to assert any and all Moral Rights he/she may have in or with respect to any Invention, even after termination of his Employment with the Company. "Moral Rights" mean any rights of paternity or integrity, any right to claim authorship of an invention, to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, any Invention, whether or not such would be prejudicial to his/her honor or reputation, and any similar right, existing under judicial or statutory law of any jurisdiction whatsoever, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right". Employee further agree that, with respect to all Inventions and Proprietary Information and other matters concerning his Employment with the Company that may result in publishable material, all such publication rights shall belong exclusively to the Company.

2.9.    Employee expressly, unconditionally and irrevocably waives: (i) any right and/or claim for ownership in relation to any Invention; (ii) all economic rights in the Inventions, including without limitation, in the framework of Section 132(b) of the Patent Law and any rights to royalties from any intellectual property rights (specifically including patent rights under the Patent Law), and any right to receive any payment or other consideration whatsoever with respect to the Inventions (other than any salary, consideration and other benefits provided to him under his Employment with the Company) pursuant to any applicable law, in any jurisdiction, including (but not limited to) pursuant to Section 134 of the Patent Law, or any provision that may supersede it.

2.10.    Employee agrees to assist the Company in every proper way to obtain and enforce, for the benefit of the Company and/or its assignees exclusive and absolute title, right, interest, patents, copyrights, mask work rights, and other legal protections for the Inventions in any and all countries. Employee will execute any documents that



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

the Company may reasonably request for use in obtaining or enforcing such patents, copyrights, mask work rights, trade secrets and other legal protections. Employee's obligations under this Section 2.92.10 will survive the termination of his Employment with the Company, provided that the Company will compensate him at a reasonable rate after such termination for time or expenses actually spent by him at the Company's request on such assistance. After the termination of the Employee's Employment with the Company, any assistance requested by the Company pursuant to this Section 2.10 shall take into account the Employee's obligations towards third parties.

2.11.     Employee hereby irrevocably appoints the Company and/or its duly authorized officers and agents (including, without limitation, the chairman of the Company's board of directors) as his/her attorney-in-fact to execute documents on his/her behalf for this purpose and agrees that, if the Company is unable because of Employee's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Employee's signature for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in this Section 2, to act for and on Employee's behalf to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by the Employee.

2.12.     <u>Full Consideration</u>. Employee hereby acknowledges and agrees that any salary, consideration and other benefits provided to him during his Employment, constitute appropriate, full and fair consideration in connection with his engagement with the Company, including, without limitation, with respect to this Agreement and including with respect to his undertakings under this Section 2 and with respect to any Inventions, all of which are assigned to the Company and/or its subsidiaries and/or affiliates, as applicable, in accordance with this Agreement. In the event that for any reason the rights detailed in this Section 2 cannot be waived, Employee hereby assigns and transfers to the Company any such right he may have to receive any additional payment or other consideration whatsoever with respect to any Invention pursuant to any applicable law, including the Patent Law, in any jurisdiction.

2.13.     The provisions of this Section 2 shall survive the termination of the Employee's Employment with the Company regardless of the cause of such termination.

### 3.     Non-Competition; non solicitation

3.1.     Employee agrees and undertakes that he/she will not, without the prior written consent of Company, so long as he/she is employed by the Company and for a period of 12 months following termination of his/her employment for whatever reason, directly or indirectly, as owner, partner, joint venture, stockholder, employee, broker, agent, principal, corporate officer, director, licensor or in any other capacity whatever (a) without derogating from the above stated in sections 1 and 2, engage in, become financially interested in, be employed by, any business or venture that is engaged in any activities involving either (i) products similar to or competing with actual or planned products of the Company or its affiliates, or (ii) information, processes, technology or equipment that is similar to information, processes, technology or equipment in which the Company or its affiliates then have a



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

proprietary interest, in any geographic area where, during the time of employment, such business of the Company or any of its affiliates is being or had been conducted, provided, however, that Employee may own securities of any corporation which is engaged in such business and is publicly owned and traded but in an amount not to exceed at any one time one percent (1%) of any class of stock or securities of such company, so long as he/she has no active role in the publicly owned and traded company as director, employee, consultant or otherwise; or (b) assist any other person, entity, or organization in competing or in preparing to compete with the business or demonstrably anticipated business of the Company; or (c) entice, solicit or encourage any employee, consultant, customer, vendor, supplier or prospective employee, consultant, customer, vendor or supplier of Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company or in any other way interfere with the Company's relationships with its employees, consultants, customers, vendors or suppliers. Exceptions to the restriction set forth in Section 3.1(a) will be permitted with written consent of the board of directors of the Company.

3.2.    Employee agrees and undertakes that during the period of his employment with the Company and for a period of 12 months following its termination for any reason, he/she will not, directly or indirectly, including personally or in any business in which he/she is an officer, director or shareholder, for any purpose or in any place, hire or engage with any person employed by the Company on the date of such termination or during the preceding twelve months (except where such person is employed at the time of such termination and thereafter by a third party).

3.3.    Employee acknowledges that the Company has entered into his/her employment agreement in reliance on his/her undertaking set forth in this Section 3, and that given his/her access to information regarding the Company, the provisions of this Section 3 are reasonable and necessary to protect the Company's business and rights.

3.4.    If any one or more of the terms contained in this Section 3 shall for any reason be held to be excessively broad with regard to time, geographic scope or activity, the term shall be construed in a manner to enable it to be enforced to the extent compatible with applicable law.

## 4.    MISCELLANEOUS

4.1. Governing Law. This Agreement shall be governed by and construed according to the laws of the State of Israel. Any dispute arising under or relating to this Agreement or any transactions contemplated herein shall be resolved by the competent courts of Tel Aviv, and each of the parties hereby irrevocably agree to the jurisdiction of such venue.

4.2. Severability. If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable Israeli law, such illegal or unenforceable provision(s) shall be limited or excluded from this agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms.

4.3. Transferability. This Agreement is fully assignable and transferable by the Company, but any purported assignment or transfer by the Employee is void.



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

4.4. <u>Injunctive Relief</u>. Any breach of this Agreement will cause irreparable harm to the Company, for which damages would not be an adequate remedy, and therefore, the Company will be entitled as a matter of right to an injunctive relief, out of any court of competent jurisdiction, restraining any violation or further violation of this Agreement by me or others acting on my behalf. The Company's right to injunctive relief shall be cumulative and in addition to any other remedies provided by law or equity and without any requirement to post bond.

4.5     <u>Change of Title/Responsibilities</u>. Any change in Employee's title and/or responsibilities and/or terms of employment by the Company, shall not effect this Agreement and the provisions herein shall remain in full force, regardless of the execution of a new agreement between Employee and the Company pursuant to such change(s).

IN WITNESS WHEREOF, the Employee has signed this Proprietary Information, Assignment of Inventions, Non Disclosure and Non Compete Agreement as of the 8 day of March 2017.

_____

Employee

_____

TAPD Israel Ltd.

By:Adi Omesy

Title: Site Manager

CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

## ANNEX C
## GENERAL APPROVAL REGARDING PAYMENTS BY EMPLOYERS TO A PENSION FUND AND INSURANCE FUND IN LIEU OF SEVERANCE PAYUNDER THE SEVERANCE PAY LAW, 5723-1963

להלן נוסח משולב של האישור הכללי מיום 9.6.1998 כפי שהתפרסם בילקוט הפרסומים 4659 ביום 30.6.1998, כפי שתוקן ביום 23.8.1999 והתפרסם בילקוט הפרסומים 4803 ביום 19.9.1999 וכפי שתוקן ופורסם בילקוט הפרסומים 4970 ביום 12.3.2001:

בתוקף סמכותי לפי סעיף 14 לחוק פיצויי פיטורים, התשכ"ג - 1963 (להלן - החוק), אני מאשר כי תשלומים ששילם מעביד החל מיום פרסומו של אישור זה, בעד עובדו לפנסיה מקיפה בקופת גמל לקיצבה שאינה קופת ביטוח כמשמעותה בתקנות מס הכנסה (כללים לאישור ולניהול קופות גמל), התשכ"ד - 1964 (להלן - קרן פנסיה), או לביטוח מנהלים הכולל אפשרות לקיצבה או שילוב של תשלומים לתכנית קיצבה ולתוכנית שאינה לקיצבה בקופת ביטוח כאמור (להלן - קופת ביטוח), לרבות תשלומים ששילם תוך שילוב של תשלומים לקרן פנסיה ולקופת ביטוח, בין אם יש בקופת הביטוח תכנית לקיצבה ובין אם לאו (להלן - תשלומי המעביד), יבואו במקום פיצויי הפיטורים המגיעים לעובד האמור בגין השכר שממנו שולמו התשלומים האמורים ולתקופה ששולמו (להלן - השכר המופטר), ובלבד שנתקיימו כל אלה:

(1)    תשלומי המעביד -

(א)    לקרן פנסיה אינם פחותים מ-% 1/3 14 מן השכר המופטר או %12 מן השכר המופטר אם משלם המעביד בעד עובדו בנוסף לכך גם תשלומים להשלמת פיצויי פיטורים לקופת גמל לפיצויים או לקופת ביטוח על שם העובד בשיעור של % 1/3 2 מן השכר המופטר. לא שילם המעביד בנוסף ל-%12 גם % 1/3 2 כאמור, יבואו תשלומיו במקום %72 מפיצויי הפיטורים של העובד, בלבד;

(ב)    לקופת ביטוח אינם פחותים מאחד מאלה:

(1)    % 1/3 13 מן השכר המופטר, אם משלם המעביד בעד עובדו בנוסף לכך גם תשלומים להבטחת הכנסה חודשית במקרה אבדן כושר עבודה, בתכנית שאישר הממונה על שוק ההון ביטוח וחסכון במשרד האוצר, בשיעור הדרוש להבטחת %75 מן השכר המופטר לפחות או בשיעור של % ½ 2 מן השכר המופטר, לפי הנמוך מביניהם (להלן - תשלום לביטוח אבדן כושר עבודה);

(2)    %11 מן השכר המופטר, אם שילם המעביד בנוסף גם תשלום לביטוח אבדן כושר עבודה, ובמקרה זה יבואו תשלומי המעביד במקום %72 מפיצויי הפיטורים של העובד, בלבד; שילם המעביד בנוסף לאלה גם תשלומים להשלמת פיצויי פיטורים לקופת גמל לפיצויים או לקופת ביטוח על שם העובד בשיעור של % 1/3 2 מן השכר המופטר, יבואו תשלומי המעביד במקום %100 מפיצויי הפיטורים של העובד.

(2)    לא יאוחר משלושה חודשים מתחילת ביצוע תשלומי המעביד נערך הסכם בכתב בין המעביד לבין העובד ובו:

(א)    הסכמת העובד להסדר לפי אישור זה בנוסח המפרט את תשלומי המעביד ואת קרן הפנסיה וקופת הביטוח, לפי הענין; בהסכם האמור יכלל גם נוסח של אישור זה;

(ב)    ויתור המעביד מראש על כל זכות שיכולה להיות לו להתזר כספים מתוך תשלומיו, אלא אם כן נשללה זכות העובד לפיצויי פיטורים בפסק דין מכח סעיפים 16 או 17 לחוק ובמידה שנשללה או שהעובד משך כספים מקרן הפנסיה או מקופת הביטוח שלא בשל אירוע מזכה; לענין זה, "אירוע מזכה" - מות, נכות או פרישה בגיל ששים או יותר.

(3)    אין באישור זה כדי לגרוע מזכותו של עובד לפיצויי פיטורים לפי החוק, הסכם קיבוצי, צו הרחבה או חוזה עבודה, בגין שכר שמעבר לשכר המופטר.

אליהו ישי
שר העבודה והרווחה

י 1302נמ, דיימסטאהתהייקק2



CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA

ANNEX D

Proprietary Information, Assignment of Inventions, Non-Disclosure and Non-Compete Agreement

CONFIDENTIAL TREATMENT REQUESTED UNDER FOIA