# KOBRE & KIM

800 Third Avenue
New York, New York 10022
www.kobrekim.com
Tel +1 212 488 1200

March 18, 2025

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Charlie Javice and Olivier Amar*, 23 Cr. 251 (AKH)

Dear Judge Hellerstein:

      On behalf of Defendant Olivier Amar, we respectfully write in response to the Government's March 17, 2025, letter seeking to reconsider the Court's ruling excluding thirteen "summary" charts through its summary witness Rachel Danko. *See* Gov't March 18, 2025, Letter ("Gov't Ltr."). The Government misconstrues the true nature of Ms. Danko's "summary" charts in an explicit last-ditch effort to fill the gaps in its case against Mr. Amar, having failed to elicit testimony on Mr. Amar's knowledge or involvement in the fraud. As noted yesterday, these "summary" charts are an improper attempt to conduct mini-summations through a testifying witness. The charts are documents for summation, not documents for evidence. *See* Mar. 17, 2025, Tr. at 2608:12-13. That is consistent with how the Court has handled other demonstratives in this case, as well. *See* Mar. 10, 2025, Tr. at 1725:18-19 (precluding counsel for Mr. Amar from using a demonstrative because it should not be used "during . . . examination. That is for closing.").

      The Government's efforts to salvage its inadmissible exhibits are spurious. The "timeline" chart in *Menendez* summarized in three short pages evidence covering a span of five years, and it focused primarily on defendants' own communications. *See* Gov't Ltr., Tab 6 at 3-5. Here, six of the Government's charts totaling fifty-one pages in length, weave various emails and documents, involving third parties, alongside communications between Defendants, for a five-day period in August 5, 2021 and a six-week period in January and February 2021.

      Nor are these charts helpful to the jury. The Government refers to thousands of pages in the underlying record in an apparent effort to shock the Court. But the extent of relevant and

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

Kobre & Kim refers to Kobre & Kim LLP, a New York Limited Liability Partnership.

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 2

admissible evidence referred to in these charts is far from voluminous requiring summary under Rule 1006. As this Court has already acknowledged, phone call records lack probative value without witness testimony. *See* March 11, 2025, Tr. 1851:19-1852:1. Surely, the "call record" and "call frequency" charts are not in fact summary of "1,800 pages of phone records" for two defendants over a few weeks in July and August. Nor are the "timeline" charts over the same few weeks, a summary of the same. They are improper attempts to take discrete portions of much larger exhibits and present them to the jury to misleadingly suggest that these discrete pieces of evidence are interwoven or interrelated.

None of the Government's charts are admissible and should be excluded under Federal Rules of Evidence 1006, 401, and 403, as well as Rule 106 and 802. They invite the jury to speculate as to Mr. Amar's alleged participation based on call records (none of which convey the substance of any communication), compilations of written communications such as emails and emails involving other individuals in addition to those of the defendants—and one incredibly misleading demonstrative that presents an incomplete and false picture of Mr. Amar's interactions with a diligence document.

**I.     The Court Should Preclude the Use of Summary Charts Purporting to Summarize and Combine Call Records and Other Communications**

As an initial matter, the Government is incorrect that Ms. Danko's charts "merely take the form of chronological summaries" that are "regularly admitted" under Second Circuit law. *See* Gov't Ltr. at 4. Indeed, many of the cases relied on by the Government did not admit such charts *as evidence*.[1] Because the Government seeks to offer Rule 1006 summary into evidence, the Court "must be scrupulous in assuring that the summary accurately portrays the contents of the underlying material and that a summary is necessary." 2 McCormick on Evid. § 241 (9th ed. 2025); *accord United States v. Neumann*, No. 21-CR-439-01 (NSR), 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023).

Each of Ms. Danko's charts reflecting telephone call records and other communications impermissibly "usurp[] the function of the jury to decide what to infer from the content" of the communications, and are highly misleading as to Mr. Amar's knowledge of the alleged fraud or his alleged participation in the conspiracy. *United States v. Grinage*, 390 F.3d 746, 750–51 (2d Cir. 2004); *UPS Store, Inc. v. Hagan*, No. 14-cv-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (document "suffused with argumentation" is "not a summary . . . but rather a thinly veiled argument as to the implications of that evidence").

---

[1] *See, e.g.*, *United States v. Lasko*, 146 F. App'x 530, 532 (2d Cir. 2005) ("[T]he district court gave clear and repeated cautionary instructions to the jury that the chart was *not* evidence . . . the district court even took the care to state that 'the chart is no better than the evidence upon which it is based and does not in and of itself constitute independent evidence'"); *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) ("District Court's limiting instruction stat[ed] that the charts were not evidence"); *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) ("the charts were not evidence").

a. "Telephone Activity" During July and August

**GX 2760 and GX 2761**: GX2760 purports to reflect the frequency of calls between the defendants over a three-week period, and GX2761 shows the same but with the addition of calls between Mr. Matt Glazer and each of the defendants.



These charts impermissibly suggest that an uptick in calls over a two-and-half week period is evidence of something improper or irregular. As this Court ruled in *United States v. Hwang*, such charts have "prejudicial value" and "depicting the frequency in this way is misleading." *See* Aug. 12, 2024, Tr. at 4368:20–4369:1, *United States v. Hwang*, 22-cr-240, at Dkt. No. 301. The sound reasoning of the Court is entirely applicable here. The defendants were "in daily conversation with each other" and had "open lines with each other," as is reflected in the emails and messages in evidence or that the Government seeks to introduce. *See* Aug. 12, 2024, Tr. at 4370:2–4. "It's a natural occurrence in a business . . . for people to be talking," and they "could be talking about anything in the world." *See id.* at 4–9. The chart, however, gives the "impression of a frequency that is more than intended by the calls," they lack "relevance," and should be precluded. *See* Aug. 12, 2024, Tr. at 4368:23–25.[2]

---

[2] The Government's attempt to distinguish *Hwang* falls short. The Government's "call frequency" charts are no different than the "bar charts designed to summarize the frequency of calls" that this Court precluded. *See* Gov't Ltr. at 7. In addition, the Government's charts do not summarize solely

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 4

### b. "Select Telephone Calls" and "Select Communications" from August 2021

The Government seeks to introduce stylized extracts of Ms. Javice and Mr. Amar's phone logs on August 1 through 4, 2021. *See* GX 2751, 2753, 2755, and 2757 (citing GX 902, 931). As detailed below, these charts impermissibly suggest that Mr. Amar would be aware of the substance of Ms. Javice's statements to others based solely on the proximity of certain calls. While Mr. Amar has no objection to the admission of the toll records in their entirety for the dates in question, the charts should be excluded as cherry-picked and misleading. *See Grinage*, 390 F.3d at 750; *see also United States Sec. & Exch. Comm'n v. Qin*, No. 20-CV-10849 (JGLC), 2024 WL 1342803, at *7 (S.D.N.Y. Mar. 29, 2024) ("The party offering the summary evidence must 'establish that the summary is accurate and nonprejudicial' and 'great care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative.'" (citation omitted)).

The Government also seeks to introduce several additional charts summarizing various communications on certain dates in August. *See* GX 2752, GX 2754, GX 2756, GX 2758, and GX 2759. These "selected communications" charts are unfairly prejudicial for similar reasons as the telephone call charts. Unlike the charts admitted in the cases on which the Government relies, these charts are advocacy documents highlighting multiple forms of communications—telephone calls, text messages, and emails—from multiple individuals that require inferential leaps to be connected. *See, e.g., Blackwood*, 366 F. App'x 207 at 212 (chart listing "well over 100 telephone calls," which presumably listed information concerning *all* phone calls during a given period, as the court noted "the accidental omission of one phone call"); *see also Yousef*, 327 F. 3d at 157 (chart "highlight[ed] certain patterns of telephone calls"). (edited)

**GX 2751 and GX 2752**: These charts purport to summarize "selected telephone calls" and "selected communications" on August 1, 2021, respectively, but are misleading and unhelpful to the jury. The charts combine calls between Ms. Javice and Ms. Wims Morris, on the one hand, and Mr. Amar and Ms. Javice, on the other. As Ms. Wims Morris testified, she did not directly interact with Mr. Amar during diligence. *See* Feb. 27, 2025, Tr. at 738:8–21. These charts, however, wrongly imply that Mr. Amar was fully aware of what Ms. Javice discussed with Ms. Wims Morris with respect to JPMC's diligence requests. The jury is fully capable of reviewing the underlying evidence and testimony to determine the nature and extent of Mr. Amar's knowledge and involvement regarding JPMC's data validation exercise. The combination of these otherwise unrelated records in this manner is argument and not evidence.

**GX 2753 and GX 2754**: These charts purport to summarize "selected telephone calls" and "selected communications" on August 2, 2021. Including Ms. Javice's communications with Mr. Vovor in these charts alongside communications involving Mr. Amar is unfairly prejudicial, confusing, and misleading. The Government has offered no evidence that on August 2, 2021, at

---

communications between defendants. They are not an effort to present only evidence "about which no percipient witness can testify." Gov't Ltr. at 7. Rather, these charts purport to summarize additional documentary evidence and events that could have been and were the subject of testimony of several government witnesses including Ms. Leslie Wims Morris, Mr. Sweeney, Mr. Vovor, and Dr. Kapelner.

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 5

7:34:11 a.m. ET, Ms. Javice and Mr. Vovor spoke about Ms. Javice's instruction to Mr. Amar to purchase student records on the open market. *See* Mar. 10, 2025, Tr. at 1696:4–15. Other evidence that the Government has offered in this case shows that Ms. Javice was speaking to Mr. Vovor about synthetic data on August 2, 2021, at 7:34:11 a.m. ET. Juxtaposing Mr. Amar's efforts to obtain student records for augmentation purposes with Ms. Javice's efforts to obtain synthetic data is unduly prejudicial, confusing, and misleading.

**GX 2755 and GX 2756**: These charts purport to summarize "selected telephone calls" and "selected communications" on August 3, 2021, which compile, for example, communications between the defendants as well as Ms. Javice's communications with Ms. Wims Morris, Mr. Sweeney, and Dr. Kapelner. Like the charts addressed above, these wrongly imply that Mr. Amar was informed as to Ms. Javice's discussions regarding JPMC's diligence requests, even though both Ms. Wims Morris and Mr. Sweeney confirmed they never interacted with Mr. Amar. *See* Feb. 27, 2025, Tr. at 738:8–21; Mar. 6, 2025, Tr. at 1514:21–25. Similarly, Mr. Amar never interacted with Dr. Kapelner in August 2021 or had knowledge of the substance of conversations between Ms. Javice and Dr. Kapelner. Juxtaposing Mr. Amar's efforts to obtain student records for augmentation purposes with Ms. Javice's efforts to obtain synthetic data from Dr. Kapelner is unduly prejudicial, confusing, and misleading.

**GX 2757, GX 2758, and GX 2759**: These charts purport to summarize "selected telephone calls" and "selected communications" on August 4, 2021, as well as "selected communications" on August 5, 2021. Like the charts addressed above, these are improper as they highlight certain parts of lengthy conversations and email chains among different parties and misleadingly create links between and among these communications that ought to be subject of argument.

### c. "Selected Communications" from January and February 2022 (GX 2762)

This eleven-page chart purports to summarize "selected communications" from January and February of 2022 and again combines various calls between the defendants and other forms of communications. Apart from summarizing inadmissible evidence—including an unfairly prejudicial WhatsApp message from Ms. Javice to Mr. Amar, *see* Mot. Preclude WhatsApp Messages, ECF 336 at 3 (GX 801-51)—the chart is unhelpful and misleading to the jury for at least three additional reasons.

*First*, like the communications charts addressed above, this chart misleadingly implies the nature and extent of Mr. Amar's involvement in data transfers to JPMC based on emails and communications among other parties. The chart includes quotes from emails regarding file uploads that do not include Mr. Amar, and in at least one instance, inaccurately reflects that an email was sent to Mr. Amar, when it was not. *Compare* GX 2762 at 9 ("Boyes replies to Mujeeb, Amar, Javice, and others . . . .") *with* GX1718 at -1317. *See UPS Store*, 2017 WL 3309721, at *5 (The party seeking to admit summary evidence must "establish that the summary is accurate and nonprejudicial."). The chart also includes uploads of data by Dr. Kapelner to a Dropbox for which Mr. Amar had no involvement. *See, e.g.*, GX 2814. By juxtaposing Ms. Javice's conversations with Mr. Amar, with such documentary evidence, the chart creates the misimpression that Mr. Amar knowledge of the contents of the data transferred in January and February, or of Ms. Javice's work on synthetic data with Dr. Kapelner. *See, e.g.*, *United States v. Bray*, 139 F.3d 1104, 1110

(6th Cir. 1998) ("[A] summary document "must be accurate and nonprejudicial. This means first that the information on the document summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner."); *Grinage*, 390 F.3d at 750.

*Second*, any statements that Mr. Amar made to JPMC employees subsequent to the acquisition cannot demonstrate Mr. Amar's intent or participation at the time of the acquisition and so are not relevant to this action. *See, e.g.*, *United States v. Guadagna*, 183 F.3d 122, 132 (2d Cir. 1999) (affirming district court's grant of judgment of acquittal where jury could not have concluded beyond a reasonable doubt that fraudulent phone call in question occurred at time when defendant "had knowledge of the falsity of his statements and the requisite intent to defraud"). Any minimal probative value of this chart is substantially outweighed by the risk of unfair prejudice, specifically the risk that the jury will infer, from references to communications in early 2022, evidence of Mr. Amar's knowledge and intent at the time of the acquisition months earlier.

*Third*, statements by Ms. Javice after the purported conspiracy was completed with the acquisition of Frank in August do not fall under the co-conspirator hearsay exclusion under Rule 801(d)(2)(E) as to Mr. Amar. *See Krulewitch v. United States*, 336 U.S. 440, 442–44 (1949) (statements subsequent to completion of the conspiracy were not in furtherance of the conspiracy); *Lutwak v. United States*, 344 U.S. 604, 616–18 (1953) (same); *United States v. Stratton*, 779 F.2d 820, 829 n.8 (2d Cir. 1985) (statements during "concealment phase" were not in furtherance of the conspiracy (citing *Krulewitch*, 336 U.S. at 443–44)). This exclusion does not apply, as to Mr. Amar, to statements made subsequent to the completion of the purported conspiracy.

II. **The Dataroom Spreadsheet 3.1.4 "Summary" Chart Is Argument and Misleading as to Mr. Amar's Involvement or Awareness of Alleged Misrepresentations**

The Government does not even attempt to argue that Ms. Danko's chart "Dataroom Spreadsheet 3.1.4 June 24, 2021," reproduced below, is proper summary, because it is not. The chart purports to summarize the defendants' alleged interactions with the virtual data room ("VDR") document 3.1.4 based on metadata already in evidence. *See* GX2750. This chart is misleading and unfairly prejudicial in at least three ways.

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 7



*First*, this chart distorts the extent of Mr. Amar's knowledge and awareness of the information in VDR spreadsheet 3.1.4, presumably to imply he added or viewed the alleged "FAFSA In Progress" misrepresentation. The chart provides an incomplete picture of the creation of the VDR document, and omits the critical points when the spreadsheet was first modified to include the alleged misrepresentation before it was sent by Ms. Javice to LionTree as "User_Breakdown_CJ_v2." The metadata shows 120 "views" or "edits" in the spreadsheet by Ms. Javice—none of which are reflected in the "summary" chart—and only three actions by Mr. Amar—all of which are. *See* GXG521. The chart therefore creates the misimpression that Mr. Amar is primarily responsible for changes to the spreadsheet, when the underlying metadata attributes only 3% of the activity to Mr. Amar. Viewing Mr. Amar's activity in isolation thus distorts the extent of his involvement and knowledge. *See U.S. v. Conlin*, 551 F.2d 534, 539 (2d Cir. 1977) ("A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error.").

*Second*, the statements that "Amar edits" and "Amar views" do not assist the jury in determining Mr. Amar's knowledge of alleged misstatements in the spreadsheet or his alleged joint participation with Ms. Javice. The metadata does not show the content of those "edits" or what was "view[ed]." As the Government's Google witness Mr. Gaddis explained, the metadata may show when an "edit" was made but does not show information about what kind of "edit" was made—whether big or small, stylistic or substantive. *See* Mar. 3, 2025, Tr. at 890:13–25 ("Q. … [S]ome edits could be as small as changing the font of a document, correct? A. Correct."). That Mr. Amar "view[s]" the spreadsheet also does not assist the jury in determining Mr. Amar's

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 8

knowledge the alleged misstatements in the spreadsheet. The metadata shows that Ms. Javice edited the document both before and after Mr. Amar's last "edit" and "views"—which is not reflected in the chart. *See United States v. Markovich*, 95 F.4th 1367, 1378 (11th Cir. 2024) (explaining that summary testimony "based on a mere subset" of evidence must "not purport to represent all the evidence"). And it is unclear based on Mr. Gaddis' testimony what, if anything, can be gleaned from the metadata term "view" at all. *See* Mar. 3, 2025, Tr. at 890:5–7.

*Third*, the inclusion of a call between the defendants alongside the selective portrayal of Mr. Amar's activity is highly prejudicial. Pairing the call alongside the cherry-picked instances of metadata appears designed to suggest that the defendants discussed alleged misrepresentations in the data room document. While the jury may consider the call records between the defendants alongside the metadata to draw inferences, it is an improper use of a summary chart to tell "what inferences to draw" and what conclusions to make from the documentary evidence in the case. *United States v. Grinage*, 390 F.3d 746, 750–51 (2d Cir. 2004); *UPS Store, Inc. v. Hagan*, No. 14-cv-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (document "suffused with argumentation" is "not a summary . . . but rather a thinly veiled argument as to the implications of that evidence").

\* \* \*

For the reasons above, each of Ms. Danko's charts are far from neutral summaries of the evidence and instead weave a narrative from cherry-picked pieces of evidence. The Court preclude the use of these "summary" charts as evidence. Such argumentative presentations of evidence are appropriate only in summation. In the interest of fairness, and to prevent undue prejudice to Mr. Amar, the Court should impose the same ruling now.

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 9

Respectfully submitted,

*/s/ Sean S. Buckley*
Sean S. Buckley
Jonathan D. Cogan
Alexandria E. Swette
Daisy Joo
KOBRE & KIM LLP
800 Third Ave.
New York, NY 10022
Tel: (212) 488-1200
Sean.Buckley@kobrekim.com
Jonathan.Cogan@kobrekim.com
Alexandria.Swette@kobrekim.com
Daisy.Joo@kobrekim.com

Matthew I. Menchel
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
Tel: (305) 967 6100
Matthew.Menchel@kobrekim.com

*Counsel for Defendant Olivier Amar*