# KOBRE & KIM

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM
TEL +1 212 488 1200

March 18, 2025

**BY ECF**

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:**  ***United States v. Charlie Javice and Olivier Amar*,
> 23 Cr. 251 (AKH)**

Dear Judge Hellerstein:

Defendant Olivier Amar submits this letter to request that the Court admit GX 802-22 (Exhibit A), a Slack chat from July 7, 2021 involving Mr. Amar, Charlie Javice, and Matt Glazer. In the chat, Mr. Amar tells Ms. Javice and Mr. Glazer during a call in preparation for a diligence meeting with Capital One that data on Frank's website visitors (in evidence as GX Cap 3.1.8) is a "huge mislabel" because it was actually "impressions," not website visitors.[1] Mr. Amar's decision to call out this misrepresentation is critical to demonstrate that Mr. Amar was not part of a conspiracy to mislead Capital One or JP Morgan. The chat is also indisputably authentic, directly relevant, and is being offered for a non-hearsay purpose.

As the Court may recall from Mr. Cowan's testimony on July 7 at 6:30 p.m., just a week before Capital One was set to decide whether to make a second-round bid for Frank,

---

[1] Impressions are different from website visitors. Feb. 25 Tr. at 368:19-369:13 (MR. MENCHEL: ". . . a visitor is somebody that literally just clicks on the website, correct?" THE WITNESS: "Yes, that's my understanding." . . . MR. MENCHEL: "Okay. An impression would be part of a search result that is typed into a Google search query or some other query box, right?" THE WITNESS: "That is my understanding, yes." MR. MENCHEL: "So instead of going onto Walmart.com, I type in 'winter gloves' in Google and then I'm going to get a search result of various stores that may sell me winter gloves, right?" THE WITNESS: "That is my understanding, yes." MR. MENCHEL: "And if, in the example I just gave you, Walmart comes up as one of the stores in that response, that's an impression?" THE WITNESS: "Yes."). And as the Government noted in the context of Correy Gaddis' testimony, "impressions will always be much higher than the actual clicks or visitors." Mar. 3 Tr. at 855:25-856:2.

**AMERICAS** (NEW YORK, DELAWARE, MIAMI, SAN FRANCISCO, SÃO PAULO, WASHINGTON DC)
**APAC** (HONG KONG, SEOUL, SHANGHAI), **CARIBBEAN** (BVI, CAYMAN ISLANDS), **EMEA** (CYPRUS, DUBAI, LONDON, TEL AVIV)

KOBRE & KIM REFERS TO KOBRE & KIM LLP, A NEW YORK LIMITED LIABILITY PARTNERSHIP.

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 2

representatives from LionTree arranged a Zoom conference with Ms. Javice, Mr. Amar, and Mr. Glazer to discuss certain outstanding due diligence requests. Feb. 25 Tr. at 380:8-382:7. On that Zoom conference, Frank and LionTree reviewed a draft PowerPoint presentation setting forth responses to requests from Capital One. *See* GX 3037 (Exhibit B, in evidence). Slide 4 in that presentation is directed to Mr. Amar's attention. It states that Frank had over 34 million "visitors" in 2020 and 19 million "visitors" through the first six months of 2021. It further includes year-over-year growth for the first 5-6 months of 2020 and 2021. Those numbers were mislabeled as "visitors" instead of "impressions."

## Frank Visitors Data

Olivier to provide definition of what these users represent – i.e. I believe you said "Organic search visitors from Google"

Question: Do users visit Frank other than the once per year to do their FAFSA?
*(Visitor Data 3.1.8 in VDR)*

### Frank Visitor Data Over the Past 16 Months

| Year | Month | Visitors | YoY Growth |
|------|-------|----------|------------|
| 2020 | 02 | 2,346,280 | -- |
|  | 03 | 2,716,814 | -- |
|  | 04 | 1,772,776 | -- |
|  | 05 | 1,710,717 | -- |
|  | 06 | 1,872,116 | -- |
|  | 07 | 3,434,013 | -- |
|  | 08 | 4,052,534 | -- |
|  | 09 | 3,906,368 | -- |
|  | 10 | 5,541,059 | -- |
|  | 11 | 3,814,799 | -- |
|  | 12 | 3,379,546 | -- |
| **2020 Total** | | **34,547,022** | -- |
| 2021 | 01 | 3,355,815 | -- |
|  | 02 | 2,826,819 | 20% |
|  | 03 | 3,433,918 | 26% |
|  | 04 | 3,472,261 | 96% |
|  | 05 | 3,054,258 | 79% |
|  | 06 | 2,878,428 | 54% |
| **2021 YTD Total** | | **19,021,499** | **50%** |

*Google search console only tracks last 16 months of data

### Year-on-Year Visitor Growth

| YoY Growth | Visitors | *Growth* |
|------------|----------|--------|
| 2020 (Feb. - Jun.) | 10,418,703.00 | -- |
| 2021 (Feb. - Jun.) | 15,665,684.00 | 50% |

YoY Visitors Comparison

50% YoY Growth

18,000,000
16,000,000
14,000,000
12,000,000
10,000,000
8,000,000
6,000,000
4,000,000
2,000,000
0
2020 (Feb. - Jun.)    2021 (Feb. - Jun.)

**FRANK.**    4

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 3

When Mr. Amar saw slide four on the Zoom conference, he immediately flagged it in writing in a Slack message to Ms. Javice and Mr. Glazer: "**That's a huge mislabel**." That Slack message—which is the subject of this motion—is GX 802-22. It provides in relevant part:



The corrected data that Mr. Amar screenshots in the chat, and sends to Ms. Javice and Mr. Glazer (on the right below, with red arrows and outline for ease of reference), includes "total impressions" data for essentially the same 5-6 month period as depicted in slide 4 of the draft presentation (on the left below, with red arrows and outline for ease of reference):



Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 4

 For the following reasons, GX 802-22 is highly relevant to Mr. Amar's state of mind and is evidence that Amar took steps inconsistent with a conspiracy; contrary to the Government's allegations; and critical to Mr. Amar's defense.

### A. The "Huge Mislabel" Slack Is Relevant and Admissible Because It Proves Good Faith and Disproves a Conspiracy

 The Government's theory of the case is that Defendants lied to Capital One and JP Morgan by telling those banks that they had 4.25 million customer accounts, or people who had provided first name, last name, email, and phone number. If Frank had 4.25 million customer accounts, its website could not have had only 4.25 million visitors, because that would mean that every single visitor of the website signed up for an account with Frank (or a 100% visitor to customer conversion rate). Put differently, if Frank had 4.25 million customer accounts, the visitor number would have to be much higher—and by extension, the impressions number would have to be even higher than that.

 Under the Government's theory, GX Cap 3.1.8, which misrepresents that Frank had over 50 million *visitors* to the website between 2019 and 2020, is central to the alleged fraud. The Government has said as much. Mar. 3 Tr. at 856:5-9 (MR. FERGENSON: "She got impressions data and changed the name to visitors because it would be higher." THE COURT: "And that's going to be one of your arguments." MR. FERGENSON: "Yes, Judge."). The fact that Mr. Amar *corrected* the very same data—in the presence of Mr. Glazer, who is not a member of the alleged conspiracy—proves that he did not have any agreement with Ms. Javice to inflate the number of customer accounts. Mr. Amar's correction serves to undermine the Government's entire theory of the fraud against him.

### B. The "Huge Mislabel" Slack Is Relevant and Admissible Because the Government Opened the Door to It and Made the Visitors Data a Central Part of Its Case

 The "huge mislabel" chat is also relevant and admissible because the Government opened the door to it. In fact, it is necessary evidence to undo the selective record the Government developed and the misleading testimony of the correction that the Government elicited.

 The Government put GX Cap 3.1.8 (the spreadsheet with the mislabeled data) into evidence through LionTree, JP Morgan, and Capital One witnesses. The Government also put into evidence GXG 573—the metadata associated with a Google Drive version of 3.1.8, called "CJ Visitors," which shows Ms. Javice alone named, viewed, and edited the spreadsheet containing the mislabeled visitors data before exporting it as an Excel to Capital One's data room. The Government further represented to the Court that the mislabeled visitors data was "relevant," that Ms. Javice mislabeled it from a file titled "GSC clicks and impressions data," and that the mislabel is one of its "arguments" against Defendants. Mar. 3 Tr. at 848:6-849:4; 855:4-856:9. The Court should not permit the Government to use the mislabeled data as evidence against both Defendants while preventing Mr. Amar from admitting evidence that he called it exactly what it was and what the Government contends it is now: a "huge mislabel."

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 5

    The Government also questioned at length multiple witnesses from both Banks on the mislabeled data, including Houston Cowan, Leslie Wims Morris, and Mason Young. It did not once elicit testimony from these witnesses about who uncovered the mislabeled data or how it came to be corrected. Mr. Cowan's testimony, excerpted below, is an example:

> MR. FERGENSON: Now, Mr. Cowan, did there come a time when you learned that that data was not unique website visits?
>
> THE WITNESS: Yes.
>
> MR. FERGENSON: And could you explain to the jury, at a high level, what you learned.
>
> THE WITNESS: **We learned that it was mislabeled and that the data actually represented impressions** on the website rather than unique visitors.
>
> . . .
>
> MR. FERGENSON: So Mr. Cowan, after you learned that, what clarifications, if any, had to be made about the visitor numbers?
>
> THE WITNESS: **We had to clarify that they represented impressions** rather than unique visitors.

Feb. 21 Tr. at 193:4-11; *id.* at 194:7-10. The jury is entitled to know the rest of the story: Mr. Amar called the data a "huge mislabel" to Ms. Javice—his supposed co-conspirator—in front of Mr. Glazer when he saw it on July 7.

    Even worse, the Government has suggested to the jury through its witnesses that Mr. Amar was not involved in correcting the mislabeled data, leaving the inaccurate impression that LionTree or Ms. Javice noticed it instead. For instance, the Government elicited testimony from Mr. Cowan that Capital One requested a meeting with Mr. Amar specifically on July 8. *Id.* at 197:9-198:14. It elicited similar testimony from Mason Young on redirect. Mar. 13 Tr. at 2284:6-12; *id.* at 2286:18-20. Yet it also elicited from Mr. Young that he does not recall Mr. Amar (or Ms. Javice) correcting any data during the July 8 meeting, as if that is the only time the correction could have occurred. Mar. 12 Tr. at 2151:11-13 (MS. BHASKARAN: "To your recollection, did either Ms. Javice or Mr. Amar identify any mislabeled data in this meeting?" THE WITNESS: "Not that I recall."). In fact, as GX 802-22 shows, Mr. Amar corrected the mislabeled data the day prior.[2]

---

[2] Mr. Cowan's testimony on cross examination is not sufficient evidence to prove the correction originated from Mr. Amar. Feb. 26 Tr. at 384:5-24 ("MR. MENCHEL: "Does that refresh your recollection that the person who informed you of this mislabel was Mr. Olivier Amar?" THE WITNESS: "It does not refresh my recollection, sir." MR. MENCHEL: "But I am right that you know it came from Frank and not from somebody at LionTree?" THE WITNESS: "That is correct, yes. The answer——rather, the clarification, yes.").

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 6

Moreover, the Government's repeated attempts to downplay the significance of Mr. Amar's correction serve only to confuse the jury, and GX 802-22 must be admitted to address that confusion. The Government has on several occasions elicited testimony that visitor data was not important to buyers. Feb. 26 Tr. at 570:20-23 (MR. CHIUCHIOLO: "You testified earlier that the number of users was important to the investment or the acquisition decision. What about the number of website visitors?" THE WITNESS: "The number of website visitors is irrelevant to us."); Mar. 12 Tr. at 2180:24-2181:1 (Young inaccurately conflating impressions and visitors). Putting aside the fact that Mr. Amar's correction of the visitor data was plainly significant to, at the very least, LionTree, as Mr. Cowan conceded, *see* Feb. 25 Tr. at 374:2-4 ("MR. MENCHEL: "Well, it was so significant that Mr. Braun had to get involved in rectifying the problem, right?" THE WITNESS: That is correct."), the "huge mislabel" chat matters because it proves Mr. Amar's state of mind. It demonstrates that he did not have conspiratorial intent and in fact took steps inconsistent with being in a conspiracy. In other words, the chat is evidence that Mr. Amar corrected inaccurate numbers on the eve of an important diligence call, deep into the diligence process, in the presence of Frank's in-house counsel (an outsider to the alleged conspiracy), and directly to his alleged co-conspirator.[3]

### C. The "Huge Mislabel" Slack Is Not Hearsay

Finally, Mr. Amar's message is not hearsay. Mr. Amar is not offering it to prove that, in fact, Frank had fewer than 50 million website visitors. He is offering it to prove that he believed the visitor data was mislabeled, and for the fact that he openly corrected Ms. Javice on a number he perceived as wrong (in front of Mr. Glazer). Indeed, it is not hearsay because it goes to Mr. Amar's state of mind and is wholly inconsistent with an agreement to defraud the Banks. *See, e.g.*, *United States v. Cardenas*, No. 21-cr-0359 (LAK), 2024 WL 2054908, at *2 (S.D.N.Y. May 6, 2024) ("fact" that defendant made a statement is what is relevant and material, and not hearsay, because it "goes to [ ] state of mind"); *United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 558146, at *24 (S.D.N.Y. Feb. 24, 2022) ("[S]tatements that relate to a defendant's belief at the time the statement is made are not excludable on the basis of hearsay."); *United States v. Hayes*, 369 F.3d 564, 568 (D.C. Cir. 2004) (not hearsay when defendant "claims the fact he told Sweeney to 'tell the truth' indicates he did not think he did anything wrong, making it less likely that he had the specific intent required to sustain the conspiracy and theft charges"). It is also a present sense impression—Mr. Amar made it while viewing the mislabeled data, and it describes exactly what he perceived.[4]

For these reasons, the Court should admit GX 802-22.

---

[3] In any event, Capital One viewed both visitors and impressions as an important metric. Mar. 13 Tr. at 2178:14-22 (THE WITNESS: ". . . we were interested in the size of, you know, website visitor audience to Frank on a monthly and annual basis"); *id.* at 2273:1-4 (MR. MENCHEL: "Can we agree that impressions was a number that was important enough for Capital One to ask that specific data be provided to it?" THE WITNESS: "Correct.").

[4] The Slack is also a business record, which the Court has routinely admitted in this trial in this exact form. *See, e.g.*, Mar. 10 Tr. at 1598:10-1599:9 (THE COURT: "If it's a written conversation, you can put it in as a business record.").

Hon. Alvin K. Hellerstein, U.S.D.J.
March 18, 2025
Page 7

Respectfully submitted,

*/s/ Jonathan D. Cogan*
Jonathan D. Cogan
Sean S. Buckley
Alexandria E. Swette
KOBRE & KIM
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
Jonathan.Cogan@kobrekim.com
Sean.Buckley@kobrekim.com
Alexandria.Swette@kobrekim.com

Matthew I. Menchel
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Tel: (305) 967-6100
Matthew.Menchel@kobrekim.com

Jake Rush (admitted *pro hac vice*)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Jake.Rush@kobrekim.com

*Counsel for Defendant Olivier Amar*