**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 23 Cr. 251 (AKH) |
| CHARLIE JAVICE and OLIVIER AMAR, | |
| Defendants. | |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**OLIVIER AMAR'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT .........................................................................................1

LEGAL STANDARDS ......................................................................................................3

ARGUMENT .....................................................................................................................4

I.    THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO
      SUPPORT A CONVICTION FOR CONSPIRACY .........................................................4

      A.    The Evidence Was Insufficient to Show that Mr. Amar Agreed to Commit
            a Crime with Ms. Javice.................................................................................4

      B.    Frequent Communication with, and Proximity to, Ms. Javice Cannot
            Establish an Agreement to Commit Fraud.................................................8

      C.    The Evidence Showed Ms. Javice Actively Sought to Exclude Mr. Amar
            from the JPMC Deal after Mr. Amar Made a Correction to Website Visitor
            Data...............................................................................................................9

            1.    Mr. Amar's Correction of Ms. Javice's False Statement
                  Concerning Frank's Website Visitors Is Inconsistent with the
                  Existence of a Conspiracy...............................................................10

            2.    Ms. Javice's Attempt to Prevent Mr. Amar from Being Hired by
                  JPMC, as Well as Her Exclusion of Mr. Amar from the JPMC
                  Diligence Process, Are Inconsistent with the Existence of a
                  Conspiracy ......................................................................................12

      D.    Mr. Amar Cannot Be Liable as a Co-Conspirator for Ms. Javice's
            Statements in 2021 ......................................................................................13

            1.    Ms. Javice's Statements Are Not Admissible as against Mr. Amar .........14

            2.    Mr. Amar Cannot Be Liable for Ms. Javice's Pre-Conspiracy
                  Crimes .............................................................................................15

            3.    Mr. Amar Cannot Be Liable for Conduct Subsequent to the
                  Acquisition ......................................................................................15

      E.    There Was Insufficient Evidence to Support a Finding that Mr. Amar
            Acted with Specific Intent to Defraud .......................................................16

II.   THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO
      ALLOW A RATIONAL JURY TO CONCLUDE THAT MR. AMAR MADE
      ANY MATERIAL MISREPRESENTATIONS .................................................................18

      A.    The Evidence Was Insufficient to Support a Finding that Mr. Amar Made
            a Misrepresentation ....................................................................................19

            1.    The Evidence Was Insufficient to Support a Finding that Mr. Amar
                  Made Any Material Misstatement .......................................................19

2.    Ms. Javice's Statements Cannot be Attributed to Mr. Amar .....................27

B.    The Evidence Was Insufficient to Support a Finding of Materiality with Respect to Any Representations by Mr. Amar .......................................................28

III.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING THAT MR. AMAR ACTED WITH THE REQUISITE INTENT.................................................29

IV.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT MR. AMAR AIDED AND ABETTED OR WILLFULLY CAUSED MS. JAVICE TO COMMIT SECURITIES, WIRE, OR BANK FRAUD..............................................................................................................45

CONCLUSION.................................................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                         **Page(s)**

*Bermudez v. Colgate-Palmolive Co.*,
  667 F. Supp. 3d 24 (S.D.N.Y. 2023) ...... 30

*Bosto v. Norbay Sec., Inc.*,
  599 F. Supp. 1563 (E.D.N.Y. 1985) ...... 16

*Ganino v. Citizens Utils., Co.*,
  228 F.3d 154 (2d Cir. 2000) ...... 29

*Grunewald v. United States*,
  353 U.S. 391 (1957) ...... 28

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ...... 18

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003) ...... 30

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) ...... 18

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...... 18

*Kogan v. Nat'l Bank of N. Am.*,
  402 F. Supp. 359 (E.D.N.Y. 1975) ...... 16

*Krulewitch v. United States*,
  336 U.S. 440 (1949) ...... 28

*O'Malley v. N.Y.C. Authority*,
  896 F.2d 704 (2d Cir. 1990) ...... 30

*Pettus v. Erole*,
  2019 WL 5863983 (E.D.N.Y. Nov. 8, 2019) ...... 18

*Pinkerton v. United States*,
  328 U.S. 640 (1946) ...... 17

*United States v. Anderson*,
  747 F.3d 51 (2d Cir. 2014) ...... 9

*United States v. Ceballos*,
  340 F.3d 115 (2d Cir. 2003) ...... 9

*United States v. Clark*,
  740 F.3d 808 (2d Cir. 2014) ................................................................... 3

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012) ................................................................... 17

*United States v. Dennis*,
  183 F.2d 201 (2d Cir. 1950) ................................................................. 14

*United States v. Gabriel*,
  125 F. 3d 89 (2d Cir. 1997) .................................................................. 30

*United States v. Gallishaw*,
  428 F.2d 760 (2d Cir. 1970) ................................................................... 7

*United States v. Geaney*,
  417 F.2d 1116 (2d Cir. 1969) ............................................................... 14

*United States v. Gore*,
  154 F.3d 34 (2d Cir. 1998) ..................................................................... 4

*United States v. Guadagna*,
  183 F. 3d 122 (2d Cir. 1999) ........................................................... 26, 30

*United States v. Johnson*,
  513 F.2d 819 (2d Cir. 1975) ................................................................... 8

*United States v. Jones*,
  393 F.3d 107 (2d Cir. 2004) ................................................................... 9

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) ................................................................... 29

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008) ................................................................... 3

*United States v. Maldonado*,
  2024 WL 4562728 (2d Cir. Oct. 24, 2024) ........................................... 3

*United States v. Napout*,
  332 F. Supp. 3d 533 (E.D.N.Y. 2018) ................................................... 3

*United States v. Parker*,
  903 F.2d 91 (2d Cir. 1990) ................................................................... 37

*United States v. Pauling*,
  924 F.3d 649 (2d Cir. 2019) ................................................................... 3

*United States v. Perry*,
  643 F.2d 38 (2d Cir. 1981) ...................................................................... 45

*United States v. Rigas*,
  490 F.2d 208 (2d Cir. 2007) .................................................................... 18

*United States v. Rodriguez*,
  392 F.3d 539 (2d Cir. 2004) .................................................................... 17

*United States v. Rosenblatt*,
  544 F.2d 36 (2d Cir. 1977) ...................................................................... 6

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010) ...................................................................... 16

*United States v. Zambrano*,
  776 F.2d 1091 (2d Cir. 1985) .................................................................. 45

*United States v. Ziegler*,
  583 F.2d 77 (2d Cir. 1978) ...................................................................... 14

**Rules**

Federal Rule of Evidence 801(d)(2)(E) ............................................... 14, 28

Rule 29 of the Federal Rules of Criminal Procedure ................................. 1, 3, 37, 46

Defendant Olivier Amar respectfully submits this memorandum of law in support of his motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

The Government's evidence at trial was insufficient for a rational jury to find Mr. Amar guilty of any of the charges against him. The crux of the Government's theory of criminal liability was that Ms. Javice and Mr. Amar lied and conspired to trick potential buyers—namely, Capital One and JPMorgan Chase ("JPMC")—into believing that Frank had 4.25 million FAFSA accounts in an effort to sell the company. The problem with the Government's theory, as demonstrated throughout trial, was that there was no evidence that Mr. Amar lied to Capital One or JPMC, or that he conspired with Ms. Javice to promote her lies.

There were two people on trial here, with starkly different evidence as to each person's knowledge, intent, and conduct. Throughout the trial, however, the Government sought to blur the distinction between Ms. Javice and Mr. Amar and to confuse the jury into lumping the two of them together by referring to "Defendants" or "they" or "Frank." Time and again, counsel for Mr. Amar, and often the Court, had to clarify through objections or cross-examination that, to the extent anyone misrepresented Frank's user data, it was Ms. Javice, not Mr. Amar.

The evidence against Mr. Amar was insufficient in other important ways. There was insufficient evidence that Mr. Amar was aware of Ms. Javice's misstatements regarding Frank's FAFSA accounts. There was insufficient evidence that Mr. Amar had any fraudulent intent regarding the data acquired from third-party data provider ASL Marketing ("ASL"). There was insufficient evidence that Mr. Amar had any involvement in the contemplation, discussion, or creation of the synthetic data used in connection with JPMC's validation of Frank's user data. To the contrary, there was evidence that Mr. Amar was totally in the dark about the data validation exercise conducted by Acxiom—indeed, he did not even know what Acxiom was—and he had no

contact with Ms. Javice's data scientist, Adam Kapelner, who created the synthetic data provided to Acxiom, during the relevant time period.

In a desperate attempt to identify a misstatement by Mr. Amar, the Government in summation argued that a slide on a presentation made to Capital One contained a misrepresentation from Mr. Amar. But there was no evidence that Mr. Amar created that slide or discussed its contents with Capital One. Tellingly, this slide was from the same deck that had, in a prior version, contained mislabeled data regarding foundational website metrics—namely, false data regarding Frank's website visitors—that Mr. Amar corrected in preparation for that same meeting with Capital One. Mr. Amar's correction, which was relayed to both Capital One and JPMC, undermined the apparent object of the alleged conspiracy. Following this correction, Capital One withdrew its bid for Frank. Ms. Javice immediately sidelined Mr. Amar during the rest of JPMC diligence, and she made efforts to cut Mr. Amar out of the deal entirely. Ms. Javice also excluded Mr. Amar from her dealings with JPMC and Acxiom regarding the data validation exercise and her work with Dr. Kapelner to create synthetic data to provide in connection with the same.

The Government never accounted for this evidence, which foreclosed any inference that Mr. Amar entered into an illegal agreement with Ms. Javice or had any intent to defraud Capital One or JPMC. Importantly, the fact that Mr. Amar had to correct aspects of the Capital One slide deck completely undermines that he "created" the misleading slide in the deck that the Government tried to attribute to him. Indeed, there was no evidence that Mr. Amar ever generated *any* false or misleading FAFSA-related data, like the information on the slide in question. Again, to the contrary, the evidence regarding this correction shows that Mr. Amar provided what he believed to be accurate FAFSA-related data during diligence.

In sum, the Government's case was about lies told by only one of the two people on trial,

and an alleged conspiracy of only two individuals for which there was insufficient evidence that one member (Mr. Amar) took any action to further the aims of the scheme. Conversely, there was ample evidence that the same purported member (Mr. Amar) took actions directly contrary to the ends of the conspiracy and was cut out as a result. Even drawing all reasonable inferences in favor of the Government, the evidence presented at trial does not establish Mr. Amar's guilt beyond a reasonable doubt for any of the charged crimes, and the Court should enter a judgment of acquittal on all four counts.[1]

## LEGAL STANDARDS

Rule 29 requires a court to ensure that a jury could reasonably find guilt beyond a reasonable doubt. Fed. R. Crim. P. 29. *See United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014) ("[I]f we are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine" the reasonableness of the jury's verdict). Thus, a "judgment of acquittal may be granted only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Maldonado*, No. 22-1077, 2024 WL 4562728, at *1 (2d Cir. Oct. 24, 2024) (internal citation omitted). Reasonable doubt necessarily exists when the evidence provides at most "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008). A rational jury cannot find guilt beyond a reasonable doubt when the conviction is based upon impermissible speculation, the evidence against the defendant is meager or nonexistent, or the Government's

---

[1] Apart from the specific arguments detailed herein, Mr. Amar's motion for a judgment of acquittal must be granted because the evidence was insufficient to support a finding as to each of the elements of the offenses charged. *See, e.g.*, *United States v. Napout*, 332 F. Supp. 3d 533, 548 (E.D.N.Y. 2018) ("[T]he court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that each element is established beyond a reasonable doubt.").

evidence established only likely guilt. *See, e.g.*, *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (internal citation omitted). Indeed, the Constitution strictly forbids conviction if a defendant is only "probably guilty" beyond a reasonable doubt. *Id.*

## ARGUMENT

## I.    THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR CONSPIRACY

To support a conviction for conspiracy to commit wire fraud and bank fraud (Count One), the Government was required to establish beyond a reasonable doubt that Mr. Amar knowingly and willfully entered into an agreement with Ms. Javice to accomplish those unlawful objectives. *See, e.g.*, *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) ("As a matter of law, the crime of conspiracy must involve the agreement of two or more persons to commit a criminal act or acts since the act of agreeing is a group act, unless at least two people commit it, no one does.") (internal citation omitted). The Government failed to carry its burden.

Indeed, "[t]he essence of conspiracy is the agreement," without which there can be no conviction. *Gore*, 154 F.3d at 40. Yet, the Government did not introduce evidence sufficient to establish a *prima facie* case that Mr. Amar knowingly and willfully entered an agreement with Ms. Javice. To the contrary, the evidence at trial supports that any misrepresentations by Ms. Javice were made without Mr. Amar's participation or knowledge and, further, that Ms. Javice actively sought to exclude Mr. Amar at critical junctures of the alleged conspiracy.

### A.    The Evidence Was Insufficient to Show that Mr. Amar Agreed to Commit a Crime with Ms. Javice

The Government's theory of fraud in this case was that Ms. Javice lied to JPMC and Capital One on numerous occasions about the number of Frank's FAFSA users. In support of this theory, the Government offered evidence of a litany of such misrepresentations by Ms. Javice, both from witnesses and in documents. But it failed to offer evidence that Mr. Amar entered into any

agreement with Ms. Javice to defraud either bank through Ms. Javice's lies. In fact, the evidence was to the contrary.

As an initial matter, there was no evidence that Mr. Amar himself made any misrepresentations as part of the charged conspiracy. Tacitly acknowledging this lack of evidence against Mr. Amar, during both its opening statement and summation, the Government repeatedly referred to the "defendants' lies." *See, e.g.*, Trial Tr. 3527:23. But the evidence at trial made clear that Mr. Amar neither made any misrepresentations—written or oral—nor did he endorse or otherwise adopt the alleged misrepresentations made by Ms. Javice, let alone agree with her to make and perpetuate such false statements.

In the Government's summation, for example, the Government asserted that "[t]he defendants told lies together during due diligence" and then cited testimony from four witnesses who purportedly "explained that they were told Frank had more than 4 million customer accounts." Trial Tr. 3514:14-3515:13. Yet each of those four witnesses expressly testified that it was Ms. Javice—not Mr. Amar—who made those representations. *See, e.g.*, Trial Tr. at 3514:21-3515:1 (describing witness testimony that: "Javice defined user" or "Javice consistently represented that Frank had 4.25 million customers"); *see also, e.g.*, Trial Tr. 142:11-22 (Q: "Who? Who told you that?" A: "To the best of my recollection, it was an answer to a request, multiple times, by Charlie Javice."); Trial Tr. 2122:10-15 (Q: "Did you get this feeling from just reading this management presentation or was it something that somebody said?" A: "It was a feeling that we had by reading through the management presentation confirmed by, I believe, Ms. Javice on the presentation during the call."). At the end of the day, not a single Government witness testified that Mr. Amar made a false statement about Frank's FAFSA users.

The Government also pointed to Mr. Amar's supposed knowledge that Ms. Javice, acting alone, had retained a data scientist, Dr. Kapelner, to prepare a synthetic data set during the final stages of due diligence with JPMC (as part of a data validation exercise conducted by the bank's vendor, Acxiom) as evidence of Mr. Amar's agreement to commit fraud. Specifically, the Government argued in summation that Mr. Amar agreed to help Ms. Javice use that data to further her alleged lie about the number of Frank's users. Trial Tr. 3541:24-3543:21. But the evidence elicited at trial did not allow for a reasonable inference that Mr. Amar had knowledge of the synthetic data project that Ms. Javice hired Dr. Kapelner to undertake.

Indeed, there was no evidence that Mr. Amar was aware of the data validation exercise, or of Dr. Kapelner's efforts to create a synthetic data set in connection with that exercise. To the contrary, the evidence at trial showed that Ms. Javice was the only one who interacted with Dr. Kapelner during the relevant period and that Mr. Amar had no involvement with—let alone knowledge of—the synthetic data that Dr. Kapelner prepared; moreover, Ms. Javice took steps to wall Mr. Amar off from Dr. Kapelner during the relevant period. *See, e.g.*, Trial Tr. 1885:2-12; 1916:6-17 (describing interactions with and requests from Ms. Javice to create synthetic data set); *see infra*, Section III at 32-35.

Further, there was no evidence Mr. Amar knew what Ms. Javice asked Dr. Kapelner to do with respect to synthetic data, nor that he knew what she intended to do with information obtained from Dr. Kapelner. Indeed, the Government did not present evidence demonstrating that Mr. Amar ever spoke with Ms. Javice about the alleged misstatements made by her, let alone that he knew how they furthered the "essential nature" of her fraudulent scheme, or that Mr. Amar spoke with Ms. Javice (or anyone else) about the data validation exercise with JPMC. *See United States v. Rosenblatt*, 544 F.2d 36, 38 (2d Cir. 1977). What is more, the evidence at trial showed that Mr.

Amar had no interactions with JPMC or Acxiom regarding data validation. *See* Trial Tr. 1448:1-6; 1455:24-1456:3; 569:11-14; 2570:22-25; 3174:16-18. Indeed, the evidence showed that Mr. Amar did not even know what Acxiom was. *See* GX 801-31 (private WhatsApp message from Mr. Amar to Ms. Javice in October 2021—"What's Axiom [sic]?"); *see also, e.g.*, *United States v. Gallishaw*, 428 F.2d 760, 762 (2d Cir. 1970) (reversing conspiracy conviction where defendant rented a machine gun to another individual "with the knowledge that there was a conspiracy to do something wrong" because there was no evidence the defendant "knew that a bank was to be robbed") (internal quotation marks omitted); *Rosenblatt*, 554 F.2d at 39 (finding that "[p]roof of the essential nature of the plan is required" and noting that "[t]he importance of making this determination cannot be overstated."); *infra*, Section III at 32-33 (explaining that the evidence showed that Mr. Amar did not know the context for the data request).

The Government also pointed to Mr. Amar's purchase of student records from a data vendor (ASL) to try to establish evidence of Mr. Amar's participation in the fraud, but, as discussed in greater detail *infra*, Section III at 37-43, the evidence at trial reflected that Mr. Amar sought to purchase third-party records in order to augment Frank's own user data, which the evidence also makes clear is an established, common, and, importantly, legal industry practice. *See, e.g.*, Trial Tr. 1328:10-20 (Steve Stolls, VP of Sales and Marketing for ASL testifying that data augmentation "is a very common industry practice"); 1034:8-18 (Jen Wong, Frank's Director of Marketing, testifying that "[i]f a marketer has some sort of personally identifying information about you, we can go to a third party and add on additional information that they may have about you, and target you through more advertising"); *see also* Trial Tr. 3100:24-3101:8 (Jenny Zeitler, Frank's Marketing Automation Manager, testifying that, on August 3, Mr. Amar spoke to her about acquiring more information on subscribers to Frank's email newsletter so that Frank could better

target them). Moreover, as discussed below, Mr. Amar received a directive to buy the ASL records—and to buy them quickly—that he believed came from Frank's Board of Directors, which negates any inference of a conspiracy relating to this data. Thus, in spite of the Government's repeated attempts to mischaracterize legal actions taken by Mr. Amar, a rational jury could not reasonably find an agreement to commit fraud based on the evidence regarding Mr. Amar's purchase of ASL records.

### B. Frequent Communication with, and Proximity to, Ms. Javice Cannot Establish an Agreement to Commit Fraud

In an attempt to excuse its lack of evidence of an agreement, the Government relied on the frequency of interactions between Mr. Amar and Ms. Javice, asking the jury to draw the inference that Mr. Amar must have been in on the scheme because he had daily phone calls and text messages with Ms. Javice. *See, e.g.*, Trial Tr. 3553:21-24 ("You heard from JPMorgan witnesses that they primarily spoke to Javice, but don't be fooled, Amar is working behind the scenes with her."). But the law is clear that a rational jury cannot find there was an agreement to defraud simply because Mr. Amar was closely associated with Ms. Javice in his capacity as an employee at her company. *See United States v. Johnson* 513 F.2d 819, 824 (2d Cir. 1975) ("Guilt may not be inferred from mere association with a guilty party."). This context is critical: Mr. Amar and Ms. Javice were executives in a start-up company in the midst of a major acquisition. That they were frequently speaking is not circumstantial evidence from which a rational jury could find there was an agreement to commit fraud; instead, it is exactly what one would expect from a professional relationship under these circumstances. *See United States v. Hwang,* 22-cr-240, Dkt. 301 at 4370:2-9 (precluding the use of summary charts depicting call volumes because "It's a natural occurrence in a business . . . for people to be talking. They could be talking about anything in the world . . ."). To the contrary, there must be actual "[e]vidence tending to show knowing

participation in the conspiracy . . . *i.e.,* facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (citations omitted).

Similarly, a rational jury could not find an agreement from evidence showing merely that Mr. Amar "was with Javice when she told some of those lies," Trial Tr. 2516:3-6, and *sometimes* failed to correct them—assuming Mr. Amar even heard and understood them to be misrepresentations. Moreover, the "scene of the crime" here are the diligence meetings where misstatements were allegedly made by Ms. Javice and the virtual data room that allegedly contained misstatements (to which there was no evidence that Mr. Amar even had access). But the law is clear that Mr. Amar's "presence at the scene of [the] crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove" an agreement to carry out unlawful conduct. *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014). "There must be something more than mere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy." *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) (reversing conviction for conspiracy to commit bribery, finding evidence insufficient to permit a rational juror to infer that the defendant willfully joined the conspiracy).

### C.    The Evidence Showed Ms. Javice Actively Sought to Exclude Mr. Amar from the JPMC Deal after Mr. Amar Made a Correction to Website Visitor Data

The evidence at trial showed that Mr. Amar corrected key data in connection with Capital One diligence, after which Ms. Javice sought to exclude Mr. Amar from the JPMC deal. This evidence is inconsistent with the existence of an agreement between Ms. Javice and Mr. Amar to defraud Capital One or JPMC.

1.    *Mr. Amar's Correction of Ms. Javice's False Statement Concerning Frank's Website Visitors Is Inconsistent with the Existence of a Conspiracy*

Far from proving the defendants were acting in concert, the trial evidence reflects that Mr. Amar directly undermined Ms. Javice's alleged fraudulent scheme by correcting at least one such alleged misstatement regarding Frank's users. Specifically, during a July 7, 2021 call between Frank and LionTree (the investment bank advising Frank in connection with the acquisition) to prepare for a presentation to Capital One the next day (which was near the end of Capital One's due diligence), Mr. Amar flagged a "huge mislabel" regarding Frank website visitor figures. *See* GX 3037; GX 802-22. While on this call, Mr. Amar realized that these figures did not represent visitors to Frank's website, but instead represented "impressions," which means when the Frank website shows up as an Internet search result. Trial Tr. 383:14-18; *see also* Trial Tr. 747:8-25 (explaining "impressions"); Trial Tr. 1030:3-11 (explaining "impressions" and "clicks").

This correction by Mr. Amar was significant. As discussed *supra*, the core lie that Ms. Javice allegedly told Capital One and JPMC was that Frank had 4.25 million FAFSA accounts—*i.e.,* 4.25 million individuals from whom Frank had collected their first name, last name, email address, and telephone number. The evidence at trial demonstrated, however, that Frank had only 4.25 million *website visitors*. *See, e.g.*, Trial Tr. 1166:13-1167:2 (Ms. Wong testifying that Frank had 4.274 million users, meaning website visitors, according to Google Analytics as of February 11, 2021); 3051:1-9 (Ms. Zeitler testifying that Frank employees were "very excited" when Frank's website visitor figures went over the 4 million mark); DX OA 103 (Frank's Google Analytics dashboard showing over 4 million "users"). Thus, when Capital One asked for data regarding website visitors, it was critical to Ms. Javice to make it appear as though Frank had substantially more than 4.25 million visitors in order to maintain her core misrepresentation that Frank had 4.25 million FAFSA accounts. Simply put, it would be absurd to suggest that every

10

single individual who ever visited the Frank website signed up for a FAFSA account. *See, e.g.*, Trial Tr. 1672:19-22 (Patrick Vovor, Frank's Director of Engineering, agreeing with the Court that not all visitors to the Frank website fill out FAFSA applications).

The inflation of Frank's visitor data was therefore a *sine qua non* to maintaining the misrepresentation regarding Frank's FAFSA account data. Accordingly, the evidence at trial showed that Ms. Javice provided substantially inflated visitor data to Capital One and JPMC by taking Frank's impressions data (which was in the tens of millions) and mislabeling it as website visitors. *See, e.g.*, Trial Tr. 570:10-19 (Leslie Wims Morris, head of corporate development at JPMC during the relevant period, testifying that Ms. Javice told JPMC that "they had 35 million website visitors"); GX 1590 (email from Ms. Javice to JPMC where Ms. Javice writes that Frank has "5-7M visitors on a monthly basis with no marketing spend"); GX 3017-A (Ms. Javice responding to Capital One questions via LionTree by providing data purporting to show 35 million website visitors in 2020). It was precisely that inflated visitor data that Mr. Amar saw and immediately flagged on July 7, 2021 as a "huge mislabel."

Had Mr. Amar been in a conspiracy with Ms. Javice to inflate Frank's FAFSA account figures in order to sell the company, it would have made no sense for Mr. Amar to correct that "huge mislabel" with respect to website visitor figures. In fact, contrary to the existence of a conspiratorial agreement between Ms. Javice and Mr. Amar, the evidence at trial demonstrated that, after Mr. Amar raised the issue while on a call with Ms. Javice, Matt Glazer (Frank's Chief Legal Officer and Chief Operating Officer, who was not an alleged co-conspirator), and LionTree (Frank's investment advisor), Ms. Javice resisted providing accurate and updated data to Capital One. *See* GX 3045 (LionTree employee stating "this meeting today for [Capital One] is everything clearly"). The LionTree team recognized that correcting Ms. Javice's false statement regarding

Frank's visitor data would be important to Capital One's investment decision and escalated the issue to one of LionTree's top three executives, Ben Braun. *See* Trial Tr. 374:2-6. Following considerable pushback and foot-dragging by Ms. Javice, LionTree ultimately convinced Ms. Javice to allow them to make the correction, and, in fact, the evidence showed that the day after LionTree relayed Mr. Amar's correction to Capital One, Capital One formally declined to acquire Frank. *See* GX 1691; Trial Tr. 2281:6-9.

> 2.    *Ms. Javice's Attempt to Prevent Mr. Amar from Being Hired by JPMC, as Well as Her Exclusion of Mr. Amar from the JPMC Diligence Process, Are Inconsistent with the Existence of a Conspiracy*

On July 7, 2021, the same day that Mr. Amar raised the "huge mislabel," JPMC's due diligence commenced with a management presentation. *See* Trial Tr. 558:15-559:25. During the one-week overlap between that management presentation to JPMC and the end of Capital One's diligence on July 14, 2021, Ms. Javice had provided similarly inaccurate data to JPMC. *See* Trial Tr. 570:10-19. The day before LionTree conveyed Mr. Amar's correction to Capital One, it conveyed the same correction to JPMC. GX 1526-A.

Immediately after Mr. Amar caused Ms. Javice's false representation concerning Frank's website visitors to be corrected to Capital One and JPMC, Ms. Javice began handling diligence meetings alone and promptly took steps to prevent Mr. Amar from coming over to JPMC with her post-acquisition. As Ms. Wims Morris testified, a mere two days after Ms. Javice's misrepresentation was corrected, Ms. Javice insisted that Mr. Amar's name be removed from JPMC's bid for Frank. *See* Trial Tr. 753:25-754:2. Thus, as set forth immediately below, while the draft bid mentioned Mr. Amar by name as a key employee, the final, executed version removed his name. *See* Trial Tr. 749:12-754:4; *compare* GX 1467A, *with* DX OA 1103-A.

8.  Additional Agreements:  It is anticipated that (a) Charlie Javice, Matthew Glazer and Olivier Amar and certain additional employees subject to ongoing diligence will enter into employment agreements at signing, to be effective at Closing and (b) stockholder support agreements or other similar agreements will be in hand to ensure requisite stockholder approval as of signing.

8.  Additional Agreements:  It is anticipated that (a) Charlie Javice and certain other key employees (subject to ongoing diligence) will enter into employment agreements at signing, to be effective at Closing and (b) stockholder support agreements or other similar agreements will be in hand to ensure requisite stockholder approval as of signing.

Once again, this evidence undermines the existence of any alleged conspiratorial agreement. Had Ms. Javice and Mr. Amar actually agreed to sell Frank based on inflated user data, it would make no sense for Ms. Javice to spurn Mr. Amar and try to prevent him from joining her at JPMC after closing. Ms. Javice would have done the opposite and tried to keep Mr. Amar in the fold. Instead, Ms. Wims Morris testified that the only reason Mr. Amar ended up coming over as an employee to JPMC was because *JPMC* ultimately determined, against Ms. Javice's wishes, that Mr. Amar "was important talent that needed to be part of the deal." Trial Tr. 649:3-650:9.

The evidence showed that Ms. Javice similarly proceeded to cut Mr. Amar out of the JPMC diligence process altogether. *See infra*, Section II.A.1 (explaining that Mr. Amar had no diligence-related communications with JPMC after July 12, the same date JPMC was informed of the correction to Ms. Javice's "huge mislabel" regarding visitor data). This, too, is inconsistent with an inference that there was a conspiracy involving Ms. Javice and Mr. Amar but rather indicates that Ms. Javice was cautious and cognizant of Mr. Amar's ability to disrupt the potential deal with JPMC, just as he did with Capital One by correcting inaccurate data.

**D.    Mr. Amar Cannot Be Liable as a Co-Conspirator for Ms. Javice's Statements in 2021**

Even if the Court were to find that the evidence was sufficient for a rational jury to find there was an agreement between Mr. Amar and Ms. Javice in 2022 to cover up Ms. Javice's 2021

fraud inducing JPMC to acquire Frank, such evidence cannot serve as the basis for a conviction on conspiracy to commit wire and bank fraud in connection with that acquisition. The former is not the conspiracy alleged in the indictment.

    *1.*  *Ms. Javice's Statements Are Not Admissible as against Mr. Amar*

   The Government's fraud theory at trial stemmed from the lies that induced the acquisition. *See, e.g.*, Trial Tr. at 35:9-17. But, as discussed *supra*, Section I.A, those alleged lies were told by Ms. Javice, not Mr. Amar. Under *Geaney* and its progeny, upon a Defendant's objection, the prosecution was required to establish the existence of a conspiracy involving Ms. Javice and Mr. Amar. Unless and until the Government established the existence of such a conspiracy through independent evidence, the Government could not invoke the co-conspirator exception under Federal Rule of Evidence 801(d)(2)(E) to admit Ms. Javice's statements as against Mr. Amar (and vice versa). *See, e.g.*, *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969); *United States v. Ziegler*, 583 F.2d 77, 80–81 (2d Cir. 1978) ("[I]t is the trial judge who must make the preliminary determination as to admissibility."); *United States v. Dennis*, 183 F.2d 201, 231 (2d Cir. 1950), *aff'd*, 341 U.S. 494, (1951) (acknowledging that "it is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments" that this assessment requires).[2] Accordingly, in light of the insufficient evidence supporting the existence of an agreement, the jury should not have been permitted to consider Ms. Javice's statements as against Mr. Amar.

---

[2] As detailed in Mr. Amar's Rule 33 Motion to Vacate Judgment, even after counsel for Mr. Amar objected, the Court did not make such a determination in this case prior to the jury being instructed, which independently constitutes grounds for a new trial. *See* Rule 33, Section I.A.

>    2.    *Mr. Amar Cannot Be Liable for Ms. Javice's Pre-Conspiracy Crimes*

Because the Government alleged only a two-person conspiracy, a conspiracy could not have existed unless and until Mr. Amar joined it, so Mr. Amar could not have been liable for any fraud committed by Ms. Javice prior to the existence of a conspiracy. *See* Trial Tr. 3413:12-3414:12, 3419:10-23, 3443:17-21 (defense counsel raising that there are only two alleged co-conspirators, and prosecution agreeing that they were focused on whether there was an agreement between the two defendants); *see also* Dkt. 140 ("The Government does not currently expect to identify other individuals as co-conspirators, although it reserves the right to do so."). By at latest September 2021, the acquisition was consummated, and Ms. Javice's alleged fraud was complete. As discussed *supra*, Section I.A, there was insufficient evidence for a rational jury to conclude that Mr. Amar entered into a criminal agreement with Ms. Javice prior to the acquisition. And to the extent Mr. Amar entered into a criminal agreement with Ms. Javice after that point, he cannot be liable for Ms. Javice's prior conduct because no conspiracy existed unless and until he joined one. *See* Rule 33, Section I.A.

Separately, but independently, even were Mr. Amar found to have subsequently entered into an agreement with Ms. Javice to cover up her fraud in connection with the acquisition, that, too, would not render Mr. Amar liable for Ms. Javice's prior statements and conduct. Evidence of a cover-up may conceivably relate to a separate, uncharged crime, but it is not sufficient to support a finding that Mr. Amar entered into an agreement with Ms. Javice related to the sale of Frank or that he was liable for any acts or statements by Ms. Javice prior to that time. *See infra*, Section II.A.2 (citing *Krulewitch* and *Grunewald*).

>    3.    *Mr. Amar Cannot Be Liable for Conduct Subsequent to the Acquisition*

Finally, any statements made or actions taken by Mr. Amar subsequent to the acquisition are necessarily not made to deprive JPMC of property that are the subject of the crimes charged

here, and so cannot constitute fraud under the federal statutes with respect to any of the substantive counts. Nor were post-acquisition statements made "in connection with the purchase or sale of a security," and they therefore cannot give rise to liability for Mr. Amar for securities fraud specifically. *See, e.g.*, *Bosto v. Norbay Sec., Inc.*, 599 F. Supp. 1563, 1566 (E.D.N.Y. 1985) (finding the "fraud practiced must have been prior to or contemporaneous with the sale of securities"); *Kogan v. Nat'l Bank of N. Am.*, 402 F. Supp. 359, 361 (E.D.N.Y. 1975) (dismissing securities fraud complaint based on when "sale was approved" because after-the-fact conduct cannot be deemed "in connection with the sale or purchase of any security").[3]

As an aside, but importantly, the securities fraud charge fails generally because the allegedly fraudulent conduct in this action in its entirety was not done "in connection with" the purchase or sale of a security, including because the purchase of an entire business cannot be considered a "securities" transaction even if accomplished by the sale of stock or other securities.

### E.    There Was Insufficient Evidence to Support a Finding that Mr. Amar Acted with Specific Intent to Defraud

Finally, courts in the Second Circuit have routinely held that, for conspiracy to commit specific intent crimes, including wire fraud and bank fraud, the knowing and willful standard requires the Government to establish beyond a reasonable doubt "that the defendant had the specific intent to violate the substantive statute." *Ceballos*, 340 F.3d at 124; *see also e.g., United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) ("[T]he Government must prove at least the degree of criminal intent necessary for the substantive offense itself."). In other words, the Government

---

[3] The Government alleged that the objects of the purported conspiracy included compensation paid in connection with Ms. Javice and Mr. Amar becoming JPMC employees. But even if the alleged objects of the conspiracy extended past the acquisition, after-the-fact conduct by Mr. Amar in 2022 cannot give rise to liability for any fraud perpetrated by Ms. Javice in 2021 absent evidence of the existence of a criminal agreement in 2021.

was required to prove that Mr. Amar acted with the specific intent to defraud. But even if Mr. Amar knew about the alleged false statements made by Ms. Javice (which is not supported by the evidence), there is insufficient evidence in the record that Mr. Amar had the specific intent to defraud JPMC at the time they were uttered by Ms. Javice. *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 47, 58, 68 (2d Cir. 2012) (reversing conspiracy conviction where there was no evidence defendant "even knew" about false statements at center of conspiracy); *see also infra*, Section III.

For example, in *Coplan*, the Second Circuit reiterated that to sustain a conspiracy conviction, the Government must present some evidence from which it can reasonably be inferred that "the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated in it*." *Coplan*, 703 F.3d at 71 (quoting *United States v. Rodriguez,* 392 F.3d 539, 545 (2d Cir. 2004)).[4] Thus, where the evidence at trial showed only that a defendant sent a three-line e-mail that did not "evince[] a knowing 'stamp of approval'" for allegedly false statements, his conviction could not stand because the Government could not show the requisite criminal intent. *Id.* So too, here, the evidence against Mr. Amar "is simply not enough." *Id.*

Because the Government failed to present sufficient evidence that Mr. Amar knowingly entered an agreement with Ms. Javice to commit fraud, the Court should enter a judgment of acquittal as to Count One and, as explained in more detail *infra*, Section II.A.2, as to all of the substantive counts as well since those convictions were based upon an erroneous legal instruction.

---

[4] Notably, the Second Circuit held that the Government must prove the required mental state even when it pursues a theory of liability based on *Pinkerton v. United States*, 328 U.S. 640 (1946), under which a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement. *Coplan*, 703 F.3d at 71.

## II. THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO ALLOW A RATIONAL JURY TO CONCLUDE THAT MR. AMAR MADE ANY MATERIAL MISREPRESENTATIONS

The Court should also enter a judgment of acquittal on Counts Two, Three, and Four, charging Mr. Amar with wire fraud, bank fraud, and securities fraud, respectively, because, as set forth below, no rational jury could have found beyond a reasonable doubt that Mr. Amar knowingly made any material false or misleading statements. *See, e.g.*, *Pettus v. Erole*, No. 19-cv-5893, 2019 WL 5863983 at *2 (E.D.N.Y. Nov. 8, 2019) ("A necessary element of a scheme to defraud is the making of a false statement or material misrepresentation . . . .").

To sustain a conviction on any of the substantive counts, the jury must have found sufficient evidence that Mr. Amar, himself, made a material false statement that he knew "at the time to be untrue." Trial Tr. 3788:1-5 (Jury Charge).[5] *See also United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (stating that where the charged crime "involves making false statements, the core of criminality is not the substance of the false statements but rather that knowing falsehoods were submitted.") (citations omitted). A defendant "does not 'make' a statement simply by preparing or publishing it on behalf of another." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 656 (2d Cir. 2016). "[P]articipation in the creation of a statement [is] not enough." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640 (S.D.N.Y. 2017). Nor can a defendant be liable for making a false statement simply by their association with or proximity to the maker of that statement. *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) ("[I]ndividuals who do not 'make' statements cannot be liable solely on account of their closer relationship with the 'maker'").

---

[5] Secondary liability is addressed *infra*, Section IV. The Government's proof at trial, however, was limited to primary liability as to Mr. Amar.

A. **The Evidence Was Insufficient to Support a Finding that Mr. Amar Made a Misrepresentation**

      1. *The Evidence Was Insufficient to Support a Finding that Mr. Amar Made Any Material Misstatement*

The Government did not adduce any evidence showing that Mr. Amar himself made any material misstatement. Instead, as discussed *supra*, the Government either improperly lumped Defendants together and attributed Ms. Javice's statements to "defendants," *see, e.g.*, Trial Tr. 3527:23, or mischaracterized the evidence in order to mislead the jury into believing that Mr. Amar made statements that he did not make. At bottom, the Government's case boiled down to the proposition that Defendants falsely represented to JPMC that Frank had 4.25 million FAFSA accounts—*i.e.*, individuals who had provided their first name, last name, email address, and phone number. *See, e.g.*, Trial Tr. 35:16-36:5. But the Government did not provide sufficient evidence from which a rational jury could conclude that Mr. Amar made such a statement.

Specifically, the Government repeatedly failed to develop evidence regarding purported misstatements by Mr. Amar in connection with: (1) a July 8, 2021 diligence meeting with Capital One; (2) a July 12, 2021 diligence meeting with JPMC; (3) a spreadsheet in the virtual data room entitled 3.1.4; and (4) a document related to the Acxiom validation exercise that the Government referred to as "Records Needed." Each of these is discussed in turn.

***July 8, 2021 Meeting***. The Government elicited through its first witness, Houston Cowan of LionTree, that a slide deck was presented during the July 8, 2021 diligence meeting with Capital One. *See* Trial Tr. 201:4-14; GX 3040. The Government specifically referenced page 12 of this exhibit, including a graph entitled "Frank FAFSA Completions Breakdown," which the Government argued contained a material misstatement delivered by Mr. Amar. *See* Trial Tr. 201:11-19; Trial Tr. 3520:3-16. However, the Government did not elicit any testimony identifying who created or presented on this particular slide. In fact, the record evidence indicates that

*LionTree* was responsible for preparing, formatting, and organizing these types of presentation materials. *See* Trial Tr. 114:17-19; 271:15-17. Notably, this is the same slide deck where, in preparation for this July 8, 2021 meeting with Capital One, Mr. Amar identified and flagged a "huge mislabel" regarding Frank's visitor data. *See supra*, Section I.C.1. It would make no sense for Mr. Amar to have corrected a false statement regarding Frank visitor data on one slide, but to have agreed to create and/or present a closely related misrepresentation related to Frank's FAFSA users on another slide from the same deck.

As to the meeting itself, the Government did not elicit any testimony regarding who prepared or presented the relevant slide at the meeting. Notably, the Government called two witnesses with personal knowledge relating to this meeting—Mr. Cowan (LionTree) and Mason Young (Senior Vice President of Corporate Development at Capital One). Mr. Cowan did not testify as to who attended or who presented specific slides. And while Mr. Young initially testified on direct that he believed that both Ms. Javice and Mr. Amar were present for this meeting and both discussed the substance of various slides in the presentation deck, *see* Trial Tr. 2146:4-2147:3, he recanted this testimony during cross examination, *see* Trial Tr. 2241:4-2242:9, and admitted that he in fact had no recollection of Mr. Amar attending the meeting.

As Mr. Amar explains in greater detail in support of his Rule 33 motion, the fact that the jury was confused by the state of the record on these points was made clear by its request, during deliberations, for "the graph and e-mail that was created by Olivier Amar that was presented to Chase that showed FAFSA completions." Trial Tr. 3867:11-13. No such document exists. Yet, faced with this question, the Government proceeded to capitalize on this confusion, mischaracterizing the record evidence supporting Mr. Amar's involvement with the purported misrepresentations during the July 8 meeting. *See* Rule 33, Section I.B. As is detailed above, the

evidence at trial was insufficient to show that Mr. Amar made any misstatements during that meeting or that he was involved in the preparation or presentation of the specific slide that purportedly contained misrepresentations regarding Frank's FAFSA completion figures.

*July 12, 2021 Meeting*. Similarly, the Government argued that both Ms. Javice and Mr. Amar provided false and misleading information regarding Frank's user data at the July 12, 2021 meeting between Frank and the JPMC deal team. Yet, the Government failed to present any evidence that Mr. Amar made or was otherwise involved in any purported misrepresentations during that meeting. The evidence from Zoom metadata indicates that Mr. Amar was logged into the relevant session for slightly less than half of the two-hour meeting. *See* GX 2035. And every single witness that testified at trial about the substance of this meeting attributed statements about Frank's user figures to Ms. Javice only. No witness testified that Mr. Amar made a misrepresentation or even specifically recalled that Mr. Amar was present when such a misrepresentation allegedly was made by Ms. Javice.

Ms. Wims Morris testified that Ms. Javice primarily presented and answered questions at the July 12 diligence meeting, and that the bank's understanding of the number of Frank's "customer accounts" was "[b]ased on information that was conveyed to [JPMC] by Ms. Javice." Trial Tr. 533:9-14; 569:1-6. Alex Sweeney, another member of the JPMC deal team, confirmed that it was Ms. Javice who primarily spoke at diligence meetings, that it was Ms. Javice who "consistently represented that Frank had 4.25 million customers that it signed up for the product," and that it was Ms. Javice who "defined a customer as a person that came to the Frank, provided their first name, last name, email address, and phone number, and accepted the terms of the Frank service, and signed up for an account." Trial Tr. 1449:25-1450:18. Sindhu Subramaniam, a junior member of the JPMC deal team, testified that discussion of data happened "at the end" of the July

12 meeting,[6] but still made clear that it was Ms. Javice who answered questions about Frank's user data, Ms. Javice who "defined a user as someone with a first name, last name, e-mail address, and a phone number," and Ms. Javice who said that Frank had 4.25 million users. Trial Tr. 2297:13-20. Moreover, Ms. Subramaniam admitted that the meeting was conducted on Zoom and that she, of course, could not say whether Mr. Amar was actually present and listening when Ms. Javice made the purported misstatements. *See* Trial Tr. 2335:16-2336:19.

The testimony of Ryan MacDonald, who was JPMC's Head of Growth Financial Products for the Consumer Bank, Trial Tr. 2367:1-6, illustrates the dearth of the evidence against Mr. Amar despite the Government's efforts to put false statements in Mr. Amar's mouth or place him in the room when the 4.25 million FAFSA account lie was made. For example, Mr. MacDonald testified that, during diligence meetings, only Ms. Javice made statements about the size of Frank's user base, and Mr. Amar was merely "present for those conversations." Trial Tr. 2372:2-17. Mr. MacDonald also testified that it was primarily Ms. Javice who spoke during these meetings, whereas any statements that Mr. Amar made "[t]ypically . . . was very related to his role as—I think he was the head of growth, so marketing, essentially . . . [s]o their investment strategies in how they deployed some of their funds to marketing and just the general strategy of driving traffic and users to the Frank site." Trial Tr. 2369:18-2372:17. In other words, Mr. Amar said nothing related to the number of Frank's users or accounts.

---

[6] Ryan MacDonald's testimony also contradicted Ms. Subramaniam's recollection. Mr. MacDonald testified that the discussion regarding Frank's users took place at "about the *beginning* of the – the user data section of the due diligence," and, what's more, Mr. MacDonald testified, "I can say for certain that Ms. Javice was there. I can't say with certainty if anyone else [*i.e.*, Mr. Amar] was present." Trial Tr. 2563:22-2564:25 (emphasis added). In fact, according to the Zoom metadata evidence, *see* GX 2035, Mr. Amar was not present at the beginning of the meeting, when Mr. MacDonald recalls the discussion of user data taking place.

On redirect, the Government tried to remedy the deficiency by showing Mr. MacDonald a document purporting to be notes from the July 12, 2021 meeting and pressing Mr. MacDonald to more closely connect Mr. Amar to the purported misstatements that multiple witnesses, including Mr. MacDonald himself, had already testified were made, if they were made at all, by Ms. Javice. *See* Trial Tr. 2551:4-2552:16. However, Mr. MacDonald continued to testify that his "recollection is that [Mr. Amar] was specifically discussing elements of their marketing strategy," and specifically "about the mix of paid and earned . . . media," meaning tracking whether individuals came to Frank's website through paid or unpaid sources. Trial Tr. 2559:9-2561:14. And, in fact, when the Court pressed further, asking "Did he say anything about quantities," Mr. MacDonald responded, "I still don't recall Mr. Amar saying anything specific about quantities or users." Trial Tr. 2561:15-17. The Government tried yet again, showing Mr. MacDonald a different section of the notes. Damning to the Government's case, Mr. MacDonald honestly testified that this section did indeed refresh his recollection that there was discussion during the July 12, 2021 meeting "about user data and specifically the users," but "[w]hat I can't say is who was in this section discussing it . . . I know that Ms. Javice was there. I don't recall if Mr. Amar spoke to this section or not." Trial Tr. 2561:19-2563:14.

At most, the evidence with respect to the July 12 meeting amounts to Mr. Amar possibly attending a portion of a virtual meeting during which Ms. Javice made purported misstatements, and that Mr. Amar may or may not have been present when Ms. Javice made the alleged misrepresentations—which is a far cry from evidence that Mr. Amar heard them and understood that they were in fact knowing misrepresentations at the time they were made. This is not sufficient for a rational jury to conclude that Mr. Amar made, or endorsed, any misrepresentations to JPMC.

*See Pauling*, 924 F.3d at 656 (no conviction if a defendant is only "probably guilty" beyond a reasonable doubt).

With respect to the remainder of JPMC's due diligence period, the evidence at trial was insufficient for a rational jury to conclude that Mr. Amar made any misstatements to JPMC—or any statements to JPMC at all—subsequent to the July 12 meeting. The evidence presented at trial consistently demonstrated that Mr. Amar did not have a single substantive interaction with JPMC related to the deal after July 12, 2021 (which was the same date that JPMC received the correction pertaining to Ms. Javice's false statements regarding Frank's visitor data), until at least after the Merger Agreement had already been signed. For example, Ms. Wims Morris confirmed that she did not participate in a single phone call with Mr. Amar, nor did she exchange a single email or text message with him, during the entire diligence period. *See* Trial Tr. 738:4-21; *see also* Trial Tr. 1455:24-1456:3 (Mr. Sweeney testifying that Mr. Amar was not involved in any discussions regarding data validation); Trial Tr. 3254:4-3255:19 (Mr. Amar's summary witness testifying that, among the emails involving JPMC that he reviewed, he only saw one email between Mr. Amar and JPMC personnel).

*3.1.4 Spreadsheet*. Throughout trial, the Government referred to virtual data room ("VDR") document 3.1.4 as containing misrepresentations regarding Frank's FAFSA user data. *See, e.g.*, Trial Tr. 3522:25-3523:13; GX 3.1.4. But the evidence at trial was insufficient to show involvement by Mr. Amar in the purported misstatements within 3.1.4.

Many individuals, including individuals at JPMC and Capital One, had access to the VDR, which was maintained by LionTree and included diligence documents. *See* Trial Tr. 337:14-338:9; 338:25-339:9. But there is no evidence in the record to conclude that Mr. Amar had such access,

and Mr. Cowan, who was the individual at LionTree who granted people access, did not recall
granting access to Mr. Amar. *See* Trial Tr. 353:11-354:5.[7]

Likewise, LionTree controlled uploading information to the VDR in general. *See* Trial
Tr. 322:18-323:1. And the evidence indicates that Mr. Amar did not transmit any versions of 3.1.4
to LionTree—those were transmitted by Ms. Javice. *See, e.g.*, GX 1509: GX 1509-A; GX 3010;
GX 3010-A; GX 3011; GX 3011-A. Accordingly, there was no evidence adduced at trial that
established that Mr. Amar even was aware of the nature, scope, or tenor of the alleged
misrepresentations that the evidence attributed solely to Ms. Javice.

As to Mr. Amar's involvement (or lack thereof) with regard to the substance of the
spreadsheet, there was extensive testimony during trial regarding the hundreds of pages of
metadata surrounding 3.1.4. The evidence at trial showed only that Mr. Amar prepared an initial
draft of the spreadsheet that did not contain the purported misrepresentations, which was then
shared with Ms. Wong, who then added data from Google Analytics. *See* GX G-516; GX G-517;
GX 1636; *see also* Trial Tr. 1078:13-1801:3 (Ms. Wong testifying that she "fill[ed] out the
spreadsheet," which contained sessions data originating from Google Analytics). It did not show,
or even suggest, that Mr. Amar was responsible for or knowledgeable about the misrepresentations
contained in the spreadsheet ultimately circulated to JPMC.

The record evidence therefore failed to show any involvement by Mr. Amar in any
purported misrepresentations in 3.1.4.

***"Records Needed" Spreadsheet***. In its opening statement, the Government misleadingly
stated that after Ms. Wims Morris made a request to Ms. Javice for Frank's user data for validation

---

[7] Moreover, as explained in greater detail in Mr. Amar's Rule 33 motion, Mr. Amar was prevented
from introducing affirmative evidence to show that he did not have access to the VDR. Trial Tr.
339:16-341:17; 347:3-355:2; *see* Rule 33, Section IV.A.1, n.22.

purposes, Mr. Amar "got straight to work" by "creat[ing] a document called 'records needed.'" Trial Tr. 41:8-15. But that was not true. Trial testimony regarding the metadata for this document showed that Mr. Amar had limited involvement with this document, creating a document entitled "Untitled Spreadsheet," which he renamed to "Funnel Since Aug 1 2020." Trial Tr. 864:11-865:14; 894:13-20. Thereafter, Ms. Javice renamed this document to "Records Needed," and Mr. Amar did not make any changes in the document after that point. *See* GX G-73; Trial Tr. 865:16-866:11; 896:2-7; 901:12-15.

Notably, the record indicates that Ms. Javice kept Mr. Amar in the dark regarding the context for this request. In other words, while the Government's theory was that the "Records Needed" spreadsheet was used by Ms. Javice to instruct Dr. Kapelner regarding the synthetic data project she used to satisfy the data validation exercise, there was no evidence at trial that Mr. Amar was involved in either the synthetic data project or the data validation exercise. *See infra*, Section III at 32-35. Consistent with this, Ms. Javice provided one version of the data validation request she received from Ms. Wims Morris to Mr. Amar, and a different version to Frank's Board of Directors—the version Ms. Javice provided to Mr. Amar contained no context to indicate that the request was part of the validation exercise that was crucial for the completion of due diligence. *See infra*, Section III at 32-33. There is accordingly no evidence from which a rational jury could have inferred that Mr. Amar made any misstatements in connection with "Records Needed."[8]

---

[8] As to evidence regarding any statements or provision of data in 2022, such evidence would be insufficient to show that Mr. Amar was involved in any fraudulent conduct prior to the acquisition. *See, e.g.*, *United States v. Guadagna*, 183 F. 3d 122, 132 (2d Cir. 1999) (affirming district court's grant of judgment of acquittal where jury could not have concluded beyond a reasonable doubt that fraudulent phone call in question occurred at time when defendant "had knowledge of the falsity of his statements and the requisite intent to defraud").

### 2. *Ms. Javice's Statements Cannot be Attributed to Mr. Amar*

Because the Government could not establish that Mr. Amar actually made any material misstatements, the Government's case against Mr. Amar focused on statements that Ms. Javice made, and the supposed conspiracy between them. But because the Government failed to establish that Mr. Amar agreed to commit fraud with Ms. Javice, Mr. Amar cannot be liable for Ms. Javice's statements, for at least three reasons, discussed further *supra*, Section I.D (discussing why Mr. Amar cannot be liable as a co-conspirator for Ms. Javice's statements).[9]

*First*, admission of these statements as against Mr. Amar during trial was by definition contingent on the Government establishing that conspiracy—*i.e.*, under *Geaney* and its progeny, they were subject to connection with the Government's anticipated proof of conspiracy with Ms. Javice. That requisite connection was not made by the Government at trial. Accordingly, Ms. Javice's misstatements were party admissions admissible against her alone and could not properly be considered by a jury in support of any of the charges against Mr. Amar.

*Second,* even were the evidence sufficient to show that Mr. Amar participated in a cover-up with Ms. Javice in 2022 (it was not), statements by Ms. Javice prior to 2022 still could not be attributed to Mr. Amar. Because the conspiracy as alleged was only between Ms. Javice and Mr. Amar, by definition, there could have been no conspiracy unless and until Mr. Amar joined. And because no conspiracy existed unless and until Mr. Amar joined, Mr. Amar cannot be liable under a theory of conspiracy for any statements or conduct by Ms. Javice prior to his joining. *See* Rule 33, Section I.A.

---

[9] *Pinkerton* liability does not apply here, so Mr. Amar could not have been found liable for Counts 2, 3, or 4 on the basis of Ms. Javice's statements or conduct. *See* Rule 33, Sections I.A.1, I.A.4.

*Third*, Ms. Javice's statements in 2021 could not be attributed to Mr. Amar and are inadmissible as against him. Because the fraud was completed with JPMC's acquisition of Frank in late 2021, any post-acquisition conduct, including any alleged actions to conceal or cover-up the fraud, is not part of the alleged scheme to defraud but is rather at best part of a separate conspiracy. *See, e.g.*, *Krulewitch v. United States*, 336 U.S. 440, 442-44 (1949) (out-of-court statements by alleged co-conspirator were not admissible when made subsequent to the completion of the conspiracy "in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment"); *Grunewald v. United States*, 353 U.S. 391, 401-02 (1957) ("[A]fter the central purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."). Accordingly, even if Mr. Amar joined a separate cover-up conspiracy in 2022, Ms. Javice's statements in 2021 would not fall under the co-conspirator exception under Federal Rule of Evidence 801(d)(2)(E) as against Mr. Amar, and he would not be liable for them.

## B. The Evidence Was Insufficient to Support a Finding of Materiality with Respect to Any Representations by Mr. Amar

Even if there were sufficient evidence of a misstatement made by Mr. Amar (there is not), the Government also failed to establish that any such misstatements were material. [10] The Government was required to prove, beyond a reasonable doubt, that any false statement made by Mr. Amar "would have been significant to a reasonable investor's investment decision" such that "there is a substantial likelihood that the misstated fact would have been viewed by the reasonable

---

[10] Mr. Amar reiterates and incorporates herein by reference the arguments, including regarding the lack of materiality of the purported misstatements, made in Mr. Amar's Motion to Dismiss (Dkt. 117), as well as those in Ms. Javice's Motion to Dismiss (Dkt. 115) to the extent they apply with equal force to Mr. Amar.

investor as having significantly altered the total mix of information made available to that investor." Trial Tr. 3789:4-11 (Jury Charge on materiality). *See also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (finding the evidence must establish beyond a reasonable doubt that there is "a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.") (internal citation omitted). Further, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Ganino v. Citizens Utils., Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

As set forth above, Mr. Amar did not make and indeed had no involvement with any of the alleged misstatements before the deal closed in 2021. *See supra*, Section II.A.1. And to the extent the jury found that Mr. Amar made a false statement related to the provision of data to JPMC in 2022, that statement cannot be considered material because a statement made post-acquisition by definition was not "important in making an investment decision." *Litvak*, 889 F.3d at 64. Indeed, by 2022, there was no investment decision to be made such that the alleged misstatement could have "altered the total mix of information" relevant to that investment. *Id.* Thus, a rational jury could not have found that Mr. Amar made any false statements that were material.[11]

## III.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING THAT MR. AMAR ACTED WITH THE REQUISITE INTENT

The Government also failed to establish sufficient evidence that Mr. Amar acted with the requisite intent for any of the charged offenses, *i.e.*, the specific intent to defraud. This requires a

---

[11] Independently, to the extent that Mr. Amar's presence during a handful of misrepresentations made by Ms. Javice was somehow sufficient to attribute those misrepresentations to him (it is not), those attributed misrepresentations still would not be material because they were repetitive of statements that Ms. Javice already made and, as such, would not "alter[] the total mix of information" available to the potential buyers. *See, e.g.*, Trial Tr. 533:9-14; 569:1-6; 1449:25-1450:18; 2297:13-20.

finding that Mr. Amar made material false statements not only with the knowledge of their falsity, but that he did so with the intent to defraud and harm. *See* Trial Tr. 3793:5-7 (Jury Charge). *See also In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 289 F. Supp. 2d 416, 426-27 (S.D.N.Y. 2003) ("[N]ot every knowing misrepresentation creates a legal cause of action under the securities laws" because "merely the intent to utter an untruth" is insufficient and does not constitute scienter). It is not sufficient that a defendant participates in a fraudulent scheme merely "with some realization of its fraudulent or deceptive character and with recognition of its capacity to cause harm to the victims of such deception." *United States v. Gabriel*, 125 F. 3d 89, 96-97 (2d Cir. 1997). Instead, the proof must demonstrate that the defendant had a "conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). A motive to profit from an investment, on its own, is insufficient to prove fraudulent intent. *See, e.g.*, *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 42 (S.D.N.Y. 2023) ("[I]t is well-settled that pointing to a company's general profit motive is insufficient to plead scienter.") (internal quotation marks omitted). Further, an "honest belief in the truth of the representation," *i.e.*, good faith, "is a complete defense even though the statement may be inaccurate." Trial Tr. 3794:18-21. *See also O'Malley v. N.Y.C. Transit Authority*, 896 F.2d 704, 706 (2d Cir. 1990) (acts done "in good faith . . . do not satisfy the requirements of [the wire fraud] statute.").

As discussed *supra*, Section II.A.1, the evidence adduced at trial supports that Mr. Amar: (1) did not make any misstatements, (2) was not involved in JPMC due diligence subsequent to the July 12 meeting, and (3) had insufficient involvement with or knowledge of any purported misrepresentations in materials provided to JPMC during the diligence process, including

GX 3.1.4. The absence of evidence on these factual issues reflects the absence of any evidence of intent to defraud on the part of Mr. Amar—he simply was not involved enough to form the requisite intent. For the same reasons, among others, the Government presented insufficient evidence to establish that Mr. Amar knowingly entered into the conspiracy under a conscious avoidance theory. To the contrary, the Government's arguments (unsupported by the evidence) were that Mr. Amar affirmatively knew (not that he consciously avoided knowledge) of the existence of the alleged conspiracy, and a conscious avoidance instruction therefore was improper and cannot support the jury's verdict here.

As a result of the deficient evidence regarding Mr. Amar's lack of involvement in or knowledge of any misstatements, at trial the Government sought to adduce other evidence of Mr. Amar's intent.

For example, the Government argued in its opening that the jury "will see what [Ms. Javice and Mr. Amar] wrote to each other privately to one another when they didn't know their words would be read out loud." Trial Tr. 41:6-8. But the actual private communications between Ms. Javice and Mr. Amar that are in evidence do not bear this out. There is no indication in these messages that they discussed the 4.25 million figure or how Ms. Javice would characterize it to potential buyers, and the messages are devoid of any references one would expect two co-conspirators to make to their plans. The messages show quite the opposite—they reflect benign, everyday conversations between two colleagues and friends that do not touch on the purported material misrepresentations at issue in this case.

More specifically, the Government focused on (1) its counter-factual and baseless claim that Mr. Amar was knowledgeable about, or otherwise involved with, the Acxiom validation exercise and provision of synthetic data to JPMC in connection with that exercise, and (2)

Mr. Amar's entirely lawful and legitimate purchase of data from ASL for what he believed was data enrichment or data augmentation. The actual record evidence does not support an inference of fraudulent intent on the part of Mr. Amar, but rather undermines it.

*Acxiom Validation and Synthetic Data*. In spite of the evidence to the contrary, the Government repeatedly argued to the jury in summation that Mr. Amar was involved with the data validation exercise conducted by Acxiom on behalf of JPMC and Frank. *See*, *e.g.*, Trial Tr. 3554:20-3555:7; 3556:3-9; 3558:22-3559:1; 3560:18-19; 3566:3-6; 3568:2-6. However, every witness who was actually involved with the validation exercise testified that Mr. Amar was not, and the evidence at trial made clear that Mr. Amar is not on any of the emails or calls with JPMC or Acxiom regarding the validation exercise. Mr. Sweeney, who oversaw the validation exercise on behalf of JPMC, testified that Mr. Amar was not involved in any discussions regarding data validation. *See* Trial Tr. 1448:1-6; 1455:24-1456:3. Ms. Wims Morris testified that her only interaction with Mr. Amar during the diligence process was in one meeting held weeks before the validation exercise. *See* Trial Tr. 569:11-14. Mr. MacDonald similarly testified he did not recall Mr. Amar being involved with the Acxiom validation exercise. *See* Trial Tr. 2570:22-25. Matthew Toland, an Acxiom employee, testified that he only received instructions from Mr. Sweeney and Ms. Javice. *See* Trial Tr. 3174:16-18. Mr. Amar's lack of involvement in Acxiom's data validation exercise is made clear by his private WhatsApp message to Ms. Javice on October 5, 2021—two months after the conclusion of the exercise and in the context of asking Ms. Javice whether Frank needed a W9—when he asks her, "What's Axiom [sic]?" *See* GX 801-31.

As discussed *supra*, Section II.A.1, the Government tried to partially fill this gap at trial by mischaracterizing the evidence regarding Mr. Amar's involvement in the "Records Needed" spreadsheet, but this evidence was insufficient to show any involvement by Mr. Amar in purported

misstatements contained therein. Moreover, the contemporaneous emails between Ms. Javice and

Mr. Amar indicate that Ms. Javice kept Mr. Amar in the dark as to the context of the request that

gave rise to the creation of the "Records Needed" spreadsheet. Specifically, on August 1, 2021,

Ms. Javice received two identical email requests from Ms. Wims Morris relating to validation,

except that one version contained information regarding the purpose of the exercise in the context

of diligence, and the other did not. *See* GX 1070; GX 1071. While Ms. Javice forwarded the

version with context about the data validation exercise and its connection to JPMC's diligence of

Frank to Frank's Board members, Ms. Javice forwarded Mr. Amar only the version without this

critical context. *See* GX 1147; DX CJ 249. This is illustrated below:



The evidence showed that the version of the request that Ms. Javice provided to Mr. Amar kept

him in the dark as to the purpose and context for the validation exercise. The lack of context

allowed Ms. Javice to lead Mr. Amar to believe that he was providing percentages from a funnel

as opposed to any representations regarding the total number of Frank users.

The Government similarly mischaracterized the evidence regarding Mr. Amar's lack of involvement with the provision of synthetic data to JPMC, including arguing in its opening and summation that Mr. Amar was involved with Ms. Javice and Dr. Kapelner in the creation of synthetic data. *See, e.g.*, Trial Tr. 37:21-24; 38:9-11; 3541:24-3542:6; 3542:16-3543:1; 3543:2-21; 3544:2-13; 3544:14-24. But the evidence does not support this contention and, in fact, refutes it. Dr. Kapelner's testimony, as well as the contemporaneous documentary evidence, show that Ms. Javice did not introduce Mr. Amar to Dr. Kapelner until October 23, 2021, in the context of an entirely different data project (which the Government did not and could not argue was connected to any fraudulent activity) and over two months after the purported provision of synthetic data to Axciom and JPMC. *See* Trial Tr. 2031:2-9; GX 1753. There is no evidence that Mr. Amar was on any calls or emails with Dr. Kapelner before they were introduced in October 2021, and no evidence that Ms. Javice passed along Dr. Kapelner's synthetic data to Mr. Amar. In yet another attempt to sandbag Mr. Amar and mislead the jury as to what the evidence showed, the Government sought on redirect of Dr. Kapelner to introduce GX 2807, an invoice from Dr. Kapelner addressed to Mr. Amar, as evidence of Mr. Amar's involvement with Dr. Kapelner— but this invoice was from more than *a year* after the validation exercise. *See* GX 2807; Trial Tr. 2102:5-2105:9. In response, the Court correctly acknowledged, outside the presence of the jury, that "Mr. Amar . . . so far had nothing to do with Dr. Kapelner." Trial Tr. 2105:4-6. Dr. Kapelner, apparently realizing that the Government was attempting to mislead the jury, proceeded to correct his prior testimony about the invoice, explaining that it was not related to his work regarding the validation exercise. *See* Trial Tr. 2106:4-7.

Reflecting Mr. Amar's lack of visibility into validation and synthetic data, on the call with Mr. Vovor in January 2022 that Mr. Vovor surreptitiously recorded, Mr. Amar audibly expressed

surprise that Mr. Vovor was not involved in past efforts to enrich Frank's data, and it is *Mr. Vovor who had to explain to Mr. Amar* that "No, no, no, I have never enriched anything. No, I gave our users, then Charlie, she took it, and she did what she wanted with it, with the data scientist." *See* GX 300-T at 3-4. Consistent with Mr. Amar's lack of knowledge and genuine surprise during the call with Mr. Vovor, Mr. Amar sent a private WhatsApp message to Ms. Javice at the same time, reporting to her that "Patrick says he never touched the ASL list," to which Ms. Javice responds, "i know . . . i didnt ask him to." GX 801-46.

The Government compounded its mischaracterization of the evidence to the jury when, in summation, the Government asserted that evidence that Ms. Javice removed certain details from one of Dr. Kapelner's invoices somehow supported the existence of a conspiracy between Ms. Javice and Mr. Amar. *See* Trial Tr. 3566:23-3567:6. Indeed, this evidence supports the opposite inference—that Ms. Javice specifically concealed the nature of Dr. Kapelner's work from Mr. Amar. Were Ms. Javice and Mr. Amar in a conspiracy, there would have been no need to hide those details from Mr. Amar, or else she would have instructed Mr. Amar—who the Government contends was her confidant and partner in crime—to alter the invoice before submission rather than an innocent third party like Dr. Kapelner.

***August Calls with Patrick Vovor***. Against this evidentiary backdrop, the Government repeatedly tried to convince the jury that Mr. Amar asked Mr. Vovor to create synthetic data for the JPMC validation exercise. In its summation, for example, in the context of discussing "Javice and Amar's fake data file," the Government described various calls on August 1, 2021 and August 2, 2021 involving Mr. Vovor. The Government referred to Mr. Vovor's testimony that, on the August 2 call, Mr. Amar asked Mr. Vovor to create synthetic data. *See* Trial Tr. 1530:4-19; 3533:5-3535:23. Mr. Vovor's testimony on this point, however, is flatly controverted by the weight of the

remaining evidence that Mr. Amar did not have any knowledge of, let alone involvement with, the validation exercise or the creation and provision of synthetic data to JPMC.

Moreover, as counsel for Mr. Amar elicited on cross examination of Mr. Vovor and others, Mr. Vovor's testimony itself does not make sense in light of the remaining evidence regarding those calls on August 1 and August 2. By the time of the call on August 2 that involved Ms. Javice, Mr. Amar, and Mr. Vovor, over the course of those two days Ms. Javice and Mr. Vovor had already spoken by phone three times *without* Mr. Amar—twice on August 1 and once on the morning of August 2. *See* GX 902; Trial Tr. 1694:20-1695:8; 1695:21-1696:16. In support of its misleading argument regarding the early August calls with Mr. Vovor, the Government in summation emphasized an article regarding synthetic data that Ms. Javice sent to Mr. Vovor during this period in early August. *See* Trial Tr. 3533:24-3534:3. The Government also highlighted Mr. Vovor's testimony that, during the call with Ms. Javice and Mr. Amar, Mr. Vovor viewed a document, Government Exhibit G 506, that displayed the data fields that the synthetic data should have. *See* GX G-506; Trial Tr. 1558:7-1559:8; 3535:25-3536:6. But the evidence at trial showed that all of this *preceded* the call with Mr. Amar and was rather in the context of the calls involving *only* Mr. Vovor and Ms. Javice. *See* GX 1054 (synthetic data article sent by Ms. Javice prior to call with Mr. Amar, *with Mr. Amar not included on the email*); GX G-507 (Google Drive metadata demonstrating that Mr. Vovor viewed "data_request"—*i.e.*, GX G-506—on August 1, not August 2).

That Mr. Amar would not have introduced a request to Mr. Vovor for synthetic data on August 2 is further evidenced by Mr. Vovor's testimony that, on the morning of August 2, he wrote to Ms. Wong expressing his nervousness regarding the request for synthetic data, stating that he was "really [not] feel[ing] good since *yesterday*," *i.e.*, August 1. *See* Trial Tr. 1737:20-1738:1;

1762:3-6 (emphasis added). And Mr. Vovor testified repeatedly that Mr. Amar was not present on the calls on August 1. *See, e.g.*, Trial Tr. 1702:17-22; 1762:16-19.

Accordingly, no reasonable jury could have credited the internally inconsistent and improbable testimony of Mr. Vovor against the weight of all of the other evidence regarding Mr. Amar's lack of knowledge of or participation in the validation exercise or synthetic data. If anything, the evidence described above is consistent with the remaining evidence indicating that Ms. Javice took pains to keep Mr. Amar in the dark regarding the validation exercise and synthetic data. Given all of this, it is highly likely that, to the extent Mr. Vovor was correct in recalling that he received a request to create synthetic data, that request came from Ms. Javice alone. *See United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990) (conviction supported by testimony that is "incredible on its face" is grounds for acquittal under Rule 29); *see also Pauling*, 924 F.3d at 657 ("[W]e may not credit inferences within the realm of possibility [on a Rule 29 motion] when those inferences are unreasonable.").

***Purchase of ASL Records***. At trial, the Government argued that Mr. Amar purchased student records from a company called ASL Marketing in early August 2021 in order to cover up Ms. Javice's purported misrepresentations. *See, e.g.*, Trial Tr. 3513:17-19. The actual evidence at trial, however, supports that Mr. Amar purchased records from ASL as part of an effort to augment Frank's existing user data for its millions of website visitors (which, as discussed *supra*, Google Analytics defines as "users"), and specifically to support new marketing efforts. Multiple witnesses testified at trial regarding the common industry practice of purchasing third-party data for purposes of augmenting existing data. *See, e.g.*, Trial Tr. 1034:8-18; 1328:10-20. Mr. Stolls, a former employee of ASL, testified that JPMC had itself purchased data from ASL. *See* Trial Tr. 1327:2-10.

The contemporaneous evidence from early August 2021 supports that this is why Mr. Amar sought to purchase data from third-party vendors. On August 2, 2021, Mr. Amar and Ms. Javice emailed about pursuing "identity resolution solutions." *See* GX 1601. Later that day, Mr. Amar asked Mr. Vovor whether Frank's engineers had "big query" experience, expressing that he would like to see what data underlies Google Analytics (*i.e.*, Mr. Amar was trying to determine whether there was a way to glean personal identifying information from Google Analytics). *See* GX 802-31. Mr. Vovor testified that he understood Mr. Amar to be asking "if by using this BigQuery I could get more data than what he has through the Google Analytics [user interface]." Trial Tr. 1606:18-21. A few days after Mr. Amar had acquired the ASL list, he followed up with Ms. Javice in a private WhatsApp message about the status of "the augmented lists" for "remarketing and lookalike campaigns." *See* GX 801-21.

The evidence also indicates that Ms. Javice led Mr. Amar to believe that Frank's Board of Directors was aware of and had approved his purchase of the ASL records, and that there was an urgency to obtaining them. On August 3, 2021, Ms. Javice sent Mr. Amar private WhatsApp messages asking, "Where are we with ASL? Michael signed off." *See* GX 801-6. Later that day, in another private WhatsApp message to Mr. Amar, Ms. Javice relayed an instruction from "Michael" and another individual to "buy it and move quick." *See* GX 801-9. The only plausible inference here is that "Michael" refers to Michael Eisenberg,[12] then a member of Frank's Board of Directors. Moreover, Marc Rowan, another Frank Board member at the time, testified that Michael Eisenberg was the Frank Board member most knowledgeable about data issues. *See* Trial Tr. 3043:3-12. The evidence therefore supports that, from Mr. Amar's perspective, Ms. Javice was relaying an instruction to quickly buy the ASL records, indicating that the purchase had been vetted

---

[12] The Government acknowledged this during its summation. *See* Trial Tr. 3567:14-16.

by the Frank Board member most qualified to weigh in on the issue. This explains Mr. Amar's belief as to the need to move with urgency—he believed he had been directed by Frank's Board to "buy it and move quick." More significantly, that Ms. Javice relayed to Mr. Amar an instruction from the Board to buy the ASL records quickly undermines any notion that the purchase of records from ASL was part of a conspiracy between Ms. Javice and Mr. Amar—if this were part of a conspiracy, Ms. Javice would not need to galvanize Mr. Amar by giving him assurances and directions from individuals, including a Frank Board member, who are not alleged to have been part of the conspiracy. Conversely, had Mr. Amar understood that purchasing the ASL records was part of a fraud he had agreed with Ms. Javice to perpetrate, one would imagine that he would not have needed assurances or urging from others, nor would he have needed anyone to explain the urgency.

Further, the evidence reflects that during the course of Mr. Amar's conversations with ASL, Mr. Amar was concerned about match rates between the data he was considering purchasing from ASL and Frank's own data. Mr. Stolls testified that this process involves comparing internal data to third-party data, and that it is common for companies to undertake this process internally or with the assistance of a data scientist. *See* Trial Tr. 1329:21-1330:1; 1330:8-14. Indeed, Mr. Amar told Ms. Javice that he first planned to obtain from ASL a "sample" and a "test" of 100,000 records. *See* GX 801-6; GX 801-9. Shortly after Ms. Javice asked Mr. Amar whether they "got [their] sample yet," Ms. Javice told Mr. Amar that she "found [her] genius." *See* GX 801-10. As discussed *supra*, Mr. Amar was not aware of Dr. Kapelner's work regarding synthetic data, so the only plausible inference here is that Mr. Amar believed that the "genius" was going to assist with the matching and augmentation process.

39

Inconsistent with the notion that Mr. Amar was seeking to pass the ASL records off to JPMC as Frank's own data, the evidence at trial indicates that, in early August 2021, Mr. Amar expressed interest in purchasing widely varying quantities of data from third-party vendors. Contemporaneous internal ASL emails, which the Government sought (but failed) to keep out of the record, reflect Mr. Amar's initial interest in purchasing *10 million*, not 4.5 million, records. *See* GX 2302. In private WhatsApp messages with Ms. Javice, Mr. Amar at various points in early August also proposed purchasing 7.5 million, 5 million, and 3 million records. *See* GX 801-9. In other words, Mr. Amar proposed one total (3 million) that would have been far too low to support the Government's theory, and several totals (5 million, 7.5 million, and 10 million) that were far in excess of what would have been necessary to do so. Were Mr. Amar in a conspiracy with Ms. Javice, he would presumably have known the number of records that were needed in order to keep that conspiracy afloat.

The Government notably omitted facts regarding these divergent quantities from its examination of Mr. Stolls. In an attempt to compound the jury's confusion, after counsel for Ms. Javice and Mr. Amar sought to elicit this testimony from Mr. Stolls on cross examination, Trial Tr. 1322:4-1324:10; 1342:23-1343:23, and with full awareness that the evidence showed that Mr. Amar had proposed purchasing several other quantities of data, the Government on redirect ended its examination of Mr. Stolls by leaving the jury with the false impression that the 4.5 million figure was the only quantity of records that Mr. Amar had sought: "Q. Other than 4.5 million, do you recall Mr. Amar requesting any other volume of student data? A. I don't. I don't recall." Trial Tr. 1363:8-14. Fortunately for the purpose of this motion, however, the entirety of the record makes clear that Mr. Amar considered purchasing multiple other quantities of data, which is

inconsistent with the Government's theory of Mr. Amar's use of the ASL records to support any conspiracy or cover-up.

The disconnect between the purchase of the ASL records and the purported conspiracy is further made plain by the evidence showing that the ASL list did not even contain phone numbers, which was one of the four data fields that Ms. Javice purportedly represented that Frank possessed for 4.25 million individuals. *See, e.g.*, Trial Tr. 1350:8-16 (Mr. Stolls of ASL testifying that ASL stopped selling phone numbers prior to 2021 and that he "probably" told Mr. Amar that ASL did not sell phone numbers); GX 2304 (Denise Lyn, another ASL employee, writing by email to Mr. Amar that "[a]s mentioned we do not have phone numbers"). Consistent with this, the final data files received from ASL do not contain phone numbers. *See* GX ASL 1; GX ASL 2. Similarly, the evidence showed that the ASL records contained fewer than 2.5 million email addresses, which was another one of the four data fields that Ms. Javice purportedly represented that Frank possessed for 4.25 million individuals. *See* GX 2330. To put it simply, were Mr. Amar seeking to purchase this data as part of a conspiracy to mislead JPMC into believing that Frank had first names, last names, email addresses, and phone numbers for 4.25 million individuals, it would have been clear to Mr. Amar that the ASL records would not have come close to accomplishing this goal.

Further undermining any nefarious purpose for the purchase of ASL records, the contemporaneous evidence showed that Mr. Amar openly discussed his purchase of ASL records and running a marketing campaign with other Frank employees, none of whom were alleged to be part of the conspiracy. Ms. Wong testified that (1) Mr. Amar told her in the summer of 2021 that he had purchased customer data from a third-party source, (2) they discussed this with Ms. Zeitler as well, (3) Mr. Amar provided Ms. Wong with a copy of the list he had obtained in the summer of 2021, and (4) Mr. Amar never told her to conceal his purchase of the data from anyone. *See*

41

Trial Tr. 1249:7-23. It strains credulity to imagine that Mr. Amar purchased this data as part of a conspiracy, but then immediately shared that fact with multiple people at his company who were not part of that conspiracy.

Moreover, Ms. Zeitler testified that, shortly before August 3, Mr. Amar spoke with her about the prospect of enhancing Frank's existing customer information using third-party data. *See* Trial Tr. 3101:12-3102:5. On August 2, Mr. Amar copied Ms. Wong on an external email expressing interest in "leverag[ing] the data we have in mparticle for identification." *See* GX 1206. On August 3, Mr. Amar spoke to Ms. Zeitler about acquiring more information on subscribers to Frank's email newsletter so that Frank could better target them. *See* Trial Tr. 3100:24-3101:8.

Moreover, the evidence showed that Mr. Amar negotiated with ASL regarding relatively minor adjustments to the price of the data. *Compare* Trial Tr. 1350:25-1352:2 (Mr. Stolls testifying that final price of data was $0.023 per record), *with* GX 2305 (sample data set reflecting price of $0.045 per record). And during the time that those negotiations were in progress, Ms. Javice continuously pressed Mr. Amar to execute the purchase. *See, e.g.,* GX 801-6 ("Where are we with ASL?"), GX 801-9 ("Do it"), GX 801-13 ("Lmk when u get the list ASAP" "Need that thing"). If Mr. Amar believed that purchasing the list was a critical part of a conspiracy and time was of the essence in order to complete the fraud, it would make no sense for him to negotiate for fractions of pennies on the dollar and delay provision of critical data in support of that conspiracy.

In an effort to counter this evidence, the Government repeatedly pointed to Mr. Amar's WhatsApp message to Ms. Javice on August 5, 2021 that "[y]ou'll have 4.5m users today. Just closed it." *See* GX 801-18; Trial Tr. 3559:2-3560:6; 3751:16-3752:4. But the Government glossed over the evidence and testimony, described *supra*, Section I.C.1, that makes clear that the term "user" has many different meanings, and the context here was that Mr. Amar was simply referring

to what he understood were the records he legitimately and legally was purchasing from a third-party data vendor. *See* GX 801-9.

Even if the ASL records were ultimately passed along to JPMC in 2022, the evidence from the time of Mr. Amar's purchase of the ASL records overwhelmingly supports the idea that Mr. Amar was purchasing third-party data in order to augment Frank's existing data, and Mr. Amar had no reason to know in advance that the information could be used for an illegitimate and fraudulent purpose. *See Gallishaw*, 428 F.2d at 762 (reversing conspiracy conviction where there was no evidence defendant "knew that a bank was to be robbed"). At bottom, the evidence adduced at trial regarding the ASL records purchase simply reflects a marketing professional preparing to hit the ground running at JPMC and in advance of the upcoming FAFSA busy season, and no rational jury could have concluded beyond a reasonable doubt that it was part of either a conspiracy or a cover-up.

***Additional Evidence Undermines Intent***. Several additional categories of evidence introduced at trial either undermine or are inconsistent with any intent to defraud on the part of Mr. Amar. Among others, the following are illustrative:

*First*, as discussed *supra*, Section I.C.1, during the diligence period for both Capital One and JPMC, Mr. Amar corrected a "huge mislabel" regarding Frank's website visitor figures that had already been provided to both Capital One and JPMC, and which was, until Mr. Amar made the correction, going to be part of a key presentation to the Capital One diligence team. Just as this evidence is inconsistent with the inference that Mr. Amar was part of a conspiracy, Mr. Amar's correction of website visitor figures, which would directly impact FAFSA account figures, is inconsistent with the notion that Mr. Amar intended to defraud Capital One or JPMC with respect to Frank's FAFSA account figures.

*Second*, given that the Government's evidence against Mr. Amar predominantly amounted to mere access to or presence for purported misstatements, evidence that other Frank employees had access to some of the same information further undermines the inference that Mr. Amar had knowledge of the purported misstatements. In particular, Mr. Glazer, who was not alleged to be a member of the conspiracy, was copied on multiple emails where Ms. Javice and LionTree exchanged versions of 3.1.4 that purportedly contained misrepresentations—and, notably, Mr. Amar is *not*. *See, e.g.*, GX 3026; GX 3026-A; GX 3027; GX 3027-A. If Mr. Glazer did not notice these purported misstatements, then it stands to reason that Mr. Amar also did not, and, therefore, that he lacked sufficient knowledge.

*Third*, the Government elicited testimony from Mr. Vovor regarding a call he had with Ms. Javice and Mr. Amar on August 2, 2021, during which Mr. Vovor testified that he told Ms. Javice and Mr. Amar "that I will not do anything illegal." Trial Tr. 1575:7-1576:18. The Government also elicited testimony from Mr. Vovor indicating that Mr. Vovor was suspicious that Mr. Glazer was not on the call. *See* Trial Tr. 1576:10-18. On cross examination, in response to questioning from the Court, Mr. Vovor testified that after he voiced concerns about Mr. Glazer not being on that call, Mr. Amar said that "this is not [Mr. Glazer's] expertise, but you can talk to him." Trial Tr. 1789:10-1790:8. The fact that Mr. Amar gave Mr. Vovor his blessing to air any concerns to Mr. Glazer is inconsistent with the notion that Mr. Amar believed he was asking Mr. Vovor to do something illegal or to join a conspiracy of which Mr. Glazer was not a member. Realizing this, the Government on redirect elicited confusing testimony from Mr. Vovor that implied (incorrectly) that Mr. Glazer may have already left Frank at the time, which makes no sense given the testimony that Mr. Vovor had asked why Mr. Glazer was not at the meeting. *See*

Trial Tr. 1854:4-6 ("Q. What happened to Mr. Glazer in August of 2021, with respect to his role at Frank? A. He left Frank.").

For these reasons, among others, the Government failed to provide sufficient evidence from which a rational jury could infer that Mr. Amar had the requisite intent for any of the charged crimes.

## IV. THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT MR. AMAR AIDED AND ABETTED OR WILLFULLY CAUSED MS. JAVICE TO COMMIT SECURITIES, WIRE, OR BANK FRAUD

To convict Mr. Amar of aiding and abetting Ms. Javice's fraud, the Government must prove: (i) the commission of the underlying crime(s) by a person other than Mr. Amar; (ii) a voluntary act or omission by Mr. Amar, with (iii) the specific intent that his act or omission bring about the underlying crime(s). *See United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir. 1985); *see also United States v. Perry*, 643 F.2d 38, 46 (2d Cir. 1981).

Similarly, to convict Mr. Amar of willfully causing another to commit one of the substantive counts, the Government must prove: (i) the commission of the underlying crime(s) by someone other than Mr. Amar; (ii) that Mr. Amar intentionally caused another to commit that crime; and (iii) that Mr. Amar had the same fraudulent intent as that required to commit the underlying offense. *See* Trial Tr. 3806:13-3807:1 (Jury Charge); *see also United States v. Nordlicht*, No. 16-CR-640 (BMC) (E.D.N.Y. July 1, 2019), Dkt. 849.

The Government failed to present sufficient evidence for a rational jury to find the Government provided the requisite elements for either aiding and abetting or willfully causing fraud beyond a reasonable doubt, including but not limited to for the reasons discussed above.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Amar's motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.


Dated:  May 1, 2025                        Respectfully submitted,

                                           **KOBRE & KIM LLP**

                                           _/s/  Sean S. Buckley_
                                           Sean S. Buckley
                                           Jonathan D. Cogan
                                           Alexandria E. Swette
                                           Michael Cinnamon
                                           800 Third Ave
                                           New York, New York 10022
                                           Tel: (212) 488-1200
                                           Sean.Buckley@kobrekim.com
                                           Jonathan.Cogan@kobrekim.com
                                           Alexandria.Swette@kobrekim.com
                                           Michael.Cinnamon@kobrekim.com

                                           Matthew I. Menchel
                                           201 South Biscayne Boulevard, Suite 1900
                                           Miami, FL 33131
                                           Tel: (305) 967-6100
                                           Matthew.Menchel@kobrekim.com

                                           _Counsel for Defendant Olivier Amar_