**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

CHARLIE JAVICE and OLIVIER AMAR,

        Defendants.

23 Cr. 251 (AKH)

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT OLIVIER AMAR'S RULE 33 MOTION TO VACATE JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... iv

TABLE OF AUTHORITIES ............................................................................... iv

PRELIMINARY STATEMENT .............................................................................1

ARGUMENT .........................................................................................................2

I.    THE COURT'S ERRONEOUS INSTRUCTIONS DURING JURY
      DELIBERATIONS AND RELATED TRIAL ERRORS REQUIRE A NEW
      TRIAL...........................................................................................................2

      A.    The Court's Erroneous Instructions Resulted In An Improper Verdict
            Based On the Jury's Misunderstanding of Co-Conspirator Liability .....................3

            1.    The Conspiracy Charge Erroneously Instructed the Jury That Mr.
                  Amar Could Be Liable for Ms. Javice's Substantive Crimes ....................5

            2.    The Conspiracy Charge Erroneously Instructed the Jury That Mr.
                  Amar Could Be Liable for Ms. Javice's Acts Even Before the
                  Alleged Conspiracy Between the Two Existed ...........................................7

            3.    The Court Erroneously Rejected a Proposed Charge Targeted to
                  the Government's Charges and Evidence Against Mr. Amar.....................8

            4.    The Court's Recharge of Co-Conspirator Acts and Statements
                  Instruction Was Erroneous .......................................................................10

      B.    The Court Failed to Correct the Jury's Misapprehension of Facts Not In
            Evidence Caused By the Government's Conduct................................................14

            1.    The Jury's Question During Deliberation Confirms That It Was
                  Misled By the Government into Believing That the FAFSA
                  Completions Graph Was Created By Mr. Amar .......................................15

                  (a)    The Court's Erroneous Denial of Re-Cross Examination
                         Prejudiced Mr. Amar ....................................................................18

            2.    The Court's Erroneous Responses to the Jury's Questions Failed to
                  Correct Clear Misapprehension of Facts Not In Evidence ......................20

                  (a)    The Court Should Have Informed The Jury That The
                         Record Was Devoid of Evidence Showing that Mr. Amar
                         "Created" the FAFSA Completions" Graph in the Capital
                         One July 8 Presentation ...............................................................20

                  (b)    The Court's Responses to the Jury's Questions Allowed
                         The Jury to Find That the Graph Was Also Presented to
                         JPMC, When It Was Not ..............................................................21

            3.    The Court's Statements Regarding Timing of Deliberations
                  Compounded Prejudice to Mr. Amar.......................................................23

II.    THE COURT'S DECISION NOT TO SEVER THE TRIAL AND RESULTING TRIAL ERRORS, INDIVIDUALLY OR IN THE AGGREGATE, SUBSTANTIALLY AND UNFAIRLY PREJUDICED MR. AMAR ............................24

    A.    Precluding Antagonistic Evidence Negating Fraudulent Intent and Knowing Participation in a Conspiracy Was Erroneous and Unfairly Prejudicial to Mr. Amar .................................................................................25

        1.    Age Distribution Exhibits (DX OA 204, 204-A; DX OA 200, 200-A; DX OA 238, 238-A) ...............................................................27

    B.    Precluding Evidence and Testimony Necessary to Clarify Mr. Amar's Role During Significant Events of the Alleged Fraud Was Erroneous and Unfairly Prejudicial ...............................................................................34

        1.    LionTree Email Regarding VDR 3.1.8. (GX 1547)...................34

        2.    Slack Communication Regarding VDR 3.1.4 Data Pull (GX 802-5)........35

        3.    JPMC Initial Data Transfer Emails (GX 1250 and GX 1328)..................36

III.    THE COURT'S ERRONEOUS CONSCIOUS AVOIDANCE CHARGE, WITHOUT A FACTUAL PREDICATE, COMPOUNDED UNFAIR PREJUDICE CAUSED BY PRECLUSION OF DEFENSES .........................................38

IV.    THE COURT'S ERRONEOUS PRECLUSION OF GOOD FAITH EVIDENCE AND RESULTING TRIAL ERRORS, INDIVIDUALLY OR IN THE AGGREGATE, SUBSTANTIALLY AND UNFAIRLY PREJUDICED MR. AMAR....................................................................................................................42

    A.    Excluding Evidence and Testimony Regarding Mr. Glazer's Involvement in Diligence was Erroneous and Unfairly Prejudicial..............................................42

        1.    Before Trial, the Court Properly Determined that Mr. Amar Could Introduce Documents Concerning Mr. Glazer's Presence During Diligence, But It Then Refused to Admit Such Evidence At Trial ..........43

        2.    Evidence Regarding Mr. Glazer's Involvement in Due Diligence Negated Any Inference of Mr. Amar's Fraudulent Intent and Was Critical to His Good Faith Defense............................................................45

        3.    The Government Opened the Door to Evidence of Mr. Glazer's Presence and Elicited False Testimony That Mr. Amar Was Precluded From Rebutting .................................................................46

    B.    Excluding the Identity of "Idan" in GX 801-9 Was Erroneous and Unfairly Prejudicial ...........................................................................49

V.    A NEW TRIAL IS WARRANTED BECAUSE THE GOVERNMENT'S MISLEADING EXAMINATIONS AND ARGUMENT CAUSED SUBSTANTIAL UNFAIR PREJUDICE TO MR. AMAR...............................................51

    A.    The Government Elicited Misleading Testimony Regarding Mr. Amar's Purchase of ASL Data............................................................................52

B.    The Government's Examination Suggested to the Jury That Mr. Amar Was Not the Source of the Correction of Mislabeled Data During Diligence for the Capital One And JPMC Transactions .........................................54

C.    The Government Suggested Without Evidence That Mr. Amar Made Misrepresentations During Diligence ....................................................56

VI.    THE COURT'S ERRONEOUS TRIAL RULINGS FAILING TO RECOGNIZE THE POTENTIAL BIAS OF JPMC WITNESS WAS PREJUDICIAL ERROR............58

A.    Excluding Testimony and Evidence About JPMC's Civil Suit was Erroneous and Unfairly Prejudicial ........................................................58

1.    The Court's Further Restrictions on Exploring Witness Bias and Credibility Compounded Unfair Prejudice ................................60

2.    The Court's Denial of Mr. Amar's *Brady* Motion Limited Evidence to Impeach and Confront Witnesses and Further Compounded Unfair Prejudice ................................................62

VII.    THE WEIGHT OF THE EVIDENCE IS AGAINST THE JURY'S VERDICT .............63

CONCLUSION...................................................................................................................63

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                         **Page(s)**

*Annunziato v. Manson,*
   566 F.2d 410 (2d Cir. 1977) ................................................................. 60

*Bollenbach v. United States,*
   326 U.S. 607 (1946) ............................................................................ 11

*Brady v. Maryland,*
   373 U.S. 83 (1963) .............................................................................. 62

*Caroll v. Trump,*
   124 F. 4th 140 (2d Cir. 2024) ............................................................. 60

*Concepcion v. City of New York,*
   2006 WL 2254987 (S.D.N.Y. 2006) .................................................... 61

*Delaware v. Van Arsdall,*
   475 U.S. 673 (1986) ....................................................................... 61, 63

*Giglio v. United States,*
   405 U.S. 150 (1972) ....................................................................... 60, 62

*Global-Tech Appliances, Inc. v. SEB S.A.,*
   563 U.S. 754 (2011) ............................................................................ 40

*Howard v. S.E.C.,*
   376 F.3d 1136 (D.C. Cir. 2004) .......................................................... 45

*Jenkins v. United States,*
   380 U.S. 445 (1965) ............................................................................ 23

*Kaplan v. S.A.C. Capital Advisors, L.P.,*
   2015 WL 5730101 (S.D.N.Y. Sept. 10, 2015) .................................... 61

*Thurber Corp. v. Fairchild Motor Corp.,*
   269 F.2d 841 (5th Cir. 1959) .............................................................. 59

*United States v. Abel,*
   469 U.S. 45 (1984) .............................................................................. 59

*United States v. Abu-Jihaad,*
   531 F. Supp. 2d 289 (D. Conn. 2008) ................................................. 12

*United States v. Adeniji,*
   31 F.3d 58 (2d Cir. 1994) ................................................................... 41

*United States v. Aina-Marshall*,
   336 F.3d 167 (2d Cir. 2003) ................................................................. 41

*United States v. Archer*,
   977 F.3d 181 (2d Cir. 2020) ............................................................ 3, 63

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ................................................................. 3

*United States v. Blackmon*,
   839 F.2d 900 (2d Cir. 1988) ................................................................. 5

*United States v. Block*,
   2019 WL 1254762 (S.D.N.Y. Mar. 19, 2019) ................................... 60

*United States v. Brown*,
   544 F.2d 1155 (2d Cir. 1976) ............................................................... 4

*United States v. Burse*,
   531 F.2d 1151 (2d Cir. 1976) ............................................................. 52

*United States v. Canter*,
   338 F. Supp. 2d 460 (S.D.N.Y. 2004) ............................................... 63

*United States v. Cantone*,
   426 F.2d 902 (2d Cir. 1970) ............................................................... 13

*United States v. Catano-Alzate*,
   62 F.3d 41 (2d Cir. 1995) ................................................................... 39

*United States v. Connolly*,
   2019 WL 2120523 (S.D.N.Y. May 2, 2019) ..................................... 62

*United States v. Corr*,
   543 F.2d 1042 (2d Cir. 1976) ............................................................... 5

*United States v. Dennis*,
   183 F.2d 201 (2d Cir. 1950) ............................................................... 13

*United States v. Detrich*,
   865 F.2d 17 (2d Cir. 1988) ................................................................. 48

*United States v. Diamond*,
   430 F.2d 688 (5th Cir. 1970) ............................................................. 23

*United States v. Eltayib*,
   88 F.3d 157 (2d Cir. 1996) ................................................................. 42

*United States v. Ferrarini*,
    219 F.3d 145 (2d Cir. 2000) .................................................................... 39, 40

*United States v. Freedman*,
    2019 WL 5387866 (S.D.N.Y. Oct. 22, 2019) ............................................ 13

*United States v. Geaney*,
    417 F.2d 1116 (2d Cir. 1969) .................................................................... 13

*United States v. Hagen*,
    542 F. Supp. 3d 515 (N.D. Tex. 2021) ...................................................... 45

*United States v. Haggett*,
    438 F.2d 396 (2d Cir. 1971) ...................................................................... 60

*United States v. Harris*,
    185 F.3d 999 (9th Cir. 1999) ..................................................................... 60

*United States v. Harvey*,
    547 F.2d 720 (2d Cir. 1976) ...................................................................... 60

*United States v. Hatfield*,
    2010 WL 1948236 (E.D.N.Y. May 12, 2010) ........................................... 48

*United States v. Hopkins*,
    53 F.3d 533 (2d Cir. 1995) ........................................................................ 41

*United States v. Joyner*,
    924 F.2d 454 (2d Cir. 1991) ................................................................. 6, 13

*United States v. Kapp*,
    781 F.2d 1008 (3d Cir. 1986) .................................................................... 10

*United States v. Kopstein*,
    759 F.3d 168 (2d Cir. 2014) ........................................................................ 4

*United States v. Krug*,
    2019 WL 336568 (W.D.N.Y. Jan. 28, 2019).............................................. 59

*United States v. Kyle*,
    257 F.2d 559 (2d Cir. 1958) ...................................................................... 46

*United States v. Lefkowitz*,
    284 F.2d 310 (2d Cir. 1960) ........................................................................ 4

*United States v. Lopac*,
    411 F. Supp. 2d 350 (Hellerstein J.) ..................................................... 4, 10

*United States v. Mastropieri,*
 685 F.2d 776 (2d Cir.) ................................................................................. 6

*United States v. McCourty,*
 562 F.3d 458 (2d Cir. 2009) ........................................................................ 3

*United States v. Morales,*
 577 F.2d 769 (2d Cir. 1978) ...................................................................... 38

*United States v. O'Campo,*
 973 F.2d 1015 (1st Cir. 1992) ................................................................. 5, 7

*United States v. Onumonu,*
 967 F.2d 782 (2d Cir. 1992) ...................................................................... 46

*United States v. Pacific Hide & Fur Depot, Inc.,*
 768 F.2d 1096 (9th Cir. 1985) ................................................................... 41

*United States v. Pedroza,*
 750 F.2d 187 (2d Cir. 1984) ..................................................................... 4, 9

*United States v. Pinkerton,*
 328 U.S. 640 (1946) ..................................................................................... 5

*United States v. Persico,*
 305 F.2d 534 (2d Cir. 1962) ...................................................................... 52

*United States v. Reed,*
 437 F.2d 57 (2d Cir. 1971) ........................................................................ 62

*United States v. Robinson,*
 544 F.2d 110 (2d Cir. 1976) ...................................................................... 34

*United States v. Rodriguez,*
 983 F.2d 455 (2d Cir.1993) .................................................................. 39, 41

*United States v. Runner,*
 2023 WL 3727532 (E.D.N.Y. May 30, 2023) ............................................ 49

*United States v. Sainfil,*
 2019 WL 4861447 (E.D.N.Y. Oct. 2, 2019) .............................................. 48

*United States v. Samaria,*
 239 F.3d 228 (2d Cir. 2001) ...................................................................... 41

*United States v. Scully,*
 877 F.3d 464 (2d Cir. 2017) ...................................................................... 48

*United States v. Sperling*,
   506 F.2d 1323 (2d Cir. 1974) ............................................................... 13

*United States v. Taylor*,
   820 F. Supp. 124 (S.D.N.Y. 1993) ......................................................... 48

*United States v. Velez*,
   652 F.2d 258 (2d Cir. 1981) ................................................................... 12

*United States v. Villegas*,
   2009 WL 1657072 (N.D. Ill. June 11, 2009) .......................................... 48

*United States v. Ziegler*,
   583 F.2d 77 (2d Cir. 1978) ..................................................................... 13

*Wilson v. Attaway*,
   757 F.2d 1227 (11th Cir. 1985) .............................................................. 61

## Rules

Rule 807 of the Federal Rules of Evidence .................................................... 53

Rule 33 of the Federal Rules of Criminal Procedure .............................. 1, 63

Defendant Olivier Amar respectfully submits this memorandum of law in support of his motion to vacate judgment and for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, because it would be a manifest injustice to let the verdict stand.[1] For the avoidance of doubt, the Court's discretion to vacate judgment and order a new trial under Rule 33(a) is broader than the grounds for acquittal under Rule 29.

## PRELIMINARY STATEMENT

Prior to trial, Mr. Amar chose to inform Ms. Javice, the Court and the Government that he intended to pursue a defense that was antagonistic to Ms. Javice. Although no rule required him to do so, Mr. Amar decided to be transparent about his intended approach to give the Court the opportunity to sever the trial if a joint trial would impede either defendant's right to pursue a vigorous defense. In denying to grant a severance, the Court assured Mr. Amar that Ms. Javice's presence as a co-defendant at his trial would in no way hamper his defense at trial.

But things changed shortly after trial began. As Mr. Amar previewed, he sought to introduce evidence that was exculpatory as to him but inculpatory as to Ms. Javice. Apparently sensitive to Ms. Javice's concerns that she was facing a trial by "two prosecutors," the Court observed at one point that it was trying to walk a "fine line" between allowing Mr. Amar to pursue the defense he previewed pre-trial and ensuring that Ms. Javice was not being prosecuted by her co-defendant. While the Court's concerns for Ms. Javice's right to a fair trial may be understandable, they did not justify what ultimately happened at trial: in an effort to protect Ms. Javice's right to a fair trial, the Court curtailed Mr. Amar's defense, repeatedly preventing him

---

[1] Mr. Amar submits that a new trial is warranted for the reasons stated, and also as raised in his objections at trial and in Mr. Amar's pretrial and trial submissions, which are each respectfully incorporated and preserved for appeal. Mr. Amar also joins and incorporates by reference the arguments set forth in Ms. Javice's motion for a new trial to the extent applicable to Mr. Amar.

from offering admissible evidence showing that he could not, and did not, know of Ms. Javice's alleged fraud in connection with the sale of Frank and certainly was not in a criminal conspiracy with her. Mr. Amar respectfully submits that these rulings were erroneous, deprived Mr. Amar of a fair trial and necessitate a new trial. *See infra* Section II.

In addition, and contrary to pre-trial rulings, Mr. Amar was likewise precluded from offering evidence of his good faith based on the active involvement of Frank's Chief Legal Officer, Matt Glazer, during diligence. The exclusion of this evidence also deprived Mr. Amar of a fair trial. *See infra* Section IV.A.

Finally, the Court gave several instructions to the jury that Mr. Amar respectfully submits in context were erroneous, including instructions which improperly permitted a conviction against Mr. Amar based on Ms. Javice's alleged misstatements (*infra* Section I.A), evidence not in the record (*infra* Section I.B), and an impermissible inference that his limited involvement during diligence could suffice to prove his knowledge of Ms. Javice's fraud (*infra* Section III).

Accordingly, and as explained further below, the Court should set aside the jury's verdict and grant Mr. Amar a new trial.

## <u>ARGUMENT</u>

## I.    THE COURT'S ERRONEOUS INSTRUCTIONS DURING JURY DELIBERATIONS AND RELATED TRIAL ERRORS REQUIRE A NEW TRIAL

The jury's questions during deliberation and the Court's responses leave no doubt that critical trial errors ultimately compromised the verdict against Mr. Amar. Under these circumstances, allowing the verdict against Mr. Amar to stand would be a manifest injustice and deny his constitutional right to a fair trial.

Specifically, the Court's instructions to the jury and responses to juror questions during deliberations created an unclear and inaccurate representation of: (1) the law on co-conspirator

liability; and (2) the record evidence regarding Mr. Amar's involvement with key alleged misrepresentations made by Ms. Javice. As detailed in Mr. Amar's Rule 29 motion, the record contains a dearth of evidence that Mr. Amar uttered a single misstatement to either JPMC or Capital One (or anyone for that matter), such that the entirety of the Government's case against Mr. Amar rested on Ms. Javice's conduct. The inaccurate instructions and confusion created therefrom resulted in a jury verdict based on a misunderstanding of the law and evidence regarding Mr. Amar's liability for Ms. Javice's acts and statements, which is a manifest injustice that must be corrected with a new trial. Under these circumstances, there is no need to "defer to [a] jury's resolution of conflicting evidence," *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (quoting *United States v. McCourty*, 562 F.3d 458, 475–76 (2d Cir. 2009)), because these errors, standing alone and in the aggregate, render "the soundness of the verdict . . . highly doubtful." *See United States v. Autuori*, 212 F.3d 105, 121 (2d Cir. 2000).

### A.    The Court's Erroneous Instructions Resulted In An Improper Verdict Based On the Jury's Misunderstanding of Co-Conspirator Liability

On the final day of deliberations, the jury asked: "*Are co-conspirators guilty of all crimes committed in the conspiracy?*" *See* Tr. 3883:25–3884:12; Ct. Ex. 12. This question was a direct result of inaccurate and confusing jury charges, which erroneously failed to instruct the jury that: (1) a defendant cannot be liable for any substantive crimes committed prior to his or her joining a conspiracy, *see infra* I.A.1; and (2) where, as here, the alleged conspiracy consisted of only two members, a defendant cannot be liable for acts that occurred before he or she agreed to participate in the conspiracy because no conspiracy existed at that time, *see infra* I.A.2. Indeed, the Court denied Mr. Amar's proposed charge that would have clarified these points. *See infra* I.A.3.

These errors unfairly prejudiced Mr. Amar because the Government's case against him focused on the alleged concealment of the completed fraud—relying on evidence regarding his

alleged purchase of student records from a company called ASL Marketing ("ASL") in August of 2021 and his conduct while employed by JPMC in January of 2022. The Government's evidence of Mr. Amar's involvement in a conspiracy, let alone the substantive crimes, was threadbare as demonstrated by the unusual focus on Mr. Amar during summation relative to the minimal evidence actually adduced at trial. It was therefore essential that the jury be instructed clearly on what extent—if at all—Mr. Amar could be liable as an alleged co-conspirator for Ms. Javice's alleged misrepresentations in the lead up to the Frank acquisition. Accordingly, these erroneous jury instructions warrant a new trial. *See United States v. Pedroza*, 750 F.2d 187, 205 (2d Cir. 1984); *United States v. Lopac*, 411 F. Supp. 2d 350, 369 (Hellerstein J.) (S.D.N.Y. 2006) (granting new trial even though "instructions to the jury, although correct and not objected to in their generality, did not sufficiently guide the jury with respect to the particular factual context of this case").

The Court's clarifying instructions in response to the jury's question did not resolve the jury's confusion and incorrectly overstated the scope of potential conspirator liability. Because "[a] jury's interruption of its deliberations 'to seek further explanation of the law' is a 'critical moment in a criminal trial,'" the Second Circuit ascribes "'crucial importance' to a 'completely accurate statement by the judge' at that moment." *United States v. Kopstein*, 759 F.3d 168, 172–73 (2d Cir. 2014) (quoting *United States v. Lefkowitz*, 284 F.2d 310, 314 (2d Cir. 1960). This error likewise warrants a new trial. *See id.* at 172 (vacating conviction and remanding for new trial where instructions "mislead the jury as to the correct legal standard or do not adequately inform the jury of the law"); *United States v. Brown*, 544 F.2d 1155, 1159 (2d Cir. 1976) (reversing conviction because supplemental charge given was plain error and highly prejudicial to defense).

1.       **The Conspiracy Charge Erroneously Instructed the Jury That Mr. Amar Could Be Liable for Ms. Javice's Substantive Crimes**

In at least two instances, the jury was instructed that Mr. Amar could be found liable for the substantive charges of wire fraud, bank fraud, and securities fraud based on Ms. Javice's acts—both before and during the existence of a conspiracy—thereby allowing the jury to convict Mr. Amar of those charges based on an inaccurate understanding of the law.

*First*, the jury was instructed that so long as a defendant is found to have entered into a conspiracy at some point, he "will still be held **responsible for all that was done before he joined** and all that was done during the conspiracy's existence while he or she was a member." Tr. 3784-3785.[2] This was in error. While the instruction may be a correct statement of law on the acts of co-conspirators that occurred before that defendant joined, the Court did not tell the jury that this instruction applies only to conspiracy liability, and not liability for substantive offenses.

In fact, the conspiracy charges did not include any explicit instruction on a co-conspirator's liability for substantive crimes. The law is clear that "with regard to *substantive offenses*, a defendant cannot be retroactively liable for [substantive] offenses committed prior to his joining the conspiracy." *United States v. Blackmon*, 839 F.2d 900, 908–09 (2d Cir. 1988) (emphasis in original); *United States v. O'Campo*, 973 F.2d 1015, 1022–23 (1st Cir. 1992). Under *United States v. Pinkerton*, 328 U.S. 640 (1946), and its progeny, a defendant can be liable only for a substantive offense committed by a co-conspirator if the jury finds, among other elements, that the defendant "was a member of that conspiracy at the time the substantive crime was committed" and "could have reasonably foreseen that the substantive crime might be committed by his co-conspirators." Sand, Instr. 19-13; *see United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir. 1976) ("[*Pinkerton*] is

---

[2] *See also* Ct. Ex. 3 (Court's proposed final charge on "Conspiracy: Second Element – Duration of and Extent of Participation in Conspiracy") at 18.

5

based upon the theory of vicarious liability which holds conspirators criminally liable for the substantive offenses of their co-conspirators committed during and in furtherance of the conspiracy."); *see also United States v. Joyner*, 924 F.2d 454, 458 (2d Cir. 1991).

A *Pinkerton* charge was not given in this case. Therefore, the Court's statement—that a co-conspirator can be "held responsible for all that was done"—misled the jury to believe that the instruction applied also to substantive crimes. The charge improperly invited the jury to convict Mr. Amar of substantive offenses based on Ms. Javice's acts and misstatements before Mr. Amar entered into the alleged conspiracy (and regardless of whether those offenses were reasonably foreseeable to Mr. Amar). [3] Where, as here, the Government's proof of the alleged fraud to sell Frank was focused on alleged misstatements by Ms. Javice, this ambiguity had grave consequences by allowing the jury to find Mr. Amar liable for crimes committed by Ms. Javice.

*Second*, the Court instructed the jury on its consideration of evidence of co-conspirator acts and statements:

> **Once you are in a conspiracy, anything done by any member of the conspiracy counts against you. It is like agency in law. If you are in a conspiracy and somebody does something in furtherance of the conspiracy, all members of the conspiracy are held to account.** However, in considering if a particular person joined the conspiracy, you can only do so by evidence relevant to that particular person independent of what others may have said or done. **That is the point of this charge.**

Tr. 3786:10-17.[4] The Court's instruction on this point (which related to the admissibility of hearsay co-conspirator statements), *see United States v. Mastropieri*, 685 F.2d 776, 786-90 (2d

---

[3] This error is especially consequential insofar as the jury was invited to convict Mr. Amar for securities fraud, which was not alleged to be an object of the alleged conspiracy.

[4] *Compare* Tr. 3761:13-24 (Court reading proposed instruction on co-conspirator statements, outside the presence of the jury), *with* Tr. 3785:25-3896:17 (Court instructing jury on co-conspirator statements). *See also* Ct. Ex. 3 (Court's proposed final charge on "Conspiracy: Additional Instructions – Co-conspirator Statements") at 19.

Cir.), *cert. denied*, 459 U.S. 945 (1982),[5] included the above extemporaneous language, not previewed to counsel, which conflated two different legal principles: (i) liability for substantive crimes based on a co-conspirator's acts; and (ii) the jury's right to consider a co-conspirator's hearsay statement against other members of the conspiracy. Here again, the Court's instruction that "anything done by any member of the conspiracy counts against you" prejudiced Mr. Amar by inviting the jury to convict Mr. Amar of substantive crimes based on Ms. Javice's acts and statements.

These statements undoubtedly contributed to the jury's confusion about the extent to which Mr. Amar could be liable for any offenses committed by Ms. Javice. The Court's instructions should have instead ensured that the "broadly stated" "language of conspiracy liability" did not "spillover into applications distinct from conspiracy liability analysis" such as "substantive responsibility for prior acts." *See O'Campo*, 973 F.2d at 1023 n.5.

### 2. The Conspiracy Charge Erroneously Instructed the Jury That Mr. Amar Could Be Liable for Ms. Javice's Acts Even Before the Alleged Conspiracy Between the Two Existed

The Court also erred in giving its conspiracy charges because they similarly stated that Mr. Amar could be convicted of conspiracy based on acts taken by Ms. Javice prior to the establishment of a conspiracy. But where, as here, there are only two conspirators, neither defendant could be found to have "joined" some pre-existing conspiracy and thus neither defendant could be legally

---

[5] As defense counsel raised in seeking to strike Ms. Javice's hearsay statements, and objecting to the charge, the defendants are the only two co-conspirators alleged in the conspiracy, and there was insufficient evidence of a conspiracy for the admission of Ms. Javice's hearsay statements against Mr. Amar. Tr. 3413:12-3414:12; *id.* 3443:17-21. Defense counsel moved to strike those statements at the close of the Government's case, and prior to the Court's charges. Tr. 3413:8-3414:12. Tr. 3423:13-20. Because argument on the defendants' motions for judgment for acquittal had been postponed in light of the Court's decision that all summations would be held in one day, the Court likewise postponed ruling on Mr. Amar's motion to strike, even though defense counsel noted it would "bear upon the jury instructions." Tr. 3423:19-3424:4.

responsible for acts committed prior to the formation of the alleged conspiracy.[6] Thus, the Court's charge that Mr. Amar can "be held **responsible for all that was done before he joined**" is inapplicable to this case and, respectfully, should never have been given to the jury. *See* Tr. 3785:1-5 (instruction on duration of an extent of participation in conspiracy); *see also* Tr. 3782:16-19 (instruction on knowing participation likewise referred to a co-conspirator's liability in reference to "join[ing]" the conspiracy).

The Court overruled defense counsel's objections to statements in the conspiracy charge which similarly referred to some preexisting conspiracy. Tr. 3439:14-22 (objecting to "*The defendant need not have joined the conspiracy at the outset.*"); *see also* Ct. Ex. 3 at 18. Describing such language "classic," the Court declined to modify its conspiracy charge due to the "extraordinarily difficult burden" to remove "repetitive" language and because it would "not [be] prejudicial to anybody." Tr. 3439:19, 3439:23-3440:1. Respectfully, the charges were, in fact, prejudicial to Mr. Amar, as they misled the jury into rendering an improper verdict.

### 3. The Court Erroneously Rejected a Proposed Charge Targeted to the Government's Charges and Evidence Against Mr. Amar

The prejudice to Mr. Amar from the Court's instructions on co-conspirator liability was compounded by the Court's erroneous denial of Mr. Amar's proposed instruction to clarify that

---

[6] Before trial, the Government confirmed that it did not "expect to identify other individuals [beyond Javice and Amar] as co-conspirators," Dkt. 140, and, consistent with that representation, argued at trial that the conspiracy was comprised of Ms. Javice and Mr. Amar only, Tr. 3419:10-23 ("[T]here is ample evidence . . . of an agreement between the defendants, . . . each defendant knowingly became a member of *that* conspiracy as charged in the indictment" (emphasis added)); Tr. 3418:23-3419:4 (referring solely to the defendants' own communications as "evidence of the conspiracy").

The Court likewise acknowledged that, while the Indictment alleged unnamed co-conspirators, it would be unnecessary to include the allegation of "unnamed co-conspirators" when addressing the Indictment in the jury charges. Tr. 3430:8-12. While the Court stated it would "eliminat[e] many unnecessary words and phrases" when charging the jury, Tr. 3433:6-11, the Court nevertheless included the references to unnamed co-conspirators, *id.* 3772:4-3774:18.

Mr. Amar could not be liable for substantive crimes based on Ms. Javice's pre-conspiracy acts. Indeed, the Court twice rejected Mr. Amar's proposal in the instruction regarding a conspiracy's duration, discussed *supra* Section I, that would have informed the jury that any alleged involvement in the concealment of the fraud (in August of 2021 and January of 2022) could not establish participation or intent with respect to the alleged fraud to sell Frank (in June and July of 2021). Tr. 3441:14-3442:12; *see also id.* 3494:13-18. The Court recognized that "[b]y definition, a coverup comes after the object is accomplished," Tr. 3442:16-17,[7] but, respectfully, wrongly denied defense counsel's request to charge.

As explained above, the Government's evidence against Mr. Amar focused on the alleged concealment of the fraud in connection with the sale of Frank. If the jury found that Ms. Javice and Mr. Amar formed a conspiracy related to the alleged cover up (but not in the sale of Frank), then neither Ms. Javice's pre-conspiracy acts nor statements during diligence could be attributed to or considered against Mr. Amar. The jury should have been instructed that evidence of acts taken by Mr. Amar in January 2022—months after JPMC's acquisition of Frank in August 2021—should not have been considered as evidence of his intent or membership in the alleged conspiracy at the time of JPMC's acquisition of Frank. Without proof of his intent with respect to the alleged scheme to defraud potential buyers in Frank's sale at that time, he could not be convicted of any of the substantive offenses or conspiracy to defraud those buyers.

The Court's conspiracy instructions, "which were general in form," were not "adequate to inform the jury that if it believed" the defense theory, then "it was entitled to conclude that [Mr. Amar] did not have the requisite intent to be convicted of the offenses charged." *United States v.*

---

[7] The Court's charges likewise did not adopt similar language proposed by Mr. Amar in the defense's proposed joint instructions, with respect to the "intent to defraud" and the "in connection with" elements of the wire fraud and securities fraud counts. Dkt. 203 at 23-24, 30-31.

*Pedroza*, 750 F.2d 187, 205 (2d Cir. 1984); *see also, e.g.*, *United States v. Kapp*, 781 F.2d 1008, 1013 (3d Cir. 1986) ("[A] defendant is entitled to a jury instruction on a theory of defense whenever some evidence supports that theory."); *Lopac*, 411 F. Supp. 2d at 369.[8]

### 4.    The Court's Recharge of Co-Conspirator Acts and Statements Instruction Was Erroneous

The confusion created by the Court's instructions on co-conspirator liability was demonstrated by the jury's request for clarification on to what extent a co-conspirator is liable for substantive crimes committed by another when it asked during deliberations: *"Are co-conspirators guilty of all crimes committed in the conspiracy?"* Tr. 3884:13–3885:13; *see* Ct. Ex. 12. The Court's response to the jury's question, respectfully, exacerbated the uncertainty by incorrectly suggesting that Ms. Javice's pre-conspiracy offenses could be imputed to Mr. Amar.

The Court, without notice to counsel, recharged the jury on the consideration of co-conspirator acts and statements:[9]

> In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements. However, in determining the factual issues before you, **you may consider against the defendants -- co-conspirators -- any acts or statements made by any of the people that you find under the standards I have already described, to have**

---

[8] Respectfully, the Court's proposed final charges, provided just hours before the final charge conference, were general instructions in many respects. The parties received only a few short hours to review the proposed jury charge before the charge conference began. *See* Tr. 3425:3-12 ("THE COURT: I customarily give two hours. You haven't been able to read it because you've been here. . . . We'll resume at 5."); Tr. 3442:22-24. The Court stated that it considered defense counsel's joint instructions, Dkt. 203, and those not reflected in the Court's draft final charges, were rejected. Tr. 3494:24-3495-2. For these reasons, and in Mr. Amar's prior written and oral submissions, which are respectfully incorporated herein, the Court's charges failed to instruct the jury on the law necessary to fairly determine Mr. Amar's culpability.

[9] Defense counsel lodged both a substantive and procedural objection outside the presence of the jury. Tr. 3888:23–3889:5; *id.* 3889:16-17. Although the Court represented it would inform the jury that its question was answered by "the first paragraph of the legal def[inition] of a conspiracy," the Court did not do so. Tr. 3882:21–22; *id* at 3866:20–22.

**been co-conspirators**, even though such acts or statements were not made in their presence or were made without their knowledge.

Tr. 3883:25–3884:12; *id.* 3785:25-3786:9 (final charge on co-conspirator statements and acts).

The Court further instructed the jury to:

> [G]o back to the indictment which alleges two purposes, two objectives of the conspiracy. Only those crimes can be considered. And with respect to those crimes, if you found, by independent evidence that they're, both Amar and Javice are members of a conspiracy, all their statements and acts are considered against -- **all the statements and acts of one are considered against the other**.

This recharge was deeply problematic and prejudicial to Mr. Amar.

*First*, because the jury's question concerned a co-conspirator's liability for substantive crimes, it was incumbent on the Court to instruct the jury on to what extent a co-conspirator may be liable for another's substantive offenses. *See Bollenbach v. United States*, 326 U.S. 607, 612-613 (1946) (where a jury "makes explicit its difficulties" in comprehending the elements of the conspiracy offense, a trial court must "clear them away with concrete accuracy"). The Court, however, again conflated distinct legal principles. Tr. 3884:13–15. Specifically, the Court responded to the jury's question about substantive liability with an instruction on the consideration of co-conspirator acts and statements as evidence. The recharge did not include the requirement that acts or statements be done or said in furtherance of the conspiracy, as counsel proposed. *See infra* note 14. The Court's response therefore reaffirmed the misimpression that Mr. Amar could be liable for crimes committed by Ms. Javice—whether or not they occurred before the conspiracy, were in furtherance of the conspiracy, or related to the conspiracy at all.[10]

---

[10] Indeed, this instruction was described by the Court during the final charge as relating to "agency in law." *See supra* I.A.1. When the Court recharged the jury, it reminded them that the instruction itself was "part of the original charge," before advising it would "perhaps" address their question. Tr. 3884:16–19.

*Second*, the Court's answer did not instruct—as all parties, including the Government suggested—that the conspiracy charge and the objects of the conspiracy are separate crimes.[11] After the Court's recharge, the jury asked for the objects of the conspiracy. But the Court's response did not mention the elements of either wire or bank fraud. Tr. 3886:14-3886:16. These truncated instructions reinforced the jury's likely confusion that if it had already determined Ms. Javice was liable for those substantive crimes, it could impute them to Mr. Amar without considering his separate liability. *See United States v. Velez*, 652 F.2d 258, 262 (2d Cir. 1981) ("After a day and half of deliberations" the Court's original instructions on those elements "may well have been but a faint memory in the juror's minds.").[12]

*Third*, the Court's responses left open the distinct possibility that the jury considered Ms. Javice's pre-conspiracy acts and statements against Mr. Amar as co-conspirator statements. The Court's recharge did not clarify that criminal acts or statements committed by Ms. Javice *before* any agreement between the two could not be considered against Mr. Amar.[13] *See United States v.*

---

[11] *See* Tr. 3882:1-7: (MR. SULLIVAN: "I propose that your Honor answer 'no' and then . . . say: No, the crime of conspiracy to violate a federal law is an independent offense, a crime separate and distinct from the actual violation of any specific federal laws."); *id.* at 3882:17-19 (MR. FERGENSON: "I think, your Honor, we may agree that they may be asking for you to clarify again that conspiracy is a separate crime from the substantive objects of the conspiracy.").

[12] The failure to instruct as requested compounded the jury's apparent confusion over the interrelation of the conspiracy and substantive counts. On the prior day of deliberations, the jury asked: *"Can a party be guilty of conspiracy + one count or by being guilty of conspiracy is the party automatically guilty of all counts?" Id.* at 3862:13–3863:6; Ct. Ex. 9. The Court declined to instruct, as defense counsel proposed, that a party is not automatically guilty of any substantive count, as each crime requires separate consideration. Tr. 3846:20-3847:13, 3847:14-19, 3848:8-15.

[13] In addition, the Court's recharge followed its response to the jury's request for the first paragraph of the "legal definition" of conspiracy, which described "conspiracy" as requiring "two or more persons to join together." Tr. 3883:25-3884:12. This definition, which referenced more than one potential co-conspirator and did not define the duration of a conspiracy, also suggested a conspiracy could exist before Mr. Amar "joined" one.

*Abu-Jihaad*, 531 F. Supp. 2d 289, 295 n.2 (D. Conn. 2008) (Second Circuit decisions "permit[ting] introduction of statements made before a participant joined a conspiracy," only "involve a pre-existing conspiracy in which at least two other participants had already formed the requisite agreement."); *United States v. Freedman*, No. 18-CR-217, 2019 WL 5387866, at *2 (S.D.N.Y. Oct. 22, 2019) ("If the Government alleges only a conspiracy between two entities . . . that conspiracy could not have existed until [one] joined it, and statements made by [the other] before that point cannot be admitted [as co-conspirator statements]").[14]

     The Court's instructions on its initial charge and recharge each misled the jury to believe that as long as evidence of Ms. Javice's acts and statements proved her commission of a substantive crime, it could convict Mr. Amar of the same crime. This is a broader theory of vicarious liability than even *Pinkerton* would permit, in a case where *Pinkerton* liability should not apply. *See also United States v. Joyner*, 924 F.2d 454, 458 (2d Cir.1991) (describing the Pinkerton doctrine as "the most expansive doctrine of vicarious criminal responsibility"); *see United States v. Sperling,* 506 F.2d 1323, 1341–42 (2d Cir. 1974) (charging the jury on *Pinkerton* liability "should not be given as a matter of course").[15] Each of these errors alone, and even more so collectively, gravely and

---

[14] The Court overruled defense counsel's objection to the charge and declined to strike the instruction—or the hearsay statements—from the record before deliberations. Defense counsel therefore proposed modifications to the Court's proposed final charge. Dkt. 356 at 1. The Court rejected the proposed carve-out for acts and statements that did not occur during and in furtherance of the conspiracy. While the Court permitted the jury to consider the preliminary question of admissibility, Tr. 3875:25-3786:17, a jury's resolution of that question provides little assurance that the verdict was not tainted by juror confusion. *See, e.g., United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969); *United States v. Ziegler*, 583 F.2d 77, 80–81 (2d Cir. 1978) ("[I]t is the trial judge who must make the preliminary determination as to admissibility.")."[I]t is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments" this assessment requires. *See United States v. Dennis*, 183 F.2d 201, 231 (2d Cir. 1950), *aff'd*, 341 U.S. 494, 71 S. Ct. 857, 95 L. Ed. 1137 (1951).

[15] As set forth in Mr. Amar's Rule 29 motion, the Government focused its proof of the substantive crimes based on alleged acts and statements made by Ms. Javice and offered little to prove a

13

unfairly prejudiced Mr. Amar's right to be independently judged for each of the charged crimes such that it would be a manifest injustice to let the jury's verdict stand. Accordingly, a new trial is warranted on all counts.

**B.    The Court Failed to Correct the Jury's Misapprehension of Facts Not In Evidence Caused By the Government's Conduct**

During deliberations, the jury asked: *"Can we see the graph + email that was created by OA that was presented to Chase that showed FAFSA completion?"* Tr. 3867:11-13; Ct. Ex. 12. In response to this question, the Court provided GX 3040—a deck that was presented to Capital One on July 8, 2021, which contains a slide with a "Frank FAFSA Completions Breakdown" graph. While the parties offered extensive evidence and testimony on the authorship, editing, and creation of documents, the trial record contained no evidence that Mr. Amar created such a graph showing FAFSA completion or that any such graph was presented to JPMC. This question, therefore, reflected the jury's fundamental misunderstanding of the facts critical to the charges against Mr. Amar. As is detailed below, the jury's misimpression of Mr. Amar's authorship of the graph was caused by the Government's improper redirect examination of Houston Cowan (an employee of LionTree, Frank's investment advisor). This misimpression was exacerbated by the Court's refusal to allow re-cross examination and by the Court's erroneous response to the jury's question.

---

conspiracy, inviting the jury to infer the "conspiracy . . . largely from the series of criminal offenses [allegedly] committed." *Sperling*, 506 F.2d at 1341-42. The "*Pinkerton* rationale is, therefore, inapplicable." *United States v. Cantone*, 426 F.2d 902, 904–05 (2d Cir. 1970) (reversing conspiracy count because "[t]he trial judge's erroneous submission to the jury of the issue of Rosen's guilt on the substantive count and the giving of the *Pinkerton* charge undoubtedly influenced the jury's finding of Rosen's guilt on the conspiracy charge.").

1. **The Jury's Question During Deliberation Confirms That It Was Misled By the Government into Believing That the FAFSA Completions Graph Was Created By Mr. Amar**

The jury's confusion over Mr. Amar's alleged input into that diligence presentation stems from the Government's misleading redirect examination of Mr. Cowan. During the cross-examination of Mr. Cowan, defense counsel elicited testimony focused on the "mislabeled" visitors data identified during the July 7, 2021 call between Frank executives, including Mr. Amar, and LionTree. For context, the relevant events, as reflected in the trial record, were as follows:

- On July 7, 2021, nearing the end of Capital One diligence, Mr. Amar joined a call between Frank and LionTree in preparation for a Capital One meeting. On that call, Mr. Amar identified a "huge mislabel" regarding Frank website visitor figures, which was flagged particularly for his review. *See* GX 3037; GX 802-22.

- On July 8, 2021, the Government elicited testimony that a slide deck was presented at a diligence meeting with Capital One, which included a graph entitled "Frank FAFSA Completions Breakdown" that purportedly contained material misstatements. Tr. 2146:16-2147:3 (direct testimony of Mason Young, Senior Vice President of Corporate Development at Capital One); GX 3040.

As explained in detail in Mr. Amar's Rule 29 Motion, Mr. Amar's affirmative efforts to flag an error in the draft presentation while on a call with Ms. Javice and Matthew Glazer, Frank's Chief Operating Officer and Chief Legal Officer, was direct proof that Mr. Amar was *not* conspiring to defraud the banks through misrepresentations related to FAFSA accounts. *See* Rule 29 Br. I.C.1. Millions of Frank FAFSA accounts would be implausible if similar numbers of website visitors were shared during diligence. *See* Rule 29 Br. I.C.1. As a result of Mr. Amar's correction during this July 7 meeting, the slide with the "mislabeled" impressions data was removed from the presentation, and after Capital One was informed of the error, the deal fell through. *See* Rule 29 Br. I.C.1.

Mr. Cowan's testimony on cross examination also established that Mr. Amar's contribution to the presentation concerned website visitors and was unrelated to any "FAFSA Completions

15

Breakdown" graph. He testified that slide 4 of the draft presentation, GX 3037, reflected a comment from LionTree seeking Mr. Amar's review in particular:



*(GX 3037 Slide 4)*

Q.  I want to direct your attention to the top right, and see where there's a box that had been inserted?

A. Yes.

Q. And it says "Olivier to provide definition of what these users represent, i.e., I believe you said organic search visitors from Google." […]

[…]

Q. And by users, you're referring—whoever wrote this is referring to the visitors in 3.1.8 …?

A. Yes, that's my understanding.

Tr. 384:2-25; *see also* Tr. 380:13-14; 381:12-382:23.

Referring to a different version of the presentation, GX 3039, updated after the July 7 call, defense counsel elicited extensive testimony showing that Mr. Amar provided website traffic graphs for use in the replaced slide, Tr. 388:16-390:7 (cross-examination of Mr. Cowan). With respect to the final presentation provided to Capital One on July 8, GX 3040, defense counsel

asked only about the fact of the July 8 call and the fact that the final presentation did not include the mislabeled website visitors data. Tr. 385:17-386:3 (cross-examination of Mr. Cowan).

On redirect, the prosecution misleadingly connected Mr. Cowan's extensive testimony regarding Mr. Amar's role in reviewing the slide on website visitors, GX 3037, and the provision of updated traffic graphs in GX 3039, to suggest that his testimony concerned the entire final presentation that was provided to Capital One. Referencing the final presentation, GX 3040, the prosecution asked:

> Q. Mr. Cowan, this is the July 8 meeting I was referencing earlier. Do you know what I am talking about now?
>
> A. Yes.
>
> Q. Now, Mr. Menchel *asked you a lot of questions about this*. Do you recall those questions, roughly?
>
> A. Yes.

Tr. 413:4-11 (emphasis added).

But in actuality, defense counsel's examination focused primarily on Mr. Amar's correction during the July 7 call and Mr. Amar's follow-up with graphs related to website traffic (not FAFSA accounts), which LionTree included in an updated presentation. The Government nevertheless proceeded to elicit testimony about the FAFSA Completions Breakdown graph on slide 10 provided to Capital One. *See* GX 3040; Tr. 414:6-415:12 (redirect testimony of Mr. Cowan).

17



*(GX 3040 Slide 10)*

The prosecution's improper suggestion to the jury was that defense counsel's extensive questioning concerning the correction and updated traffic graphs in prior versions of the presentation, GX 3037 and GX 3039, concerned the FAFSA Completions Breakdown graph. In reality, however, that graph was not addressed on cross examination at all. The Government's misleading redirect examination left an inaccurate impression that Mr. Cowan had testified that Mr. Amar created the "FAFSA Completions Breakdown" graph, which included an alleged misrepresentation. This misrepresentation proved important in the jury's deliberative process.

**(a)    The Court's Erroneous Denial of Re-Cross Examination Prejudiced Mr. Amar**

Seeking to correct the misleading impression the prosecution left with the jury, counsel for Mr. Amar requested a re-cross examination of Mr. Cowan, making explicit the need to correct the misimpression:

> MR. MENCHEL: Your Honor, just now, the last 10 minutes of Mr. Fergenson's redirect examination he directed the witness to new sections in these exhibits that he did not ask

him about on direct examination, specifically pointing Mr. Amar's involvement in this and has left a false impression that Mr. Amar has helped create a spreadsheet which he didn't create, and in fact we are going to prove that, and also that he said things or was involved in certain slides. I think I should be allowed to recross the witness on that as well because it did not come up on the government's direct examination and I am now being sandbagged with new cross-examination that I can't respond to – new direct examination.

Tr. 420:7–19. The Court denied the request. *Id.* 420:20-21.

Left unaddressed, and as evidenced by the jury's question during deliberations ("Can we see the graph + email *that was created by OA* that … showed FAFSA completion?" Tr. 3885:16-18 (emphasis added)), the jury was led to believe that Mr. Amar created the slide with the graph of FAFSA completions, despite there being zero testimony or evidence on its authorship, or that Mr. Amar spoke at all during the July 8 Capital One meeting, let alone on that particular graph.

The Government continued to mislead the jury by repeatedly stating to the jury in summation that the FAFSA Completion Graph in the final Capital One presentation (GX 3040) was Mr. Amar's. In closing argument, the Government, without any basis in evidence, continually misstated that Mr. Amar presented at the Capital One meeting on July 8, 2021. Tr. 3519:3-3522:24. Each witness who testified regarding the July 8 meeting, however, could recall Mr. Amar's involvement. *See* Rule 29 Br. II.A.1. The Government further described the slide deck, GX 3040, as "Amar's presentation," and argued that "Amar did it himself." Tr. 3522:3-5, 3522:22-24. The Government told the jury that "Amar falsely claim[ed] that there were 500,000 FAFSA completions of those years. They didn't even have 500,000 FAFSA users let alone completed applications." Tr. 3520:13-16.

These arguments were likewise echoed in the Government's rebuttal, where the prosecutors again stated, "This is [Mr. Amar's] presentation," before attributing the FAFSA Completion Graph to Mr. Amar: "This slide is a lie. It is the main lie. It is the lie about how many people had started and completed FAFSAs. This shows nearly 600,000 people who had completed

19

a FAFSA with Frank. It is right there. Mr. Amar is presenting this." Tr. 3743:22-25. These arguments were improper and contrary to the evidence. *See* Rule 29 Br. II.A.1. In fact, weeks after the July 8 Capital One meeting, Mr. Amar provided accurate FAFSA account numbers in connection with JPMC's diligence request, which were inconsistent with the alleged misrepresentations in the FAFSA Completion Graph, but Mr. Amar was prevented from offering this evidence over the objections of Ms. Javice and the Government. *See infra* Section II.A.1.

**2.      The Court's Erroneous Responses to the Jury's Questions Failed to Correct Clear Misapprehension of Facts Not In Evidence**

The Court recognized the misleading nature of the Government's attribution of the FAFSA Completions Graph to Mr. Amar when considering the jury's question. But the Court's incorrect responses introduced ambiguities which failed to correct the jury's fundamental misunderstanding of the record. The jury deliberated with the belief that: (1) there may be evidence that Mr. Amar created the FAFSA Completions graph in the presentation to Capital One; and (2) there may be evidence that a presentation with the graph went to JPMC. These responses seriously prejudiced Mr. Amar and warrant a new trial.

**(a)      The Court Should Have Informed The Jury That The Record Was Devoid of Evidence Showing that Mr. Amar "Created" the FAFSA Completions Graph in the Capital One July 8 Presentation**

When the Court solicited the Government's position on the jury's question, the prosecution was unable to provide any evidence in the record to show the FAFSA completion graph was in fact created by Mr. Amar. That is because such evidence was not in the record at all.

First, referring to GX 3040, the final Capital One presentation, the Government wrongly represented that it showed authorship by Mr. Amar:

THE COURT:  . . . Does the document mention Mr. Amar?

MR. FERGENSON: Yes, Judge.

20

…

THE COURT: This doesn't say anything about Mr. Amar.

Tr. 3870:12-14; *id.* 3872:20.

Next, the Government attempted to offer argument, causing the Court to remark, "this should not be a contentious issue." Tr. 3872:10-11.

THE COURT: That means there is a page in the transcript that supports what you are saying.

MR. FERGENSON: There is, Judge.

THE COURT: I would like to see that page.

Tr. 3873:7-10. Ultimately, the prosecution did not—because it could not—point to any testimony.

The Government then attempted to use the same tactic as done during its redirect examination of Mr. Cowan, which the Court rebuffed. The Government directed the Court's attention to GX 3039, the communication between LionTree and Frank following the July 7 call with a prior version of the presentation. Tr. 3873:23-3875:23.

The Court rejected this effort, stating: "**I don't see the connection between 3039 and 3040**." Tr. 3875:6. The Court thereafter declined to instruct the jury as the Government proposed, recognizing that providing the jury the final presentation, GX 3040, "without saying more" on the issue of authorship would be misleading, Tr. 3881:13-16; and rejected the Government's request, stating "I am not putting thumbs on any scale," Tr. 3883:1-12.

> **(b)**    **The Court's Responses to the Jury's Questions Allowed The Jury to Find That the Graph Was Also Presented to JPMC, When It Was Not**

Although the Court declined to adopt defense counsel's formulation, it agreed to say that "there is no such document," Tr. 3880:9, and if the jury would like to see GX 3040, the presentation

to Capital One, it would state that it "doesn't mention authorship." Tr. 3881:2-3.[16] The Court did

not respond in the way it indicated it would and instead created additional confusion that caused

substantial unfair prejudice for two reasons.

*First*, the Court introduced a critical ambiguity in the response it previewed to defense

counsel, which suggested there may be a FAFSA Completions Graph "created" by Mr. Amar:

> There is no such document **and there is too many things putting it together.** We have a
> graph and e-mail that shows FAFSA completions, Exhibit 3040. **It** does not show who
> created the document and it was to Capital One, not to Chase.

Tr. 3885:19-24. That statement was equivocal over whether evidence existed to show that the

graph and email showing FAFSA completions was created by Mr. Amar and whether such a

presentation was sent to JPMC. Stating both that "there is too many things putting it together" and

that "it" (i.e., the document itself) does "not show who created the document" leaves open the

possibility that other evidence may have been presented that would allow the jury to conclude that

Mr. Amar created it (e.g., a percipient witness). In fact, however, no such evidence was introduced.

*Second*, the Court, without soliciting counsel's views, responded to a follow-up question

from the jury, which compounded this confusion. The jury asked immediately thereafter: "For

Exhibit 3040, is it the same presentation that was sent to [JPMC]?" Tr. 3886:11-12. This question

likewise assumed a fact not in evidence: that a diligence presentation was sent to JPMC. And it

also reflected that the jury failed to comprehend that Mr. Amar was not involved during JPMC

diligence, Tr. 735:16-20 (cross-examination of Leslie Wims Morris, head of corporate

development at JPMC during the Frank deal) ("When we purchased the company and her product,

everything I knew about her business and her product was conveyed to us directly by Ms. Javice."),

---

[16] Defense counsel made clear that it needed to be explicit that there is no evidence of Mr. Amar's
authorship and that "it needs to be said that it is in dispute in this case about whether or not he
created anything in connection with that slide." Tr. 3880:18-23.

due to Ms. Javice's efforts to cut him out of the deal, Tr. 647:14-648:10 (direct testimony of Ms. Wims Morris). Rather than solicit counsel's views, to consider a response that would correct any misimpression of facts not in evidence, the Court responded, "I am not able to answer that." *Id.*

These responses to the jury's questions reaffirmed the possibility that there may be evidence in the record that both Mr. Amar created a graph of FAFSA completions and that a presentation with that graph was also provided to JPMC. In reality, there was evidence of neither. The risk that the jury convicted Mr. Amar based on facts not in evidence compromises the reliability of the jury's verdict on all counts. A new trial is warranted on this basis alone.

3.    **The Court's Statements Regarding Timing of Deliberations Compounded Prejudice to Mr. Amar**

The prejudice caused by the Court's erroneous instructions during jury deliberations was further compounded by the Court's statements regarding its preference for quick jury deliberations.[17] The potential that the Court's statements to the jury rendered the jury unable to give due consideration to the evidence particular to Mr. Amar leaves grave doubt that the verdict returned was just. *See, e.g.*, *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (remanding for new trial because "in its context and under all the circumstances the judge's statement [that the jury had to reach a decision in the case] had the coercive effect attributed to it."); *United States v. Diamond*, 430 F.2d 688, 695–96 (5th Cir. 1970) (remanding for new trial where, during

---

[17] The Court's statements earlier that week suggested to the jury that the Court preferred deliberations to end on that Friday. On Monday, March 24, just four days before the jury reached its verdict, the Court stated to the jury, "I hope you had a pleasant weekend … And I hope I don't have to ask you that next week, did you have a pleasant weekend." Tr. 3154:2–6. On Friday, just after responding to the jury's questions pertaining to Mr. Amar, the Court reminded the jurors the day would end at 3 p.m. Tr. 3888:13–15. The jury returned a verdict within that timeframe by 2:33 p.m., just one hour after the Court provided a recharge on the "definition" of securities fraud. Tr. 3891:5–3899:21; *id.* at 3899:15-16 ("We have a note. It will be marked Court Exhibit 13. 2:33 p.m. 'We have reached a verdict.'").

supplemental instructions, the Court made prejudicial statements, such as, "Well I hope you will reach a verdict long before [the] time comes [for you to go home])."

## II. THE COURT'S DECISION NOT TO SEVER THE TRIAL AND RESULTING TRIAL ERRORS, INDIVIDUALLY OR IN THE AGGREGATE, SUBSTANTIALLY AND UNFAIRLY PREJUDICED MR. AMAR

The Court erroneously precluded significant evidence in support of Mr. Amar's antagonistic theory of defense, and likewise limited Mr. Amar's ability to present evidence and elicit testimony even when not offered for antagonistic purposes. Mr. Amar was forced, time and again, to offer evidence and argue to the jury to distinguish his conduct from that of his co-defendant and his relative involvement during diligence (which, by necessity, required showing that Ms. Javice acted alone). Ms. Javice's counsel is therefore not wrong to complain of the prejudice caused by the evidence and argument offered by Mr. Amar.

Still, in the Court's attempt to walk a "fine line" between balancing the two defendants' constitutional rights, the Court precluded Mr. Amar from offering significant evidence that went further than merely proving that he was not involved in the alleged misrepresentations. *First*, he was precluded from introducing evidence that showed repeated occurrences in which Ms. Javice concealed from Mr. Amar that the data he (and other employees) provided to her during diligence was altered before she alone transmitted it to Capital One and JPMC. *See infra* II.A. This category of evidence was crucial to prove Mr. Amar's lack of intent to defraud and would have directly rebutted a finding of conscious avoidance. *Second*, Mr. Amar was hindered from introducing evidence to rebut the Government's carefully curated presentation of evidence in their effort to inculpate Mr. Amar. *See infra* II.B.

As Mr. Amar argued in prior written and oral submissions to the Court, *see* Dkt. 292, 315, 349; Tr. 775:25-776:12, which are respectfully reasserted and incorporated herein, the failure to sever denied Mr. Amar a right to fair trial. The Court's attempt to balance constitutional rights of

both defendants resulted in numerous erroneous evidentiary rulings, which individually and collectively, are grounds for reversal.

### A. Precluding Antagonistic Evidence Negating Fraudulent Intent and Knowing Participation in a Conspiracy Was Erroneous and Unfairly Prejudicial to Mr. Amar

When Mr. Amar informed the Court in advance of trial of his antagonistic defense, the Court assured defense counsel that he would be permitted to pursue the defense, or else, mistrial would be triggered. *See* Tr. 27:24–28:5; 20:13-22.[18] Yet, beginning with the Government's first witness, defense counsel was repeatedly halted from introducing evidence and pursuing lines of examination over perceived concerns of prejudice to Ms. Javice. Indeed, the Court itself acknowledged it was curtailing Mr. Amar's defense to protect Ms. Javice:

> MR. MENCHEL: Your Honor, if you want to ask the questions I will do it any way you want. I don't want to upset the Court. I just want to get the right testimony.
>
> THE COURT: … I am trying to steer a fine line.
>
> MR. MENCHEL: I understand.
>
> THE COURT: And it is not always possible to do that.

---

[18] Because of the Court's decision not to sever the trial, Mr. Amar was in the untenable position of having to battle both the Government and Ms. Javice in order to introduce exculpatory evidence demonstrating lack of conspiracy and specific intent to defraud on the part of Mr. Amar. It was for this reason that Mr. Amar proactively raised the antagonistic defense with the Court and counsel for Ms. Javice and understood that he would be permitted to offer such evidence even at a joint trial. *See, e.g.,* Tr. 1231:20-1232:3 (during Frank Director of Marketing Jen Wong's examination, Mr. Amar's counsel seeks to introduce communication that Ms. Javice's counsel argues "suggest Ms. Javice is driving this process, this is what she wants to do" prompting "motion for mistrial and severance if this were to come in"); Tr. 2963:7-2965:17 (Ms. Javice's counsel objects to admission of GX 1250 as it results in Ms. Javice having "effectively two prosecutors" and subsequently renews "motion for mistrial and severance on that basis"); Tr. 2535:24-2536:1 Tr. 2539:4-18 (following Mr. Amar's cross examination of Mr. MacDonald, Ms. Javice's counsel moves "for a mistrial and severance" due to Mr. Amar's cross examination suggesting that "Ms. Javice was manipulating some data that isn't even contended by the government"); *see also, e.g.*, Tr. 3209:20-24 (Government claiming, despite introducing evidence and eliciting testimony relating to mislabeled impressions data against defendants, "[t]he central issue in this case is not this distinction between website impressions versus website visitors").

Tr. 1814:25-1815:9. In doing so, the Court's trial rulings, respectfully, severely impeded Mr. Amar's ability to put on a defense and infringed on Mr. Amar's right to a fair trial.

Mr. Amar was repeatedly obstructed from admitting evidence supporting his antagonistic defense theory, including those that were plainly relevant to the virtual data room documents shared with Capital One and JPMC, that the Government offered as proof of the alleged fraud. *See* Dkt. 292; Dkt. 315; Dkt. 349 & Items No. 1–4 in Appendix A.[19] Indeed, even when the Court recognized that such evidence may be relevant, it deferred ruling on its admissibility over concerns of prejudice to Ms. Javice. *See, e.g.*, Tr. 774:25-775:2 (in denying Ms. Javice's motion to sever, "THE COURT: Mr. Cogan said that [the defense will elicit testimony that Ms. Javice manipulated accurate data provided by Mr. Amar] and I granted your objection to the testimony."); *id.* 776:8-9 ("THE COURT: [Evidence that Mr. Amar would provide accurate information to Ms. Javice, which she changed and transmitted without including Mr. Amar] may be relevant. I will examine it when it comes in. It is not in yet."; *id.* at 776:13 ("THE COURT: I say I couldn't allow [the

---

[19] These submissions are respectfully incorporated herein. In addition to the exhibits addressed in this brief, the Court denied admission of numerous other documents establishing Mr. Amar's limited involvement during diligence, and the repeated instances where Mr. Amar or other Frank employees provided to Ms. Javice accurate information in connection with diligence requests, which she manipulated before she alone transmitted the data to LionTree, Capital One, or JPMC. *See* Dkt. 292 (identifying evidence of Mr. Amar's involvement in diligence vis-à-vis Mr. Glazer: DX OA 234, GX 1457); Dkt. 349 (identifying evidence of Ms. Javice mislabeling data relating to user engagement: DX OA 88, DX OA 153, GX 802-5; identifying evidence of Ms. Javice mislabeling Google Analytics data: GX 802-5; identifying evidence of Ms. Javice mislabeling website impressions data: GX 802-22, GX 801-51, DX OA 90, GX 1547; identifying evidence of Ms. Javice altering age distribution data: DX OA 53, DX OA 53-A, GX 1153, GX 1153-A; identifying evidence of Ms. Javice altering scholarship data provided by Mr. Amar: DX OA 197, DX OA 203; identifying evidence of Ms. Javice misrepresenting FAFSA submitter capacity: GX 1405, DX OA 228; identifying evidence of Ms. Javice modifying a monthly users report provided by Mr. Amar: DX OA 176, DX OA 176-A, DX OA 212, DX OA 212-A, DX OA 233).

evidence] at the time."). At a minimum, it should have been for the jury to consider such evidence regarding Mr. Amar's lack of knowledge and intent.

### 1.    Age Distribution Exhibits (DX OA 204, 204-A; DX OA 200, 200-A; DX OA 238, 238-A)

The Court's erroneous preclusion of evidence supporting Mr. Amar's antagonistic defense, and the resulting prejudice, is demonstrated by its wholesale exclusion of evidence concerning JPMC's diligence request for demographic data on Frank's FAFSA users. *See* Tr. 3319:17-19. As set forth in Mr. Amar's prior submission, which is incorporated herein, Mr. Amar sought to introduce among other exhibits, DX OA 204 and 204-A, a communication from Mr. Amar to Ms. Javice with an attached spreadsheet, which included a column of raw FAFSA user numbers. This column clearly showed **a total of 5,931 FAFSA users over several months**. This exhibit is strong proof of Mr. Amar's lack of intent to defraud, and undercuts any evidence of conspiracy, because it shows him not hesitating to provide, in response to a JPMC request, real data that clearly indicated that the actual number of Frank's FAFSA users was far below the 4.25 million number that formed the crux of the Government's case.

| month | (Multiple Items) | | | | |
|---|---|---|---|---|---|
| | | | March-May | | |
| Row Labels | Count of distinct id | | Age | Count | Percentage |
| 15 | 8 | | 15 | 8 | 0.16% |
| 16 | 48 | | 16 | 48 | 0.99% |
| 17 | 546 | | 17 | 546 | 11.25% |
| 18 | 1184 | | 18 | 1184 | 24.39% |
| 19 | 635 | | 19 | 635 | 13.08% |
| 20 | 406 | | 20 | 406 | 8.36% |
| | | * | * | * | |
| 80 | 1 | | 80 | 1 | 0.02% |
| 81 | 1 | | 81 | 1 | 0.02% |
| 114 | 1 | | 114 | 1 | 0.02% |
| undefined | 1077 | | | 4854 | |
| Grand Total | 5931 | | | | |

*(DX 204-A: attachment sent by Mr. Amar)*

In addition, Mr. Amar sought to introduce DX OA 200 and 200-A, reflecting Ms. Javice's transmission of an altered version of Mr. Amar's data to LionTree (without Mr. Amar included), which removed the FAFSA user "Count" column and used an Excel formula to skew the age distribution of FAFSA users to a younger, more favorable, demographic; and DX OA 238 and 238-A, which reflected JPMC's receipt of Ms. Javice's spreadsheet:



*(DX OA 204-A: attachment sent by Mr. Amar)        (DX OA 200-A: attachment sent by Ms. Javice)*

These documents were squarely relevant to the key alleged misrepresentations in the case. Opposing their admission, the Government sought to diminish their probative value, asserting the evidence, which included a FAFSA user count, did not relate to—"the number of users and specifically, what those users had provided to JPMorgan"—and second, "[i]t d[id]n't matter what discussions Mr. Amar and Ms. Javice had about changing data that was transmitted to the bank." Tr. 2538:3-7, 14-15. Far from the truth, the prosecution's theory of motive was that the defendants thought potential buyers would pay more for a younger demographic—indeed, the Government's own witnesses testified as much—and therefore inflated the number of Frank's FAFSA accounts. Tr. 36:24-37:5; *see, e.g.*, Tr. 2144:22-2145:5 (Mr. Young testifying that Capital One wanted to acquire a large audience of young people to cross-market financial products). Thus, these exhibits are plainly relevant and probative of lack of intent to deceive.

On the Government's theory, Mr. Amar conspired with Ms. Javice to deceive potential acquirers by representing that over four million Frank website users were those who completed

FAFSA applications, because they knew buyers would want to acquire a younger demographic of engaged FAFSA product users. But the evidence showed that (1) Mr. Amar downloaded data from reliable analytical tools in response to a diligence request that reflected actual counts for those product users and sent that data to Ms. Javice, and (2) Ms. Javice, without including Mr. Amar on any correspondence, sent an altered version of his data to LionTree, which removed both the number of actual FAFSA accounts and increased the proportion of younger FAFSA user. Such evidence was important for the jury to see, as it rebutted the Government's allegations of Mr. Amar's involvement in making these alleged misrepresentations to the banks and undermined any potential finding of conscious avoidance.

The Court denied Mr. Amar's motion to admit such evidence, ruling in favor of both the Government and Ms. Javice on grounds of "relevance," because the documents required "explanation" from a "percipient witness" and "issues of completeness." Tr. 3316:20-3317:6; *see also* Tr. 3319:17-19 ("THE COURT: … No one was asked why [Mr. Amar] gave it, in what connection he gave it, how it was received, in what connection it was received."). That ruling was erroneous and unfairly prejudicial for several reasons: (1) the rationale was inconsistent with the Court's prior remarks that such evidence would not be subject to preclusion on grounds of antagonism; (2) the Court itself did not permit defense counsel to elicit testimony relating to such connection; (3) additional percipient witness testimony was not necessary, as defense counsel sought to admit such evidence through Mr. Amar's summary witness that established the relevance on the face of the documents; and (4) at the behest of the Government, the ruling was erroneously applied to other evidence on the same grounds.

*First,* during the pre-trial *ex parte* colloquy regarding severance, defense counsel specifically previewed for the Court—and explained in the face of the Court's questioning as to

its admissibility—why evidence that Mr. Amar was unaware of inaccurate statements made by Ms. Javice was directly relevant to Mr. Amar's knowledge and intent. *See* Jan. 23, 2025 Tr. 28:25–29:15 (MR. BUCKLEY: "[W]e expect the government is going to seek a conscious avoidance charge here of willful blindness and argue that one of the ways that the jury should convict Mr. Amar is that he willfully blinded himself to various red flags, and they're going to point to various statements, we expect, by Ms. Javice and say those constituted red flags that Mr. Amar consciously avoided, and therefore you can infer that he knew of the fraud. We are going to contend that he was not aware of those red flags in part because of Ms. Javice's deception."). The Court's refusal to sever, on the one hand, coupled with its refusal to consider this evidence during trial, on the other hand, underscores the unfairness. This prejudice was compounded by the Court's *sua sponte* decision to charge the jury on a conscious avoidance theory. *See infra* Section III.

*Second*, the Court consistently deferred ruling on the admission of these documents, over concerns of prejudice to Ms. Javice, preventing Mr. Amar from eliciting testimony from JPMC witnesses. Defense counsel moved to admit such evidence on the cross-examination of a Government witness from JPMC, Alex Sweeney, after the Court did not permit Mr. Amar to do so on cross-examination of the Government's first JPMC witness, Ms. Wims Morris. *See* Dkt. 315.[20] The Court ruled that DX OA 238 and DX OA 238-A, reflecting LionTree's transmission of the altered data to JPMC, could be admitted only subject to connection. *See* Tr. 1515:6–1516:12.

---

[20] Defense counsel first sought to introduce such evidence on cross-examination of Ms. Wims Morris, after she testified that early in the diligence period Ms. Javice informed her that 70 percent of Frank's customers were under the age of 24, because it was "important to understand who her customers actually were." Tr. 756:20-757:6. Counsel for Ms. Javice moved to strike such testimony. Tr. 757:7. The Court, without the benefit of understanding Mr. Amar's complete defense initially and erroneously concluded that "what Javice told Amar and what Javice told Chase are not relevant to Amar's case. Amar is not more if not less guilty depending on the status of culpability of Javice, and I think that your going into this has no value to Amar but has prejudicial value for Javice." Tr. 758:17-24.

The Court noted with respect to prejudice to Ms. Javice, that defense counsel "is not doing anything with it now." Tr. 1489:17-20.

When defense counsel attempted to establish such a connection with the Government's witness, Ryan MacDonald, JPMC's head of growth financial products for the consumer bank, the Court did not admit OA 238 or OA 238-A into evidence, even though the witness recognized the exhibit and recalled seeing an age breakdown of Frank's FAFSA users during diligence. *See* Tr. 2526:24-2527:9. The Court again prevented the defense from eliciting testimony about JPMC's approval of the acquisition, and a related document in evidence, which featured the altered age distribution data. Tr. 2528:19-2529:17. The Court stated that such questioning was "not for the witness." Tr. 2529:22-25. Defense counsel argued that such examination was necessary to "establish a connection," but was told not to "argue" because the "ruling" was made. Tr. 2529:23-2530:3. When Ms. Javice again moved for mistrial and severance, the Court reasoned "very little, if anything" came in today. Tr. 2573:11-2576:10. To preclude such evidence for lack of percipient witness testimony that Mr. Amar was not permitted to elicit is fundamentally unfair and denies due process.

*Third*, additional percipient witness testimony was unnecessary to explain the relevance of the documents or for completeness. A jury could readily draw reasonable inferences that Mr. Amar assisted with JPMC's diligence request for data relating to the age of Frank's FAFSA users, that he provided a version of the spreadsheet with figures that are inconsistent with the alleged fraud, and that Ms. Javice altered the version Mr. Amar provided to her and excluded him on the transmission of that altered data during diligence. These inferences are reasonably drawn from the face of the communications Mr. Amar sought to admit, based on their contemporaneous timing,

the sender and recipients, and a straightforward comparison of the contents of the attached spreadsheets:

- **DX OA 238 and DX 238-A**: July 28, 2021, email from JPMC employee, forwarding communication and spreadsheet attachment from LionTree, copying Mr. MacDonald, Mr. Sweeney, and Ms. Wims Morris. Mr. MacDonald testified on cross-examination that he recognized the spreadsheet entitled "Age_distribution_72821" and the receipt of data reflecting the age distribution of Frank's FAFSA users during diligence. Tr. 2526:18–2527:4.

- **DX OA 200 and DX 200-A**: July 28, 2021, email from Ms. Javice to LionTree from earlier in the afternoon, at 2:51 PM, in which she sends a spreadsheet attachment entitled the same.

- **DX OA 204 and DX 204-A**: July 28, 2021, Slack communication from Mr. Amar to Ms. Javice from thirty minutes earlier, at 2:27 PM, in which Mr. Amar attaches a spreadsheet entitled "Age Breakdown Mar-May 2021.csv."

- **GX 801-1**: July 28, 2021, defendants' contemporaneous WhatsApp messages less than half an hour earlier, at 2:06 PM, in which Ms. Javice directs Mr. Amar to "pull age" from Mixpanel, which witnesses testified was a Frank database storing data on Frank's FAFSA users.

As Mr. Amar's summary witness, Peter Manning, testified outside the presence of the jury, a comparison of Mr. Amar's spreadsheet with Ms. Javice's spreadsheet showed that they were the same, except in two critical ways: Ms. Javice's spreadsheet (1) *removed the columns containing absolute counts of FAFSA users*, thereby removing any indication of the relatively small number of people to which the percentages corresponded, and (2) *inflated the percentage data for ages 17 and 18*, so that the data skewed younger. No further witness testimony was necessary. Tr. 3308:9–3310:25. The blatant modifications to Mr. Amar's data—done without Mr. Amar's knowledge or involvement—spoke for themselves.

*Fourth*, the Court further erred by applying that ruling to categorically exclude other documents unrelated to the age distribution exhibits. For example, counsel for Mr. Amar attempted to introduce GX 802-51 and DX OA 90 into evidence—two documents which, when taken

32

together, substantiate Mr. Amar's long-standing contention that he provided accurate data during diligence that was later altered by Ms. Javice. Tr. 3376:10-3378:21. As with the "age distribution" documents, the import and relevance of these documents is self-evident: GX 802-51 shows Mr. Amar receiving a data file from Ms. Wong of clicks and impressions data; DX OA 90 shows Mr. Amar providing that same data file to Ms. Javice, just two minutes after he originally received it. These documents were squarely related to the Government's own proof of the alleged misrepresentations during diligence. At trial, the Government represented that the mislabeled visitors data was "relevant," that Ms. Javice allegedly mislabeled it from a file titled "GSC clicks and impressions data," and that the mislabel is one of its "arguments" against Defendants. Tr. 848:6-849:4 (direct testimony of Mr. Gaddis); 855:4-856:9 (argument outside the presence of the jury).

The Court excluded these documents on the basis that they were "related" to the age distribution documents previously excluded. *See* Tr. 3377:1–3378:21. The Court asked, "Didn't we do that yesterday? Wasn't there an exhibit with columns?" and the Government stated that the ruling related to the age distribution documents applied to these documents:

> Mr. Buckley had shown one document that was meant to be a category of documents. It's all in the same flavor, essentially, that there was data that Mr. Amar provided to Ms. Javice and that they later claimed that Ms. Javice changed or altered…. And so this is within the same category.

*Id.* This was incorrect. Yet the Court categorically excluded these documents. *See* Tr. 3377:24–3378:15. The Court's exclusion of this evidence was directly at odds with its guidance when Mr. Amar previewed his antagonistic defense before trial. *See* Jan. 23, 2025 Tr. 20:18–20 (THE COURT: "If I were to curtail a defense, I would [be] triggering a mistrial, wouldn't I? Isn't that right? I can't restrict your ability to put in relevant information."). As the Court previously recognized, the exclusion of relevant evidence tending to prove that someone other than defendant

33

committed the crime charged would deny the accused the fundamental right to present evidence in his own defense. *See, e.g.*, *United States v. Robinson*, 544 F.2d 110, 112-113 (2d Cir. 1976). Ultimately, Mr. Amar's attempts to admit these documents were unsuccessful, *see* Dkt. 349, and as a result, Mr. Amar's defense was inarguably curtailed.

### B.   Precluding Evidence and Testimony Necessary to Clarify Mr. Amar's Role During Significant Events of the Alleged Fraud Was Erroneous and Unfairly Prejudicial

Faced with repeated threats of mistrial, the Court precluded other evidence and testimony, in a manner that not only curtailed Mr. Amar's antagonistic defense, but also his ability to rebut the Government's efforts to inculpate Mr. Amar based on a carefully curated presentation of evidence. The below errors, among others, individually and cumulatively, warrant a new trial.

### 1.   LionTree Email Regarding VDR 3.1.8. (GX 1547)

The Court did not permit Mr. Amar to introduce certain correspondence into evidence on the examination of Mr. Cowan, because Mr. Amar was not a "recipient" of the communication. This erroneous ruling was prejudicial and necessary to rebut the Government's allegations that Mr. Amar made misrepresentations during Capital One diligence.

As explained *supra*, the Government introduced evidence and elicited extensive testimony regarding Frank's website impressions data shared during diligence that was "mislabeled" as visitors data. The Government elicited testimony that Mr. Amar, along with Ms. Javice and Mr. Glazer, was included in correspondence, GX 3017 and GX 3017-A, attaching the mislabeled data, and yet Mr. Amar was not included on correspondence with LionTree, GX 3044, discussing how to advise potential buyers of the correction. *See* Tr. 191:3-196:11; 197:5-7 ("Q. Now, Mr. Cowan, Olivier Amar is not on this email chain, correct?" A. That is correct."). The jury was therefore left with the misleading impression that the fact Mr. Amar was not included in the email with LionTree discussing the potential correction suggested that he was not the source of the correction.

Defense counsel therefore sought to introduce GX 1547, a continuation of GX 3017 and GX 3017-A, in which Ms. Javice presumably speaking on behalf of Mr. Amar stated that the impressions figure Mr. Amar quoted on a call with LionTree represented unique visitors. Tr. 376:5-377:16 (cross-examination of Mr. Cowan). The Court precluded the evidence on grounds that Mr. Amar was "not on the memo. He's not on the email." Tr. 377:14-15. As defense counsel argued, the document was not offered to prove the truth of that statement, *see* Tr. 378:11-22, but to show that Mr. Amar was also not included on an email between LionTree, Ms. Javice, and Mr. Glazer, where either individual could have corrected that the unique visitors data represented impressions.

Nevertheless, the Court concluded the email was not admissible on the basis that Mr. Amar was "not the recipient of" the email and the communication was offered for the truth of the statements. Tr. 378:11. The Court thereafter encouraged Ms. Javice's counsel to object on grounds of antagonism. *See* Tr. 378:1–379:15; 416:12-420:4.

### 2.    Slack Communication Regarding VDR 3.1.4 Data Pull (GX 802-5)

The Court also erroneously precluded admissible state-of-mind evidence in the form of Slack communications as to the alleged misrepresentations regarding Frank's FAFSA users, characterizing it as lacking any "relevance." For example, on the cross examination of Ms. Wong, Mr. Amar sought to admit into evidence GX 802-5, a Slack communication in which Mr. Amar directed Ms. Wong to pull data regarding Frank's website users from Google Analytics. *See* Tr. 1228:5-23. The Government objected on hearsay grounds, while impermissibly commenting before the jury regarding its inability to examine Mr. Amar. Tr. 1228:24-1229:11.

The Court appeared to recognize the probative nature and non-hearsay use of the communication to establish Mr. Amar's state of mind in directing Ms. Wong to download information about Frank's users from Google Analytics, *see* Tr. 1231:11-19 ("Well, you can't say it's accurate or not; just to pull information from Google Analytics"; "No you can't use accurate.

She's not vouching for it. She says this is what Google Analytics shows"; "Any objection to that?"). However, upon hearing the threat of mistrial lodged by Ms. Javice's counsel, the Court reversed course. Tr. 1231:20-1232:3 (characterizing evidence as "directly adverse to our client" that it would imply that "Ms. Javice is driving this process, this is what she wants to do," and would therefore constitute another basis for mistrial and severance).

The Court precluded the communication, stating that "the argument of relevance is very thin and the probability of use of hearsay and information of little relevance outweighs that relevance. It's a 403 point." Tr. 1232:16-18. That ruling was in error, and significantly prejudicial to Mr. Amar as critical state-of-mind evidence with respect to the key alleged misrepresentation at the heart of the case. While the Government was permitted to argue that both defendants misrepresented the number of Frank's FAFSA users, Mr. Amar was not permitted to introduce evidence in support of his defense that he understood that the diligence request pertained to Frank's website users, as made apparent by his willingness to communicate with another Frank employee about that request and how to download data for diligence in support of that request.

### 3.    JPMC Initial Data Transfer Emails (GX 1250 and GX 1328)

The Court erroneously ruled that Mr. Amar could not introduce GX 1250 and GX 1328, critical email communications necessary to rebut the Government's allegations that Mr. Amar conspired with Ms. Javice to transfer purchased student data to JPMC in January as a cover up to the alleged fraud. During the cross-examination of Mr. MacDonald, the Court precluded Mr. Amar from admitting evidence and eliciting testimony about the receipt of Frank's user data and the communications that occurred concerning those transfers. The Court limited the scope of examination to the mere fact that Mr. Amar was not invited or present at a meeting in January, during which the contents of the data files were discussed. Tr. 2533:22-25.

When defense counsel sought to admit GX 1250 and GX 1328, emails Mr. MacDonald received or sent concerning the data transfers in January, the Court initially sustained objections on grounds of antagonism, even though, as defense counsel argued, the evidence was necessary to rebut allegations of conspiracy. Tr. 2535:22-23. The fact that Mr. Amar was not "involved in transferring data and communications about transferring to the data to the bank" was critical for Mr. Amar to be able to rebut allegations that he conspired with Ms. Javice with respect to the alleged continuing efforts to conceal the fraud. Tr. 2535:12-19. The Court said it would reconsider and ultimately refused to allow defense counsel to lay the foundation necessary for their admission, on the erroneous ground that the witness (despite being both on the communications and identifying them as such) did not have an independent memory of the emails. Tr. 2542:11-22; 2544:2-2545:1. That ruling was directly contrary to the Court's earlier, and correct, statement at trial allowing a document into evidence "through anybody who is a recipient who has knowledge and can satisfy a foundation." Tr. 96:1-3.

The erroneous exclusion of that evidence prejudiced Mr. Amar because it again prevented him from clarifying his limited role in the January data transfers and left him unable to respond to key Government allegations. After the Court's initial preclusion of GX 1250 and GX 1328, the Government introduced GX 1017—an email chain beginning with a communication from JPMC employees to Mr. Amar with instructions related to the data transfers—through its summary witness Rachel Danko. The Government, however, did not introduce the communications stemming from that same initial email GX 1250 and GX 1328, that Mr. Amar had sought to admit with Mr. MacDonald. Left with just GX 1017, the jury was under the misimpression that Mr. Amar was one of the primary actors in Frank's data transfer when, in fact, he had little to no involvement. The introduction of GX 1250 and GX 1328 were important to Mr. Amar's defense because they

would have corrected this misimpression: these emails, which stemmed from the original email that the Government introduced, make clear that Mr. Amar's only action in connection with the data transfer was to forward Ms. Javice the originating email.

The Court initially agreed that Mr. Amar could introduce one of the communications with Ms. Danko under Rule 106. Tr. 2957:23-2958:7. Ultimately, the Court reversed course and ruled that the evidence could only be admitted if Mr. Amar agreed to allow GX 801-51, a highly unfairly prejudicial and misleading WhatsApp message, which had already been precluded. *See* Dkt. 336; Tr. 2968:7-16; *id.* 2958:9-2960:10; 2961:4-5 ("THE COURT: If you want your piece of evidence to come in, this will come in."). The WhatsApp conversation could not conceivably be admitted under Rule 106 with respect to the email strings at issue, nor was there a basis to revisit the Court's prior ruling precluding the messages. This ruling lacked an evidentiary foundation, denied due process, and itself warrants a new trial. The prejudice caused by this ruling was compounded by the Government seeking to handicap Mr. Amar's ability to introduce other evidence based on the same rationale.

## III. THE COURT'S ERRONEOUS CONSCIOUS AVOIDANCE CHARGE, WITHOUT A FACTUAL PREDICATE, COMPOUNDED UNFAIR PREJUDICE CAUSED BY PRECLUSION OF DEFENSES

Absent any evidence supporting a sufficient factual predicate for a conscious avoidance charge, permitting Mr. Amar's conviction to stand would be manifestly unjust. A conscious avoidance instruction should "rarely" be given because of the danger that a jury will find the defendant guilty based on less than a criminally culpable state of mind. *See, e.g.*, *United States v. Morales*, 577 F.2d 769, 744 n.4 (2d Cir. 1978) (a conscious avoidance instruction poses the risk that jurors will convict for a "kind of negligence or foolishness that does not constitute a basis for a 'knowing' violation."). The charge was doubly prejudicial, where the Court erroneously precluded significant evidence offered in support of Mr. Amar's antagonistic defense, *see supra*

Section II, which would have rebutted a finding of willful blindness. *See United States v. Catano-Alzate*, 62 F.3d 41, 43 (2d Cir. 1995) (conscious avoidance does "not permit a finding of guilty knowledge if the defendant actually did not believe that he or she was involved in the [alleged illegal activity], however irrational that belief may have been").

The Court's rationale did not rely on a predicate supported by the evidence, as the law requires. Only after a finding that "the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability" of a fact, yet "consciously avoided" it, would such a charge be permissible. *See United States v. Ferrarini*, 219 F.3d 145, 157-78 (2d Cir. 2000) (quoting *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)).

The Court determined a conscious avoidance charge was appropriate based on its belief that the Government would argue that Mr. Amar's involvement "with the charts" showed "intent to use false information." Tr. 3465:20-3468:18; *id.* at 3466:5-3; Tr. 3760:24 - 3761:1 ("There will be a conscious avoidance charge given because, as I said before, it's in the case whether or not argued.")

This ruling was erroneous for three reasons.

*First*, the Government did not pursue a theory of conscious avoidance against Mr. Amar, and the prosecution did not argue it at closing. Instead, the Government portrayed Mr. Amar and Ms. Javice as having actual knowledge of the misrepresentations, Tr. 3508:20-3509:2, 3586:4-10, 3511:4-10, who worked together during the alleged cover-up, *id.* 3512:24-3513:3. Indeed, the Government never argued Mr. Amar deliberately avoided knowing that Capital One and JPMC were being deceived by misrepresentations concerning Frank's FAFSA users and, instead, consistently portrayed Mr. Amar and Ms. Javice possessing actual knowledge of the alleged

misrepresentations during diligence, Tr. 36:19-24; 40:3-5; 40:18-22; 40:24-41:4, JPMC's validation of Frank's data, *id.* 37:21-23, and the purported cover-up, *id.* 39:7-11.

*Second*, consistent with the fact that the Government did not pursue such a theory, it did not offer any evidence sufficient to satisfy the necessary factual predicate. Specifically, the prosecution did not offer evidence that could give rise to any inference that Mr. Amar took "*deliberate actions* to avoid confirming" the fact at issue, namely that Ms. Javice was committing fraud. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-70 (2011) (emphasis added); *Ferrarini*, 219 F.3d 145, 157-78 (2d Cir. 2000). There was no evidence concerning "charts" that would prove deliberate actions to avoid knowledge of the alleged misrepresentations. *See* Rule 29 Br. III. Indeed, there was no evidence that he was involved in any diligence charts that showed alleged misrepresentations, nor any evidence he ignored or avoided confirming whether such charts contained misrepresentations. To the extent the Court was referring to the VDR document 3.1.4, no record evidence showed what Mr. Amar saw or knew about the information reflected in the spreadsheet when shared with Capital One or JPMC. *See* Rule 29 Br. II.A.1. By contrast, Ms. Jen Wong, a former employee on Mr. Amar's Growth Team, testified that she "fill[ed] out the spreadsheet," which contained accurate sessions data originating from Google Analytics. Tr. 1078:13-1801:3. Any alleged misrepresentation occurred when Ms. Javice later modified the document before transmitting it to LionTree (without Mr. Amar's involvement) for inclusion in the VDR (to which Mr. Amar did not have access). *See* Rule 29 Br. II.A.1.

*Third*, while conscious avoidance may be used to establish knowledge of a criminal endeavor, it may not be used to establish the defendant's "intent to use false information," as the Court's remarks suggested. *Ferrarini,* 219 F.3d at 145. Where, as here, "the substantive offenses underlying the conspiracy charges require the specific intent" to defraud, and "not simply

40

knowledge that these crimes were afoot, conscious avoidance would not provide the requisite proof needed for conviction." *United States v. Samaria*, 239 F.3d 228, 240 (2d Cir. 2001), overruled on other grounds by *United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008).

This error was prejudicial to Mr. Amar and cannot be deemed harmless. *See United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994). Here, there was no evidence to support a finding that Mr. Amar, while performing work at the direction of Ms. Javice consistent with his role as Frank's Chief Growth Officer, took steps to avoid learning that unbeknownst to him Ms. Javice was manipulating, altering, or otherwise mischaracterizing data, in ways that allegedly deceived Capital One and JPMC into believing that Frank had millions of FAFSA accounts. Thus, this case is in contrast to one where a defendant is presented with the fact at issue but deliberately ignores or closes his eyes to it. *See, e.g.*, *United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995) (in case involving violations of Clean Water Act, conscious avoidance instruction appropriate where witness testified that on 25–30 occasions when he presented defendant with satisfactory water samples after having previously presented him with unsatisfactory samples, defendant insisted, "I know nothing, I hear nothing."). Absent a factual predicate, the charge was erroneously put to the jury, where at most they could infer negligence. *See United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) ("decided not to learn the key fact, not merely . . . failed to learn it through negligence") (citing *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993)); *see also United States v. Pacific Hide & Fur Depot, Inc.*, 768 F.2d 1096, 1098 (9th Cir. 1985) ("It is not enough that defendant . . . negligently failed to inquire.").

The trial record makes clear that the prejudice caused by the Court's decision to charge a conscious avoidance theory over defense counsel's objections was compounded because the jury likely did not appreciate how the theory applied to the conspiracy count. It is only "if the

defendant's participation in the conspiracy has been established [that] conscious avoidance may support a finding with respect to the defendant's knowledge of the objectives or goals of the conspiracy." *United States v. Eltayib,* 88 F.3d 157, 170 (2d Cir. 1996). The Court's lengthy charges and the jury's apparent inability to absorb the instructions suggests that the charge did not make certain that the instruction did not apply to consideration of *mens rea* for the conspiracy count.[21]

The risk is too great that the jury convicted simply because Mr. Amar failed to take steps to confirm what he—and no other Frank employee who likewise assisted Ms. Javice during the Frank acquisition—never suspected, not that he acted to deliberately to ignore red flags.

## IV.    THE COURT'S ERRONEOUS PRECLUSION OF GOOD FAITH EVIDENCE AND RESULTING TRIAL ERRORS, INDIVIDUALLY OR IN THE AGGREGATE, SUBSTANTIALLY AND UNFAIRLY PREJUDICED MR. AMAR

The Court erroneously precluded evidence in support of Mr. Amar's good faith defense. Those errors each compromised the reliability of the verdict. Individually and collectively, they require reversal and a new trial.

### A.    Excluding Evidence and Testimony Regarding Mr. Glazer's Involvement in Diligence was Erroneous and Unfairly Prejudicial

The Court excluded evidence and testimony regarding Mr. Glazer's active involvement in the marketing and sale of Frank in support of Mr. Amar's good faith defense, despite the Court's pre-trial ruling that Mr. Amar could offer such evidence. The prejudice to Mr. Amar was compounded because the Government strategically chose not to call Mr. Glazer as a witness, which

---

[21] Indeed, the Government's own proposed instruction included an explicit statement that conscious avoidance "cannot be used as a basis for finding that the defendant you are considering knowingly joined the conspiracy" since it "is logically impossible for a defendant to agree to join the conspiracy unless he or she affirmatively knows that the conspiracy exists" and that "if the defendant was merely negligent or careless with regard to what knowledge he or she had, he or she lacked the knowledge necessary to become a coconspirator." *See* Dkt. 198 at 56.

created a false impression that Mr. Glazer was *not involved* in the sale of Frank, and that his absence was a basis to infer fraudulent intent.

      1.      **Before Trial, the Court Properly Determined that Mr. Amar Could Introduce Documents Concerning Mr. Glazer's Presence During Diligence, But It Then Refused to Admit Such Evidence At Trial**

As set forth in Mr. Amar's prior submissions, which are respectfully reasserted herein, evidence of Mr. Glazer's involvement was relevant to negate the Government's allegations that Mr. Amar had the intent to defraud. *See* Dkt. 233; Dkt. 327. Before trial, the Court ruled that Mr. Amar would be permitted to demonstrate his good faith and lack of fraudulent intent based on evidence of Mr. Glazer's involvement, even if he could not pursue a formal advice of counsel defense. *See* Feb. 4, 2024 Hr'g Tr. 63:19-65:4 ("THE COURT: You make your own case. I don't interfere with your making a case.") ("I'm not precluding evidence that attorneys were hanging around."). In reliance on that ruling, and on the Government's claim during its opening statement that the jury would hear from a lawyer who worked at Frank, referring to Mr. Glazer, Mr. Amar's counsel informed the jury during opening statements that they would hear evidence of Mr. Glazer's involvement in due diligence and his involvement in reviewing and approving Frank's representation on its website regarding 4.25 million users. *See* Tr. 40:10-11, 75:6-9, 76:12-77:8. Contrary to its initial ruling and the defense's reliance upon it, the Court repeatedly prevented Mr. Amar from introducing such evidence at trial to the substantial prejudice of Mr. Amar.

The Court's erroneous rulings were based on the Government's mischaracterizations on the record that the evidence was being offered in support of an "advice of counsel" defense.[22] The

---

[22] *See* Tr. 325:14-18; 340:18-341:3; 354:3-355:3 (seeking to admit OA 234, a June 14, 2021 email from Mr. Cowan reflecting that Mr. Amar was not given access to Frank's virtual data room) 362:6-14; 364:1-16; 1218:19-1220:18; 2922:9-2925:5 (seeking to admit OA 3, an April 30, 2021 email from Mr. Glazer announcing to Frank investors that Frank had reached 5.3 million users);

Court explained that it was prohibiting evidence about Mr. Glazer because it believed Mr. Amar was "trying in an indirect way to get him involved as a lawyer issuing legal opinions." Tr. 3373:18-22. Based on that critical misunderstanding, the Court excluded evidence upon the mere mention of the name "Glazer" without further consideration, even when it was about something other than Mr. Glazer's involvement in the acquisition process or was necessary to counter the Government's misleading suggestions to the jury about Mr. Glazer's *absence. See infra* IV.A.3; *see* Tr. 3107:2-18 (MR. COGAN: "Okay. I just want to know——" THE COURT: "I heard it. It's sustained. We've been fighting this fight now for almost every day. Sustained. Don't touch it." MR. COGAN: "I'll obviously follow your Honor's instruction. ***This is something entirely different.***" THE COURT: "Yes, you will." (emphasis added) (cross-examination of Jennifer Zeitler, Frank's Director of Marketing Automation).

Similarly, the Court erroneously rejected the defendants' proposed good faith jury instruction that addressed the relevance of counsel: "In evaluating whether a defendant acted in good faith, you may consider whether she or he had any discussions with counsel, or understood that counsel had been consulted, concerning the propriety or legality of conduct that the government claims was allegedly fraudulent." Dkt. 203 at 28. Compounding the error, the Court threatened to use the Government's proposed "presence of counsel" charge if defense counsel raised the issue in summation. Tr. 3496:23-25. The Government's "presence of counsel" instruction would have nonsensically instructed the jury that the Defendants "cannot claim, that the defendants' conduct was lawful because they acted in good faith on the advice of a lawyer,"

---

3373:2-3375: (seeking to admit OA 247, an August 4, 2021 email from Mr. Vovor to Mr. Glazer regarding his stock options); 3676:11-19; 3724:11-16.

though, as explained, that is not what Mr. Amar was claiming. Dkt. 198 at 54. These rulings severely prejudiced Mr. Amar's ability to mount a defense.

### 2.    Evidence Regarding Mr. Glazer's Involvement in Due Diligence Negated Any Inference of Mr. Amar's Fraudulent Intent and Was Critical to His Good Faith Defense

Mr. Amar was not seeking to introduce evidence to establish that he received a formal legal opinion from Mr. Glazer. Instead, he sought to present evidence of Mr. Glazer's active participation in discussions, representations, and due diligence to demonstrate Mr. Amar's good faith when participating with Mr. Glazer in those same activities. This type of evidence—even if not a full-throated or formal "advice of counsel" defense—is a recognized good faith defense and uncontroversial way to negate scienter. *See, e.g., Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter"); *United States v. Hagen*, 542 F. Supp. 3d 515, 517, 518–519 (N.D. Tex. 2021) ("[A] good-faith defense is based on a lack of knowledge of wrongdoing and an absence of intent to participate in the offense; it does not require advice of counsel." (internal quotation marks omitted)).

Mr. Glazer's involvement as Frank's CLO was critical to Mr. Amar's good faith defense for a number of reasons. First, Mr. Glazer was not alleged to have been part of the conspiracy and yet the evidence showed Mr. Amar talking openly and directly with Ms. Javice in front of Mr. Glazer about the key alleged FAFSA account misrepresentations. Second, Mr. Glazer was an executive at Frank whose responsibilities involved review of representations about Frank and its customer base in outward-facing materials, and his approval of Frank's numbers clearly contributed to Mr. Amar's good faith belief that they were accurate. In other words, the fact that Mr. Amar knew that Mr. Glazer, a Harvard and Fordham Law trained lawyer, was involved in reviewing and signing off on representations made during diligence, including with respect to

Frank's contention it had 4.25 million "students" or "users", is highly relevant to assessing whether Mr. Amar thought those phrases were false and misleading as used marketing materials. Third, Mr. Glazer was intimately involved in the due diligence process (though not alleged to have been a co-conspirator), and like Mr. Amar was present during the various misstatements that the Government attributed to Ms. Javice—undercutting the Government's argument that because Mr. Amar was present when Ms. Javice uttered a misrepresentation then Mr. Amar must have been conspiring to commit fraud. Evidence of Mr. Amar's good faith—his "belief and motive" are "material," as "such evidence if believed by the jury might tend to repel the inferences of fraudulent intent revealed by his activities." *United States v. Kyle*, 257 F.2d 559, 563 (2d Cir. 1958). By excluding such evidence, the Court severely hampered Mr. Amar's ability to defend against the Government's allegations of intent, which is alone a basis for reversal. *See United States v. Onumonu*, 967 F.2d 782, 789 (2d Cir. 1992) (reversing conviction and remanding for new trial, holding that the exclusion of relevant testimony that deprived defendant of a fair opportunity to present his case to the jury was not harmless error and had a substantial effect on the jury's verdict).

> **3.    The Government Opened the Door to Evidence of Mr. Glazer's Presence and Elicited False Testimony That Mr. Amar Was Precluded From Rebutting**

The prejudice caused by the Court's exclusion of this evidence was repeatedly compounded because, while the defense could not offer any evidence on the mere mention of Mr. Glazer, the Government created the misleading impression that Mr. Glazer *was not present* and that his absence was indicative of Mr. Amar's lack of good faith.

The Government elicited testimony from Mr. Vovor that he felt concerned by a conversation that he had on August 2, 2021, with Mr. Amar and Ms. Javice specifically because Mr. Glazer was not on the call.  Tr. 1564:1-21; 1575:12-1576:18. The Government then elicited

46

misleading testimony from Mr. Vovor suggesting (incorrectly) that Mr. Vovor did not raise the conversation with Mr. Glazer because Mr. Glazer had left Frank in August 2021.  *See* Trial Tr. 1854:1-6 (MS. BHASKARAN: "And you were asked questions about whether you told Mr. Glazer?" THE WITNESS: "Yes." MS. BHASKARAN: "What happened to Mr. Glazer in August of 2021, with respect to his role at Frank?" THE WITNESS: "He left Frank."). The Government thus held out Mr. Glazer's absence as a cause for concern, implying that Ms. Javice and Mr. Amar had excluded Mr. Glazer because they were discussing something they knew to be illegal and then – inconsistently – suggested that Mr. Glazer was not available to discuss Mr. Vovor's concerns because he had left the company by then.

Even though the Government opened the door, the defense was not permitted to confront those inaccurate allegations, and specifically to correct the record that in fact Mr. Glazer left Frank a month *after* this call in September 2021. *See* Dkt. 366; DX CJ 381 (Matt Glazer CV). Mr. Amar tried to elicit this simple fact—which has nothing at all to do with Mr. Glazer providing legal advice—in testimony, but the Court sustained the Government's objection without considering defense counsel's position. Tr. 3107:1-14 (cross-examination of Ms. Zeitler).

The Court precluded Mr. Amar from introducing evidence of Mr. Glazer's general presence and involvement in related events, which would have negated any inference of fraudulent intent arising from his absence from this single conversation.  *See*, *e.g.*, Tr. 1564:1-21 (direct testimony of Mr. Vovor); 1575:12-1576:18 (direct testimony of Mr. Vovor). Indeed, during trial, Mr. Amar moved to admit ten documents that would have corrected the misimpression that Mr. Glazer left Frank in August 2021 and exemplified his participation in Frank's acquisition

process—but the Court did not receive any of them into evidence. *See* Dkt. 356.[23] Those rulings were erroneous. *See United States v. Hatfield*, No. 06-cr-0550 (JS), 2010 WL 1948236, at *2 (E.D.N.Y. May 12, 2010) (noting government witness's testimony "did open the door to similar factual testimony from defense witnesses" (emphasis omitted)); *United States v. Taylor*, 820 F. Supp. 124, 128 n.3 (S.D.N.Y. 1993) ("Should the government, notwithstanding this opinion and order, advert at trial to Taylor's marital state, then defendant can argue that the government opened the door to battered women's syndrome proof."); *United States v. Villegas*, No. 07-CR-260, 2009 WL 1657072, at *5 (N.D. Ill. June 11, 2009) (explaining that line of questioning during cross-examination "opened the door" to redirect examination where cross-examination "mislead the jury and left them with only part of the full picture").

The Court's inconsistent application of evidentiary rules, its refusal to allow Mr. Amar to cure misleading and inaccurate testimony elicited by the Government, and its repeated rulings excluding evidence of Mr. Glazer's continued involvement at Frank—bearing no relation to a presence of counsel or advice of counsel argument—unfairly prejudiced Mr. Amar. *See United States v. Sainfil*, No. 16-CR-652 (DRH), 2019 WL 4861447, at *9 (E.D.N.Y. Oct. 2, 2019), *aff'd sub nom.*, 44 F.4th 99 (2d Cir. 2022) (finding under Rule 33 that the "issue was fairly framed for the jury's consideration" because the court allowed the defense to present a video after the government's introduction of a video "opened the door"). As such, the Court should grant a new trial.  *See United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (granting new trial where the trial court wrongly excluded defense evidence to negate scienter); *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (similar).

---

[23] *See* Dkt. 356 (identifying evidence of Mr. Glazer's involvement during diligence: DX OA 247, DX OA 249, DX OA 250, DX OA 253, GX 802-72, DX OA 24, DX OA 24-A, GX 802-24, GX 1160).

**B.      Excluding the Identity of "Idan" in GX 801-9 Was Erroneous and Unfairly Prejudicial**

On August 3, 2021, Ms. Javice sent Mr. Amar a WhatsApp message that said, "On with Michael and Idan and they both said buy [the ASL list] now and move quick." GX 801-9. "Michael" referred to Michael Eisenberg, a member of Frank's Board, and "Idan" referred to Idan Netser, Frank's outside counsel.  Despite the clear context of this message, which indicated that Mr. Amar believed he was acting on instructions purportedly approved by both a member of the company's Board and its legal counsel, and not solely at the direction of or in agreement with Ms. Javice, the Court's rulings obscured this critical information from the jury. Specifically, on the Government's motion to exclude the message, the Court ruled that the defense could not reference "Idan as a lawyer."  Tr. 2314:19.

This ruling was in error and prejudicial to Mr. Amar. The WhatsApp message was critical to Mr. Amar's defense to the Government's key allegation against Mr. Amar that his purchase of data from ASL was untoward and related to the alleged fraud. Mr. Amar sought to offer the WhatsApp message to show that as an employee of Frank, he was entitled to rely upon instructions from his direct supervisor and to explain to the jury why he purchased the ASL list quickly and that such instructions were understood by him to be legitimate.

Offered for this purpose, it did not matter whether Ms. Javice's statement was true, whether it reflected or contained legal advice, or whether such legal advice was accurate or appropriately informed. Indeed, Mr. Amar was not claiming that he consulted with, that he considered or accepted advice from, or even that such advice was proper. The key point for Mr. Amar's defense was that the message bore on Mr. Amar's state of mind based upon a representation he received (whether accurate or not) from his alleged co-conspirator. *See United States v. Runner*, No. 18-

CR-0578(JS), 2023 WL 3727532, at *8 (E.D.N.Y. May 30, 2023) (recognizing good faith defense premised on "indirect legal advice").

What Ms. Javice told Mr. Amar when she directed him to purchase the list (which, according to Mr. Vovor, was just after he had raised a question about the legality of a different assignment from Ms. Javice) was highly probative of Mr. Amar's good faith understanding in purchasing it—that he believed he was following a direction that was sanctioned by Frank's board as well as its counsel, which undermines any suggestion that it was purchased on the basis of an illicit agreement or understanding with Ms. Javice. The evidence directly refuted the Government's allegation in its opening and throughout trial that Mr. Amar bought the ASL list quickly to cover up the alleged fraud. The message was also strong evidence of the lack of conspiracy. If there truly was an unlawful agreement, it would make no sense for Ms. Javice to give Mr. Amar (her alleged co-conspirator) a directive glossed with legal or Board approval.

Neither attorney-client privilege, nor concerns about an advice of counsel defense could have justified the Court's prohibition of identifying Mr. Netser. The WhatsApp communication was between Ms. Javice and Mr. Amar, neither of whom are attorneys. It did not copy any legal counsel and contained a business directive, not legal advice. The Court itself acknowledged, "This is not legal advice." Tr. 2310:7. Moreover, the Government knew that Mr. Netser never actually provided legal advice regarding the purchase of student data in connection with the JPMC acquisition. *See* Dkt. 321, at 3-4 (stating that counsel for Frank would testify that "he never advised anyone at Frank that they could purchase student data and pass it off as Frank's customers").

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ [24] Therefore, any claim of attorney-client privilege over this message would have been baseless. Mr. Amar did not want to identify Mr. Netser as a lawyer to prove that anyone actually received legal sign off to purchase the ASL list—just that Mr. Amar believed a lawyer was aware of the purchase and signed off on it. By redacting the message to erase reference to "Idan" and preventing the jury from understanding that Ms. Javice explicitly claimed to have legal sign-off to purchase the ASL list, the Court precluded Mr. Amar from presenting critical and exculpatory state-of-mind evidence that undermined the Government's allegations against him. Such manifest injustice entitles Mr. Amar to a new trial.

## V.    A NEW TRIAL IS WARRANTED BECAUSE THE GOVERNMENT'S MISLEADING EXAMINATIONS AND ARGUMENT CAUSED SUBSTANTIAL UNFAIR PREJUDICE TO MR. AMAR

In addition to the prosecution's suggestions to the jury that Mr. Amar was responsible for the FAFSA Completions graph, the Government pursued similar strategies with respect to evidence and testimony concerning: (1) the ASL data purchase; (2) evidence of Mr. Amar's correction of a mislabel inconsistent with intent to defraud; and (3) the alleged misrepresentations during diligence. The prejudice caused by the Government's misleading examinations was compounded by erroneous evidentiary rulings which hampered Mr. Amar from introducing evidence or testimony necessary to rebut the Government's misleading examinations and arguments. These rulings were animated both by unfounded concerns that Mr. Amar was eliciting testimony or evidence that was unfairly antagonistic to Ms. Javice, *see supra* Section II, and on the erroneous assumption that Mr. Amar was offering evidence of his good faith in an effort to

---

24 ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████

lodge an improper "advice of counsel" defense, *supra* Section IV. The unfair circumstances in which Mr. Amar was required to defend therefore require reversal and a new trial. *See United States v. Persico*, 305 F.2d 534 (2d Cir. 1962); *United States v. Burse*, 531 F.2d 1151, 1154 (2d Cir. 1976) (reversing conviction for improper summation including arguing on facts not in evidence).

### A.   The Government Elicited Misleading Testimony Regarding Mr. Amar's Purchase of ASL Data

The crux of the Government's case against Mr. Amar was that he purchased 4 million records of student data on the open market in early August 2021 from ASL. The prosecution's theory of Mr. Amar's liability was that the purchase of data from ASL, which evidence showed was for marketing campaigns consistent with his role as Frank's Chief Growth Officer, *see* Rule 29 Br. III; *see also*, *e.g.*, GX 801-21, was somehow a premeditated effort to cover up the alleged fraud on JPMC orchestrated by him and Ms. Javice. To bolster the inference the prosecution drew, and set out to argue before the jury, the Government focused on the number of student records Mr. Amar bought from ASL (4.5 million) and suggested that it proved intent to defraud and participation in the conspiracy because Ms. Javice had told JPMC that Frank had a similar number of users (4.25 million). But record evidence proved that Mr. Amar sought many more than 4.5 million records—10 million—for the purpose of augmenting data, *see* GX 2302, and samples of such data for that use, *see, e.g.*, Tr. 1300:1-11 (direct testimony of Mr. Stolls); 1349:7-1350:7 (cross-examination of Mr. Stolls); *see also* Rule 29 Br. III.

During its redirect examination of Mr. Stolls, the prosecution questioned Mr. Stolls on whether he recalled "Mr. Amar requesting any other volume of student data [besides 4.5 million]." Tr. 1363:12–14. The Government's question was leading and designed to create the misimpression that Mr. Amar did not request any other amount, when the Government's own exhibit, GX 2302,

demonstrated on its face that Mr. Amar had asked for several different counts, including 10 million

records of students. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Mr. Stolls' testimony that he could not recall Mr. Amar requesting any other amount other

than 4.5 million records, therefore left the inaccurate and misleading impression that the number

of records was indicative of Mr. Amar's culpability. That Mr. Stolls may have forgotten the email

communication in which Mr. Amar asked for multiple counts may be plausible, but it would defy

common sense that the prosecution—which prepared Mr. Stolls to testify, produced the email

exchange, and interviewed and memorialized Mr. Stolls' recollection of the request for 10 million

records—was unaware of the same.

Defense counsel raised this issue at the close of redirect and requested that the Court correct

the record by admitting GX 2302 and striking the inconsistent testimony of Mr. Stolls. Tr. 1383:8–

1384:11. The Court denied the request. Tr. 1381:1–1384:12, which allowed for the prejudicial

effect of Mr. Stolls' redirect to remain with the jury, despite the defense's well-founded effort to

admit GX 2302 pursuant to FRE 807. Tr. 1382:20-1383:4.

Still, the Court insisted:

> The point here is that this is a statement begging for an explanation. In and of itself
> it's more misleading, potentially, than relevant. The statement is made, he is
> looking for 10 million records and would like a call. So this is a comment, an
> observation made by Denise Lyn to Steve Stolls. Stolls had no recollection. Maybe
> Lyn would have a recollection. Maybe you get it in through Lyn. But it's not
> admissible in its own sense. That was my ruling. I adhere to the ruling.

Tr. 1383:8-16. The Court's ruling denied GX 2302 admittance into evidence for two weeks, until

the parties compromised to stipulate to its admission. *See* Tr. 2860:10-16 (Stipulation S8). This

failure to cure the misleading nature of Mr. Stolls' examination in the moment left this

misimpression with the jury for weeks, and it could not adequately be addressed in light of the compressed time frame of summations.

      **B.**    <u>The Government's Examination Suggested to the Jury That Mr. Amar Was Not the Source of the Correction of Mislabeled Data During Diligence for the Capital One And JPMC Transactions</u>

During openings, defense counsel represented that the jury would hear evidence that would establish that Mr. Amar was the source of the correction regarding "mislabeled" data shared in diligence, proving Mr. Amar's lack of intent to defraud. Tr. 78:14-24. Without any basis in evidence, the Government suggested that Mr. Amar was *not* the source of the correction and actively prevented Mr. Amar from introducing that evidence. *See e.g.*, Tr. 3209:20-24 (argument outside the presence of the jury); Tr. 3212:11-3213:24 (argument outside the presence of the jury).

During its direct examination of Mr. Cowan, the Government questioned the witness regarding the correction, while misleading the jury as to who made that correction. The Government implied that it was some external actor—and not Mr. Amar—who was responsible for making the correction. *See* Tr. 193:4–11. The Government's confusing and indeterminate attribution ("Now, Mr. Cowan, *did there come a time when you learned* that that data was not unique website visits?") and Mr. Cowan's subsequent reply ("[…] *We had to clarify* that they represented impressions rather than unique visitors.") substantially misled the jury about the source of the correction and undermines a key prong of Mr. Amar's defense: that he made corrections wherever he encountered inaccurate data. *See id.* 194:7–10 (emphasis added). Recognizing the paramount importance of this correction saga, counsel for Mr. Amar twice moved to admit documents to correct the misleading testimony of the correction that the Government elicited. Dkt. 340, 349.

The Government took great efforts to preclude the admission of evidence that would correct the misimpression left by its questioning. As set forth in a prior submission, Dkt. 340,

which is respectfully reasserted herein, Mr. Amar sought to introduce GX 802-22, a Slack chat from July 7, 2021 involving Mr. Amar, Ms. Javice, and Mr. Glazer, which reflected Mr. Amar's correction to mislabeled "impressions" data for diligence, while on a call with LionTree, Ms. Javice, and Mr. Glazer, in preparation for a meeting with Capital One. *See* Rule 29 Br. I.C.1 (setting for detailed explanation of the significance of Mr. Amar's mislabel correction). The evidence was also necessary to correct the misimpression that the Government sought to leave with the jury that perhaps Mr. Amar was not the source of the correction.

After the Court allowed Mr. Amar to offer into evidence GX 802-22, the Government sought to introduce the highly prejudicial and misleading WhatsApp message, GX 801-51, which had already been precluded. *See* Dkt. 336; Tr. 2968:7-16. This WhatsApp message, which was from February 2022, between the defendants had no conceivable relation to the July 2021 communication in which Mr. Amar corrected mislabeled impressions data. *See* Tr. 3219:11-15. The messages in GX 801-51 occurred nearly seven months after those in GX 802-22. The Government's efforts to introduce the WhatsApp message, in relation to the "huge mislabel" Slack, nearly caused the complete exclusion of the evidence:

> MR. FERGENSON: We'd ask to put in 801-51, which is the "we are fucked" text message from February 2022 between the two defendants, talking about the data transfer files. So if they get to put in "huge mislabel," we should put in "we are fucked."
>
> THE COURT: I change my mind. Nobody's putting anything, either one. They're both irrelevant, and need too much explanation that's not in the case, and apt to lead us into all kinds of problems. …
>
> MR. COGAN: Judge, you're ruling that the language that says "huge mislabel" is no longer admissible?
>
> THE COURT: No longer admissible.

Tr. 3219:11-22. Only after defense counsel persisted in pursuing its admission, following recess, the Court reversed its prior ruling and allowed its admission. Tr. 3235:3-12.

The prejudice to Mr. Amar was not cured by the admission of this single document—he was subject to other similar rulings, as discussed *supra*, and his ability to contextualize the late-admission of this and other evidence was severely hamstrung due to scheduling of summations on a single day.[25]

### C.    The Government Suggested Without Evidence That Mr. Amar Made Misrepresentations During Diligence

At trial, the Government repeatedly questioned witnesses and argued that evidence of alleged fraudulent misrepresentations made during diligence were attributable to both defendants, despite presenting no such supporting evidence.

The Government inappropriately and confusingly questioned witnesses referring to Mr. Amar and Ms. Javice together, even after witnesses and the evidence confirmed such acts and statements were Ms. Javice's alone.[26] For example, during its direct examination of Mr. Young, the Government asked about GX 2020, a spreadsheet compiled by LionTree and others that tracked key diligence requests. One of those questions (" … how does [user definition in GX 2020]

---

[25] The Court, over defense counsel's objections, reversed its prior decision to schedule summations over two days and, instead, required all parties to close on a single day. Tr. 3337:14-18. The compressed schedule acutely impacted Mr. Amar's defense because it prevented defense counsel from effectively providing necessary context, because, by then, it had been weeks since the jury had heard about the subject matter, and it required extensive attention of the jury to trace how the materials corrected or clarified the prosecution's misleading evidence. The Court was cognizant of this real possibility when it initially decided to schedule summations over two days: "You know, the absorbability of the human mind is limited and I don't think it's healthy for either side to have such a long day." Tr. 3134:1-6.

[26] *See, e.g.*, Tr. 2387:19-2388:3 (direct testimony of Mr. MacDonald) (when asked by prosecutor "What did Ms. Javice and Mr. Amar say in response?," witness responded "Charlie – . . . it was something to the  - around that the file had to be cleaned."). Indeed, in one such instance, the Court intervened during the examination of Mr. Cowan, Tr. 111:6-21, who ultimately recanted his attribution of the alleged fraudulent misrepresentations to Mr. Amar. Tr. 318:23-319:6.

compare to *the responses you received from Ms. Javice or Mr. Amar* during the course of diligence?") improperly implied to the jury that Mr. Amar had, in fact, given a definition of user during diligence. *See* Tr. 2169:24–2170:1 (emphasis added). Counsel for Mr. Amar objected on the grounds that the Government was assuming facts that were not in evidence; however, after a series of questions from the Court to Mr. Young, the document was admitted. *See* Tr. 2170:2–2173:15.[27]

During summation, the Government also continued to wrongly conflate the defendants regarding conduct that the witnesses attributed only to Ms. Javice. *See* Tr. 3586:4-10 ("When those buyers, when JPMorgan asked for proof of those customers, the defendants doubled down. They lied again, and they created fake customers."); *id.* at 3511:4-7 ("So, during diligence both defendants lied about Frank's customers. They claimed Frank had 4.25 million customer accounts and defined a customer account as one who had signed up and provided first name, last name, e-mail, and phone."). The Government again repeated those misleading statements in rebuttal, compounding the prejudice to Mr. Amar. *See id.* at 3740:16-22.

In a similar vein, the Government attempted to suggest that evidence of Mr. Amar's limited participation in diligence was sufficient on its own to show a two-person conspiracy between Mr. Amar and Ms. Javice and his knowledge of the alleged fraud. That effort was achieved in part by writing out the existence of Mr. Glazer, who was consistently on email communications, including those with alleged misrepresentations, and involved throughout the acquisition process. To support that narrative, the Government elicited testimony from Mr. Cowan, suggesting that Ms. Javice had a supposed preference to exclude Mr. Glazer but *not* Mr. Amar from certain meetings:

---

[27] Immediately after, the Government rephrased its question, this time omitting Mr. Amar's name and referring only to information provided by "Ms. Javice […] during the course of due diligence?" *See* Tr. 2173:17–22.

MR: FERGENSON. Do you recall any discussion about not including Matt Glazer on this meeting?

THE WITNESS: Not specifically this meeting. But there had been preferences . . . Not specifically this meeting, but there had been instances where there was a preference to have Mr. Glazer included or not included on various calls.

MR. FERGENSON: Do you recall Ms. Javice ever expressing a preference that Mr. Amar not attend?

THE WITNESS: I don't recall any of those.

Tr. 199:23-200:9. The jury was therefore left with the misleading impression that Mr. Glazer's relative lack of involvement in diligence as compared to Mr. Amar was suggestive of a conspiracy. In reality, Mr. Glazer was materially more involved in diligence than was Mr. Amar, but Mr. Amar was repeatedly prevented from demonstrating this fact. *See supra* Section IV.A.

## VI.   THE COURT'S ERRONEOUS TRIAL RULINGS FAILING TO RECOGNIZE THE POTENTIAL BIAS OF JPMC WITNESS WAS PREJUDICIAL ERROR

The Court erroneously precluded Mr. Amar from presenting evidence and cross-examining the Government's witnesses on issues critical to their potential credibility and bias. These failures prevented the jury from considering evidence of bias on the part of multiple JPMC witnesses, and thus, individually and collectively, warrant a new trial.

### A.   Excluding Testimony and Evidence About JPMC's Civil Suit was Erroneous and Unfairly Prejudicial

As set forth in a prior submission, which is respectfully reasserted herein, the Court erroneously precluded Mr. Amar from presenting evidence and cross-examining witnesses regarding the fact that JPMC had filed a civil lawsuit against both Mr. Amar and Ms. Javice. *See* Dkt. 348. This exclusion prevented the jury from considering evidence of bias on the part of multiple JPMC employees who testified as Government witnesses.

At trial, Mr. Amar's counsel attempted to cross-examine Mr. Vovor and Mr. MacDonald— Government witnesses and current JPMC employees—about the lawsuit, but the Court

immediately shut down the line of questioning, without rationale. Tr. 1769:16-20 (sustaining objection); Tr. 2546:16-19 ("Mr. Mandel, stop that now. There's no relevance to this case."). The Court likewise denied Mr. Amar's motion to admit evidence of the civil lawsuit, arguing its clear relevance to the potential bias of JPMC-employee witnesses. Dkt. 348, Tr. 3339:12-3345:4. While initially acknowledging that the jury could consider bias in assessing the credibility of the JPMC witnesses, the Court ultimately concluded, "it is more danger of risk and digression and misleading material and so I exclude, in my discretion, mention of the civil lawsuit." Tr. 3345:2-4.[28]

The fact that JPMC had sued to recover $175 million from Mr. Amar and Ms. Javice created a clear and substantial potential for bias among JPMC employees testifying against Mr. Amar in the criminal trial. *See, e.g.*, *United States v. Krug*, 2019 WL 336568, at *8 (W.D.N.Y. Jan. 28, 2019) (holding that evidence of civil lawsuits filed by witnesses against defendants is admissible as relevant to show bias); see *also Thurber Corp. v. Fairchild Motor Corp.*, 269 F.2d 841, 845 (5th Cir. 1959) ("It is axiomatic that [witnesses'] employment by someone with such a direct [financial] interest in the outcome of the case is a fact that the jury should know in weighing their testimony."); *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). Mr. Amar should have been permitted to present this evidence and cross-examine witnesses about their awareness of the lawsuit. *See, e.g.*, *Caroll v. Trump*, 124 F. 4th 140, 173 (2d Cir. 2024) ("Extrinsic

---

[28] Although the Court provided a general instruction regarding witness credibility and the potential influence of a witness's relationship with the government or JPMC, or the witness's interest in the outcome of the case, the instruction did not cure the substantial prejudice to Mr. Amar. *See* Tr. 3812:20-3815:1. The Court did not inform the jury about the civil suit. And because Mr. Amar was explicitly barred from exploring the potential bias of the witnesses through cross-examination, the general instruction was insufficient to allow the jury to assess the extent of the incentive these witnesses had to support the Government's case.

evidence may be introduced to prove a witness's bias."); *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976) ("The law is well settled in this Circuit . . . that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely.").  Indeed, he had a constitutional right to do so.  *See United States v. Harris*, 185 F.3d 999, 1008 (9th Cir. 1999) ("A defendant has a constitutional right under the Confrontation Clause to cross examine prosecution witnesses for bias . . . Pecuniary interest may be shown to prove bias. A defendant may ordinarily cross examine a prosecution witness to prove bias by proving that the witness is suing him.").

Moreover, evidence of this potential bias constituted impeachment material that should have been disclosed to the jury under *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  *See United States v. Block*, 2019 WL 1254762, at \*6-7, \*9 (S.D.N.Y. Mar. 19, 2019), *aff'd*, 797 Fed. App'x. 668 (2d Cir. 2020).  The jury was entitled to have "all the cards on the table" to make its own assessment of the credibility of the JPMC witnesses.  *Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir. 1977).  And evidence about the civil suit could have suggested to the jury that the JPMC witnesses had a motive to shade their testimony in favor of making Mr. Amar appear more culpable.  As such, the Court's failure to permit Mr. Amar to present this evidence severely prejudiced his defense.  *See*, *e.g.*, *United States v. Haggett*, 438 F.2d 396, 399-400 (2d Cir. 1971) (granting new trial where the defendant was not "afforded the opportunity to present facts which, if believed, could lead to the conclusion that a witness who has testified against him either favored the prosecution or was hostile to the defendant").

### 1.    The Court's Further Restrictions on Exploring Witness Bias and Credibility Compounded Unfair Prejudice

The unfair prejudice that Mr. Amar suffered because he could not question the JPMC witnesses about the civil suit was further compounded when the Court precluded him from

examining JPMC's payment of witnesses' legal fees, and from questioning witnesses about the apparent coaching they had received from the Government.

Mr. Amar attempted to elicit testimony to show that JPMC was paying for the legal representation of multiple Government witnesses, but the Court prohibited the inquiry, holding: "Whoever's paying it is not relevant. I've made my decision. The rule is that it's precluded." Tr. 244:23-246:20. The Court then reiterated this ruling when Ms. Javice moved for reconsideration. The Court expressed concern that if the defense presented evidence that witnesses were biased because JPMC paid their legal fees then "that means that Ms. Javice and Mr. Amar are not getting independent counsel" because JPMC was also responsible for paying defense counsel fees. *See* Tr. 527:1-3. As such, it denied Ms. Javice's motion. *See* Tr. 526:24 ("You can't ask the question").

The Court's ruling was in error. *See, e.g.*, *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-CV-9350 VM KNF, 2015 WL 5730101, at *2 (S.D.N.Y. Sept. 10, 2015) ("courts have found that fee payment agreements that may be relevant to credibility and bias"); *see also Concepcion v. City of New York,* 2006 WL 2254987, at *4 (S.D.N.Y. 2006) (permitting plaintiff to "explore the potential bias or prejudice of adverse parties" via disclosure of an indemnification agreement); *Wilson v. Attaway*, 757 F.2d 1227, 1243 (11th Cir. 1985) (finding it was proper for trial court to permit defense counsel to examine plaintiffs' attorney's fees arrangements). A criminal defendant must be permitted "to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Precluding this line of questioning violated Mr. Amar's Sixth Amendment rights by denying him the opportunity to explore a "highly relevant" matter bearing on witness credibility and bias. *United States v. Reed*, 437 F.2d 57, 59 (2d Cir. 1971). And evidence that JPMC is paying the witnesses' legal fees would not, as the Court assumed, introduce doubt as to the independence

of defense counsel. The defendants and the witnesses are differently situated. JPMC's payment for defense counsel fulfills a pre-existing indemnity obligation, whereas its payment of witness fees— if proven to be discretionary—would raise important questions about bias and motivation.

> **2.    The Court's Denial of Mr. Amar's *Brady* Motion Limited Evidence to Impeach and Confront Witnesses and Further Compounded Unfair Prejudice**

Additional rulings precluding Mr. Amar's ability to effectively confront JPMC witnesses on potential bias were highly prejudicial. In particular, the Court erroneously denied Mr. Amar's motion to compel the Government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and disclose potentially exculpatory evidence held by JPMC. *See* Dkt. 232 at 29-32; Feb. 4 PTC Tr. 29:1-2 (denying motion to compel). For the reasons stated in the motion, Dkt. 232, which are respectfully reasserted herein, the record showed extensive coordination between JPMC's counsel and the prosecution. *See* Dkt. 232 at 4-6; *see also United States v. Connolly*, No. 16-CR-0370, 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019). The Government should have been required to provide full and complete copies of internal notes from JPMC's interviews of Government witnesses, but the Court erroneously declined to find that the bank was an agent of the prosecution. Critically, these notes would have provided Mr. Amar the opportunity to test the witnesses' recollections with their prior statements made *before* the witnesses were interviewed by the Government and presumably *before* they were coached by JPMC's lawyers. Such impeachment material was especially important in this case given the potential bias stemming from the fact that JPMC—these witnesses' employer— sued the defendants in a separate civil action. The erroneous ruling therefore further limited Mr. Amar's ability to effectively cross-examine and confront key Government witnesses at trial. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986) (constitutionally adequate confrontation includes the meaningful opportunity to challenge the Government's witnesses for "prototypical

form[s] of bias," such as prior inconsistent statements); *United States v. Canter*, 338 F. Supp. 2d 460, 462 (S.D.N.Y. 2004).

## VII.    THE WEIGHT OF THE EVIDENCE IS AGAINST THE JURY'S VERDICT

As detailed in Mr. Amar's Rule 29 motion, the weight of the evidence is against the jury's verdict: no reasonable juror could have inferred on this evidentiary record that Mr. Amar participated with Ms. Javice in the charged conspiracy to commit bank fraud and wire fraud or that he independently committed securities fraud. As such, the judgment should be vacated and a new trial granted on this independent ground. *See United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) ("Rule 33 allows a court to vacate a judgment and grant a new trial where the evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand.").

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Amar's motion to vacate judgment and order a new trial under Rule 33 of the Federal Rules of Criminal Procedure.


Dated:  May 1, 2025                                     Respectfully submitted,

                                                        **KOBRE & KIM LLP**

                                                        */s/ Sean S. Buckley*
                                                        Sean S. Buckley
                                                        Jonathan D. Cogan
                                                        Alexandria E. Swette
                                                        Daisy Joo
                                                        800 Third Ave
                                                        New York, New York 10022
                                                        Tel: (212) 488-1200
                                                        Sean.Buckley@kobrekim.com
                                                        Jonathan.Cogan@kobrekim.com
                                                        Alexandria.Swette@kobrekim.com
                                                        Daisy.Joo@kobrekim.com

Matthew I. Menchel
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Tel: (305) 967-6100
Matthew.Menchel@kobrekim.com