**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

CHARLIE JAVICE and OLIVIER AMAR,

        Defendants.

23 Cr. 251 (AKH)

**CONSOLIDATED REPLY IN SUPPORT OF**
**DEFENDANT OLIVIER AMAR'S RULE 29 AND RULE 33 MOTIONS**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................................................I

TABLE OF AUTHORITIES ...................................................................................................II

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT ...........................................................................................................................2

I.    THE COURT'S CO-CONSPIRATOR LIABILITY CHARGE AND RECHARGE
WERE IMPROPER .....................................................................................................2

    A.    The Court Incorrectly Instructed the Jury that Mr. Amar Could be Liable
for Ms. Javice's Substantive Crimes and/or Acts Taken Before the Alleged
Conspiracy Even Existed .................................................................................3

    B.    The Court's Instruction Improperly Conflated Two Distinct Legal
Principles, Compounding the Jury's Confusion that Mr. Amar Could Be
Liable for Ms. Javice's Substantive Crimes ...........................................5

    C.    The Court's Erroneous Recharge on Conspiracy Further Confused Matters
for the Jury.......................................................................................................7

    D.    The Government Recasts Its Theory of Mr. Amar's Liability to Distract
from The Erroneous Jury Charges and Recharge ...................................8

II.    THE COURT'S EVIDENTIARY RULINGS, DESIGNED TO "STEER A FINE
LINE" BETWEEN MR. AMAR'S ABILITY TO FULLY DEFEND HIMSELF
AND MS. JAVICE'S RIGHT TO A FAIR TRIAL, RESULTED IN MANIFEST
INJUSTICE.................................................................................................................9

III.    THE GOVERNMENT'S UNSUPPORTED THEORIES OF CULPABILITY
CONTINUE TO CAUSE A MANIFEST INJUSTICE ...................................................13

    A.    July 8 Capital One Meeting .................................................................16

    B.    "Huge Mislabel" Correction .................................................................17

    C.    Enformion ............................................................................................19

    D.    10 Million Records Request to ASL......................................................19

IV.    EVEN WHEN VIEWED IN THE GOVERNMENT'S FAVOR, THERE WAS
INSUFFICIENT EVIDENCE FOR A RATIONAL JURY TO FIND MR. AMAR
GUILTY OF THE CHARGED CRIMES.........................................................................21

    A.    The Government Failed to Offer Sufficient Evidence to Establish that Mr.
Amar Agreed to Commit a Crime with Ms. Javice in 2021 .................................21

    B.    The Government's Evidence from 2022 Was Insufficient to Support a
Conviction for Conspiracy....................................................................26

    C.    The Government Waived Certain Arguments ...................................29

CONCLUSION....................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Bollenbach v. United States,*
   326 U.S. 607 (1946) ......................................................................................... 8

*Curry Mgmt. Corp. v. JPMorgan Chase Bank*, N.A.,
   643 F. Supp. 3d 421 (S.D.N.Y. 2022) ............................................................. 29

*Direct Sales Co. v. United States,*
   319 U.S. 703 (1943) ....................................................................................... 16

*Grunewald v. United States,*
   353 U.S. 391 (1957) ................................................................................. 27, 28

*In re Fannie Mae 2008 Sec. Litig.,*
   891 F. Supp. 2d 458 (S.D.N.Y. 2012) ............................................................. 24

*Krulewitch v. United States,*
   336 U.S. 440 (1949) ................................................................................. 27, 28

*Lutwak v. United States,*
   344 U.S. 604 (1953) ....................................................................................... 27

*United States v. Alegria,*
   1991 WL 238223 (S.D.N.Y. Nov. 6, 1991) .................................................... 20

*United States v. Anderson,*
   747 F.3d 51 (2d Cir. 2014) ............................................................................. 24

*United States v. Aparo,*
   221 F. Supp. 2d 359 (E.D.N.Y. 2002) ............................................................ 12

*United States v. Archer,*
   977 F.3d 181 (2d Cir. 2020) ........................................................................... 14

*United States v. Banks,*
   687 F.2d 967 (7th Cir. 1982) .......................................................................... 10

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005) ............................................................................. 26

*United States v. Faisal,*
   282 F. App'x 849 (2d Cir. 2008) .................................................................... 15

*United States v. Flores,*
   362 F.3d 1030 (8th Cir. 2004) ........................................................................ 10

*United States v. Garguilo,*
   310 F.2d 249 (2d Cir. 1962) ............................................................................. 8

*United States v. Gilliam,*
   167 F.3d 628 (D.C. Cir. 1999) ........................................................................ 10

*United States v. Gleason,*
   616 F.2d 2 (2d Cir. 1979) ............................................................................... 17

*United States v. Hamilton,*
   334 F.3d 170 (2d Cir. 2003) ........................................................................... 11

*United States v. Hernandez,*
   2006 WL 861002 (D. Conn. Mar. 31, 2006) ................................................. 29

*United States v. Knauer,*
   707 F. Supp. 2d 379 (E.D.N.Y. 2010) ........................................................... 15

*United States v. Lopac,*
   411 F. Supp. 2d 350 (S.D.N.Y. 2006) ..................................................... 15, 21

*United States v. Marcus Schloss & Co.,*
   710 F. Supp. 944 (S.D.N.Y. 1989) ................................................................ 28

*United States v. Martinez,*
   54 F.3d 1040 (2d Cir. 1995) ........................................................................... 22

*United States v. Mendoza-Acevedo,*
   950 F.2d 1 (1st Cir. 1991) .............................................................................. 10

*United States v. Morales,*
   185 F.3d 74 (2d Cir. 1999) ............................................................................. 11

*United States v. Ness,*
   565 F.3d 73 (2d Cir. 2009) ............................................................................. 15

*United States v. Pauling,*
   924 F.3d 649 (2d Cir. 2019) ..................................................................... 15, 22

*United States v. Roshko,*
   969 F.2d 1 (2d Cir. 1992) ............................................................................... 27

*United States v. Rubinson,*
   543 F.2d 951 (2d Cir. 1976) ..................................................................... 15, 17

*United States v. Rucker,*
   586 F.2d 899 (2d Cir. 1978) ........................................................................... 28

*United States v. Siddiqi*,
    98 F.3d 1427 (2d Cir. 1996) ............................................................................... 18

*United States v. Stratton*,
    779 F.2d 820 (2d Cir. 1985) ............................................................................... 28

*United States v. Tellier*,
    83 F.3d 578 (2d Cir. 1996) ................................................................................. 12

*United States v. Triumph Cap. Grp., Inc.*,
    544 F.3d 149 (2d Cir. 2008) ............................................................................... 22

*United States v. Velez*,
    652 F.2d 258 (2d Cir. 1981) ................................................................................. 8

*United States v. Yuan Li*,
    2020 WL 6393038 (E.D.N.Y. Nov. 2, 2020) .................................................... 11

*Zafiro v. United States*,
    506 U.S. 534 (1993) ........................................................................................... 11

**Rules**

Federal Rules of Criminal Procedure 29 and 33 ......................................................... 2

## PRELIMINARY STATEMENT

In its Opposition, the Government does more of the same: it improperly lumps together Olivier Amar with his co-defendant, Charlie Javice, against the balance of the record, and glosses over—or outright mischaracterizes—evidence undermining the jury's verdict. Incredibly, well over a dozen times in its 40-page narrative of the trial record, the Government claims that "*Defendants*" did something, while pointing to acts that Ms. Javice alone undertook. That cannot be the basis for a conviction.

In addition, the Government attempts to shore up holes in its case against Mr. Amar with new theories of culpability that are outside the realm of possibility, practically conceding that the case it put before the jury fails on its own terms. For instance, faced with no evidence that Mr. Amar ever uttered a false statement, the Government now announces he must have made one by playing up metadata from the July 8 meeting with Capital One. The Government reads that metadata to mean Mr. Amar and Ms. Javice joined the meeting from different devices, and because Ms. Javice "dialed in" from a phone, Mr. Amar did all of the talking. Even if the Government's assumption about the Zoom metadata is true (it is unsupported by the record), it is wholly irrelevant because a person can speak in a Zoom meeting regardless of how they join. Also against all evidence, the Government now claims that when Mr. Amar called Ms. Javice's representation of website visitor data a "huge mislabel"—instigating a correction that ultimately tanked the Capital One deal—it was a "cover" to prevent Matt Glazer (Frank's Chief Operating Officer and Chief Legal Officer) from getting suspicious. Here, the Government ignores (among other things) that Ms. Javice exposed Mr. Glazer to her misrepresentations well before July 8 and Mr. Glazer attended diligence meetings well after. Far from reasonable inferences, the Government's Opposition demands quantum leaps of logic that contradict not only the trial record but common sense.

In all, the Government's Opposition fails for four key reasons:

(1) The Government alleged a two-person conspiracy, and Mr. Amar therefore cannot be liable for anything Ms. Javice did or said before he joined the purported conspiracy. The Court's jury instructions confused that point (as evidenced by the jury's question during deliberations, which the Government ignores), and the Court's recharge compounded that confusion.

(2) By trying to "steer a fine line" as to Mr. Amar's antagonistic defense, while acknowledging that was not "always possible," the Court inadvertently exacerbated the prejudice of the joint trial.

(3) The Government relies on speculative (sometimes brand new) theories of culpability that, just like at trial, go far afield of any reasonable reading of the record.

(4) Even on the Government's view of the record, there is insufficient evidence to support the verdict.

Accordingly, and for the reasons stated in Mr. Amar's opening briefs, *see* ECF 390 ("Rule 29 Brief" or "Rule 29 Br."); ECF 391 ("Rule 33 Brief" or "Rule 33 Br."), Mr. Amar is entitled to relief under Federal Rules of Criminal Procedure 29 and 33.[1]

## **ARGUMENT**

## I. **THE COURT'S CO-CONSPIRATOR LIABILITY CHARGE AND RECHARGE WERE IMPROPER**

The Government fails to adequately address the most pressing issue raised in Mr. Amar's Rule 33 Brief: the Court's errors in its jury charge (and recharge) as to co-conspirator liability—in tandem with numerous other errors—led to jury confusion and a fundamental misunderstanding of the law underpinning Mr. Amar's conviction. This, in turn, resulted in an improper verdict in violation of basic due process. As detailed in Mr. Amar's Rule 33 Brief, respectfully, the Court made at least two legally incorrect statements during jury charges, which muddled the law

---

[1] This reply is submitted for the limited purpose of highlighting certain key deficiencies in the Government's Opposition. *See* ECF 392 ("Opp."). It does not attempt to address every single argument made in that lengthy submission. Mr. Amar does not concede or waive any arguments not referenced herein.

applicable to co-conspirator liability as applied to this case, unfairly prejudiced Mr. Amar, and resulted in an unjust conviction:

- First, the Court instructed the jury that so long as a defendant is found to have "joined [the conspiracy] at any time in its progress," he "will still be held **responsible for all that was done before he joined** and all that was done during the conspiracy's existence while he or she was a member." Trial Tr. at 3785:2-5 (emphasis added); and

- Second, the Court instructed the jury on its consideration of evidence of co-conspirator acts and statements: "**Once you are in a conspiracy, anything done by any member of the conspiracy counts against you.** It is like agency in law. If you are in a conspiracy and somebody does something in furtherance of the conspiracy, **all members of the conspiracy are held to account.**" *Id.* at 3786:10-14 (emphasis added).

That these instructions confused the jury as to the extent to which Mr. Amar could be liable for offenses committed by Ms. Javice is demonstrated by the fact that the jury actually asked the Court for clarification during deliberations: *Are co-conspirators guilty of all crimes committed in the conspiracy?* The Government ignores the jury's apparent confusion and question entirely and, instead, argues that the instructions and recharge are facially proper. Not so.

A.    **The Court Incorrectly Instructed the Jury that Mr. Amar Could Be Liable for Ms. Javice's Substantive Crimes and/or Acts Taken Before the Alleged Conspiracy Even Existed**

The Court's instruction that a defendant who is found to have entered into a conspiracy at some point "will still be held responsible for all that was done before he joined" incorrectly implied to the jury that Mr. Amar could be liable for Ms. Javice's *substantive crimes* and actions taken before the existence of a conspiracy.

The Government fails to engage with clear case law, which holds that where, as here, there are only two alleged co-conspirators, neither can be legally responsible for acts committed by the other prior to the formation of the alleged conspiracy. Rather, the Government states in conclusory fashion that it is clear in the "context" of the instructions that "'all that was done' referred to the conspiracy." Opp. at 64-65. But the instructions were not clear, which is presumably why the jury

asked the question it did. Because there are only two alleged co-conspirators, there was no pre-existing conspiracy that the jury could find Mr. Amar to have "joined," so the instruction invited the jurors to believe Mr. Amar could be liable for "all that was done" by his alleged co-conspirator—*i.e.* Ms. Javice's substantive offenses—as long as it found that, at some point (even if only during the alleged cover up), the Defendants entered into a conspiracy with each other. The Government's Opposition effectively concedes this point in arguing that, "if no such conspiracy existed, the Court's instruction did not permit the jury to convict a co-conspirator for substantive crimes that occurred before the formation of the conspiracy." *Id.* at 64-65.

The Government also fails to address the *Pinkerton* problem identified in Mr. Amar's Rule 33 Brief. In the absence of a *Pinkerton* charge, the Court's instructions wrongly led the jury to believe that Mr. Amar could be liable for substantive offenses based on Ms. Javice's acts and misstatements before Mr. Amar entered into the alleged conspiracy. In its Opposition, the Government claims the "Court clearly explained to the jury the differences between substantive and conspiratorial offenses." *Id.* at 61. But the plain language of the instruction—that a defendant who at some point joins a conspiracy "will still be held responsible for **all that was done** before he joined" (emphasis added)—strongly implies that a defendant can be convicted of the substantive crimes of his co-conspirator. Trial Tr. at 3785:3-4. Without an instruction telling the jury that "all" does *not* include substantive offenses, the jury was left confused as to a co-conspirator's liability for substantive crimes of another. The jury's confusion is obvious, as demonstrated by its question whether conspirators are guilty of all crimes committed in the conspiracy. And the Government fails to explain how simply distinguishing conspiracy counts and other substantive offenses would clarify that the broad imputation of liability for "all that was done before" a defendant "joined a conspiracy" precluded substantive crimes committed by a co-conspirator.

**B.    The Court's Instruction Improperly Conflated Two Distinct Legal Principles, Compounding the Jury's Confusion that Mr. Amar Could Be Liable for Ms. Javice's Substantive Crimes**

The Court's instruction that "[o]nce you are in a conspiracy, anything done by any member of the conspiracy counts against you . . . like agency in law" incorrectly conflated two distinct legal principles, similarly inviting the jury to misapprehend the law of conspiracy liability. *Id.* at 3786:10-12. Specifically, this statement was included in the Court's instruction on the consideration of evidence of co-conspirators' acts and statements against another co-conspirator, which misled the jury to believe that it must convict Mr. Amar of substantive crimes based on Ms. Javice's acts and statements. That is not the law. In its Opposition, the Government provides a series of unpersuasive counterarguments that fail both as a matter of law and a matter of fact, only underscoring exactly why these erroneous instructions demand a new trial.

<u>First</u>, the Government asserts that because the Court made this statement during the conspiracy charge, it did not mislead the jury. Opp. at 63. But the instruction on the admissibility of co-conspirator hearsay statements was not cabined to the conspiracy count. Indeed, the Court erroneously recharged the jury on this topic in response to the jury's question about co-conspirator liability of *substantive* offenses, which reaffirmed the misimpression that all of Ms. Javice's acts and statements (that make up substantive offenses) "count[] against [Mr. Amar]." *See infra*, Section I.C.

<u>Second</u>, the Government claims the as-delivered charge was given at Mr. Amar's request and was "substantively identical" to language previewed by the Court, to which Mr. Amar did not object. Opp. at 63. This is a serious mischaracterization of the record. Not only did Mr. Amar *not*

request this language,[2] but the language Mr. Amar challenges as erroneous is far from "substantively identical" to the language previewed by the Court. In fact, it is *entirely* different. The Government's own comparison between the language previewed by the Court and the as-charged language—buried in the second part of a lengthy footnote on pages 63-64—clearly shows the stark differences between the two. Indeed, there is *no overlap*. Below is the Court's previewed language:

> However, in determining the factual issues before you, you may consider against the defendants any acts or statements made by any of the people that you find under the standards I've described to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge.

And below is the Court's as-charged language, which was never previewed to counsel:

> Once you are in a conspiracy, anything done by any member of the conspiracy counts against you. It is like agency in law. If you are in a conspiracy and somebody does something in furtherance of the conspiracy, all members of the conspiracy are held to account.

The former (previewed) language clearly and specifically relates to the jury's ability to consider *evidence*; the latter (as-charged) language muddles the concept and, on its face, appears to relate to substantive liability. The Court's modification of the instruction it previewed conflated two legal concepts, leading to prejudicial jury confusion as to Mr. Amar's liability.

---

[2] The Government makes this clear when it states that Mr. Amar requested the following language: "You are reminded that a defendant's membership in the conspiracy must be established by independent evidence of that defendant's own acts or statements, and not solely by the acts or statements of others." Opp. at 63. Defense counsel requested that language because the Court overruled Mr. Amar's objection to the charge as a whole, and it has *nothing* to do with the erroneous instructions Mr. Amar challenges here.

### C.    The Court's Erroneous Recharge on Conspiracy Further Confused Matters for the Jury

We respectfully submit that, on this record, the Court's charging instructions were incorrect as a matter of law and left the jury confused and with an incorrect understanding of the law of co-conspirator liability, as most clearly shown through the jury's question during deliberation: *Are co-conspirators guilty of all crimes committed in the conspiracy?* Instead of correcting this misunderstanding that Mr. Amar could be liable for Ms. Javice's substantive offenses and/or pre-conspiracy conduct (the topic the jury asked about), the Court's response to this question[3] instructed the jury on the unrelated consideration of co-conspirator acts and statements as evidence, which conflated two separate legal concepts, further confused the jury, and ultimately compounded the prejudice resulting from the Court's prior charging errors.

The Government argues that this recharge was proper because "the Court made clear that substantive and conspiratorial offenses are separate." Opp. at 67. But the Government attempts to rewrite the trial record. The Court did not "address[] this question" by stating that substantive and conspiracy offenses are separate, as the Government suggests. *Id.* at 65. Additionally, the Government claims that the Court made statements throughout the trial that the jury must consider

---

[3] The full language of the Court's recharge is as follows:

> "In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements. However, in determining the factual issues before you, you may consider against the defendants – co-conspirators – any acts or statements made by any of the people that you find under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge. . . . [G]o back to the indictment which alleges two purposes, two objectives of the conspiracy. Only those crimes can be considered. And with respect to those crimes, if you found, by independent evidence that they're, both Amar and Javice are members of a conspiracy, all their statements and acts are considered against -- all the statements and acts of one are considered against the other."

Trial Tr. at 3884:20–3885:13.

the Defendants' guilt as to each count separately. But a handful of incidental, disconnected statements during a six-week trial (including from *voir dire*) are irrelevant to, and cannot cure, the fundamental errors in the recharge during the jury's deliberations.

As a stretch, the Government also claims the "hours-long jury charge that explained, in detail, the elements of the substantive offense[s]"—which took place one day prior—somehow eliminates the need for the recharge to be fulsome and accurate. But this response ignores entirely that the "hours-long jury charge" is what led to this question in the first place.[4] *Id.* at 67. And where, as here, the jury "makes explicit its difficulties" in comprehending instructions on the law, the court must "clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–613 (1946). Instead, the errors in the original charge were only amplified by the recharge, resulting in instructions that left the jury unable to accurately apply the legal standards and evidence against Mr. Amar. The risk that the jury would convict Mr. Amar for Ms. Javice's substantive crimes, solely on the finding that he was a co-conspirator and without sufficient evidence of his own fraudulent intent, "imposed an obligation on the trial judge to instruct the jury with extreme precision." *United States v. Garguilo*, 310 F.2d 249, 254–55 (2d Cir. 1962). Respectfully, the Court's recharge failed to do so.

### D. The Government Recasts Its Theory of Mr. Amar's Liability to Distract from The Erroneous Jury Charges and Recharge

To get around these fatal errors—which improperly invited the jury to convict Mr. Amar for substantive crimes based on Ms. Javice's pre-conspiracy acts or statements *or* to consider Ms. Javice's pre-conspiracy acts and statements against Mr. Amar as co-conspirator statements—the

---

[4] *See United States v. Velez*, 652 F.2d 258, 262 (2d Cir. 1981) ("After a day and half of deliberations . . . original instructions on willful membership may well have been but a faint memory in the juror's minds, if indeed this important principle in the complex area of conspiracy law was recalled at all.").

Government claims that the flawed instructions were harmless because Mr. Amar should be liable for Ms. Javice's acts and statements during Capital One and JPMC diligence. Opp. at 65. But the jury's question itself shows that it was not convinced that Mr. Amar had himself committed fraud. Had the Government's case against Mr. Amar proven his participation from as early as the time of diligence, the jury would not have needed to ask whether Mr. Amar should be found guilty of Ms. Javice's crimes. Indeed, as further detailed in Section IV and Mr. Amar's Rule 29 Brief, the Government's case at trial against Mr. Amar focused on his involvement in August 2021 and January 2022 in the alleged concealment of the alleged fraud to sell Frank, and there is insufficient evidence by which a jury could find Mr. Amar joined a conspiracy in June or July 2021.

## II.    THE COURT'S EVIDENTIARY RULINGS, DESIGNED TO "STEER A FINE LINE" BETWEEN MR. AMAR'S ABILITY TO FULLY DEFEND HIMSELF AND MS. JAVICE'S RIGHT TO A FAIR TRIAL, RESULTED IN MANIFEST INJUSTICE

In response to an "ongoing" objection from Ms. Javice's counsel to "antagonism," Trial Tr. at 1804:19–21, the Court remarked that it was "trying to steer a fine line" with its rulings, but "it is not always possible to do that," *id.* at 1815:3–6. Despite the Court's attempts to thread the needle, in the end, it was not possible to reconcile Mr. Amar's antagonistic defense with Ms. Javice's in a way that preserved both Defendants' rights. The Constitution entitles Mr. Amar to either his own trial or a full defense in a joint trial with Ms. Javice, even if that defense involved implying Ms. Javice's wrongdoing, not a half-measure that "steer[ed] a fine line."

The Government does not meaningfully engage with any of this in its Opposition. The Government instead offers a handful of throwaway arguments: Defendants did not have mutually antagonistic defenses because Mr. Amar "never conceded that a fraud occurred or argued that Ms. Javice was guilty of a crime," Opp. at 79, 82; the jury returned a "guilty verdict for both defendants

on all counts," *id.* at 79–80; and Mr. Amar advanced other defenses that Ms. Javice agreed with, *id.* at 82–84 & n.24. The Government is wrong on all fronts.

<u>First</u>, Mr. Amar was not required to assert that Ms. Javice committed a crime for his defense to be mutually antagonistic.[5] "Mutually antagonistic defenses exist when the jury must disbelieve the *core* of one defense in order to believe the core of the other." *United States v. Flores*, 362 F.3d 1030, 1040 (8th Cir. 2004) (emphasis added); *United States v. Gilliam*, 167 F.3d 628, 635 (D.C. Cir. 1999). Here, while Ms. Javice argued that she did not intentionally misrepresent anything, Mr. Amar argued that Ms. Javice manipulated his accurate data to be inaccurate and sent it to the Banks without his knowledge. The Government's own brief plainly points this out. Opp. at 57 ("Not only did Amar claim to be in the dark about Javice's misrepresentations, but he also argued that Javice at times took steps to commit parts of the fraud on her own by changing or altering materials Amar had provided to her in connection with due diligence."); Trial Tr. at 3680:7-14. The Court should take the Government at its word. In any event, to the extent Mr. Amar's defense fell short of "mutual antagonism," it is only because the Court declined to admit highly exculpatory evidence— including on Ms. Javice's data manipulation, discussed in detail below. The Court should reject the Government's attempt to turn that into a shield against Mr. Amar's post-trial challenge now.

The Government's argument that Mr. Amar presented other, alternative defenses with which Ms. Javice agreed at trial equally misses the mark. Mr. Amar—a criminal defendant fighting for his liberty—is not required to choose between antagonism and everything else. *United States v. Mendoza-Acevedo*, 950 F.2d 1, 3 (1st Cir. 1991) (defendants "generally ha[ve] the right to pursue alternative defenses"); *accord United States v. Banks*, 687 F.2d 967, 972–73 (7th Cir. 1982)

---

[5] If the Government had its way, Mr. Amar would apparently need to concede, for example, that Ms. Javice's misrepresentations were material—an element of the offenses that the Government does not even mention in its brief.

(upholding a joint trial, but not because defendant "implicated" co-defendant yet raised "alternative defense that his level of involvement could not rise to the level of aiding and abetting"). Again, that is particularly so here, where Mr. Amar faced constant opposition from both Ms. Javice and the Government on antagonistic arguments and evidence. The Government suggests Mr. Amar should have abandoned all other defenses to preserve one that he could not fully make.

Second, the Government all but admits the prejudice Mr. Amar suffered when it points out that the jury convicted him on all counts, same as Ms. Javice. Opp. at 79. That verdict is a manifestation of the "serious risk" that the joint trial posed from the start, because it shows the jury "erroneously" eschewed "markedly different degrees of culpability" between the Defendants. *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[E]vidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened."). The Government declares that a *split* verdict would indicate prejudice, not disprove it. Opp. at 80. That too is wrong. A split verdict would show the jury adequately compartmentalized the evidence and separated the Defendants, as black letter law makes clear. *See, e.g. United States v. Yuan Li*, No. 18-cr-302 (BMC), 2020 WL 6393038, at *10 (E.D.N.Y. Nov. 2, 2020) ("The Second Circuit has recognized that prejudice warranting a new trial cannot be shown where, as was the case here, the jury's split verdict reflects careful consideration of proof as to each individual count."); *United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) ("absence of such spillover" is "readily inferable where the jury has convicted a defendant on some counts but not on others"); *United States v. Morales*, 185 F.3d 74, 83 (2d Cir. 1999) ("Partial acquittal of a defendant strongly indicates that there was no prejudicial spillover.").

11

In short, Mr. Amar had a specific trial right that the jury not lump him in with Ms. Javice, but the spillover effect of the evidence against her—coupled with the divergence of the Government's case and theories of culpability against him—compromised that right. *United States v. Aparo*, 221 F. Supp. 2d 359, 363 (E.D.N.Y. 2002) (severing because of "widely disparate degrees of culpability with which [defendants] are charged"); *see also United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996) (reversing conviction based on "the enormous amount of prejudicial spillover evidence" against one defendant, and stating "[i]t suffices to note that the government's brief contains a description of the defendants' crimes that is forty-three pages long" and "recites" many acts in which that defendant did not participate, just like the record shows in this case).

The Government devotes the rest of its argument on this issue to recasting the Court's rulings on Mr. Amar's excluded exculpatory evidence, claiming that even if Mr. Amar had a mutually antagonistic defense, he did not suffer prejudice because none of the evidentiary rulings would change in a solo trial. Opp. at 88. Not so. Take, as one example, the "age distribution" exhibits that Mr. Amar repeatedly sought to admit (DX OA 204, 204-A, 200, 200-A, 238, and 238-A). On July 28, 2021, Mr. Amar provided Ms. Javice with real data showing Frank had only a few thousand FAFSA users over a time period from earlier that year—a fraction of 4.25 million. Mr. Amar's proffered (but precluded) defense was that Ms. Javice manipulated this data behind Mr. Amar's back by deleting the low numbers and conveying percentages only (among other things). Ms. Javice then sent the manipulated data to LionTree, for JPMC, without copying Mr. Amar on the email (*i.e.*, she hid it from him). *See* DX OA 200; DX OA 200-A.

There can be no doubt that the Court excluded these exhibits in part because of concerns that their admission would harm Ms. Javice—because it said so. Trial Tr. at 3318:9–12. And in excluding them, the Court expressly credited Mr. Amar's theory of relevance: "there is an

argument that if something was changed it shows a lack of agreement between Mr. Amar and Ms. Javice." *Id.* at 3318:1–3. This surely is correct. If Mr. Amar were in a criminal conspiracy with Ms. Javice, he would not have sent her accurate data in the first place (which flatly contradicted her prior representations to the Banks), and she would not have needed to manipulate it to inflate Frank's user numbers, nor hide her manipulation from him. That this happened (here and in other instances) is undeniable proof that Mr. Amar was in the dark about a so-called conspiracy. The Court's concerns about prejudice to Ms. Javice infected its Rule 403 balancing on these and numerous other exculpatory exhibits offered by Mr. Amar.[6]

Respectfully, the Court could have either severed the Defendants' trials or permitted Mr. Amar's full-throated antagonistic evidence. It did neither. As a result, Mr. Amar is entitled to a new trial.

## III.   THE GOVERNMENT'S UNSUPPORTED THEORIES OF CULPABILITY CONTINUE TO CAUSE A MANIFEST INJUSTICE

At trial, the Government's evidence implicating Mr. Amar was thin and largely speculative. He was on the fringes of a one-person scheme looking in, not at the center of a conspiracy looking out. *See, e.g.*, Rule 33 Br. at 15-20; *infra*, Section IV. So the Government elicited misleading testimony and mischaracterized critical evidence to make its case. Several instances bear repeating. The Government misled the jury to believe that Mr. Amar lied directly to Capital One, *see, e.g.*, Rule 29 Br. at 19-21, and bought the ASL list strictly in bad faith, seeking 4.5 million records from the start (false) rather than 10 million, 7 million, 5 million, and 3 million first (the truth), *see, e.g.*,

---

[6] The "age distribution" exhibits are just one example of many instances in 2021 where Ms. Javice manipulated information behind employees' backs (mostly Mr. Amar's) and hid the red flags from them so that they could not discover the misrepresentations. Mr. Amar repeatedly attempted to admit exhibits proving this defense. *See* Rule 33 Br. at 26 n.19 (citing at least twenty-three plainly relevant exhibits that the Court improperly excluded).

Rule 33 Br. at 52-58. The Government went out of its way to attack Mr. Amar for Mr. Glazer's absence from the August 2 call with Patrick Vovor, and misled the jury into thinking that Mr. Glazer had left Frank around that time (in an effort to explain why Mr. Vovor—despite apparently being alarmed by remarks made at the August 2 call—never expressed his concerns to Mr. Glazer, Frank's CLO). At the same time, the Government objected vigorously when Mr. Amar sought to introduce ten documents (from the Government's own discovery) demonstrating that Mr. Glazer still worked at Frank throughout August. *See* Rule 33 Br. at 47; ECF 356. The Government knew that Mr. Glazer stayed at Frank until mid-September, when the merger closed, because he told them so before trial. 3507-012 (Jan. 24, 2025) at 1. Considered "as a whole," *United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020), these events constitute manifest injustice under Rule 33, because the Government secured a conviction in part through evidence it knew to be at the very least misleading.

In a similar vein, the Government distorted the law on advice of counsel by arguing essentially that any reference to a lawyer, no matter the context or purpose, must meet the specific threshold for that defense. It knew, for example, that Idan Netser, Frank's outside counsel at Sidley Austin for the merger, never blessed the ASL purchase—because Mr. Netser said so in Government interviews. *See* Rule 33 Br. at 50-51; 3562-001 at 1. Still, it convinced the Court to erase any reference to Mr. Netser's name or occupation from a key WhatsApp where Ms. Javice told Mr. Amar: "on with Michael and Idan and they both said buy [the ASL list] and move quick." GX 801-9. Under any conception, the advice of counsel defense did not apply because Mr. Amar's theory was that Ms. Javice may well have fabricated the purported direction from Mr. Netser. The Government used the same tactic throughout trial with respect to Frank's in-house lawyer— describe a defense Mr. Amar was not making (advice of counsel) and apply a legally dubious

theory to it—to convince the Court to block most evidence involving Mr. Glazer. *See, e.g.*, Rule 33 Br. at 43-44 n.22 (citing multiple excluded exhibits); ECF 356.

To salvage the insufficient record, the Government doubles down in its Opposition, devising speculative new theories of culpability to implicate Mr. Amar in a conspiracy and arguing "excessively and inappropriately" from the record. *United States v. Lopac*, 411 F. Supp. 2d 350, 367 (S.D.N.Y. 2006) (Hellerstein, J.) (granting Rule 33 motion). As a matter of law it cannot reimagine its case that way. *See, e.g.*, *United States v. Ness*, 565 F.3d 73, 79 (2d Cir. 2009) ("This theory was not presented to the jury and therefore cannot support an affirmance." (citations omitted)); *United States v. Knauer*, 707 F. Supp. 2d 379, 390 (E.D.N.Y. 2010) ("It is well established that after a jury trial, a criminal conviction cannot be upheld on the basis of a theory not presented to the jury." (collecting cases in appellate context)); *accord United States v. Rubinson*, 543 F.2d 951, 966 (2d Cir. 1976) (on rebuttal, Government cannot use "the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial"); *United States v. Faisal*, 282 F. App'x 849, 850–51 (2d Cir. 2008) (noting "[i]mproper statements made during summation" raise process concerns and can "require a new trial").

Even if the law permitted the Government to take a second bite at the apple, its novel narratives here stray too far afield of the evidentiary record to be accorded any weight. They are not only unreasonable, but outside the "realm of possibility." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019). Indeed, the Government's Opposition piles speculative "inference upon inference" to create a "dragnet" that impermissibly catches Mr. Amar in the purported scheme. *Lopac*, 411 F. Supp. 2d at 360 ("The Supreme Court has made clear, however, that charges of

conspiracy are not to be proven by 'piling inference upon inference.' (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (warning against "dragnet")).

### A.    July 8 Capital One Meeting

The Government argues that Mr. Amar "himself presented the very misrepresentations that went to the heart of the fraud in a July 2021 meeting with Capital One." Opp. at 60. The Government refers to slide 10 in the July 8 presentation, which states that Frank had hundreds of thousands of FAFSA users in the first six months of every year. GX 3040. The Government never elicited a single line of testimony from any witness about who (if anyone) presented a single data point on that slide. Trial Tr. at 2146:16-2151:5. The Government never even asked a witness that question. This is in stark contrast to its line of questioning on other slides in the same deck. For instance, just moments before questioning Mr. Young on slide 10, the Government elicited testimony from him about who presented slide 8, which also contained user data charts. *Id.* at 2146:21-2147:3. It is as if the Government purposely avoided eliciting testimony on the presenter so it could wait, see, and exploit slide 10 against Mr. Amar, knowing that slide was its best chance to tie him to "the heart of the fraud." Opp. at 60.

The Government does not stop there. It also argues that Mr. Amar presented the July 8 slide deck because he "was logged in via the Zoom application, whereas the only other Frank employee present, Javice, merely dialed in by phone, such that she would not be able to see which page of the PowerPoint was being shared on the screen during the video call." *Id.* at 75. This assumption finds no support in the Zoom metadata in GX 2036, nor elsewhere in the record. The Government did not put on a single witness to explain the metadata, or to testify to what (if anything) it means when a person's Zoom login shows a phone number, since it is entirely possible to open the Zoom application from a cell phone. Neither did the Government offer an affidavit from a custodian with knowledge. Drawing inferences in the Government's favor is one thing;

allowing the Government to speculate wildly from already thin evidence to fend off a post-trial challenge is another. On top of that, Mr. Amar did not have the opportunity to offer any rebuttal evidence (such as his own metadata with different, additional data fields) or witness testimony from a Zoom custodian, Mr. Young, or Houston Cowan.[7]

Setting that aside, the Government's newly minted theory of culpability contradicts testimony from the Government's own witness, Mr. Young, that Ms. Javice *did* present on slides on July 8, including parts of slide 8 on Frank's user data. Trial Tr. at 2146:21-2147:3. So whether she "dialed in" is irrelevant; by even the Government's account, she spoke and apparently understood "what was being shared on the screen." Opp. at 75. The Government's new theory also defies common sense. People can present on Zoom calls no matter how they join the meeting, including from a cell phone, and Ms. Javice could have had the slide deck in front of her in hard copy or on another device, to name just two possibilities. The Government's brazen effort to advance this new theory of culpability (based on attenuated inferential leaps) proves exactly why Mr. Amar's requested relief is warranted.

### B.    "Huge Mislabel" Correction

The Government advances another new theory—this time, to downplay Mr. Amar's correction of Ms. Javice's "huge mislabel," where she misrepresented 35 million Google impressions as Frank web visitors. The Government claims that Mr. Amar said this "as a cover" to ensure Mr. Glazer did not catch onto the fraud, and that Ms. Javice and Mr. Amar then cut him

---

[7] The Government alluded to this theory (and certain others discussed below) in rebuttal summation. Trial Tr. at 3519:24-3520:2; 3743:2-6. That itself is improper and cannot justify relying on those theories to bolster the jury's verdict in response to Mr. Amar's post-trial challenge. *See, e.g.*, *Rubinson*, 543 F.2d at 966; *United States v. Gleason*, 616 F.2d 2, 26 (2d Cir. 1979) ("fairness would dictate" that the defense be confronted with a "new theory" in time to respond to it rather than "at almost literally the last minute of a long trial"). If the Government cannot make new arguments at the end of trial, surely it cannot make new ones after the trial has ended.

out of the July 8 diligence meeting as a result. *Id.* at 51. To begin, the Government knew the centrality of "huge mislabel" to Mr. Amar's defense from the start. Mr. Amar told the jury to remember it in his opening, Trial Tr. at 78:14-20, and briefed it before closing, ECF 340. The Court heard extensive argument on it. Trial Tr. at 3201:10-3215:1. Yet, all along, the Government made a completely different case to exclude it—claiming, not that Mr. Amar's flagging the mislabel was somehow designed to protect the conspiracy from Mr. Glazer's detection, but rather that the mislabel itself was an "orthogonal" "sideshow" that has "nothing to do with the core allegations in this case." *Id.* at 3212:15-3213:24. The Government is stuck with what it put before the jury; it cannot "shift" its theory to "fill in gaps in its case" and "deflect the ripostes of the defense" by claiming "huge mislabel" is suddenly, and remarkably, inculpatory. *United States v. Siddiqi*, 98 F.3d 1427, 1438-40 (2d Cir. 1996).

In any case, the Government's "huge mislabel" theory defies common sense and the trial record. The evidence shows that Ms. Javice repeatedly exposed Mr. Glazer to her alleged misstatements about FAFSA users in meetings and over email. *See, e.g.*, Trial Tr. at 2264:6-14 (June 23 call where Ms. Javice allegedly represented Frank had two million users and defined a user as an account); GX 3026 (Ms. Javice defining user as "accounts"); GX 3026-A (attaching 3.1.4 with 4.265 million representation); GX 3027-B (same). Not only that, Mr. Glazer was not cut out after Mr. Amar's correction: he attended meetings thereafter. The Government's theory also does not, because it cannot, account for the fact that immediately after LionTree informed JPMC and Capital One of the mislabel, Ms. Javice removed Mr. Amar's name from the JPMC bid and said *he* should not come over in the merger. Most implausible of all, the Government's theory would mean that Mr. Amar corrected data drawing attention to the "heart of the fraud" because Frank could not have 4.5 million FAFSA users if it had only 4.5 million website visitors as a means

of covering it up. Far from a cover, Mr. Amar's correction put Mr. Glazer on notice of a significant misstatement being made during diligence and gave him information he needed to expose it. Mr. Amar of course could have put this before the jury, had the Government not improperly objected to any evidence involving Mr. Glazer and declined to call him as a witness despite telling the jury in its opening that it would do so.

### C.    Enformion

The Government further claims in its Opposition that "they," meaning Mr. Amar and Ms. Javice, "augmented the ASL list with additional data from another third-party data provider company named Enformion." Opp. at 26. For the first time, the Government attempts to tie Mr. Amar to this part of the conspiracy. It does so by citing a WhatsApp from Ms. Javice where she vaguely tells Mr. Amar on August 5, 2021, that she will "address" the ASL list "this weekend." *Id.* at 28-29; GX 801-20. According to the Government, this single message means Defendants "discussed the [Enformion] data augmentation exercise." Opp. at 28. Without more context (and there is none), nothing about this ambiguous message supports that inference. At the time she sent it, not even Ms. Javice knew her plan, according to the trial record. The contours of it did not crystallize until weeks later, and she had not yet contacted Adam Kaplener, the data scientist who purchased records from Enformion, about it. The Government also cites WhatsApps from August 11, 2021, where Mr. Amar asks Ms. Javice to market to the augmented list of Frank users. *Id.* at 29; GX 801-21. But on their face these messages show Mr. Amar was out of the loop, not in a conspiracy. And Dr. Kapelner's testimony did not implicate Mr. Amar in Enformion in any respect. Trial Tr. at 2031:2-12.

### D.    10 Million Records Request to ASL

Finally, the Government claims in its Opposition that Mr. Amar's initial request to ASL for 10 million records is "devastating proof of his guilt." Opp. at 111-12. That is because, according to

19

the Government, Frank projected 10 million users by the end of 2021, *id.* at 112, which Mr. Amar supposedly knew, GX 801-27. Except that was never the Government's case, and there is no evidence Mr. Amar knew it. The Government did not connect the 10 million number to GX 801-27, or to Frank's 2021 projections, until rebuttal summation, which it cannot do. *United States v. Alegria*, No. 90-cr-0450 (RWS), 1991 WL 238223, at *12 (S.D.N.Y. Nov. 6, 1991) ("That the evidence the government argued from was already in the record is immaterial. . . . Utilizing a new fact in the record during a rebuttal is not objectionable; deploying a new argument is." (citation omitted)); *supra*, note 7. Even so, the Government's theory cannot explain why Mr. Amar subsequently requested at least three other, *lesser* quantities, including three million records, Trial Tr. 3738:15-3739:8, which would have been insufficient to support a conspiracy centered on backing up either 4.5 million or 10 million users.

Perhaps worst of all, the Government cites "3.1.4" for its claim that "JPMC was told, falsely, that Frank was projected to have 10 million customers by the end of 2021," as if to imply that Mr. Amar knew of the projection from that spreadsheet. Opp. at 112. But no version of 3.1.4 in evidence contains a 10 million number. Not GX 1678, which Mr. Amar allegedly received from Ms. Javice and edited on June 24, 2021. Not GX 3010-A and GX 3011-A, two versions of 3.1.4 that Ms. Javice sent to LionTree for the Capital One data room, without copying Mr. Amar. Not GX 1145-A, which Ms. Javice sent to Mr. Vovor and Mr. Amar on August 2, 2021. Not any spreadsheet Dr. Kapelner received from Ms. Javice. GX 603. And not any that either Bank ever received. GX 3.1.4; CAP3.1.4. Not a single one. *See also* GX 3012-A; GX 3015-A; GX 3018-A; GX 3022-B; GX 3026-A; GX 3027-A; GX 3027-B; GX 3028-A; GX 3028-B. The highest projection in any of these exhibits is 8 million—a number that, critically, Mr. Amar never asked ASL to provide. Unsurprisingly, and consistent with Mr. Amar's theory that Ms. Javice kept

information from him, the trial evidence shows that the 10 million user number comes from an email between Ms. Javice and JPMC alone, before due diligence even began. GX 1590. Here, again, the Government attempts to justify the jury's verdict with unsupported inferences that ultimately amount to nothing except further proof of the manifest injustice imposed by its misleading reading of the record.

In sum, just as the Government at trial sought to secure a verdict using misleading testimony and argument, the Government seeks to cure the record in its Opposition by briefing speculative new theories of culpability. That is all but a concession of the insufficiency of the case it put to the jury. Properly construed, the evidence shows that Mr. Amar was on the outside of a scheme looking in, his "knowledge was limited by a manipulative [boss]," and both he and Ms. Javice took actions inconsistent with his being in a conspiracy, including on some of the most important pieces of evidence against him. *Lopac*, 411 F. Supp. 2d at 368 ("Lopac was on the outermost fringes of a conspiracy, her knowledge was limited by a manipulative boyfriend, and she evidenced intentions inconsistent with joining a conspiracy."). "In the interests of justice, a new trial is required." *Id.*

## IV. EVEN WHEN VIEWED IN THE GOVERNMENT'S FAVOR, THERE WAS INSUFFICIENT EVIDENCE FOR A RATIONAL JURY TO FIND MR. AMAR GUILTY OF THE CHARGED CRIMES

### A. The Government Failed to Offer Sufficient Evidence to Establish that Mr. Amar Agreed to Commit a Crime with Ms. Javice in 2021

While the Government in its Opposition assembles a laundry list of purported "evidence of Amar's guilt," Opp. at 46-48, closer inspection of these arguments reveals them to be either recitations of uncontroversial background information that nobody disputes, mischaracterizations of the evidence, or unreasonable inferences based on that evidence. In truth, the evidence at trial

was insufficient for a rational jury to conclude that Mr. Amar entered into a criminal agreement with Ms. Javice.[8]

The Government's putative evidence of Mr. Amar's conspiratorial agreement with Ms. Javice in 2021 boils down to the following:

1. Involvement in creating the document in the Virtual Data Room ("VDR") entitled 3.1.4;

2. Involvement in a meeting on July 8 with Capital One;

3. Presence at a meeting on July 12 with JPMC;

4. Involvement in the creation and provision of synthetic data; and

5. Purchase of ASL records.

*See id.* at 46-48. But the requirement to draw inferences in the Government's favor does not require "credit[ing] inferences within the realm of possibility when those inferences are unreasonable." *Pauling*, 924 F.3d at 657. None of the evidence underlying these claims leads to a reasonable inference that Mr. Amar entered into a criminal agreement with Ms. Javice.[9]

**3.1.4 Spreadsheet (Rule 29 Br. at 24-25)**. The Government tells the story of the creation of the VDR spreadsheet called 3.1.4 as if Mr. Amar was intimately involved in putting it in its final form (*i.e.,* the form that contained alleged misrepresentations regarding Frank's FAFSA user

---

[8] The arguments in this section apply not only to conspiracy but also to the substantive charges.

[9] The Government argues that Mr. Amar "draws all inferences from the isolated evidence under discussion *against* the Government" and urges the Court to consider "categories of evidence of Amar's guilt . . . in combination, not in isolation." Opp. at 46 & n.10. But to satisfy its burden under Rule 29, the Government is required to have introduced evidence sufficient for a rational jury have found that every element of every charged offense was established beyond a reasonable doubt. *See United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) ("Where a fact to be proved is also an element of the offense, however, 'it is not enough that the inferences in the government's favor are permissible.' A court 'must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.'" (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995))).

and FAFSA completion figures). *See* Opp. at 5-8. The evidence established at trial belies this. As Mr. Gaddis (of Google) explained to the jury, metadata does not reveal what a document (including 3.1.4) looked like at any specific moment during its development, nor does it show what a user's edit changed about a document. Trial Tr. 832:3-10; 892:13-15; 894:24-895:7; 896:2-9. What metadata does show, however, is that while both Ms. Javice and Mr. Amar had access to an internal Frank draft of 3.1.4, Ms. Javice took more than 100 "actions" with respect to that document, whereas Mr. Amar took only three actions and made only one "edit." *See* GX G-521. And, perhaps most importantly, there is no evidence in the record that Mr. Amar had access to the VDR, where Capital One and JPMC diligence documents (including 3.1.4) were housed during the diligence period. *See* Rule 29 Br. at 24-25. In fact, Mr. Cowan, who was the individual at LionTree who granted people access to the VDR, did not recall granting access to Mr. Amar, and Mr. Amar was prevented at trial from introducing affirmative evidence to show that he did not have such access. *See id.* at 24-25 & n.7. It is thus pure speculation that Mr. Amar had any involvement with the version of 3.1.4 that contained alleged misrepresentations.

**July 8 Capital One Meeting (Rule 29 Br. at 19-21)**. As discussed *supra*, Section III.A, the Government's narrative surrounding the July 8 meeting is rife with speculative leaps in logic. Speculation aside, the evidence adduced at trial supports only an inference that Mr. Amar was present during the July 8 meeting. There is no evidence, however, that would lead to a reasonable inference that Mr. Amar made any misstatements during that meeting. To the contrary, of the two witnesses who testified regarding the meeting at trial, one (Houston Cowan of LionTree) did not recall who attended or presented specific slides, and the other (Mason Young of Capital One) admitted that he had no recollection of Mr. Amar attending the meeting (presumably because the

Zoom metadata for this meeting makes clear that Mr. Young attended for only 12 minutes in the middle of the meeting). *See id.* at 20; GX 2036.

> ***July 12 JPMC Meeting (Rule 29 Br. at 21-24)***. The Government does not even try to argue that Mr. Amar made any misrepresentations at the July 12 meeting with JPMC—and the record is clear that he did not. *See* Opp. at 46 ("On July 12, 2021, Amar was *present* when *Javice* lied to JPMC during a diligence session . . ." (emphasis added)). At most, the Government can argue mere "presence," which is insufficient to prove an unlawful agreement. *See United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (finding defendant's "presence at the scene of [the] crime" or "general knowledge of criminal activity" insufficient to establish agreement to commit fraud).

> The evidence at trial, however, requires multiple levels of inferences to even get to mere presence: (1) that Ms. Javice's representation was made while Mr. Amar was present in the meeting (he only joined for the second half of the relevant meeting, *see* GX 2035, and at least one Government witness recalled Ms. Javice's misrepresentations to have been made near the beginning of the meeting, *see* Trial Tr. 2563:22-2564:25); (2) that Mr. Amar was actually paying attention during the fleeting moment that Ms. Javice made any misrepresentation, even if he was present when it was made; and (3) that Ms. Javice made statements in such a way that Mr. Amar would have obviously understood them to be misstatements. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 485 (S.D.N.Y. 2012) (rejecting argument that defendant has a duty to correct another party's misrepresentations under Janus), *aff'd*, 525 F. App'x 16 (2d Cir. 2013).

> ***Acxiom Validation and Synthetic Data (Rule 29 Br. at 25-26, 32-37)***. There was insufficient evidence at trial connecting Mr. Amar to the Acxiom data validation exercise or to Ms. Javice's work with Dr. Kapelner to create synthetic data—both critical pieces of the Government's

theory of the alleged scheme to defraud.[10] Ignoring this, the Government's Opposition makes assertions (again, by lumping Defendants together) that are unsupported by the record, for example, that "*Javice and Amar* used synthetic data to create a list of 4.25 million fake users in order to fraudulently pass the data validation exercise." Opp. at 13 (emphasis added). But the record evidence belies these contentions, *see* Rule 29 Br. at 32-35, and the Government's arguments to the contrary are rife with mischaracterizations and should be rejected.

For example, the Government once again mischaracterizes Mr. Amar's involvement with a document related to the validation exercise that the Government referred to as "Records Needed." Opp. at 14-15. Mr. Amar never interacted with a document entitled "Records Needed," but rather created an earlier iteration of this document called "Untitled Spreadsheet" and then re-named it "Funnel Since Aug 1 2020." *See* Rule 29 Br. at 25-26. The Government casts "Records Needed" as a document providing instructions for Dr. Kapelner, but the evidence at trial established that there is no way of knowing (a) what "Records Needed" (a document Mr. Amar never saw) looked like when it was shared with Dr. Kapelner (a person Mr. Amar never interacted with in August 2021); or (b) what the earlier iterations of the document ("Untitled Spreadsheet" and "Funnel Since Aug 1 2020"), which Mr. Amar did have some involvement with, actually said.

In another particularly glaring mischaracterization, the Government refers to a WhatsApp where Mr. Amar tells Ms. Javice that certain fields were "'eliminated from the report' to JPMC." Opp. at 15. The words "to JPMC" are nowhere to be found in the message at issue, GX 801-7, and are rather a speculative inference by the Government that is not required to be credited by the

---

[10] *See* Rule 29 Br. at 32-35 (explaining that every witness involved with the validation exercise testified that Mr. Amar was not, that Ms. Javice kept Mr. Amar in the dark regarding the validation request underlying the "Records Needed" spreadsheet, and that Mr. Amar did not know who Dr. Kapelner was).

Court on a Rule 29 motion and is not reasonable under a Rule 33 analysis. The only reasonable inference here, especially given the remaining evidence that Mr. Amar had no involvement in or knowledge of the validation exercise, is that Mr. Amar simply meant the internal Frank report.

*Purchase of ASL Records (Rule 29 Br. at 37-43)*. The Government admits in its Opposition that in early August 2021, "[a]s reflected in their WhatsApp chats, the defendants appeared to be looking for a company that could provide additional PII for Frank's website visitors." *Id.* at 17. This, for once, is a fair and accurate characterization of the evidence regarding Mr. Amar's purchase of ASL records. The Government adds that "[t]he defendants ultimately abandoned that effort," *id.* at 17, but this is unsupported by any record evidence. *See* Rule 29 Br. at 37-43; *supra*, Section III. There is also no support for the Government's inference that Mr. Amar's efforts to augment Frank's website visitors was part of a conspiracy to defraud JPMC.

## B.    The Government's Evidence from 2022 Was Insufficient to Support a Conviction for Conspiracy

The Government spends many pages of its Opposition discussing evidence from 2022, but this evidence fails to give rise to a reasonable inference that Mr. Amar believed himself to be participating in any fraud in June, July, or August 2021, let alone a cover-up of such fraud. Much of the Government's argument surrounding the evidence from 2022 focuses on the proposition that "the Defendants [p]assed off ASL [d]ata as Frank [u]ser [d]ata." Opp. at 31-39. The Government argues that the evidence that Ms. Javice and Mr. Amar discussed providing data, including ASL records, to JPMC in 2022 leads to the inference that Mr. Amar was part of a criminal agreement with Ms. Javice to cover up the misrepresentations prior to the acquisition, in the summer of 2021. But participation in a cover up, by itself, constitutes at most evidence of "after-the-fact consciousness of guilt" and was insufficient to convict. *See United States v. Cassese*, 428 F.3d 92, 100-01 (2d Cir. 2005) (affirming grant of judgment of acquittal, including because

after-the-fact evidence "supplies only a modicum of information about [defendant's] intentions at the relevant time," and "such evidence is insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt" (citation omitted)).

Moreover, even if (contrary to the evidence) Mr. Amar participated in a cover up in 2022,[11] a conspiracy in 2022 to cover up Ms. Javice's fraud in 2021 would, as a matter of law, have to be analyzed separately from any supposedly fraudulent conduct in 2021. *See, e.g.*, *Krulewitch v. United States*, 336 U.S. 440, 442-44 (1949) (out-of-court statements by alleged co-conspirator were inadmissible when made subsequent to the completion of the conspiracy "in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment"); *see also Lutwak v. United States*, 344 U.S. 604, 616-18 (1953) (same); *Grunewald v. United States*, 353 U.S. 391, 401-02 (1957) ("[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."); *United States v. Roshko*, 969 F.2d 1, 7-8 (2d Cir. 1992) ("Once we have ascertained the scope of the conspiracy, we must then

---

[11] There are multiple holes in this argument from a sufficiency perspective, which the Government ignores entirely or glosses over. The most glaring hole involves Mr. Vovor, who the Government describes as having "declined Amar and Javice's request" to join the conspiracy back in August 2021. Opp. at 49. Only a few months later, though, Mr. Amar has no qualms about going right back to Mr. Vovor to enlist Mr. Vovor's help in transferring data, including ASL records, to JPMC. *See id.* at 32-38. Mr. Amar even suggests, in private WhatsApp messages with Ms. Javice the day before the call that Mr. Vovor recorded in January 2022, that they "ask Patrick [Vovor] for" the "million user list" that the Government argues is key evidence that Ms. Javice and Mr. Amar's criminal conspiracy extended to 2022. *See id.* at 32. Mr. Amar's eagerness to seek Mr. Vovor's assistance with these efforts in 2022 undermines the notion that Mr. Amar believed he was asking Mr. Vovor to engage in fraudulent conduct—both in August 2021 and in January 2022.

determine when it terminated, keeping in mind that a conspiracy continues 'until its aim has been

achieved, it has been abandoned, or otherwise terminated.'" (citing *United States v. Rucker*, 586

F.2d 899, 906 (2d Cir. 1978)); *United States v. Stratton*, 779 F.2d 820, 829 n.8 (2d Cir. 1985)

("statements made during the 'concealment phase' of a conspiracy are not 'in furtherance of' the

conspiracy" (citing *Krulewitch*, 336 U.S. at 443-44)); *United States v. Marcus Schloss & Co.*, 710

F. Supp. 944, 950 (S.D.N.Y. 1989) (efforts to "obstruct[] the SEC inquiry" into defendants'

conduct did not "form an inherent and indivisible part of" the original conspiracy (citing

*Grunewald*, 353 U.S. at 402)).

In his Rule 29 Brief, Mr. Amar pointed out several implications that follow from this,

including:

1. Because the Government alleged a two-person conspiracy, by definition no conspiracy
   could have existed here unless and until Mr. Amar joined one, which means that Mr.
   Amar could not have been liable for any fraud committed by Ms. Javice prior to his
   joining. *See* Rule 29 Br. at 15, 27; *supra*, Section II.A.

2. Evidence of a cover-up in 2022 is not sufficient to support a finding that Mr. Amar
   entered into an agreement with Ms. Javice related to the sale of Frank in 2021, or that
   he was liable for any acts or statements by Ms. Javice prior to a cover-up. *See* Rule 29
   Br. at 15, 28.

3. Any conduct or statements by Mr. Amar in 2022 were necessarily not made to deprive
   JPMC of property, nor were they made "in connection with the purchase or sale of a
   security." *Id.* at 15-16.

The Government's Opposition does not respond to any of these points, except to note that the

Government charged Ms. Javice and Mr. Amar with a conspiracy that continued through

November 2022. *See* Opp. at 50-51. But this argument misses the mark. The Government's charge

of a conspiracy that continued through November 2022 is entirely irrelevant to the analysis of

whether the evidence at trial was sufficient to find that Ms. Javice and Mr. Amar entered into a

conspiracy, *prior to the acquisition*, both to fraudulently induce the sale of Frank *and* to cover-up

that conspiracy—which is what the law requires in order to consider these periods together.

Because there is no evidence that such a conspiracy *and* cover-up agreement existed prior to the acquisition, the law requires separate analysis of (1) any pre-acquisition conspiracy whose objective was accomplished upon the acquisition of Frank by JPMC and (2) any agreement months later to cover up said conspiracy.

### C.    The Government Waived Certain Arguments

By not responding to several arguments that Mr. Amar made in his Rule 29 Brief, the Government has waived any challenge to them, and Mr. Amar's Rule 29 motion should be granted on this basis alone. *See United States v. Hernandez*, No. 02-cr-341 (EBB), 2006 WL 861002, at *3 (D. Conn. Mar. 31, 2006) (finding government waived right to oppose defendant's Rule 29 and 33 motions on timeliness grounds by not objecting in opposition, noting that "[b]ecause these rules are not considered jurisdictional, they can be waived if . . . not raised by the government in its opposition."); *Curry Mgmt. Corp. v. JPMorgan Chase Bank*, N.A., 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief.").

These arguments include: (1) that the jury should not have been permitted to consider Ms. Javice's statements as against Mr. Amar under *Geaney* and its progeny, *see* Rule 29 Br. at 14;[12] (2) that a rational jury could not have found that Mr. Amar made any false statements that were material, *id*. at 28-29; (3) the securities fraud charge fails because the allegedly fraudulent conduct in this action was not done "in connection with" the purchase or sale of a security, *id*. at 16.

---

[12] The Government contends in a footnote that Mr. Amar's *Geaney* argument fails because "the Government proved the charged conspiracy *beyond a reasonable doubt*." Opp. at 51 n.13. This misses the thrust of Mr. Amar's *Geaney* argument. A jury finding of guilt beyond a reasonable doubt cannot replace the Court's role under *Geaney* to ensure that the existence of a conspiracy was established through independent evidence. Accordingly, the Government concedes that, to the extent there was insufficient independent evidence of conspiracy, the jury should not have been permitted to consider Ms. Javice's statements as against Mr. Amar.

## CONCLUSION

For the foregoing reasons, and the reasons stated in his opening briefs, the Court should

grant Mr. Amar's Rule 29 and Rule 33 motions.


Dated:  May 27, 2025                              Respectfully submitted,

**KOBRE & KIM LLP**

*/s/ Jonathan D. Cogan*
Jonathan D. Cogan
Sean S. Buckley
Alexandria E. Swette
Michael Cinnamon
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
Jonathan.Cogan@kobrekim.com
Sean.Buckley@kobrekim.com
Alexandria.Swette@kobrekim.com
Michael.Cinnamon@kobrekim.com

Matthew I. Menchel
Victoria R. Fordin
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Tel: (305) 967-6100
Matthew.Menchel@kobrekim.com
Victoria.Fordin@kobrekim.com

Jake Rush (admitted *pro hac vice*)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Jake.Rush@kobrekim.com