UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :   **ORDER AND OPINION**
        -against-                                            :   **DENYING MOTIONS FOR**
                                                             :   **ACQUITTAL AND A NEW**
CHARLIE JAVICE and OLIVIER AMAR,                             :   **TRIAL**
                                                             :
                        Defendants.                          :   23 Cr. 251 (AKH)
                                                             :
------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendant Charlie Javice, the founder and CEO of a company known as Frank, and Defendant Olivier Amar, its Chief Growth Officer, were found by the jury to have made material misrepresentations in the sale of Frank to JP Morgan Chase ("Chase"). The jury found them guilty, following a six-week trial, of all four counts alleged against them: conspiracy to commit wire fraud or bank fraud, wire fraud, bank fraud, and securities fraud. The jury delivered its verdict on March 28, 2025.

        Javice and Amar each move for a judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. I denied the motions at oral argument on May 29, 2025. This opinion gives a fuller account of my reasons.

## FACTS

        Defendant Charlie Javice's start-up company TAPD, Inc., d/b/a "Frank," offered current and prospective students several tools related to financial aid and college applications. Frank's flagship product was a tool designed to help students fill out the Free Application for Federal Student Aid ("FAFSA"). In order to access that tool on the Frank website, students had to sign up for an account with Frank by providing their first and last name, email address, and phone number. Frank also maintained a public website which offered free resources such as

1

articles about student loans, and used Google Analytics to track the number of people who visited the website. Defendant Olivier Amar, Frank's Chief Growth Officer, oversaw marketing and user data.

In early 2021, Frank retained investment bank LionTree LLC to assist in selling the company. Capital One expressed interest in acquiring Frank, and began the due diligence process that precedes acquisition. During the due diligence process, Capital One asked how Frank defined a user. Mason Young, Capital One's Senior Vice President of Corporate Development, testified that they asked this question because "understanding the individual company's definition [of a user] was critical . . . at this stage of diligence, it was common for Capital One to really dig into the quality [of the u]ser base, which in this case, would allow us to better model the size of the synergy opportunity with Capital One realized by cross-marketing our products to their customers." Tr at 2138. Javice responded that a user was "someone who ha[d] visited the Frank website and created an account" with their full name, email, and phone number. Tr. at 2139.

A data room was created to facilitate Frank sharing documents with Capital One. Young testified that he saw a document in that data room entitled the User Breakdown spreadsheet. Tr. at 2141-42. The User Breakdown spreadsheet was created by Javice and edited by Amar on June 24, 2021. The final version of the spreadsheet stated that Frank had a total of 4,265,085 "FAFSA in process." GX CAP 3.1.4. Young understood that "to begin[] the FAFSA process you had to be, you know, a user of Frank and provide a name, e-mail, and phone number." Tr. at 2142. The spreadsheet also listed 2,100,184 "FAFSA completion." GX CAP 3.1.4. Young understood FAFSA completion to mean "[a] user of Frank who had successfully completed the FAFSA application process leveraging Frank's platform." Tr. at 2143.

2

The number of "FAFSA in process"—4,265,085—was, in fact, the number of visitors to Frank's website as of February 2021, as recorded by Google Analytics, and not the number of users who had established accounts at Frank. Tr. at 1138. The true number of Frank user accounts—as Javice told Young, those who had given Frank their full name, e-mail, and phone number—was considerably less, around 300,000, as reflected in an August 2, 2021 report pulled by Frank's chief engineer, Patrick Vovor. Tr. at 1596. There was no evidence to support the assertion that 4,265,085 people used Frank's FAFSA tool. There was also no evidence to support the assertion that 2,100,184 people had completed Frank's FAFSA form.

Additionally, Javice and Amar created and edited a PowerPoint presentation that represented that in the first five months of 2018, 2019, 2020, and 2021, Frank had a total of over 580,000 FAFSA completions. There was no evidence to support that statistic, nor was there evidence to reconcile all the numbers of Frank users given to Capital One. The PowerPoint presentation was presented during a July 8, 2021 virtual meeting with Capital One employees which Amar attended on Zoom and Javice by telephone. Ultimately, Capital One withdrew its interest in acquiring Frank.

During the summer of 2021, JPMorgan Chase ("Chase") also expressed interest in acquiring Frank, and the due diligence process for the acquisition began in early July 2021. Frank gave Chase access to the same data room and information as it had given Capital One, including the User Breakdown spreadsheet containing the 4.25 million and 2.1 million figures for FAFSA applications in process and completions, respectively. Alex Sweeney, at the time a member of Chase's corporate development team, testified that he understood the 4.25 million figure to mean "[t]hat 4,265,085 customers had signed up for the [FAFSA] product and were in

3

the process of entering the FAFSA information that required a sign-up for the product to even start entering." Tr. at 1474-75.

Throughout the diligence process with Chase, Javice continued to misrepresent the same 4,265,085 number of Frank users to Chase employees, including Sweeney, Leslie Wims Morris—the head of corporate development at Chase at the time—and others. At the July 7, 2021 management presentation meeting attended by Javice and Chase representatives, Javice was asked about the number of Frank customers. Wims Morris testified that Javice responded that "[t]he total number of customers . . . was 4.25 million." Tr. at 565. In further diligence meetings held on July 12 and 13, Javice "said that she had 4.25 million customers . . . [s]he [defined user] . . . as someone who signed up for her service, so someone who signed up and entered their first name, last name, telephone number, and e-mail address." Tr. at 570.

Frank was not itself a profitable company. Its value to Chase derived from its engaged customer base, that is, the number of Frank account holders, which could be used as a source of future Chase customers. Wims Morris testified that Chase was:

> [V]ery much focused on deepening our customer relationships and strategies in the student . . . market segment[] . . . when we talk about wanting to grow our customer base, the fact that [Ms. Javice] had 4.25 million customers in a segment where at the time we had only four to four and a half million customers, the number of customers that she had was very important to how we thought about the attractiveness of the opportunity.

Tr. 548, 554.

Chase's corporate development team asked to validate Frank's user data, specifically data fields such as first name, last name, email address, phone number, mailing address, and date of birth. Javice refused to provide Frank's data, claiming privacy concerns with turning over personally identifiable information ("PII"). On August 1, 2021, Wims Morris

4

asked that a third party, Acxiom, validate that Frank did in fact have this data. Javice forwarded Wims Morris's email request to Amar and texted him: "Hey – have time to chat this am [/] Need to talk about a data pull and strategy [/] Ur gonna need to block off ur day." GX 801-2. Javice and Amar called each other nineteen times that day.

That same day, Javice asked chief engineer Vovor if he could create a larger list of customers with the same statistical attributes as Frank's actual customer list. The following day, August 2, Javice and Amar held a joint video call with Vovor, during which they asked him to generate a file of four million users with FAFSA data. Amar showed Vovor a spreadsheet listing the fields for which they needed data to provide for validation. Vovor refused to create the fake data.

Javice then turned to a college friend, Dr. Adam Kapelner, a professor of mathematics, data science, and statistics at Queens College. She texted him on August 2 that she was "in an urgent pinch." GX 2801. In a phone call on August 3, Javice asked Kapelner to create "synthetic" data for 4.25 million users. Javice then called Amar. Amar created a spreadsheet specifying the total numbers, 4,265,085 total accounts and 2,100,184 completions, that Kapelner would need to generate synthetically, and shared that spreadsheet with Javice, who in turn gave a copy to Kapelner for reference. Javice texted Amar, "I found my genius. He says it will take him an hour." GX 801-10.

Javice also provided Kapelner with a file of 293,193 actual customers to use as a reference for generating the 4.25 million synthetic records. Kapelner's task "was to create a look-alike data set from . . . the seed file" by using the real data to generate fake data that mimicked the attributes of the real data. Tr. at 1878-79, 1903. For example, he would take a real name such as "Adam Kapelner" and substitute a fake name such as "Jared Kaplan." Tr. at 1878.

5

Kapelner provided the final data set of 4.25 million synthetic entries to Acxiom on August 5, 2021. That same day, Acxiom validated that it was given 4,265,085 million data records and that 100% of those records had a first name, last name, email address, and phone number, and gave its report to Chase.

On August 2, 2021, even before Kapelner created the synthetic data, Javice and Amar contacted a company, Exact Data, and asked to purchase real student data. Exact Data provided Javice with a sample data set and a purchase order agreement for 1.7 million records. Amar then asked Exact Data to modify its invoice to not show the quantity of data provided. Instead of moving forward with Exact Data, Amar contacted another company, American Student List ("ASL") and asked to purchase 4.5 million records of real student data. Amar told ASL employee Steve Stolls that "we're rushed on this." GX 2310. Javice also expressed urgency in multiple texts with Amar on August 2, 3, and 4, texting him "Lmk when u get a hold of ASL," "Where are we with ASL?", "I need the data today," "When can they get this to us," and "Lmk when u get the list ASAP [/] Need that thing." GX 801-4, 801-6, 801-9, 801-13.

On August 5, Amar texted Javice: "You'll have 4.5m users today. Just closed it." Amar and Javice shared copies of the ASL invoice with each other, and the final version of the invoice omitted the quantities of data purchased.

One of the data fields requested by Chase was the email addresses of customers, but the ASL list did not contain email addresses for many of the student records. So on August 6, 2021, Javice again asked Kapelner for help, this time to add email addresses to the ASL list. Javice told Kapelner that the ASL list was "Frank's user database." Tr. 2000. At Javice's request, Kapelner augmented the ASL data by purchasing data from Enformion.

6

On August 8, 2021, Chase signed an agreement to acquire Frank for $175 million. Under the terms of that merger agreement, Chase also agreed to pay Javice a $20 million retention bonus and to pay Amar a $3 million retention bonus. The acquisition closed in September 2021.

In January 2022, Ryan MacDonald, Chase Consumer Bank's Chief Marketing Officer, and other Chase employees, asked Javice and Amar to provide a copy of Frank's user data. Javice and Amar told the Chase employees that, at that time, Frank had around one million marketable users. MacDonald understood that figure to represent a subset of the total number of Frank users, taking out those users who had opted out of marketing emails or who otherwise could not be marketed to, as well as those students who had graduated. MacDonald testified that "it was also not entirely clear, to be honest, the specific counts, which, again, is why we wanted the file." Tr. 2402. In fact, Frank did not have one million total users at the time; the true number was closer to 140,000. *See* Tr. at 2900. After some delay, Javice and Amar finally provided Chase with the data lists purchased from ASL and augmented by Enformion, as well as a recreated copy of the synthetic data file that Kapelner had initially created in August 2021.

In July 2022, Chase sent a marketing campaign email to what it believed to be the list of Frank customers. Only 28% of those emails were delivered, as compared to the benchmark of a 98% delivery rate, and 30% of the emails that were sent bounced back. MacDonald testified that "[u]sually, that's a sign this is not a great list." Tr. 2428. Chase shut down the FAFSA tool that summer and terminated Javice and Amar a few months later.

## LEGAL STANDARD

"[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could

7

find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (citation omitted). In analyzing a motion for acquittal, the evidence should be viewed "in the light most favorable to the Government" and all reasonable inferences must be drawn in the Government's favor. *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002). The court's evaluation looks at "the evidence in its totality," and the Government "need not negate every theory of innocence." *Id.* at 63 (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

The court may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. Such motions are granted only in "the most extraordinary circumstances," that is, where the evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *U.S. v. Archer*, 977 F.3d 181, 187-88 (2d Cir. 2020).

## DISCUSSION

### I.   Rule 29 Motions for a Judgment of Acquittal

The jury found Defendant Charlie Javice guilty on all four counts: conspiracy to commit wire fraud or bank fraud, wire fraud, bank fraud, and securities fraud. The jury heard substantial testimony and evidence about Javice's misrepresentations to Chase and Capital One about the number of Frank customer account sign-ups, her scheme to purchase data to cover up those misrepresentations, her coordination of that scheme with Amar, the material value to the banks of the number of customer accounts Frank had, and the ultimate success of that scheme in defrauding Chase out of the $175 million purchase price, plus an additional $20 million in bonus compensation to Javice and $3 million to Amar. There is no question that there was sufficient evidence for a jury to find Javice guilty of all counts against her.

The jury also found Defendant Olivier Amar guilty on all four counts: conspiracy to commit wire fraud or bank fraud, wire fraud, bank fraud, and securities fraud. The jury likewise heard sufficient evidence to conclude that Amar was involved in a conspiracy with Javice and committed wire fraud, bank fraud, and securities fraud.

Amar argues that he was uninvolved in certain key aspects of the fraud and that there was no evidence presented of an actual criminal agreement. But the existence of a conspiracy can be inferred: "A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance, . . . a lack of surprise when discussing the conspiracy with others, . . . [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy . . . or received or expected to receive a share of the profits from the conspiracy." *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) (citations omitted). The Government presented evidence that Javice and Amar worked together to carry out certain elements of the criminal scheme, such as editing spreadsheets containing misrepresentations, coordinating the purchase of data from ASL, and asking Vovor to create fake data in a video call on August 2, 2021. The Government also presented evidence that the defendants communicated with each other via text message and phone about other aspects of the scheme, such as obtaining fake data from Kapelner and coordinating which data fields would be sent to Acxiom for data validation.

There was ample evidence that Amar, as Frank's Chief Growth Officer and thus the person in charge of Frank customer sign-ups, was aware of the true number of Frank users and heard Javice repeatedly lie about that number to the banks while also assisting her in making and concealing those lies. Indeed, the jury heard evidence tending to show that Amar himself

9

made misrepresentations about the number of Frank users to Capital One in the July 8, 2021 meeting, and heard evidence that Amar lied to Chase employees about the number of Frank users in January 2022. The evidence, "viewed deferentially and in the aggregate," was sufficient for a reasonable jury to find Amar guilty of all four counts. *Glenn*, 312 F.3d at 64.

## II.     Rule 33 Motions for a New Trial

### A. Severance

As I held before and during trial, severance was not warranted because neither Javice nor Amar met the heavy burden required for severance. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994). The mere fact that defendants point the finger at each other does not compel severance; the defenses must be so mutually antagonistic such that in order to acquit one defendant, the jury must by necessity convict the other. *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989); *United States v. Serpoosh*, 919 F.2d 835, 837-38 (2d Cir. 1990).

Amar's evidence against Javice was limited, tending to show that Javice's role was greater than his, but that evidence did not rise to the level of antagonism required for severance. The evidence at trial showed mutual guilt, not the innocence of either, and the denial of severance was not prejudicial to Javice or Amar. Amar was permitted to admit relevant evidence to support his argument that he should not have been blamed for providing inaccurate information. That he corrected a mislabeling of website visitor data did not take away his complicity in providing false and misleading information. Amar's absence from Javice's August 1, 2021 conversations with Vovor about creating synthetic data, the fact that he did not have access to the data room, and his absence from certain meetings during which Javice made

misrepresentations about the number of Frank users, also did not negate other evidence showing his role in creating and representing false and misleading material information about Frank's customers.

### B. Rulings on Evidence

To the extent Javice was precluded from presenting certain evidence, such preclusion was proper. *See Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988). Evidence of statistics posted on Frank's website as to students and families helped by Frank are not relevant to the misrepresentations made directly to the banks. Indeed, there was no evidence that bank employees saw those specific statistics. Likewise, evidence that Javice made public statements about Frank having hundreds of thousands of customers and evidence that Frank's partner, Sallie Mae, was interested in Google Analytics' user count for Frank, are not relevant to the material misrepresentations made to the banks. And evidence that Javice sought to introduce from after the fraudulent acquisition of Frank, for instance, about marketing to Frank's customers and website visitors, was properly precluded as irrelevant. My preclusion of cross-examination about Chase paying certain witness's legal fees was also proper. Chase paid those legal fees pursuant to a uniform policy which also applied to the fees incurred by Javice and Amar.

The evidence I precluded Amar from presenting or eliciting was also properly precluded. Amar argues, for example, that he should have been permitted to introduce evidence of Frank general counsel Matt Glazer's involvement in due diligence as proof that Amar was acting in good faith. But that evidence was misleading and irrelevant: the mere fact of a lawyer's involvement does not show good faith on the part of others. Amar also objects to my preclusion of evidence related to his providing accurate age distribution data. But evidence that Amar on some occasions provided accurate information does not negate the fact that he gave inaccurate

11

information on other occasions, nor does it negate evidence of his participation in the central scheme: lying and covering up lies about the number of Frank user accounts.

Amar objects to certain lines of questioning pursued by the Government, but he was permitted to cross-examine those witnesses on those topics, to argue vigorously against the Government's theory of the case in summation, and, when appropriate and admissible, to present relevant evidence clarifying the record, such as evidence showing that Amar was the one who corrected the mistakenly labeled unique website visitor data.

Dr. Salve was called by the Government to summarize other evidence in the record, through the work of assistants he supervised. Fed. R. Evid. 1006. Dr. Salve's testimony did not violate Javice's Confrontation Clause right because Dr. Salve personally reviewed and verified the work done by his assistants. His testimony was properly admitted as that of a summary witness, comparing the spreadsheets provided by Frank to Chase with the spreadsheets that the Defendants obtained from ASL, Enformion, and Dr. Kapelner, and summarizing his findings for the jury in the form of summary charts. Dr. Salve's use of software applications to aid him in viewing large Excel spreadsheets and summarizing the data contained within them did not render him an undisclosed expert witness.

### C. Jury Instructions

Javice objects that, in addition to giving a definition of materiality, to which she had no objection, it was prejudicial error not to give an instruction that a victim can't turn a "blind eye" to a misrepresentation and that if he does, it is relevant to the issue of the materiality of a misrepresentation. The materiality charge in my proposed jury instructions given at the charging conference read as follows:

> A material fact is one that would have been significant to a reasonable investor's investment decision. A misrepresentation or

12

omission is significant if there is a substantial likelihood that the misstated or omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to that investor. Materiality is an objective standard. It asks what the reasonable investor would have found significant in the total mix of information made available to him. If you find that the government has proved beyond a reasonable doubt that defendants, or each of them, made false or fraudulent representations, and if those representations were material, it does not matter whether the intended victims were gullible buyers or sophisticated investors, because the fraud laws protect the gullible and unsophisticated as well as the experienced investor. However, puffery or sales talk that is too general for a reasonable investor to consider significant is not actionable under the fraud laws. Puffery includes expressions of optimism and general statements about a company's reputation that do not include misrepresentations of facts.

Although this charge was sufficient, I offered to add additional language that Defendants requested: "[A] victim cannot intentionally turn a blind eye to a misrepresentation. If he does, you may take that into consideration in determining if the misrepresentation was material." Tr. at 3460-61; *see* Trial Tr. at 3156, *USA v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. 2023). However, Javice's summation used the illustration of a blind eye in a way that conflated materiality and reliance. In summation, Javice's counsel argued:

> You can't turn a blind eye to information and claim you were defrauded. That's a fact and Judge Hellerstein will give you some instructions about that. But you can't turn a blind eye and say, well, I didn't see that, I didn't see that, and I didn't see that. All of their questions, the second they were pressed with the actual information thy should have seen, they turned a blind eye to it. And you can't do that under law. You cannot.

Tr. at 3631-32. I determined that adding that language to my charge would be misleading by conflating the issues of materiality and reliance. Reliance is not an issue in a criminal case of fraud. *See Neder v. United States*, 527 U.S. 1, 24-25 (1999); *United States v. Weaver*, 860 F.3d

13

90, 95-96 (2d Cir. 2017). Accordingly, I did not give the requested instruction and so advised counsel before I gave my charge. Tr. at 3762.

Defendants argue that they were misled, and relied on my statement that I would give that charge. However, it was but one paragraph in a two-hour summation. Furthermore, the defendants were put on notice that the charge delivered to the jury may deviate slightly from the charge discussed at the charging conference, and the instructions actually given to the jury, including the lengthy instruction on materiality, were accurate and adequate statements of the law. *See United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

Javice also objects to my not giving her "theory of defense" charge. Her proposed instructions read:

> Ms. Javice's theory of defense is that J.P. Morgan Chase received what it bargained for. If the government has failed to convince you beyond a reasonable doubt that J.P. Morgan Chase received what it thought it was buying—the Frank website, Ms. Javice, and her team—you must find Ms. Javice not guilty of Counts 2-4 . . . Ms. Javice's theory of defense is that Frank's FAFSA data was not material to J.P. Morgan Chase because it did not take steps that a reasonable investor would to verify Frank's FAFSA data before agreeing to purchase Frank for $175 million. I remind you that materiality is an objective standard, judged from the perspective of a reasonable investor. If you believe that a reasonable investor would not agree to a deal without first verifying Frank's FAFSA data, you must find Ms. Javice not guilty of Counts 2-4.

I did not give her charge because it was argumentative and repetitive of the balance of my instructions. I instructed the jury that Defendants denied all charges against them and were presumed innocent until proven guilty beyond a reasonable doubt. Tr. at 3778. An instructing judge is not required to charge the exact statement requested by a party. *See United States v.*

*Johnson*, 994 F.2d 980, 988 (2d Cir. 1993). What matters is that the jury is given a thorough and accurate materiality instruction, and the instruction did that.

Javice also requested an instruction based on the Supreme Court's recently issued opinion in *Thompson v. United States*, 604 U.S. ___ (2025):

> Ms. Javice's theory of defense is that she did not make any materially false statements or representations to J.P. Morgan Chase in the course of its acquisition of Frank. I instruct you that the terms "misleading" and "false" are not interchangeable, and that misleading statements can be true. If you find that Ms. Javice made statements to J.P. Morgan Chase, but that those statements, though misleading, were not false, you must find Ms. Javice not guilty of Counts 2-4.

My charge conformed to *Thompson*, even to the extent of giving the same illustrative analogy as was in Justice Alito's concurrence:

> Fraud . . . includes all the possible means by which a person seeks to obtain money or property of another person by making false representations, false pretenses, or omissions of facts necessary to make what was said not false and misleading . . . A representation, statement, claim, or document also may be fraudulent if it contains half truths or if it conceals material facts in a manner that makes what is said or represented false and misleading. A half truth is something that in the context is misleading and false, both. It has to be misleading and has to be false . . . or some kind of omission to be actionable . . . So, for example, if mother made some cookies, say 10 cookies in a jar and accuses her daughter of eating all the cookies and she says mommy, I only ate 3, that's the omission. She ate all 10 but says I ate 3. I ate 3 is accurate, but in the context of the question, it is false.

Tr. at 3787-88; *see also id.* at 3800:16-17, 3801: 1-3, 3802: 12-14.

During deliberations, the jury sent a note asking for a repetition and a clarification of my charge on conspiracy. Court Ex. 11. As requested, I repeated the beginning portion of my initial conspiracy charge, telling the jury:

> The first element that the [G]overnment must prove beyond a reasonable doubt is the existence of a conspiracy. A conspiracy is a kind of criminal partnership, an agreement of two or more persons

15

> to join together to accomplish some unlawful purpose. The crime of conspiracy to violate a federal law is an independent offense, a crime separate and distinct from the actual violation of any specific federal laws even if the conspiracy is not successful.

Tr. at 3884. I then repeated another portion of my initial charge on conspiracy:

> In considering whether a defendant knowingly and willfully participated in a conspiracy, be advised that a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements. However, in determining the factual issues before you, you may consider against the defendants—co-conspirators—any acts or statements made by any of the people that you find under the standards I have already described, to have been co-conspirators, even though such acts or statements were not made in their presence or were made without their knowledge . . . You have to go back to the indictment which alleges two purposes, two objectives of the conspiracy. Only those crimes can be considered. And with respect to those crimes, if you found, by independent evidence that they're, both Amar and Javice are members of a conspiracy, all their statements and acts are considered against—all the statements and acts of one are considered against the other.

Tr. at 3884-85.

Amar argues that the jury was erroneously instructed on that re-charge that he could be liable for any substantive crimes committed by Javice, even prior to his joining the conspiracy. Nothing in my charge said that.

Amar also objects to the fact that a conscious avoidance charge was given, but such a charge was appropriate. Amar argued that he had not made the misrepresentations or participated in certain key meetings. However, Amar was aware that the numbers Javice was representing were not true, was present in some meetings when Javice lied about those numbers, and had access to many of the documents containing the central misrepresentations.

16

## CONCLUSION

For the foregoing reasons, Defendant Charlie Javice and Defendant Olivier Amar's respective motions for a judgment of acquittal and a new trial are denied. The Clerk is directed to terminate the motions, ECF Nos. 389, 390, and 391.

SO ORDERED.

Dated:   August 7, 2025
         New York, New York

ALVIN K. HELLERSTEIN
United States District Judge