**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 23 Cr. 251 (AKH) |
| CHARLIE JAVICE and OLIVIER AMAR, | |
| Defendants. | |

**<u>OLIVIER AMAR'S SENTENCING MEMORANDUM</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   PERSONAL STORY ................................................................................................. 4

   A.   Mr. Amar Is Fiercely Devoted To His Family ...................................................... 4

   B.   Mr. Amar Instilled Strong Values And Convictions In His Children.................... 8

   C.   Mr. Amar's Life Has Been Guided By His Jewish Faith and Heritage ................. 9

   D.   Mr. Amar Is A Caring And Selfless Community Member.....................................11

   E.   Mr. Amar Is A Positive Mentor And Professional Guide.................................... 12

   F.   Mr. Amar Believed In Frank, Its Mission, And Ms. Javice ................................. 14

   G.   Mr. Amar Will Continue To Do Good.................................................................. 15

III.  OFFENSE CONDUCT ............................................................................................ 15

IV.   THE PSR'S GUIDELINES CALCULATION IS WRONG..................................... 16

   A.   A 4-Point Downward Adjustment For Mitigating Role Is Warranted ................. 18

   B.   No Loss Enhancement Is Warranted .................................................................... 25

   C.   A 2-Point Sophisticated Means Enhancement Is Not Warranted......................... 41

   D.   Enhancements For Abuse Of Trust And Obstruction Of Justice Are Not Warranted ....... 44

   E.   A 2-Point Gross Receipts Enhancement Is Not Warranted.................................. 44

   F.   A 3-Point Unconstitutional Trial Penalty Is Not Warranted ............................... 44

V.    A NONCUSTODIAL SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a)....... 45

   A.   A Noncustodial Sentence Is Appropriate Considering Mr. Amar's Alleged Conduct And His Strong Character.......................................................................... 46

   B.   A Noncustodial Sentence Avoids Unwarranted Sentencing Disparities.............. 47

   C.   A Noncustodial Sentence Avoids Punishing Mr. Amar For Being A Noncitizen ............ 50

   D.   A Non-Custodial Sentence Is Appropriate Considering Mr. Amar's Post-Trial Assistance .................................................................................................... 56

   E.   A Noncustodial Sentence Provides Specific and General Deterrence ............................ 58

   F.   A Noncustodial Sentence Provides Just Punishment ........................................... 60

   G.   A Noncustodial Sentence Is Warranted Considering the Overstated Impact Of Loss ...... 62

VI.   RESTITUTION IS NOT WARRANTED.................................................................. 66

VII.  CONCLUSION......................................................................................................... 70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dean v. United States*,
581 U.S. 62 (2017) ................................................................................ 45

*Ellingburg v. United States*,
145 S. Ct. 1899 (Mem.) (2025) ............................................................ 67

*Erlinger v. United States*,
602 U.S. 821 (2024) .............................................................................. 67

*Gall v. United States*,
552 U.S. 38 (2007) .......................................................................... 45, 47

*Garcia v. BOP*,
2011 WL 1113461 (N.D. Ohio Mar. 24, 2011) .................................... 51

*Hester v. United States*,
586 U.S. 1104 (2019) ............................................................................ 67

*NM IQ LLC v. McVeigh*,
2004 WL 2827618 (S.D.N.Y. Dec. 9, 2004) ........................................ 37

*Paroline v. United States*,
572 U.S. 434 (2014) ................................................................................ 2

*Rimlawi v. United States*,
604 U.S. ---, 2025 WL 581567 (Mem.) ................................................ 67

*Rita v. United States*,
551 U.S. 338 (2007) .............................................................................. 45

*Rizk v. Warden FCI Fort Dix*,
2023 WL 8271803 (D.N.J. Nov. 30, 2023)............................................ 50

*United States v. Abraham*,
498 F. Supp. 3d 175 (D. Mass. 2020) .................................................. 45

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................... 1, 48, 59, 63

*United States v. Adepoju*,
756 F.3d 250 (4th Cir. 2014).......................................................... 44, 45

*United States v. Aggrey-Fynn,*
  2007 WL 473731 (S.D.N.Y. Feb. 14, 2007) ...................................................................... 22, 25

*United States v. Algahaim,*
  842 F.3d 796 (2d Cir. 2016) ................................................................................................ 63

*United States v. Amico,*
  416 F.3d 163 (2d Cir. 2005) ................................................................................................ 43

*United States v. Bakhit,*
  218 F. Supp. 2d 1232 (C.D. Cal. 2002) ............................................................................. 32

*United States v. Booker,*
  543 U.S. 220 (2005) ............................................................................................................ 50

*United States v. Bryson,*
  101 F. Supp. 3d 147 (D. Conn. 2015) ................................................................................ 41

*United States v. Cambrelen,*
  29 F. Supp. 2d 120 (E.D.N.Y. 1998) .................................................................................. 19

*United States v. Carmona-Rodriguez,*
  2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ...................................................................... 59

*United States v. Coppola,*
  671 F.3d 220 (2d Cir. 2012) ................................................................................................ 37

*United States v. Corsey,*
  723 F.3d 366 (2d Cir. 2013) .............................................................................. 2, 60, 63, 65

*United States v. Cuti,*
  2011 WL 3585988 (S.D.N.Y. July 29, 2011) .............................................................. 26, 32

*United States v. Deutsch,*
  987 F.2d 878 (2d Cir. 1993) ................................................................................................ 26

*United States v. Dorvee,*
  616 F.3d 174 (2d Cir. 2010) ................................................................................................ 48

*United States v. Ebbers,*
  458 F.3d 110 (2d Cir. 2006) ...................................................................................... 26, 38, 39

*United States v. Emmenegger,*
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) ................................................................................ 64

iii

*United States v. Fell*,
   360 F.3d 135 (2d Cir. 2004) ............................................................................. 23

*United States v. Fofanah*,
   765 F.3d 141 (2d Cir. 2014) ............................................................................. 42

*United States v. Free*,
   839 F.3d 308 (3d Cir. 2016) ............................................................................. 26

*United States v. Goodrich*,
   12 F.4th 219 (2d Cir. 2021) ............................................................................. 67

*United States v. Greenwood*,
   145 F.4th 248 (2d Cir. July 28, 2025) ............................................................... 5

*United States v. Guldi*,
   141 F.4th 435 (2d Cir. 2025) ............................................................................ 43

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................... 59, 63

*United States v. Gushlak*,
   2011 WL 782295 (E.D.N.Y. Feb. 24, 2011) .................................................. 37

*United States v. Hatfield*,
   2015 WL 13385926 (E.D.N.Y. Mar. 27, 2015) ............................................. 68

*United States v. Hernandez*,
   2005 WL 1242344 (S.D.N.Y. May 24, 2005) ................................................ 59

*United States v. Hodges*,
   2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) ................................................. 67

*United States v. Isola*,
   548 App'x 723 (2d Cir. 2013) .......................................................................... 61

*United States v. James*,
   2025 WL 2486539 (2d Cir. Aug. 29, 2025) ................................................... 51

*United States v. Johnson*,
   567 F.3d 40 (2d Cir. 2009) ............................................................................... 45

*United States v. Johnson*,
   2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ............................................... 64

*United States v. Kenner*,
    443 F. Supp. 3d 354 (E.D.N.Y. 2020) ................................................................ 57

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ............................................................................... 32

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ............................................................................. 31, 32

*United States v. MacCallum*,
    821 F. App'x 11 (2d Cir. 2020) ........................................................................... 42

*United States v. Mangano*,
    749 F. App'x 910 (11th Cir. 2018) ...................................................................... 43

*United States v. Martoma*,
    48 F. Supp. 3d 555 (S.D.N.Y. 2014) .................................................................. 40

*United States v. Mehta*,
    307 F. Supp. 2d 270 (D. Mass. 2004) ................................................................ 47

*United States v. Moran*,
    2024 WL 2577970 (E.D.N.Y. May 24, 2024)........................................... 25, 37, 40

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ................................................................ 60

*United States v. Olis*,
    2006 WL 2716048 (S.D. Tex. Sep. 22, 2006) ..................................................... 59

*United States v. Olson*,
    1995 WL 743845 (10th Cir. 1995) ...................................................................... 23

*United States v. Pacheco-Soto*,
    386 F. Supp. 2d 1198 (D.N.M. 2005) ................................................................. 54

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................................... 3, 62, 63, 64

*United States v. Peters*,
    732 F.3d 93 (2d Cir. 2013) .................................................................................. 57

*United States v. Pina*,
    2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019).......................................................... 26

*United States v. Pu*,
   814 F.3d 818 (7th Cir. 2016) ................................................................. 25

*United States v. Ramirez-Ramirez*,
   365 F. Supp. 2d 728 (E.D. Va. 2005) ..................................................... 52

*United States v. Redemann*,
   295 F. Supp. 2d 887 (E.D. Wis. 2003) ................................................... 54

*United States v. Roth*,
   2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ............................................ 61

*United States v. Ruiz*,
   246 F. Supp. 2d 263 (S.D.N.Y. 2002) ......................................... 18, 22, 25

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007) ........................................... 27, 31, 37, 40

*United States v. Sanchez*,
   925 F. Supp. 1004 (S.D.N.Y. 1996) ...................................................... 22

*United States v. Schneider*,
   930 F.2d 555 (7th Cir. 1991) ............................................................... 26

*United States v. Serafini*,
   233 F. 3d 773 (3d Cir. 2000) ................................................................ 47

*United States v. Simmons*,
   544 F. App'x 21 (2d Cir. 2013) ............................................................. 37

*United States v. Sponaugle*,
   2022 WL 4079197 (D. Del. Sept. 6, 2022) ............................................ 61

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ................................................................... 60

*United States v. Sullivan*,
   118 F.4th 170 (2d Cir. 2024) ........................................................... 68, 70

*United States v. Tavberidze*,
   769 F. Supp. 3d 264 (S.D.N.Y. 2025) ................................................... 44

*United States v. Thurston*,
   544 F.3d 22 (1st Cir. 2008) .................................................................. 47

*United States v. Treadwell*,
  593 F.3d 990 (9th Cir. 2010) ........................................................................ 27, 28

*United States v. Troche*,
  2003 WL 223468 (S.D.N.Y. Jan. 31, 2003) ..................................................... 18, 25

*United States v. Troncoso*,
  691 F. App'x 47 (2d Cir. 2017) ............................................................................. 18

*United States v. Vicente Fernandez*,
  312 F. Supp. 2d 522 (S.D.N.Y. 2004) ............................................... 19, 22, 23, 24

*United States v. Xue*,
  2020 WL 5645765 (E.D. Pa. Sept. 22, 2020) ...................................................... 26

*United States v. Yeaman*,
  248 F.3d 223 (3d Cir. 2001) ................................................................................. 59

*United States v. Yu*,
  285 F.3d 192 (2d Cir. 2002) ........................................................................... 18, 22

*United States v. Zimmerman*,
  2012 WL 3779387 (E.D.N.Y. June 19, 2012) ...................................................... 60

## Statutes

8 U.S.C. § 1226 ...................................................................................................... 55

18 U.S.C. § 3553(a) ....................................................................................... *passim*

18 U.S.C. § 3624(g) ............................................................................................... 50

18 U.S.C. § 3632(c) ............................................................................................... 51

18 U.S.C. § 3632(d) ............................................................................................... 50

18 U.S.C. § 3663 ........................................................................................... *passim*

## Rules

Fed. R. Evid. 1101(d)(3) ........................................................................................ 23

## **Regulations**

28 C.F.R. § 523.20 ............................................................................................................ 52

28 C.F.R. § 523.44(b)(1), (c), (d)(3) ............................................................................... 50

## **Other Authorities**

Judgment, *United States v. Connolly*, No. 16-cr-370 (CM)
    (S.D.N.Y. Nov. 13, 2019), ECF No. 456 ...................................................................... 62

Judgment, *United States v. Phillips*, No. 22-cr-138 (LJL)
    (S.D.N.Y. June 25, 2024), ECF No. 124 ...................................................................... 62

Sentencing Order, *United States v. Potapenko*, No. 22-cr-185 (RSL)
    (W.D. Wash. Aug. 25, 2025), ECF No. 241 .......................................................... 49, 56

Transcript of Proceedings, *United States v. Amanat*, No. 15-cr-536 (PGG)
    (S.D.N.Y. Sep. 8, 2024), ECF No. 1221 ...................................................................... 49

Transcript of Proceedings, *United States v. Block*, No. 16-cr-595 (JPO)
    (S.D.N.Y. Dec. 4, 2017), ECF No. 169 .................................................................. 40, 49

Transcript of Proceedings, *United States v. Cohen*, No. 19-cr-741 (WHP)
    (S.D.N.Y. June 16, 2020), ECF No. 48 ........................................................................ 56

Transcript of Proceedings, *United States v. Connolly*, No. 16-cr-370 (CM)
    (S.D.N.Y. Oct. 24, 2019), ECF No. 451 ............................................................ 46, 56, 59

Transcript of Proceedings, *United States v. Desai*, No. 19-cr-864 (TMD)
    (N.D. Ill. June 27, 2024), ECF No. 850 .................................................................. 53, 56

Transcript of Proceedings, *United States v. Hild*, No. 18-cr-602 (RA)
    (S.D.N.Y. Jan. 27, 2023), ECF No. 156 ...................................................................... 49

Transcript of Proceedings, *United States v. Hussain*, No. 16-cr-462 (CRB)
    (N.D. Cal. Apr. 10, 2019), ECF No. 515 .................................................................... 52

Transcript of Proceedings, *United States v. Milton*, No. 21-cr-478 (ER)
    (S.D.N.Y. Dec. 18, 2023), ECF No. 322 ................................................................ 49, 66

Transcript of Proceedings, *United States v. Petit*, No. 19-cr-850 (JSR)
    (S.D.N.Y. Feb. 23, 2021), ECF No. 249 ................................................................ 49, 66

Transcript of Proceedings, *United States v. Phillips*, No. 22-cr-138 (LJL)
(S.D.N.Y. June 24, 2025), ECF No. 125......................................................................... 66

Transcript of Proceedings, *United States v. Saltsman*, No. 07-cr-641 (NGG)
(E.D.N.Y. July 28, 2010), ECF No. 163 ........................................................................ 62

U.S. Const. amend. VI ........................................................................................................ 44

U.S.S.G. § 2B1.1 ........................................................................................................ *passim*

U.S.S.G. § 3B1.2 ........................................................................................................ *passim*

U.S.S.G. § 3B1.3 .............................................................................................. 16, 17, 44

U.S.S.G. § 3C1.1 .............................................................................................. 16, 17, 44

U.S.S.G. § 3E1.1 .............................................................................................. 17, 44, 45

U.S.S.G. § 5K2.0(a)(2) ............................................................................................... 56

U.S.S.G. § 6A1.3 ........................................................................................................ 23

Mr. Amar respectfully submits this memorandum and attached support letters from family and friends who know him best to assist the Court in determining a just sentence.[1]

## I.     **PRELIMINARY STATEMENT**

"Each of us is more than the worst thing we've ever done." Bryan Stevenson, *Just Mercy: A Story of Justice and Redemption* at 17 (2014). Mr. Amar is far more than the portrait of an accomplice the Government painted at trial. He is a caring son, brother, husband of 24 years, and father of two beautiful children. He is a loyal friend, mentor, and giving member of his community—offering everything from advice, to shelter, to even a kidney to those in need. He is a proud Jew, with unshakable faith and pride in his heritage. He is many other things, too: a service-member, a foreign national and determined immigrant, and a cancer survivor. Mr. Amar is also a believer. He believed in Frank, its CEO Charlie Javice, and its mission to help underserved students afford college—so much so that he moved his family from Israel to New York to get the company off the ground. Mr. Amar's good deeds "were not performed to gain status or enhance his image"—indeed, "[m]ost of them were unknown to all but a few people until the time of his sentencing." *See United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). In sentencing Mr. Amar, the Court must consider the full picture of his character: "[S]urely, if ever a man is to receive credit for the good he has done, . . . it should be at the moment of his sentencing, when his very future hangs in the balance." *Id.* at 513–14.

In addition to Mr. Amar's character, the Court must consider the unique circumstances of the alleged offense and Mr. Amar's role in it. As even the Probation Office recognizes, Mr. Amar

---

[1] Mr. Amar accepts the jury's verdict for purposes of sentencing, but maintains his innocence, intends to appeal, and reserves all rights.

was not the architect of the alleged fraud. He was a siloed, minimal participant who did not personally lie to anyone. Mr. Amar should be liable only for "the consequences and gravity of [his] own conduct, not the conduct of others." *Paroline v. United States*, 572 U.S. 434, 462 (2014).[2]

To these ends, the Court should not allow the Sentencing Guidelines' draconian loss enhancement to dictate Mr. Amar's punishment, particularly where, as here, the Government has not met its burden to establish loss. The Government's loss calculation is tied principally to the deal price ($175 million) and assumes, without substantiation, that Frank was a sham company (it was not) and that Mr. Amar caused that loss (he did not). Under the Government's theory, the Guidelines would endorse an extreme sentence of 22–27 years, 14 years of which is driven exclusively by the $175 million that JP Morgan spent on Frank. But that number bears no connection to Mr. Amar's actual conduct. And while $175 million is a staggering number on its face, for JP Morgan it is the equivalent of $225 to a person making $75,000 a year. That relative loss amount should not be the reason that Mr. Amar spends effectively the rest of his life behind bars. *See United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013), *as corrected* (July 24, 2013) (Underhill, J., concurring) ("[N]ot all actual loss is equally serious. . . . contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible."). The Government's Guidelines calculation demonstrates a fundamental disconnect between the loss enhancement—which it has not earned—and Mr. Amar's culpability or harm to JP Morgan.

Indeed, in recognition of the unduly harsh, arbitrary, and disproportionate results under the Guidelines, judges on the United States Sentencing Commission are in the process of revisiting

---

[2] All cases cited herein omit internal citations, quotation marks, and further citations and references. Articles and other sources are underlined and hyperlinked for the Court's convenience. Emphasis is original unless otherwise noted.

the loss enhancement entirely, throwing the existing sentencing regime for Mr. Amar up in the air. *See* U.S. Sent'g Comm'n, Press Release, Public Comment Informs Sentencing Commission's 2025-2026 Policy Priorities (Aug. 6, 2025). That alone should prompt the Court to place greater emphasis on the many other, far more relevant sentencing factors that Congress has instructed it to balance—including, as recognized in the Presentence Investigation Report ("PSR"), that Mr. Amar has been "a law-abiding and contributing member of society . . . [with] a longstanding history of gainful employment" whose "behavior was opportunistic and aberrant" and who "was not an organizer, leader, manager, or supervisor in the scheme." PSR at 54. This Court should not "place much stock in a guidelines range that does not provide realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

Likewise, the Court should not allow Mr. Amar's immigration status to dramatically increase his punishment. As explained below, Mr. Amar will almost certainly be ineligible for early release under both the First Step Act and Second Chance Act. That alone means he will likely serve, on average, 50% more of *any* term of imprisonment than a U.S. citizen sentenced to the same number of years for the same offense. Thus, if the Court were to sentence Mr. Amar to a period of incarceration, it is entirely possible that Mr. Amar would serve a longer sentence than Ms. Javice—a truly unconscionable outcome. Not only that, but Mr. Amar will also serve his sentence in harsher conditions of confinement because he is not eligible for a minimum-security camp. And when his sentence ends, he may face additional time in Immigration and Customs Enforcement ("ICE") custody, even if he has a final removal order in hand.

Regardless of how the Court ultimately calculates Mr. Amar's sentence under the Guidelines, prison is not necessary to punish Mr. Amar: He has already paid deeply for his involvement in Frank, and he will continue to do so for the rest of his life. His family has endured

a highly publicized prosecution and trial. He has lost his livelihood, his status within his community, and his ability to earn a living. His involvement with Frank will forever haunt him, as even a simple Google search demonstrates. He has not been able to travel for multiple years to see his ailing 87-year-old father, who depends on him for support. His deportation will once again uproot his family, who moved to America in the first place so he could pursue Frank's noble mission. And civil penalties and private litigation will hang over his head for decades to come.

Considering all of the factors—including, among others, Mr. Amar's character and relative culpability; the unwarranted sentencing disparities he will face as a noncitizen (which could put him in prison for years longer than Ms. Javice); the collateral consequences of his conviction and the extent to which Mr. Amar and his family have been punished already; and the excessive impact of the loss enhancement, to which the Government has not proven entitlement—we respectfully submit that a noncustodial sentence is sufficient but not greater than necessary to punish Mr. Amar.

## II.    <u>PERSONAL STORY</u>

Mr. Amar has lived his life with a strong moral compass and resolute beliefs, exemplified by his devotion to his family, commitment to his Jewish heritage and faith, and dedication to his community and friends. The Court must bear in mind the full man: Mr. Amar has always placed his family above everything, from childhood through today. We respectfully ask the Court to consider Mr. Amar's character, as well as the many support letters submitted on his behalf, in imposing a noncustodial sentence.

### A.  **Mr. Amar Is Fiercely Devoted to His Family**

Olivier Amar was born on March 19, 1974, in Montreal, Quebec to parents David René Amar and Sylvia Sabbah. The youngest of two children, he has a special bond with his brother, Emmanuel, who describes it as "[o]ne of the most meaningful relationships in my life." Ex. A-1 at

2.[3] The two share "heartfelt conversations, deep listening, [and] moments of encouragement." *Id.* Mr. Amar also spent much of his childhood surrounded by and learning from his maternal grandparents, who lived above his family in a shared duplex.

Mr. Amar's parents divorced when he was 21 years old, while his mother was in the midst of what would become a 25-year battle with cancer—a battle she would lose in 2015. This coincided with another challenge in Mr. Amar's life: His brother suffered an accident that left him with serious injuries, ██████████████. Mr. Amar, just a college kid, became his family's foundation—something that never changed. To support his mother and brother, he moved back to Montreal and withdrew from Bishop's University, where he was studying business. As his father put it, "Olivier was ready to drop everything to be with his brother. . . [and] chose to stay in Montreal to help care for his brother and his mother, Sylvia, from whom I had recently separated." Ex. A-2 at 2. Mr. Amar never went back to college.

Mr. Amar's devotion to his family remained the guiding force in his life as he grew older. In 2001, he married Noa, his wife of 24 years and, as Mr. Amar describes her, the "heart of the family." They hoped to start their own family, but faced challenges that many couples find difficult even to discuss. Noa suffered from ████████████████████████████

---

[3] In conjunction with the filing of this memorandum, Mr. Amar seeks the Court's permission to maintain under seal the redacted portions of this memorandum and support letters submitted on Mr. Amar's behalf, which contain sensitive information about Mr. Amar, his family, and/or the letter writers. *See United States v. Greenwood*, 145 F.4th 248 (2d Cir. 2025). The proposed redactions are made consistent with and pursuant to the protective order, *see* ECF No. 37, or are narrowly tailored to protect personally identifying information, as well as information regarding medical and mental health, private family circumstances, and identifying details of third parties, among other things, and therefore the redactions are appropriate, *see id.* at 256 ("Higher values that may justify redactions include 'the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure,' […] as well as '[f]inancial records . . ., family affairs, illnesses, [and] embarrassing conduct with no public ramifications'" (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) and *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995))).

██████████████████████████████████. Mr. Amar became Noa's rock throughout these struggles, which intensified throughout their move to Canada and separation from her family. As his father observed, Mr. Amar "showed exemplary consideration for his wife, never leaving her alone and supporting her with unwavering attention[.]" Ex. A-2 at 3. Happily, Noa gave birth to their first child, ████████████████████████████████████████ ████.

Soon after ██████ was born, Mr. Amar and Noa decided to leave Canada to return to Israel, where both had previously lived, to raise their children in an environment that fostered pride in their shared heritage. Unfortunately, Noa's health issues continued. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. Without wavering, Mr. Amar was there for Noa and ██████, who was just a toddler. They welcomed their daughter, ████████ ██████████████████████.

Mr. Amar's commitment to his family in Canada remained steadfast even as he raised his own children across the world in Israel. Decades after his mother's cancer diagnosis, her condition had deteriorated significantly. Notwithstanding the life he was building on the other side of the world, Mr. Amar was there for his mother every step of the way. "████████████████████ ████████████████████████████████████████████████ ████████████████████████" Ex. A-2 at 3. Despite his professional obligations as the CEO and founder of his own startup company (myPermissions) and his young family back in Israel, Mr. Amar showed unwavering devotion. He would frequently visit his mother in Montreal, systematically stopping through before continuing his journey on frequent business trips and "even spent three whole months at her bedside." *Id.*

6

Tragically, Sylvia lost her battle with cancer in 2015, just a few years before Mr. Amar started at Frank. He was devastated. But it was important to him that her memory live on. So "Olivier collected and began recreating all of her cherished holiday recipes . . . an immense devotional gesture that kept her spirit alive in our lives. It wasn't just about food; it was about preserving her legacy, maintaining family bonds, and making sure our 87-year-old father – who has now lived alone for nearly 10 years – still felt connected" to everyone. Ex. A-1 at 2.

All the while, Mr. Amar dealt with his own life-threatening health issues. He was diagnosed with an aggressive form of cancer in 2011, just a few years before his mother lost her battle with cancer. But he again put his family—not himself—front of mind. That was second nature to him. As Noa explains, he saw his struggle as an opportunity to help others: "Even then, while battling physically and emotionally, he continued to think of others – especially his mother . . . he asked the doctor to conduct extensive genetic testing, hoping to find answers that could help his mother," who had for years suffered with various, recurring forms of the disease. Ex. A-3 at 4.

Mr. Amar also shares a special relationship with his father, René, who is now 87 and living alone in Canada. They speak every day, but Mr. Amar's confinement to the United States has prevented him from supporting his father in the same way he supported his mother and brother, which has been a source of great emotional pain for both. But Mr. Amar still does what he can from afar. For example, Mr. Amar's father has a hearing condition that causes him great pain. Mr. Amar consulted his father-in-law's partner, an audiologist, for help: "From the very beginning, his caring and deep involvement stood out – he dedicated time and resources to fully understand the situation and to explore every possible way to ease his father's challenges and improve his quality of life. He didn't settle for general recommendations but demonstrated genuine interest, asked questions, and made the effort to learn – all out of sincere concern and great love." Ex A-17 at 1.

Nevertheless, as his father writes, Mr. Amar's "forced absence weighs heavily, because at my advanced age I am painfully aware that the time I have to share with him and my grandchildren is running out, and he cannot be by my side. This situation is particularly difficult for me, especially when I was hospitalized and the government refused his request to be there to help me, as he has always done in the past." Ex. A-2 at 4. In August 2025, René endured a week-long hospitalization after emergency gall bladder surgery, with no one to care for him in Mr. Amar's absence.

### B. Mr. Amar Instilled Strong Values and Convictions in His Children

At trial, the Government portrayed Mr. Amar as a weak man who buried his head in the sand and became complicit in Ms. Javice's fraud, rather than putting a stop to it. But that distorted image stands in stark contrast to the life Mr. Amar has led and the manner in which he has raised his children. Mr. Amar is a man of strong convictions and is dedicated to being of service to others. He has passed on those traits and beliefs to his children. Reflecting on who Mr. Amar is and what he stands for, his daughter, ▮▮▮, speaks of a "small" moment that meant "everything" to her. Ex. A-4 at 1. "In 11th grade, I panicked and tried to cheat on a test. I was shaking with guilt. I told my teacher the truth immediately and then went home expecting my dad to be furious. But he wasn't. Instead, my dad told me how proud he was that I'd come clean. He reminded me that making a mistake doesn't define you, but how you respond to mistakes does. That's who he is, who he's always been, and who he continues to be. Not someone who expects perfection, but someone who lives by his principles and expects you to do the same." *Id.*

Mr. Amar's son, ▮▮▮ also takes after his father in the strength of his convictions. After attending college in the United States, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ following October 7, 2023, when Hamas attacked southern Israel. ▮▮▮▮▮▮▮▮ ▮▮ remembered his father's teachings, particularly that "by doing what's right, you can never

8

be wrong." Ex. A-5 at 3. ███, who recently graduated from high school in the United States, is determined to follow in her brother's footsteps ██████████ She similarly reflects on her values learned from her father in coming to this decision: "Dad didn't just teach me about holidays and customs; he taught me the long, often difficult, arc of our people's history—the persecution we've faced—and why carrying our identity forward with strength is so vital. He instilled in me that deep understanding, that rootedness, and it has shaped everything about me, from how I see the world ████████████." Ex. A-4 at 2.

Mr. Amar's children have learned from him what it means to "serve something bigger than themselves." Ex. A-4 at 3. ███ knows her father as "the man who lived by the values he passed on to us—honesty, loyalty, accountability, and unwavering love." *Id.* And, to the broader communities of which he is a part, Mr. Amar "is someone people rely on, and he delivers with grace and humility . . . His character, in my view, reflects a person of integrity, empathy, and moral grounding." Ex. A-6 at 2.

Mr. Amar's children worry about what their life will look like without their father there to guide them. ███ explains that Mr. Amar is "always present, thoughtful, and strong. He's the kind of father who'd drive me to ballet every single day for eight years, then fully support me when I finally decided to leave because the environment became toxic." Ex. A-4 at 2. ███ feels that his "family will fundamentally not be the same without my Aba. . . . He is the undisputed heart of our family, the quiet strength that keeps us together no matter where we are in the world. Without him, I honestly don't know what my day-to-day life would look like." Ex. A-5 at 4.

### C. Mr. Amar's Life Has Been Guided by His Jewish Faith and Heritage

Mr. Amar's commitment to his faith and culture is as old as he can remember. He was raised in a Sephardic Jewish family, where he developed a strong sense of community and steadfast

pride in his heritage. Learning about Jewish traditions as a child was a "particularly rewarding period for Olivier and reinforced his keen sense of family and tenderness. All the Jewish holiday celebrations were spent together and were the highlights of his week." Ex. A-2 at 1. Mr. Amar has a "remarkable intellectual curiosity and a thirst for learning" when it comes to his religion. *Id*. When Mr. Amar was a child and his maternal grandparents moved into his parents' home, Mr. Amar embraced everything they taught him—practices that he still upholds today with his family, including attending synagogue and preparing elaborate, traditional meals.

Growing up Jewish in Montreal was not easy. As a young adult, Mr. Amar voluntarily enrolled in the Canadian Grenadier Guards Infantry Cadets, but his experience was marred by prejudice from his superiors during his year of service. Despite the risk of retaliation, Mr. Amar stood by his beliefs, and reported the antisemitism he experienced to his base commander. When nothing changed, Mr. Amar decided to leave the military, and he was honorably discharged as an infantryman. Despite his desire to serve his country before attending college, when faced with deeply entrenched antisemitism, Mr. Amar chose to stand on his values.

It was not long before those values led Mr. Amar to Israel. In 1997, when he was in his mid-20s, he moved from Montreal to Tel Aviv for the first time. He returned to Canada in 2001 to help care for his ailing mother, this time with his wife Noa, but was called back to Israel again in 2005 after ▇▇▇ was born. ▇▇▇ birth brought into sharp focus Mr. Amar's deep desire to return to his ancestral homeland and make *aliyah*. This act of resettling was guided by Mr. Amar's sincere desire to connect further with his faith and his passion for the State of Israel and its future. He and Noa not only sought to raise ▇▇▇ in a strong Jewish community, but to protect his son from rising antisemitism in Canada. Noa recalls the moments leading up to their move: "[h]e truly believed that the right place to raise our children was in Israel - not just as a homeland, but as a place of

identity, values, belonging, and meaning. Despite the challenges of starting over, he didn't hesitate for a moment, and he led us home." Ex A-3 at 2. Today, his daughter ███ expresses immense gratitude for the opportunity to grow up in Israel, where she was born, describing her Jewish and Sephardic identity as "the most profound gift Dad gave me." Ex. A-4 at 2.

Wherever he lived, Mr. Amar carried with him this same moral fortitude and proud belief in his faith. When he married Noa in Israel in 2001, Mr. Amar felt like a black sheep in Noa's resolutely secular family. But Mr. Amar's love for and determination to carry on his family's traditions were infectious and influenced his new family's approach to their faith. Noa experienced Shabbat for the first time at Mr. Amar's table. She recalls "the *piyyutim* (liturgical poems), the songs, and the atmosphere surrounding the Shabbat table at Olivier's parents' home [which] deeply moved and attracted me." Ex. A-3 at 2. To this day, Mr. Amar and Noa regularly host traditional Shabbat meals, and, because of Mr. Amar's impact, Noa's extended family does too. Noa credits Mr. Amar with introducing the concept of Shabbat to her secular mother, sister, nieces, and nephews, and it has become "an inseparable part of [their] identity." *Id.*

### D. Mr. Amar is a Caring and Selfless Community Member

Mr. Amar's devotion and support extend beyond his family. A close friend and neighbor, who attended most of his trial, recalls Mr. Amar's response when she told him that her son would one day require a kidney transplant: "Olivier did not hesitate even one breath to volunteer his kidney." Ex. A-7 at 2. Another friend describes Mr. Amar as "someone who goes out of his way to help others, even when there's nothing in it for him." Ex. A-8 at 1.

Mr. Amar is not just a good friend. He is a giving member of his community. For a long time, Mr. Amar has devoted himself to programs focused on the Jewish community. Each year, he participates in an initiative that invites Israeli combat veterans to his synagogue for eight days of

rest, healing, and conversation. The goal is to provide physical and emotional space for these veterans to confront their wounds. Mara Silverstein, ███████████████████████, observes: "Olivier makes himself available, not out of obligation but out of a deeply held belief that community care matters. He listens without judgment, offers encouragement without condescension, and brings a warmth that is genuinely comforting to people who have endured tremendous pain. His presence in these moments is not performative, it is deeply meaningful and deeply felt by those around him." Ex. A-6 at 2.

Following the October 7 attacks, Mr. Amar's synagogue opened its doors to wounded and traumatized victims. Despite grappling emotionally with his recent indictment, Mr. Amar welcomed them into his home without a second thought. Ms. Silverstein further recalls:

> Olivier . . . didn't just open his home; he opened his heart. Olivier worked tirelessly to ensure that the coaches and children felt embraced, safe, and seen. He coordinated meals, attended games, participated in difficult conversations, and spent hours helping to create an environment where healing could begin. He didn't do it for recognition. He did it because that's who he is. He is someone who instinctively responds to suffering with action, presence, and humanity.

Ex. A-6 at 1. The victims that he helped witnessed atrocities, lost loved ones, and some had been taken hostage themselves. As always, he set aside his own trauma and stress to guide others as they confronted theirs, handling their stories with the utmost attention and care. He spent countless hours engaged in dialogue with them, praying with and for them, and meticulously preparing traditional meals for them.

### E. Mr. Amar Is a Positive Mentor and Professional Guide

Mr. Amar also generously donates his time in the business community and has served as a positive mentor to many young professionals. As one friend who personally benefitted from Mr. Amar's mentorship explained, "I owe my career and much of my personal stability during the

hardest years of my life to Olivier Amar." Ex. A-9 at 1. Adam Benayoun, an entrepreneur who has known Mr. Amar for 15 years, tells a similar story: Mr. Amar went out of his way to help Mr. Benayoun with his startup, despite Mr. Amar "having no obligation" to do so and even though there was "nothing in it for him." Ex. A-8 at 1. Mr. Benayoun describes how "[t]his initial act of generosity perfectly encapsulates who Olivier is as a person." *Id.*

Another former colleague, Chok Ooi, observes that Mr. Amar is "genuinely committed to helping local entrepreneurs thrive—not for personal gain, but because he cares about innovation and empowering others." Ex. A-10 at 2. Mr. Ooi met Mr. Amar in 2016 through a mentorship initiative called "Geeks on a Plane," which aims to introduce "a cohort of investors, entrepreneurs, and technologists to the startup communities in China, Japan, Hong Kong, and Taiwan." Ex. A-10 at 1. Mr. Amar self-funded a trip to these communities with Mr. Ooi's organization. Mr. Amar stood out "for his enthusiasm, curiosity, and his sincere desire to contribute meaningfully." *Id.* "He is someone others recognize as a thoughtful contributor—never loud, never self-serving, always present in ways that matter." *Id at 2.*

Noa Raiten, a former Frank employee who reported directly to Mr. Amar, emphasizes that Mr. Amar was a "great boss," "the kind of manager that celebrated my successes and helped me grow," and someone who deeply "cared about our team, challenged us and pushed us to be the best." Ex. A-11 at 1. Shaylee Russo, who worked with Mr. Amar for 4 years at Frank, shares these sentiments: "During those four years, Olivier served as both a mentor and a professional guide, influencing not only my career trajectory but also my personal growth. Olivier was always generous with his time and knowledge. He created a workplace culture that valued hard work, accountability, and respect—and he consistently led by example . . . His character, as I observed over years, is grounded in integrity and a sincere commitment to those around him." Ex. A-12 at

1. Jennifer Wong, who worked directly under Mr. Amar as Frank's Director of Marketing, speaks very positively of her relationship with Mr. Amar as a boss and describes Mr. Amar as a "███████ ████████████████████████████████████████████" *See* Tr. 990:22–23; ██████████████ ████████████████████.

### F.  Mr. Amar Believed in Frank, Its Mission, and Ms. Javice

Mr. Amar is the type of man who will move across the world for something he believes in. That is what drove him to Frank. Ms. Raiten describes Mr. Amar's contagious passion for his job at Frank: "Olivier was always passionate about everything that he did . . . I was truly under the impression that we had a shared goal of helping Frank do good and help students by making higher education financially accessible." Ex. A-11 at 1.

Mr. Amar joined Frank because he believed in its mission to provide young adults, particularly those from socioeconomically disadvantaged backgrounds, easier access to financial aid. Even the Government recognized this at trial: Frank and everyone at the company set out to sincerely transform the otherwise painful college financial aid process into something more accessible. *See* Tr. 36:13–16. This mission especially resonated with Mr. Amar, as he never finished college after leaving to take care of his brother and mother. When he first joined Frank, Mr. Amar was living happily with his family in Israel, but he was so committed to Frank's cause that he uprooted his family's lives to move to the United States.

As did so many others, Mr. Amar genuinely trusted Ms. Javice's motivations and leadership. When Mr. Amar met Ms. Javice, she was an accomplished graduate of University of Pennsylvania's Wharton School of Business with connections to powerful industry leaders and a compelling vision for her company. Ms. Javice was on a meteoric trajectory and, as witnesses testified at trial, waltzed confidently into JP Morgan Chief Executive Jamie Dimon's office to pitch

the company in the early days of diligence. Tr. 3013:18–3014:4. Ms. Javice was widely recognized as a star of the business world, listed by *Forbes* on their "30 Under 30" financial professionals and entrepreneurs in 2019. Inspired by her story and her vision for Frank, Mr. Amar and Noa developed a personal relationship with Ms. Javice, affectionately referring to her as *bat bayit*, their honorary daughter.

### G.  Mr. Amar Will Continue To Do Good

Mr. Amar should not be defined by his short time at Frank, let alone the 8-month snapshot that the Government emphasized at trial. Mr. Amar is more than that, and he should be judged by the values he has demonstrated throughout his life. He is a dedicated father of two children, a doting husband, a loving son and brother, a man of conviction, a loyal friend, a kind neighbor, and a mentor. He takes equal action to help those he loves and strangers. And he is a pillar of his religious and professional communities. His purported involvement in the sale of Frank does not change this. On the contrary, it proves what an aberration that period was. Mr. Amar will continue to show up in meaningful ways for those around him, because that is who Mr. Amar is.

### III.    OFFENSE CONDUCT

Following a 6-week trial beginning on February 18, 2025, a jury in the Southern District of New York convicted Mr. Amar of wire fraud, bank fraud, securities fraud, and conspiracy. Mr. Amar intends to appeal. Mr. Amar refers the Court to his post-trial briefing for a full recitation of the facts. *See* ECF Nos. 390-91. Even accepting the jury's verdict, the record shows that Mr. Amar played a minor role in the conduct leading to the convictions. As the Court knows from presiding over the trial, the Government's case overwhelmingly emphasized Ms. Javice's conduct. While the Government's theory was that Ms. Javice repeatedly and brazenly lied to potential buyers (and her own advisors), the Government did not present any evidence that Mr. Amar made a single false

statement during due diligence. Indeed, no witness testified that he did. Mr. Amar's purported misconduct boiled down primarily, if not exclusively, to a few days in early August 2021 when he bought a list of student records to cover up Ms. Javice's fraud. For purposes of this submission, we do not seek to quarrel with the sufficiency of the evidence to support a conviction against Mr. Amar, but we do submit that his relative role in the alleged fraud is highly relevant to assessing an appropriate sentence.

## IV.    **THE PSR'S GUIDELINES CALCULATION IS WRONG**

The Probation Office disclosed its final Presentence Investigation Report ("PSR") on August 4, 2025. ECF No. 413. The PSR sets forth a total offense level of 39 and a criminal history category of I, resulting in a sentencing range of 262–327 months (22–27 years). To get to this result, the Probation Office concludes that the base offense level is 7, while improperly increasing it by 26 levels under U.S.S.G. § 2B1.1(b)(1)(N) for a loss amount of $197.5 million; 2 levels under U.S.S.G. § 2B1.1(b)(10)(C) for using sophisticated means; 2 levels under U.S.S.G. § 3B1.3 for abusing a position of trust; and 2 levels under U.S.S.G. § 3C1.1 for obstructing justice. As to the last enhancement, even the Government agrees it does not apply.

The Probation Office ultimately recommends a sentence of 120 months for Mr. Amar—an overly harsh decade behind bars for a first-time, nonviolent offender who, even on the Government's theory, played a significantly lesser role in the overall alleged scheme. This recommendation is a 12-year (54%) downward variance from the Guidelines due to the "details of the offense" and Mr. Amar's "personal history and characteristics": namely, that Mr. Amar's "behavior was opportunistic and aberrant, . . . he was not an organizer, leader, manager, or supervisor in the scheme," and he "has otherwise been a law-abiding and contributing member of society [with a] longstanding history of gainful employment." *Id.* at 53–54. Recognizing Mr.

16

Amar's relative lack of involvement in the Government's alleged scheme, the Probation Office also sought to avoid "unwarranted sentencing disparities" with Ms. Javice. *Id.* at 54.

As detailed below, the Probation Office's Guidelines calculation is wrong for a number of reasons and its recommendation—which is anchored to the Guidelines' radical starting point—still vastly overstates Mr. Amar's culpability. Mr. Amar does not dispute that his criminal history category is I and his base offense level is 7. But the Court should reject every other proposed enhancement, particularly the 26-point loss enhancement, which the Government has the burden to establish and has failed to meet. The Probation Office also omits a 4-point reduction for Mr. Amar's minimal role in the offense and adds 3 points compared to a defendant who "accepts responsibility" simply because Mr. Amar exercised his right to trial. All told, Mr. Amar's Guidelines calculation is at most 2 points, resulting in a range of 0–6 months. The chart below reflects Probation's and Mr. Amar's calculations:

| | Probation Office | Mr. Amar |
|---|---|---|
| Base Level (U.S.S.G. § 2B1.1(a)(1)) | 7 | 7 |
| Loss Enhancement (U.S.S.G. § 2B1.1(b)(1)) | +26 | 0 |
| $1M Gross Receipts (U.S.S.G. § 2B1.1(b)(17)(A)) | +2 | 0 |
| Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 | 0 |
| Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 | 0 |
| Abuse of Trust (U.S.S.G. § 3B1.3) | +2 | 0 |
| Trial Penalty (U.S.S.G. § 3E1.1) | 0 | -3 |
| Minimal Role (U.S.S.G. § 3B1.2(a)) | 0 | -4 |
| Total Offense Level | 39 | 0 |
| Guidelines Range | 262–327 months | 0–6 months |
| **Recommendation** | **120 months** | **Noncustodial** |

17

### A.  A 4-Point Downward Adjustment for Mitigating Role Is Warranted

A downward adjustment pursuant to U.S.S.G. § 3B1.2 is warranted in light of the minimal role Mr. Amar played in the alleged conduct. A defendant is entitled to a 4-point minimal role adjustment when he is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2(a) cmt. n.4. That is Mr. Amar to a tee. In evaluating a defendant's role, courts consider factors such as (i) "the nature of the defendant's relationship to other participants," (ii) "the importance of the defendant's actions to the success of the venture," and (iii) "the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002) (quoting *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990)). Although this is a "highly fact-specific" inquiry, *United States v. Troncoso*, 691 F. App'x 47, 49 (2d Cir. 2017), in assessing the applicability of a mitigating role adjustment, the Court "should not lose sight of the effect of the adjustment on the fairness of the resulting sentence" given "each defendant's culpability," *United States v. Ruiz*, 246 F. Supp. 2d 263, 269 (S.D.N.Y. 2002). Here, even as alleged by the Government, Mr. Amar did not plan or organize the purported fraud, his fleeting and siloed actions were not pivotal to its success, and he could not have been aware of its nature and scope—in fact, Ms. Javice routinely obscured critical information from him. On these facts, a mitigating role adjustment is warranted.

i.  <u>Mr. Amar Did Not Plan or Organize the Alleged Fraud and Played an Exceedingly Minimal Role in the Alleged Offense Relative to Ms. Javice</u>

Mr. Amar was not the architect of the purported fraud. His alleged participation resembles that of someone on its outermost fringes and pales in comparison to Ms. Javice's. *See United States v. Troche*, No. 01-cr-274 (RWS), 2003 WL 223468, at *2 (S.D.N.Y. Jan. 31, 2003) (granting minimal role adjustment where defendant was courier who "did not devise the scheme" and

evidence suggested it was "the other participants who planned the operation"); *United States v. Cambrelen*, 29 F. Supp. 2d 120, 126–27 (E.D.N.Y. 1998) (granting minimal role adjustment where evidence showed defendants "lacked knowledge of the details and scope of the group's criminal enterprise," were not part of the group's previous activities, and were not part of any of the "negotiations or planning").

*First*, Mr. Amar was not the leader of the purported scheme, and the Government never alleged that he was. To the contrary, the Government concedes that Ms. Javice "clearly" was the leader of the scheme, and she "regularly took the lead on deceiving external parties like LionTree, JPMC (and other potential buyers), and even the data scientist Adam Kapelner. . . . [She] led the company and orchestrated the fraud related to the company's sale." ECF No. 419 at 27–28.

*Second*, Mr. Amar's alleged conduct—including buying the ASL list—was directed by Ms. Javice. *See United States v. Vicente Fernandez*, 312 F. Supp. 2d 522, 525 (S.D.N.Y. 2004) (upholding minor role adjustment where defendant "had no decision-making authority within the [criminal] operation, or in connection with the specific transaction at issue"). Indeed, the Government concedes that Ms. Javice "*did* exercise control and give direction to" Mr. Amar during the alleged scheme, for example by issuing "directives" to Mr. Amar in connection with the purchase of student records in August 2021. ECF No. 419 at 27.

*Third*, Mr. Amar's alleged role is dwarfed by Ms. Javice's.[4] While the record shows Ms. Javice made dozens of misrepresentations during due diligence, not a single witness testified that

---

[4] This point is addressed in detail in Mr. Amar's post-trial briefing. *See* ECF Nos. 390–391.

Mr. Amar made any.[5] To the contrary, Mr. Amar affirmatively *corrected* Ms. Javice's false statements. Additionally, whereas Ms. Javice was omnipresent during due diligence, Mr. Amar was almost entirely absent—indeed, he participated even less than Matthew Glazer, Frank's Chief Legal Officer, who has never been accused of wrongdoing. The data, as set forth in the below charts, bears this out: Mr. Amar was on a fraction of emails with potential buyers; he was barely on emails with LionTree, Frank's investment advisor; and he hardly interacted or met with JPMorgan.



---

[5] Not only did no witness testify that Mr. Amar made a single misrepresentation, but no one testified that he said anything at all about Frank's FAFSA users. *See* Tr. 533:9–14 (Leslie Wims Morris); 1450:5–18 (Alex Sweeney); 2372:2–13 (Ryan MacDonald); 2297:13–25 (Sindhu Subramaniam); 2241:21–2242:9 (Mason Young recanting testimony that he remembered Mr. Amar even attending a meeting).

The handful of times Mr. Amar did participate in due diligence, Ms. Javice choreographed when and how. *See, e.g.*, Tr. 2271: 8–10 (Mason Young: "Ms. Javice . . . was consistently on the diligence meetings" and "would bring in her team, as relevant"); GX 1582 (Ms. Javice instructing Mr. Amar and Mr. Glazer that she will Zoom them into a diligence meeting on July 7, 2021, for half an hour). Ms. Javice would even speak for Mr. Amar at diligence meetings and monopolized the one and only diligence meeting meant exclusively for Mr. Amar so she could control the narrative. *See* Tr. 2525:12–18 (Mr. MacDonald recalling "at least one occasion" where Ms. Javice answered questions directed at Mr. Amar); GX 3037; PSR ¶ 19.

There is a similar disparity as to Mr. Amar's involvement in what the Government termed "the fraud spreadsheet," or 3.1.4. *See* Tr. 3520:24.



After Ms. Javice mislabeled that data for LionTree without anyone's knowledge—thereby creating one of the key misstatements alleged by the Government—Mr. Amar interacted with the spreadsheet just once and he *did not* edit it at all. *Id.*; GX 3010; GX 3010-A. Nor did Mr. Amar even have access to the virtual data room where 3.1.4 was stored for potential buyers—the alleged "scene of the crime." Only Ms. Javice and Mr. Glazer did. *See* Tr. 354:3–5.

ii. <u>Mr. Amar Did Not Take Any Integral Actions During the Sale</u>

Mr. Amar's actions also were not integral to the alleged conspiracy. *See, e.g.*, *Yu*, 285 F.3d at 200 (considering "the importance of the defendant's actions to the success of the venture" for purposes of mitigating role adjustment). Mr. Amar's most significant contribution to the Government's alleged conspiracy was purchasing student data from ASL. But that list was never provided to JP Morgan during diligence, and Ms. Javice did not use it to complete the data validation exercise (a requisite step to close the deal)—indeed, she could not have. Ms. Javice had represented to JP Morgan that Frank had collected 4.5 million phone numbers (among other data fields). Mr. Amar bought the ASL list knowing ASL did not sell phone numbers. *See* GX 1666. As such, Ms. Javice augmented the ASL list several weeks later with Dr. Kapelner—without Mr. Amar's knowledge or involvement—presumably so it would contain all of the data fields she had promised to the Bank.

Put differently, Mr. Amar's unknowing participation in Ms. Javice's alleged scheme was not "critical to the success of the enterprise, except in the trivial sense in which every cog in the machine has to play its part in order for the machine to work." *See Ruiz*, 246 F. Supp. 2d at 272. Where a defendant is "essentially fungible," as Mr. Amar was in the instant case, a mitigating role adjustment is appropriate. *See United States v. Aggrey-Fynn*, No. 04-cr-1148 (RWS), 2007 WL 473731, at *4 (S.D.N.Y. Feb. 14, 2007); *Vicente Fernandez*, 312 F. Supp. 2d at 525 (upholding minor participant downward adjustment). Here, Mr. Amar easily could have been replaced— indeed, he was replaced by Dr. Kapelner—without threatening Ms. Javice's efforts. *See Ruiz*, 246 F. Supp. 2d at 272 ("Virtually anyone could have been inserted . . . without threatening the success of the enterprise."); *United States v. Sanchez*, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996) (adhering to minor role adjustment where defendant was "replaceable").

iii.  <u>Ms. Javice Took Steps to Hide the Alleged Fraud from Mr. Amar</u>

Mr. Amar did not have full insight into the scope of Ms. Javice's purported scheme—indeed, he could not have—because she took affirmative steps to hide it from him. *See Vicente Fernandez*, 312 F. Supp. 2d at 525 (applying minor role adjustment where defendant "did not know the type or amount of the drugs, nor anything about the larger trafficking operation"); *accord United States v. Olson*, 76 F.3d 393, 1995 WL 743845, at *5 (10th Cir. 1995) (unpublished) (upholding 4-level decrease for defendant's minimal participation in investment scheme where co-conspirators acted without defendant's knowledge and "attempt[ed] to keep much of the details of the scam" from him). From the start of due diligence with Capital One through the end of it with JP Morgan, Ms. Javice repeatedly obscured her misconduct, including by secretly mislabeling or inflating Mr. Amar's reliably-sourced information, then keeping him off the transmission emails to LionTree and potential buyers. This Court is familiar with the many examples. The Court can and should take into account this critical evidence, which the jury did not consider, as the Court now analyzes Mr. Amar's purported complicity in Ms. Javice's scheme.[6]

If Mr. Amar had played a central role in the alleged fraud, there would have been no need for Ms. Javice to go to such lengths to conceal from Mr. Amar her many manipulations of his accurate data. The events surrounding Mr. Amar's correction of Frank's website visitor data—deep

---

[6] Mr. Amar's briefing during and after trial details the many examples in which Ms. Javice mislabeled or misrepresented accurate data provided by Mr. Amar (and others). *See* ECF No. 349; ECF No. 391 at 26. Several of these examples were ruled inadmissible at trial (and thus did not factor into the jury's conviction), but they are critical at the sentencing stage, in which the Rules of Evidence do not apply. *See* Fed. R. Evid. 1101(d)(3); *see also United States v. Fell*, 360 F.3d 135, 144 (2d Cir. 2004) ("[T]he FRE are inapplicable in several criminal proceedings, including sentencing proceedings before a judge."); U.S.S.G. § 6A1.3 ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial.").

into Capital One diligence and at the outset of diligence with JP Morgan—demonstrate his limited insight and further prove the point. As shown at trial, Frank could not have had the same number of FAFSA customers as website visitors (4.5 million) because not everyone who went to the Frank website started a FAFSA application. So, Ms. Javice needed to inflate the visitor data by a factor of 10 to support 4.5 million FAFSA customers. Mr. Amar's characterization of Ms. Javice's inflated data as a "huge mislabel," *see* GX 802-22, which forced a correction to both banks, *see* GX 1691 (to Capital One), GX 1747 (to JP Morgan), makes clear that Mr. Amar could not have fully understood the goal of the purported conspiracy.[7]

There are many more examples of Mr. Amar's limited knowledge and involvement in the purported scheme: Ms. Javice kept Mr. Amar in the dark about the context of the data validation exercise with Acxiom, Dr. Kapelner's work generating synthetic data,[8] why she needed the ASL list, and her augmentation of the ASL list with data from Enformion. *See* GX 801-31 (Mr. Amar on October 5, 2021: "What's Axiom?"); *compare* GX 1070 (email forwarded to Mr. Amar omitting context about data validation), *with* GX 1071 (email not forwarded to Mr. Amar including context that data validation was "critical" to closing); Tr. 1455:24–1456:3 (Alex Sweeney testifying Mr. Amar was not involved in data validation); Tr. 2031:2–12 (Dr. Kapelner testifying

---

[7] After he corrected her misrepresentation about Frank's website visitors, Ms. Javice tried to cut out Mr. Amar in the middle of due diligence with JP Morgan, convincing the Bank to remove his name from its Indication of Interest and sidelining him for 17 straight days (out of 37 total). *See* Tr. 749:22–750:4. This further obscured Mr. Amar's already curtailed visibility into Ms. Javice's dealings with JP Morgan and her broader scheme.

[8] The fact that Mr. Amar never interacted with Dr. Kapelner during the relevant period, *see* Tr. 2031:2-12 (Dr. Kapelner testifying he did not meet Mr. Amar until October 2021), also counsels in favor of a mitigating role adjustment, *see Vicente Fernandez*, 312 F. Supp. 2d at 525 (upholding minor role adjustment where defendant "did not know the other participants in the crime, nor did he have any long-standing relationship or commitment to those persons").

he did not meet Mr. Amar until October 2021). Indeed, Mr. Amar purchased the ASL list at Ms. Javice's instruction and only after Ms. Javice falsely told him that Frank's Board of Directors and outside counsel approved the purchase and wanted him to move fast. *See* GX 801-6; GX 801-9. Ms. Javice would not have felt the need to lie to Mr. Amar about the Board's approval if he understood the scope of her purported scheme.

Even accepting that the jury found Mr. Amar sufficiently culpable to warrant conviction, the Court should recognize the world of difference between Ms. Javice's creation of an elaborate scheme to defraud JP Morgan, on one end of the culpability scale, and Mr. Amar's purported participation at the very last moment to seemingly help Ms. Javice cover up her wrongdoing, on the other. That clear disparity warrants a downward adjustment under U.S.S.G. § 3B1.2. *See Aggrey-Fynn*, No. 04-cr-1148 (RWS), 2007 WL 473731, at *5 ("the facts of this case demonstrate that the defendant played a role that was 'limited in importance, duration, skill and authority-in a word, minor'" (quoting *Ruiz*, 246 F. Supp. 2d at 272)).[9]

**B.  No Loss Enhancement Is Warranted**

The Government bears the burden of establishing loss. It is not entitled to a punitive loss finding, and loss is not required to sentence Mr. Amar. *See United States v. Moran*, No. 14-cr-348 (NGG) (VMS), 2024 WL 2577970, at *3 (E.D.N.Y. May 24, 2024) (finding $0 in loss where the government had "not met its burden"); *United States v. Pu*, 814 F.3d 818, 828 (7th Cir. 2016)

---

[9] The same facts that show Mr. Amar's minimal role as compared with Ms. Javice's also illustrate that he is "substantially less culpable" than the "average" member of a multi-million-dollar scheme to defraud a bank. *See United States v. Troche*, No. 01-cr-274 (RWS), 2003 WL 223468, at *2 (S.D.N.Y. Jan. 31, 2003) ("The Government has objected that Troche is not 'substantially less culpable than the average participant,' as required by § 3B1.2. Based on the facts of this case, Troche's participation does meet the required standard for the downward departure because the evidence suggests that it was the other participants who planned the operation which Troche helped execute."); *Ruiz*, 246 F. Supp. 2d at 272.

(holding loss "is a special offense characteristic" and Guidelines "do not require a loss calculation greater than zero"); *see also United States v. Xue*, No. 16-cr-22 (JHS), 2020 WL 5645765, at *13 (E.D. Pa. Sept. 22, 2020), *aff'd sub nom.*, 42 F.4th 355 (3d Cir. 2022). For this reason, courts have described the loss enhancement as "bonus punishment points" that the Government must "earn." *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991); *see also United States v. Free*, 839 F.3d 308, 323 (3d Cir. 2016) (same).

For a loss enhancement to apply, the Government must prove both the existence and the amount of actual loss attributable to the offenses of conviction, *United States v. Cuti*, No. 08-cr-972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011), which means "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)(i). A sentencing court's estimation of loss must be reasonable and it must not engage in speculation, *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993). Where, as here, the government fails to present sufficient evidence to allow the Court to make a reasonable, nonspeculative loss estimate, no loss enhancement should be applied. *See United States v. Pina*, No. 18-cr-179 (JSR), 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (rejecting the government's proposed loss amount as "entirely speculative" and insufficient for the court to "make a principled assessment" of the amount "properly attributable" to the defendants' scheme beyond a smaller amount directly traceable to the scheme); *Cuti*, 2011 WL 3585988, at *4 (finding government failed to meet its burden to establish loss, in part due to "other factors" that may have contributed to loss and impacted the investment decision, and which "make a determination of loss difficult and speculative").

"[L]oss ***must*** be the result of the fraud." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). Put another way, "[l]osses from causes other than the fraud must be excluded from the loss

26

calculation." *Id.*; *see also United States v. Rutkoske*, 506 F.3d 170, 178-79 (2d Cir. 2007) (vacating sentence because district court failed to consider all factors relevant to decline in company's share price). Further, a defendant may not be "automatically" held "responsible for losses attributable to the entire conspiracy"; instead, the court "must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010), *overruled on other grounds*, *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).

Here, putting aside for the moment whether the Government provided sufficient, reliable evidence to support its purported loss calculation of "approximately $174 million,"[10] it unquestionably has not established how much of that, if any, is properly attributable to Mr. Amar. Critically, the Government's purported loss amount was neither caused by Mr. Amar's conduct, nor was conduct of Ms. Javice's that led to the Bank's loss foreseeable to Mr. Amar. Further, the Government's loss calculation fails to account for Frank's actual value, instead assuming (without proving) that Frank was worthless, and also ignores multiple factors unrelated to the alleged fraud that negatively impacted Frank's value after the acquisition closed. Because the Government has failed to meet its burden to establish loss, the Court should decline to apply the enhancement.

    i.    <u>Neither Mr. Amar's Conduct, Nor Conduct Reasonably Foreseeable to Him, Caused Loss</u>

The Government cannot meet its burden to show that any loss amount was attributable to

---

[10] The Government's calculation includes 7 categories of purported losses: (1) Frank's acquisition price ($168,531,714.00); (2) JPMC acquisition legal fees ($641,324.00); (3) Salary and benefits paid to Javice ($1,171,524.00); (4) Salary and benefits paid to Amar ($652,605.00); (5) Retention payments to Frank employees ($830,000.00); (6) Salaries paid to Frank employees ($2,056,339.00); and (7) Post-acquisition costs related to Frank ($164,468.00). *See* ECF No. 419 at 16-17. As to the first category, the deal price was $175 million, but that includes certain closing adjustments set forth in the Merger Agreement. *See* GX 2000.

Mr. Amar. The "district court [must] calculate the amount of loss attributable to an individual defendant's conduct" or the "reasonably foreseeable acts" taken in connection with "jointly undertaken criminal activity." *Treadwell*, 593 F.3d at 1002. The application notes to the Guidelines make clear that the "scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy." *Id*. (quoting USSG § 1B1.3 cmt. n.2). Indeed, the Second Circuit has found that the "scope of conduct for which a defendant can be held under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *See United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015) (emphasis added) (finding district court improperly attributed entire loss from conspiracy to defendant despite lack of evidence that his agreement was "sufficiently broad to include all of the conspiracy's activities." (quoting *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013))); *see also United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991) (same). And "neither knowledge of another participant's criminal acts, nor aware[ness] of the scope of the overall operation alone is enough to deem the defendant responsible for the acts of co-conspirators." *Khandrius*, 613 F. App'x at 7.

The Government did not allege that Mr. Amar made a single false statement to JP Morgan, either before or after the acquisition closed. Nor has the Government argued, much less shown, that the "scope of the criminal activity jointly undertaken" by Mr. Amar is the same as the scope of the entire conspiracy. To the contrary, the Government specifically told the jury it could convict Mr. Amar based solely on the post-closing purported coverup in January 2022. *See* Tr. 3570:3–3571:7. And the jury's questions during deliberations suggested lack of unanimity as to the conspiracy start date. *See* Tr. 3867:7–9; 3862:15–17.

No matter when Mr. Amar allegedly formed a conspiracy with Ms. Javice, his specific conduct did not cause a loss to JP Morgan. Even if the Court were to find Mr. Amar formed a

conspiracy with Ms. Javice before the deal closed in August 2021 (rather than during the alleged coverup in January 2022), the purchase of the ASL list was the sum and substance of his own purportedly fraudulent conduct. But the Government alleged that the ASL list was used only to cover up the fraud *after the fact*.[11] That severs any causal link between what Mr. Amar contributed to the alleged scheme and the loss JP Morgan suffered in purchasing Frank.[12] *See, e.g.*, *United States v. Isaacson*, 752 F.3d 1291, 1306 (11th Cir. 2014) (declining to attribute bank's losses to defendant because "Morgan Stanley never saw the valuations [defendant] helped . . . to prepare" and would have invested anyway); *see also In re Ikon Off. Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 690 (E.D. Pa. 2001) (finding in "the assertion of a cover-up does not appear to help plaintiffs establish loss causation" in Rule 10b-5 context because, "[i]f the FY97 misstatements were successfully covered up, they were never disclosed to the market and therefore could not have caused a loss."); *United States v. Calderon*, 944 F.3d 72, 97 (2d Cir. 2019) (reversing restitution award because loss was not caused by fraud where misstatements occurred "*after* [the banks] had *already* decided to offer loans to the relevant . . . banks," and therefore could not have "influenced" the banks' decision).

Nor was the loss caused by Ms. Javice within the scope of foreseeable acts taken in furtherance of any jointly undertaken criminal activity. *See Khandrius*, 613 F. App'x at 8 (vacating sentence because government did not prove "the fraud loss caused by the conspiracy" fell within

---

[11] *See, e.g.*, Tr. 39:9–12 (Government's Opening) ("Eventually [the defendants] sent JP Morgan what was supposedly the data from Frank's 4 million users. What was it really? It was the [ASL list] that Amar bought to cover up this fraud.").

[12] The same analysis applies to Mr. Amar's purported meeting with Mr. Vovor on August 2, 2021. Because Mr. Vovor declined the request, nothing came of it, and it did not cause JP Morgan to buy Frank or lose money.

scope of agreement for jointly undertaken activity). To hold Mr. Amar accountable for *any* loss, the Court must specifically find (i) that the scope of jointly undertaken criminal activity began pre-closing (such that it could have even possibly caused a loss), and (ii) then that the joint activity actually did cause a loss. *Getto*, 729 F.3d at 234 (remanding because court did not "make particularized findings" on scope of activity of foreseeability of conduct in sentencing); *United States v. O'Neil*, 118 F.3d 65, 74 (2d Cir. 1997) (loss enhancement requires "particularized findings of . . . the scope of the criminal activity agreed upon by the defendant" to calculate "the amount of loss attributable to the defendant"). The Government has not met its burden to show that Mr. Amar agreed pre-closing to jointly undertake any criminal activity.[13]

At trial, the Government focused on Mr. Amar's conduct in connection with 3.1.4, the so-called "fraud spreadsheet." But, to the extent JP Morgan relied on that spreadsheet when purchasing Frank—rather than Ms. Javice's oral representations and the synthetic list she created to complete the data validation exercise, *see* PSR ¶ 29—Mr. Amar's contributions to it did not cause a loss. Those contributions were minimal, accurate, and sourced from Google Analytics in coordination with Ms. Wong. Moreover, Ms. Javice also intervened to misrepresent the accurate data without Mr. Amar's knowledge. *See* GX G-521; GX 1509; GX 1509-A; GX 3010; GX 3010-A; Tr. 175:5–14; Tr. 847:1–7; 832:3–10. Her concealed, independent misrepresentations are not within the scope of any jointly undertaken criminal activity to which Mr. Amar agreed. This breaks the causal chain, rendering it improper to hold Mr. Amar liable for any loss that followed. *United*

---

[13] Even if Mr. Amar had "knowledge of [Ms. Javice's] criminal acts" or "aware[ness] of the scope of the overall operation," that awareness alone still is not "enough to deem [Mr. Amar] responsible for the acts of" Ms. Javice. *Khandrius*, 613 F. App'x at 7; *see also United States v. Hunter,* 323 F.3d 1314, 1320 (11th Cir. 2003) (finding that "the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole.")

*States v. Rutkoske*, 506 F. 3d 170, 179 (2d Cir. 2007) ("[A] plaintiff must prove that the misrepresentation proximately caused the economic loss."); U.S.S.G. app. C vol. II amend 617, at 178 (2003) (loss requires line-drawing as to proximate cause). Because Ms. Javice repeatedly and affirmatively hid her actions from Mr. Amar, it was impossible for Mr. Amar to foresee her fraudulent conduct. *See supra* § IV.A. The Court cannot sentence Mr. Amar based on Ms. Javice's unforeseeable loss-causing conduct.

ii.    The Government's Loss Calculation Fails to Account for Frank's Real Value Unrelated to the Alleged Fraud[14]

Notwithstanding that the purported loss amount cannot be attributed to Mr. Amar, the Government also fails to carry its burden on loss because it makes no effort to account for the fact that Frank had actual value independent of the alleged fraud. *See United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (reversing district court for computing loss amount "as equal to the entire cost of the securities sold" and holding "the district court erred in not deducting from the purchase price the actual value of the instruments"). This is not a Ponzi scheme case, or one involving the sale of a worthless asset. In calculating loss in the context of a fraudulently induced purchase of a legitimate asset or security, the Court should consider "the reduction that resulted *from the offense* in the value of" that asset, U.S.S.G. § 2B1.1 cmt. n.3(B)(v) (emphasis added). This is because where, as here, the purchased asset has a real-world value greater than zero, a fraudulently induced purchase of that assets does not mean the loss equals the entire purchase

---

[14] For the avoidance of doubt, evidence of Frank's legitimate value is not a "credit" against loss, such that the burden of proof could arguably shift to Mr. Amar. U.S.S.G. § 2B1.1 cmt. 3(D).

price.[15] "It is the Government's burden to prove loss and the Court must recognize that . . . 'other factors'"—here, the value of Frank unrelated to the purported fraud, which the Government ignores completely—"make a determination of loss difficult and speculative." *See Cuti*, 2011 WL 3585988, at *4 (finding government failed to prove loss).

To be clear: Frank had real value. Even the Government's trial evidence demonstrates that Frank indisputably had substantial value separate from the purported fraud, which must be reflected in any loss amount. *See, e.g.*, Tr. 550:19–551:4; Tr. 2110:24–2111:4; Tr. 2118:21–2119:4 (JPMC and Capital One Executives both testified on direct examination to the value of Frank's mission and target demographic outside of the user metrics they received). Indeed, according to the Government, JP Morgan was misled because the number of users who had provided personal information to Frank was *less than* JP Morgan believed it to be, *not* that there were no users at all. Thus, the Government's attempt to use the deal price as a proxy for the total loss amount, without any consideration of Frank's legitimate value and assets, should be rejected.[16] *Accord United States*

---

[15] *See Leonard*, 529 F.3d at 93 ("Although we defer to the district court's determination that the members would not have purchased the investment had they known [the truth], this does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without value. After all, the investors did obtain an interest in a company. . . ."); *see also United States v. Bakhit*, 218 F. Supp. 2d 1232, 1237 (C.D. Cal. 2002) (finding that loss based on total sale proceeds is inappropriate where the defendants "at most . . . intended to inflate the [company's price], not create a valuable [entity] out of a worthless commodity.").

[16] In arguing that the entire purchase price is properly considered loss in its response to Ms. Javice's sentencing memorandum, the Government relied in part on cases where the fraud was so pervasive that it tainted the entire investment, such that the total investment price could be considered in the loss calculation. *See* ECF No. 419 at 17–18 (citing, *inter alia*, *United States v. Stitsky*, 536 F. App'x 98, 111 (2d Cir. 2013) (applying loss enhancement for entire security value where court explicitly found that securities "conferred no value at all on the investors"). But that is not the case here, so those authorities have no application. The Government also improperly relies on *United States v. Turk*, in which the court rejected the defendant's argument to offset the purported loss by the underlying value of buildings used as collateral for a fraudulently induced loan. 626 F.3d 743, 748-49 (2d Cir. 2010) (finding loss amount was the unpaid

*v. Laurienti*, 611 F.3d 530, 558 (9th Cir. 2010) ("If the underlying company was worthless or practically worthless, it is reasonable to use the total investment cost as the actual loss. . . . But, if the underlying company has intrinsic value, then the use of the total investment cost is erroneous.").

*First*, at the time of the acquisition, Frank had numerous, legitimate assets, including: (a) 500,000 customers across all products, *see* Tr. 985:20–24; (b) 300,000 FAFSA-specific customer accounts, *see* Tr. 1596:16–23, with over 100 highly valuable data points for some of these accounts; (c) thousands of pages of financial literacy content that drove students to its website, *see* DX CJ 371; (d) a highly attractive brand name and reputation; "trusted relationships" with a key—and "historically" underserved—demographic, *see* Tr. 550:23–551:4; (e) employee talent, including multiple people who still work at JP Morgan, *see* Tr. 1526:23–1527:3; (f) a celebrated, Forbes "30 Under 30" CEO, *see* Tr. 696:6–15 (Leslie Wims Morris testifying that large companies told her Ms. Javice, in addition to Frank generally, was "about to blow up," meaning "she was gaining a lot of traction in the market"); and (g) a board of directors guiding it, including titans of industry such as Marc Rowan (the co-founder and CEO of Apollo Global Management, one of the world's largest private equity firms).

Most notably, Frank had a significant and engaged audience: 4.5 million website visitors, which itself is a source of substantial value. Mr. Rowan testified that this alone made Frank a valuable acquisition target. *See* Tr. 3006:14–3007:5 ("[T]he more users who came to their website

---

principal from the fraudulently induced loan). But *Turk* is inapposite, because, as the court expressly found, "the purported collateral had no meaningful value" at all because the victim's mortgages were never recorded and thus they had no interest in that collateral (that could be used to offset the loss amount). *Id.*

. . . would make them more and more valuable.").[17] Similarly, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████. One industry study quantified the independent, commercial value of website visitors as high as "$700 per unique monthly visitor." *See* Shivaram Rajgopal et al., The Relevance of Web Traffic for Stock Prices of Internet Firms (Oct. 2000) ("[M]arket participants appear to attach a value of $700 per unique monthly visitor."). According to that metric, Frank's 57,982 average monthly visitors would be worth approximately $75 million in 2021, an eight-figure source of value unrelated to the purported fraud.

   *Second*, according to JP Morgan's own deal model, Frank had significant synergistic value to JP Morgan, which motivated the acquisition and did not depend on the purportedly inflated number of FAFSA accounts. *See, e.g.,* ████████████████████████████

████████████████████████████████████████████████

████████████; GX 1591 (describing JP Morgan's goals to generate synergy, including but not limited to: (i) scaling Frank's content and best practices to JP Morgan's "Financial Wellness Platform"; (ii) building "strategic partnerships/customers" to expand JP Morgan's customer base; and (iii) "exclusive value prop" of marketing Frank's "trusted customer brand" to existing JP Morgan customers); ████████████████████████████████████████

████████████████████████████████████████████████).

---

[17] Capital One requested Frank's visitor number multiple times during diligence, even escalating that question to the highest priority, itself an indication of value. *See, e.g.,* GX 2006 (diligence session agenda: "How many visitors do you get?"); GX 1691 at 1, 3.

Frank's mission—to help underserved students afford college and to resolve a major pain point for families—was also valuable to JP Morgan because it aligned with the Bank's own focus on "financial inclusion." *See, e.g.*, ████████████████████████████ ████████████████████████. Mission-driven companies with value profiles analogous to Frank's financial inclusivity (a social good) earn as much as a 50% premium. *See* McKinsey, The ESG Premium: New Perspectives on Value and Performance (Feb. 12, 2020). Though the Probation Office and Government ignore this source of value, JP Morgan apparently did not, as the Bank paid a considerably greater premium for Frank compared to other acquisitions from the summer of 2021. *See* ████████████████████████████ ████████████████████.[18] Capital One likewise recognized the value of financial inclusivity, which was "████████" with that bank's strategy. *See* ████████████ ████████████████████; Tr. 2117:16–2118:1.

Relatedly, Frank's strong reputation for financial inclusivity was valuable to JP Morgan because it was a way to bolster the Bank's reputation and to brand itself as a socially-good company—a benefit that exists regardless of the number of FAFSA customers. As Ms. Wims Morris testified, Frank "developed trusted relationships with a segment of the population that historically had not . . . embraced traditional banks," Tr. 550:23–551:4, in particular students from lower-middle-income households, Tr. 680:21–681:13. Since the acquisition, JP Morgan has redoubled its efforts to advertise its position as a financially inclusive institution as a source of value. *See, e.g.*, JPMorgan Chase & Co., 2021 Environmental Social & Governance Report (May

---

[18] To the extent Frank was not worth its mission premium, that loss was caused by the market's overvaluing such companies, not anything Mr. Amar said or did, so it is unattributable to him and cannot be said to have resulted from the fraud for purposes of applying a loss enhancement. *See infra* §IV.B.

10, 2023) (highlighting "access to banking"); JPMorgan Chase & Co., <u>JPMorganChase Announces Enhanced Strategy to Support Financial Health and Wealth Creation</u> (June 3, 2025) ("Supporting financial health is at the core of what we do. . . . Our strategy reflects our commitment to driving meaningful change by tailoring our services to meet the unique needs of underserved communities."); JPMorgan Chase & Co., <u>What Works: Advancing Global Financial Health Through Tech</u> (Sept. 20, 2024) (announcing LMI initiatives in India); JPMorgan Chase & Co., <u>Our Racial Equity Commitment</u> (last visited Sept. 29, 2025) (announcing $30 billion commitment in 2020 to "advance economic inclusion"); Peter Georgescu, <u>JP Morgan Chase Does Well By Doing Good</u>, FORBES (Sept. 8, 2023) (describing CEO Jamie Dimon's annual letter to shareholders in which he emphasized congruence of profit motive and "lifting up [communities]" and announced a $400 million investment in minority-owned businesses in 2022).

***Third***, and finally, JP Morgan derived value simply by taking Frank off the market so that other competitors could not acquire it while, at the same time, avoiding the substantial costs associated with building a similar product. *See* GX 1591 ("Acquire a digital capability designed to meet the needs of the [college student] segment."); *id.* ("[B]uild cost avoidance."); *id.* ("JP Morgan will be at a competitive disadvantage [if it does not acquire Frank]."); *id.* ("Defensive play to ensure another [financial institution] does not acquire [Frank]."); ███████████████████████ ████████████████████████████████.

The Government's loss calculation of "approximately $174 million"—the majority of which is the $175 million acquisition price (minus closing costs)[19]—accounts for none of this

---

[19] With respect to the 6 other categories (beyond deal price) that are asserted as loss in the Victim Impact

value and instead assumes, without substantiation, that Frank was worthless.[20] That assumption is divorced from reality, the trial record, and the Government's own evidence. The Government has failed to proffer sufficient evidence to demonstrate that Frank was a worthless company such that its value was entirely derived from the purported fraud. *See Rutkoske*, 506 F.3d at 180, n.4 (vacating sentence and remanding to "redetermine the amount of loss" and noting that "[t]he record does not suggest that the District Court understood [the defendant] to have 'promoted worthless stock in worthless companies,' which would justify attributing the entire loss amount to [the defendant's] fraud"); *United States v. Gushlak*, No. 03-cr-833 (NGG), 2011 WL 782295, at *7 (E.D.N.Y. Feb. 24, 2011) (declining to apply loss enhancement where "the Government has not proffered evidence that would be sufficient for the court to conclude either that [the acquired entity] was a worthless company with worthless stock, or that [the defendant's] offense conduct was entirely responsible for rendering [the entity's] stock worthless"). The Government's failure to meet its burden on loss is fatal to the enhancement. *See Moran*, 2024 WL 2577970, at *1 ("[T]he

_____

Statement, neither the Government nor the Probation Office even attempt to substantiate the claimed lump-sum amounts, let alone make any showing sufficient to establish that these losses were caused by Mr. Amar. These amounts should be excluded from any loss calculation. *See United States v. Simmons*, 544 F. App'x 21, 24 (2d Cir. 2013) (finding district court abused discretion in determining loss in context of restitution where government "provided almost no information about the loss amount, no documentation regarding [the victim's] asserted loss, and no explanation as to why procuring details or documentation [is] impracticable," and instead relied on "an unsworn letter from [the victim] setting forth a lump-sum loss amount"); *see also United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence. . . .").

[20] The Government's loss calculation is based entirely on self-serving say-so from JP Morgan's Victim Impact Statement and testimony from JP Morgan witnesses regarding the materiality of certain metrics of engagement at Frank. *See* ECF No. 419 at 16–17 & Ex. A. Trial evidence on materiality is insufficient, on its own, to satisfy the causation requirement for a loss enhancement under the Guidelines—particularly when, as here, loss was not a required finding by the jury at trial. *See, e.g.*, *NM IQ LLC v.McVeigh*, 2004 WL 2827618, at *10 (S.D.N.Y. Dec. 9, 2004) ("'Materiality' and 'reliance' are separate and distinct elements of fraud claims.").

court finds that the Government has not provided sufficient evidence to meet its burden to demonstrate . . . loss as to Defendant's bank fraud count and therefore sets these amounts at $0.").

    iii.   <u>There Were Multiple Causes of Loss Unrelated to the Alleged Fraud</u>

In arguing that Frank was ultimately worth nothing, *see* ECF No. 419 at 26, the Government also ignores "[l]osses from causes other than the fraud." But these "must be excluded from the loss calculation," as they are neither attributable to Mr. Amar nor any foreseeable, jointly undertaken criminal activity to which he agreed. *See United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). This includes actions undertaken by the Bank and others post-fraud, which negatively impacted Frank's value separate and apart from the alleged fraud. Though it is difficult to reliably recreate all of the factors here—itself a reason why the Government has not met its burden to establish loss—a few are evident.

***First***, Frank's value was directly and negatively impacted after the acquisition closed by the FAFSA Simplification Act, which Congress passed in 2020. The Act meant that the Department of Education ("DOE") would compete with Frank by making the FAFSA form easier to complete on its own website, thus rendering FAFSA submitter tool redundant. *See* ███████████████████ ████████████████████████████████████████████████████████ ███████████; GX 1396 (JP Morgan notes from a diligence call: "FAFSA simplification . . . down to 36 questions"). In the spring of 2022, the DOE also implemented two-factor authentication ("2FA") on their FAFSA application, a privacy measure that requires users to login on multiple devices. This feature was incompatible with Frank and thus also rendered the FAFSA submitter tool inoperable without modifications, which JP Morgan did not attempt. JP Morgan ultimately "sunset" the tool for these reasons. While these post-acquisition events—federal legislation and JP Morgan's independent business decisions in response to the same—undoubtedly drove Frank's

value down, they cannot be attributed to the alleged fraud. The reduction in value from these events must be excluded from any loss calculation, but the Government fails to do so.

*Second*, and relatedly, any diminution in Frank's value attributable to JP Morgan's post-acquisition business strategy for Frank—which is completely independent of the fraud—must also be accounted for in any loss calculation. But again, the Government fails to do so. Many of the strategic decisions made during JP Morgan's integration of Frank further reduced Frank's value—including, for example, cutting down Frank's staff, relinquishing Frank's partnerships, using Frank's reputation to sell financial products to its students rather than promote its mission, and shuttering Frank's consumer and degree segments.[21] In arguing that Frank is valueless such that the entire purchase price is properly considered a "loss," the Government improperly ignores the financial impact from all of these post-acquisition business decisions that could not be caused by the alleged fraud.

*Third*, independent market forces from a widely acknowledged acquisition frenzy in 2021 artificially inflated the $175 million deal price. *See Ebbers*, 458 F.3d at 128 ("[T]he dot-com bubble burst and its likely negative future effect on WorldCom's business was public knowledge. The effect of that knowledge would be a downward pressure on share price not attributable to the defendant."); Niket Nishant, Global M&A volumes hit record high in 2021, breach $5 trillion for

---

[21] *See, e.g.,* ███████████████████████████████████████████████████████; DX CJ 356 (Mr. Javice to JP Morgan 1 month after closing: "the proposed budget and headcount … cannot stabilize the company," "[d]ecisions have been made" with respect to Frank's "communications, engineering, seo content production . . . that impact . . . the business negatively") ████████████████████████████████████████████████████ ; GX 1093 (JP Morgan decision to fire Frank's critical Ukraine technology contractors); GX 1424 (Sonali Divilek describing in June 2022 Frank's "strained . . . customer care / operations resources," more than 8 months after initially flagged).

first time, REUTERS (Dec. 31, 2021). JP Morgan alone acquired 30 companies in 2021 by the time

the Frank deal closed. *See* Elizabeth Dilts Marshall, JPMorgan's 2021 Deal Spree Aims to Fill the

Few Holes Left in Its Global Operations, REUTERS (Sept. 22, 2021); Jamie Dimon, Annual PSR

2021 (last visited Sept. 29, 2025) (JP Morgan spent "nearly $5 billion on acquisitions" in 18

months). This valuation inflation, an independent market force, must be isolated and offset in the

loss calculation. *See United States v. Martoma*, 48 F. Supp. 3d 555, 569 (S.D.N.Y. 2014) ("[I]n

fraudulent misrepresentation cases, it makes sense to isolate the effect of the defendant's conduct

on the market from other market forces."). But, again, the Government did not do so here.

In sum, just as the Probation Office and the Government ignore Frank's legitimate value

unrelated to the fraud, they overlook these unrelated factors and events that negatively impacted

Frank's value. Such a "basic failure to at least approximate the amount of the loss caused by the

fraud without even considering other factors," *Rutkoske*, 506 F.3d at 179–80, is fatal to the

Government's burden to prove even a dollar of loss, much less its purported calculation of $174

million. *See Moran*, 2024 WL 2577970, at *3 (finding loss $0 where government had "not met its

burden to show by a preponderance of the evidence . . . the amount of actual loss suffered by the

victim Bank and caused by the Defendant"); Sent'g Tr. 38:21–39:17, *United States v. Block*, No.

16-cr-595 (JPO) (S.D.N.Y. Dec. 4, 2017), ECF No. 169 (declining to apply any loss enhancement

because, even though court agreed $300 million was "probably about right," it still "require[d] a

degree of speculation and assumption . . . given the significant confounding factors," including

that "fraud was interwoven with problematic accounting issues" that were "essentially impossible

to untangle").

For each of the reasons described above, the Government has not met its burden to establish

loss and, thus, the Court should not apply a loss enhancement here.

### C.  A 2-Point Sophisticated Means Enhancement Is Not Warranted

The Court should reject the Probation Office's recommendation to apply a 2-point enhancement for Mr. Amar's purported use of "sophisticated means." In support of the enhancement, the Probation Office points to: (1) Mr. Amar's purchase of the ASL list; and (2) Ms. Javice's "generat[ion] [of] a synthetic data set." *See* PSR ¶ 113. Neither constitutes sophisticated conduct *by Mr. Amar* warranting an enhancement. The purchase of the ASL list was not "sophisticated," and while this Court found that the use and generation of synthetic data was "sophisticated," Mr. Amar had nothing to do with that.

### i.  The ASL List Lacks the Hallmarks of Sophistication

As a threshold matter, acts taken to conceal fraud do not, on their own, constitute sophisticated means. *See, e.g.*, *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (rejecting application of sophisticated means enhancement and holding that because "virtually all bank fraud will involve misrepresentation, . . . the realm of especial complexities and intricacies involves more than the forgeries, misrepresentation, and concealment inherent in bank fraud"). As such, Mr. Amar's purchase of the ASL list to supposedly "cover up" the fraud does not qualify for a sophisticated means enhancement.

What is more, the conduct was not "sophisticated." Sophisticated means must be "especially complex or especially intricate," and the enhancement is only applicable where "the defendant intentionally engaged in or caused the conduct constituting sophisticated means. . . ." U.S.S.G. § 2B1.1(b)(10)(C), cmt. 9(B). In other words, a sophisticated means enhancement is appropriate where, unlike here, the defendant's own "offense conduct, viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme." *United States v. Bryson*, 101 F. Supp. 3d 147, 159 (D. Conn. 2015). "[F]raud per se is inadequate" to establish sophisticated means

41

because the enhancement "requires more than the concealment or complexities inherent in fraud." *Adepoju*, 756 F.3d at 257. An alleged fraud that is easily or quickly detected—as here, where the Bank unearthed the issue shortly after closing and just weeks into integration—weighs against application of the enhancement. *Contra United States v. MacCallum*, 821 F. App'x 11, 13 (2d Cir. 2020) (finding that a fraud that went "undetected for many years" weighed in favor of applying enhancement).

Mr. Amar bought the ASL list legally on the open market—a straightforward undertaking that involved no particular skill, planning, or coordination—and it was a one-off act. *Contra United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) (applying enhancement in part because of factors absent here, including that defendant repeated and coordinated conduct 17 times). Ms. Javice and Dr. Kapelner (who is not a co-conspirator and had no marketing experience or expertise) executed a nearly identical data purchase just a few weeks after Mr. Amar with no planning or preparation, and without asking for Mr. Amar's input or even telling him beforehand. There was nothing sophisticated about it. Further, as numerous witnesses testified at trial, companies across industries—including JP Morgan itself, *see* Tr. 1327:2–10—buy the same type of data for entirely legitimate purposes on a routine commercial basis, *see, e.g.*, Tr. 906:15–907:20, 947:4–8 (Ms. Ochs); 1034:8–18 (Ms. Wong); 1328:10–20 (Mr. Stolls); 2076:14–2077:3 (Dr. Kapelner). In fact, JP Morgan not only has purchased data from a company involved in this case (Acxiom), but it now sells its own customer data, *see, e.g.*, Evan Weinberger & Paige Smith, <u>JPMorgan Tells Fintechs They Have to Pay Up for Customer Data Access</u>, Bℓᴏᴏᴍʙᴇʀɢ (July 11, 2025).

On these facts, *United States v. Guldi*, 141 F.4th 435 (2d Cir. 2025), is instructive. There, the Second Circuit recently found that application of the enhancement to "two relatively unsophisticated" acts was in error because (1) "we have never said *every* multi-step effort to

conceal an offense warrants an enhancement," (2) the defendant's acts were "easy for anyone to execute," and (3) the defendant did not use any "particular skill, knowledge, planning, or coordination." *Guldi,* 141 F.4th 435, 452–53 (2d Cir. 2025). The same result is warranted here. Buying data is "garden-variety," not intricate or complex, and does not warrant the application of the sophisticated means enhancement.

ii.    Mr. Amar Did Not Use Synthetic Data, Only Ms. Javice Did With the Help of Dr. Kapelner

Even if the Court were to accept that the generation of a synthetic data set was "sophisticated," the fact remains that Mr. Amar had nothing to do with Ms. Javice and Dr. Kapelner's creation and/or use of that data. For purposes of applying the sophisticated means enhancement to Mr. Amar's sentence, the Court may only consider Mr. Amar's actions, not Ms. Javice's or Dr. Kapelner's. Indeed, the Guidelines were specifically revised in 2015 to enforce this limitation. *See* U.S.S.G. § 2B1.1(b)(10)(C); *United States v. Mangano*, 749 F. App'x 910, 913–14 (11th Cir. 2018) (amendment designed "to narrow the focus of the enhancement to the sophistication of the defendant's personal conduct, not the scheme as a whole"); *United States v. Amico*, 416 F.3d 163, 169 & n.4 (2d Cir. 2005) (considering whether it would be "unfair" to apply "full breadth" of enhancement to "minor participant who had neither awareness nor notice of the use of sophisticated means by others"). As such, the sophisticated means enhancement may not be applied to Mr. Amar here, where Ms. Javice (together only with Dr. Kapelner) "generated a synthetic data set." *See* PSR ¶ 113; Tr. 1455:24–1456:3 (Mr. Sweeney testifying Mr. Amar was not involved in data validation); Tr. 2031:2–12 (Dr. Kapelner testifying he did not meet Mr. Amar until months later in October 2021).

For these reasons, the sophisticated means enhancement has no application here.

### D.  Enhancements for Abuse of Trust and Obstruction of Justice Are Not Warranted

The Court should reject the Probation Office's recommended enhancements for Mr. Amar's purported abuse of a position of trust, *see* U.S.S.G. § 3B1.3, and obstruction of justice, *see* U.S.S.G. § 3C1.1, both of which the Government expressly did not seek in connection with Ms. Javice's Guidelines calculation. *See* ECF No. 419 at 15. At Ms. Javice's sentencing, the Government confirmed it was not seeking application of either enhancement and thus made no attempt to carry its burden to establish a basis for either enhancement. Accordingly, Court declined to apply both enhancements to Ms. Javice. The Court should similarly decline to apply them for Mr. Amar.

### E.  A 2-Point Gross Receipts Enhancement Is Not Warranted

As the Court ruled at Ms. Javice's sentencing, a 2-point enhancement for allegedly deriving more than $1,000,000 in gross receipts from a financial institution is not appropriate in this case. *See* PSR ¶ 114; U.S.S.G. § 2B1.1(b)(17)(A); Sent'g Hr'g Sept. 29, 2025.

### F.  A 3-Point Unconstitutional Trial Penalty Is Not Warranted

The Sixth Amendment guarantees Mr. Amar's right to trial. U.S. Const. amend. VI. He exercised that right. Defendants who forego trial and plead guilty can receive up to a 3-point reduction for accepting responsibility, with one of those points available specifically and solely for saving the Government time. *See* U.S.S.G. § 3E1.1. Thus, simply because Mr. Amar exercised his constitutional rights and held the Government to its burden of proof, he will now have 3 additional points assessed against him. While the law contemplates this result, it remains within this Court's power to reduce Mr. Amar's sentence by the same amount, to offset what has been described as an unconstitutional "trial penalty." *See United States v. Tavberidze*, 769 F. Supp. 3d 264, 267, 273 (S.D.N.Y. 2025) (describing section 3E.1.1 as a "trial penalty" and therefore "treat[ing] the defendant for purposes of sentencing as if he had an offense level" that was 3 points less than set

forth in the PSR); *United States v. Abraham*, 498 F. Supp. 3d 175, 183 (D. Mass. 2020) ("Much of this Court's concern is driven by how section 3E1.1 is applied in practice, and how it effectively acts as a 'trial penalty.'"). In the interest of justice, the Court should do so here.

*  *  *

In sum, the Probation Office incorrectly concludes Mr. Amar's Offense Level is 39. Properly calculated, his Offense Level is 0, with a sentence of 0-6 months.

## V.   A NONCUSTODIAL SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), the Court "shall impose a sentence sufficient, but not greater than necessary." The Sentencing Guidelines are merely advisory, not mandatory, and there is no presumption that they should apply. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Instead, they are a "starting point" or "initial benchmark," from which the Court must "make an individualized assessment based on the facts presented" at sentencing. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009).

While Section 3553(a) provides several factors courts must consider in making this assessment, "[t]he list of factors [in the Guidelines] is preceded by . . . [the] broad command" to ensure the sentence is "not greater than necessary" to ensure justice. *Dean v. United States*, 581 U.S. 62, 67 (2017). Here, a number of important factors should be considered, including: (A) the limited nature of Mr. Amar's alleged conduct and his strong character; (B) the need to avoid unwarranted sentencing disparities; (C) the need to avoid punishing Mr. Amar more severely for being a noncitizen; (D) Mr. Amar's cooperative and helpful conduct since trial; (E) specific and general deterrence; (F) just punishment; and (G) the need to discount the outsized impact of loss on the Guidelines' and the Probation Office's analysis. *See* 18 U.S.C. § 3553(a)(1)–(7). Each of

these factors demonstrates that a noncustodial sentence is "sufficient, but not greater than necessary" for Mr. Amar.

### A. A Noncustodial Sentence Is Appropriate Considering Mr. Amar's Alleged Conduct and His Strong Character

The nature and scope of Mr. Amar's alleged conduct must factor into his sentence—particularly here, where the Government's own proof, if credited, establishes that Mr. Amar's conduct was minimal and an aberration. The gravamen of the Government's case against Mr. Amar centered on his legal purchase of real student records data over the course of a few days in August. In a misrepresentations case centered on the supposed telling of innumerable lies—to potential investors, to Frank's board, to deal advisors, and others, *see* ECF No. 419 at 1—Mr. Amar told none of them. Courts in this district have imposed noncustodial sentences under similar circumstances, finding that "proportionality to others involved is really an important consideration in sentencing" because a sentence must only reflect a defendant's "own proven misconduct," not the conduct of anyone else. Sent'g Tr. 88:4–17, 93:13–14, *United States v. Connolly*, No. 16-cr-370 (CM) (S.D.N.Y. Oct. 24, 2019), ECF No. 451 (imposing a noncustodial sentence where the defendant, convicted of one count of conspiracy to commit wire fraud and bank fraud and two counts of wire fraud, "made just six documented requests," "there [was] no real basis on which the government could even allege seriously that he made any other requests," and his co-defendant was "far more culpable").

What is more, Mr. Amar is a first-time offender whose alleged misconduct is a total departure from his otherwise exemplary character. While the Government painted Mr. Amar as an opportunistic person who failed to speak up, that is not who Mr. Amar is. As is reflected in letters from those who know him best, Mr. Amar has always been a man of conviction and service, who

selflessly devotes time to the people and causes he cares about, whether family, friend, or stranger. *See supra* § I. Courts routinely take this kind of positive character into account at sentencing. *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (upholding downward departure because "[s]everal constituents and friends described situations in which [the defendant] extended himself to them in unique and meaningful ways during times of serious need"); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming sentence of 3 months, despite recommended Guidelines sentence of 60 months, based in part on defendant's "generosity with time, and spiritual support and assistance to others"); *United States v. Mehta*, 307 F. Supp. 2d 270, 271, 279–80 (D. Mass. 2004) (imposing a below-Guidelines sentence of 3 years' probation because of the defendant's "substantial amounts of time and personal attention" to members of his religious community and the Indian community generally, including "personal support" when they fell ill or needed help on mortgage payments).

Considering the nature and circumstances of the offense and the history and characteristics of Mr. Amar, a noncustodial sentence is appropriate.

## B. A Noncustodial Sentence Avoids Unwarranted Sentencing Disparities

A noncustodial sentence is necessary to avoid imposing a more severe sentence on Mr. Amar than not only similarly situated defendants, but defendants convicted of exponentially more egregious conduct in far larger frauds. *See United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010) ("[C]ourts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct."); *Gall*, 552 U.S. at 55 (affirming sentence where "it is perfectly clear that the District Judge . . . considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated").

***First***, in cases where defendants have been convicted of more culpable conduct involving

higher loss amounts, courts have varied down by much larger margins than the Probation Office's 10-year recommendation here. In *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), for example, the court sentenced the former president of a cancer-data company for his role in a $260 million fraud. The Guidelines were life—reduced to 85 years only by virtue of the statutory maximum—but the court deviated significantly, and sentenced the defendant to just 42 months, finding that the defendant "became aware of the fraud toward its latter stages" and was afraid of "exposing what he had belatedly learned was the substantial fraud [of] others." *Id.* at 507–13. The court reasoned that although the defendant "made the improper decision to conceal" the fraud, he was more akin to an "accessory after the fact," justifying the court's sentencing decision. *Id.* at 512–13. Accepting the jury's verdict, at best, the same could be said about Mr. Amar's involvement in Frank's sale.

**Second**, in cases where higher level C-suite executives have been alleged to have engaged in far more egregious conduct by knowingly and repeatedly lying over many years, funding lavish lifestyles motivated by greed, intentionally obstructing justice through perjury or fabricating documents, and remaining undeterred by prior Government enforcement, courts *still* deviate from the Guidelines by as much as 96%—nearly 2 times the deviation that Probation recommends here. These cases involved not only worse alleged conduct but higher loss amounts, with frauds perpetrated against vulnerable victims situated differently than JP Morgan:

| Case | Position | Conduct | Nature of Victim/Extent of Harm | Loss | Sentencing Rec. (months) | Sentence |
|---|---|---|---|---|---|---|
| *Milton* (S.D.N.Y. 2023) [22] | Founder & CEO | Lied "over and over" and spent $83 million in 3 months | Thousands of ordinary investors, some who lost retirement savings | $660 million | Guidelines: 332-405 Probation: 132 | 48 mos |
| *Hild* (S.D.N.Y. 2022) [23] | Founder & CEO | "[E]gregious, systemic, and brazen conduct" in "multi-year scheme," plus trial perjury | Conservation advocates, City of Richmond, people who "counted on" defendant for jobs | $70 million | Guidelines: 324-405 Probation: 180 | 44 mos |
| *Petit* (S.D.N.Y. 2022) [24] | CEO | "Undermine[d] the integrity of the entire [financial] system" with "expansive, cyclical, and calculated" conduct | 20+ institutional investors | $34 million | Guidelines: Life Probation: 72 | 12 mos |
| *Amanat* (S.D.N.Y. 2020) [25] | Owner & Manager | "Central figure" of fraud scheme who committed 3 years of "flagrantly wrong" conduct | Public company shareholders | $9.75 million | Guidelines: 108-135 Probation: 108 | 48 mos |
| *Block* (S.D.N.Y. 2017) [26] | CFO | "Mastermind" who "brazenly" "ma[de] up numbers" with "some cover-up" | Thousands of everyday investors/shareholders | $300 million | Guidelines: Life Probation: 84 | 18 mos |
| *Potapenko* (W.D. Wash. 2025) [27] | Founders | $577M scheme, "largest fraud ever prosecuted" in district | 440,000 "traumatically affected" customers who lost jobs, houses, assets, even "relationships" | $300 million | Guidelines: Life Probation: 240 | Time served |

In line with these cases, even if the Court accepts Probation's Guidelines range, it should impose a sentence well below it in order to avoid "unwarranted sentencing disparities," achieve

---

[22] For *Milton* sources, *see* Sent'g Tr. 4:3–6, 89:6–10, 92:16–24, 95:21–23, 98:24–25, *United States v. Milton*, No. 21-cr-478 (ER) (S.D.N.Y. Dec. 18, 2023), ECF No. 322; Gov't Sent'g Memo at 6, 10, 11 (Dec. 12, 2023), ECF No. 315.

[23] For *Hild* sources, *see* Sent'g Tr. 5:18–21, 9:22–24, 14:4–6, 25:12–21, 33:1–4, 33:8–17, *United States v. Hild*, No. 18-cr-602 (RA) (S.D.N.Y. Jan. 27, 2023), ECF No. 156; *United States v. Hild*, 644 F. Supp. 3d 7, 16 (S.D.N.Y. 2022), *aff'd*, 147 F.4th 103 (2d Cir. 2025); Gov't Sent'g Memo at 11 (January 20, 2023), ECF No. 144.

[24] For *Petit* sources, *see* Sent'g Tr. 5:3–5, 15:20–16:1, 27:8–14, *United States v. Petit*, No. 19-cr-850 (JSR) (S.D.N.Y. Feb. 23, 2021), ECF No. 249; Gov't Sent'g Memo at 2, 25 n.3 (Feb. 16, 2021), ECF No. 145.

[25] For *Amanat* sources, *see* Sent'g Tr. 14:23–15:3, 40:4–9, 40:12–14, 44:3–9, 43:17–24, 45:16–19, *United States v. Amanat*, No. 15-cr-536 (PGG) (S.D.N.Y. Sep. 8, 2021), ECF No. 1221.

[26] For *Block* sources, *see* Sent'g Tr. 14:23–15:3, 40:15–18, 68:15–20, 70:1–4, 72:6–8, *United States v. Block*, No. 16-cr-595 (JPO) (S.D.N.Y. Nov. 8, 2017), ECF No. 169; Gov't Sent'g Memo at 21, 27 (Oct. 26, 2017), ECF No. 157.

[27] For *Potapenko* sources, *see* Sent'g Order at 2, 6, 12, 13, *United States v. Potapenko*, No. 22-cr-185 (RSL) (W.D. Wash. Aug. 25, 2025), ECF No. 241.

"proportionality," and give appropriate weight to the more relevant sentencing factors it must consider. *See United States v. Booker*, 543 U.S. 220, 264 (2005).

### C.  A Noncustodial Sentence Avoids Punishing Mr. Amar for Being a Noncitizen

A noncustodial sentence also helps to avoid unwarranted sentencing disparities based on Mr. Amar's foreign national status. *See* 18 U.S.C. § 3553(a)(6). Mr. Amar is here legally, but because he is not a U.S. citizen and will stipulate to removal, he will not benefit from the First Step Act or Second Chance Act, which Congress passed to dramatically shorten sentences for first time, nonviolent offenders just like Mr. Amar. As a result, he will likely serve somewhere between 32% and 62% more of any custodial sentence than an identically sentenced citizen, including his more culpable co-defendant, Ms. Javice. When he does, he likely will do so in harsher conditions of confinement because he will not be eligible for a minimum-security camp.[28] This sets Mr. Amar apart from, and makes his punishment more severe than, other fraud defendants who are citizens.

i.    Mr. Amar Will Not Benefit from the First Step Act or Second Chance Act

As a foreign national who has agreed to stipulate to a final order of removal, Mr. Amar is not eligible for the First Step Act's Earned Time Credits ("ETCs"). ETCs provide early release to incarcerated individuals once credits accrued equal time left to serve. *See* 18 U.S.C. § 3632(d)(4)(E)(i); *Rizk v. Warden FCI Fort Dix*, No. 22-cv-6538 (RMB), 2023 WL 8271803, at *1 (D.N.J. Nov. 30, 2023) (foreign nationals with final orders of removal are "statutorily ineligible for earned-time credit"). Mr. Amar will thus serve 33% more of his sentence than a U.S. citizen

---

[28] The calculations herein represent Mr. Amar's best estimate, given available information and current BOP guidance. *See* 18 U.S.C. § 3632(d); 18 U.S.C. § 3624(g); 28 C.F.R. § 523.44(b)(1), (c), (d)(3). As of 2023, the average earned time under the First Step Act is 10.3 months. *See* U.S. Sent'g Comm'n, First Step Act Earned Time Credits (last visited Sept. 29, 2025).

sentenced to the same number of years for the exact same offense based solely on his ineligibility under the First Step Act ("FSA"). The Court should consider this, among other factors, in determining a just sentence for Mr. Amar.[29]

Mr. Amar is also ineligible for the Second Chance Act, which permits U.S. citizens to serve the final 12 months of their sentences in a halfway house—and 6 months of that time in their own homes. *See* 18 U.S.C. § 3632(c); *Garcia v. BOP*, No. 10-cv-2480 (JSG), 2011 WL 1113461, at *4 (N.D. Ohio Mar. 24, 2011) ("[T]he BOP has determined that it is not practicable to include deportable aliens in the class of prisoners eligible [for the Second Chance Act]."); Bureau of Prisons, U.S. Dep't of Justice, P7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedures (Dec. 16, 1998). Thus, as a non-citizen, if sentenced to a period of incarceration, Mr. Amar will necessarily be serving longer in an institution than a similarly situated U.S. citizen.

All told, Mr. Amar will face substantially more prison time as a noncitizen:[30]

---

[29] The Second Circuit recently ruled that district courts "may not rely on the potential for earned time credit under the [FSA] as a stand-alone factor to enhance a defendant's sentence," because doing so "would contravene Congress's intent to allow a prisoner to earn a reduction . . . under the sentence that the District Court already found proper based on § 3553(a) factors." *United States v. James*, No. 24-cr-849, 2025 WL 2486539, at *7, 9 (2d Cir. Aug. 29, 2025) (reversing district court sentence where court expressly added 2 years based on defendant's potential receipt of FSA credits). The Second Circuit did not, however, preclude sentencing courts from considering FSA *ineligibility* as one factor *among many* to *reduce* a sentence and avoid unwarranted sentencing disparities under § 3553(a), as the Court should do here.

[30] The numbers have been calculated for Mr. Amar by assuming a final order of removal is in place, then multiplying any period of incarceration imposed by the Court in months by 0.85 to reflect Good Time Credit; for a U.S. Citizen, any period of incarceration imposed by the Court in months has been multiplied by 0.85 to reflect Good Time Credit, as well as 0.66 to reflect First Step Act credit, and then subtracting 12 months from the result to reflect the Second Chance Act credit. This is an estimate, based on available guidance from the BOP. *See* Fed. Bureau of Prisons, U.S. Dep't of Justice, Press Release, Directive to Fully Implement First Step Act and Second Chance Act (June 17, 2025).

| Imposed Sentence | Mr. Amar's Time Served (always 85% of sentence)[31] | U.S. Citizen's Time Served (% of sentence varies) |
|---|---|---|
| 3 years | 2.55 years | 0.70 years (23%) |
| 5 years | 4.25 years | 1.83 years (37%) |
| **7 years** | **5.95 years** | **2.96 years (42%)** |
| 10 years | 8.50 years | 4.67 years (47%) |

The Court should take this disparity into account in sentencing Mr. Amar.

ii.    <u>Mr. Amar Will Go to a Low Security Facility Not a Camp</u>

Additionally, Mr. Amar will not be eligible to serve his sentence in a minimum-security camp despite his status as a first-time, non-violent, white-collar offender with no history of misconduct. Simply because he is a foreign national, and despite his posing zero risk to the community, the BOP will automatically apply a Public Safety Factor ("PSF") to his placement designation, overriding all other factors and requiring that he be confined, at a minimum, to a low security facility. *See* Fed. Bureau of Prisons, U.S. Dep't of Justice, P5100.08, <u>Inmate Security Designation and Custody Classification</u> at 43 (2006).

A low security facility is excessive, inappropriate, and overly punitive. *See United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732–33 (E.D. Va. 2005) (considering in sentencing, among other things, that defendant could not serve in a camp despite no record of violence); Sent'g Tr. 49:16–25, *United States v. Hussain*, No.16-cr-462 (CRB) (N.D. Cal Apr. 10, 2019), ECF No. 515 (considering, in imposing sentence, that "a person who is an alien . . . cannot be confined to a camp" and that a low security facility is "a very different kind of incarceration"). Instead of a "work- and program-oriented" camp with "dormitory housing, a relatively low staff-to-inmate

---

[31] The only credit Mr. Amar is eligible for is the Good Time Credit, which is worth 54 days per year, or 15% of the imposed sentence. 18 U.S.C. § 3624(b); 28 C.F.R. § 523.20.

ratio, and limited or no perimeter fencing," Mr. Amar could be subject to strip searches, multi-day lockdowns, call and visitation limits, movement restrictions, armed guards trained to use lethal force, and an overcrowded population including violent offenders serving sentences exceeding 10 years. *See* Fed. Bureau of Prisons, U.S. Dep't of Justice, <u>About Our Facilities</u> (last visited Sept. 29, 2025). In fact, according to an expert analysis of the BOP's own data, the risk of assault for individuals placed in federal correctional institutes rises 143%, and the risk of serious assault rises 553%. *See* Sickler Decl. at 6, *United States v. Desai*, No. 19-cr-864 (TMD) (N.D. Ill. June 14, 2024), ECF No. 753-17; Sent'g Tr. 65:20–25; 97:21–98:3, *Desai* (N.D. Ill. June 27, 2024), ECF No. 850 (crediting BOP expert's analysis). Even in a low security facility, Mr. Amar may face a higher likelihood of victimization, including extortion, based on his perceived financial means as a white-collar offender. *See* Perdue Decl. at 11, *Desai* (N.D. Ill. June 14, 2024), ECF No. 753-18; Sent'g Tr. 65:20–66:4; 97:21–98:3; 98:13–18, *Desai*, ECF No. 850 (crediting BOP expert's analysis). This is reason enough to impose a noncustodial sentence.

That is not all. As a foreign national subject to deportation, Mr. Amar may be held in a privately-run "shadow prison" contracted by BOP to cut costs and specifically house immigrants who will be deported. *See* Emma Kaufman, *Segregation by Citizenship*, 132 Harv. L. Rev. 1379, 1401–03, 1409 (2019). Shadow prisons offer no rehabilitative programming, are notoriously violent, and lack even basic medical care. *See* U.S. Gov't Accountability Off., GAO-08-6, <u>Cost of Prisons: Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities</u> at 11 (2007) ("[P]rivate facilities primarily confine criminal aliens . . . Programs that focus on preventing returns to prison are not required . . . because criminal aliens are released for removal."); U.S. Dep't of Homeland Sec. Off. of Inspector Gen., <u>Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons</u> at 73–74 (Aug. 2016) ("We found that

. . . contract prisons incurred more safety and security incidents per capita than comparable BOP institutions [and BOP failed to verify people were receiving] basic medical services."); Dep. Att'y Gen., U.S. Dep't of Justice, Reducing Our Use of Private Prisons (Aug. 18, 2016) (privately-run prisons "compare poorly" to BOP facilities and fail to "maintain the same level of safety and security").

Mr. Amar's foreign national status will also strip him of his support system while incarcerated to a greater extent than a U.S. citizen. For instance, Mr. Amar will not be eligible for furlough should his father's condition further deteriorate. See Fed. Bureau of Prisons, U.S. Dep't of Justice, P5280.09, Inmate Furloughs at 4 (Jan. 20, 2011). Neither will he be able to attend a funeral or sit *shiva*. And whereas U.S. citizens must be held within 500 miles of their homes, foreign nationals are held anywhere in the country, on average 737 miles from their place of sentencing. See Kaufman, *supra*, at 1411–12 & n. 209–10. Designation to a remote facility will isolate Mr. Amar from his wife Noa and his daughter ████████████████████ ██████, render it impossible for his ailing father to see him, and curtail his access to counsel. "These consequences are severe and unfair," *see United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005), and the Court should seek to avoid them, *United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wis. 2003) (noting that "courts have approved departures for alien defendants if the conditions of their confinement or other consequences of conviction would result in punishment more onerous than for the typical defendant convicted of the same offense" and collecting cases).

iii.    Post-Incarceration, Mr. Amar May Be Released to ICE Custody

When Mr. Amar's sentence ends, he may not be released into the care of his family or go home. Instead, if he is not immediately removed from the United States, armed ICE agents will

transport him to an ICE detention center.[32] *See* 8 U.S.C. § 1226. And even with a final removal

order in hand, Mr. Amar's foreign status may result in months of additional detention while ICE

determines when and how to remove him. *See* Off. of Inspector Gen., U.S. Dep't of Justice, No.

21-123, Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates

at 20–21 (2021). Legal noncitizens like Mr. Amar are detained the longest. *See* TRAC

Immigration, Legal Noncitizens Receive Longest ICE Detention (June 3, 2013).

Courts in the Southern District have drawn heavily on these disparities to sentence foreign

nationals to noncustodial sentences. This Court should do the same. In *United States v. Connolly*,

No. 16-cr-370 (CM) (S.D.N.Y. Oct. 24, 2019), for instance, the court observed the following about

the co-defendant, a United Kingdom citizen convicted of wire fraud and conspiracy in what the

Government called one of the most appalling financial crimes in recent history:

> If I could sentence Mr. Black to a term of incarceration – a brief term of
> incarceration – knowing that he would go to a facility appropriate to his criminal
> conduct, I would do it. But I know that I can't. I know that simply because he is a
> noncitizen – and I use that term advisedly. He is not an illegal alien. But because
> he is a non-citizen, he will not be eligible to service his sentence in the same way
> that any American citizen who stood convicted of this crime would serve. And that's
> not right.
>
> . . . [Moreover], for reasons I cannot comprehend, at the end of that term he could
> not walk out the door and be picked up by [his attorney] and taken to the airport.
> He would be treated like an illegal alien, and he would be released into the custody
> of ICE, and at some point long after my intended sentence had expired he would be
> deported. And that's not right.

---

[32] Horror stories about the "barbaric" and abusive conditions of confinement in ICE detention are well
documented. *See* U.S. Dep't of Homeland Sec. Off. of Inspector Gen., Concerns About ICE Detainee
Treatment and Care at Four Detention Facilities at 3 (June 3, 2019) (observing "issues with expired food,"
"dilapidated and moldy [bathrooms]," and "significant health and safety risks"); Tom Dreisbach,
Government's Own Experts Found "Barbaric" and "Negligent" Conditions in ICE Detention, NPR (Aug.
16, 2023) (examining more than 24 facilities across 16 states and finding "unsafe" and "filthy" conditions,
as well as unjustified uses of force, and medical and mental health care so negligent it was deadly).

> . . . I can't bring myself to impose a sentence of incarceration in the United States for Mr. Black.

Sent'g Tr. 91:4–92:9, ECF No. 451; *see also* Sent'g Tr. 42:7–12, *United States v. Cohen*, No. 19-cr-741 (WHP) (S.D.N.Y. June 16, 2020), ECF No. 48 (imposing home confinement for non-citizen defendant convicted of insider trading because of the harsh imprisonment conditions and ICE detention defendant would face compared to a citizen).

Courts in other districts have done the same. *See, e.g.*, Sent'g Tr. 97:25–100:5, *Desai*, No. 19-cr-864 (TMD) (N.D. Ill. June 14, 2024), ECF No. 850 (imposing sentence of 1 day in BOP custody and 3 years of supervised release because, although the court believed that the non-citizen defendant deserved to go to jail, the court refused to "put someone in the position where they can be physically abused or extorted."); Order on Sent'g at 11–12, *United States v. Potapenko*, No. 22-cr-185 (RSL) (W.D. Wash. Aug. 25, 2025), ECF No. 241 (imposing noncustodial sentence because court was "gravely concern[ed]" about the ramifications for first-time, nonviolent, white-collar offender who, as a noncitizen, would "face a significantly longer and harsher term of imprisonment in this country" than would his American counterparts "receiving the same sentence for the same crime"). The Court should do the same here.

## D.  A Non-Custodial Sentence is Appropriate Considering Mr. Amar's Post-Trial Assistance

In sentencing Mr. Amar, the Court should consider his actions since trial, including his cooperation on asset seizure and forfeiture, as well as his proactive assistance on removal. A sentencing court can adjust downward for "circumstances of a kind not adequately taken into consideration" by the Guidelines. U.S.S.G. § 5K2.0(a)(2). "[A]ny such circumstance" counts. *Id* at § 5K2.0(a)(2)(A).

**First**, Mr. Amar continues to engage with the Government in an effort to reach agreement on the forfeiture amount. It was the Government's burden to prove what portion of that $2.4 million was traceable. *See United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013); *United States v. Kenner*, 443 F. Supp. 3d 354, 363 (E.D.N.Y. 2020). By consenting to forfeiture, Mr. Amar is taking steps to help the Government avoid expending additional resources (i.e., having to call witnesses or conduct a hearing) to meet its burden of proof.

**Second**, Mr. Amar went to great lengths to fix up, market, and sell his family home, a substitute and non-fungible asset, without being asked to do so. He spent months negotiating with his former contractor on a lien amount, unfinished improvements, and outstanding permits to fetch a higher sales price. He handled the sale himself when he could have left it to the U.S. Marshall Service. Defendants rarely make it easier to forfeit any assets, let alone an asset as important and sentimental as a family home, nor go out of their way to maximize the Government's profits. Mr. Amar did all of that.

**Third**, Mr. Amar's cooperation on forfeiture began years ago. After the Government froze his accounts in April 2023, and his post-JP Morgan employer fired him, Mr. Amar had little money and struggled to get work. But he never missed a single mortgage payment or let his house fall into default. Instead, he and Noa borrowed hundreds of thousands of dollars from family to effectively preserve the Government's interest in his house and ensure it was in a position to maximize any eventual forfeiture. The Probation Office alludes to this rare effort and the sacrifices it required. *See* PSR at 53 ("[T]heir family relied on significant financial assistance from family members to afford their expenses which they can no longer do as their family's resources have been depleted.").

**Fourth**, Mr. Amar appreciates that in light of his conviction, he will be deported when he completes his sentence. In recognition of that reality, and mindful of the unnecessary cost and burden that any subsequent immigration proceedings would place upon an already overburdened system, Mr. Amar has taken affirmative steps to enter into a stipulated order of removal with the Government. This order will greatly facilitate Mr. Amar's deportation upon the conclusion of his sentence. This act, alone, will save the Government considerable resources, and demonstrates yet another way that Mr. Amar—although maintaining his innocence—has made efforts at every reasonable turn to ease the burden his conviction has placed upon the United States.

In sum, Mr. Amar's post-conviction efforts to work with the Government on resolution of various issues set him apart from many other fraud defendants, and the Court should consider these efforts in determining a just sentence.

### E.  A Noncustodial Sentence Provides Specific and General Deterrence

A custodial sentence is not necessary to protect the public from Mr. Amar or to deter potential offenders from committing a similar crime under 18 U.S.C. § 3553(a)(2)(B).

**First**, Mr. Amar is unlikely to commit another offense. Mr. Amar's many letters in his support prove that his short time at Frank was an aberration—something with which the Probation Office agrees. *See* PSR at 53–54 ("Amar, who is now 51 years old, has otherwise been a law-abiding and contributing member of society. . . Amar's behavior was opportunistic and aberrant in that he has never committed a prior criminal offense."). As a 51-year-old first-time offender, he is, statistically, almost guaranteed not to reoffend.[33] His ruined reputation, loss of livelihood, and need

---

[33] See *United States v. Hernandez*, No. 03-cr-1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24,

to provide for his wife and children precludes any remaining risk of recidivism. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("[H]aving suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result"); *United States v. Olis*, No. 03-cr-217 (SL), 2006 WL 2716048, at *13 (S.D. Tex. Sep. 22, 2006) (imposing below-Guidelines sentence where "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

**Second**, Mr. Amar does not need to be incarcerated at all, never mind as harshly as Probation recommends, to deter the public. As an initial matter, "[i]t is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes." *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("[C]onsiderable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); Sent'g Tr. 89:23–90:11, *United States v. Connolly*, No. 16-cr-370 (CM) (S.D.N.Y. Nov. 4, 2019), ECF No. 451 (imposing time served in part because "a long period of incarceration . . . is simply not needed to accomplish the goal of general deterrence" given significant "collateral consequences").

In any event, "one word—deterrence" cannot outweigh the "totality of the circumstances in this case," meaning that it cannot by itself override the limited nature of Mr. Amar's offense

---

2005) (finding offenders over the age of 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants" and thus imposing below-Guidelines sentence); *United States v. Hodges*, No. 07-cr-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting "inverse relationship between age and recidivism" and "tak[ing] into account the defendant's age in fashioning his sentence"); *United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citing defendant's age and lower rates of recidivism as grounds for imposing below-Guidelines sentence).

conduct, his minimal culpability compared to Ms. Javice, his near-zero chance of reoffending, the collateral consequences he and his family have already suffered and will continue to suffer, and the other factors that compel a noncustodial sentence, including significantly his deportation. *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013); *id.* at 381 (Underhill, J., concurring).

### F.  A Noncustodial Sentence Provides Just Punishment

A custodial sentence is unnecessary for just punishment under 18 U.S.C. § 3553(a)(2)(A) because "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, No. 10-cr-598 (JG), 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012). Collateral consequences are just as- and in some cases, more—important. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider "collateral consequences facing a convicted defendant"). There are many collateral effects here that make a noncustodial sentence sufficient punishment for Mr. Amar. Mr. Amar has already endured significant punishment. By any measure, the highly publicized charges and trial in this case have destroyed Mr. Amar's good name, and they have stripped him of his career and livelihood. Despite his best efforts, he has struggled to maintain consistent employment and was fired from the job he held after JP Morgan even before trial began. He will never again use the marketing skills he developed over a lifetime and moved across the world to devote to Frank's students.

Mr. Amar's liberty has also been greatly restricted for the better part of 3 years. He has not been able to travel to see his 87-year-old ailing father since his indictment in July 2023. His children have also felt his absence every day. As Mr. Amar remained in the United States pending trial, he could not proudly watch his son ███████████████████. ██ remembers

that day as "marking a significant step into adulthood ███████████████, and [Mr. Amar's] absence was a void that couldn't be filled." Ex. A-5 at 3. █████████████████████████ ████████████████, fears that her father will also miss this moment, one that should otherwise be "filled with pride, fear, love, and memory." Ex. A-4 at 3.[34]

And Mr. Amar will continue to suffer, regardless of the Court's sentence. The same collateral consequences will follow him to Israel, his home country, where already the media is characterizing him as a disgrace, known as Ms. Javice's "Israeli right-hand."[35] Further, the SEC and civil action, and their attendant civil penalties, continue to weigh on Mr. Amar.

Each of these collateral and deeply-felt punishments counsel in favor of a noncustodial sentence. *See United States v. Sponaugle*, No. 19-cr-103 (LPS), 2022 WL 4079197, at *6–7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of a noncustodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects," and impact on defendant's reputation); *United States v. Roth*, No. 05-cr-792 (JWD), 2008 WL 686783, at *2–3 (N.D. Ill. Mar. 11, 2008) (finding noncustodial sentence for defendant who did not "initiate or design the fraudulent scheme" was justified in part by "great embarrassment and humiliation" already suffered from "[t]he publicity regarding [defendant's] conduct" and defendant's loss of law license).

---

[34] ████████████████████████████████████████████████████████████████████ ███████████████████. The Court should consider the impact of even a short custodial sentence for Mr. Amar on ██████████████████████. *See United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (defendant's "family circumstances and the effects of his incarceration on his daughter" a mitigating factor).

[35] Assaf Gilad, The Lesser-Known Israeli Who Was Convicted in the Case That Is Stirring Investors in the US, GLOBES (Heb.) (Mar. 30, 2025); Ofir Dor, The Founder of the Startup Frank and Her Israeli Right-Hand Were Convicted of Fraud, THE MARKER (Heb.) (Mar. 29, 2025).

Even if the Court finds that additional punishment is necessary, there are other "kinds of sentences available" to it, 18 U.S.C. § 3553(a)(3), including the option to order a term of supervised release, probation, community service, or even home confinement for Mr. Amar to complete in Israel after his removal proceeding.[36] Courts routinely take this approach in cases with foreign defendants. *See* Sent'g Tr. 42:6–43:4, *United States v. Saltsman*, No. 07-cr-641 (NGG), (E.D.N.Y. July 28, 2010), ECF. No. 163 (sentencing defendant to probation in Israel, including community service); Judgment at 5, *United States v. Phillips*, No. 22-cr-138 (LJL), (S.D.N.Y. June 25, 2024), ECF No. 124 (sentencing defendant to time served and 2 years of supervised release in London and South Africa); Judgment at 5, *United States v. Connolly*, No. 16-cr-370 (CM), (S.D.N.Y. Nov. 13, 2019), ECF No. 456 (sentencing defendant to 3 years of supervised release in United Kingdom).

### G. A Noncustodial Sentence is Warranted Considering the Overstated Impact of Loss

Even if the Court accepts Probation's Guidelines calculation, it should deviate substantially therefrom because the 26-level loss enhancement balloons Mr. Amar's sentence to the top 10% of the Guidelines, where it is "unreasonable as a matter of law." *United States v. Parris*, 573 F. Supp. 2d 744, 755 (E.D.N.Y. 2008) (finding same for 18-level loss enhancement); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding because enhancement caused 12-level increase and finding that when "Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence").

---

[36] Such an order could require Mr. Amar to waive extradition so that he will face the Court if he violates the terms in Israel.

There is perhaps "no better illustration of the irrationality of [the loss enhancement] than the instant case" because it "exclusively" accounts for 66% of Mr. Amar's Guidelines points despite being "incidental" to his culpability and the harm he caused, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), "dwarf[ing] other potentially more relevant considerations" such as his limited role and the unique financial status of the victim, Jillian Hewitt, Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases, 125 YALE L.J. 1018, 1033 (2016), and failing to "fairly convey the reality of the crime or the criminal," Jed S. Rakoff, Why the Federal Sentencing Guidelines Should Be Scrapped, 29 Fed. Sent'g Rep. 226, 227 (2017).

These flaws are not unique to Mr. Amar's case: More than 50% of courts impose a below-Guidelines sentence in cases involving the loss enhancement. *See* Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18.2 OHIO ST. J. CRIM. L. 605, 621–622 (2021). For years, courts have described the loss enhancement as an "utter travesty of justice," *Adelson*, 441 F. Supp. 2d at 512, 515; "a black stain on common sense," *Parris*, 573 F. Supp. 2d at 754; and as something that is "broken," offering no "meaningful guidance," *Corsey*, 723 F.3d at 378 (Underhill, J., concurring). Given the outsized role loss plays in sentencing, and against this backdrop of widespread criticism, the Sentencing Commission recently announced that it plans to rethink the loss enhancement entirely—a positive development for the criminal justice system, and one that makes clear any loss-based sentence for Mr. Amar would be improper. *See* U.S. Sent'g Comm'n, Press Release, Public Comment Informs Sentencing Commission's 2025-2026 Policy Priorities (Aug. 6, 2025) (unanimous vote to prioritize examining loss enhancement and fraud guidelines).

Here, the 26-level loss enhancement is "a relatively weak indicator of the moral seriousness of [Mr. Amar's] offense." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004);

*United States v. Johnson*, No. 16-cr-475 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (enhancement does not "result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of [it]"). To begin, the Government did not adduce any loss evidence at trial, and the jury did not make a finding on loss. *See supra* § IV.B. The Government's heavy focus at trial on Capital One—a potential buyer which did not suffer a loss because of the purported fraud—further proves the point: Loss is not relevant to what the Government thinks Mr. Amar did wrong and is not a surrogate for the harm he supposedly caused. *See* Tr. 2259:14–18.

The 26-level loss enhancement is further flawed because it treats all dollars of fraud loss identically and fails to account for important differences in the nature and identity of the victim that merit consideration in the sentencing decision. This "one-shoe-fits-all" approach should be rejected. *Accord Parris*, 573 F. Supp. 2d 744, 755 (E.D.N.Y. 2008) (disagreeing with the Guidelines' "one-shoe-fits-all" approach for its number of victims, officer/director, and manager/supervisor enhancements.). While the $175 million deal price is high, it must be placed in context, and rooted in the facts of this case, which involves the world's biggest and richest bank, with a market capitalization approaching $1 trillion and over $4 trillion in assets under management. *See* JP Morgan Chase & Co., Resolute Annual Report 2024 (April 7, 2025). To put it into perspective, $175 million to JP Morgan is equivalent to $225 to a person who makes a $75,000 salary, and the Bank earned it back in under 2 days of normal business. *See* JP Morgan Chase & Co., Annual Report 2024 Chairman and CEO Letter to Shareholders (April 7, 2025) (reporting JPMC's 2024 revenue at $180.6 billion and net income at $58.5 billion).

Internal correspondence from JP Morgan confirms that the Bank itself viewed the alleged loss amount as inconsequential. *See, e.g.*, DX CJ 133 (David Katz: "He [Andre Ramos] . . . isn't

used to deals so $200mm has sticker shock to them." Ms. Wims Morris: "Too funny re: $200mm – [we're] like aww that's nothing!"); DX CJ 130 (Mr. Katz: "I'm adding an empty bar in the waterfall called table stakes [when a 'new product or investment' requires 'no analysis at all'] . . . equal it to the purchase price"); JPMorgan Chase & Co., 3Q21 Financial Results, Earnings Call Transcript at 12 (Oct. 13, 2021) (Dimon response to Q&A: "[W]e don't need dry powder. We have an extraordinary amount of capital liquidity. I mean, extraordinary. And we earned $40 billion pretax a year. I mean how much dry powder do you need? . . . I think our capital cup runneth over where it is.").[37]

In *United States v. Corsey*, Judge Underhill thoughtfully explained in his concurrence how the context-blind, dollars-driven Guidelines fail to capture that some losses cause real pain to actual people, while others are absorbed by large institutions or entities:

> [N]ot all actual loss is equally serious. A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible.

723 F.3d 366, 381 (2d Cir. 2013), *as corrected* (July 24, 2013) (Underhill, J., concurring).

---

[37] JP Morgan's own financial reporting demonstrates that "loss" is relative. JP Morgan did not account for *any* loss related to Frank in its 2022 accounting, which it publicly filed after it had investigated the purported fraud, terminated Mr. Amar, shuttered Frank, filed civil suit in Delaware, and coordinated with the Government on its criminal investigation. *See* JPMorgan Chase & Co., Investor Relations, SEC Filings, Form 10-K at 151 (Feb. 21, 2023) ("[T]he Firm has concluded that goodwill was not impaired as of December 31, 2022. For each of the reporting units, fair value exceeded carrying value by at least 10% and there was no indication of a significant risk of goodwill impairment based on current projections and valuations."). And the same day JP Morgan's suit went public, JP Morgan's market capitalization *grew* by over $3 billion. *See* Investor Relations, *supra*, at 45.

Other courts in this District have considered these points in determining a just sentence. *See* Sent'g Tr. 37:3–9, *United States v. Phillips*, No. 22-cr-138 (LJL), (S.D.N.Y. June 25, 2024), ECF No. 125 (sentencing defendant to time served for a multi-million dollar fraud in part because it "was [not] committed on the market as a whole or on anonymous victims; it was committed on wealthy investment bank Morgan Stanley); *see also* Sent'g Tr. 91:13–18, *United States v. Milton*, No. 21-cr-478 (ER) (S.D.N.Y. Dec. 18, 2023), ECF No. 322 (distinguishing defendant favorably from Elizabeth Holmes on the grounds that she "market[ed] a technology which affected people's health and their very livelihood, their very life, . . . it was used in very real-life circumstances and resulted in very real life harm to any number of people"). The Court should do the same here.

Given the attenuated connection that loss bears to the seriousness of Mr. Amar's purported conduct or his culpability in this case, and in light of the enhancement's outsized impact, the Court should substantially vary downward from the Guidelines calculation and order a noncustodial sentence.

## VI.    RESTITUTION IS NOT WARRANTED

The Government seeks an astonishing $300 million in restitution for JP Morgan.[38] This covers the deal price ($175 million), ████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████. The Government has not met its burden to show that these amounts were caused by Mr. Amar's conduct, and the Court should decline to order the requested restitution here. *See supra* § IV.B.

---

[38] Specifically, $283,462,397 in restitution would go to JP Morgan and the other $17,460,000 would go to JP Morgan's insurer, Euclid Transactional LLC. *See* PSR ¶ 185.

Pursuant to the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. § 3663, the Court may order restitution only if the Government shows by a preponderance of the evidence that "the specific conduct that is the basis of the offense of conviction" both "directly and proximately" caused a loss. *United States v. Goodrich*, 12 F.4th 219, 228-29 (2d Cir. 2021) (requiring "defendant's conduct" to "have been a necessary factor in bringing about the victim's harm" and that "the defendant could have foreseen the extent of losses that the fraudulent scheme was incurring") (internal citations omitted).

***First***, a non-zero restitution order would violate Mr. Amar's constitutional due process rights under the Fifth and Sixth Amendments because the jury made no findings on loss at trial and, thus, there is no jury verdict as to this aspect of Mr. Amar's sentence. Indeed, the constitutionality of restitution has been recently subject to challenge, based on the Supreme Court's findings in other contexts that "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" *Erlinger v. United States*, 602 U.S. 821, 833 (2024) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *cf. Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., dissenting from denial of cert.) ("[J]ust as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order."); *Rimlawi v. United States*, 604 U.S. ---, 2025 WL 581567 (Mem.), at *1 (Feb. 24, 2025) (Gorsuch, J., dissenting from denial of cert.); *Ellingburg v. United States*, 145 S. Ct. 1899, 2025 WL 1020364 (Mem.) (Apr. 7, 2025) (granting certiorari to decide whether restitution is a criminal rather than civil penalty). Accordingly, a restitution order based on any amount of loss would violate Mr. Amar's constitutional rights under the Fifth and Six Amendments.

**Second**, as discussed *supra* § IV.B, restitution related to the deal price should be $0 because the Government has not proved loss. *See United States v. Sullivan*, 118 F.4th 170, 228 n.35 (2d Cir. 2024) (where Guidelines' loss calculation is limited to actual losses, restitution is too).

**Third**, there is no basis to order Mr. Amar to reimburse JP Morgan for legal fees advanced to firms representing Mr. Amar or Ms. Javice in this action, ███████████. Pursuant to 18 U.S.C. § 3663A(b)(4), a restitution order may allow for reimbursement of "lost income, child care, transportation, and other expenses incurred during and directly related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." The Supreme Court has found: "The words 'investigation' and 'proceedings' in subsection (b)(4) of the [MVRA] are limited to government investigations and criminal proceedings and do not include private investigations and civil or bankruptcy proceedings." *Lagos v. United States*, 584 U.S. 577, 577 (2018). Furthermore, the Supreme Court has held that "participation" refers to "a victim's role in a government's investigation and in the criminal proceedings that a government conducts" and does not "describe a victim's role in its own private investigation and as a party in noncriminal court proceedings." *Id*. Finally, the Supreme Court noted that the statute's listing of specific types of expenses—i.e., lost income, child care, and transportation—demonstrates "precisely the kind of expenses that a victim is likely to incur when missing work and traveling to participate in a government investigation or to attend criminal proceedings." *Id.* at 577–78.

With this framework in mind, courts in the Second Circuit have "identified three categories of legal expenses for which a corporate victim may seek restitution: (1) responding to subpoenas and requests from the Government in connection with assisting in the prosecution; (2) preparation of witnesses who testify at trial; and (3) preparation of materials in support of a post-verdict request for restitution." *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG, 2022 WL 452385, at *5

(S.D.N.Y. Feb. 14, 2022), *aff'd*, 81 F.4th 171 (2d Cir. 2023). None of these circumstances apply here, and the legal fees at issue plainly do not constitute the type contemplated by § 3663A(b)(4) As such, they are not recoverable.

To begin, the fees are not the victim's (JP Morgan's) own expenses incurred "during and directly related to participation in the investigation or prosecution of the offense." *See* 18 U.S.C. § 3663A(b)(4). In fact, no such fees or expenses are included in JP Morgan's Victim Impact Statement. Instead, the Victim Impact Statement refers vaguely to "ongoing legal fees" that JP Morgan "has advanced" to date, listing various fees incurred by various law firms and consultants retained by Mr. Amar and Ms. Javice, without regard for time or even proceeding at issue. For years, Mr. Amar and Ms. Javice have been defending against three actions: (1) the instant criminal matter; (2) a now-stayed parallel proceeding brought by the U.S. Securities & Exchange Commission ("SEC"); and (3) a private civil suit brought by JP Morgan in Delaware federal court. They also retained counsel in connection with JP Morgan's private investigation, predating the filing of any complaints. All of the legal fees that Mr. Amar and Ms. Javice have incurred in connection with these actions and investigations have been advanced by JP Morgan pursuant to existing contractual obligations. A court order from the Court of Chancery in Delaware requires as much.

The Victim Impact Statement does not make clear which of these legal fees are included in the lump sums provided therein. To the extent these fees were incurred in connection with JP Morgan's internal investigation, the SEC action, or the private civil suit, they are plainly not recoverable. And to the extent these fees pertain to fees incurred in the instant criminal case, they still are not recoverable. Any legal fees advanced to Mr. Amar to pay for his representation against the Government's allegations did not "assist" the Government's prosecution. *See Avenatti*, 2022

WL 452385, at *5 (discussing cases in which restitution is allowed for expenses incurred by a victim in connection with assisting "government investigations and criminal proceedings"). Far from it, these fees were used to oppose and defend against it.

What is more, these fees were incurred in connection with Mr. Amar and Ms. Javice's defenses, which JP Morgan paid pursuant to preexisting contractual commitments providing certain indemnification and advancement rights. In this regard, Mr. Amar's conduct did not cause JP Morgan to incur the fees; rather, JP Morgan had an independent obligation to do so, which arose before the alleged fraud occurred. *See Sullivan*, 118 F.4th at 233 (finding district court did not abuse its discretion in determining, based on a lack of causation, that energy cooperative was not entitled to restitution under MVRA from defendant executives, who were convicted of theft, for amounts paid by cooperative for defendants' legal fees, where cooperative had decided on its own initiative to pay the legal fees in accordance with its bylaws and a contract that it willingly executed). That obligation flows from Frank's bylaws (which JP Morgan acquired in the deal) and the Merger Agreement (which preserved the bylaws), covers Mr. Amar's legal fees through final appeal, and dictates the process for recovery. *See* Br. Ex. A § 8.6, Ex. B § 6.2(a), *Olivier Amar v. JPMorgan Chase Bank, N.A.*, No. 23-0040 (KSJM) (Del. Ch. Jan. 13, 2023). Reimbursing JP Morgan now is not only improper under § 3663A(b)(4) but would be premature and would preempt the state advancement litigation.

## VII.    <u>CONCLUSION</u>

In undertaking the weighty task of sentencing Mr. Amar, we respectfully urge this Court to view this case and this individual in their entirety—to remember that Olivier Amar is a good man, with no prior record, who has spent his life supporting others. He did not design, direct, or lead the alleged scheme. His relative role, even in the Government's version, was minor. And while the

world's biggest bank might have paid more for Frank than it was worth, Frank was not a sham company, and none of Mr. Amar's alleged conduct actually caused any loss to JP Morgan, much less $174 million dollars' worth of loss. This context alone—particularly when considered against the backdrop of a lifetime of kindness and service—warrants leniency. But there is more, including the consequences Mr. Amar has already suffered, the unwarranted sentencing disparities he will face as a noncitizen, the collateral consequences of his conviction on his family, and the outsized and unwarranted impact of the loss enhancement. Considering all of the factors, and for the reasons set forth above, we respectfully submit that a noncustodial sentence is sufficient, but not greater than necessary, for Mr. Amar in this case.

Dated: September 29, 2025

Respectfully submitted,

**KOBRE & KIM LLP**

*/s/ Alexandria E. Swette*
Alexandria E. Swette
Jonathan D. Cogan
Jessica Fender
A. Zoe Bunnell
800 Third Avenue
New York, NY 10022
Tel: (212) 488-1200
Alexandria.Swette@kobrekim.com
Jonathan.Cogan@kobrekim.com
Jesse.Fender@kobrekim.com
Zoe.Bunnell@kobrekim.com

Matthew I. Menchel
Victoria R. Fordin (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Tel: (305) 967-6100
Matthew.Menchel@kobrekim.com
Victoria.Fordin@kobrekim.com

Jake Rush (admitted *pro hac vice*)
1919 M Street, NW
Washington, DC 20036
Tel: (202) 664-1900
Jake.Rush@kobrekim.com