UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                :

UNITED STATES OF AMERICA       :
                                :

            - v. -           :   S1 23 Cr. 251 (AKH)
                                :

OLIVIER AMAR               :
                                :

              Defendant.     :
                                :

------------------------------------------------------x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

AMANDA HOULE
Attorney for the United States,
Acting under Authority Conferred by
28 U.S.C. § 515

Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

*- Of Counsel*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ......................................................................................... 1

II. PROCEDURAL BACKGROUND .................................................................................... 2

III. STATEMENT OF FACTS ............................................................................................... 3

    A. Background ................................................................................................................... 3

    B. The Defendants Told Lies During Diligence ............................................................... 4

    C. The Data Validation Exercise ...................................................................................... 7

    D. The Acquisition ............................................................................................................ 9

    E. The Defendants Purchased Data To Cover Up Their Fraud ......................................... 9

    F. Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers and Sent Purchased Data .............................................................................................. 12

    G. The Frank Marketing Campaign Was a Disaster ....................................................... 14

    H. The Defendants Lied To JPMC's Investigators, and Javice Brought False Civil Claims Against JPMC ............................................................................................................. 14

IV. GUIDELINES CALCULATION ................................................................................... 15

    A. The Guidelines Loss Amount Is Approximately $174 Million .................................. 16

    B. A Mitigating Role Adjustment Is Wholly Unwarranted ........................................... 32

    C. The Sophisticated Means Enhancement Applies ....................................................... 36

    D. Amar Has Not Accepted Responsibility and Should Not Receive a Reduction ............. 38

V. THE SENTENCE ............................................................................................................ 38

    A. The Nature and Circumstances of the Offense Warrant a Lengthy Sentence ................. 39

    B. Specific Deterrence is Required ................................................................................. 40

    C. A Lengthy Sentence is Necessary for General Deterrence ............................................ 42

    D. The Need to Avoid Unwarranted Sentencing Disparities .......................................... 45

    E. Amar Cannot Game the Immigration System to Shorten His Sentence ......................... 47

    F. Amar's "Post-Trial Assistance" on Forfeiture Is Self-Interested ................................... 50

VI. FORFEITURE ............................................................................................................... 50

VII. RESTITUTION ............................................................................................................. 52

VIII. CONCLUSION ............................................................................................................ 55

## I.  PRELIMINARY STATEMENT

The Government respectfully submits this memorandum to assist the Court in determining the appropriate sentence for defendant Olivier Amar.

Our "system of justice" is "dedicated to a search for truth."  *Nix v. Whiteside*, 475 U.S. 157, 174 (1986).  The truth in this case is that Olivier Amar—no less than his co-conspirator Charlie Javice—is guilty of committing a brazen fraud out of greed.  That is why a jury of twelve citizens, after hearing evidence and argument over six weeks, returned a verdict unanimously finding Amar guilty beyond any reasonable doubt.  That is why this Court remarked that the jury's verdict was "reasonable" (Tr. 3911), and subsequently held that "[t]here was ample evidence" supporting Amar's guilt. (Dkt. 415 at 9).  It is why this Court found the evidence showed that Amar "heard Javice repeatedly lie about [the Frank user] number to the banks while also assisting her in making and concealing those lies," and that "[i]ndeed, Amar himself made misrepresentations about the number of Frank users to Capital One in the July 8, 2021 meeting, and . . . lied to Chase employees about the number of Frank users in January 2022."  (Dkt. 415 at 9-10).

In the face of this truth, Amar seeks to minimize his way to unwarranted leniency by continuing to blatantly distort the facts.  It is one thing to avoid acknowledging guilt and preserve one's issues for appeal.  But it is another to continue to minimize and misrepresent indisputable facts.  Amar repeatedly asserts, for example, that he "did not personally lie to anyone."  (Amar Sub. 2; *id.* at 15-16 ("the Government did not present any evidence that Mr. Amar made a single false statement during due diligence"); *id.* at 28 ("The Government did not allege that Mr. Amar made a single false statement to JP Morgan, either before or after the acquisition closed.")).  That itself is false, as the Court has already found.  (Dkt. 415 at 9-10).  Similarly, Amar asserts that his "misconduct boiled down primarily, if not exclusively, to a few days in early August 2021" related

to buying data.  That, too, is false, as the Court has already found.  (Dkt. 415 at 9-10).  Far from calling for leniency, Amar's persistent misrepresentations and minimizations about his *proven* misconduct make the rendering of a substantial sentence all the more important, lest his sentencing be seen to do disservice to the virtue paramount in our system of justice: the truth.  The truth is that Amar committed a serious crime, a $175 million fraud, and that his criminal conduct deserves a serious punishment.

In the end, the Court must satisfy the purposes of sentencing set forth in 18 U.S.C § 3553(a) by imposing a sentence that delivers just punishment for what Amar chose, repeatedly, to do, and that promotes respect for the law. A significant sentence will be required to deter Amar—who, to this day, falsely proclaims his innocence and fails to accept *any* responsibility for his crimes—and to signal to those similarly situated that their misrepresentations to investors will be met with serious sentences. For the reasons that follow, the Government respectfully submits that the sentence of 120 months' imprisonment recommended by the Probation Office is an appropriate sentence to satisfy the goals of sentencing.  Nonetheless, in light of co-defendant Javice's sentence of 85 months, the Government recommends a sentence of no less than 72 months' imprisonment. In addition, the Court should order Amar to forfeit his criminal proceeds and direct him to pay victim restitution.

## II.  PROCEDURAL BACKGROUND

On July 12, 2023, a grand jury in this District issued a superseding indictment charging the defendants in four counts.  Count One charged the defendants with conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349.  Count Two charged the defendants with wire fraud, in violation of Title 18, United States Code, Section 1343. Count Three charged the defendants with bank fraud, in violation of Title 18, United States Code,

Section 1344.   Count Four charged the defendants with securities fraud, in violation of and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

On March 28, 2025, following a six-week trial, the jury returned guilty verdicts on all counts against each defendant.

## III.  STATEMENT OF FACTS

### A.  Background

Javice founded Frank in or about 2017 and served as its CEO until its acquisition in September 2021.   Amar was Frank's Chief Growth Officer.   Frank was a startup focused on college, and its flagship tool was designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA").

As of 2021, Frank had, at most, approximately 500,000 user accounts, the majority of which were related to the FAFSA tool.  (Tr. 454:1-5; 17-21; GX 802-60).   In order to create a FAFSA account with Frank, an individual needed to provide his or her first name, last name, email address, and phone number.  (GX 214).   Frank saved and maintained the data provided by its users, including the detailed information that users submitted as part of their FAFSA application, which included information about demographics, student finances, and parent finances.  (GX 3.1.12).   As of August 2021, approximately 142,000 FAFSA applications had been completed using Frank's FAFSA tool.  (GX APP).

In January 2021, Frank began the process of putting itself up for sale.   Around the same time, Javice directed that Frank start referring to Frank's website visitors, *i.e.*, someone who merely clicked on Frank's website—for whom Frank collected no personally identifying information (or "PII")—as a Frank "user."   While Frank only had several hundred thousand customers, *i.e.*, people who had created an account by providing their name, email, and address,

3

Frank's website had more than 4 million visitors. (Tr. 986). Thus, by referring to website visitors as "users," Frank was able to claim it had millions of users.

**B. The Defendants Told Lies During Diligence**

In early 2021, Frank retained an investment bank, LionTree LLC, to advise on a potential sale of the company. Javice repeatedly told LionTree, falsely, that Frank had 4.25 million users and that a "user" was someone who had created a Frank account by providing their full name, email, and home address. (Tr. 142, 147, 211; GX 3034). Javice repeated these same lies to potential buyers—at times with Amar's participation or knowledge.

**1. Capital One**

The first serious potential buyer was the bank Capital One. Capital One was interested in exploring an acquisition of Frank for the opportunity to engage with a very large audience of young people and to sell banking products to them. (Tr. 2110-11, 2118-19, 2129). Consistent with the lies Javice had told to LionTree, Javice also lied to Capital One, asserting that Frank had 4.25 million users and that a user was someone who had created a Frank account by providing their name, email, and address. (Tr. 2111, 2123, 2133, 2139, 2142, 2143, 2148). During its diligence, Capital One representatives primarily met with Javice and Amar. As the Frank employee most knowledgeable about users, Amar responded to Capital One's questions about users, along with Javice. (Tr. 2183, 2285).

In response to a request for more detailed information about Frank's user base, Javice and Amar prepared a purported monthly breakdown of "user" signups across all Frank products since 2017, which became the data room document named "3.1.4 User Breakdown." (*See* GX CAP 3.1.4; GX 3.1.4; GX 521). The defendants' account breakdown spreadsheet falsely showed that more than 4.265 million Frank users had started a FAFSA application, and that more than 2.1

million Frank users had completed a FAFSA application. (GX 3.1.4). In truth, approximately 500,000 Frank users, at most, had created an account and thus could have started a FAFSA application, and less than 142,000 completed a FAFSA application. (*See* Tr. 1580). Javice and Amar had inflated the number of Frank accounts by roughly a factor of ten.[1]

On July 7, 2021, Capital One requested a meeting with Amar to discuss questions related to Frank's users, including "FAFSA starts and completions." (GX 1691). The meeting occurred virtually on July 8, 2021. (GX 3041; GX 2036). In advance of the meeting, LionTree emailed to Capital One a PowerPoint that Amar and Javice had created with LionTree. (*See* GX 3040). That PowerPoint, reviewed and approved by Amar and Javice, contained blatant falsehoods relating to Frank's FAFSA customers.

Ultimately, Capital One declined to move forward with an acquisition of Frank.

### 2. JPMC

In the summer of 2021, JPMC also expressed significant interest in acquiring Frank. During that diligence process, Javice and Amar told the same lies to JPMC that they had previously told to Capital One. Among other things, JPMC received, early on, the defendants' fraudulent monthly breakdown of Frank's users, which had been prepared by the defendants in connection with Capital One's diligence. (*See* GX 3.1.4; GX 1692 (in response to an urgent question on July 8, 2021 from JPMC regarding the number of Frank households, LionTree directed JPMC to the 3.1.4 User Breakdown spreadsheet in the data room); Tr. 211 (Cowan testifying that the JPMC diligence process was "[m]uch smoother" because they had "been through essentially a whole—

---

[1] In fact, the figures in the fraudulent 3.1.4 spreadsheet did not even accurately represent what Google Analytics calls "users," that is, *unique* website visitors. Rather, the figures in the 3.1.4 spreadsheet represented what Google Analytics calls "sessions," that is, *not* unique hits on the Frank website. (*See* GX 414; Tr. 1087).

the majority of the second-round process with another buyer [Capital One]")).  JPMC ultimately

acquired Frank for $175 million based on the defendants' lies about Frank's users.

JPMC's diligence process began in early July 2021.  On July 2, 2021, Javice emailed

updates to Leslie Wims Morris, JPMC's head of corporate development.  The first update related

to customer acquisition, and falsely claimed that Frank had generated 200,000 new customer

accounts from a single marketing email and that five to seven million visitors came to the Frank

website monthly.  (GX 1590).  In reality, Frank had, in total since 2017, just a few hundred

thousand customer accounts and approximately 4 million non-unique website sessions.  Javice

repeated these types of lies about Frank's accounts and website visitors throughout JPMC's

diligence.

In at least one instance, Amar was present when Javice lied to JPMC about Frank's users.

During a July 12, 2021 diligence session about Frank's users, with Amar present, Javice falsely

claimed that a Frank user was someone who had supplied their name, email, and address, and that

Frank had 4.25 million such users.  (Tr. 2297; GX 2035 (Zoom record showing Amar's attendance

at the second half of the July 12 diligence session)).  Javice repeated these lies to JPMC executives

throughout JPMC's diligence outside of Amar's presence as well.  (Tr. 570, 1450; GXs 1140,

3.1.4).

Frank's customer base was the "main source of value" to JPMC and thus Frank's customer

volume as well as the quantity and type of data that Frank collected from its customer base were

critical to JPMC's evaluation of the value of a potential acquisition.  (Tr. 1393, 1395, 1407).

Among other things, JPMC wanted to assess the degree of "personal and confidential" information

provided by Frank's customers, which was relevant to the "established . . . level of trust" between

Frank and its customers and its ability to do business with those customers in the future.  (Tr. 1395,

1431). The more engaged a Frank customer was, the more likely it was that that customer could be converted to a JPMC customer. (Tr. 1391). Based on data provided by Frank during diligence, JPMC estimated it could convert a certain percentage of Frank customers to JPMC customers, which was the sole source of value to JPMC. (GX 1591). Thus, the defendants' false statements about the number of customers had a vast impact on JPMC's valuation. Based on the defendants' lies, JPMC projected it could generate more than $500 million in revenue from selling banking products to Frank's customers. (GX 1591). Had JPMC known the truth—that Frank only had a few hundred thousand users—the bank would not have acquired Frank. (Tr. 635-36, 1398).

## C.  The Data Validation Exercise

Given the importance of Frank's customer base and its user data, JPMC asked to review Frank's customer list as part of diligence. (Tr. 615-619). Javice initially refused, citing customer privacy concerns. (Tr. 615). JPMC proposed alternative solutions and ultimately told Javice that the deal would not move forward unless JPMC was able to validate Frank's customer list. (Tr. 621; GX 1070, 1071). Specifically, on August 1, 2021, JPMC told Javice that the bank would not proceed with the acquisition unless a third party, Acxiom, reviewed Frank's customer list to confirm the number of customer accounts and the types of data Frank possessed for each of those customers. (Tr. 621; GX 1070, 1071). The same day, Javice informed Amar of JPMC's request. (*See* GX 1147; GX 801-2). Over the course of the next several days, Javice and Amar used synthetic data to create a list of 4.25 million fake users in order to fraudulently pass the data validation exercise.

### 1.  Patrick Vovor

Javice and Amar first asked one of Frank's engineers to create synthetic data. On August 1, 2021, the same day that JPMC made data validation a condition to the acquisition, Javice asked

Frank's chief engineer, Patrick Vovor, if he could create a list of 4.25 million fake customers that had the same statistical attributes as Frank's actual customers. (Tr. 1529; GX 1762). The following day, Amar repeated the request for fake data to Vovor in greater detail. In a three-way video call between Amar, Javice, and Vovor,[2] Amar asked Vovor "to take the FAFSA data [for Frank's real customers] and generate a bigger file of 4 million users that would have FAFSA data . . . ."—i.e., the data that a Frank customer would supply when using the FAFSA product. (Tr. 1661; GX 1066). Amar showed Vovor a spreadsheet that listed the data fields for which they needed fake data for 4.265 million fake people. (GX G506). Vovor asked Javice and Amar if their request to create this data was legal and expressed concern that Frank's general counsel was not present. (Tr. 1564, 1575). Amar avoided the question, and Javice said that she did not want to end up in an orange jumpsuit, referring to prison clothes. (Tr. 1575-76). Ultimately, Vovor told Javice and Amar that he would not do anything illegal, and he refused Javice and Amar's request to create fake data for JPMC's data validation request. (Tr. 1576).

### 2. Dr. Adam Kapelner

The defendants then turned to Javice's friend from college, Dr. Adam Kapelner, an associate professor of mathematics at Queens College. Javice explained that she was "in an urgent pinch." (GX 2801). Javice asked Kapelner to do the same thing that Amar and Javice had asked Vovor to do: create a list of 4.25 million users with synthetic data. Unlike Vovor, who knew that Frank had nowhere close to 4.25 million customers, Kapelner did not work at Frank. Javice led Kapelner to believe that Frank actually had 4.25 million customers and that synthetic data was needed to protect these purported customers' personally identifiable information. (GX 1752). Javice and Amar prepared instructions on how much fake data to generate, so the data counts

---

[2] A video call invitation was circulated to Javice, Amar, and Vovor on August 1, 2021. (GX 1762).

would match their previous lies to JPMC.  (*See* GX G72, G73).  Javice then spoke on the phone with Kapelner.  After the call, Javice texted Amar: "I found my genius. He says it will take him an hour." (GX 801-10).  Kapelner worked around the clock creating the defendants' fake data, and on August 5, 2021, at Javice's direction, Kapelner submitted the final product—a list of 4.25 million fake people with fake data—to Acxiom, the third party that JPMC had selected to validate Frank's user data.  Acxiom then confirmed to JPMC that Frank's customer list contained 4.265 million total customers.  (GX 1292A).

### D.   The Acquisition

On August 8, 2021, after confirming the existence of the purported 4.265 million customers, JPMC signed a merger agreement to acquire Frank for $175 million.  (GX 2000).  In exchange for their equity, Javice received over $28 million in merger proceeds, and Amar received over $5 million in merger proceeds.  (CJ 2171).  JPMC also entered into employment agreements with the defendants.  (GX 2027, 2028).  JPMC also agreed to pay Javice a $20 million retention bonus over the course of three years, and to pay Amar a $3 million retention bonus over two years, both in addition to their salaries and incentive compensation.  The following month, the acquisition closed.

### E.   The Defendants Purchased Data To Cover Up Their Fraud

Beginning on August 2, 2021, one day after JPMC made its data validation request, the defendants undertook an effort to acquire millions of records of student data in order to cover up their brazen fraud—*i.e.*, to acquire a "customer list" consisting of real people with real contact information that could be sent to JPMC when JPMC inevitably asked for the customer list to conduct cross-marketing.  While the defendants ultimately purchased data from ASL Marketing ("ASL"), the defendants contacted—and discussed contacting—several different data and

marketing analytics companies, including Exact Data, Acxiom, mParticle, Narrative, LiveRamp, and TransUnion.   As reflected in their WhatsApp chats, the defendants initially appeared to be looking for a company that could provide additional PII for Frank's website visitors.   The defendants ultimately abandoned that effort and instead purchased millions of student records outright from ASL.   Before finalizing the purchase from ASL, Javice and Amar also spoke with another data company, Exact Data.   Javice and Amar doctored the paperwork from both Exact Data and ASL to try to conceal their fraud.

### 1.  Exact Data

On August 2, 2021, Javice contacted Exact Data and ultimately spoke with Tani Ochs about "pretty rapidly," (Tr. 908-909), buying "a student marketing list" that "needed to contain email." (Tr. 910; *see also* Tr. 972 ("e-mail was one of the main components or one of the most important components that they were in search of")).   After sending a data sample, Ms. Ochs also sent Javice a purchase order agreement for approximately 1.7 million data records.   (GX 1651 (purchase order showing a "Quantity" of 1,773,703); Tr. 931-34)).   In response to Ms. Ochs's email, Javice added Amar to the email chain, stating in part: "Will have Olivier here provide the payment info."   (GX 1651).   After receiving this email, Ms. Ochs had a phone call with Amar in which Amar "requested that [Ms. Ochs] modify the invoice to remove the quantity" listed.   (Tr. 934).   Amar did not provide a reason for requesting that the approximately 1.7 million quantity figure be removed.   (*Id.*).   To accommodate Amar's request, Ms. Ochs "had to reach out to [Exact Data's] accounting department to manually create this invoice that would allow them to remove the rate and the quantity."   (Tr. 936; *see* GX 1580 (email from Ms. Ochs to Amar sending modified invoice, with quantity removed, as Amar requested)).   Ultimately, however, the defendants did not actually purchase the data from Exact Data, and instead purchased the records from ASL.

### 2. ASL

Also on August 2, Amar contacted ASL regarding purchasing student data records. Ultimately, Amar specifically requested that the total amount of student data records purchased equal 4.5 million—approximately the number of "FAFSA In Process" users that the defendants had falsely claimed that Frank possessed. (GX 2310 (Amar: "I'd like the tots to be 4.5m"); Tr. 1305). ASL sent the 4.5 million student records purchased by Amar in two data files, one of which included email addresses and one which did not. (GX ASL-1; GX ASL-2). While all 4.5 million records from ASL contained name and address, only 2,460,489 also contained an email address. (*See* Tr. 1307, 1309). The total purchase price was $105,000. (*See* Tr. 1310). As they had done with the Exact Data paperwork, the defendants doctored the ASL invoicing paperwork. (*Compare* GX 2330 (invoice sent to Amar by ASL that lists quantities), 2328 (invoice sent back to ASL with the quantities deleted); *see also* Tr. 1310-11). Javice deleted the quantities from the ASL paperwork, signed the paperwork, and emailed it back to Amar, who then conveyed it to ASL. (GX 1086).

After finalizing the ASL transaction, Amar and Javice had the following text exchange on August 5, 2021:

| | |
|---|---|
| **Amar**: | You'll have 4.5m users today. Just closed it |
| | 2.3 cents per user. 105k price |
| **Javice**: | perdfect [sic] |
| | love you |
| | :-) |

(GX 801-18). In his private WhatsApp chat with Javice, Amar intentionally used the term "users" to describe the 4.5 million records of data purchased from ASL because he knew that the reason

for the ASL purchase was to cover up the defendants' lies during diligence about the number of Frank's "users."

### 3. Enformion

After the defendants obtained the ASL data, they augmented the ASL list with additional data from another third-party data provider company named Enformion.  Javice used Kapelner as an intermediary for this data augmentation.  (Tr. 1959).  Javice lied to Kapelner about the reason for the project, claiming that it was to fix a problem with an earlier Frank database.  (GX 2801; Tr. 1978 (Kapelner expected to receive "what [he] believed to be her [Javice's] student users")).  In reality, Javice provided Kapelner with the 4.5 million records from ASL and tasked him with contacting data vendors to augment the ASL records.  (Tr. 2000-2001; GX S11).  Having been misled by Javice, Kapelner sought to have the ASL data augmented by a data provider, ultimately using Enformion.  (Tr. 2008-2010).  Enformion appended data where it could identify a match, but Enformion did not always have data to append.  (*Id.*).  In an effort to get more email matches in particular, Javice instructed Kapelner to have Enformion match on last name only, which would return hits for parents' or other family members' emails, and not just students' emails.  (*See* Tr. 2013-16; GX 1761; GX 2405.)  After expanding its email matching criteria, Enformion then emailed the augmented data set to Kapelner and Javice in seventeen separate files.  (*See* Tr. 2017-2026; GX 2821–2837; GX ENF1–ENF17).

### F. Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers and Sent Purchased Data

Following the acquisition, the defendants continued their lies to JPMC, and sent to JPMC what purported to be "Frank user data" but what was in fact data purchased from ASL.  First, in connection with an early January 2022 request from JPMC Marketing for Frank's user data (*see* GX 1726), the defendants told lies about the number of Frank's users that were derivative of the

defendants' lies during diligence.  Specifically, starting in January 2022, the defendants now claimed that Frank had 1 million "marketable" users.  (*See, e.g.*, GX 1067 (Jan. 13, 2022 email from Javice to JPMC employees, including Amar, attaching a spreadsheet showing .99 million "Net Marketable Users"); GX 1693 (Jan. 18, 2022 email from Javice to JPMC employees, including Amar, showing the same number of purported net marketable users, and noting that "Olivier has already shared the net number last week with Kelly and Mark")).  That was a lie in itself, as Frank never had more than a few hundred thousand users.  That lie was also derived from the false premise—represented by the defendants in diligence to JPMC and to Capital One—that Frank had several million users total (*i.e.*, including users that were supposedly no longer "marketable").  (*Compare* GX 1693 (claiming, in January 2022, that Frank had a total of 5.6 million users and subtracting several million of those as no longer "marketable" because they graduated) *with* GX 3.1.4 (spreadsheet from June 2021 claiming Frank had, in total, approximately 5.4 million users)).  In fact, these several million Frank users simply did not exist.

Second, in response to JPMC Marketing's request for Frank's user data, the defendants sent to JPMC Marketing (1) the purchased third-party data from ASL and Enformion, as well as (2) an edited copy of the synthetic data file prepared by Dr. Kapelner.  The first "Frank user" file that the defendants caused to be sent to JPMC consisted of approximately 1 million records purchased from ASL.  (GX 1718; GX 501 (the "Frank_Marketing_List.csv" data file)).  Despite being named "Frank_Marketing_List," and despite being sent in response to a request for "Frank's user data" (GX 1718), this "Frank_Marketing_List" file did not contain a single piece of Frank user data.  (*See* GX 2708).  Although the "Frank_Marketing_List" file was sent by a Frank engineer, the defendants directed the transfer of this file.  (GX 801-45; GX 801-46; GX 300; GX 300-T; GX 801-47; GX 801-48).

Ultimately, Javice sent to JPMC an additional 29 data files.  (GX 2706).  These data files consisted of: (a) the data purchased from ASL, (b) the data purchased from ASL that had been augmented by Enformion data, (c) an edited version of the synthetic data file that had been sent to Acxiom during diligence, and (d) a small amount of Frank's real user data.  (GX 2708).  In discussions with JPMC employee Keona Drakeford, Javice falsely claimed that the 29 data files all related to Frank's users.  (Tr. 2665-66, 2668).  Internally, Javice also shared these 29 data files with Amar on February 10, 2022 (*see* GX 802-59, 570, 571, 570-1 to 570-29; Tr. 2783), and Javice shared a subset of them with Amar earlier on January 14, 2022 (*see* GX 801-46, 572, GX 572-1 to GX 572-18; Tr. 2776, 2781-82, 2786-87).

### G.   The Frank Marketing Campaign Was a Disaster

In July 2022, JPMC conducted a marketing campaign using data that the defendants represented was from Frank's customers, but which in reality was from the data that the defendants had purchased from ASL and Enformion.  The results were disastrous.  Of the approximately 440,000 people whom JPMC solicited, only ten became JPMC customers.  (GX 1248-A).

### H.   The Defendants Lied To JPMC's Investigators, and Javice Brought False Civil Claims Against JPMC

In September 2022, Javice was interviewed by a JPMC investigator, and repeatedly lied (among other things) about having sent fake, synthetic data to JPMC during diligence.  PSR ¶¶ 92-96.  Amar also lied in his interview with the JPMC investigator. PSR ¶ 97.

Following her termination and JPMC's civil lawsuit against the defendants, Javice countersued JPMC with false claims.   PSR ¶¶ 98-99.  Among other things, Javice falsely claimed in her federal court filing that JPMC "asked that Frank provide synthetic data" during diligence.  PSR ¶ 99.  Javice and Amar privately texted about her false filing, with Amar writing "You really

laid it all out there.  Good for you Charlie."  Javice responded in part, "It needed to be said [. . .]
It's so insane." PSR ¶ 100.

## IV.  GUIDELINES CALCULATION

The applicable Guidelines range is 168 to 210 months' imprisonment, based on an adjusted
offense level of 35 and a Criminal History Category of I.  The computation of the offense level is
as follows:

- Base offense level of 7, pursuant to § 2B1.1(a);

- An increase in 26 levels because the offense involved losses in excess of $150 million,
  pursuant to § 2B1.1(b)(1)(N);

- An increase of 2 levels because the offense used sophisticated means, pursuant to §
  2B1.1(b)(10);

- An increase of 2 levels because the defendant derived more than $1 million in gross
  receipts from a financial institution as a result of the offense, pursuant to §
  2B1.1(b)(17)(A);[3]

- A decrease of 2 levels because, based upon the information now available to the
  Government, the defendant meets the criteria set forth in subdivisions (a)(1)-(10) of
  U.S.S.G. § 4C1.1§3B1.1(c).

The Probation Office's calculation of the applicable Guidelines range mirrors the
Government's calculation with three exceptions:  (1) the PSR applies a 2-level increase, pursuant
to § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or
impede, the administration of justice by making multiple false statements during JPMC's internal
investigation (PSR ¶ 117); (2) the PSR applies a 2-level increase for Amar's abuse of a position of

---

[3] The Court declined to apply this enhancement at Javice's sentencing because of "duplication."
(Javice Sen'g Hr. Tr. 18).  The Government respectfully submits that this was incorrect.  While
the Court has discretion, the Second Circuit has previously held that the "dollar amount
enhancement and the financial institution enhancement do not constitute impermissible double-
counting because the two enhancements serve different purposes."  *United States v. Kilkenny*, 493
F.3d 122, 131 (2d Cir. 2007).

public or private trust, or use of a special skill, in a manner that significantly facilitated the commission or concealment of the offense (PSR ¶ 116); and (3) the PSR does not apply a 2-level decrease pursuant to § 4C1.1, in light of the obstruction enhancement.  While Amar's attempts to obstruct JPMC's internal investigation, as well as the abuse of his position at JPMC in order to conceal his offenses, are each serious in their own right—and should be considered by the Court in fashioning an appropriate sentence—the Government does not seek enhancements under § 3B1.3 or § 3C1.1.

Amar argues for an Offense Level of 0.  He contends that there was no loss or intended loss, that no enhancements apply to his conduct, that he is entitled a 4-level reduction pursuant to § 4C1.13B1.2(a) for having a minimal role, and to a 3-level reduction for acceptance of responsibility.[4]  Amar's Guidelines calculation is without any merit.  As set forth below, Amar misconstrues the law and the factual record.  The trial proof, record evidence, and PSR support the Government's Guidelines calculation and an offense level of 35.

**A.  The Guidelines Loss Amount Is Approximately $174 Million**

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, cmt. 3(A).  "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i).  And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.*, cmt. 3(A)(iii), (iv).  "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," and includes any "intended pecuniary harm that would have been impossible or unlikely to occur."  *Id.*, cmt.

---

[4] Amar does not address the application of § 4C1.1.

3(A)(ii).  The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997).  Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt. 3(c); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

Here, the Guidelines loss amount is approximately $174 million, as set forth in greater detail in JPMC's June 6, 2025 letter to the Government and its accompanying materials itemizing the losses, which is attached hereto as Exhibit A.  The following categories of losses in the letter give rise to an approximately $174 million loss under § 2B1.1(b)(1):[5]

| LOSS | AMOUNT |
|------|--------|
| Frank acquisition price | $168,531,714.00 |
| JPMC acquisition legal fees | $641,324.00 |
| Salary and benefits paid to Javice | $1,171,524.00 |
| Salary and benefits paid to Amar | $652,605.00 |
| Retention payments to Frank employees | $830,000.00 |
| Salaries paid to Frank employees | $2,056,339.00 |
| Post-acquisition costs related to Frank | $164,468.00 |

---

[5] JPMC's June 6 letter also describes two other categories of loss sustained by JPMC: $114,911,501.00 in Javice's and Amar's defense legal fees, which JPMC was contractually obligated to indemnify, and $11,962,922 in prejudgment interest.  While these two categories of losses must be included in the defendants' restitution obligations under the Mandatory Victims Restitution Act, the Government has not included these two categories of loss in the Guidelines loss amount calculated under § 2B1.1(b)(1).

| TOTAL | $174,047,974.00 |
|-------|-----------------|

Amar argues the Court should decline to find any Guidelines loss amount, principally because Frank provided "real value unrelated to" the fraud scheme and because any loss was not foreseeable to Amar. These arguments are meritless, as set forth in greater detail below. As the Court already held in connection with Javice's sentencing, there is no offset unless the defendant returns property to the victim. (Javice Sen'g Hr. Tr. 15). But even if the Court were to account for Frank's actual value, consistent with the Court's previous finding at Javice's sentencing, Frank provided no real value to JPMC, and thus, the loss amount is the full amount JPMC paid to acquire Frank. (Javice Sen'g Hr. Tr. 15-16). Finally, the loss amount was plainly foreseeable to Amar, who worked closely with Javice to induce JPMC to acquire Frank for approximately $175 million.

### 1. The Loss Calculation Should Not Include a Credit for Frank's Purported Value

The Guidelines provide for "credits against loss" in two specific circumstances, neither of which applies here. First, where the defendant returns the victim's money or property before the offense was detected, and, second, in cases where the defendant pledged collateral to the victim. U.S.S.G. § 2B1.1 cmt. n. 3(D)(i), (ii). It is undisputed that neither Javice nor Amar returned JPMC's money before their criminal offenses were detected (and in fact never returned JPMC's money), and this case does not involve pledged collateral. Rather, and importantly, the defendants' offense involved fraudulent inducement. Specifically, the defendants fraudulently induced JPMC to acquire 100% of the capital stock of Frank in exchange for $175 million and to pay the defendants handsome retention bonuses and salaries. The Second Circuit has specifically rejected the argument that there should be a reduction of loss based on the value of a victim's equity stake in a business where the defendant's offense was to fraudulently induce the victim to acquire that equity in the first place. *See United States v. Komar*, 529 F. App'x 28, 29 (2d Cir. 2013) (noting

18

that the § 2B1.1(b)(1) "application notes significantly omit any direction to apply the value of an equity stake as a credit against actual loss," and holding that "[t]he 'loss' was the money that the investors were fraudulently induced to invest . . . irrespective of the value of the [property]"); *see also United States v. Paul*, 634 F.3d 668, 677–78 (2d Cir. 2011) (rejecting need to consider non-fraud factors that may have reduced a stock's value, because "[i]n the instant case . . . the loss to [the victim banks] was not caused by the decline" in stock value, but by the victim banks being fraudulently induced into "the making of the loans in the first instance"); *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010) (rejecting defendant's contention that loss amount is zero "because the properties in which her victims thought they were investing arguably had some market value," and emphasizing that the victims' loss is the "principal value of the loans they made to [defendant]"); *United States v. Stitsky*, 536 F. App'x 98, 110–12 (2d Cir. 2013) ("the district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because [the victim] investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance."); *United States v. Shkreli*, No. 15 Cr. 637 (KAM), 2018 WL 9539774, at *18 (E.D.N.Y. Feb. 26, 2018), *aff'd*, 779 F. App'x 38 (2d Cir. 2019) ("Consistent with Second Circuit precedent, the appropriate calculation of loss for Count Three is [the] amount 'that the investors were fraudulently induced to invest' and keep invested in MSMB Capital, based on Mr. Shkreli's many misrepresentations relating to the size, investing strategy, and performance of his MSMB Capital fund." (quoting *Komar*, 529 F. App'x at 29)); *United States v. Bryson*, 101 F. Supp. 3d 147, 155–56 (D. Conn. 2015) (holding that the loss to "investors who were fraudulently induced to invest" was "the total value of their

investment" because "[t]he loss to these investors was caused not by the decline in value of [their investment], but by their having invested in the first place").

The cases cited by Amar are inapposite. For example, Amar cites *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) as standing for the proposition that the fraudulently induced purchase price of a company does not equal the purchase price. (Amar Br. 31-32). But *Leonard* involved the application of a Guidelines provision that does not apply here and has since been removed from the Guidelines, § 2F1.1, and a specific application note to § 2F1.1, note 8(a), which the Sentencing Commission has removed from the Guidelines entirely.

### 2. JPMC Received No Value from Its Acquisition of Frank

As the Court has already concluded (Javice Sen'g Hr. Tr. 15-16), even if the Court were to consider what, if any, value JPMC received when it acquired Frank, the result would have no impact on the applicable Guidelines range. That is because Frank had no value to JPMC, and JPMC has completely written off its investment. As explained below, the sole source of value in Frank was its purported relationships with millions of college age students. Those millions of relationships with students turned out to be illusory and, as a result, so too was Frank's value.

Frank was not a profitable company and had "very little" income. (Tr. 431, 1393). It had no real assets and did not have valuable technology.[6] (Tr. 1393-1394). Indeed, JPMC's internal accounting for the Frank acquisition shows that it booked 100% of the purchase price to good will. (GX 1591). Frank, nonetheless, was an attractive target for financial institutions looking to increase market share with college-age students because it claimed, falsely, to have millions of engaged customers and the ability to attract millions more each year. Chase's CFO, Sarah

---

[6] For example, one pre-acquisition analysis valued Frank's tangible assets at just $637,489, or less than 1% of the purchase price. (USAO_REL_001966492).

Youngwood, explained, "we were buying engaged users that had gone through a process of actually giving some very personal information through this application process, and that enabled us to believe that we were able to then do more with those people." (Tr. 1394, 1412 ("we were buying engaged customers"), 1415 ("We were buying a platform which had generated the ability to attract 4 million users, and those users were very engaged. As such, there was a value in the platform because it had attracted 4 million engaged users and it would continue to do so for us.")). Witness after witness—including from JPMC, Capital One, and Frank's own investment advisor, LionTree—testified that the value in Frank was its millions of engaged users. (Tr. 2110-2111 (Mason Young, Vice President of Corporate Finance at Capital One: "Capital One was interested in acquiring a large audience of primarily young adults that we could engage with outside of financial products and services but over time cross-market Capital One's financial products to that audience."); Tr. 153 (Houston Cowan from LionTree: "[The banks] that were interested would leverage the data and users to then . . . grow with that customer, providing them credit cards or . . . bank accounts, whatever it might be, in that context."); Tr. 552 (Leslie Wims Morris, head of Corporate Development at JPMC: "we were looking to have the ability to sell in more of our products to this customer base and acquire more customers.")).

In truth, Frank did not have millions of engaged customers. Frank had only about 300,000 FAFSA customers, a small percentage of what Javice had claimed.[7] (GXs 802-60, 1464A; Tr. 1529). Moreover, Frank did not have the ability to acquire millions of customers every year. Frank's millions of customers and impressive growth rate—key assumptions to buyers and

---

[7] Throughout his sentencing submission, Amar asserts that Frank had 500,000 users. (*See, e.g.*, Amar Br. 33). This is dubious. While the exact number of Frank accounts is unknown, the evidence presented at trial tended to show that it was closer to 300,000. (*See, e.g.,* GXs 802-60, -1464A, Tr. 1529).

JPMC's valuation model—were a fiction.  The value that Javice had pitched to potential buyers, and the value that those buyers perceived, did not exist.  Once the fraud came to light, JPMC shuttered the business, moved Frank's remaining employees to other business lines, and took a loss on the full investment.  The loss to JPMC, both on paper and in practice, was the entire amount it was induced to pay as a result of the defendants' fraud, approximately $175 million.

Amar's arguments to the contrary have no merit.  First, Amar argues that Frank's website visitors had value.  (Amar Br. 33-34).  This argument is contradicted by the record.  Frank did not (and could not) collect personally identifying information from its website visitors and thus could not market to visitors in any meaningful way.  (Tr. 1033).  Moreover, JPMC's valuation modeling ascribed no value to website visitors.  (GX 1591).  That is because mere website visitors were not engaged customers to whom JPMC had a likelihood of selling banking products.  (Tr. 1395 (Youngwood: "if somebody comes once to a website, we don't know if they have a relationship with Frank, but if somebody actually takes the time to give you information that is very personal and confidential, at that point you have established a level of trust that is relevant to continuing to do more with that relationship."), 570-571 (Wims Morris: "The number of website visitors is irrelevant to us [b]ecause we were focused on real customers and selling in our products to those customers.")).  Website visitors were not engaged customers, and the vast majority of them did not sign up for a Frank account, did not show an interest in starting their financial journey, and did not take the time to provide basic demographic information, let alone detailed financial information that the banks were most interested in.  Website visitors did not provide value, in theory or in reality.  Indeed, the very reason that the defendants committed this crime—which primarily rested on conflating website visitors with true customers—was because they knew that their true customer numbers were not high enough to be appealing to a serious purchaser.  If

website visitors were as valuable as Amar now claims, they would never have needed to commit the fraud that they did. (Tr. 635 ("Q. Would you have been interested in acquiring Frank if the 4.25 million users were website visitors and not account holders? A. No. Q. Why not? A. **Because it would have been of no value to us**.")).

Second, Amar argues that, "according to JP Morgan's own deal model, Frank had significant synergistic value to JP Morgan, which . . . did not depend on the purportedly inflated number of FAFSA accounts." (Amar Br. 34-35). Not so. According to JPMC's valuation model, 100% of the synergistic value was to be derived from selling banking products, such as college checking accounts, savings accounts, and credit cards, to Frank users, and the model used a multiple of the number of converted Frank users to estimate those synergies. As a result, JPMC's valuation of the synergies derived from the Frak acquisition, and which justified the $175 million purchase price, relied directly on the fraudulent user numbers.[8]

Third, Amar argues that there was value in keeping Frank out of the hands of JPMC's main competitors for the lucrative student market. (Amar Br. 36). It is true that JPMC perceived the Frank acquisition to have some defensive value. But that was when, based on the defendants' lies, the bank was under the misimpression that Frank had millions of engaged users and was acquiring millions more each year. Frank, as it really was—a company with only a few hundred thousand

---

[8] Amar also argues that that Frank's purported reputation for financial inclusivity and mission to help underserved students afford college, provided value to JPMC and is why JPMC agreed to pay the premium it did to acquire Frank. (Amar Br. 35-36). This argument lacks any basis in fact. First, as Leslie Wims Morris explained, the premium and purchase price was set by Frank's own investment advisor, LionTree, and not JPMC. (Tr. 558 "LionTree shared that . . . to be competitive in the process and win the bid we had to pay anywhere from 175 to 180 million dollars."). Second, and as explained above, 100% of the value JPMC expected to derive from Frank, based on JPMC's valuation model and the testimony at trial, was from selling banking products to Frank's users.

customers that took many years to acquire and no ability to acquire millions of customers annually—was not a threat to JPMC in the hands of a competitor.

### 3. The Losses Were Reasonably Foreseeable

Amar argues that the $175 million loss amount—which mirrors the sale price—was not reasonably foreseeable to him. First, Amar contends that only Javice's conduct caused loss to JPMC and that he could not have reasonably foreseen those losses. Consistent with much of Amar's sentencing submission, this argument ignores the overwhelming evidence of his involvement in the fraud scheme. As the Government established at trial, Javice and Amar worked together to defraud JPMC and, indeed, the fraud could not have been successfully accomplished without the involvement of Amar—the Chief Growth Officer.

Under Section 2B1.1 of the Guidelines, the Court must calculate the greater of actual loss or intended loss. U.S.S.G. § 2B1.1(b)(1)(A). As relevant here, loss is defined as "reasonably foreseeable pecuniary harm," which includes harm that the defendant knew or should have known "was a potential result of the offense." *Id.* § 2B1.1(b)(1)(C)(iv); *Turk*, 626 F.3d at 750. "To be 'reasonably foreseeable' under the Guidelines, the loss need not be the likely or probable aggregate outcome of the fraud, only an outcome the defendant 'should have known was a potential result of the offense.'" *United States v. Evans*, No. 14 Cr. 14, 2015 WL 1011602, at *2 (E.D. Va. Mar. 6, 2015). This includes conduct that may not have been intended but was nonetheless foreseeable. *See United States v. Molina*, 106 F.3d 1118, 1122 (2d Cir. 1997) ("Even if Molina hoped that the original plan would be carried out and that no shooting would occur, it was nonetheless reasonable

for him to foresee that, in an encounter between armed robbers and armed guards protecting an armored car, a shooting was likely to occur.").[9]

Amar argues that the $175 million loss was not reasonably foreseeable to him principally by claiming that only Javice's conduct caused loss to JPMC. In making this argument, Amar argues, incredibly, that the proof against him was limited to the acquisition of student data from ASL Marketing and his contributions to the 3.1.4 diligence spreadsheet, a/k/a the "fraud spreadsheet."[10] Amar continues to select only portions of evidence, and in isolation, and ignore the voluminous trial evidence of his participation in a scheme and conspiracy to defraud JPMC

---

[9] Amar quotes *United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015) (summary order), which noted that the "scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." This language originally came from *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991). In *Perrone*, the Second Circuit explained that the difference between conspiracy law and the Guidelines is that under the Guidelines "a defendant convicted of conspiracy can only be held accountable for what he could reasonably have foreseen." *Id.* As explained above, the $175 million loss amount was reasonably foreseeable to Amar and, in fact, caused by Amar.

[10] Even if Amar's involvement with the ASL list and the 3.1.4 fraud spreadsheet was the extent of his involvement in the conspiracy, it would be more than sufficient to hold him responsible for the $175 million loss amount. Amar "urgently" purchased 4.5 million student records from ASL (GX 2310 ("I'd like the tots to be 4.5m")), seeking the same data fields that JPMC sought to verify (*compare* GX-2308, *with* GX-1140), just days after JPMC demanded to see proof of Frank's 4.5 million users. And when Amar completed the purchase, he boasted to Javice that she would "have 4.5 million *users* today" (GX 801-18). Amar purchased 4.5 million student records to deliver the misleading appearance to JPMC that Frank had 4.5 million records. Amar's argument that the ASL data was ultimately used to "conceal" the fraud and was not part of the fraud itself is meritless. (Amar Br. 28-30). Amar's "seriously urgent" (GX 801-17) purchase of the ASL data—which occurred *before* the Frank acquisition—was part and parcel of the fraud scheme, which continued well after the acquisition. Amar was also involved in the attempted purchase of student data from another data provider, Exact Data, and he doctored the invoice from Exact Data by having the quantity of data removed. (GX 1580 and 1651). The evidence against Amar in connection with the purchase of data to pass off as Frank's real data is alone sufficient to hold him responsible for the purchase price loss. So too is his involvement in the creation of the fraud spreadsheet, which was a critical diligence spreadsheet, specifically requested by Capital One, to analyze Frank's (fictitious) 4.25 million user volume. The trial evidence showed that Amar helped Javice create the fraud spreadsheet. (GX 1678, 3011, GXG 521).

and other potential buyers into acquiring Frank for $175 million.  As the Court has already noted, the evidence against Amar was "substantial" (May 29, 2025 Tr. 23, 27) and included the following:

- On June 24, 2021, Amar worked with Javice to create a fraudulent user breakdown spreadsheet that falsely claimed Frank had 4,265,085 "FAFSA In Process" users and over 2 million FAFSA completions.

- On July 8, 2021, Amar presented a PowerPoint to Capital One that contained lies about Frank's FAFSA completions, consistent with the fraudulent user breakdown spreadsheet Amar and Javice had created on June 24.

- On July 12, 2021, Amar was present when Javice lied to JPMC during a diligence session, claiming that Frank had 4.25 million users who had created accounts— consistent with the fraudulent user breakdown spreadsheet Amar and Javice had created on June 24.

- In August 2021, Amar knew of the data validation request and assisted Javice's use of synthetic data.

- On August 1, Javice forwarded to Amar the data validation request from JPMC and texted him to clear his day.  That day, Amar and Javice spoke on the phone 19 times.

- That same day, Javice shared a Google Doc called "Data Request" with Amar and Vovor, which listed 4,265,085 FAFSAs in progress and 2,100,184 FAFSA completions—consistent with the fraudulent user breakdown spreadsheet created by the defendants.

- That same day, Javice emailed Vovor and Amar a copy of the user data provided to JPMC during diligence, attaching a spreadsheet named "CJ_PV_FrontEnd_UserData" that included, among other things, a version of the fraudulent user breakdown spreadsheet created by the defendants.

- On August 2, in a video call with Javice and Vovor, Amar asked Vovor to create 4 million FAFSA "users" with synthetic data, and Vovor declined Amar's request out of concern it could be illegal.

- On August 3, Amar created and shared a Google Sheet with Javice, ultimately named "Records Needed," which listed the data fields and total numbers that needed to be generated synthetically—including 4,265,085 accounts and 2,100,184 completions, consistent with the user breakdown spreadsheet the defendants created.

- That same day, Javice had her first call with Kapelner, and then immediately called Amar. Thereafter, Amar shared the "Records Needed" spreadsheet with Javice and the two had another call.  Amar and Javice then texted about the "Records Needed" spreadsheet, with Amar explaining that certain fields were not included because "we eliminated them from the report" to JPMC.

- Later that day, Javice sent Kapelner the documents for the project, including a version of the "Records Needed" spreadsheet that Amar had created. Javice then spoke on the phone with Kapelner. After the call, Javice texted Amar: "I found my genius. He says it will take him an hour."

- On August 5—prior to Amar receiving data from ASL, and thus not related to any purported data augmentation project—Javice told Amar she "Finished data at 2am . . . He did a fantastic job. Truly. We powered through together [/] Fun getting to work ur old stat professor :)"

- That same day, Amar approved the wire payment to Kapelner for his synthetic data work.

- Between August 1 and August 5, Amar and Javice were on the phone constantly, speaking 99 times in just those five days—a dramatic spike in the number of calls between the two of them, as depicted below:



- Also in early August 2021, Amar and Javice contacted Exact Data about purchasing millions of records for a purported marketing campaign. Amar requested a doctored invoice from Exact Data that removed the quantity of records from the invoice.

- Again in early August 2021, Amar purchased 4.5 million student records from ASL, claiming the records were for data augmentation; in truth, these records were never used for data augmentation (or for marketing). As with Exact Data, the quantity of records from the ASL paperwork was removed. After the transaction closed on August 5, Amar texted Javice: "you'll have 4.5m users today."

| August 5, 2021 | | |
|---|---|---|
| **Time (Eastern)** | **Sender** | **Message** |
| 12:05:33 PM | Amar | You'll have 4.5m users today. Just closed it |
| 12:05:59 PM | Amar | 2.3 cents per user. 105k price |
| 12:06:06 PM | Javice | perdfect |
| 12:06:07 PM | Javice | love you |
| 12:06:18 PM | Amar | :-) |

- Later that month, on August 26, 2021, Amar texted Javice, "I really wouldn't talk about the 5m anymore," referencing the Frank user numbers provided to JPMC during diligence. Javice responded later in the chat, "remember no one on that team [at JPMC] has seen the data room." GX 801-27.

- After the acquisition, in January 2022, Amar and Javice continued to lie to JPMC about Frank's users, claiming that their approximately 5 million Frank users had dwindled to approximately 1 million "marketable" users.

- In January and February 2022, Amar and Javice transferred purchased third-party data to JPMC in response to JPMC's request for Frank's user data.

This fraud scheme was not a one-woman show. Amar—the second-in-command at Frank; the person responsible for user growth; the one with the "secret sauce" (GX 3010) for growing users that potential buyers were focused on; and the only other Frank employee to both tell lies to potential buyers and be beside Javice when she told lies—was a willing and knowing participant in the fraud scheme with full knowledge of its objective: to extract $175 million from the victim.

In arguing that the $175 million loss was only foreseeable to Javice, Amar suggests that the Government did not allege that he made false statements. As explained above, and as the Court has already concluded, the Government both alleged and proved that Amar made misrepresentations. But even if that were not the case, it would not change the applicable loss amount. As this Court has already noted, in addition to making misrepresentations himself, "[Amar] supplied information that enabled misrepresentations to be made. He didn't have to do it himself, but he knew the purpose of his activities. He knew what he was doing, and he knew the false and misleading aspect of what was going to come about." (May 29, 2025 Tr. 43). Amar knew that the purpose of his activities was to deceive JPMC and other victims into believing Frank had 4.25 million users in order to obtain $175 million. The loss amount here not only was reasonably foreseeable, it was obvious.

### 4.    The Victim Loss Was Caused by Defendants and Not Intervening Causes

Amar argues that there were other, non-fraudulent events after the acquisition that led to the victim's losses. This argument lacks merit for several reasons. As an initial matter, because the defendants' fraudulently induced JPMC to acquire Frank for $175 million, and JPMC would not have purchased Frank but for the fraud, the alleged intervening events occurring after the acquisition did not cause JPMC's loss. Rather, the defendants' fraud that induced the bank to acquire Frank for $175 million was the cause of loss. Also, as explained above, the "main source of value" was Frank's customer base, which turned out to be fake. That there may have been additional factors that made Frank less valuable is beside the point. Once it became clear that Frank's userbase—the main, if not sole, source of value—was fake, the victim suffered a $175 million loss.

29

But even if that were not the case, Amar's arguments about supposed other "causes of loss" are unpersuasive.  First, Amar argues that the FAFSA Simplification Act and two-factor authentication on FAFSA caused JPMC to "sunset" the Frank FAFSA product.  (Amar Br. 38). That is not accurate.  JPMC disconnected Frank's FAFSA tool in the summer of 2022 (Tr. 1210), *before* the Department of Education actually implemented two-factor authentication for existing FAFSA accounts.  Based on witness interviews, the Government understands that JPMC disconnected the FAFSA product because it learned that the Frank submitter tool, which submitted FAFSA applications to the Department of Education on behalf of Frank customers, provided inaccurate information about the identity of the submitter.  JPMC disconnected the Frank FAFSA tool in order to prevent Frank from submitting inaccurate information to a government agency. But even if Amar were correct, it strains credulity to suggest that JPMC, the largest financial institution in the world, could not have built a simple workaround to maintain Frank's functionality with dual-factor authentication.

Second, Amar argues that JPMC's business decisions, including "cutting down Frank's staff, relinquishing Frank's partnerships, [and] using Frank's reputation to sell financial products to its students rather than promote its mission," caused "diminution in Frank's value."[11]  (Amar Br. 39).  Again, Amar chooses to ignore that the main source of perceived value in Frank was its relationship with millions of students and its purported ability to attract millions each year.  In reality, Frank did not have those users or ability to acquire them, and thus, there was no "diminution" in value—the value did not exist in the first place.

---

[11] Amar's argument that JPMC's attempt to sell banking products to Frank's customers caused "diminution in Frank's value" is baffling.  Selling banking products to Frank's customers was the entire premise of the Frank acquisition—as pitched by Frank, *see, e.g.*, GX-1.1—and the main source of value to any potential buyer of Frank.

In any event, victims, such as JPMC, have no obligation to avoid or mitigate their damages (Javice Sen'g Hr. Tr. 16), and the Guidelines do not countenance a contributory negligence theory when calculating the loss amount. Indeed, in the context of restitution awards, the Second Circuit has rejected an argument for the use of contributory negligence theory to reduce the overall loss amount. *See United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008) ("Nothing in the detailed provisions of the [Restitution Act] contemplates that a defendant guilty of criminal fraud can escape mandatory restitution by requiring district courts to conduct mini-trials on the possible contributory negligence of the very persons victimized by the defendant."); *see also United States v. Agnew*, 171 F. App'x 376, 379 (2d Cir. 2006) ("We additionally reject Agnew's claim that the Department of Labor had a duty to mitigate its damages once a criminal investigation was underway against Agnew.").[12] That JPMC, in a hypothetical world, could have made different "strategic decisions" to monetize Frank is of no relevance here. (Amar Br. 39).

Third, Amar contends that "independent market forces from a widely acknowledged acquisition frenzy in 2021 artificially inflated the $175 deal price." (Amar Br. 39). This argument misapprehends the derivation of the $175 million sale price and JPMC's valuation modeling. JPMC did not value Frank at $175 million. Rather, JPMC determined whether it could justify the $175 million sale price—proposed by Frank and its advisors (Tr. 558)—through revenue generation from sales of banking products to Frank customers. (GX-1591). That modeling relied heavily on the false user numbers prepared by Javice and Amar. There is no evidence that "independent market forces . . . artificially inflated the $175 million deal price." (Amar Br. 39).

---

[12] To be clear, the Government does not view JPMC's decision to not throw good money after bad as being negligent.

### B.   A Mitigating Role Adjustment Is Wholly Unwarranted

Amar's argument that he should receive a 4-point reduction for playing a "minimal role" in the offense is meritless.  Amar is wrong on the facts—he grossly distorts the record in an effort to minimize his conduct and culpability—and the cases he cites are completely inapposite.

To start, Amar's description of his role as "that of someone on [the scheme's] outermost fringes" (Amar Br. 18) is absurd.  Amar was a full participant in the scheme.  He knew of the lies about Frank's users prior to the acquisition—indeed, he told them himself.[13]  He knew that the two major potential buyers were considering paying huge sums—over $100 million in both cases—for Frank based on those lies.  And he knew the payout he would receive from such an acquisition would be enormous.  His knowing participation was not momentary or fleeting.  It lasted well over a year, beginning at least by June 2021, when he and Javice created the fraud spreadsheet together, and continued through his lying to JPMC's internal investigators in the summer of 2022 and beyond.  As the person most knowledgeable about Frank's users and the number-two executive at the company, Amar was anything but a fungible functionary at Frank or in the scheme.  He was the second-in-command at Frank—*specifically in charge of "users"*—and his participation in the scheme was essential to its success. He benefited enormously from the success of the fraud— standing to receive over $8 million—second only to Javice among Frank employees.  *Cf.* U.S.S.G. § 3B1.2 app. note 3(C) (reduction might apply to "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks").

---

[13] Amar asserts that "the Government did not present any evidence that Mr. Amar made a single false statement during due diligence." (Amar Sub. 15-16).  That is false.  Amar helped draft and presented to Capital One a PowerPoint containing false statements about Frank's FAFSA users.

Nor is it the case that Amar simply knew of the scheme and failed to stop it.[14]  He actively furthered the fraud.  He lied directly to LionTree and to Capital One before the acquisition, and directly to JPMC after the acquisition.  He was also well aware of the lies told to JPMC before the acquisition, having been present when Javice told them to JPMC—including after the purportedly exculpatory "huge mislabel" chat that the defense cites.  (Amar Br. 23-24).  And Amar participated, behind the scenes, in what was perhaps the biggest misrepresentation of all: the scheme's use of synthetic data.  Indeed, Amar himself tried to enlist Patrick Vovor to create the fake data for JPMC's diligence (after Javice had forwarded JPMC's data validation request to Amar[15]).  Once Vovor refused, Amar worked with Javice to create the parameters for Adam Kapelner's synthetic data set.  Amar also participated in the related misrepresentation: the use of purchased data to try to dupe JPMC again.  Amar dealt directly with Exact Data and with ASL, doctoring with Javice the invoicing records related to both transactions.  Amar was also aware that the purchased data would be further augmented.[16]  And Amar worked in tandem with Javice to transfer that purchased data to JPMC post-acquisition.  Roughly a year after the acquisition, Amar was still actively lying to JPMC when questioned by internal investigators.  *Cf.* U.S.S.G. § 3B1.2 app. note 3(A) (reduction might apply to "a defendant in a health care fraud scheme, whose

---

[14] Amar states that "[a]t trial, the Government portrayed Mr. Amar as a weak man who buried his head in the sand and became complicit in Ms. Javice's fraud, rather than putting a stop to it." (Amar Sub. 8).  No.  The trial showed that Amar was a co-conspirator who actively furthered the fraud, told lies himself, and benefited hugely from it.  Javice led the crime, to be sure, but Amar was Javice's partner in crime.

[15] Amar claims that the email Javice forwarded to him was missing "context."  (Amar Sub. 24). That is nonsense.  The email speaks for itself.  (*See* GX 1070).

[16] Amar asserts the augmentation was done "without [his] knowledge of involvement." (Amar Sub. 22).  That is false.  *See, e.g.*, GX 801-21 (Javice and Amar discussing the augmented list as early as August 11, 2021).

participation in the scheme was limited to serving as a nominee owner and who received little personal gain").

To be sure, Javice led Frank, led the scheme, and is more culpable. But that does not make the critical and substantial participation of Amar—who held significant equity in Frank and was Javice's number two at Frank and in the crime—in this extensive $175 million fraud scheme on a U.S. financial institution "minor," much less "minimal." *See, e.g.*, *United States v. Cutler*, 520 F.3d 136, 159-61, 169 (2d Cir. 2008) (reversing minor-role reductions for two less-culpable defendants in $100 million bank fraud scheme; Cutler, the chief financial officer, "knew the goal" of the scheme "and . . . took significant steps to help achieve it" despite not being "involved in the everyday communications with the banks that the coconspirators were attempting to defraud"; Freedman "was a key participant," "aware of the frauds' magnitude," and received "a multi-million dollar" benefit from the fraud, even though he "was not one of the two major beneficiaries of the frauds"); *United States v. Mitchell*, 613 F.3d 862, 870 (8th Cir. 2010) (affirming the denial of a minor-role reduction where the two individuals were "the only principals in the . . . conspiracy"; even though one "was less culpable than" the other by virtue of participating in a fraction of the illicit conduct, that did not warrant a reduction because the defendant was still "a full participant in the conspiracy"). No minor-role reduction is appropriate for Amar.

In addition to simply misstating the record, Amar provides no persuasive legal authority suggesting he qualifies for a minor-role reduction. Indeed, nearly all of the cases Amar cites deal with whether to apply a minor-role reduction to low-level couriers in drug trafficking organizations—and even in that context, several courts have found that no reduction is warranted. *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002) (denying reduction for defendant involved in drug sales); *United States v. Troncoso*, 691 F. App'x 47, 49 (2d Cir. 2017) (denying

reduction for drug courier despite "his lack of participation in planning or organizing the offense"); *United States v. Ruiz*, 246 F. Supp. 2d 263, 269-72 (S.D.N.Y. 2002) (applying reduction to drug courier who "was a buffer hired to engage in the risky business of taking delivery from potentially dangerous outsiders," had no "ownership interest in the drugs," and his "remuneration was unspecified and clearly extremely modest"); *United States v. Troche*, No. 01 CR 274-01 (RWS), 2003 WL 223468 (S.D.N.Y. Jan. 31, 2003) (applying reduction to cash courier); *United States v. Vicente Fernandez*, 312 F. Supp. 2d 522, 525 (S.D.N.Y. 2004) (applying reduction to one-off drug courier); *United States v. Aggrey-Fynn*, No. 04CR.1148-4 (RWS), 2007 WL 473731, at *4 (S.D.N.Y. Feb. 14, 2007) (similar); *United States v. Sanchez*, 925 F. Supp. 1004, 1012 (S.D.N.Y. 1996) (similar); *see also United States v. Cambrelen*, 29 F. Supp. 2d 120, 126–27 (E.D.N.Y. 1998), *aff'd*, 5 F. App'x 30 (2d Cir. 2001) (applying reduction to "plainly 'the least culpable' members of" a criminal enterprise who participated, in a limited way, in only one of eight robberies by the enterprise).  Needless to say, these defendants bear no relation to Amar, who was the number two executive at Frank and essential to the scheme, knew the scope of the fraud, actively participated in the fraud for well over a year, held significant equity in Frank, and stood to make over $8 million from the scheme.

The only fraud case cited by Amar is a nonprecedential opinion from the Tenth Circuit, affirming a minor-role reduction for a defendant whose co-conspirators "acqui[red] . . . investor funds without [the defendant's] knowledge and . . . attempt[ed] to keep much of the details of the scam from [the defendant]." *United States v. Olson*, 76 F.3d 393 (10th Cir. 1995). Unlike that defendant, Amar clearly knew Frank was being acquired—and fraudulently so—as he participated in the process, lied himself, and listened to Javice's lies before any money changed hands.  And contrary to Amar's already-disproven assertions, Amar was informed of all the important details

of the scheme, as described above. An inapposite, non-precedential, out-of-circuit opinion holds no weight when measured against, for example, the Second Circuit's decision in *Cutler*. *See Cutler*, 520 F.3d at 159-61, 169 (2d Cir. 2008) (reversing minor-role reductions).

Accordingly, a mitigating role reduction for Amar is wholly unwarranted and the Court should reject Amar's arguments.

### C. The Sophisticated Means Enhancement Applies

Amar disputes the 2-level adjustment for sophisticated means provided in U.S.S.G. § 2B1.1(b)(9)(C). The "sophisticated means" that trigger the offense level enhancement relate to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 App. N. 8(B). "[E]ven if each step in the scheme was not elaborate, the total scheme [may be] sophisticated [when] all the steps [are] linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003). Just as it did with Javice, the sophisticated means enhancement applies to Amar due, at least, to the scheme's use of synthetic data and purchased data lists. *See, e.g.*, *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (applying enhancement because "the Defendant's fabrication of sophisticated false documents relating to the status of the funds he took from his victims constituted sophisticated means").

Seeking to escape that straightforward conclusion, Amar claims he "he had nothing to do with" the use of synthetic data in the scheme. (Amar Sub. 41-42). That is false. The record is clear that Amar participated in the synthetic data component of the scheme. First and foremost, *Amar himself asked Vovor to generate synthetic data to use in JPMC's diligence*. Then, when Vovor refused, Amar worked with Javice to have Kapelner take on the task. Amar and Javice prepared instructions on how much fake data to generate, so the data counts would match their previous lies to JPMC. (GX G72, G73). On August 3, 2021, Amar created and shared a Google

Sheet with Javice, ultimately named "Records Needed," which listed the data fields and total numbers that needed to be generated synthetically—including 4,265,085 accounts and 2,100,184 completions—consistent with the user breakdown spreadsheet the defendants created. (GX G72). That same day, Javice had her first call with Kapelner, and then immediately called Amar. (GX 902). Thereafter, Amar shared the "Records Needed" spreadsheet with Javice and the two had another phone call. (GX G73; GX 902). Amar and Javice then texted via WhatsApp about the "Records Needed" spreadsheet, with Amar explaining that certain fields were not included because "we eliminated them from the report" to JPMC—a reference to Javice's negotiations with Alex Sweeney about which data fields would be included in the data validation exercise. (GX 801-7). Javice then sent Kapelner the documents for the project, including a version of the "Records Needed" spreadsheet. (*See* GX 603, 1077, 1752; Tr. 1916-17 (GX 603 sent to Kapelner by Javice via AWS)). Javice then spoke on the phone with Kapelner. After the call, Javice texted Amar: "I found my genius. He says it will take him an hour." (GX 801-10). Then, on August 5—prior to Amar receiving data from ASL, and thus not related to any purported data augmentation project— Javice told Amar she "Finished data at 2am . . . He did a fantastic job. Truly. We powered through together [/] Fun getting to work ur old stat professor :)." (GX 801-15). That same day, Amar approved the wire payment to Kapelner for his synthetic data work.

Further, Amar does not dispute he was deeply involved in the scheme's other principal deception: the acquisition and use of millions of records of purchased data. Amar claims that buying data is legal and not complex. (Amar Sub. 41-43). Even that proposition is dubious. Indeed, Amar previously argued that expert testimony was required to understand this "niche area" that "is beyond the ken of the average juror." (Dkt. 227 at 13 (Amar's opposition to Government's *Daubert* motion)). More important, Amar simply chooses not to engage with the actual record.

Amar did not simply purchase data for some legitimate use.  Amar and Javice repeatedly lied to the data companies, doctored the business records related to their data purchase, sent one another contemporaneous cover-up emails, further augmented the purchased data, and then post-acquisition—after telling more lies to JPMC that were derivative of their lies pre-acquisition—passed off the purchased data as Frank's user data.  And all that is on top of, and in conjunction with, the use of synthetic data to pass JPMC's data validation exercise.

In short, the sophisticated means enhancement plainly applies, and Amar's arguments to the contrary are baseless.

### D.  Amar Has Not Accepted Responsibility and Should Not Receive a Reduction

Amar claims that not affording him a three-point reduction for acceptance of responsibility constitutes an unconstitutional trial penalty.  Amar is wrong.  The Guidelines provide a benefit for accepting responsibility, not a penalty for going to trial.  As the Second Circuit has recognized, a "show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial." *United States v. Araujo*, 539 F.2d 287, 292 (2d Cir. 1976); *see United States v. Platt*, 715 F. App'x 80, 82 (2d Cir. 2018) (rejecting a challenge similar to Amar's); *United States v. Chambers*, No. 13 Cr. 345-3 (LGS), 2023 WL 6850232, at *2 (S.D.N.Y. Oct. 17, 2023), *reconsideration denied*, No. 13 Cr. 345-3 (LGS), 2024 WL 3161663 (S.D.N.Y. June 25, 2024) (similar).  Amar has not accepted responsibility—far from it, as he still continues to falsely assert his innocence (Amar Sub. 1 n.1)—and thus no reduction is warranted.

## V.  THE SENTENCE

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of his offense, the need to avoid unwarranted sentencing disparities, and the importance of specific and general deterrence, a very

substantial but below-Guidelines sentence is warranted.  While the Government agrees with the Probation Office that a 120-month sentence is warranted here, in light of the Court's sentence for Javice, the Government respectfully submits that the Court should sentence Amar to a term of no less than 72 months' imprisonment.  A sentence of time served or anything close to it, would be woefully inadequate to satisfy the purposes of sentencing, and send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

### A.   The Nature and Circumstances of the Offense Warrant a Lengthy Sentence

Amar was an essential co-conspirator in an audacious and multifaceted criminal scheme built on sustained deceptive conduct.  In doing so, Amar caused enormous victim loss, ultimately causing JPMC to pay more than $300 million for a shuttered company.  The fraud has all the hallmarks of the most serious white-collar crimes:  pre-planned and orchestrated conduct, sustained deception, obstruction to conceal the fraud, and staggering victim loss.  Notably, Amar cannot blame his criminal conduct on youth or inexperience; he was an experienced businessman—the sort of individual who should have stopped this kind of fraud from occurring at a startup.  Instead, Amar joined the fraud and propelled it to completion.  Amar engaged in this fraud out of greed.  He received over $5 million in merger proceeds, and stood to receive an additional $3 million in retention payments, on top of his salary, benefits, and bonuses.  Indeed, days after the fraud succeeded and the merger agreement was signed, Amar purchased a "black on black defender"—a luxury Land Rover.  (GX 801-23).  He added renovations to his house costing hundreds of thousands of dollars.  Amar partnered with Javice to commit a sophisticated and long-lasting fraud scheme that would make both of them rich and led to hundreds of millions of dollars of victim loss.  He did this for no other reason than to line his own pockets with millions of dollars and to feed his ego.  A substantial term of imprisonment is made necessary by the nature and

seriousness of this conduct, the need to promote respect for the law, and to provide just punishment.

**B.  Specific Deterrence is Required**

The need for specific deterrence also weighs heavily in favor of a lengthy custodial sentence.  Here, Amar has utterly failed to grapple with his criminal conduct and take even a shred of responsibility.  For years, and even to this day, Amar has vehemently denied the truth about his crimes and his responsibility for them.  Before the criminal case was filed, Amar tried to do anything to avoid accepting responsibility, lying to JPMC investigators.  After being indicted, Amar went to trial, repeatedly argued that he was "an innocent man" (Tr. 66), and "maintains his innocence" to this day (Amar Br. 1 n. 1), even in spite of the "substantial" evidence presented against him (May 29, 2025 Tr. 43).

In the face of the overwhelming evidence against him, Amar dodges, deflects, and minimizes.  He points the finger at Javice and claims he was at the "outermost fringes" and was "almost entirely absent" in the scheme.  (Amar Br. 18-20).  The trial evidence speaks for itself. Amar was not absent; he was omnipresent.  Amar was an active participant in the fraud at nearly every juncture.  And there was nothing aberrational about his conduct.  The defendants' scheme was purposeful, well planned, and persistent.  For over a year, he engaged in an audacious and multi-faceted criminal scheme built on highly deceptive conduct that filled his pockets with millions of dollars.  Nothing about Amar's crimes can be dismissed as temporary error or diminished as improvident impulse.  Amar's refusal or inability to grapple with and truly recognize the nature and extent of his criminal conduct underscores the need for specific deterrence.

Amar's total failure to accept responsibility meaningfully distinguishes him from Javice. Prior to sentencing and at her sentencing proceeding, Javice at least purported to accept "full

responsibility for [her] actions" and "poor decisions". (Dkt. 418-2). At Javice's sentencing hearing, Javice again reiterated her acceptance of responsibility and apologized to the victim and the victim's shareholders for her conduct. In pronouncing Javice's sentencing, the Court underscored Javice's "very moving" words as one of the bases for a downward variance. Amar does not even attempt to accept responsibility. To the contrary, Amar blames others but not himself. As Javice's purported acceptance of responsibility was a meaningful mitigating factor in her sentence, Amar's total failure to accept responsibility should be a meaningful aggravating factor in his sentence.

Finally, Amar asserts that he is ready for the next chapter of his life and that there's no risk of him reoffending. Of course, every fraudster claims they will not reoffend. And while that may ultimately be the case for Amar, there are many examples of first-time fraudsters in this district who become recidivists. *See, e.g., United States v. Calvin Darden*, 23 Cr. 134 (VSB) (committed new financial fraud while awaiting sentencing for fraud conviction); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Pukke*, 23 Cr. 168 (JPO) (committed real estate fraud after prior conviction for wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78-month sentence for the same scheme). Were the Court to impose the sentence requested by the defendant, he would be motivated and fully capable of repeating his past conduct without fear of significant jail time. For that reason, a significant sentence is also necessary for specific deterrence.

41

### C.   A Lengthy Sentence is Necessary for General Deterrence

A lengthy sentence and one no less than 72 months is also necessary to deter other would-be fraudsters—especially in the start-up sector—from engaging in fraud. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."). The Second Circuit emphasized the importance of general deterrence in a recent white-collar case in which the Court remanded for resentencing, finding that the district court insufficiently weighed the importance of general deterrence. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) ("We have said . . . that consideration of general deterrence is especially important in the crimes of the sort that this case involves.").

Here, imposing a lengthy sentence will send a clear message that fraud in the sale of startup companies is no less blameworthy than other types of fraud and will be punished accordingly. This message is desperately needed. There has been an alarming trend of founders and executives of small startup companies engaging in fraud, including making misrepresentations about their

companies' core products or services, in order to make their companies attractive targets for investors and/or buyers. *See, e.g.*, *United States v. Elizabeth Holmes*, 18 Cr. 258 (N.D. Cal.) (founder of blood-testing company, Theranos, defrauded investors by making misrepresentations about the company's innovative technology); *United States v. Trevor Milton*, 21 Cr. 478 (S.D.N.Y.) (founder of Nikola Corp. defrauded investors by making false and misleading statements about the company's electric and hydrogen-powered truck technology); *United States v. Albert Saniger*, 25 Cr. 157 (S.D.N.Y) (indictment alleges that Albert Saniger engaged in a scheme to defraud investors in his start-up Nate, Inc. by making false and misleading statements about the company's use of proprietary artificial intelligence ("AI") and its operational capabilities); *United States v. Christine Hunsicker*, 25 Cr. 318 (S.D.N.Y.) (Hunsicker, founder of fashion and technology business, CaaStle, alleged to have provided investors forged corporate documents and falsified financial income statements in order to raise money from investors). Startup companies, which are not subject to SEC registration requirements, are fertile ground for fraudsters who prey on investor excitement and competition. A message needs to be sent about the consequences of fraud in this area.

This case presents such an opportunity. In January 2022, Javice and Amar exchanged messages about Elizabeth Holmes, indicating that those who find themselves in positions similar to those once occupied by Javice and Amar—or, for that matter, Holmes—will pay attention to this case and its sentence:

| January 3-4, 2022 WhatsApp Messages |
| --- |
| JAVICE:    Wow |
| JAVICE:    The Elizabeth Holmes verdict: Theranos founder is guilty on four of 11 charges in fraud trial - The Wall Street Journal (https://apple.news/AxkwY2_ZVSNmMM3VNMweB4Q) |

| JAVICE: | Hopefully it's light sentencing |
|---|---|
| AMAR: | Yeah, it sets a dangerous precedent for founders either way |
| JAVICE: | I think health is different. Investors should be blamed on letting a 19 year old go rogue |
| AMAR: | They tried to make that case, they failed |

**January 23, 2022 WhatsApp Messages**

| AMAR: | Listen to the first 20 minutes of the Kara Swisher podcast Pivot. The latest episode. The part about Elizabeth Holmes |
|---|---|
| JAVICE: | Kk. It's still so ridiculous she got one of the top sentences in fraud possible |
| AMAR: | Yup.  Go listen |
| JAVICE: | Discrimination at its finest. She defrauded sophisticated assholes where it was a blimp of nothing |

That the defendants believed the conviction of Holmes set "a dangerous precedent for founders" reflects their view of the permissibility and pervasiveness of misrepresentations to investors in startups.

Amar argues that the negative publicity from the prosecution in his case and the non-incarceratory consequences he has faced are adequate deterrence.  (Amar Br. 4, 59-62).  Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public

> humiliation and the public nature of his prosecution were punishment enough—
> would mean that the more flagrant the crime, the less actual statutorily prescribed
> "punishment" it would require. And of course, the less punishment that is meted
> out, the less deterrent effect the sentence will have on others contemplating similar
> crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

The publicity this case has received weighs in favor of a substantial sentence. It presents an appropriate opportunity for the Court to send a strong signal to would-be fraudsters like Amar, and, especially in light of the publicity to which the defendant points, that this type of conduct will be met with serious punishment. On the other hand, an unjustifiably lenient sentence would encourage others who might be tempted to engage in investor fraud that the rewards of such wrongful activity may be worth the price. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

### D.  The Need to Avoid Unwarranted Sentencing Disparities

The Court must consider the need to avoid unwarranted sentencing disparities. This factor is especially important here because, as explained below, available sentencing data shows that if Amar were to receive the non-incarceratory sentence he seeks, he would be the *only* defendant in the nation in his 2B1.1 Guidelines range to have received such a lenient sentence. Such a sentence would be a singular outlier. Comparing Amar's conduct to that of other similar white-collar defendants in this Circuit and throughout the United States reveals that a sentence of substantial term of imprisonment is needed to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Sentencing data from the last five years shows that defendants with similar Guidelines ranges often receive sentences *far greater* than the sentence the Government advocates for here. According to available sentencing data from the Sentencing Commission, during the last five years there have been 47 defendants (excluding cooperating witnesses) whose primary guideline was § 2B1.1 with a total offense level of 35 and no prior criminal history. All 47 of those defendants received sentences of imprisonment. The average length of imprisonment was 102 months' imprisonment, and the median length of imprisonment was 99 months. As a result, the Court should impose a significant custodial sentence, and reject the defendant's requested sentence or anything close to it, to avoid unwarranted sentencing disparities.

Focusing on defendants that committed offenses similar to Amar, who went to trial, and whose conduct resulted in a Guidelines range similar to the applicable Guidelines range here, courts impose sentences above the range advocated for here by the Government. Indeed, as the chart below indicates, in other frauds on investors of public and privately traded company, corporate officers that were involved in making misrepresentations were often sentenced to terms of imprisonment above the sentence recommended here.

| Case | Guidelines | Sentence |
|------|-----------|----------|
| *United States v. John Surgent*, 04 Cr. 364 (JG) (EDNY) (pump and dump scheme) | 168-210 months | 168 months |
| *United States v. Patrick Bennett*, 97 Cr. 639 (JSM) (SDNY) (Bennett Funding Group fraud) | 188-235 months | 264 months |
| *United States v. Bernard Ebbers*, 02 Cr. 1144 (BSJ) (WorldCom fraud) | 360 months to life | 300 months |
| *United States v. Jeffrey Skilling*, 04 Cr. 25 (SL) (SDTX) (Enron fraud) | 292 to 365 months | 292 months |
| *United States v. Walter Forbes*, 02 Cr. 264 (AHN) (D. Conn.) (Cendant fraud) | 112 to 149 months | 120 months |
| *United States v. Elizabeth Holmes*, 18 Cr. 258 (EJD) (NDCA) (Theranos fraud) | Life (capped at 80 years) | 135 months |

| *United States v. Carlos Watson*, 23 Cr. 82 (E.D.N.Y.) (Ozy Media fraud) | 286 to 351 months | 116 months |
| *United States v. Samuel Bankman-Fried*, 22 Cr. 673 (LAK) (SDNY) (FTX fraud) | Life | 300 months |

Accordingly, in order to avoid unwarranted sentencing disparities, the Court should sentence Amar to a very substantial sentence.

### E.    Amar Cannot Game the Immigration System to Shorten His Sentence

Amar makes several arguments for leniency based on his immigration status and perceived, but inaccurate, consequences of that status.  First, Amar argues that the Court should sentence him more leniently because, if an order of removal is entered, he would be ineligible for First Step Act and Second Chance Act sentencing reductions.  (Amar Br. 50-52).  This argument is flawed for several reasons.  As an initial matter, in asking the Court to consider Amar's potential ineligibility for First Step Act and Second Chance Act sentencing credits, Amar asks this Court to do precisely what the Second Circuit forbids.  In *United States v. James*, 24 Cr. 849, 2025 WL 2486539, at *6 (2d Cir. Aug. 29, 2025), the Second Circuit held that a sentencing court may not consider application of the First Step Act or Second Chance Act in imposing sentence.  In a footnote, Amar halfheartedly suggests that *James* only limits a sentencing court from *enhancing* a sentence, as opposed to *reducing* a sentence, based on the defendant's eligibility or ineligibility for First Step Act or Second Chance Act credits.  But the *James* decision does not state or imply that it is limited in the way Amar suggests.  To the contrary, the Court's reasoning makes crystal clear that Amar's self-serving gloss is wrong.  The Court's holding was based on the "plain text" of 18 U.S.C. § 3553(a), which "directs a district court to consider certain factors 'in determining the particular sentence to be *imposed*" [as opposed to] any term of imprisonment that the defendant may ultimately *serve*.'" *Id.* at *6 (emphases in original).  "A district court bypasses that statutory

47

imperative when it extends a sentence to account for how long it anticipates a term of imprisonment will actually last." *Id.* In forbidding district courts from considering what sentence the "defendant may ultimately serve" in imposing sentence, the Second Circuit's holding necessarily prohibits sentencing courts from enhancing *or* shortening a sentence based on assumptions of how long the defendant will ultimately serve. Under Section 3553(a), the focus must remain on what sentence to impose, as opposed to what sentence the defendant may ultimately serve, and for that reason, Amar's arguments about ineligibility for certain sentencing credits must be rejected.

Aside from being legally impermissible, Amar's argument is also factually flawed. He argues that non-citizens who have been ordered removed will serve up to 62% more than citizens. (Amar Br. 50-51). Amar illustrates this point by claiming that if a citizen and non-citizen were both sentenced to 10-years of imprisonment, the non-citizen would serve 8.5 years while the citizen would serve only 4.67 years in BOP custody. (Amar Br. 52). That is incorrect. The Government has conferred with BOP and understands the following. Under the First Step Act, eligible prisoners can reduce their sentence by up to a year by earning time credits for "successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d). Additional earn time credits, if earned, can be applied to placement in a community confinement facility. Thus, assuming maximum credit is earned and applied by BOP, an individual sentenced to 10 years of imprisonment would serve approximately 7.5 years of confinement, including, if allowed by BOP, 2.7 years in community confinement. *See* 18 U.S.C. §§ 3632(d)(4), 3624(g). To be sure, the defendant would remain in BOP custody while in a BOP

community confinement facility.  In short, the possible disparity between sentences of a citizen and a non-citizen who has been ordered removed are more modest than Amar contends.[17]

Finally, Amar is, in fact, eligible to receive First Step Act sentencing credit.[18]  Non-citizens who have a final order of removal against them are ineligible for First Step Act sentencing credit. Amar is a lawful permanent resident in the United States.  There is no order of removal against him.  Indeed, as far as the Government knows, no removal proceedings have even been commenced against Amar.  And, based on discussions with counsel at the Department of Homeland Security, it is unlikely that removal proceedings would be commenced until after Amar completes his term of imprisonment.  Amar's arguments assume he will be subject to an order of removal—and thus not eligible for certain sentencing reduction credits—on the sole basis that he is asking for a stipulated order of removal.  In other words, Amar is choosing to bring about the condition that will make him ineligible for First Step Act credit.  Amar should not be permitted to game the system by seeking an order of removal now—when one would not otherwise issue until after he completes his term of imprisonment—in order to seek a more lenient sentence.

In short, the Court should give no weight to Amar's argument that he will be "punished" based on his immigration status.  As explained above, the Second Circuit recently held that these considerations are improper.  Moreover, Amar's arguments are based on speculative and, in some cases, inaccurate information.

---

[17] Amar's fear of being "held in a privately run 'shadow prison' contracted by BOP to . . . house immigrants who will be deported" is unfounded.  (Amar Br. 53).  Based on information from BOP, the Government understands that BOP is not currently using privately operated prisons.

[18] It is less likely that Amar will be eligible for Second Chance Act credit.  The Government understands that BOP will determine eligibility based, in part, whether there is an immigration detainer or whether one is likely to issue.  It appears that there is no immigration detainer associated with Amar at this time, and it is unclear how BOP will classify him.

### F.  Amar's "Post-Trial Assistance" on Forfeiture Is Self-Interested

Amar's argument that he is entitled to a lesser sentence for "cooperation" on forfeiture is without merit.  (*See* Amar Sub. 56-58).  There is nothing remarkable about Amar's forfeiture-related actions: he has acted, and continues to act, in his own self-interest.  Amar characterizes paying his mortgage during his criminal case as "preserv[ing] the Government's interest in his house" to "maximize any eventual forfeiture."  (Amar Sub. 57).  That is absurd.  Amar was, and is, *living* in the house—he would have been evicted if the bank foreclosed on it.  And the Government would have "preserved" its forfeiture claim to the proceeds of any foreclosure sale.  Moreover, it bears remembering that Amar actually filed a motion in this Court to allow him to use his frozen fraud proceeds to pay for the mortgage on that house—which, of course, this Court denied.  (*See* Dkt. 100, 110).  Similarly, Amar suggests that he is fixing up the home and seeking to maximize its value in order to the benefit the Government.[19]  (Amar Sub. 57).  In reality, a higher sale will help offset his forfeiture burden, while maximizing the amount of money potentially recoverable his wife who is a co-owner of the house.  There is nothing particularly noteworthy in acting in one's own interest.  Finally, Amar suggests he is consenting to forfeiture, but the figure he references—$2.4 million—is nowhere near the actual money judgment amount of approximately $5.7 million.  (Amar Sub. 57).

## VI.  FORFEITURE

The Indictment contained forfeiture allegations that placed the defendant on notice that various proceeds would be subject to seizure upon conviction.  The Court should order Amar to forfeit the proceeds she obtained from the offenses, and impose a money judgment in the amount

---

[19] Amar characterizes the home as a substitute asset.  In fact, Amar spent hundreds of thousands of dollars of JPMC fraud proceeds on the property.

of $5,690,707.31, as set out below.  The Government will submit a proposed forfeiture order in advance of sentencing.

Section 981(a)(1)(C) subjects to civil forfeiture: "Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) of Title 18, United States Code, in turn provides that the term "specified unlawful activity" includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under [31 U.S.C. §§ 5311 et seq.]." The list of offenses identified in 18 U.S.C. § 1961(1) are thus included within "any act or activity constituting an offense listed in section 1961(1) of this title."  Among the offenses set forth in 18 U.S.C. § 1961(1) is violations of 18 U.S.C. § 1343, for which Javice was convicted, and fraud in the sale of securities, for which Javice was also convicted.  Title 28, United States Code, Section 2461(c) authorizes the use of civil forfeiture in criminal cases as part of a defendant's sentence. *See United States v. Contorinis*, 692 F.3d 136, 145 n.2 (2d Cir. 2012).

Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1)(A).  The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), "including testimony at the earlier trial."  *United States v. Mathieu*, 853 F. App'x 739, 742 (2d Cir. 2021) (internal quotation marks omitted).  "The calculation of forfeiture amounts is not an exact science."  *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).  The Court is only required to "make a reasonable estimate," based on "the available information."  *Id.* (quotation marks and citation omitted).  Courts may use "general points of reference as a starting point" and "make reasonable extrapolations from the evidence."  *Id.*  As

"an aspect of sentencing," *Libretti v. United* States, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

Here, the Court should impose a money judgment in the amount of $5,690,707.31, which is the sum of merger proceeds and salary and benefits paid to Amar by JPMC due to the fraud:

| | |
|---|---|
| Merger proceeds paid to Amar | $5,038,102.31[20] |
| Salary and benefits paid to Amar | $652,605.00[21] |
| **TOTAL:** | **$5,690,707.31** |

In addition, the Court should forfeit specific property traceable to proceeds of the offense, including property previously seized by the Government, which the Government will include in its forthcoming proposed preliminary order of forfeiture.

## VII.  RESTITUTION

Under the MVRA, the Court must order restitution to Amar's victims. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2).  The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution,"

---

[20] *See* CJ 2171.

[21] *See* Ex. A (JPMC's June 6, 2025 Letter).

and need only make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States* v. *Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

Based on JPMC's June 6 and 27, 2025 letters, which are attached as Exhibits A and B, the Government agrees with the Probation Office that the Court should order restitution to the victims in the amount of $300,922,397. (PSR at 59). Restitution is owed to JPMC in the amount of $283,462,397, and to JPMC's insurer in the amount of $17,460,000. As set forth in greater detail in JPMC's letters, the restitution obligation arises from the following categories of loss:

| | |
|---|---|
| Frank acquisition price | $168,531,714.00 |
| JPMC acquisition legal fees | $641,324.00 |
| Salary and benefits paid to Javice | $1,171,524.00 |
| Salary and benefits paid to Amar | $652,605.00 |
| Retention payments to Frank employees | $830,000.00 |
| Salaries paid to Frank employees | $2,056,339.00 |
| Post-acquisition costs related to Frank | $164,468.00 |
| Defense legal fees indemnified by JPMC | $114,911,501.00 |
| Prejudgment interest | $11,962,922 |
| **TOTAL:** | **$300,922,397.00** |

The Government will submit a proposed restitution order in advance of sentencing.

Amar argues, as did Javice, that he should not be required to pay restitution to JPMC for the defense legal fees that JPMC indemnified as a result of the defendants' crimes because JPMC was obligated to pay these fees under Frank's bylaws. As it did previously, the Court should reject this argument. *See United States v. Sullivan*, 118 F.4th 170, 233 (2d Cir. 2024) ("We can easily imagine circumstances where an advance of defense fees is sufficiently related to a defendant's criminal conduct such that they might be recoverable as a loss of property caused by that conduct."). Amar's argument that his criminal conduct "did not cause JP Morgan to incur the fees" (Amar Br. 70) defies common sense and common-sense causation. Absent Amar's criminal conduct, JPMC would not have had occasion to pay for Amar's massive legal fees. Consistent

53

with its prior ruling, the Court should order restitution for the defense legal fees paid by the victim.

Finally, the Court should reject Amar's argument that a "non-zero restitution order would violate [his] constitutional due process rights under the Fifth and Sixth Amendments because the jury made no findings on loss at trial. (Amar Sub. 67). The Second Circuit has repeatedly held that "there is no constitutional requirement that the facts needed for [a] district court's fashioning of a restitution order be found by a jury or found beyond a reasonable doubt." *United States v. Reifler*, 446 F.3d 65, 116 (2d Cir. 2006); *see also United States v. Boccagna*, 450 F.3d 107, 108–09 (2d Cir. 2006) ("Reifler holds that judicial factfinding relevant to an MVRA restitution order does not implicate Sixth Amendment rights."); *United States v. Tin Yat Chin*, 476 F.3d 144, 147 (2d Cir. 2007) (finding that a defendant's argument that a district court's determination of restitution under the MVRA violated his alleged constitutional right to have that determination made by a jury was foreclosed by *Reifler*).

## VIII.  CONCLUSION

Olivier Amar committed a brazen fraud to pocket millions of dollars by claiming Frank had as customers millions of people who did not actually exist.  In the process, he along with his co-defendant caused over $300 million of losses to a victim financial institution.  Amar has utterly failed to grapple with his crimes and continues to minimize and misrepresent his conduct.  A substantial sentence, in line with those in other significant fraud cases, will provide just punishment and serve the purposes of specific and general deterrence, particularly in the startup sector.  For these and the foregoing reasons, the Government respectfully submits that the Court should sentence Amar to a term of no less than 72 months' imprisonment.

Dated: New York, New York
October 6, 2025

                    Respectfully submitted,

                    AMANDA HOULE
                    Attorney for the United States,
                    Acting under Authority Conferred by
                    28 U.S.C. § 515


            By:     ___/s/_____
                    Nicholas W. Chiuchiolo
                    Micah F. Fergenson
                    Georgia V. Kostopoulos
                    Assistant United States Attorneys
                    Telephone: (212) 637-1247 / -2190 / -2212